UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JAMES KARAM and LISA KARAM,

                         Plaintiffs,

    -against-

COUNTY OF RENSSELAER, NEW YORK;
JACK MAHAR, in his individual and official
capacity as the Sheriff of Rensselaer County;
PATRICK RUSSO, in his individual and official
capacity as the Undersheriff of Rensselaer County;
KATHLEEN JIMINO, in her individual and official
capacity as the County Executive of Rensselaer
County; RUTH VIBERT, in her individual and official
capacity as Chief of Corrections of the Rensselaer
County Sheriff's Department; HAROLD SMITH,
in his individual and official capacity as a Captain
of the Rensselaer County Sheriff's Department;
TOM HENDRY, in his individual and official capacity
as Director of Human Resources of Rensselaer County;
LINDA BALDWIN, in her individual and official
capacity as the Payroll Clerk of Rensselaer County;
and JOHN DOE(S) and JANE DOE(S), in their
individual and official capacities as officials, officers,
agents, employees and/or representatives of Rensselaer County,

                         Defendants.

**AFFIDAVIT OF
SHERIFF JACK MAHAR**

Civil Case No.:  13-cv-01018
(MAD/RFT)

---

**SHERIFF JACK MAHAR**, being duly sworn deposes and says:

1.     I am the Sheriff of Rensselaer County and a named defendant in the above-referenced matter.  I submit this affidavit in support of my and the remaining defendants' Motion for Summary Judgment.

1

2.    I was elected Sheriff of Rensselaer County in 2003 and have held the office since January 1, 2004.

3.    The Sheriff's Office is split into three divisions.  A Corrections Division, a Civil Division, and a Patrol Division.  The Corrections Division is managed by the Chief of Corrections, the Patrol Division is managed by the Captain, and the Civil Division is managed by the Patrol Captain.  As Sheriff, I oversee all three divisions with the assistance of the Undersheriff and my command staff.  It is my ultimate responsibility to supervise these divisions and to make hiring, firing, and disciplinary decisions within the Office after review by supervising command staff.

4.    Within the Corrections Division, the ranks range from Correctional Officer, Corporal, Sergeant, Lieutenant, Captain, and Chief.  The highest ranking officer in the Corrections Division, under the Sheriff and Undersheriff, is the Chief of Corrections.

5.    Within each rank there are different duties assigned to different officers. For example, a Correctional Officer may hold the title of Correctional Officer, but also serve as the Transport Officer.

6.    There are several Sergeants and Lieutenants assigned to different shifts and different duties.  The Lieutenants were part of the Corrections Division command staff and each had various duties for which they were responsible.

7.    A lieutenant's direct supervisor would be a Captain or the Chief of Corrections.  The Chief of Corrections reports to the Undersheriff and Sheriff.

8.    I understand that Lt. Karam claims that he was subject to discrimination by the Sheriff's Office and the County throughout the course of his employment.

9.      While I was not Sheriff or otherwise employed by the Sheriff's Office when Lt. Karam first started, I have reviewed his personnel file and am able to provide a synopsis of Lt. Karam's employment with the Sheriff's Office based on same.  True and accurate copies of portions of Lt. Karam's personnel file maintained by the Rensselaer County Sheriff's Office are attached below.

10.      Lt. Karam was first employed by the Sheriff's Office as a Correctional Officer in September 19, 1988.  Between 1988 and 2002, Lt. Karam was promoted 5 times and received several salary increases.  The Civil Service Change of Personnel Forms along with Oaths of Office that are maintained in Lt. Karam's personnel file by the Sheriff's Office are attached hereto as **Exhibit "M-1"**.

11.      During Lt. Karam's tenure with the Sheriff's Office his employment-related efforts and accomplishments were formally recognized on a number of occasions (copies demonstrating the same are attached as **Exhibit "M-2"**):  (1) selection to County Emergency Response Team by Rensselaer County Sheriff's Office, September 16, 1996; (2) memorandum of appreciation from Rensselaer County Sheriff's Office, December 8, 1998; (3) memorandum of appreciation from Rensselaer County Sheriff's Office, May 31, 2000; (4) Office-wide congratulatory announcement of complainant's promotion, January 10, 2002; (5) memorandum of appreciation from Rensselaer County Sheriff's Office, May 28, 2002; (6) certificate of recognition of loyal and dedicated service bestowed by Rensselaer County Sheriff's Office, May 12, 2004; (7) Letter of Recognition bestowed by Rensselaer County Sheriff's Office, May 12, 2004; (8) memorandum of appreciation from Rensselaer County Sheriff's Office, November 5, 2004; (9)

memorandum of appreciation from Rensselaer County Sheriff's Office, February 15, 2005; (10) Commendation from Rensselaer County Sheriff's Office, May 11, 2005; (11) Letter of Recognition from Rensselaer County Sheriff's Office, May 11, 2005; (12) correspondence from Rensselaer County Legislature, recognizing award bestowed by Rensselaer County Sheriff's Office, June 8, 2005; (13) letter of appreciation from Rensselaer County Sheriff's Office, September 14, 2005; (14) memorandum of appreciation from Rensselaer County Sheriff's Office, September 22, 2005; (15) Letter of Recognition from Rensselaer County Sheriff's Office, May 17, 2006; (16) appointment to Rensselaer County Emergency Radio Communications Committee by Rensselaer County Legislature, February 9, 2010; and (17) letter of appreciation from Rensselaer County Probation Department, March 15, 2012.

12.     In addition to the above letters of recognition directed to Lt. Karam throughout his career, Lt. Karam's personnel file also contains a letter requesting recognition of Lt. (now a retired Cpt.) Harold Smith.  A copy of that letter is attached hereto as **Exhibit "M-3"**.

13.     Lt. Karam also achieved consistent, favorable performance evaluations, the reports of which are annexed hereto as **Exhibit "M-4"**

14.     I also approached Lt. Karam about taking the position of Chief of Corrections in 2011.  At that point, the prior Chief (then called Superintendent) of Corrections, Robert Loveridge, retired and the position was vacant.  Captain Hal Smith had been serving as the acting superintendent until a replacement was found.  I thought that Lt. Karam would be a good fit.  However, this was also an election year and I was

involved in a contentious election with my opponent.  Lt. Karam expressed concern that if he took the position, since it fell outside of civil service protection, he could be let go if a new sheriff was elected.  He opted to not take the position because of this risk.  As such, following the election and the position being vacant for over a year, I hired Ruth Vibert to serve as Chief of Corrections.

15.    Despite the above, it is my understanding that Lt. Karam claims that throughout his career promotions were made in an unfair manner.  In particular, I understand that Lt. Karam claims that he and another officer, Scott Ryan, were passed over for a promotional position; that Lt. Karam was promoted to a conditional provisional sergeant as opposed to simply a sergeant; and that when Lt. Karam was promoted to Lieutenant, overtime compensation was simultaneously eliminated for that position.  It is my understanding that Lt. Karam claims each of these actions were based on his ethnicity or national origin.  All of these events pre-date my election to the position of Sheriff.

16.    Based on a review of the personnel files of the officers[1] involved and respective civil service documents maintained by the Sheriff's Office, I have ascertained the following:

17.    First, it should be noted that the titles of "Correctional Officer Transport", "First Sergeant", and "Master Sergeant" are not official Civil Service titles.  There titles are used for in-house purposes only and have been abandoned since 2013.

---

[1] Documents from the involved non-party officers have not been attached as they are confidential pursuant to New York State Civil Rights Law §50-a.

18.     James Karam was promoted to Correctional Sergeant on July 19, 1993. See, Ex. "M-1" – Report of Personnel Change dated July 22, 1993.  Prior to this appointment, he held the permanent position of Correctional Supervisor.  See, Ex. "M-1" – Report of Personnel Change dated January 11, 1993.  He was thereafter appointed as "First Sergeant" on January 7, 2000. See, Ex. "M-1" – Oath of Office Statement dated January 7, 2000.  The appointment to "First Sergeant" was subsequent to Lt. Karam's permanent appointment to the position of Sergeant in 1993. While I understand that Lt. Karam claims he was provisionally appointed to "First Sergeant", there is no actual Report of Personnel Change for a provisional appointment to the position of "First Sergeant".  The only paperwork in Lt. Karam's file indicating any provisional appointment is a Report of Personnel Change dated August 18, 1990 appointing him provisionally to the position of Correctional Office Transport. See generally, "M-1".

19.     Scott Ryan is a former Correctional Sergeant who retired in 2013.  He was promoted to Correctional Sergeant from an eligible list on October 23, 1993.  The individual Lt. Karam claims was promoted over him and Mr. Ryan is Paul Higgit. (Karam dep. p. 29).  However, Paul Higgit was promoted to Correctional Sergeant on May 18, 1994 from a Civil Service eligible list.  Paul Higgit had been appointed provisionally to the Training and Compliance Technical Sergeant on January 4, 1993 based on his training and experience.  This was a newly created position, a civil service test had not yet been created for the position and there was no applicable eligible list for the position.  The position was ultimately reclassified to Correctional Sergeant and Paul Higgit was permanently appointed to the reclassified position on May 18, 1994.

20.     Finally, the elimination of overtime compensation for Lieutenants was done as part of the annual budgetary process for the 2002 budget year, with the budget request having been made in July of 2001.  The elimination appears to be a budgetary decision, upon which there was an annual salary increase provided for the position of Lieutenant from $39,995.00 to $48,000.00 with overtime being eliminated.  Two additional Lieutenant positions were then created in the 2002 budget.  It appears that the salary for these positions was created using the eliminated overtime budget line for funding. Effective January 1, 2002, all then-current Lieutenants were granted a raise to the $48,000.00 with no overtime to be paid.  Lieutenant Karam was promoted to Lieutenant on January 5, 2002, subsequent to the changes made affecting the Lieutenants' salaries and overtime eligibility.  See, Ex. "M-1" – Report of Personnel Change dated January 10, 2002.

21.     I also understand that Lt. Karam claims that he was not provided a cell phone, take-home vehicle or additional support staff/resources due to his ethnicity and national origin.

22.     As Sheriff, part of my responsibilities is to ensure that the Office is operating within its budget.  The Office's budget is ultimately approved by the County of Rensselaer legislature.  The Office only has a certain number of cell phones and take-home vehicles within its budget.  These items are dispersed to officers based on their duties and their need.  If an officer is required to respond to hospital transport calls, Jail emergencies, crime scenes, etc. then the officer will likely be issued a cell phone and take-home vehicle.  Absent these circumstances, a cell phone and take-home vehicle

would not be issued.  The Office does maintain extra vehicles on-site that can be used if

an officer so requires one during their shift.

23.     A copy of records reflecting cell phones issued to employees of the

Sheriff's Office between 2005 and 2012 is attached hereto as **Exhibit "M-5".**  A copy of

records reflecting take-home vehicles issued to employees of the Sheriff's Office

between 2005 and 2012 is attached hereto as **Exhibit "M-6"**.  These records accurately

reflect those individuals assigned take-home vehicles and cell phones during the

referenced time frame and are maintained by the Sheriff's Office.  The records reflect

that a majority of the individuals issued cell phones and take-home vehicles are

investigators in the Highway Division or administrators who would have to be available

in case of emergency.  The investigators would have to respond to crime scenes.  The

handful of Corrections Divisions employees who had cell phones and take-home vehicles

were me, the Undersheriff, the Chief of Corrections, the transport officer (Sgt. Ryan and,

at one point, Cpt. Smith), K-9 officers, and the operations commander (Lt./Cpt. Smith).

Master Sergeant Patricelli also had a cell phone and take-home vehicle because of his

assignments to Project Impact, the Safe Sweeps Task Force, and his work on gang

intelligence.  These assignments required Sgt. Patricelli to perform warrant sweeps,

patrols, and work with the FBI, Troy Police Department, and other outside agencies.

24.     When I first took office, the Internal Affairs Division for the Sheriff's

Office was not handled by just one person.  Rather, pre-employment background

investigations and internal investigations, were conducted on an as-needed basis.

Typically these duties were assigned by the Commanding Officers of the Patrol and

Corrections Bureau.  When I took office, Deputy Sheriff Arthur Hyde, Deputy Sheriff

Lieutenant Derek Pyle, and Deputy Sergeant Shane Holcomb typically assisted with these

duties in addition to their normal deputy duties.  There was no additional compensation

afforded for the additional duties.

25.     After taking office, I approached Lt. Karam about consolidating internal

affairs to one officer and offering him that position.  The decision to have Lieutenant

Karam handle Internal Affairs was based on discussion between me, Colonel Loveridge,

and Captain Eckert from the Highway Patrol.  Lt. Karam also expressed his desire to hold

this position.  The assignment occurred in November 2005.

26.     Lt. Karam was not singled out because of his ethnicity in not being given a

take-home vehicle or cell phone.  No Correctional Lieutenants were provided take home

vehicles or cell phones.  Pagers were provided to the Lieutenants.  The only exception to

this is when Cpt. Smith was a Lieutenant and he would perform transports.  This required

him to take calls from the jail and the hospital at home to transport inmates.  For this

purpose he would be afforded a take-home vehicle.

27.     Lt. Karam was advised that if he needed assistance in an investigation, he

could pull a Sergeant or other officer from the Corrections Division or the Highway

Patrol as necessary.  While he was not provided a take-home vehicle, he had the ability to

use a fleet vehicle when needed.

28.     Most of the time since I have been Sheriff, the Sheriff's Office has been

short-staffed.  Due to this, most officers have performed extra job duties throughout their

employment with the Office and have a taxing workload. Lt. Karam was not an exception.

29.     It is also my understanding that Lt. Karam claims he was denied sick leave donations and his application for 207-c benefits was delayed due to his ethnicity, a perceived disability, and/or because of testimony he gave in a sexual harassment complaint filed against the Sheriff's Office.

30.     These claims are not true.

31.     The sick leave donations bank was a policy put in place before I became Sheriff. This was instituted by the County of Rensselaer. When an employee ran out of accruals, they could apply for a request for time donations from other employees. Employees would then fill out a form to donate a portion of their sick time to an individual who was out of accruals. Those sick time donations would go to a three person committee for approval. The three person committee would consist of a union representative, Tom Hendry as the Rensselaer County Human Resources Manager, and Undersheriff Russo. Once the committee approved the sick time donations, they were then attributed to the individual without the accruals.

32.     It is my understanding that the purpose of the policy was to allow individuals with catastrophic illnesses to be donated additional sick time by other employees so that they would not have to go without pay.

33.     Over the years, the program has been abused by those who do not have catastrophic illnesses but have still used all their sick time accruals. I knew the program costs the Sheriff's Office additional expenses in paying overtime and sick leave that

would not have been paid absent the donations.  When I looked into the actual cost of the program to the Sheriff's Office, I discovered that the cost of simply paying sick leave that would otherwise been unpaid between 2004 and 2012 totaled $290,154.47, not including overtime paid to employees called to cover shifts.

34.     I was never a fan of the program because of these increased costs. In the fall of 2012, I made the decision to end sick leave donations for all Sheriff's Office employees.  I did receive backlash from the union because of my decision.  It was ultimately agreed that anyone who had been approved for sick time donations by the committee prior to the end of the program could use those donations through December 31, 2012.  Since that time, I have not had any grievances from the union regarding the abolishment of the sick leave bank.

35.     Lieutenant Karam was one of those individuals that received sick time donations in 2012 but the donations had not yet been approved by the committee in 2012. As such, he was subject to the new policy which precluded donations for all Sheriff's Office employees.

36.     I decided to end the sick leave donation bank before I knew that Lt. Karam had been diagnosed with Post-Traumatic Stress Disorder or the reason that Lt. Karam was out on extended sick leave.

37.     As a lieutenant, James Karam was not a member of a union.  It is my understanding that Lt. Karam claims that another non-union employee, Cliff McClain, was permitted to use sick time donations in 2012 when he was not permitted to do so. However, a review of Mr. McClain's donations reveal that they were approved by the

Committee prior to my ending the program and, as such, he was permitted to use them until December 31, 2012.

38.    Since December 31, 2012 no Sheriff's Office employee, union or non-union, have been permitted to use sick leave donations.

39.    Additionally, an officer may apply for 207-c benefits.  These are benefits afforded to officers under New York State law that are injured in the course of their duties.  The procedure for processing 207-c applications are negotiated in collective bargaining agreements with the union.  If an officers is not a member of the union, the Sheriff's Office follows the procedure required under New York State General Municipal Law.

40.    The benefits allow an officer who has sustained a work related injury to receive full salary and health benefits paid for by the County and its Sheriff's Office until that officer is able to return to work.

41.    In the Sheriff's Office, both a union and a non-union member officer would fill out a workplace injury form.  That form would go to the officer's commander for approval and then to the Undersheriff.  The Undersheriff may order an independent medical examination or conduct a hearing as to whether the 207-c benefits should be provided.  If there is no question as to what caused the injury, meaning that it was obviously related to work, then the 207-c application would automatically be granted by either myself or the Undersheriff.  This determination would usually be made on whether there is video of the accident or witness accounts as to what caused the injury.

42.     If the medical issue or injury was not easily verifiable, we would then send the individual for an independent medical examination, wait for that report, and make a determination as to whether 207-c was applicable and based on the report from the doctor and after consulting with our legal counsel.

43.     On October 31, 2012, Lieutenant James Karam filed a 207-c application stating that he has Post-Traumatic Stress caused by his employment with the Sheriff's Office. I did not review this application personally. Undersheriff Russo reviewed the application and advised me that the application had been filed due to a stress issue. I was not aware that Lt. Karam was diagnosed with Post Traumatic Stress Disorder until his application for 207-c benefits was submitted. When it was received, I, in turn, contacted the Sheriff's Office labor counsel and apprised him of the application. It was agreed that Lt. Karam should be sent for an independent medical examination. A copy of Lt. Karam's 207-c application is attached hereto **Exhibit "M-7"**.

44.     In Lt. Karam's case, the psychiatrist that the Sheriff's Office would typically use stated that he had a conflict of interest and that he could not perform the evaluation. As such, it took a longer period of time to locate another psychiatrist to perform the evaluation. The Sheriff's legal counsel took over the process of locating a new psychiatrist to perform the evaluation.

45.     A report was issued following Lt. Karam's examination that verified his injury was work related. As such, on September 16, 2013 Lt. Karam's 207-c application was approved and he was issued a check for retroactive 207-c benefits. Attached hereto as **Exhibit "M-8"** is a copy of the letter I sent Lt. Karam approving his 207-c benefits.

46.     While there was a delay in processing Lt. Karam's 207-c benefits, it was not because of retaliation or discrimination.  Lt. Karam was not the only officer who experienced a delay in receiving 207-c benefits.  Other officers, such as Ronald Jacques, Shalauren Johnson, Erica Terry, Darlene Vondell, and Scott Newell waited between 5 to 22 months for their 207-c applications to be approved or denied.  A copy of the list compiled by my office regarding 207-c applications is attached hereto as **Exhibit "M-9"**, see also, Defendants Third Supplemental Response to Plaintiff's Document Demands.

47.     Additionally, Lt. Karam is one of only two individuals that has ever applied for 207-c benefits for an indefinite term while I have been Sheriff.  All other officers who have received 207-c benefits either returned on light duty or were absent for a finite period while their injury healed.  Both Lt. Karam and the other officer that are out on indefinite leave were asked to return their keys, badge, and weapon.  If they eventually return to work, these items would be returned.  This precaution is to prevent unauthorized access to the Sheriff's Office while an officer is out on leave and to prevent the officer from purchasing a weapon based on their peace officer status while they are on medical leave.

48.     While Lt. Karam has identified several individuals that claims to be similarly situated with that did not have their keys or weapon confiscated, the individuals identified in Plaintiff's Response to Defendant's Interrogatories are not similar to Lt. Karam.  All the individuals identified were out for a finite amount of time and have been or are expected to return to work.  The only individual that is out for an indefinite period,

14

Timothy Dobert, did, in fact, have his keys and weapon collected and e-mail deactivated. (See, Plts. Resp. to Interrogatories, ¶ 8).

49.     I understand that Lt. Karam claims that he was subjected to derogatory statements about his ethnic heritage.  I personally have never heard anyone make such comments about Lt. Karam.  Nor has anyone ever reported to me that such comments have been made.

50.     I have never made a comment about Lt. Karam's ethnic heritage.  The statement I did make to former Chief of Corrections, Ruth Vibert, is that perhaps Lt. Karam had difficulties getting along with her because of his childhood.

51.     This first I learned of Lt. Karam's claims of discrimination were when he filed a Notice of Claim against the County.  Lt. Karam never reported to me that he had experienced discrimination of any type while working at the Sheriff's Office.

52.     In this respect, there is a process in the Office for an individual to file a complaint if they feel that they have been discriminated against for any reason, including on the basis of race and ethnicity.  If that is to occur, that individual is asked to file a written complaint.  If they refuse to put the complaint in writing, then one of the commanders would be asked, depending on the division in which the individual worked, to investigate the allegation to find out if there is any veracity to it.  If the complaint is a written formal complaint, then it would be assigned to one of the commanders or to the Chief of Corrections to investigate.  All complaints would be reported to the County's Human Resources Department as well.  A copy of the Sheriff's Order regarding its anti-harassment and discrimination policy is attached hereto as **Exhibit "M-10"**.

53.     I also understand that Lt. Karam claims that I retaliated against him by delaying his 207-c approval and ending the sick time donation bank due to testimony from a discrimination case brought by Lora Abbott.

54.     The Lora Abbott matter involved a claim of sexual harassment against a corrections officer. The internal investigation was handled by Lt. Karam. I also assigned a criminal investigation to an investigator on the highway patrol. The matter was eventually brought to the New York State Division of Human Rights by Ms. Abbott. Lt. Karam was asked to provide testimony regarding his investigation of her complaint on behalf of the County. I was not present when Lt. Karam testified in that matter and I did not read or review his testimony after the fact. However, my understanding is that Lt. Karam testified that the Sheriff's Office investigated the complaint, took action against the officer involved, and addressed claims that individual corrections officers were retaliating against Ms. Abbott for her complaint. I did not retaliate against him for it.

55.     I have also been advised that Lt. Karam claims that I retaliated against him due to allegations he made about me. In particular, statements made to the County's labor counsel, Bryan Goldberger, regarding allegations of criminal misconduct on my part. If Lt. Karam did, in fact, make these statements to the County's labor counsel, they were never relayed to me. Lt. Karam never discussed with me any concerns he had about my conduct, criminal or otherwise.

56.    The first time I learned of these allegations was in the context of this lawsuit.

_Jack Mahar_

Sheriff Jack Mahar

Sworn to before me this

27th day of April 2015

_Marcelle M. Swanberry_

Notary Public – State of New York

MARCELLE M SWANBERRY
Notary Public, State of New York
No. 01SW6311993
Qualified in Schoharie County
Commission Expires September 22, 20 18