Exhibit 5

Page 714

1        STATE OF NEW YORK
         DIVISION OF HUMAN RIGHTS
2
         ---------------------------------------------------
3
         NEW YORK STATE DIVISION OF HUMAN RIGHTS
4        on the Complaint of LORA ABBOTT,
5                            Complainant,
6
                      - vs -
7
         RENSSELAER COUNTY SHERIFF'S DEPARTMENT,
8        WILLIAM FENTON AS AIDER AND ABETTOR,
9                            Respondents.
10       Case No. 10144564
         Federal ID No. 16GB100204
11
         ---------------------------------------------------
12
13                            NYS Division of Human Rights
                              Albany, New York
14                            9:00 a.m.
                              Friday, March 9, 2012
15
16       BEFORE:
17               CHRISTINE MARBACH KELLETT
                 Chief Administrative Law Judge
18               Corning Tower, 28th Floor
                 Empire State Plaza
19               P.O. Box 2049
                 Albany, New York  12220
20               518.474.3419
                 Ckellett@dhr.state.ny.us
21
         WITNESSES:
22
                 LT. JIM KARAM
23
24       REPORTED BY:
25               Christine Greenaway, RPR-RMR

(ABBOTT - MARCH 9, 2012)

Page 715

1    APPEARANCES:

2

3              NAPIERSKI, VANDENBURGH, NAPIERSKI &
               O'CONNOR, L.L.P.

4         BY:   SHAWN F. BROUSSEAU, ESQUIRE
                296 Washington Avenue Extension

5               Albany, New York  12203
                (518) 862-9292

6               Sfb@nvnlaw.com

7               Counsel for Complainant

8

9         LUIBRAND LAW FIRM, PLLC.
          BY:   KEVIN A. LUIBRAND, ESQUIRE

10              950 New Loudon Road
                Latham, New York  12110

11              (518)783-1100
                KLuibrand@LuibrandLaw.com

12
                Counsel for Respondents

13

14

15

     ALSO PRESENT:

16

17              Jim Seabury

18

19

20

21

22

23

24

25

(ABBOTT - MARCH 9, 2012)

Page 716

1              P R O C E E D I N G S

2              JUDGE KELLETT:  Good morning.

3    This is the fourth day of public hearing in

4    the matter of the New York State Division

5    of Human Rights on the complaint of Lora

6    Abbott Seabury versus Rensselaer County

7    Sheriff's Department, William Fenton as

8    Aider and Abettor.  Case 10144564, Federal

9    ID No. 16GB100204.

10             My name is Christine Marbach

11   Kellett and I've been assigned to conduct

12   this hearing.

13             Counsel, will you please put your

14   appearances on the record and also the

15   appearances of the parties.

16             MR. LUIBRAND:  Kevin Luibrand on

17   behalf of the Complainant, and Miss Abbott

18   Seabury is here with me this morning.

19             JUDGE KELLETT:  Good morning.

20             MR. LUIBRAND:  Good morning, your

21   Honor.

22             MR. BROUSSEAU:  Shawn Brousseau

23   from Napierski, Vandenburgh, Napierski &

24   O'Connor.  I represent the County of Albany

25   -- I'm sorry, County of Rensselaer only,

Page 717

1      and with me is Lt. James Karam of the

2      Rensselaer County Sheriff's Department.

3                  LT. KARAM:  Good morning, your

4      Honor.

5                  JUDGE KELLETT:  Good morning.

6      Mr. Fenton continues not to be here?

7                  MR. BROUSSEAU:  Correct.

8                  JUDGE KELLETT:  Has anyone had

9      any contact with Mr. Fenton?

10                 MR. LUIBRAND:  No, your Honor.

11                 JUDGE KELLETT:  We note that he

12     was not present the other three days.

13                 There's been a brief gap between

14     our last hearing, which was Friday, January

15     6th and today.  So as a preliminary matter,

16     I just want to go over a couple of things.

17                 I have three days of testimony.

18     I have three transcripts.  The first tran-

19     script goes from Page 1 through 318; the

20     second, 320 through 563; and the third, 564

21     through, we believe, 713.  So I would ask

22     the court reporter to please start with

23     714.

24                 And I do want to, on the record,

25     thank the court reporter for finding that

(ABBOTT - MARCH 9, 2012)

Page 718

1    page number for us.  Thank you.

2           Additionally, we have ALJ

3    Exhibits 1 through 3 in and Respondent's 1

4    through 27?

5           MR. BROUSSEAU:  And there are a

6    couple I need to clean up that aren't in

7    yet.

8           JUDGE KELLETT:  But essentially

9    that's it?

10          MR. BROUSSEAU:  Yes.

11          JUDGE KELLETT:  And Complainant's

12   1 through, I have like 28, you said?

13          MR. LUIBRAND:  I would concur

14   with whatever the record shows, your Honor.

15   I didn't look at it.

16          JUDGE KELLETT:  I agree, and if

17   the record may show I'm wrong, because I

18   have a little issue right now, but we'll

19   resolve it later on.

20          I did receive correspondence from

21   the parties regarding time and attendance

22   records.  Are you going to introduce that

23   sheet of paper?

24          MR. BROUSSEAU:  You're referring

25   to the letter I gave you last time, Judge?

Page 719

1            JUDGE KELLETT:  Yes.

2            MR. BROUSSEAU:  I can.

3            JUDGE KELLETT:  Okay, we'll take

4     care of that at that time.

5            And we were here another day, but

6     there was a snafu out of the Bronx office

7     and we weren't able to reassemble, so the

8     delay is not the fault of the parties, but

9     rather the Division.  I do recognize that.

10           MR. BROUSSEAU:  Regarding that

11    letter, your Honor, my understanding is

12    Mr. Luibrand, I don't know whether he has

13    had a chance to submit anything as to

14    whether he concurred with my computations

15    or not.

16           JUDGE KELLETT:  Okay.

17           MR. BROUSSEAU:  So I assume he

18    wants or I think you wanted to submit

19    something after the hearing?

20           MR. LUIBRAND:  What I was

21    intending to do, your Honor, was once the

22    record is complete, because the time and

23    attendance records are in evidence, it's

24    really an analysis of those, and I was

25    going to do that and make that part of my

(ABBOTT - MARCH 9, 2012)

Page 720

1     post-hearing submission.

2                JUDGE KELLETT:  Okay.  Just so

3     the transcript is clear, we are discussing

4     time and attendance because there's a

5     question of overlap between some of the

6     identified individuals and the Complainant,

7     and Mr. Fenton and the Complainant, and

8     that's what we're talking about.

9                MR. LUIBRAND:  Yes.

10                MR. BROUSSEAU:  And, Judge, I'm

11     fine waiting to submit that letter or that

12     evidence -- or not that evidence, that

13     analysis in the post-hearing brief because

14     the time and attendance records are in

15     evidence.

16                JUDGE KELLETT:  Okay.  I would

17     almost prefer that it come in --

18                MR. BROUSSEAU:  Okay.

19                JUDGE KELLETT:  -- because the

20     post-hearing briefs are not evidence.

21                MR. BROUSSEAU:  Okay.

22                JUDGE KELLETT:  And so if it's

23     going to be referenced, it would be better

24     if it were an exhibit.

25                MR. BROUSSEAU:  Okay.  All right.

(ABBOTT - MARCH 9, 2012)

Page 721

1    And then Kevin can reference it as an

2    exhibit and take issue with it if he wants

3    to in his post-hearing.

4              JUDGE KELLETT:  Okay.

5              MR. BROUSSEAU:  Do you still have

6    that in front of you, Judge?

7              JUDGE KELLETT: It's in my office.

8    I'll get it at break.

9              MR. BROUSSEAU:  Okay.

10             JUDGE KELLETT:  Who is calling

11   the first witness today?

12             MR. BROUSSEAU:  I am.  I am

13   calling Lt. James Karam.

14             JUDGE KELLETT:  Thank you.

15   Mr.  Karam -- Lt. Karam, please come up and

16   take the witness stand.

17             Lieutenant, in a moment you're

18   going to be sworn in as our next witness,

19   and after that I'm going to ask you to

20   state your name, correct spelling, and your

21   business address for the record.  After

22   that you'll be asked questions by the

23   attorneys - first by the attorney who has

24   called you, and then by the attorney for

25   the Complainant, and at any time by me.

(ABBOTT - MARCH 9, 2012)

Page 722

1           Please listen carefully to the
2    questions and answer the question that is
3    asked.  If you don't know, don't recall, or
4    don't understand the question, those are
5    fine responses.  I don't want you to
6    speculate or guess.
7           If there is an objection to the
8    question, please wait until I have ruled on
9    the objection before answering.  We're in a
10   room that's going to get very warm or very
11   cold.  If you need a break for any reason
12   at any time, please let me know.
13           THE WITNESS:  Thank you, your
14   Honor.
15           JUDGE KELLETT:  Please swear the
16   witness.
17                   -   -   -
18        L T.   J A M E S   K A R A M,
19        having been duly sworn, was examined
20        and testified as follows:
21                   -   -   -
22           JUDGE KELLETT:  Please state your
23   name and business address for the record.
24           THE WITNESS:  My name is James
25   Karam, K-a-r-a-m.  And my address, my

(ABBOTT - MARCH 9, 2012)

Page 723

```
 1        business address, is 4000 Main Street,
 2        Troy, New York.  12180.
 3                    MR. BROUSSEAU:  Judge, you don't
 4        mind if I remain seated?
 5                    JUDGE KELLETT:  I do not.
 6                    I do just want to make sure, is
 7        that Mr. Seabury back there?
 8                    MR. SEABURY:  Yes.
 9                    JUDGE KELLETT:  But he's not
10        going to be a witness?
11                    MR. LUIBRAND:  No.
12                        -  -  -
13                    DIRECT EXAMINATION
14   BY MR. BROUSSEAU:
15        Q.   Lt. Karam, can you just give the
16   Administrative Law Judge a brief history of your
17   educational background and how you came into law
18   enforcement.
19        A.   My educational background is that of
20   attaining an Associate's degree from Hudson Valley
21   Community College in criminal justice.  I also
22   attended high school at Catholic Central High School
23   in Troy, New York.
24        Q.   And what did you do after you got your
25   degree in criminal justice?
```

(ABBOTT - MARCH 9, 2012)

Page 724

1      A.    Well, I received my degree as I was

2  working.   I started my employment with the Sheriff's

3  Office in 1988.

4      Q.    And when you first began working for the

5  Sheriff's Department, what job were you in?

6      A.    I was a correctional officer when I first

7  joined the Sheriff's Office -- if you like me to

8  give you a time line or rundown --

9      Q.    Sure.   Why don't you tell me how your

10 career progressed with the Sheriff's Department.

11     A.    I was made a transport officer in

12 approximately 1990.   I was promoted to corporal in

13 1992; sergeant in 1993; first sergeant and training

14 director in 1999; and lieutenant in 2001 or 2.

15     Q.    During the relevant time period, the

16 spring through the summer of 2010, what position did

17 you hold at the Rensselaer County Sheriff's Depart-

18 ment?

19     A.    Lieutenant in charge of internal affairs

20 and training and some other areas.

21     Q.    As a lieutenant in charge of the current

22 internal affairs, what were you specific job duties?

23     A.    I would investigate allegations of

24 excessive uses of force; complaints as they came in

25 from the citizens outside; personnel complaints

Page 725

1  against department members; special investigations

2  as assigned by the sheriff; and the bulk of the work

3  that I did was mainly background investigations.

4      Q.   And who did you report to then?

5      A.   For internal affairs matters, it was

6  mainly the sheriff.  But sometimes it would be the

7  undersheriff in the sheriff's absence; superinten-

8  dent if we were working on a case together.

9      Q.   You did not report to Capt. Smith;

10 correct?

11     A.   He's above me in rank, so directly

12 reporting to him on internal affairs matters, no.

13 Other issues, yes.

14     Q.   What other issues might you report to him?

15     A.   Well, if it was a training issue, I would

16 report to him.  If it was an issue with keys or

17 cameras, or I had to deal with, you know, bringing

18 somebody in from a higher level, I would deal with

19 him.

20          But the internal affairs stuff, again,

21 directly with the sheriff for the most part, unless

22 I was working on a specific case with the captain.

23     Q.   How long have you known Lora Abbott?

24     A.   Ever since she started working with us,

25 and I'm not quite sure of the date of hire, Lora's

(ABBOTT - MARCH 9, 2012)

Page 726

1    date of hire.  It has been awhile, though.

2         Q.   As of the spring of 2010, what was Lora

3    Abbott's rank at the county jail?

4         A.   Sergeant.

5         Q.   What shift did she typically work?

6         A.   She worked A line, I believe is her shift,

7    as the watch commander, but she did overtime.

8         Q.   And did there come a time when you learned

9    that Lora Abbott had made a complaint that Sgt.

10   Richard Fenton had sexually assaulted her on the

11   tier a few years prior to 2010?

12        A.   Yes.

13        Q.   How did you first come to learn of that?

14        A.   I was notified by, I believe, Capt. Smith.

15        Q.   Were you notified verbally or in writing

16   or some other way?

17        A.   It was verbally.

18        Q.   What did you do after Capt. Smith told you

19   about that?

20        A.   I ended up investigating the allegations

21   of sexual harassment.  And it was, it was something

22   that I took to be pretty important because Lora was

23   a friend of mine and still is a friend of mine.  I

24   still consider her to be my friend.

25        Q.   Did someone assign you to investigate it?

Page 727

1      A.    When I was notified that the complaint had

2   been made in writing, we notified the superinten-

3   dent, I believe.   The time line of who we call when,

4   I'm unsure of that, but I know that when Capt. Smith

5   told me that he had a complaint in writing, that we

6   made the notifications of the chain of command and

7   that it was assigned back to me to investigate.

8      Q.    When did the investigation regarding Lora

9   Abbott's complaint began?   What date; do you know?

10      A.    If I can take a look at my notes, I'll let

11   you know the exact date.

12              MR. BROUSSEAU:   Judge, I've got a

13        marked copy for you.   These are time lines

14        he prepared.

15              MR. LUIBRAND:   I think I handed

16        them back.

17              MR. BROUSSEAU:   I don't have --

18              THE WITNESS:   If I may, I think I

19        have another copy in my --

20              MR. BROUSSEAU:   Actually, I do

21        have another copy, Judge.   Let me make sure

22        it's the same one.

23              (Respondent's Exhibit 33 marked

24        for identification.)

25   BY MR. BROUSSEAU:

Page 728

1    Q.   Lt. Karam, we give you what's marked as

2    Respondent's 33.  Can you just identify what this

3    document is?

4    A.   It's a time line that I prepared of the

5    reports and actions taken.

6    Q.   Is it a time line that you prepared from

7    your investigative file to help you give testimony

8    here at this hearing?

9    A.   That's correct.

10                   MR. BROUSSEAU:  I would offer

11        Exhibit 33 into evidence.

12                   MR. LUIBRAND:  Can I have a brief

13        voir dire, your Honor?

14                   JUDGE KELLETT:  Yes, you may.

15                        -   -   -

16              VOIR DIRE DIRECT EXAMINATION

17    BY MR. LUIBRAND:

18    Q.   Lt. Karam, this is what we generally call

19    a Word document on a computer; is that a fair state-

20    ment?

21    A.   Yes.

22    Q.   So it can be revised and amended at any

23    point in time; right?

24    A.   Yes.

25    Q.   Is there original notes or anything that

Page 729

1    exists that you referred to when you -- that you

2    used as an original source to place these different

3    entries on here?

4         A.    The original source that I used was the

5    actual investigative file, which I have right there.

6    But it was mainly the reports.  As I pulled the

7    reports out of the investigative file, I made the

8    time line.

9              I also have some handwritten notes that I

10   would make on the inside of the manila folders that

11   contain the reports, and some of this information

12   may have come off of, not only the front page of the

13   manila file folders, but also on the inside.  I

14   would make notes as I went along.

15        Q.    What does this summary relate to?  Is it a

16   particular allegation or is it just what you did in

17   connection with a number of allegations?

18        A.    This was -- it started with, as I'm

19   looking at the form itself, it starts with Sgt.

20   Abbott's complaint against Richard Fenton for

21   sleeping on the job, and then I believe it ends with

22   -- it's kind of a time line of that time period

23   between April 21st and, it looks to be July 20th of

24   2011.

25              MR. LUIBRAND:  Judge, I have no

(ABBOTT - MARCH 9, 2012)

Page 730

1          objection to the document being received

2          for what's it's been described as.

3                    JUDGE KELLETT:  Very well, it's

4          been received for what it has been

5          described as.

6                    (Whereupon, Respondent's Exhibit

7          33 was received into evidence.)

8                         -   -   -

9                    DIRECT EXAMINATION

10   CONTINUED BY MR. BROUSSEAU:

11        Q.   In reviewing your time line, Lt. Karam,

12   does that refresh your recollection as to when the

13   investigation regarding Lora Abbott's sexual harass-

14   ment complaint began?

15        A.   Yes.

16        Q.   And when did the investigation begin?

17        A.   May 27, 2010.

18        Q.   Was that the same date that Lora Abbott

19   made the written complaint of sexual harassment?

20        A.   Yes.

21        Q.   And what was the first thing that you

22   remember doing to investigate the sexual harassment

23   complaint?

24        A.   I'm sorry, can you repeat that question?

25        Q.   Sure.  What's the first thing you remember

Page 731

1  doing to investigate the sexual harassment com-

2  plaint?

3       A.   Reviewing the reports as they were

4  submitted.

5       Q.   And you reviewed reports submitted by

6  whom?

7       A.   Sgt. Abbott and CO Hoffman.

8       Q.   Did there come a time when you spoke to

9  Lt. Abbott about her complaint?

10      A.   Sgt. Abbott?

11      Q.   Sgt. Abbott, yes.

12      A.   Yes.

13      Q.   When did you first speak to Sgt. Abbott

14  about her complaint?

15      A.   Without giving a specific time, because

16  I'm not exactly sure about the specific time or the

17  date, I've had several conversations with Sgt.

18  Abbott, numerous conversations with Sgt. Abbott at

19  work, and also calls that were made on my cell

20  phone, personal cell phone to her cell phone, about

21  the investigation and trying to get information with

22  regard to when the actual incident had occurred with

23  her because there was a lot of time, there was a lot

24  of time that had gone by when the incidents had

25  actually occurred and when it was reported.

(ABBOTT - MARCH 9, 2012)

Page 732

1    Q.   Were you able to pinpoint, from looking at
2    time and attendance records, approximately when the
3    incident with William Fenton could have occurred?
4        A.   To the best of both of our abilities, Sgt.
5    Abbott and myself had discussed, trying to pinpoint
6    and bracket it in time when it actually happened,
7    and I think we did a pretty good job at it, but it
8    was still within several months.
9            It was after the end of a relationship
10   that she had and it was before -- I think it was
11   after the relationship she had with Bob -- I forget
12   his last name -- and before Sgt. Seroy was promoted.
13   There was like a little bit of time frame there.
14       Q.   And when you say Sgt. Seroy, Sgt. Seroy is
15   Stacy Stover?
16       A.   Stacy Stover is Sour (phonetic) now.  I
17   think it was Seroy, and then it went to Stover, and
18   now it's Sour.
19       Q.   She remarried and now it's Sour?
20       A.   Yes.
21       Q.   Was there also a criminal investigation
22   that was taking place at the time?
23       A.   Yes.
24       Q.   Who was conducting the criminal investi-
25   gation?

(ABBOTT - MARCH 9, 2012)

Page 733

1      A.   Our highway patrol investigator, William
2  Webster.
3      Q.   What was your understanding of the purpose
4  of the criminal investigation?
5      A.   The Sheriff had assigned it to Investi-
6  gator Webster to determine whether or not charges
7  should be filed against Sgt. Fenton.
8      Q.   Criminal charges should be filed?
9      A.   Criminal charges, right.
10     Q.   You were conducting the internal sexual
11 harassment investigation and Billy Webster was
12 investigating Sgt. Fenton's potential criminal
13 charges; correct?
14     A.   That's correct.
15     Q.   What happened regarding Sgt. Fenton's
16 employment at the Rensselaer County Sheriff's
17 Department on May 27th, 2010?
18     A.   He was immediately suspended.
19     Q.   And was he suspended with pay or without
20 pay?
21     A.   I believe at the time he was suspended
22 with pay.
23     Q.   Do you have an understanding why he would
24 initially be suspended with pay?
25     A.   The allegations of sexual harassment were

(ABBOTT - MARCH 9, 2012)

Page 734

1    severe enough that he needed to be removed from

2    employment -- or not removed from employment, but

3    removed from the work place until we could do a

4    preliminary investigation, get the reports from

5    the -- well, the Complainants had signed initial

6    reports, but they also had to be interviewed by the

7    criminal investigator.

8            Then there were other individuals that

9    were also mentioned as being part of this

10   investigation and possible victims of the sexual

11   harassment, so we had to get reports from them, too.

12           We wanted to ensure that the work place

13   was safe, so he was initially taken out of the work

14   place and paid, which we have to do, until preferred

15   charges against somebody.

16           Unless we know that somebody is a danger

17   to other staff or to inmates, then we can suspend

18   them without pay immediately.  But in this case,

19   until we had developed more information, that's what

20   we did.

21       Q.   Okay.  And I believe Capt. Smith might

22   have previously testified that he thought that Sgt.

23   Fenton was initially suspended without pay, and

24   you've checked the records; is that accurate?

25       A.   I would have to go back through them again

(ABBOTT - MARCH 9, 2012)

Page 735

1   and look exactly at his pay records, but I believe

2   he was suspended with pay.  I could be wrong, but I

3   believe he was suspended with pay and --

4                    JUDGE KELLETT:  Is this

5             suspension with or without pay pursuant

6             to a Collective Bargaining Agreement or

7             provision of the Civil Service Law?

8                    THE WITNESS:  In the Collective

9             Bargaining Agreement, there is a provision

10            in there that allows us to suspend without

11            pay until we can prove that the staff

12            member or show that the staff member is a

13            danger to other staff members or the

14            inmates.

15  BY MR. BROUSSEAU:

16       Q.   And then your understanding is that his

17  employment situation was charged to suspended

18  without pay once formal charges were preferred?

19       A.   That's correct.

20       Q.   From May 27th, 2010 forward, did Sgt.

21  Abbott ever have to work with Sgt. Fenton?

22       A.   No.

23       Q.   Now, you said that there were additional

24  individuals that needed to be interviewed by you and

25  the criminal investigator.  Do you recall who those

(ABBOTT - MARCH 9, 2012)

Page 736

1   individuals were?

2       A.   There was an officer by the name of Wendy

3   Vega, who, through my conversation with Sgt. Abbott,

4   Sgt. Abbott believed that Ofc. Vega may have been

5   the subject of sexual harassment by Ofc. Fenton.

6       Q.   In addition, I think there's been testi-

7   mony that -- and let's just refer to her as Stacy

8   Stover because that was her name at the time of

9   this, the investigation was going on -- Stacy Stover

10  and another individual that needed to be inter-

11  viewed?

12      A.   Yes.

13      Q.   Did you eventually have the opportunity to

14  interview CO Vega?  Wendy Vega?

15      A.   I asked her to do a report.  Actually, I

16  believe it may have been Capt. Smith that asked her

17  to do the report.

18      Q.   You eventually received and reviewed the

19  report from Wendy Vega?

20      A.   That's correct, and I actually talked to

21  her about the report when she submitted it.

22      Q.   And what do you recall Wendy Vega telling

23  you during the investigation?

24      A.   She told me that she was never sexually

25  harassed by Sgt. Fenton.

(ABBOTT - MARCH 9, 2012)

Page 737

1      Q.   What about Stacy Stover?

2      A.   Stacy Stover, according to some of the

3 information that I was getting from Sgt. Abbott, was

4 reluctant about coming forward to discuss the

5 incident she had with Sgt. Fenton.

6      Q.   Were you eventually able to speak with

7 Stacy Stover?

8      A.   Yes.

9      Q.   And what was the process of finally being

10 able to speak with Stacy Stover?  What effort did

11 you have to go through to speak with her?

12      A.   Well, there was a delay in time with me

13 discussing anything with Stacy Stover or bringing

14 her in for an interview because I wanted -- and as a

15 matter of course of business, we allowed the crimi-

16 nal investigations to be conducted first and for the

17 witnesses to be, or any potential complainants to be

18 interviewed by the criminal investigators first so

19 that I wasn't contaminating their investigation in

20 any way by letting information out that would help

21 them in the criminal prosecution.

22           And then she was reluctant to come forward

23 as a witness and she got the union involved in, I

24 wouldn't say stalling, but that's pretty much what

25 it was.  She was kind of stalling being interviewed

(ABBOTT - MARCH 9, 2012)

Page 738

1    by the criminal investigator because she was getting

2    advice from the former union president and vice

3    president and the attorneys that she did not have to

4    file a complaint, which wasn't what we were looking

5    at.

6         We believed she was a witness to possible

7    conduct or actions that Mr. Fenton may have had and

8    also to conversations that may have occurred between

9    her and Sgt. Abbott.

10        Q.   It was her prerogative whether she wanted

11   to file a complaint, but it was not her prerogative

12   whether she was going to appear and speak to you as

13   a witness?

14        A.   According to our admin. manual, which

15   governs the staff member's conduct, she has to

16   comply with an investigation if she is called as a

17   witness.

18             JUDGE KELLETT:  Is that in

19        evidence?

20             MR. BROUSSEAU:  It is not, no.

21             JUDGE KELLETT:  You call it an

22        admin. manual?

23             THE WITNESS:  Administrative

24        manual, your Honor.

25             MR. BROUSSEAU:  Rensselaer County

(ABBOTT - MARCH 9, 2012)

Page 739

1          Sheriff's Department Administrative Manual,

2          is that what you're referring it?

3                    THE WITNESS:  Yes.

4                    MR. BROUSSEAU:  I do have a copy

5          of it.

6                    (Respondent's Exhibit 32 marked

7          for identification.)

8    BY MR. BROUSSEAU:

9          Q.  Lt. Karam, I'm just going to show you

10   what's been marked for identification as

11   Respondent's Exhibit 32, which is entitled

12   Rensselaer County Office of the Sheriff Corrections

13   Bureau Administrative Manual.  Can you take a look

14   at that.

15                   JUDGE KELLETT:  While he's

16         looking at that, Mr. Luibrand, was Stacy

17         Stover at one time an inlaw of your

18         Complainant?

19                   MR. LUIBRAND:  Yes.

20                   JUDGE KELLETT:  I'm making sure

21         I'm keeping all this in my mind.

22                   MR. LUIBRAND:  You have a good

23         memory, your Honor.

24                   JUDGE KELLETT:  Off the record.

25                   (Discussion off the record.)

Page 740

1  BY MR. BROUSSEAU:

2      Q.   Lt. Karam, is Exhibit 32 a true and

3  accurate copy of the Sheriff's Department

4  administrative manual that you were just referring

5  to?

6      A.   Yes.

7              MR. BROUSSEAU:  I would offer

8      Exhibit 32 into evidence.

9              JUDGE KELLETT:  Any objection?

10             MR. LUIBRAND:  Just a brief voir

11     dire.

12                     -  -  -

13             VOIR DIRE DIRECT EXAMINATION

14  BY MR. LUIBRAND:

15     Q.   Was this the manual that was in effect as

16  of May of 2010?

17     A.   Yes.

18             MR. LUIBRAND:  No objection, your

19     Honor.

20             JUDGE KELLETT:  It's received.

21             (Whereupon, Respondent's Exhibit

22     32 was received into evidence.)

23                     -  -  -

24             DIRECT EXAMINATION

25  CONTINUED BY MR. BROUSSEAU:

Page 741

1    Q.   Did you eventually have the opportunity to
2    interview Sgt. Stacy Stover?
3    A.   Yes.
4    Q.   What type of interview did you conduct?
5    Informal interview, a formal recorded interview, or
6    something else?
7    A.   It was a formal recorded interview.
8    Q.   Did she have a union representative
9    present?
10   A.   Yes, she did.
11   Q.   When did that formal recorded interview
12   finally take place?
13   A.   I believe it was sometime in August, and
14   if you refer to the notes -- yep, it was August 2nd.
15   Q.   And you've given me audio recordings of
16   the recorded interviews that you did take in this
17   case and those were some that you recorded in your
18   office at the time pursuant to the policies and
19   procedures of the Rensselaer County Sheriff's
20   Department; correct?
21   A.   That's correct.
22             MR. BROUSSEAU:  And I believe,
23   Judge, those are already in evidence.
24   BY MR. BROUSSEAU:
25   Q.   What do you recall Stacy Stover telling

(ABBOTT - MARCH 9, 2012)

Page 742

1    you during the recorded interview?

2         A.    If I may, I need to kind of back up a

3    little bit and clarify something.

4         Q.    Sure.

5         A.    When Sgt. Abbott told me that Stacy Stover

6    and she had discussed Sgt. Fenton's actions and that

7    if, according to Sgt. Abbott, if anything happened

8    in the future to any one of the new female officers,

9    that they would both agree to come forward and

10   complain about Sgt. Fenton.

11            Sgt. Abbott was adamant that they had that

12   pact together and that Sgt. Stover had been a victim

13   of Sgt. Fenton.  So I carefully wanted to develop

14   the information that I needed in order to interview

15   her.

16            Although she was reluctant as a complain-

17   ant, I didn't want to force her into a position to

18   complain, but I felt that if I developed enough

19   information to talk to her about the situation that

20   I would be able to get her to discuss what actually

21   happened between her and Fenton.

22            During the interview, that's exactly what

23   happened.  We ended up discussing the interaction

24   that she had with Sgt. Fenton; and she did, in fact,

25   admit to me during the interview that Sgt. Fenton's

Page 743

1    actions towards her were sexual harassment.

2        Q.   During the initial stage of the investi-

3    gation when Miss Stover was not cooperating, did

4    Lora Abbott give you some additional information to,

5    you know, corroborate the fact that she and Stacy

6    had talked about this pact?

7        A.   I believe that the information did come

8    from Sgt. Abbott and that she -- that Sgt. Abbott

9    said that Stacy Stover actually did a report during

10   her basic supervisory training at Albany County on

11   sexual harassment and that she used her incident

12   with Sgt. Fenton as the example that she presented

13   to the class.

14          I then did try to get ahold of any reports

15   that may still be on file at Albany and I talked to

16   the training director over there to see if any of

17   that stuff could be corroborated, which I couldn't

18   get it corroborated through the training she went

19   through, but Sgt. Stover did admit to it during the

20   interview.

21       Q.   Okay.  And I believe there's already been

22   testimony, Sgt. Abbott testified or told you about a

23   conversation that occurred between her and Stacy

24   Stover on her cell phone when her cell phone was on

25   speaker phone and her daughter was a witness about

(ABBOTT - MARCH 9, 2012)

Page 744

1   this?

2        A.    That's correct.

3        Q.    And you talked to Lora Abbott about that;

4   didn't you?

5        A.    That's correct.

6        Q.    And you received a written report from

7   Lora Abbott regarding that event?

8        A.    That's also correct.

9        Q.    And did you speak to Lora's daughter, who

10  was a witness to this telephone conversation?

11       A.    Yes, I did.

12       Q.    And did you even take a recorded interview

13  of her?

14       A.    Yes, I did.

15       Q.    During the course of your investigation,

16  did you come to any determination as to whether or

17  not Lora Abbott was telling the truth when she said

18  that she and Stacy Stover had a pact?

19       A.    I would have to actually go through and

20  listen again to my interview with Stacy Stover.

21       Q.    In any event, what Lora Abbott said -- I'm

22  sorry, your Honor.

23            JUDGE KELLETT:  I'm trying to

24       understand your answer.  His question I

25       was hearing was asking if you came to a

(ABBOTT - MARCH 9, 2012)

Page 745

1      conclusion as to whether or not there had

2      been a pact between Stacy Stover and Lora

3      Abbott.

4              Did you come to a conclusion

5      about a pact?

6              THE WITNESS:  I believed Sgt.

7      Abbott, she told me that the pact had

8      existed.  And then when I was able to

9      corroborate -- or not corroborate, but when

10     I was able to corroborate by Sgt. Stover's

11     testimony about the sexual harassment, that

12     there was truth behind what Sgt. Abbott was

13     telling me about the pact that she had

14     with --

15             JUDGE KELLETT:  And that's with

16     regard to an agreement between her and

17     Stacy Stover as to when they would go

18     forward with complaints against Fenton?

19             THE WITNESS:  Yes, your Honor.

20             JUDGE KELLETT:  Okay.  Before we

21     go on, did I give you that little disc that

22     you asked for, the blue disc?  I just don't

23     want to misplace something else.  The CD --

24             MR. BROUSSEAU:  Yes, yes, I've

25     got it and it's keyed up to start now.

(ABBOTT - MARCH 9, 2012)

Page 746

```
 1            JUDGE KELLETT:  Oh, good.
 2   BY MR. BROUSSEAU:
 3       Q.   There came a time when Lora Abbott went
 4   out of work on disability; is that correct?
 5       A.   Yes.
 6       Q.   Did you continue to have communication
 7   with Lora Abbott after she went out on disability?
 8       A.   Yes.
 9       Q.   How did you continue to communicate with
10   Lora Abbott after she went out on disability?
11       A.   We would call on the phone.  I have her
12   cell phone -- I have her cell phone number.
13       Q.   And did you ever have to meet with her to
14   give her documents that she requested?
15       A.   Yes.
16       Q.   And what's your recollection regarding
17   that?
18       A.   I believe I had to give her a copy of her
19   initial report that she had typewritten and had
20   given me and we had made an arrangement to go to
21   meet at Wal*Mart, at the Wal*Mart parking lot.
22       Q.   And why did you meet at the Wal*Mart
23   parking lot?
24       A.   She was, I think she said she was going to
25   be there, her and her daughter were going to
```

(ABBOTT - MARCH 9, 2012)

Page 747

1    Wal*Mart to go shopping or had to pick something up.

2         Q.   Was that just one of the reports that she

3    didn't keep her own copy of?

4         A.   That's correct, which she was entitled to

5    a copy, and there was no problem with her getting a

6    copy of it.

7         Q.   She didn't want to come to the jail to get

8    it; is that correct?

9         A.   That's correct.

10        Q.   At some point had she made some claims to

11   you about some alleged improper activities on the

12   part of Stacy Stover?

13        A.   That's correct.

14        Q.   This was during the period of time Miss

15   Stover wasn't cooperating with the investigation?

16        A.   That's correct.

17        Q.   What claims did she make regarding Stacy

18   Stover?

19        A.   That Miss Stover was receiving or had

20   received letters from a former inmate at the jail;

21   improper contact with an inmate.

22        Q.   After she made that complaint to you, did

23   you have an obligation to investigate it?

24        A.   Yes.

25        Q.   Did Lora Abbott tell you that she had some

(ABBOTT - MARCH 9, 2012)

Page 748

1   documentation regarding that?

2        A.    She told me that her -- Lora told me that

3   her brother had in his possession letters from this

4   former inmate.

5        Q.    When you met at the Wal*Mart parking lot,

6   did she give you copies of those letters for your

7   investigation?

8        A.    I believe that's when we exchanged the

9   letters.

10        Q.    Okay.  Was it a conditional exchange - you

11   would not give her the report unless she gave you

12   the Stacy Stover documents?

13        A.    Absolutely not.

14        Q.    What happened regarding the claims

15   regarding Stacy Stover?

16        A.    With the inmate?

17        Q.    Yes.

18        A.    There was in the admin. manual, when it

19   was being negotiated, they had gone through great

20   pains to remove a section in there about contact

21   with former inmates.

22              At the time, although I had correspondence

23   from the inmate, there was nothing else that I could

24   prove.  There was no other contact that I could

25   prove between her and this inmate, so nothing was

2c71f71c0dcb0749

(ABBOTT - MARCH 9, 2012)

Page 749

1  done with it.

2      Q.   You had no documentation that she did

3  anything improper, just that the inmate mailed her

4  letters?

5      A.   That's correct.

6      Q.   Did there come a time where you also did a

7  recorded interview of Michelle Hoffman?

8      A.   Yes.

9      Q.   And now let's back up regarding Michelle

10  Hoffman.  Michelle Hoffman was also involved as

11  someone who was allegedly -- or sexually harassed by

12  Sgt. Fenton; correct?

13      A.   That's correct.

14      Q.   Do you recall the specifics of the alleged

15  harassment regarding Michelle Hoffman?

16      A.   She said that one night on the A line

17  shift that Sgt. Fenton had come in, that she was

18  sitting in a chair with her feet up and I believe

19  she had her shoes off, and that Sgt. Fenton, I

20  believe he made some kind of advance to her.

21           I don't know if he started at her

22  shoulders, rubbing her shoulders or if he took a

23  hair tie out of her hair and started like rubbing

24  his fingers through her hair, or if he asked her if

25  she wanted a foot massage, but it was one of those

(ABBOTT - MARCH 9, 2012)

Page 750

1    things.

2        Q.   And during your investigation, did you

3    come to a determination as to whether the actions of

4    Sgt. Fenton with regard to Michelle Hoffman consti-

5    tuted sexual harassment?

6        A.   I believe they did, and I interviewed

7    another staff member, Robert Patrick, about it.

8        Q.   Did he corroborate Michelle Hoffman's

9    story?

10       A.   What he was able to testify to was that

11   she was nervous; she had stated that she did not

12   want to be left alone with Sgt. Fenton anymore.

13            So it wasn't that he was in direct

14   observation of that interaction between the two, but

15   that she didn't want to be around him.

16       Q.   And ultimately Sgt. Fenton was charged

17   with sexual harassment with regard to Michelle

18   Hoffman and Stacy Stover and Lora Abbott; correct?

19       A.   That's correct.

20       Q.   During your investigation, I believe, just

21   so we're clear, you had recorded interviews of

22   Michelle Hoffman, Lora Abbott, and Amber Mattey, who

23   is Lora Abbott's daughter; correct?

24       A.   Yes.

25       Q.   As well as Robert Patrick and Stacy

(ABBOTT - MARCH 9, 2012)

Page 751

1    Stover; correct?

2        A.    That's correct.

3        Q.    In addition, Ofc. Webster was conducting

4    the criminal investigation; is that correct?

5        A.    That's correct.

6        Q.    What ultimately became of the criminal

7    investigation, if you know?

8        A.    Ultimately, I think it was no longer

9    pursued, the criminal charges against him.  And I

10   believe that occurred when Fenton, through I believe

11   it was a negotiated settlement, that he was to quit;

12   basically resign from his position.

13       Q.    And as a result of that, the District

14   Attorney did not pursue the criminal charges?

15       A.    I believe that to be correct.

16            MR. BROUSSEAU:  Your Honor, can

17       you hand me Exhibit R-13, please?

18            (Discussion off the record.)

19            MR. BROUSSEAU:  Oh, I'm sorry,

20       Judge, they're not in evidence yet.

21            (Respondent's Exhibit 13 marked

22       for identification.)

23   BY MR. BROUSSEAU:

24       Q.    I'm going to show you, Lt. Karam, what's

25   been marked as Respondent 13 for identification, and

Page 752

1    if you can take a look at that and I'll ask you a

2    couple of questions.

3         A.    (Witness complies.)

4                   MR. BROUSSEAU:  I gave you a copy

5         of that, right, Kevin?

6                   MR. LUIBRAND:  Yes, you did.

7    BY MR. BROUSSEAU:

8         Q.    Do you recognize those documents, Lt.

9    Karam?

10        A.    It looks to be the Incident Report that

11   Investigator Webster filled out; some narrative

12   supplementals to his investigation and voluntary

13   statements.

14        Q.    Is that a true and accurate copy of the

15   criminal investigation records that you provided to

16   me during the course of this case?

17        A.    Yes.

18                   MR. BROUSSEAU:  I would offer

19        Exhibit R-13 into evidence.

20                   JUDGE KELLETT:  Mr. Luibrand?

21                   MR. LUIBRAND:  Brief voir dire.

22                        -  -  -

23                   VOIR DIRE DIRECT EXAMINATION

24   BY MR. LUIBRAND:

25        Q.    Lieutenant, this is the Incident Report

(ABBOTT - MARCH 9, 2012)

Page 753

1    that contains the investigative materials into a

2    possible criminal claim against Sgt. Fenton;

3    correct?

4         A.    Yes.

5         Q.    Is there anything in here that relates to

6    any criminal investigation or any investigation of

7    retaliation by officers in the department against

8    Miss Abbott -- against Sgt. Abbott?

9         A.    No.  This is just the criminal investi-

10   gation into Sgt. Fenton.

11        Q.    So for the initial sexual assaults of

12   possibly three correctional officers or sergeants;

13   correct?

14        A.    Yes.

15        Q.    Nothing in regards to retaliation?

16        A.    No -- well, I don't know without reading

17   the actual statements what was claimed in these

18   statements.  I did look at them at one point in

19   time, but to comment on their content at this point,

20   I don't know exactly what is written in here that

21   any one of these individuals would have said to the

22   investigator about retaliation.

23                     -   -   -

24              VOIR DIRE CROSS-EXAMINATION

25   BY MR. BROUSSEAU:

(ABBOTT - MARCH 9, 2012)

Page 754

1     Q.   Let me stipulate that Sgt. Webster was

2   assigned to do, in fact, a criminal investigation

3   regarding the underlying sexual harassment of the

4   three female employees in the Rensselaer County

5   Sheriff's Department; correct?

6     A.   Yes.

7     Q.   You did not at any time task him to

8   investigate anyone at the Sheriff's Department for

9   any criminal charges relating to any retaliation?

10    A.   No, I have not.

11         MR. LUIBRAND:  No objection to

12       the document as described.

13         JUDGE KELLETT:  It is received.

14       Thank you.

15         (Whereupon, Respondent's Exhibit

16       13 was received into evidence.)

17                  -   -   -

18              DIRECT EXAMINATION

19   CONTINUED BY MR. BROUSSEAU:

20    Q.   Lt. Karam, now that we're discussing the

21   retaliation issues, after your investigation had

22   commenced, did there come a time when Lora Abbott

23   made some complaints regarding actions of other

24   corrections officers regarding her and other staff

25   members of the Rensselaer County Sheriff's Depart-

2c71f71c0dcb0749

(ABBOTT - MARCH 9, 2012)

Page 755

1    ment?

2         A.   Yes.

3         Q.   What's the first complaint you recall from

4    Lora Abbott regarding actions of other officers?

5         A.   The first complaint that I recall was one

6    that was shared with me by Capt. Smith about, I

7    think it was a report that was done sometime around

8    June 21st, that staff members were retaliating

9    against, I believe, Sgt. Abbott and Michelle

10   Hoffman, CO Hoffman.

11        Q.   And in what way were you told that staff

12   members were retaliating against Michelle Hoffman

13   and Lora Abbott?

14        A.   It was a report filed by, I believe,

15   Sgt. Abbott.

16        Q.   And what type of harassment did she

17   describe?

18        A.   I would have to actually see the report

19   again to read it, to go through it.

20             MR. BROUSSEAU:  I would like to

21        hand the witness Exhibit R-9, please.

22             THE WITNESS:  If I could, I

23        believe that report was on the 19th.  It

24        was June 19th.

25             JUDGE KELLETT:  I'm passing what

(ABBOTT - MARCH 9, 2012)

Page 756

1          is already in evidence as Respondent
2          Exhibit 9 to the witness.
3                    THE WITNESS:  Thank you.
4                    MR. BROUSSEAU:  And since it goes
5          hand in hand, Judge, can you hand the
6          witness Exhibit R-10, please?
7                    JUDGE KELLETT:  Certainly.
8                    (Respondent's Exhibits R-9 and
9          R-10 marked previously for identification
10         and received into evidence.)
11                   THE WITNESS:  Thank you.
12    BY MR. BROUSSEAU:
13         Q.   Does that refresh your recollection?
14         A.   Yes.
15         Q.   Now, what do you remember about the first
16    complaint of retaliation that you heard on or about
17    June 21, 2010?
18         A.   I remember having a discussion with Capt.
19    Smith, he brought this to my attention, and I said
20    -- I told him that the staff members don't under-
21    stand because the sexual harassment complaint was
22    not widely known to a lot of people, and that they
23    all thought it was over -- they thought -- the
24    majority of this was over Sgt. Abbott's filing a
25    complaint and writing reports on Sgt. Fenton

2c71f71c0dcb0749

(ABBOTT - MARCH 9, 2012)

Page 757

1    sleeping.

2         Q.   And that was the report that was done

3    about a month before she came forward about the

4    sexual harassment?

5         A.   That's correct.

6              JUDGE KELLETT:  Is it any better

7         or worse that these actions are going on

8         because they thought he had been reported

9         for sleeping versus he had been reported

10        for sexual harassment?

11             THE WITNESS:  What I can recall

12        from the time was that staff members felt

13        that it was unfair that Sgt. Fenton had

14        been reported for sleeping on the job.

15             The problem with sleeping on the

16        job is in our county work rules, which were

17        in the admin. manual, you can literally do

18        it four times before anything happens to

19        you.

20             So historically in the jail where

21        people were allowed to sleep, I think it

22        was overlooked by supervisors.  I think

23        that it was allowed to happen.  And when a

24        complaint came forward, it made a lot of

25        staff members angry because it was like an

Page 758

1    accepted practice that, you know, super-

2    visors did it on the shift and COs did it

3    on the shift, and to have a sergeant

4    complain about another sergeant infuriated

5    a lot of people; made them angry about it.

6            Some of the staff members

7    actually brought in timers so that they

8    would be reminded or woken up every half an

9    hour to go do a punch.  That's where a lot

10   of this resentment was coming from.

11           And I believe that, you know, if

12   there were actions that were taking place,

13   it was because of that, and that they

14   didn't know, because a lot of people didn't

15   know about the sexual harassment complaint.

16           JUDGE KELLETT:  But would it have

17   been appropriate to have been taking that

18   action because of making rat noises or any

19   of the other things we heard about because

20   the sleeping was reported?

21           I'm just trying to ascertain,

22   wouldn't you have to take action?

23           THE WITNESS:  It wouldn't have --

24   when I looked through this report quickly,

25   a lot of the allegations were nameless and

Page 759

1    faceless.  It wasn't specific to this

2    person did this, that person did that.

3              You know, there was some stuff in

4    here about certain sergeants being short

5    and not giving, you know, I wouldn't say

6    not giving the information that they needed

7    in their conduct, but if you go through and

8    look at it, it just doesn't really focus

9    down on the specifics that can be followed

10   up.

11             My main focus was to focus on the

12   sexual harassment complaint and not to drop

13   that to pick this up to try and figure out

14   who may have -- you know, who, because no

15   one was specifically listed as this person

16   made a rat noise, this person swore at me,

17   this person -- it just wasn't there.

18             So I had asked Capt. Smith if he

19   would pull some people in and to put them

20   on notice about their conduct because they

21   didn't know the bigger picture of what was

22   going on; and, again, they were all coming

23   to Sgt. Fenton's defense at that time

24   without knowing about the sexual harass-

25   ment.

(ABBOTT - MARCH 9, 2012)

Page 760

```
1              JUDGE KELLETT:  And the defense
2       was of sleeping on the job?
3              THE WITNESS:  Yes.
4  BY MR. BROUSSEAU:
5       Q.   Lt. Karam, if say, hypothetically, if that
6  was the only charge pending against Sgt. Fenton and
7  there were no sexual harassment, is calling someone
8  a rat and making rat noises or calling somebody
9  names under their breath because they've disciplined
10 somebody for sleeping, is that acceptable behavior
11 at the Rensselaer County Sheriff's Department?  I
12 think that's what the judge was asking.
13      A.   No, it's not acceptable behavior.
14             When it's a documented incident and if it
15 can be corroborated, then we do our best to address
16 that issue.  There are some issues that, you know,
17 in the course of this whole investigation where when
18 things were brought to light, they were taken care
19 of.
20             The sexual harassment complaint against
21 Sgt. Fenton is one.  When that was documented and we
22 had something to go on, we suspended him immediate-
23 ly.  We went after him and took care of it immedi-
24 ately.
25             Sgt. Abbott brought up some other
```

(ABBOTT - MARCH 9, 2012)

Page 761

1    incidents, like Sgt. Connell placing Ofc. Caulfield

2    on a different housing assignment.  He was disci-

3    plined for that.

4          Even Sgt. Fenton for sleeping, Sgt. Abbott

5    had the courage to come forward and to write him up

6    for doing that.  Disciplined.

7          So we've taken steps as we had stuff that

8    we can actually do something about.

9          Q.    Did Capt. Smith tell you that he spoke to

10   some individuals regarding that complaint of Lora

11   Abbott?

12         A.    That's correct.  I actually talked to him

13   about it and I talked to the undersheriff about

14   putting people on notice.

15         Q.    Did you have a notation in your file that

16   Capt. Smith told you that he spoke to people?

17         A.    That's correct.

18         Q.    All right.

19         A.    I also, I believe, had a conversation with

20   Sgt. Abbott about this report and that people had

21   been put on notice.  I had told her that steps were

22   taken.

23              (Respondent's Exhibit 11 marked

24         for identification.)

25   BY MR. BROUSSEAU:

(ABBOTT - MARCH 9, 2012)

Page 762

1       Q.   I'm going to show you what's been marked

2   as Respondent Exhibit 11 for identification.  That's

3   your handwriting; is that correct?

4       A.   Yes.

5       Q.   And do you recognize what that document

6   is?

7       A.   It appears to be a note that I wrote on

8   the inside of one of my investigative folders.

9       Q.   And what's the date of that?

10      A.   6/21/2010.

11      Q.   Did does that mean you wrote it on

12  6/21/2010?

13      A.   Yes.

14      Q.   Is that your handwriting?

15      A.   Yes.

16              MR. BROUSSEAU:  I would like to

17      offer Exhibit R-11 into evidence.

18              JUDGE KELLETT:  Counsel?

19              MR. LUIBRAND:  Brief voir dire.

20                  -   -   -

21              VOIR DIRE DIRECT EXAMINATION

22  BY MR. LUIBRAND:

23      Q.   This handwritten note is dated 6/21/10; am

24  I correct?

25      A.   Correct.

(ABBOTT - MARCH 9, 2012)

Page 763

1      Q.   And had Capt. Smith informed you for what

2  length of time and what the contact was of the

3  claims of harassment that Sgt. Abbott had been

4  reporting to him?

5      A.   No.

6      Q.   Did you ask him?

7      A.   No.  I was just dealing with this report

8  that had come to me.

9      Q.   So your role was not at any point in time

10  to either investigate or take any steps with respect

11  to retaliation against Sgt. Abbott; correct?

12      A.   I'm sorry, can you repeat that question?

13      Q.   Your role, your role, in so far as it

14  relates to having to do with Sgt. Abbott, never

15  extended to taking steps against anyone allegedly

16  involved in retaliating against her; is that

17  correct?

18      A.   That's not correct.

19      Q.   I thought you just said that?

20      A.   I just said what?

21      Q.   What steps did you take with respect to

22  the people identified in this note - Connell, Piche,

23  Hayes, Higgitt and Case - with respect to what Capt.

24  Smith had reported to you about retaliation against

25  Sgt. Abbott?  What steps did you take?

(ABBOTT - MARCH 9, 2012)

Page 764

1       A.    When this report came to my attention, I

2   had conversation with Capt. Smith and with the

3   undersheriff that people needed to be put on notice

4   because they didn't understand what the true

5   complaint was behind this.

6            Again, the assumption was by staff that it

7   was just the sleeping issue, which was perceived as

8   unfair, but that wasn't the case.  So I had asked

9   Capt. Smith if he would do this and put people on

10  notice.

11           So you're asking me whether or not I was

12  involved in it.  I was involved in it by telling him

13  this is what needs to happen.  And Capt. Smith was

14  aware of the sexual harassment investigation going

15  on.

16           These complaints about this harassment,

17  this was the first step of corrective action, which

18  should have been taken at the captain's level, and I

19  was basically helping him with that saying you need

20  to do something about this and put these people on

21  notice.  So, yes, I was involved in it.

22           And then the other thing was Caulfield.

23  Abbott had brought up the fact that Caulfield being

24  moved off a housing unit because of a perceived

25  connection between Ofc. Caulfield and Sgt. Abbott

(ABBOTT - MARCH 9, 2012)

Page 765

1   and she complained about that and we looked into it.

2          The reason that was given for the movement

3   or reassignment was so that a female didn't have to

4   work on a housing unit where the inmates were.  That

5   was the reason that was given to the captain.

6          But the rule, the standing rule was if

7   somebody is on an ownership, they stay under

8   ownership and you don't bump them.  So Sgt. Connell

9   did get disciplined for moving Ofc. Caulfield when

10  he shouldn't.

11         So I do have, I do have a direct influence

12  on what happens in regards to complaints about

13  retaliation and we did take steps and I did take

14  steps with Capt. Smith to correct some of these

15  allegations of harassment.

16     Q.   I don't want to get too far afield because

17  it's only with respect to this document, but this

18  document says that you were given reports by Capt.

19  Smith.  Are those written or oral reports?

20     A.   This report right here?

21     Q.   The document, which has just been marked

22  as an exhibit, says that you were given reports by

23  Capt. Smith.  Do you see that?

24              JUDGE KELLETT:  We're talking

25         about 11.

(ABBOTT - MARCH 9, 2012)

Page 766

1           THE WITNESS:  Oh, reports plural.

2     There may have been other reports along

3     with this, with regard to the --

4           MR. LUIBRAND:  When you use this

5     and that, that doesn't help us at all.

6           MR. BROUSSEAU:  What exhibit are

7     you referring to?

8           THE WITNESS:  I'm sorry, this

9     exhibit is exhibit -- I don't know how to

10    read this.

11          JUDGE KELLETT:  That's 9.

12          THE WITNESS:  This is Exhibit 9,

13    but this note right here --

14          MR. BROUSSEAU:  R-11.

15          THE WITNESS:  R-11, Mr. Luibrand,

16    that word says "given reports" would have

17    been this report and I believe, but I'm not

18    100 percent sure, other reports as related

19    to the sexual harassment complaint.

20 BY MR. LUIBRAND:

21    Q.   And those were given to you by Capt. Smith

22 on June the 21st?

23    A.   I believe so.

24    Q.   When you say reports with an "s", do you

25 mean written reports or could it cover oral reports?

(ABBOTT - MARCH 9, 2012)

Page 767

1      A.   It could have covered oral reports, too,
2  but if I wrote -- if I wrote "given reports," I mean
3  written reports, but I did talk to Capt. Smith about
4  what had happened in this report itself.
5      Q.   And then the next sentence says, "Captain
6  advises me he talked to staff involved"; correct?
7      A.   That's correct.
8      Q.   So it doesn't say you told him to talk to
9  staff.  He told you that he had spoken to staff?
10     A.   He told me he had, but I was the one that,
11  when I got this report and read it, I called him and
12  said that we needed to do something about this
13  harassment and this report.
14          I called the undersheriff and I told the
15  undersheriff what my concerns were and he said to
16  have Capt. Smith bring the people in and talk to the
17  people.  I called Capt. Smith and talked to him and
18  that's why this reads the way it does.
19     Q.   But in this, it doesn't say you told him,
20  it says he told you.
21     A.   Because there were staff that he was going
22  to talk to and I believe there was staff that he
23  didn't get around to talking to, you know, that day,
24  that he had to wait for them coming back in.
25     Q.   And you used the phrase, "I told him to

(ABBOTT - MARCH 9, 2012)

Page 768

1    put the people on notice."  What does that mean "on

2    notice"?

3         A.    On notice in my mind means that they have

4    to stop doing their high school, childish garbage

5    that happens in the work place.

6         Q.    Is that what you concluded the activities

7    towards Miss Abbott were?

8         A.    With no specifics that I could follow up

9    on, and again with my focus being on the sexual

10   harassment complaint, that's what I concluded with

11   this.  And, again, because their misunderstanding of

12   staff was this was all about sleeping and it was

13   much more serious than that.

14            I was under a time line and a dead line

15   also to ensure that charges were preferred as soon

16   as possible against Sgt. Fenton for his actions.  So

17   it was pretty serious, and my notes, the folder I

18   have on the sexual harassment complaint, show a lot

19   of activity when the complaint first came in.

20                 MR. LUIBRAND:  Judge, I have no

21        objection to R-11 being received.

22                 JUDGE KELLETT:  Okay, 11

23        received.

24                 (Whereupon, Respondent's 11

25        received into evidence.)

(ABBOTT - MARCH 9, 2012)

Page 769

1                   DIRECT EXAMINATION

2    CONTINUED BY MR. BROUSSEAU:

3         Q.   Can you just read it for the record, since

4    it's in your handwriting?

5         A.   "Given records by Capt. Smith.  Captain

6    advises me he talked to staff involved - Connell,

7    Piche, Hayes, Higgitt.  Higgitt off as of this date.

8    Case will be talked to as well.  Stover will be

9    addressed as well by Capt. Smith."

10        Q.   In that complaint, Lora Abbott in R-9,

11   Lora Abbott makes complaints against Stacy Stover as

12   well?

13        A.   Unless I read it word for word, I'm not

14   100 percent sure if she's actually in R-9.

15        Q.   R-10 is the complaint you received from

16   Michelle Hoffman; correct?

17        A.   Yes.

18        Q.   Now, does Michelle Hoffman make some

19   specific allegations regarding the specific

20   sergeant?

21        A.   Yes, she says that conversation had been

22   occurring with Sgt. Piche and some unknown people,

23   and that she wasn't paying attention to the conver-

24   sation, but that as she was walking towards him, he

25   said, "I better not say -- I better not say it.  I

(ABBOTT - MARCH 9, 2012)

Page 770

1    wouldn't want to be brought up on charges."  And

2    then she goes on to say she felt as though the

3    comment was -- she's got "directly to me."

4         Q.   Was that one of the two reports you

5    received from Capt. Smith on or about June 21, 2010?

6         A.   It could have been one of the reports.

7    It's dated that he reviewed it on the 21st.

8         Q.   What did she do in response to Michelle

9    Hoffman's complaint?

10        A.   I interviewed Miss Hoffman in my office.

11   I asked her to come down.  It wasn't recorded, but I

12   talked to her about the incident that had happened

13   and if she knew any part of the conversation and

14   what the conversation was about, and she said that

15   she couldn't.

16             I had told her that I was going to talk to

17   Sgt. Piche about his conversation and who he was

18   talking to and what he was talking about.

19             And I said, "Are you sure that it was

20   about you?"  I said, "Do you know for a 100 percent

21   certainty that that conversation was about you?"

22   And she said, "No, I can't.

23             So I said there's not really a lot I can

24   do about this other than to ask Sgt. Piche about

25   what he was talking about.  But then she goes on to

Case 1:13-cv-01018-MAD-DJS   Document 111-5   Filed 06/03/15   Page 59 of 180

(ABBOTT - MARCH 9, 2012)

Page 771

1  say, "Many under breath comments," and I believe

2  it's condescendingly negative -- "condescending

3  remarks are made by other officers towards me and

4  Sgt. Abbott, on occasions making it uncomfortable to

5  have to work in the jail.  Sergeants have become,"

6  it looks like "unapproachable as well."

7         With that, there was no - it was this

8  officer; this date; it was this time; this is what

9  they said to me.  It was a generalized statement.

10         The same things with sergeants becoming

11  unapproachable - no sergeant; no specific incident;

12  no specific request to a sergeant.  A generalized

13  statement.  Nothing I could go on.

14     Q.   When you brought her in for her interview,

15  did she give you any more specifics?

16     A.   No, no.  And she was doubting, she was

17  doubting herself and whether or not anything truly

18  occurred, other than eye contact being made during

19  that statement.

20     Q.   What did you do with regard to Sgt. Piche

21  at that time?

22     A.   I called Sgt. Piche in and I asked him

23  about his conversation, and Sgt. Piche had said that

24  he had been writing a lot of reports -- he couldn't

25  remember the actual conversation he was having,

VERITEXT REPORTING COMPANY
212-267-6868        www.veritext.com        516-608-2400

Page 772

1    except for the fact that he had been writing a lot

2    of reports lately and he was getting sick and tired

3    of being dragged into what he considered other

4    peoples messes.

5         Q.    By writing reports, you mean writing

6    reports on other corrections officers that he might

7    have supervised?

8         A.    That's correct.

9         Q.    He didn't submit any written reports

10   regarding Sgt. Fenton's sexual harassment charges;

11   did he?

12        A.    No.

13        Q.    That's a good point to go off on and

14   explore Sgt. Piche a little bit.

15             Sgt. Piche, what is his current employment

16   status with the Rensselaer County Sheriff's Depart-

17   ment?

18        A.    Suspended.

19        Q.    What is he suspended for?

20        A.    He's suspended for -- it was if -- it's a

21   total of three incidents.  One he had just received

22   a written warning because he had written something

23   on a bulletin board, a remark directed toward the

24   master sergeant and he had received a write-up for

25   that.

(ABBOTT - MARCH 9, 2012)

Page 773

1          When he had left, he had actually pulled

2     up in front of the jail in his truck.  It was

3     raining out and he rolled his window down and he

4     gave the middle finger to, it was either me or it

5     was the first sergeant or it was both of us.

6          Q.   And that resulted in pretty immediate

7     discipline?

8          A.   It was that incident, and then there was

9     at roll call he had -- somebody had given informa-

10    tion out at roll call about a directive that

11    sergeant -- or that Lt. Hetman had and he swore at

12    roll call and that he said...

13              THE WITNESS:  Is it alright for

14         me to swear?

15              JUDGE KELLETT:  Yes.

16         A.   He said, "Fuck Lt. Hetman; fuck Lt.

17    Hetman; fuck Lt. Hetman," and he stormed out of the

18    roll call.

19              The one incident he had been written up

20    and served; and then the second incident where he,

21    you know, flipped us off with his middle finger; and

22    then the roll call incident.  It was all kind of

23    combined into a disciplinary report against him and

24    then he was suspended for that.

25         Q.   Okay.  Did you have any hesitation in

Page 774

1    disciplining him for these matters?

2         A.    Negative.  No hesitation at all.

3         Q.    And going back, there's been some testi-

4    mony -- Sgt. Sinnott has given testimony in this

5    case regarding some prior problems he had with Sgt.

6    Piche years back.

7              Were you involved in the issues between

8    Sgt. Sinnott and Sgt. Piche?

9         A.    Yes, there were complaints made by Sgt.

10   Sinnott about Sgt. Piche making a comment to an

11   inmate services assistant, I think her title is.

12   Her name is Kristin Wing.

13             After we interviewed Miss Wing and other

14   staff members that were involved, it was apparent

15   that Sgt. Sinnott had taken the interaction between

16   Sgt. Piche, Ofc. Kosowsky and Kristin Wing out of

17   context and wrote a report alleging that Sgt. Piche

18   was being difficult.

19             When Kristine Wing was being interviewed

20   she said it was all over getting an inmate list

21   printed from booking and Sgt. Piche said not to ask

22   a certain individual and that they would take care

23   of it because that individual would get written up,

24   or something about that.  And they kind of laughed

25   about it, and then Sgt. Sinnott wrote a report on it

Page 775

1    alleging improper conduct on the part of Sgt. Piche.

2        Q.    Did Sgt. Piche make some complaints

3    regarding Sgt. Sinnott as well during this time

4    period?

5        A.    Sgt. Piche made a complaint about Sgt.

6    Sinnott not reporting to a code on time.

7        Q.    What is a code?  Can you explain?

8        A.    When we would have a code in the facility,

9    it's like an emergency situation and they go by --

10   we have them called out by number.  Like a code one

11   would be inmate assault on an officer; code two

12   would be inmates fighting; code three is refusing a

13   look-in of an inmate; and code four is a medical

14   emergency.

15            So Sgt. Piche made a claim that Sgt.

16   Sinnott was not responding to codes and wrote a

17   report against Sgt. Sinnott.

18       Q.    And in response, what happened next

19   between Sgt. Sinnott and Sgt. Piche?

20       A.    There were a couple of more incidents

21   where Sgt. Piche and Sgt. Sinnott had interaction.

22   One where Sgt. Sinnott had written reports and had

23   complained about Sgt. Piche's behavior.  There were

24   several reports that were submitted to the super-

25   intendent and all those reports were lost.  They

(ABBOTT - MARCH 9, 2012)

Page 776

1   were from probably three, I think they were from

2   three different officers.

3        Q.   By the superintendent, you're referring to

4   Colonel --

5        A.   Col. Robert Leverage (phonetic).

6        Q.   Were you able to, when you were investi-

7   gating complaints, were you able to reassemble the

8   complaints from copies from Sgt. Sinnott and others?

9        A.   Yep.  About three months later I was

10  tasked with -- because the issue of Sgt. Piche's

11  interaction wasn't being addressed, and then three

12  months later the Sheriff tasked me with trying to

13  find out what had gone on with these complaints.

14            So we were able to get copies, unsigned

15  copies of the report from Sgt. Sinnott; we were able

16  to get a copy of the report from -- it wasn't a

17  complete copy, it was only the back page of a report

18  from Patty Sawyer; and then the other one was a

19  report from Tammy Thomas.

20       Q.   Patty Sawyer, that was an officer at the

21  jail and she was the one who complained that, if I

22  recall correctly, that Sgt. Piche was making

23  Scooby-Doo noises whenever she walked into the room?

24       A.   That's correct.

25       Q.   And so you investigated all these matters

(ABBOTT - MARCH 9, 2012)

Page 777

1  regarding Sgt. Piche and Sgt. Piche's complaint

2  against Sgt. Sinnott.

3          What was the result of your investigation

4  into Sgt. Piche's complaints against Sgt. Sinnott?

5       A.   My investigation with regards to Sgt.

6  Piche -- First, if I can back up.

7          The complaint with -- or the reports that

8  were written by Sgt. Sinnott against Sgt. Piche,

9  when I interviewed Kristin Wing, she said that no

10  one was trying to cause trouble for her; no one was

11  harassing her; and they were laughing about the

12  comment that was made about someone getting in

13  trouble about printing out a report.

14          That's to the best of my recollection, but

15  she was not a complainant and she said no one was

16  doing anything wrong to her.

17          The report, or the complaint from Piche

18  about Sgt. Sinnott, we actually reviewed -- Piche

19  had run down the hall to go to the code and Ofc.

20  Radliffe was in the control room.  He had waved

21  Sgt. Piche to come in.

22          Ofc. Radliffe wanted help with opening the

23  doors and he asked Sgt. Piche to come in and help

24  him, and so they actually came in.  They were

25  opening the doors and responding -- getting staff

(ABBOTT - MARCH 9, 2012)

Page 778

1    members to respond down to the code.

2            I pulled the videos of Sgt. Sinnott, and

3    Sgt. Sinnott was hung up at a gate, which happens

4    from time to time when you report to codes, that you

5    don't, unless you're actually on the radio telling

6    people, directing them to come back to open up a

7    certain gate, you can get hung up at a code as they

8    are allowing other staff members to go in there.

9            So Sgt. Sinnott stood there and he pressed

10   the button and pressed the button again, but never

11   got on the radio to say, Control, open up gate

12   whatever, and I've got that in a file.

13           So it's not that he wasn't trying to get

14   there, he was trying to get there, and so Sgt.

15   Piche's complaint against him was unfounded.  But

16   again, he wasn't taking the steps necessary to get

17   on the radio to get himself down to the code.

18           And that was a complaint that a lot of

19   staff members were making about Sgt. Sinnott just

20   not responding to the codes at the jail.

21       Q.   But he wasn't disciplined as a result of

22   Sgt. Piche?

23       A.   Negative.  Nobody was.

24       Q.   What was the result of your investigation

25   into the Patty Sawyer issue?

Page 779

1      A.   By the time, and it was three months later

2  I think, that the investigation, so to speak...

3              THE WITNESS:  I'm sorry, your

4       Honor, did you want to say --

5              JUDGE KELLETT:  I was just

6       wondering, how does this relate to our

7       case?

8              MR. BROUSSEAU:  It only relates

9       to our case, your Honor, to the extent that

10      Sgt. Sinnott's testimony was trying to

11      paint the administration as nonresponsive

12      to complaints regarding Sgt. Piche alleging

13      that complaints regarding Sgt. Piche were

14      lost and no actions taken.  We don't have

15      to go into the minute details of the Sawyer

16      matter, but --

17              JUDGE KELLETT:  I would prefer

18      hearing a time frame delineated.  I'm not

19      exactly sure how --

20              MR. BROUSSEAU:  Well, the

21      approximate time frame is well before --

22              THE WITNESS:  They all came in in

23      one big bunch.  I can't give you the exact

24      date of Ofc. Sawyer's complaint because the

25      front page of the complaint wasn't copied.

(ABBOTT - MARCH 9, 2012)

Page 780

1          (Court reporting machine

2      disconnected.)

3          JUDGE KELLETT:  Well, we'll take

4      a break then.

5  BY MR. BROUSSEAU:

6      Q.   Where we left off, Lt. Karam, you were

7  talking about an incident regarding Sgt. Piche and I

8  believe we were talking about Patty Sawyer.

9          Just so the record is clear, would you

10 clarify -- I know you said that you cannot tell the

11 exact dates of these complaints, but can you give us

12 the general time period?  What year the complaints

13 were from?

14     A.   You know, unless I pull the actual, unless

15 I pull the actual file that had the reports in it

16 and all that stuff, off the top of my head --

17     Q.   It was prior to --

18     A.   -- I can't.

19     Q.   -- the matter with regard to Sgt. Fenton

20 though; correct?

21     A.   I believe that to be true.

22     Q.   What happened when you investigated the,

23 just briefly, when you investigated the Patty Sawyer

24 matter?

25     A.   By the time I had gotten around to getting

(ABBOTT - MARCH 9, 2012)

Page 781

1    the reports from everybody -- I actually drove out

2    to the Sawyer's residence -- they live in Nassau --

3    and she had a copy of it, but she never copied the

4    front of the page with the date and the time and if

5    it had been reviewed by the captain.  It was just

6    the back part of it.

7             By the time that I had gotten that stuff,

8    her husband, Tom Sawyer, who works for the Sheriff's

9    Office as a transport officer, had discussed the

10   matter with Mark and --

11        Q.   Mark is?

12        A.   Mark Piche.  And Mark had said -- and I

13   believe he wrote a report on it -- that he was not

14   trying to harass her and he considered them friends,

15   and the whole issue between them had resolved.

16             Patty, I believe, was pregnant at the time

17   and in Tommy's discussion, Tommy Sawyer's discussion

18   with Mark Piche, he attributed that her sensitivity

19   to that stuff to her being pregnant.

20        Q.   Did Mark Piche know that she was pregnant?

21        A.   Maybe.  I'm not 100 percent sure.  I don't

22   know.

23        Q.   And then with regard to the complaints

24   that Sgt. Sinnott made regarding Sgt. Piche's

25   behavior --

(ABBOTT - MARCH 9, 2012)

Page 782

1          JUDGE KELLETT:  I just want to go

2      back to that.  There is an assumption in

3      the Sheriff's Office that pregnant women

4      are more sensitive?

5          THE WITNESS:  That's not my

6      assumption, ma'am.  I'm just telling you

7      what the two individual's talked about.

8          JUDGE KELLETT:  So you think

9      Sgt. Piche had that assumption?

10         THE WITNESS:  No, I think Tom

11     Sawyer, Patty's husband, had that assump-

12     tion about why she was upset and made an

13     issue out of it because they had all been

14     friends.

15         JUDGE KELLETT:  Okay, thank you.

16  BY MR. BROUSSEAU:

17     Q.   And finally with regard to Sgt. Sinnott's

18  complaints regarding Sgt. Piche, you investigated

19  those complaints as well?

20     A.   Those reports were reports that were --

21  there was an incident that happened in front of

22  visitation and there was another incident that

23  happened at roll call.

24         The three people that were listed as

25  witnesses, from what I understand, no one heard or

Page 783

1    saw Sgt. Piche swear or yell at Sgt. Sinnott.

2           I think it was Mike Patrick was one guy,

3    maybe Nick Dillenbeck I think was the next guy, and

4    the captain, Capt. Smith, whose office was right

5    around the corner, reported not hearing anything;

6    not being in the room and not hearing any part of

7    this.

8           When the issue of the missing reports came

9    up and it was pressed as to the Colonel's actions,

10   the Colonel ended up telling the Sheriff that he

11   had, in fact, talked to Mark Piche about it and had

12   told Mark Piche that he needs to watch the way he

13   talks to other people and how he addresses other

14   people.

15          And from that day forward there were no

16   further complaints from Sgt. Sinnott about Sgt.

17   Piche.

18          So from what the Colonel was saying, he

19   had addressed Sgt. Piche about that behavior and

20   about the incidents that he had with Sgt. Sinnott.

21       Q.   So Sgt. Piche was given a verbal warning

22   from the Colonel?

23       A.   According to the Colonel.

24          And then the last thing we had talked

25   about was Ofc. Thomas and that was to staff members

(ABBOTT - MARCH 9, 2012)

Page 784

1   calling each other, teasing each other on the phone,

2   hanging up on each other, and Sgt. Piche actually

3   called Ofc. Thomas and she hung up on him thinking

4   it was Ofc. Bruno.  That was the issue with that

5   whole thing.

6        Q.   Also during his testimony here before the

7   Division, Sgt. Sinnott had made some statements that

8   he believes that it was possible he was moved to the

9   A line shift and he thought it was possible it was

10  as a result of some testimony he gave during the

11  Division's investigatory conference that took place

12  in May of 2011, and I told you after that testimony

13  to look into it to ensure that there was no indica-

14  tion that any retaliation was occurring; is that

15  correct?

16       A.   That's correct.

17       Q.   What did your investigation tell you?

18       A.   That accusation is incorrect and --

19       Q.   Why?

20       A.   I was part of the process of selecting

21  staff members to become certified as instructors in

22  the jail.  Sgt. Sinnott had said that he was

23  interested in becoming an instructor.

24            We had -- we recently had gone through an

25  expansion at the jail.  We expanded the facility,

Page 785

1   and with that expansion, there's new floors that

2   they've put in.  We used to have seamless floors

3   that were, not maintenance free, but all you had to

4   do was mop them, and we've since gone to the tile

5   type floors that I believe are just outside this

6   doorway and they have to be maintained.

7          Sgt. Sinnott said that he had experience

8   maintaining floors in I believe it was Crossgates or

9   at some facility.  He had expressed an interest in

10  wanting to take over being the sergeant in charge of

11  maintaining the floors.

12         The discussions that we had had were that

13  the floors were going to be done on the midnight

14  shift because there's less traffic on that shift.

15         And, in fact, prior to Sgt. Sinnott's

16  testimony, he actually was on the midnight shift and

17  was paid overtime for doing the floor detail on the

18  midnight shift.

19         We had paid -- just in training in over-

20  time -- well, it was a combination of training and

21  actually doing the floor detail, over $9,000 to Sgt.

22  Sinnott.

23         The purpose of the floor maintenance

24  program was that it was to be done on the midnight

25  shift and it was to be done when Sgt. Sinnott was on

Page 786

1    the shift, so that we didn't have to pay that over-

2    time anymore.  It's an exorbitant amount to have to

3    pay somebody, especially when the floors are not

4    being maintained properly and they are not staying

5    clean.  We can't have people walking on polished and

6    waxed floors during the day shift.  So he knew and

7    that was before he actually testified.

8              So the answer is no, it wasn't in

9    retaliation.  It was always the plan that that was

10   what was going to happen.

11        Q.   Going back to the alleged retaliation that

12   took place regarding Michelle Hoffman and Lora

13   Abbott after Lora made the sexual harassment

14   complaint, I believe you already testified with

15   regard to an event regarding the placement of

16   Michelle Hoffman on a tier and Sgt. Abbott alleged

17   that she was placed in an improper position as a

18   result of making the sexual harassment complaint?

19        A.   That's correct.

20        Q.   What was your involvement in that?

21        A.   The morning that that all, that that all

22   took place, I received a phone call from Capt. Smith

23   saying that Sgt. Abbott was in his office and that

24   she wanted to talk to me.

25        Q.   Can you specify the date?

(ABBOTT - MARCH 9, 2012)

Page 787

1      A.    Just give me one minute, please.   (Pause.)

2  I believe it was the 25th.

3      Q.    Was that also Lora Abbott's last day on

4  the job?

5      A.    I believe so, the 25th or the 26th.

6      Q.    So what was your involvement in this

7  matter?

8      A.    Sgt. Abbott came out to my office to

9  report to me that she had discovered that Michelle

10  Hoffman was placed on one of the larger housing

11  units.  She felt that it was unfair and she believed

12  that it was in retaliation.  She tried to talk to

13  the captain about it.  And she felt that the captain

14  was not handling the situation properly.

15          I ended up making -- well, I ended up

16  calling the captain and telling him that he needed

17  to take Ofc. Hoffman off of that housing unit and to

18  place her on a different housing unit that had only

19  three inmates on it.

20          Lora was quite upset at the time.  I told

21  her that I needed her to document stuff and to get

22  her report to me as to what was going on.  I can't

23  remember a lot of the conversation, but she was

24  upset.  She was crying.

25          I told her that I would take care of it

(ABBOTT - MARCH 9, 2012)

Page 788

1   and she said that she didn't want to deal with the

2   captain anymore, and I said, "You can deal directly

3   with me on these issues," and we pretty much kept it

4   that way and dealt with just each other from that

5   point in time.

6        Q.   Did you investigate the issue of Michelle

7   Hoffman's placement?

8        A.   Yes, I did.

9        Q.   What did you do to investigate that?

10       A.   Well, we took a look at the paperwork.  I

11   had the captain move her.  The supervisors had the

12   right to leave her right there.  She could have

13   stayed there for the next eight hours.

14            There's nothing that dictates that when

15   somebody is on 16 hours that you move them to one

16   housing unit or another based on how many inmates

17   are on housing unit, but the perception was that it

18   was unfair and it was upsetting to Sgt. Abbott and I

19   agreed with that, and that's when I said to Capt.

20   Smith we need to move her.

21            Sgt. Abbott had also said that she had

22   walked into the watch commander's office and she

23   believed that they were laughing about the placement

24   of Ofc. Hoffman on that housing unit and whether or

25   not Sgt. Abbott had picked up on it.

(ABBOTT - MARCH 9, 2012)

Page 789

1    Q.   Did you speak to anyone regarding the

2    matter?

3    A.   I talked to Sgt. Roy about it, and

4    received a report from Sgt. Roy.  He said that they

5    did discuss whether or not Sgt. Abbott had picked up

6    on the fact that Hoffman was placed on that housing

7    unit.

8    Q.   Who was "they"?

9    A.   It was the other sergeant, some other

10   people that were in the office.

11   Q.   All right.  Who were the other sergeants

12   who were in the office?

13   A.   I think Higgitt was in there, Sgt. Higgitt

14   was in there.  I think Ofc. Kosowsky was in there.

15   Sgt. Roy was there.  Connell, I believe, may have

16   been in there.

17   Q.   And who had made up that duty roster that

18   placed Michelle Hoffman where she was initially

19   placed?

20   A.   Sgt. Connell did.

21   Q.   Had Sgt. Connell just been written up for

22   the way he placed Gary Caulfield?

23   A.   Yes -- well, no, no.

24   Q.   He hadn't been written up, but there had

25   been a complaint written up against him at that

(ABBOTT - MARCH 9, 2012)

Page 790

1  time; correct?

2      A.   I believe that he was aware of -- I

3  believe that he was aware of that fact.

4                  JUDGE KELLETT:  He was aware of

5      what fact?

6                  THE WITNESS:  That his placement

7      of staff members was being looked into.

8  BY MR. BROUSSEAU:

9      Q.   Did you review some video of the watch

10  commander's office from that day?

11      A.   Yes, I did.

12      Q.   I have the watch commander's -- Do certain

13  portion of the Rensselaer County jail have video

14  surveillance cameras in them?

15      A.   Yes.

16      Q.   Not all areas of the jail are under video

17  surveillance at the time?

18      A.   Not all of them.

19      Q.   And is there audio associated with the

20  video surveillance?

21      A.   No.

22      Q.   And you've given me a copy of the video

23  surveillance from the watch commander's office; is

24  that correct?

25      A.   That's correct.

(ABBOTT - MARCH 9, 2012)

Page 791

1          MR. BROUSSEAU:  Do you want to

2      take a look at it, Judge?  I guess the way

3      we're configured now, we'll have to bring

4      it up here.

5          JUDGE KELLETT:  Does he have to

6      see it?

7          MR. BROUSSEAU:  It is good for

8      him to describe who the parties are.

9          JUDGE KELLETT:  Why don't you

10     leave it on that desk and that way...

11          (Discussion off the record.)

12          JUDGE KELLETT:  Please get on

13     the record that we're moving to see the

14     computer screen to see a video.

15          (Commencement of video.)

16  BY MR. BROUSSEAU:

17     Q.   Now, this is starting at -- the date on it

18  is 6/25/2008 and start time we got keyed up to is

19  6:41 a.m., 42 seconds; is that correct?

20     A.   Yep.

21     Q.   Who is shown in this video, or this still?

22     A.   It looks like Sgt. Abbott, top of Sgt.

23  Abbott's head; and it looks like Sgt. Bates, Michael

24  Bates.

25     Q.   Is this the watch commander's office?

(ABBOTT - MARCH 9, 2012)

Page 792

1      A.    Yes.

2      Q.    Could that be Sgt. Roy?

3      A.    At the time -- No, it's not Sgt. Roy.  At

4    the time that was the watch commander's office.

5    It's now inmate services office.

6      Q.    I'm going to start hitting play.  At 6:41

7    a.m., this would be just before change of shift;

8    correct?

9      A.    Change of shift, correct.

10     Q.    And A line would be shortly switching over

11   to B line; is that right?

12     A.    In a little while, yes.  Roll call is at

13   quarter after.

14     Q.    I'm going to try and fast forward to

15   around roll call time.  (Pause.)

16           Who is that in the frame now at 6:50:26?

17     A.    That looks like Sgt. Roy.

18           MR. BROUSSEAU:  I'm sorry, Judge,

19     but this is as fast as it will go forward.

20           JUDGE KELLETT:  It's a modern

21     miracle that we can see it at all.

22   BY MR. BROUSSEAU:

23     Q.    Who is the female officer that just came

24   in the frame at around 7:03?

25     A.    In looked like Ofc. Vega.

(ABBOTT - MARCH 9, 2012)

Page 793

1    Q.   So what is going on typically around 7:00
2   in the morning between A line and B line?
3    A.   The A line shift would be winding down.
4   Sergeants would be getting some of their paperwork
5   together, which I think that's what Sgt. Abbott is
6   doing right now.
7    Q.   That is Sgt. Abbott depicted in the still
8   at 7:09?
9    A.   Yes.
10    Q.   And it looks like she's getting ready for
11   roll call?
12    A.   Yes.  Other staff members would be coming
13   into the facility getting ready to walk in the roll
14   call room.  That's Sgt. Roy.
15    Q.   (Pause.)  Now we're here at around 7:20
16   a.m.  Who is in the frame now?
17    A.   Sgt. Higgitt is behind the desk and Sgt.
18   Connell is standing, and it looks like Ofc. Kosowsky
19   is looking at a schedule and he's sitting down.
20    Q.   Now, who is that who just walked into the
21   room at 7:21:17?
22    A.   Sgt. Roy.
23    Q.   Who is that individual?
24    A.   That looked like Ofc. Pachley.
25    Q.   That's at 7:21:30.

Page 794

1          This looks like the point at 7:22:38 where

2     Lora Abbott comes back into the watch commander's

3     office?

4          A.    That's correct.

5          Q.    What is over there?  Where is she going?

6          A.    What Lora had told me was that she was

7     going back in because she wasn't sure if she had

8     locked her file cabinet up or not.  She was pressing

9     the lock.

10         Q.    As she's leaving, who is there in the

11    watch commander's office?

12         A.    It looks like Sgt. Higgitt is standing at

13    the desk looking to his right.  Connell was sitting

14    to the left of the desk, looking forward.  Sgt. Roy

15    is standing at the corner of the desk and it looks

16    like he and Connor is facing Sgt. Higgitt.  And

17    Jamie Kosowsky is still seated.

18         Q.    It looks like Lora Abbott leaves and is

19    walking down the hall to the left and then down a

20    center hallway.  Where would that take her?

21         A.    I believe she's going to the captain's

22    office.  I believe she was, yeah, to the captain's

23    office, or she may have gone to booking.

24         Q.    Now, the gentleman on the left, all the

25    way to the left of the screen who just walked in,

(ABBOTT - MARCH 9, 2012)

Page 795

1    who is that?

2         A.   It looks like Dan Hogel.

3              MR. LUIBRAND:  Can we get a time

4         on that?

5              MR. BROUSSEAU:  That's around

6         7:23:30.

7    BY MR. BROUSSEAU:

8         Q.   And who is the individual that looks like

9    he's holding a box of Dunkin' Donuts?

10        A.   It looks like Ofc. Reid.

11        Q.   About 7:25, is this typical activity that

12   goes on in the morning at the change of shift in a

13   watch commander's office?

14        A.   Yeah, from the appearance of it, just

15   people coming in, going back out again.  Program

16   officers, probably.  Officers that were just

17   relieved.

18              JUDGE KELLETT:  What are we

19        supposed to be seeing?

20              MR. BROUSSEAU:  This is the

21        incident from the watch commander's office,

22        the Michelle Hoffman incident, and I'm

23        trying to also establish who was in there

24        at the time.  We actually have video of the

25        one event, so...

(ABBOTT - MARCH 9, 2012)

Page 796

1  BY MR. BROUSSEAU:

2       Q.   At this point we haven't seen Sgt. Piche

3  at all; correct?

4       A.   That's correct.

5       Q.   (Pause.)  This is Sgt. Piche now

6  approaching the watch commander's office?

7       A.   That's correct.

8            MR. LUIBRAND:  Can we get a time

9       on that?

10           MR. BROUSSEAU:  It's 8:00.

11 BY MR. BROUSSEAU:

12      Q.   And he's wearing a different colored

13 uniform from everyone else?

14      A.   That's correct.

15      Q.   Why is that?

16      A.   He was a K-9 sergeant at the time.

17      Q.   Who just walked in the room after Sgt.

18 Piche?

19      A.   That looks like Ofc. Boston.

20      Q.   It looks like Sgt. Piche is talking to

21 Lt. Higgitt and getting some coffee or something?

22      A.   That's what it looks like.

23      Q.   Who's the female officer who just

24 returned?

25      A.   Lora Pipher (phonetic).

(ABBOTT - MARCH 9, 2012)

Page 797

1    Q.    Sgt. Piche is gone by 8:02:31; correct?

2    A.    Correct.

3                MR. LUIBRAND:  Gone from the

4        room?

5                THE WITNESS:  Gone from the room.

6                MR. BROUSSEAU:  Judge, have you

7        been given permission to look at this on

8        your computer?

9                JUDGE KELLETT:  Not yet, but I

10       did ask.

11               MR. BROUSSEAU:  So we might as

12       well keep going then and see -- My notes

13       indicate Hal Smith comes in at 8:37.

14       There's no way to skip ahead any faster

15       than this; is there?

16               THE WITNESS:  If you use the

17       larger, which you're right on the end;

18       right?

19               MR. BROUSSEAU:  Uh-huh.

20               THE WITNESS:  That's as fast as

21       you're going to get.

22               MR. BROUSSEAU:  Okay.  (Pause.)

23       Oh, no, my battery died.

24               (Break taken for computer

25       hookup.)

(ABBOTT - MARCH 9, 2012)

Page 798

1   BY MR. BROUSSEAU:

2        Q.   Lt. Karam, now we're at 8:37:43, and who

3   is that coming into the office?

4        A.   I would say it's me, based on the bald

5   head, but it looks like Capt. Smith from behind.

6   Yeah, that's Capt. Smith.

7        Q.   So it looks like Capt. Smith comes in and

8   it looks like he's taking a look at the roll call

9   sheet?

10       A.   He's looking at something.  I'm not quite

11  sure what paperwork he's looking at.

12       Q.   (Pause.)  Now, we're at 8:41:56, and it

13  looks like Capt. Smith is now back in the room with

14  Sgt. Higgitt and he appears to be talking to him and

15  pointing at a piece of paper; right?

16       A.   Yep.

17       Q.   So, again, you're recollection of what

18  happened that day was Capt. Smith came to you and

19  told you what was going on, and you told Capt. Smith

20  to move her back; correct?

21       A.   That's correct.

22       Q.   And she was moved -- and Michelle Hoffman

23  was moved back; correct?

24       A.   That's correct.

25       Q.   All right.  Now, when you reviewed this

(ABBOTT - MARCH 9, 2012)

Page 799

1   video as part of your investigation, were you able

2   to observe any laughing or anything like that at

3   Lora Abbott when she enters the room or shortly

4   after she leaves the room?

5        A.   No.

6        Q.   I don't think we have to keep going

7   through this then.

8             And that was Lora Abbott's last day on the

9   job?  I think we already went over that; correct?

10       A.   That's correct.

11       Q.   You had further contact with Lora Abbott

12  after she was off the job.  We've established that

13  you met with her a couple of times and shredded

14  paperwork, etcetera?

15       A.   That's correct.

16       Q.   And you took a recorded interview of Lora

17  Abbott regarding the sexual harassment complaint as

18  well as some of her allegations regarding retalia-

19  tion?

20       A.   That's correct.

21       Q.   Did she ever tell you that she understood

22  that you and Capt. Smith were doing everything you

23  could to address her concerns?

24       A.   She had written in one of the reports -- I

25  believe it was the report that she wrote on the

(ABBOTT - MARCH 9, 2012)

Page 800

1    19th -- she had told me that the day that she had

2    left that she only trusted me and I think it was

3    Master Sgt. Patricelli (phonetic) and that's when I

4    said just deal with me on that stuff and don't

5    contact anybody else.

6         At that point she didn't have faith that

7    Capt. Smith was going to be able to handle anything

8    with regards to this situation correctly, and Lt.

9    Hetman as well.

10        Q.   And at a certain point you also -- now

11   Lora Abbott is off, not working there anymore, and

12   Michelle Hoffman is continuing to work there and

13   Michelle Hoffman also made a complaint of sexual

14   harassment and at least one complaint against Sgt.

15   Piche; correct?

16        A.   That's correct.

17        Q.   And there came a time after June 25th,

18   2010, where you did a recorded interview of Michelle

19   Hoffman; correct?

20        A.   That's correct.

21        Q.   And did you ask Michelle Hoffman if she

22   was experiencing any retaliation?

23        A.   I believe I may have in the interview.

24   There were no complaints after the one that she

25   wrote about Sgt. Piche, she made no further

(ABBOTT - MARCH 9, 2012)

Page 801

1  complaints.

2      Q.   Did you talk to her about what she should

3  do if she experienced retaliation?

4                MR. LUIBRAND:  Can we get the

5      she's down?

6                MR. BROUSSEAU:  Yes.

7  BY MR. BROUSSEAU:

8      Q.   Did you talk to Michelle Hoffman about

9  what she should do if she experienced any

10  retaliation?

11     A.   I believe so.  I believe I told her to let

12  me know if anything happened, to come to me directly

13  with it.

14     Q.   You told her no retaliation would be

15  tolerated?

16     A.   Yes.

17     Q.   I'm going to show you -- Actually, let me

18  get it marked first.

19                (Respondent's Exhibits 21 and 30

20      marked for identification.)

21  BY MR. BROUSSEAU:

22     Q.   I show you what's been marked as

23  Respondent R-21 and ask that you take a look at

24  that.

25     A.   (Witness complies.)

(ABBOTT - MARCH 9, 2012)

Page 802

1      Q.   Is that the general Rensselaer County

2    sexual harassment policy that would have been in

3    effect at the time?

4      A.   It appears to be, yes.

5           MR. BROUSSEAU:  I would offer

6    R-21 into evidence.

7           JUDGE KELLETT:  Any objection?

8                  -  -  -

9         VOIR DIRE DIRECT EXAMINATION

10   BY MR. LUIBRAND:

11     Q.   This is the Rensselaer County --

12     A.   This is the general county policy, yes.

13     Q.   Does the sheriff have a procedure?

14     A.   Yes.

15     Q.   What's that?

16           MR. BROUSSEAU:  I'm going to show

17   him next.

18   BY MR. LUIBRAND:

19     Q.   So the one we're looking at is not for the

20   Sheriff's Department?

21     A.   It's the policy that the county developed.

22     Q.   Which is not the Sheriff Department's

23   policy?

24     A.   Because the Sheriff's Office is a duel

25   employer, there's two.

(ABBOTT - MARCH 9, 2012)

Page 803

1      Q.    There's two different policies?

2      A.    There is this one that the county comes up

3  with and one specific for the Sheriff's Office.

4      Q.    And this one, when you are referring to R,

5  R what, when you say "this one"?

6      A.    R-21.

7      Q.    R-21 is the county policy and there's

8  another policy, which is the sheriff's policy, which

9  we haven't seen yet?

10     A.    Yes.

11              JUDGE KELLETT:  But both apply to

12         sheriff's employees because they're really

13         employed by the sheriff and not the county;

14         Is that what you're saying?

15              THE WITNESS:  The one that we

16         file is the next one.

17              MR. BROUSSEAU:  That's the

18         general policy; this other policy?

19              THE WITNESS:  Yes.

20  BY MR. LUIBRAND:

21     Q.    I just want to be clear.  Does R-21 apply

22  to how sexual harassment is handled within the

23  Sheriff's Department?

24     A.    Again, I believe this was the basis for

25  the policy, the specific policy for the Sheriff's

(ABBOTT - MARCH 9, 2012)

Page 804

1    Office.  So that policy, whatever number that is

2    going to be, Mr. Brousseau has, was based off of

3    this.

4        Q.   My question stands.  Is R-21 the policy

5    for sexual harassment that applies to the Sheriff's

6    Department?

7        A.   I would say that it is that policy, the

8    next policy that Mr. Brousseau has.

9            JUDGE KELLETT:  Listen to the

10       question.  He wants to know about R-21.

11   BY MR. LUIBRAND:

12       Q.   Is the policy in your hand, R-21, which at

13   the top says Topic, Sexual Harassment, is this the

14   policy that was applicable to the Rensselaer County

15   Sheriff's Department in 2010?

16       A.   No.

17           MR. LUIBRAND:  Okay, then I

18       object to the document.

19           JUDGE KELLETT:  What is the

20       relevance then?

21           MR. BROUSSEAU:  The relevance is

22       it is the general policy for the county

23       that is the genesis of this policy.  I just

24       wanted it to be complete.

25           JUDGE KELLETT:  I'll allow it to

(ABBOTT - MARCH 9, 2012)

Page 805

1    come in for what it's worth then, but note

2    clearly on the record it is not the policy

3    applicable to the Sheriff's Department.

4              (Whereupon, Respondent's 21 was

5    received into evidence.)

6                   -  -  -

7              DIRECT EXAMINATION

8    CONTINUED BY MR. BROUSSEAU:

9    Q.   Let me show you what's been marked

10   Respondent 30, which is titled Rensselaer County

11   Sheriff's Department General Order, it looks like

12   it's general order number 01 SD 96.

13             MR. BROUSSEAU:  And I gave you

14   the copy there, Kevin.

15   BY MR. BROUSSEAU:

16   Q.   Is that the specific policy for the

17   Rensselaer County Sheriff's Department regarding

18   sexual harassment that would have been in place at

19   the time that Lora Abbott made her complaint?

20   A.   Yes.

21             MR. BROUSSEAU:  I would offer

22   that into evidence.

23             JUDGE KELLETT:  Mr. Luibrand?

24             MR. LUIBRAND:  I would like to --

25   I've just been given this one.  Could I be

(ABBOTT - MARCH 9, 2012)

Page 806

1          given a minute?

2                    JUDGE KELLETT:  Of course.

3                    (Pause for document review.)

4                    MR. LUIBRAND:  I have no

5          objection, your Honor.

6                    JUDGE KELLETT:  It is received.

7          Are you going to question him on it?

8                    MR. BROUSSEAU:  No.

9                    JUDGE KELLETT:  Then I'll take

10         it, please.

11                   (Witness complies.)

12                   JUDGE KELLETT:  Thank you.

13                   (Whereupon, Respondent's 30

14         received into evidence.)

15                        -  -  -

16                   DIRECT EXAMINATION

17    CONTINUED BY MR. BROUSSEAU:

18         Q.   Is Lora Abbott still an employee of the

19    Rensselaer County Sheriff's Department?

20         A.   Yes.

21         Q.   What is her current status?

22         A.   She's out on leave.

23         Q.   Out on disability leave?

24         A.   I believe.

25         Q.   Since June 25th of 2010, have any of the

(ABBOTT - MARCH 9, 2012)

Page 807

1  women involved in these sexual harassment investiga-

2  tions - Wendy Vega, Stacy Stover, Wendy Hoffman --

3  have any of those individuals complained of any

4  retaliation by any male employees of the Rensselaer

5  County Sheriff's Department?

6       A.   No.

7       Q.   As far as the three individuals that Lora

8  Abbott has named as people who were in the group

9  that were making rat noises or calling her names -

10 Sgt. Piche, Sgt. Higgitt, Sgt. Connell -- and I

11 think we've already established Lora Abbott gave

12 Sgt. Connell a performance evaluation about that

13 same period of time; is that correct?

14      A.   That she evaluated him?

15      Q.   Yes.

16      A.   It's possible that she did.

17      Q.   Okay.  Did you take a look at the work

18 schedules to see how often Lora Abbott had worked

19 with Sgt. Piche or Sgt. Higgitt or Sgt. Connell

20 after she reported Sgt. Fenton for sexual harass-

21 ment?

22      A.   I believe it was how many times she worked

23 with Sgt. Piche and Sgt. Higgitt.

24      Q.   Did you make a determination that they

25 worked together a lot after the 25th?

(ABBOTT - MARCH 9, 2012)

Page 808

1      A.   It was a minimal amount of time that they

2  would have actually worked full shifts together.

3      Q.   Has anyone other than Lora Abbott told you

4  that they overheard or they saw anyone making any

5  derogatory comments to Lora Abbott or making rat

6  noises to her?

7      A.   Other than Michelle Hoffman putting it in

8  her report, no.

9      Q.   All right.  Sgt. Connell wasn't actually

10  given a written warning for the way that he placed

11  Gary Caulfield, CO Caulfield; is that correct?

12      A.   That's correct.  It was an oral warning or

13  written warning, whatever the first step would have

14  been in the disciplinary process.

15              MR. BROUSSEAU:  I don't have

16       anything further.

17              JUDGE KELLETT: Cross-examination?

18              MR. LUIBRAND:  Thank you, your

19       Honor.

20              JUDGE KELLETT:  Do you want to

21       take a brief moment?

22              MR. LUIBRAND:  I don't need one.

23       I might take a short break before I end to

24       make sure I covered everything, but I'm

25       ready to go.

(ABBOTT - MARCH 9, 2012)

Page 809

1          (Discussion off the record.)

2                    -  -  -

3                CROSS-EXAMINATION

4    BY MR. LUIBRAND:

5          Q.   Lt. Karam, there were long lapses of time

6    between the occasions when Sgt. Fenton placed his

7    hands physically on Sergeants Stover, Abbott and

8    Hoffman; correct?

9          A.   There is a long lapse of time between

10   Sgt. Fenton's contact, reported contact with Sgt.

11   Abbott.

12         Q.   "Long" meaning a number of years?

13         A.   A number of years, yes.

14         Q.   How about Stover?

15         A.   Same thing with Stover.

16         Q.   Number of years?

17         A.   And with --

18         Q.   Yes, a number of years lapsed between when

19   it would have happened --

20         A.   Yes, a number of years.

21         Q.   Let me finish my question.  A number of

22   years lapsed from when it happened until when she

23   reported it?

24         A.   She didn't report it.

25         Q.   How about Hoffman, how long between when

(ABBOTT - MARCH 9, 2012)

Page 810

1    she was physically touched and when she reported it?

2         A.    That, I believe was -- that, I believe,

3    was March.  If I can ask Lora, she would be able to

4    clarify it for me.

5         Q.    That's okay.  It was a number of months,

6    perhaps?

7         A.    It was when Lora was out, that's when it

8    happened.

9         Q.    And Lora was out February-ish time frame;

10   right?

11        A.    Yes.

12        Q.    And you would agree that Abbott, Stover,

13   and Hoffman did not welcome being touched in a

14   sexual manner by Fenton; did they?

15        A.    That's correct.

16        Q.    And yet they each allowed a substantial

17   amount of time to pass before they, in your words

18   referring to Abbott, had the courage to come forward

19   and report it; right?

20        A.    That's correct.

21        Q.    And part of the reason, if not all of the

22   reason, is they're in an environment that is a male

23   dominated environment; right?  They're in a working

24   environment that is a male dominated work environ-

25   ment; correct?

Page 811

```
 1      A.    That's correct.

 2      Q.    It's a dangerous environment; right?

 3      A.    That's correct.

 4      Q.    And they had a fear of retaliation as a

 5  result of coming forward?

 6                  MR. BROUSSEAU:  Objection.  He's

 7          asking the witness as to what Lora Abbott

 8          was thinking.

 9                  JUDGE KELLETT:  I agree with that

10          objection.

11                  MR. LUIBRAND:  Okay.

12                  JUDGE KELLETT:  But perhaps Miss

13          Abbott told him.

14  BY MR. LUIBRAND:

15      Q.    Tell us, based upon your experience, what

16  you viewed the reason that they did not come forward

17  when the events happened.

18      A.    What I know about the investigation and

19  having talked to individuals after the fact, Lora

20  initially told Capt. Smith that there was contact

21  between Fenton and her, but that she said that she

22  didn't want to complain about it and that if Hal had

23  done something to complain about it, that she wasn't

24  going to testify to it -- or she wasn't going to

25  corroborate Hal's -- the captain's allegation about
```

(ABBOTT - MARCH 9, 2012)

Page 812

1    it.

2            And from what I understand at the time

3    when she told the captain that -- and this is

4    according to what I've heard from the captain -- he

5    was respecting her wishes to not cause her embar-

6    rassment at the work place and not to make an issue

7    out of this because it was her desire that no

8    complaint be made.

9            As far as the other two individuals,

10   Stover did not want to make a complaint about it,

11   and Hoffman also did not complain about it.  But it

12   was Sgt. Abbott who found out about it during a

13   conversation in staff dining is when she found out

14   about it, and because of the discussion that Lora

15   had had with Sgt. Stover about the pact, this pact

16   that supposedly existed between her and Sgt. Stover

17   that they weren't going to stand for any of the new

18   staff members becoming victimized by Sgt. Fenton,

19   she -- I don't know if Sgt. Abbott directed Ofc.

20   Hoffman to do the report or encouraged her to do the

21   report, but that's when it was first documented when

22   we had something or at least I had something action-

23   able to go on.

24       Q.   What did you conclude was the reason it

25   was not documented for such a long period of time

(ABBOTT - MARCH 9, 2012)

Page 813

1    after each of the women experienced sexual assaults
2    by Sgt. Fenton?
3         A.   As I've already explained, I believe that
4    the first one was because Sgt. Abbott did not want
5    to make a complaint about it at that time.
6              I believe the second incident was unknown
7    to myself and I don't know if it was shared with
8    anybody else, and that would be the Stover incident.
9              And the third incident was documented when
10   Sgt. Abbott found out about it, so...
11        Q.   I don't believe you're answering my
12   question and I'm going to try and rephrase it.
13        A.   I'm sorry.
14        Q.   I'm asking why didn't they come forward
15   sooner?
16        A.   That I'm not -- I don't know.  I really
17   don't know why they didn't come forward sooner.  It
18   was their responsibility -- or it was Sgt. Abbott's
19   responsibility when the first incident happened as a
20   sergeant and also as a victim, to have documented it
21   and done something about it right then and there.
22             When they found out about Stover, when she
23   found out about Stover in that incident, that should
24   have been documented and forwarded right then and
25   there.

(ABBOTT - MARCH 9, 2012)

Page 814

1       When it came to Hoffman, Hoffman's

2   incident was documented and Sgt. Abbott then took

3   the right steps with either requesting that report

4   from Ofc. Hoffman or directing her to do it.  I'm

5   not quite sure which one it was.

6           JUDGE KELLETT:  I thought he

7       wasn't answering your question, but that's

8       fine.

9   BY MR. LUIBRAND:

10      Q.  Did you give any consideration in your

11  role as to why each of them would not have come

12  forward sooner after they had experienced the actual

13  physical assaults?

14      A.  Can you just say that again for me?  I'm

15  sorry.

16      Q.  Sure.  Have you ever given consideration

17  as to why they would not have come forward sooner

18  after they had actually experienced the physical

19  assaults?

20      A.   I didn't question Sgt. Abbott's reluctance

21  to come forward at the time.  Again, I was trying to

22  be -- with Sgt. Stover, I was trying to be as

23  cautious as possible with a possible complaint,

24  someone that was reluctant to come forward about it,

25  because by the time we did end up getting the

(ABBOTT - MARCH 9, 2012)

Page 815

1  complaint from Sgt. Abbott, I had two out of three.

2  I needed the third one.

3         And so, you know, I didn't want to force

4  Sgt. Stover into making a complaint that she didn't

5  want to make a complaint.  I didn't want to have to

6  discipline her for not cooperating with the

7  complaint.

8         If that answers your question; if not, you

9  can ask it again.  I'll try to go over it, but those

10 are my concerns.

11     Q.   Do you know why they didn't want their

12 complaints -- withdraw.

13         Do you know why they wouldn't want some-

14 body who is sexually touching them in an unwanted

15 manner, why they wouldn't want that addressed and

16 reported?  Why wouldn't they?

17             MR. BROUSSEAU:  Objection.  He's

18     asking the witness what they thought.

19             JUDGE KELLETT:  If he doesn't

20     know, he can say he doesn't know.

21             THE WITNESS:  And I really don't

22     know why it didn't happen.

23 BY MR. LUIBRAND:

24     Q.   Did you, in your role, give consideration

25 to the possibility that accepting sexual harassment

(ABBOTT - MARCH 9, 2012)

Page 816

1    was an easier path than enduring retaliation, had

2    they reported the sexual harassment?

3                    MR. BROUSSEAU:   Same objection.

4                    JUDGE KELLETT:   Well, actually I

5          don't know that I have had any evidence

6          that makes me suspect any of the women

7          involved accepted -- the testimony from

8          your client was that she took care of it by

9          a very deliberate statement to the offender

10         as to what she would do if it happened

11         again.

12                   So I'm going to say the question

13         is inappropriate because it is assuming

14         facts not in evidence.

15   BY MR. LUIBRAND:

16         Q.   Did you give consideration as to whether

17   the prospects of retaliation, if they had reported

18   it, outweighed the act of reporting the sexual

19   harassment?

20         A.   I would say no.

21         Q.   Why not?

22         A.   Because I encouraged everybody that if

23   they had -- if there was retaliation that was

24   occurring, that they needed to come to me and talk

25   to me about it and we would take care of it.   My

(ABBOTT - MARCH 9, 2012)

Page 817

1     steps have been -- my steps have been just that.

2          Q.   Who did you encourage and when?

3          A.   About retaliation, if anything is said?

4     Well, when Sgt. Abbott came to me and said this is

5     what's happening and here's the retaliation that I

6     see occurring, we took steps to move Hoffman off of

7     the housing unit.

8          Q.   Which was the end of June?

9          A.   Right.

10                    JUDGE KELLETT:   That's the day

11          that it occurred?

12                    MR. LUIBRAND:   June 25th, I

13          believe.

14                    THE WITNESS:   She would have

15          spent minutes on the housing unit.

16     BY MR. LUIBRAND:

17          Q.   But that was the date, the date we're

18     talking about is June 25th?

19          A.   The date that the -- yeah, the date that

20     that incident happened, which was the 25th, was it?

21          Q.   Now, according to your notes, there was

22     nothing relayed to you by Capt. Smith from the date

23     that Sgt. Abbott reported Sgt. Fenton until May 27th

24     of 2010; correct?

25          A.   As far as?

(ABBOTT - MARCH 9, 2012)

Page 818

1    Q.    Retaliation directed towards Sgt. Abbott.

2    A.    I believe that to be correct.

3    Q.    Do you know -- if you look at R-30.  You

4    might still have that in front of you.  That's the

5    general order.

6              JUDGE KELLETT:  I'm passing it to

7         the witness.

8    BY MR. LUIBRAND:

9    Q.    Go to the second half of it.  There's

10   pages one through four and then there's another

11   section that's pages one through three.

12             Do you see the second section?

13   A.    Yes.

14   Q.    Would Capt. Smith be the first line

15   supervisor?

16   A.    If he was the first one that it was

17   reported to.

18   Q.    So if the testimony -- I'll ask you to

19   assume that Sgt. Abbott on a fairly regularly basis,

20   daily when she was working, would go in and report

21   to Capt. Smith acts of retaliation directed towards

22   her.  Would he then assume the role of first line

23   supervisor for purposes of this order?

24   A.    For purposes of that, yes.

25   Q.    And according to the order, his responsi-

Page 819

1   bility was to properly investigate the violations;

2   right?

3       A.   That's correct.

4       Q.   Anything that you learned through this

5   investigation that leaves you to believe that he

6   investigated anything?

7       A.   I think he did look into things.  I don't

8   think that he did a thorough investigation as far as

9   writing reports and putting stuff down.

10          I think that he took actions that he

11  deemed necessary, but it was more on an operational

12  level than it was on an investigative level.  Again,

13  he handles things operationally and when problems

14  arise or if they're directed to his attention, he

15  should be handling them operationally.

16          So let's say for instance the issue with

17  Caulfield being put on a housing unit that he

18  shouldn't have been put on, when that was brought to

19  his attention, he did the discipline on it.

20          What would be considered his investigation

21  would be looking at the assignments and the paper-

22  work that already been filed and in determining that

23  the assignment was incorrect according to the

24  ownership, and then doing the discipline on it.

25      Q.   Staying in accord with this R-30, this

(ABBOTT - MARCH 9, 2012)

Page 820

1   responsibilities of the first line supervisor --

2   forgetting about Hoffman -- when Sgt. Abbott goes in

3   and says here's what's happening to me today to

4   Capt. Smith, his duty is to properly investigate

5   what happened; right?

6         A.   According to this, that's correct.

7         Q.   And the procedure is to conduct a thorough

8   preliminary investigation into the facts and circum-

9   stances of the allegation; right?

10        A.   That's correct.

11        Q.   And he didn't do that; did he?

12        A.   Not to my knowledge, no.

13        Q.   And he's supposed to direct -- let me

14  finish.  He's supposed to direct Sgt. Abbott to

15  place in writing any allegations that she has;

16  right?

17        A.   Yes, that's correct.

18        Q.   And then he's supposed to submit it to his

19  superior, his supervisor within five days of being

20  notified; right?

21        A.   That's correct.  But let me, if I could --

22        Q.   Let me just ask the questions --

23        A.   -- correct what I was saying earlier,

24  which was no.  But as far as the sexual harassment

25  complaint is concerned, yes, he did and the forms

(ABBOTT - MARCH 9, 2012)

Page 821

1    are actually there and are filled out.

2           In fact, if you look at the back of this

3    and you look at the reporting, the sexual harassment

4    complaint form, this right here, I actually drove

5    this out to Jimmy Seabury's house to have Lora fill

6    it out and bring it back and then Hal and I believe

7    Lt. Hetman filled out their sections of this.

8           So for the purpose of this policy, yes,

9    that did happen for the sexual harassment.  I just

10   wanted to make that clear.

11          Q.   I'm talking about retaliation.

12          A.   Yes, I understand that.

13          Q.   Let me ask you this.  Is this the

14   procedure used when there's retaliation as well?

15          A.   No.

16          Q.   Is there another procedure?

17          A.   Yeah, to report it to the supervisors and

18   the supervisor to handle it, or the next line super-

19   visor to handle it.

20          Q.   So if there's retaliation for having

21   reported sexual harassment, then Sgt. Abbott's

22   responsibility is to tell her front line, first line

23   supervisor; right?

24          A.   Yes, sir.

25          Q.   Which is Capt. Smith, who she told; right?

(ABBOTT - MARCH 9, 2012)

Page 822

1      A.    Yes.

2      Q.    And then Capt. Smith's responsibilities

3  are set forth in this document, what he's supposed

4  to do is set forth in R-30, the second section,

5  which is order number 002 FD 96; right?  That's what

6  he's supposed to do?

7      A.    Yes.

8      Q.    Right?  And he did not do this; did he?

9      A.    For sexual harassment?

10     Q.    For retaliation for sexual harassment.  He

11  did not do that?

12     A.    No.

13     Q.    All right.  And when Sgt. Abbott came to

14  you in June, she was crying and upset; right?

15     A.    That's correct.

16     Q.    And she told you that she's been telling

17  Capt. Smith on a regular, constant basis of the

18  retaliation she was experiencing; correct?

19             MR. BROUSSEAU:  Object to the

20        form.

21             THE WITNESS:  Correct.

22             JUDGE KELLETT:  Overruled.

23  BY MR. LUIBRAND:

24     Q.    And you didn't know anything about that;

25  did you?

Page 823

1    A.    The constant retaliation that she was
2    supposedly enduring?
3                 JUDGE KELLETT:   No, that she had
4        been telling Smith.
5    BY MR. LUIBRAND:
6        Q.    That she had been telling Capt. Smith.
7        A.    No.
8        Q.    And how often would you speak with Capt.
9    Smith back in May and June of 2010?
10       A.    I would speak with him almost daily.
11       Q.    And he never said anything to you about
12   what she was experiencing or what she was reporting?
13       A.    No.
14       Q.    And he never did any investigation as to
15   what she was reporting?
16       A.    No.
17       Q.    So what if you -- Let me ask you this.
18   You said you're friends with Sgt. Abbott; right?
19       A.    That's correct.
20       Q.    And you find her to be -- you found her to
21   be a good employee; right?
22       A.    That's correct.
23       Q.    Not a malingerer?
24       A.    No.
25       Q.    Not a complainer?

(ABBOTT - MARCH 9, 2012)

Page 824

1    A.    No -- Well, let me back that up.  Not a

2    malingerer and a good employee, but Lora would, she

3    would complain about a lot of stuff, everything.

4    Q.    Okay.

5    A.    And there are personal things that Lora

6    would talk to me about that I don't believe are part

7    of this investigation that she would come in and

8    complain to me about, and I'm not going to get into

9    any of that stuff, the personal issues and personal

10   relationship.  But she would complain about stuff,

11   that's correct.

12   Q.    She was good at taking orders?

13   A.    Absolutely.

14   Q.    And she was respectful of the chain of

15   command?

16   A.    That's correct.

17   Q.    That was never abused at any time?

18   A.    Not to my knowledge, no.

19   Q.    So when she comes in crying, upset to you,

20   you recognize that it's serious for her?

21   A.    Absolutely.

22   Q.    Which to you gives credibility to her

23   having said, I've been telling Capt. Smith this

24   everyday and he's done nothing?  Did you believe her

25   when she told you?

(ABBOTT - MARCH 9, 2012)

Page 825

1    A.   Some credibility in that, yes, yes.

2    Q.   And there's nothing in this general order

3 about her going to you to tell you in your position

4 anything; right?

5    A.   No.

6    Q.   Her job is to tell Capt. Smith --

7         JUDGE KELLETT:  Wait a minute.

8    You said no.  The no -- is it -- he said

9    right.

10        Are you saying that his statement

11   -- there is nothing in there that says they

12   have to go to you is accurate or are you

13   saying no, it's not accurate?

14        THE WITNESS:  I'm saying there's

15   nothing in here that says that they have to

16   come to me.  It's reporting to the first

17   line supervisor.

18 BY MR. LUIBRAND:

19   Q.   And that would be Capt. Smith?

20   A.   Which would be Lt. Hetman for Sgt. Abbott.

21   Q.   Or Capt. Smith?

22   A.   Or Capt. Smith in Lt. Hetman's absence,

23 yes.

24   Q.   Now, you testified that Sgt. Piche was

25 suspended?

Page 826

1      A.   Yes.

2      Q.   And you said he gave you the middle

3  finger?

4      A.   It could have been me or it could have

5  been directed to the first sergeant, but it was in

6  our direction.

7      Q.   You and the first sergeant were

8  together --

9      A.   Or the Master Sgt.  I'm sorry.

10     Q.   You and the Master Sgt. Patricelli were

11 together, he gave you the middle finger, and he's

12 suspended?

13     A.   That's correct.

14     Q.   You didn't put him on notice; did you?

15     A.   What do you mean?

16     Q.   Well, when Sgt. Abbott came upset and

17 crying about what was happening to her, the

18 direction was put Piche on notice; right?

19     A.   Piche wasn't the subject of her complaint.

20     Q.   In your notes he is; isn't he?  Put Piche,

21 Higgitt, Connell, Hayes on notice; right?

22     A.   He was included on that as the union

23 president to make sure the word got out to everybody

24 else that they all had to basically back down and be

25 put on notice because they didn't know about the

Page 827

1  sexual harassment complaint.  They all thought it

2  was over the sleeping incident, which wasn't.

3      Q.  Did you consider when you were given the

4  finger to just put Piche on notice?

5      A.  It was more than just him giving the

6  finger.

7      Q.  Okay.

8      A.  Because he had been put on notice for

9  writing the stuff on the board prior to hopping in

10  his car and doing that.

11          So it was a continuation of the same, you

12  know, his same conduct, basically.  He was being put

13  on notice and given his piece of paper for writing

14  the stuff on the board, he goes out, hops in his

15  car -- this is all the same day -- and he does that

16  with his finger.  And then we found out that the

17  night before is when he made the statements about

18  Lt. Hetman.

19      Q.  And so then he's suspended?

20      A.  One big package for everything, yes.

21      Q.  In connection with Sgt. Abbott's complaint

22  when she comes crying and you learn that she'd been

23  telling Capt. Smith for at least a month about

24  retaliation, the thing that you did to Capt. Smith,

25  either he on his own or you told him, to place those

(ABBOTT - MARCH 9, 2012)

Page 828

1   five or four sergeants, supervisors on notice.  That

2   was the consequence of what she reported to you?

3        A.    That's incorrect.

4        Q.    Isn't that what your notes say --

5        A.    No.

6        Q.    -- put them on notice?

7        A.    The 21st was the placing them on notice.

8   The 25th is when she came in complaining about the

9   reassignment of Hoffman.

10       Q.    When she came and was upset and crying and

11  said Capt. Smith had done nothing --

12       A.    That was the 25th.

13       Q.    Did you tell her at that point in time it

14  was to put them on notice?

15       A.    No, it was the 21st when we put everyone

16  on notice.  It was the 25th when she came in crying

17  about the issue with Hoffman and with Caulfield.

18       Q.    Did you talk to her on the 21st when she

19  came in?

20       A.    I don't believe so.  I believe it was just

21  a report that was issued.  I mean I may have talked

22  to her, but I think it was -- I think it was just

23  that I received a report from the Captain and I

24  reviewed the report and said this is what needs to

25  happen.

(ABBOTT - MARCH 9, 2012)

Page 829

1    I could have talked to her then, but the
2    bigger of the two incidents was the 25th.  That's
3    when she came in and was very upset and said this is
4    what's going on; this is what they're doing to that
5    girl; this is what they did to Caulfield.
6    And in both incidents I took steps to make
7    sure that Connell got written up and that CO Hoffman
8    was moved.  I did that immediately.
9    Q.   In your notes of June 19th, '10, you say,
10   "Lora Abbott writes a report regarding the
11   harassment she has to deal with from employees after
12   she turned Fenton in for sexual harassment."
13   That's what you write in your notes;
14   right?
15   A.   That's a note based on a report that was
16   submitted.  It doesn't mean that this note or these
17   notes were taken in time as this was all occurring.
18   This was just a compilation of everything that --
19   all of these reports.
20   If the reports are submitted to Capt.
21   Smith, they don't necessarily make it to me that
22   exact day or that minute.
23   JUDGE KELLETT:  I'm confused.
24   I'm confused.  Let me ask a question,
25   please.  A few questions.

(ABBOTT - MARCH 9, 2012)

Page 830

1          The Complainant comes in and says

2     they're making rat noises; they're

3     harassing me.  It's in retaliation because

4     I reported sexual harassment.  What is the

5     response?

6          What I'm hearing is the response

7     is, they're harassing you because you

8     reported him for sleeping.

9          THE WITNESS:  No, that's not

10     correct.

11          JUDGE KELLETT:  Well, let's clear

12     up what's going on.

13          THE WITNESS:  No, again, the way

14     I see this as occurring is that the reports

15     were submitted to Capt. Smith and made

16     their way out to me and then I got them.

17          So it's not that somebody is

18     coming in the office to report it, and

19     we're talking on the 21st when the reports

20     come in.

21          So I read the report and then

22     say, this is what we need to do.  We've got

23     to put people on notice.  They think it's

24     something other than this.

25          And on the 25th when she came in

(ABBOTT - MARCH 9, 2012)

Page 831

1    and said, this is what they just did, and
2    this is actionable stuff I can work on and
3    correct, which is they moved Hoffman -- or
4    they placed Hoffman on this unit.
5           I corrected that right then and
6    there because it was actionable.
7           And then the second one was
8    Caulfield, Caulfield being placed some
9    place out.  That was actionable.  That was
10   taken care of.
11          So there's confusion about when
12   somebody came in and talked to me and when
13   reports were submitted.  That's the issue
14   here.  When Lora actually came in on the
15   25th, things were done that day.
16 BY MR. LUIBRAND:
17   Q.   But her obligation wasn't to come to you;
18 her obligation was to go to Capt. Smith.  She did
19 that; right?
20   A.   Yes.
21   Q.   All right.  It was only that she went to
22 you after Capt. Smith failed her; right?
23          MR. BROUSSEAU:  Objection to
24   form.
25   A.   That's exactly what she said, she said she

1  couldn't trust him and she didn't want to deal with

2  him anymore because she felt she wasn't getting

3  anywhere with him.

4  BY MR. LUIBRAND:

5      Q.   And at that point in time, she's already

6  falling apart?

7      A.   That's correct.

8      Q.   And at that point in time is there any

9  notes you have or that Capt. Smith has that you're

10 aware of, of any -- either of you interviewing

11 Connell, Higgitt, Piche, Hayes, or those four people

12 about what they were doing to her or what she was

13 claiming they were doing to her?  Is there anything?

14     A.   No.  The notes were -- it wasn't a note,

15 but the actions were to pull the video and to see

16 what was actually happening in the watch commander's

17 office that morning.

18     Q.   That's June 25th; right?

19     A.   That was the 25th.

20     Q.   How about the month beforehand?

21     A.   Those allegations never came to me.  Those

22 complaints never came to me except on the 21st when

23 that stuff came in.

24          Again, how do you prove who said what,

25 when they're saying it was a noise that was made.

(ABBOTT - MARCH 9, 2012)

Page 833

1  You're not given it was Officer X, it was Supervisor

2  Y.  They're noises; they're people.

3          The reports aren't specific.  It's nothing

4  that can be followed up on.

5          But when it's actionable information, I

6  followed up on it and I did the discipline I had to

7  do, or at least made sure the discipline was done.

8      Q.   Isn't it the obligation, both within the

9  rules and otherwise, that when she comes in and

10  says, this is what they're doing to me today, Capt.

11  Smith is supposed to go get the person who allegedly

12  did it and look at tapes and talk to the people that

13  were there then and say, Any of you see this?  Any

14  of you know what's going on?  Isn't that what

15  they're supposed to do?

16      A.   That's what they're supposed to be.

17      Q.   Because if a month goes by, nobody remem-

18  bers anything; right?

19      A.   That's correct.

20      Q.   And the rules are that's how it's supposed

21  to be; right?

22      A.   That's correct.

23      Q.   But Capt. Smith didn't investigate

24  anything as it happened; right?

25      A.   I can't speak to exactly what he said or

(ABBOTT - MARCH 9, 2012)

Page 834

1    what he did.

2         Q.   And when you were told what happened, you

3    didn't interview with respect to what happened over

4    that month?  You didn't interview Higgitt, Connell,

5    Piche, or anyone as to what happened?  Any of the

6    people who allegedly were causing her problems who

7    were harassing her?

8         A.   You keep saying Piche.  Piche was not in

9    her report that she submitted after she left on the

10   25th.  His name is not in there.

11             JUDGE KELLETT:  It's immaterial

12        whose name is in there.  What we want to

13        know is what did you know when, and what

14        did you do with the information, that's the

15        important question.

16             THE WITNESS:  What I ended up do-

17        ing was investigating the sexual harassment

18        complaint and interviewing people.  That

19        was the biggest thing.

20             MR. LUIBRAND:  Show him R-9,

21        please.

22             JUDGE KELLETT:  Certainly.

23        Passing R-9.

24   BY MR. LUIBRAND:

25        Q.   If you go to page 304, and at the

(ABBOTT - MARCH 9, 2012)

Page 835

1    bottom -- or the middle it says, "I'm finding it
2    virtually impossible to give my job the attention it
3    needs when I constantly have to watch my back from
4    these people; namely, Sgt. Piche, Master Sgt.
5    Higgitt, Sgt. Connell."
6              It's in there; isn't it?
7         A.   Yes, it is.  The specific that they did,
8    the action that they did; what is the specific that
9    they did that I should have followed up on?
10             That to me is the point of this thing -
11   What is it exactly that they did?  And when?  What
12   date did it happen?  Did Sgt. Piche call Sgt. Abbott
13   a name?  Did he make a noise?  What time did it
14   happen?  Where did it happen?  I can check that on
15   cameras and do all of that stuff.
16             It's all general.  It's all thrown in
17   there.  The thing that was actionable to me were
18   things I can actually prove and discipline people
19   for.
20        Q.   But going back to if Capt. Smith had done
21   his job as the rules say that he's supposed to, he
22   could have addressed each act as it happened,
23   allegations of rats or whatever, noises?
24        A.   If that was reported that way, that's
25   correct.

(ABBOTT - MARCH 9, 2

1        Q.    Okay.  So by the time

2   very hard to investigate what

3        A.    My focus was mainly

4   ment at that time.

5        Q.    But your focus was

6   sexual harassment; wasn't it?

7        A.    Absolutely.  Not completely.  I shouldⁿ

8   say completely because there was other steps being

9   taken and other investigations that were occurring

10  and other job duties and responsibilities that I

11  handle.

12       Q.    I understand.

13       A.    But the biggest thing was to make sure

14  that Sgt. Abbott's complaint was investigated.  And

15  I think I did a hell of a job with putting together

16  that whole investigation and getting rid of Sgt.

17  Fenton and doing it in a timely manner.

18       Q.    Whose focus was the retaliation, to

19  investigate it?

20       A.    It should have been Capt. Smith's as it

21  was happening.

22       Q.    Now, do you recognize that by Capt. Smith

23  not investigating or taking steps when there's

24  retaliation for filing a sexual harassment complaint

25  that people would then become reluctant to file

(ABBOTT - MARCH 9, 2012)

Page 837

1    sexual harassment complaints?

2        A.    I recognize that the majority of people

3    thought it was for sleeping.

4        Q.    That's not my question, though.

5            Do you recognize the importance of

6    investigating and taking steps with respect to

7    retaliation for reporting sexual harassment is

8    needed so that people are willing to come forward

9    and report sexual harassment?

10       A.    I do recognize that, and steps were taken

11   to discipline people for the perceived retaliation

12   that was occurring in the jail.

13           And I bring your attention back to Hoffman

14   with moving her off the housing unit; and Caulfield,

15   which was reported to me.  And those were the

16   biggest things that came out of the report that Sgt.

17   Abbott had submitted after she left on the 25th.

18       Q.    You testified here that you are also in

19   charge of training in the department?

20       A.    That's correct.

21       Q.    What sexual harassment training has been

22   given since the year 2000 to the sergeants in the

23   department?

24       A.    Recently, I think it was in September,

25   they were all given sexual harassment training

Page 838

1    again; when staff members come through training,
2    they get sexual harassment; and some of the
3    supervisory basics, although not all of them, sexual
4    harassment is also a component of that.
5         Q.    Prior to 2010, in the ten years before-
6    hand, what training in sexual harassment was given
7    by the department?
8         A.    In service training, there was one in
9    1997.
10        Q.    So 13 years before the allegations
11   regarding Sgt. Abbott and the other women, there had
12   been no sexual harassment training in the Rensselaer
13   County Sheriff's Department?
14        A.    Again, that would depend on the employee
15   when they were hired and what training they
16   received.  If they were hired after that date, they
17   would have gotten sexual harassment training.  It's
18   part of their basic.
19            If they went to a supervisory basic that
20   included sexual harassment, if they were promoted
21   within that 13 year time frame, they would have
22   gotten sexual harassment training.
23            But in-service training between 1997 and
24   what we just did recently, there wasn't in-service
25   training for everybody in sexual harassment.  It did

Page 839

1    not occur.

2         Q.   Now, you testified on several occasions,

3    including just now in cross, that people believe

4    that the -- withdraw that.

5              You testified on several occasions that

6    while there may have been retaliation, that it must

7    have been because the sergeants believed that Sgt.

8    Abbott had reported Fenton for sleeping; right?

9         A.   That was early on, yes.

10        Q.   Of the complained harassers - Higgitt,

11   Connell, Piche - which one of them told you that

12   that was their reason for their actions?

13        A.   I'm sorry, I don't understand that

14   question.

15        Q.   Who told you that retaliation was occur-

16   ring because Sgt. Abbott had reported Fenton for

17   sleeping?  Who told you that?

18        A.   That was -- well, it was -- what I gleaned

19   from other staff members, talking to other staff

20   members inside the jail as to -- and just hearing

21   from the rumor mill what people thought was going on

22   with this investigation.  And nobody knew during the

23   initial sexual harassment complaint that that's

24   exactly what it was, was that it was a sexual

25   harassment complaint that was going on.

(ABBOTT - MARCH 9, 2012)

Page 840

1          It was all kept pretty quiet.  We didn't

2     want to put it out there for benefit of the

3     complainants; nor would we have put it out there.

4          Again, they all thought it was, you know,

5     the sleeping thing.  There was one staff member that

6     had come in and given me a report on -- in fact, it

7     was Kelly Connell, who was Dave Connell's wife,

8     alleging that Sgt. Abbott was retaliating against

9     Sgt. Fenton and that she was trying to get her

10    husband tied up in this whole thing, and there were

11    some other unsavory things that were said in Kelly

12    Connell's report about Sgt. Abbott.

13          But a lot of that stuff was going back and

14    forth because no one really knew what the true heart

15    of the matter was, which was the sexual harassment

16    complaint, which finally surfaced.

17       Q.   I want to follow up on actually what I had

18    asked you.  You said that you gleaned from people

19    that they believed that the harassment was based

20    upon the sleeping reporting by Sgt. Abbott?

21       A.   That's correct.

22       Q.   So you had some idea that there was

23    harassment going on with respect to Sgt. Abbott?

24       A.   Well, I believe that it was going on.  If

25    there was anything going on, whether it was a noise

(ABBOTT - MARCH 9, 2012)

Page 841

1   being made or if anything was occurring inside the

2   jail, it was because of that.

3          Again, actionable information --

4               JUDGE KELLETT:  Why would it be

5        because of that?  I'm struggling with the

6        sleeping and the sexual harassment com-

7        plaint as kind of being simultaneous in

8        the report that I saw.

9               THE WITNESS:  One preceded the

10       other one.  The sleeping preceded the

11       sexual harassment.

12              JUDGE KELLETT:  You're saying

13       people are hearing this.  How are they

14       hearing about one and not the other?  Who

15       would have been saying she reported him for

16       sleeping, but not, oh, she reported him for

17       sexual harassment?

18              THE WITNESS:  Sgt. Fenton was

19       written up and he was served his disci-

20       pline, but he wasn't suspended.  It wasn't

21       something we could have suspended him on,

22       so he was still at the work place.  He was

23       still in the work place.

24              JUDGE KELLETT:  So he was written

25       up for sleeping and that's what triggered

(ABBOTT - MARCH 9, 2012)

Page 842

1        it; is what you're saying?

2                    THE WITNESS:  I believe so.

3                    JUDGE KELLETT:  Do we know when

4        he was written up?

5                    MR. BROUSSEAU:  Yes, it's in the

6        documents.  It was like April 27th, I

7        believe.  It was a full month before the

8        sexual harassment complaint.

9                    And then he's on the job for that

10       month.  She makes the sexual harassment

11       complaint on the 25th, and then he's out of

12       work.

13                   JUDGE KELLETT:  It's getting a

14       little confusing.  It seems like everything

15       is going on at the same time, so I'm trying

16       to distinguish why one and not the other.

17                   Thank you.  Sorry, go ahead,

18       counsel.

19  BY MR. LUIBRAND:

20       Q.    Piche was president of the union?

21       A.    That's correct.

22       Q.    Would he be involved in any reports

23  concerning improper actions by employees?

24       A.    I don't understand the question.

25       Q.    If there's any allegations against an

Page 843

1   employee, would the president of the union be

2   informed?

3        A.    That's correct.

4        Q.    Was Fenton ever disciplined for sleeping?

5        A.    I don't know if we actually took a

6   sanction from him; if we ever really made it to that

7   point because I think what happened was there was

8   the complaint, the charges for sleeping, and then

9   the process allows for arbitration, so that took

10  time, and it never really occurred.

11            The second incident -- not the second

12  incident, but the sexual harassment complaint then

13  came in and that was vigorously investigated.

14            And then I think the sexual harassment one

15  kind of took precedent over sleeping.  Like I had

16  said earlier, sleeping, you can do up to four times

17  and, you know -- not that it wasn't a big issue.  It

18  was a big enough issue.

19            But the focus was then on the sexual

20  harassment, and then that's what we ultimately

21  suspended him for, and then, you know, got rid of

22  him for the sexual harassment.

23        Q.    Was there ever any charges advanced at

24  all --

25        A.    Well, charges --

(ABBOTT - MARCH 9, 2012)

Page 844

1      Q.    Let me finish.   Let me finish.

2            Was there ever any discipline started

3    against Fenton for sleeping on the job?

4      A.    Yes, yes.

5      Q.    Was there ever any discipline filed

6    against Fenton for sex harassment?

7      A.    Yes.

8      Q.    You used a phrase that you wanted the --

9    withdraw that.

10           You used a phrase that when Sgt. Abbott

11   came to you complaining about what was happening to

12   her, that you wanted the people involved - Piche,

13   Connell and Higgitt - to knock off the high school

14   type stuff; right?

15           Do you remember using that phrase?

16     A.    I possibly did.

17     Q.    What do you mean by that high school type

18   stuff?

19     A.    In the work environment, sometimes people

20   act like, they act like high schoolers.

21     Q.    How so?   What about their conduct led you

22   to believe that it should be characterized as high

23   school type behavior by these fellows?

24     A.    It goes both ways and it's stuff that's

25   said.   Like, for instance, in the report from Kelly

(ABBOTT - MARCH 9, 2012)

Page 845

1   Connell that she ended up writing, she said that

2   Sgt. Abbott had said to her that she had gotten her

3   promotion by performing oral sex on an admini-

4   strator.

5            Now, she put that in her report, and I

6   don't know if that actually was said or if it wasn't

7   said.  The fact that there was this tit for tat

8   because she believed her husband was being targeted

9   by Lora Abbott, just -- it's childish.  It makes no

10  sense to me.

11           And that's the kind of stuff that I talk

12  about.  A lot of times the place is like, it's like

13  ice -- it's nonsense and rumors --

14                JUDGE KELLETT:  I got lost on the

15       she's.  Kelly --

16                THE WITNESS:  No, that Lora did.

17                JUDGE KELLETT:  Lora got a

18       promotion by doing oral sex?

19                THE WITNESS:  Yes.

20                JUDGE KELLETT:  That's what she

21       said?

22                THE WITNESS:  Yes, that's what

23       she said.

24       A.   In my statement, that's what I mean.  It's

25  a lot of times it's nonsense.  They did this to me;

(ABBOTT - MARCH 9, 2012)

Page 846

1    they did that to me; and it's childish, childish

2    stuff.

3              There was the incident with Fenton and

4    Sgt. Abbott, in the reports where Sgt. Abbott was

5    upset at the fact that Fenton wrote in a log book

6    that he was sent down to the unit to take care of an

7    issue by Sgt. Fenton.  Sgt. Abbott took exception to

8    that.

9              He, he's supposed to write in the log book

10   when he goes on a unit when he's down there, and

11   Sgt. Abbott took it as though it was Fenton

12   attacking her about was he supposed to do that; why

13   he's on a unit and what the reason is for.  She felt

14   that it was retaliation.

15             There was another incident where Sgt.

16   Knight --

17                  JUDGE KELLETT:  Is that the page

18        we looked at extensively; can we agree on

19        that?

20                  MR. BROUSSEAU:  Yes.

21                  MR. LUIBRAND:  Yes.

22        A.   Sgt. Knight was yelled at because he was

23   going to do a switch with Sgt. Fenton, I believe,

24   and Sgt. Abbott was calling him a liar in roll call

25   because apparently at some point Sgt. Knight had

(ABBOTT - MARCH 9, 2012)

Page 847

1    said that he wasn't going to do the switch, but then

2    he changed his mind and did the switch and it upset

3    Sgt. Abbott.  And so she was calling him a liar in

4    front of the people, which is referenced in Ofc.

5    Connell's report.

6            That's the kind of stuff that I'm talking

7    about when I'm talking about high school stuff.

8    It's just -- it's nonsense.

9            John can switch with whoever he wanted to

10   switch with, Johnny Knight.

11           Fenton is supposed to sign in the log book

12   when he goes down to the housing unit.

13           That is inter-dispersed in a lot of this

14   stuff.  The main focus that I had was with the

15   sexual harassment complaint and making sure that I

16   can substantiate that because I had the three,

17   possible three complainants to the whole thing.

18           So in trying to wave myself through all of

19   these complaints and all of these reports, it was

20   the actionable stuff that I did take action on.

21           I can't tell you why other people did what

22   they did or why they didn't do things they should

23   have done, but I'm telling you I took it serious and

24   that's why Sgt. Abbott came to me to get this stuff

25   handled.

(ABBOTT - MARCH 9, 2012)

Page 848

1    BY MR. LUIBRAND:

2        Q.   My question was that you characterized the

3    actions of Piche, Higgitt, and Connell towards Sgt.

4    Abbott as high school type stuff.

5             Is that what you meant, that that kind of

6    activity was high school type stuff?

7        A.   What I just explained as examples is the

8    kind of examples that happens in there all the time,

9    and if they had any interaction with Sgt. Abbott

10   that that would be it.

11            But Mark Piche, there's nothing in the

12   reports that show that he did anything to Sgt.

13   Abbott specifically.  He called her a name on a

14   certain date or he prevented her from getting

15   something on a certain date or he prevented her from

16   doing her job on a certain date, it's not in there.

17            It's not in the reports.  It's just trying

18   to be made into something it's not.  It's not in

19   there.  He wasn't in the report that was submitted

20   after the 25th.

21       Q.   What conduct directed towards Sgt. Abbott

22   by Connell, Higgitt and/or Piche would you

23   characterize as high school type stuff?

24            JUDGE KELLETT:  I heard what it

25       was and it was going in both directions.

Page 849

1        Move on.

2   BY MR. LUIBRAND:

3        Q.    You testified that no one complained of

4   being harassed after the reports except for Sgt.

5   Abbott; correct?

6        A.    Can you please clarify after what reports?

7        Q.    You said that after Sgt. Abbott submitted

8   her report and Hoffman and Stover to the extent she

9   did, submitted their reports, none of those other

10  women complained of retaliation except for Sgt.

11  Abbott; correct?

12       A.    No, Hoffman complained about what she

13  perceived as harassment by Sgt. Piche.

14             But then since that date, since I did the

15  interview with her and Sgt. Piche, there have been

16  no complaints from Hoffman.

17             There have been no complaints from Stover.

18             MR. LUIBRAND:  I would like to

19       have just a moment to go through my notes,

20       your Honor, and I'll wind up.

21             THE WITNESS:  May I take that

22       break now?

23             JUDGE KELLETT:  Yes, of course.

24             (Break taken.)

25  BY MR. LUIBRAND:

(ABBOTT - MARCH 9, 2012)

Page 850

1      Q.   Do you have R-33, which is your notes in

2  front of you?

3      A.   Yes, I do.

4      Q.   If I look at your notes, there's an entry

5  for 4/27/10; do you see that?

6      A.   Yes.

7      Q.   And it has to do with Sgt. Fenton, and

8  then there's no entries for anything being done

9  between April 27th, 2010 and May 27th, 2010.

10          Do you see that?

11     A.   Yep.

12     Q.   And nothing happened during that period of

13  time by way of investigation or anything; correct?

14     A.    I can't say that for 100 percent certain.

15  I don't know what steps, if any, the captain took,

16  you know.

17          Again, these are just, these are just

18  bullet points off of reports that were submitted and

19  then memories that I may have had.

20     Q.   Did you ask Capt. Smith at any point in

21  time what, if anything, he did from April 27th to

22  May 27th as far as relates to any actions directed

23  towards Sgt. Abbott?

24     A.   No.

25               MR. LUIBRAND:  That's all I have.

(ABBOTT - MARCH 9, 2012)

Page 851

1    Thank you, your Honor.

2              JUDGE KELLETT:  Redirect?

3              MR. BROUSSEAU:  Just a couple.

4                   -  -  -

5              REDIRECT EXAMINATION

6  BY MR. BROUSSEAU:

7    Q.    Sgt. Kevin Smith has given testimony at

8  this hearing.  You haven't talked to Capt. Smith

9  about his testimony at this hearing; have you?

10   A.    No.

11   Q.    Have you ever reviewed his transcript?

12   A.    No.

13   Q.    Did you review Lora Abbott's transcripts?

14   A.    No.

15   Q.    Do you know what -- do you know if Lora

16  Abbott was giving Capt. Smith any details regarding

17  this alleged harassment?

18   A.    Well, can I back up, because now as I'm

19  thinking about my answer -- No, Capt. Smith and I

20  did talk about, we did talk about -- we didn't talk

21  about -- no, we didn't talk about his testimony.  We

22  didn't talk about his testimony.

23   Q.    Because you were here that one day?

24   A.    Yep.

25   Q.    Do you know what details regarding this

(ABBOTT - MARCH 9, 2012)

Page 852

1    alleged harassment Lora Abbott was giving to Capt.
2    Smith during these oral meetings?
3        A.   During the meetings when she would talk to
4    him about stuff in the morning?  No.
5        Q.   Do you know what his testimony was
6    regarding whether he asked her to provide him with
7    more specifics so that he could do something?
8        A.   I don't know.
9        Q.   And when you received Exhibit R-9, which
10   was Lora Abbott's complaints dated 6/19 and then
11   reviewed by Capt. Smith on 6/21 regarding some
12   harassment, after that is when everyone was put on
13   warning?
14       A.   That day.
15       Q.   Now, on 6/21 -- or I'm sorry, do you have
16   R-9 with you still?
17       A.   Yes.
18       Q.   On R-9, reviewing R-9, does R-9 mention
19   anywhere people swearing at her?
20       A.   I would have to read the whole thing
21   again.
22       Q.   All right.  Let me direct your attention
23   to the last page --
24                JUDGE KELLETT:  Wait, he's
25       reading this.

(ABBOTT - MARCH 9, 2012)

Page 853

1           MR. BROUSSEAU:  Oh, okay.

2               (Pause for review of exhibit.)

3           JUDGE KELLETT:  Have you finished

4     your reading?

5           THE WITNESS:  Yes, your Honor.

6  BY MR. BROUSSEAU:

7     Q.   In that complaint, does Lora Abbott

8  complain about anyone swearing at her?

9     A.   No.  On page 4 of 4, I do have to point

10 out what I did find, though.

11    Q.   What's that?

12    A.   Which is in line with what you were

13 saying.  It says that "most people don't realize why

14 Sgt. Fenton is out and so they were making up

15 stories for gossip.  Myself and Hoffman have been

16 berated, belittled, humiliated and embarrassed."

17    Q.   I'm going to refer you to the last page,

18 top paragraph, where it says, there's a sentence,

19 "They think and call me a rat because they assume

20 he's out of work because he made a bed and was

21 sleeping.  The administration knows better."

22         And after you read that report, that's

23 when you had everyone put on warning; right?

24    A.   That's correct.

25    Q.   Okay.  And then the second time was June

(ABBOTT - MARCH 9, 2012)

Page 854

1    25th -- or withdrawn.

2            You also were dealing with a retaliation

3    complaint from Michelle Hoffman where she made a

4    specific complaint that Sgt. Piche made a statement

5    to her; correct?

6        A.   He didn't make -- she felt that the

7    statement was made to her.

8        Q.   And you investigated that and you talked

9    to Piche?

10       A.   Yes.

11       Q.   Then she had her typewritten report that

12   she gave to you on June 25th, 2010, after the

13   incident in the control room; right?

14       A.    It was dated the 25th, but I think I got

15   it, I think I got it like the next day I think, or

16   maybe the day after.

17       Q.   And in that she complains about Sgt.

18   Caulfield or Gary Caulfield's placement, and then

19   she complains about Michelle Hoffman's placement.

20   And again in this document, did she make any

21   specific claims of anyone swearing at her or calling

22   her a rat?

23       A.    I don't believe there's anything in there

24   specifically.  I would like to take a look at it,

25   though.

(ABBOTT - MARCH 9, 2012)

Page 855

1          JUDGE KELLETT:  What document do
2     you want him to review?
3          MR. BROUSSEAU:  I'm sorry, R-12.
4     I thought you had it.
5          MR. LUIBRAND:  The document
6     speaks for itself.  If it's in there; it
7     is.  If not, it's not; right?
8          JUDGE KELLETT:  I'll give him
9     R-12.
10          THE WITNESS:  With a quick
11     glance, I don't see anything in there.
12          MR. BROUSSEAU:  No further
13     questions.
14                    -  -  -
15               RECROSS-EXAMINATION
16     BY MR. LUIBRAND:
17     Q.   In keeping with that, in that same
18     exhibit, which is R-12, Sgt. Abbott reported at page
19     five, "I hear them call me rat and bitch under their
20     breath;" right?  Page five, the second to last
21     paragraph.
22     A.   Second to last -- oh, I'm sorry.  Yes,
23     sir.
24     Q.   And at page one, the first page of it, she
25     said that "Lt. Hetman has his hands tied"; right?

(ABBOTT - MARCH 9, 2012)

Page 856

1      A.   Yes, sir.

2      Q.   And that she was told by Capt. Smith that

3  he doesn't know what to do; right?

4      A.   That Capt. Smith doesn't know what to do?

5      Q.   She says, "I have been told by Capt. Smith

6  that he doesn't know what to do."

7      A.   That's what it says.

8      Q.   And that "the humiliating and embarrassing

9  bullying has gotten out of control"?

10     A.   And that is --

11     Q.   On that next sentence, right after that.

12     A.   Yes.

13              MR. LUIBRAND:  That's all I have,

14     your Honor.

15              MR. BROUSSEAU:  Just a quick

16     follow-up.

17                  -  -  -

18              REDIRECT EXAMINATION

19  BY MR. BROUSSEAU:

20     Q.   The sentence on page five about the, "I

21  hear them calling me a rat," can you read the

22  complete sentence?

23     A.   "I hear them call me rat and bitch under

24  their breath, so I don't know who did it."

25     Q.   Okay.  So she did not know who was doing

(ABBOTT - MARCH 9, 2012)

Page 857

1    it; right?

2         A.    According to that statement.

3         Q.    And that's the statement she gave you

4    after she had left the job on --

5         A.    This is the report I requested her to do

6    about what's been going on.

7                    MR. BROUSSEAU:  All right.

8                    JUDGE KELLETT:  Would it be fair

9         for me to assume that you need a specific

10        incident with names, places and allegations

11        of actions to investigate?

12                   THE WITNESS:  The reluctance of

13        people to report, your Honor, is a big

14        problem.

15                   If incidents actually happen and

16        they can identify who's done it, then I can

17        build around that and who else was there,

18        what time did it happen.  I can put people

19        in places.

20                   It's what I had to do to

21        determine the incidents for Hoffman and

22        Stover because they couldn't remember the

23        day, but when they told me who they worked

24        with and what holiday it may have been

25        around -- Hoffman, when she was harassed

Page 858

1    had like Easter socks on with little chicks

2    or something I think her report says.  So I

3    would -- so that's details that help me to

4    do that job.

5             If I don't have them, they're

6    allegations that are in the air and it

7    makes it very difficult for me to narrow

8    things down.

9             JUDGE KELLETT:  How many people

10   work at the jail, roughly?

11            THE WITNESS:  If I was to take a

12   guess, I would say -- well, I know there's

13   138 sworn staff, but not all the positions

14   are filled.

15            JUDGE KELLETT:  But everyone we

16   talked about here is sworn staff?

17            THE WITNESS:  Kristin Wing is

18   not; she was civilian.

19            And then there's another, I would

20   say, another 25 to 30 civilian staff.

21            JUDGE KELLETT:  Thank you.

22            I have no further questions of

23   this witness.  I'll take all your exhibits,

24   though.  Thank you.

25            (Whereupon, the witness was

Page 859

1    excused.)

2              MR. BROUSSEAU:  Your Honor, you

3    want to give me that one letter and I'll

4    get it marked and get it in before we

5    forget?

6              (Respondent's Exhibit 34 marked

7    for identification.)

8              MR. BROUSSEAU:  I'm just going to

9    offer into evidence Respondent's Exhibit

10   34, which is a letter dated February 7,

11   2012 that I hand delivered to the Judge and

12   to Mr. Luibrand that contains my analysis

13   of the times when Sgt. Abbott, Sgt.

14   Connell, Sgt. Piche, and Sgt. Higgitt could

15   have worked together on the same shift,

16   according to the duty rosters and time

17   sheets that are in evidence already.

18             MR. LUIBRAND:  I have no

19   objection for that limited purpose.  It's

20   really an argument document, but I'm okay

21   with it as it's been described.

22             JUDGE KELLETT:  Okay, and there

23   was an extensive attempt on the record to

24   try and figure out the schedules, some of

25   which seem to be repeated in that in terms

(ABBOTT - MARCH 9, 2012)

Page 860

1    of the number of days.

2              This is received and I do

3    appreciate this very much.  Thank you.

4              (Whereupon, Respondent's Exhibit

5    34 was received into evidence.)

6              JUDGE KELLETT:  Any further

7    witnesses or rebuttal witnesses?

8              MR. LUIBRAND:  No, your Honor.

9              JUDGE KELLETT:  Well then, I am

10   having Complainant's exhibits copied, so

11   hopefully that will be resolved.

12             Do we have any further issues?

13             MR. LUIBRAND:  I don't think I

14   have a copy of that letter.  I think I saw

15   it and I may have misplaced the very last

16   exhibit that just came in.

17             JUDGE KELLETT:  Why don't I run

18   and make it?

19             MR. LUIBRAND:  Thank you, your

20   Honor.

21             (Break taken.)

22             JUDGE KELLETT:  Gentlemen, are

23   there any requests to submit post-hearing

24   findings of fact, conclusions of law?

25             MR. LUIBRAND:  Yes, your Honor.

(ABBOTT - MARCH 9, 2012)

Page 861

1          MR. BROUSSEAU:  Yes, your Honor.

2          JUDGE KELLETT:  And how much time

3    do you think you need?

4          MR. LUIBRAND:  Your Honor, I'm

5    going to ask for 60 days when I get the

6    last transcript.

7          JUDGE KELLETT:  Thirty days from

8    receipt of the transcript.

9          MR. LUIBRAND:  Thirty days, okay.

10          JUDGE KELLETT:  Which should be

11    here in two weeks, within two weeks under

12    our contract.  So that's going to be the

13    last week in April.  April 30th?  Is that

14    okay, April 30th?

15          MR. LUIBRAND:  Is that simultane-

16    ous submissions, your Honor?

17          JUDGE KELLETT:  Please.

18          MR. LUIBRAND:  And do we direct

19    it directly to your Honor or some other

20    location?

21          JUDGE KELLETT:  No, to me.  Send

22    it to me.

23                  -   -   -

24              TRANSCRIPT ORDER

25          MR. BROUSSEAU:  I would like to

(ABBOTT - MARCH 9, 2012)

Page 862

1      order the transcripts.

2              MR. LUIBRAND:  Yes, I order this

3      next transcript.

4              MR. BROUSSEAU:  Yes, I already

5      have the other ones, and I want this one as

6      well.

7              JUDGE KELLETT:  And they're going

8      to fix the pages.

9              MR. LUIBRAND:  And for us as

10     well, so we can refer to what your Honor is

11     going to be looking at.

12             JUDGE KELLETT:  Right.  Which

13     when I looked at it, it got page numbers in

14     the index, so I really never even thought

15     to look at it.

16             Thank you very much, Christine,

17     for helping us with that.  And thank you,

18     Counsel, for the hearing.

19             The matter is closed subject to

20     the receipt of the post-hearing briefs.

21                 -   -   -

22             (Whereupon, the hearing

23         was concluded at 12:40 p.m.)

24                 -   -   -

25

(ABBOTT - MARCH 9, 2012)

Page 863

1              C E R T I F I C A T E
2
3
4   STATE OF NEW YORK    )
                         ss.:
5   COUNTY OF SARATOGA   )
6
7
         I, CHRISTINE GREENAWAY, Registered Professional
8
    Reporter and Notary Public, do hereby certify that
9
    the foregoing transcript to which this Certificate
10
    is annexed is a true and correct transcript of my
11
    original stenographic notes.
12
         I further certify that I am neither an attorney
13
    nor counsel for, nor related to or employed by any
14
    of the parties to the action in which this
15
    deposition is taken; and, furthermore, that I am
16
    not a relative or employee of any attorney or
17
    counsel employed by the party hereto or
18
    financially interested in the action.
19
20
21
22
23                      CHRISTINE GREENAWAY
24
25

(ABBOTT - MARCH 9, 2012)

Page 864

```
1                        I N D E X
2
3    STATEMENTS                                      PAGE
4    Judge Christine Marbach Kellett                  716
5
6    RESPONDENT'S CASE
7
     WITNESS           Direct    Cross    Redirect    Recross
8
9    LT. JAMES KARAM     723      809       851         855
                          --       --       856          --
10
11
     VOIR DIRE
12
     Respondent's
13
     Exhibit 11          --       762
14   Exhibit 13          --       752       753
     Exhibit 21          --       802
15   Exhibit 32          --       740
     Exhibit 33          --       728
16
17
     EXHIBITS REFERENCE                            PAGE
18
19   Respondent's  9                              756
     Respondent's 10                              756
20   Respondent's 12                              855
21
22   TRANSCRIPT ORDER                              861
23
     VIDEO REVIEW                                  791
24
25
```

(ABBOTT - MARCH 9, 2012)

Page 865

```
 1              E X H I B I T S
 2
    NUMBER/IDENTIFICATION              I.D.   REC'D
 3
 4  Respondent's
 5  Exhibit 11...........................  761    768
    Note written by Lt. Karam on inside of
 6  Investigative folders dated 6/21/2010
 7
    Exhibit 13...........................  751    754
 8  Criminal investigation records
 9
    Exhibit 21...........................  801    805
10  General Rensselaer County sexual
    harassment policy
11
12  Exhibit 30...........................  801    806
    Rensselaer County Sheriff's Department
13  General Order, No. 01 SD 96.
14
    Exhibit 32...........................  739    740
15  Rensselaer County Office of the Sheriff
    Corrections Bureau Administrative Manual
16
17  Exhibit 33...........................  727    730
    Time line of reports and actions
18  prepared by Lt. Karam
19
    Exhibit 34...........................  859    860
20  Letter dated February 7, 2012 containing
    time and attendance sheets
21
22
23
                    -   -   -
24
25
```

[& - 8:37:43]                                                                    Page 1

| & | 2 | 2nd 741:14 | 713 717:21 |
|---|---|---|---|

**&**   715:3 716:23

**0**

**002**   822:5
**01**   805:12 865:13

**1**

**1**   717:19 718:3,3,12
**10**   756:6,9 769:15
  829:9 864:19
**100**   766:18 769:14
  770:20 781:21
  850:14
**10144564**   714:10
  716:8
**11**   761:23 762:2,17
  765:25 766:14,15
  768:21,22,24
  864:13 865:5
**12**   855:3,9,18
  864:20
**12110**   715:10
**12180**   723:2
**12203**   715:5
**12220**   714:19
**12:40**   862:23
**13**   751:17,21,25
  752:19 754:16
  838:10,21 864:14
  865:7
**138**   858:13
**16**   788:15
**16gb100204**   714:10
  716:9
**1988**   724:3
**1990**   724:12
**1992**   724:13
**1993**   724:13
**1997**   838:9,23
**1999**   724:14
**19th**   755:23,24
  800:1 829:9

**2**   724:14
**2000**   837:22
**2001**   724:14
**2010**   724:16 726:2
  726:11 730:17
  733:17 735:20
  740:16 756:17
  770:5 800:18
  804:15 806:25
  817:24 823:9 838:5
  850:9,9 854:12
**2011**   729:24 784:12
**2012**   714:14 859:11
  865:20
**2049**   714:19
**20th**   729:23
**21**   756:17 770:5
  801:19,23 802:6
  803:6,7,21 804:4,10
  804:12 805:4
  864:14 865:9
**21st**   729:23 755:8
  766:22 770:7 828:7
  828:15,18 830:19
  832:22
**25**   858:20
**25th**   787:2,5 800:17
  806:25 807:25
  817:12,18,20 828:8
  828:12,16 829:2
  830:25 831:15
  832:18,19 834:10
  837:17 842:11
  848:20 854:1,12,14
**26th**   787:5
**27**   718:4 730:17
**27th**   733:17 735:20
  817:23 842:6 850:9
  850:9,21,22
**28**   718:12
**28th**   714:18
**296**   715:4

**3**

**3**   718:3
**30**   801:19 805:10
  806:13 818:3
  819:25 822:4
  858:20 865:12
**304**   834:25
**30th**   861:13,14
**318**   717:19
**32**   739:6,11 740:2,8
  740:22 864:15
  865:14
**320**   717:20
**33**   727:23 728:2,11
  730:7 850:1 864:15
  865:17
**34**   859:6,10 860:5
  865:19

**4**

**4**   853:9,9
**4/27/10**   850:5
**4000**   723:1
**42**   791:19

**5**

**518**   715:5,11
**518.474.3419**   714:20
**563**   717:20
**564**   717:20

**6**

**6/19**   852:10
**6/21**   852:11,15
**6/21/10**   762:23
**6/21/2010**   762:10,12
  865:6
**6/25/2008**   791:18
**60**   861:5
**6:50:26**   792:16
**6th**   717:15

**7**

**7**   859:10 865:20

**713**   717:21
**714**   717:23
**716**   864:4
**723**   864:9
**727**   865:17
**728**   864:15
**730**   865:17
**739**   865:14
**740**   864:15 865:14
**751**   865:7
**752**   864:14
**753**   864:14
**754**   865:7
**756**   864:19,19
**761**   865:5
**762**   864:13
**768**   865:5
**783-1100**   715:11
**791**   864:23
**7:03**   792:24
**7:09**   793:8
**7:21:17**   793:21
**7:21:30**   793:25
**7:22:38**   794:1
**7:23:30**   795:6
**7:25**   795:11

**8**

**801**   865:9,12
**802**   864:14
**805**   865:9
**806**   865:12
**809**   864:9
**851**   864:9
**855**   864:9,20
**856**   864:9
**859**   865:19
**860**   865:19
**861**   864:22
**862-9292**   715:5
**8:00**   796:10
**8:02:31**   797:1
**8:37**   797:13
**8:37:43**   798:2

**[8:41:56 - allow]**

**8:41:56**  798:12

**9**

**9**  714:14 755:21
756:2,8 766:11,12
769:10,14 796:16
834:20,23 852:9,16
852:18,18,18
864:19
**9,000**  785:21
**950**  715:10
**96**  805:12 822:5
865:13
**9:00**  714:14

**a**

**a.m.**  714:14 791:19
792:7 793:16
**abbott**  714:4 716:6
716:17 725:23
726:9 730:18 731:7
731:9,10,11,13,18
731:18 732:5
735:21 736:3,4
737:3 738:9 742:5,7
742:11 743:4,8,8,22
744:3,7,11,21 745:3
745:7,12 746:3,7,10
747:25 750:18,22
753:8,8 754:22
755:4,9,13,15
760:25 761:4,11,20
763:3,11,14,25
764:23,25 768:7
769:10,11 771:4
786:13,16,23 787:8
788:18,21,25 789:5
791:22 793:5,7
794:2,18 799:3,11
799:17 800:11
805:19 806:18
807:8,11,18 808:3,5
809:7,11 810:12,18
811:7,13 812:12,19
813:4,10 814:2
815:1 817:4,23

818:1,19 820:2,14
822:13 823:18
825:20 826:16
829:10 835:12
837:17 838:11
839:8,16 840:8,12
840:20,23 844:10
845:2,9 846:4,4,7
846:11,24 847:3,24
848:4,9,13,21 849:5
849:7,11 850:23
851:16 852:1 853:7
855:18 859:13
**abbott's**  726:3 727:9
729:20 730:13
750:23 756:24
787:3 791:23 799:8
813:18 814:20
821:21 827:21
836:14 851:13
852:10
**abettor**  714:8 716:8
**abilities**  732:4
**able**  719:7 732:1
737:6,10 742:20
745:8,10 750:10
776:6,7,14,15 799:1
800:7 810:3 812:23
**absence**  725:7
825:22
**absolutely**  748:13
824:13,21 836:7
**abused**  824:17
**acceptable**  760:10
760:13
**accepted**  758:1
816:7
**accepting**  815:25
**accord**  819:25
**accurate**  734:24
740:3 752:14
825:12,13
**accusation**  784:18
**act**  816:18 835:22
844:20,20

**action**  758:18,22
764:17 812:22
835:8 847:20
863:14,18
**actionable**  831:2,6,9
833:5 835:17 841:3
847:20
**actions**  728:5 738:7
742:6 743:1 750:3
754:23 755:4 757:7
758:12 768:16
779:14 783:9
819:10 832:15
839:12 842:23
848:3 850:22
857:11 865:17
**activities**  747:11
768:6
**activity**  768:19
795:11 848:6
**acts**  818:21
**actual**  729:5 731:22
753:17 771:25
780:14,15 814:12
**adamant**  742:11
**addition**  736:6
751:3
**additional**  735:23
743:4
**additionally**  718:2
**address**  721:21
722:23,25 723:1
760:15 799:23
**addressed**  769:9
776:11 783:19
815:15 835:22
**addresses**  783:13
**admin**  738:14,22
748:18 757:17
**admini**  845:3
**administration**
779:11 853:21
**administrative**
714:17 723:16
738:23 739:1,13

740:4 865:15
**admit**  742:25
743:19
**advance**  749:20
**advanced**  843:23
**advice**  738:2
**advises**  767:6 769:6
**affairs**  724:19,22
725:5,12,20
**afield**  765:16
**agree**  718:16 742:9
810:12 811:9
846:18
**agreed**  788:19
**agreement**  735:6,9
745:16
**ahead**  797:14
842:17
**ahold**  743:14
**aider**  714:8 716:8
**air**  858:6
**albany**  714:13,19
715:5 716:24
743:10,15
**alj**  718:2
**allegation**  729:16
811:25 820:9
**allegations**  724:23
726:20 729:17
733:25 758:25
765:15 769:19
799:18 820:15
832:21 835:23
838:10 842:25
857:10 858:6
**alleged**  747:11
749:14 786:11,16
851:17 852:1
**allegedly**  749:11
763:15 833:11
834:6
**alleging**  774:17
775:1 779:12 840:8
**allow**  804:25

[allowed - believed]

**allowed** 737:15 757:21,23 810:16
**allowing** 778:8
**allows** 735:10 843:9
**alright** 773:13
**amber** 750:22
**amended** 728:22
**amount** 786:2 808:1 810:17
**analysis** 719:24 720:13 859:12
**angry** 757:25 758:5
**annexed** 863:10
**answer** 722:2 744:24 786:8 851:19
**answering** 722:9 813:11 814:7
**answers** 815:8
**ant** 742:17
**anybody** 800:5 813:8
**anymore** 750:12 786:2 788:2 800:11 832:2
**apart** 832:6
**apparent** 774:14
**apparently** 846:25
**appear** 738:12
**appearance** 795:14
**appearances** 715:1 716:14,15
**appears** 762:7 798:14 802:4
**applicable** 804:14 805:3
**applies** 804:5
**apply** 803:11,21
**appreciate** 860:3
**approaching** 796:6
**appropriate** 758:17
**approximate** 779:21
**approximately** 724:12 732:2

**april** 729:23 842:6 850:9,21 861:13,13 861:14
**arbitration** 843:9
**areas** 724:20 790:16
**argument** 859:20
**arrangement** 746:20
**ascertain** 758:21
**asked** 721:22 722:3 736:15,16 745:22 749:24 759:18 764:8 770:11 771:22 777:23 840:18 852:6
**asking** 744:25 760:12 764:11 811:7 813:14 815:18
**assault** 775:11
**assaulted** 726:10
**assaults** 753:11 813:1 814:13,19
**assign** 726:25
**assigned** 716:11 725:2 727:7 733:5 754:2
**assignment** 761:2 819:23
**assignments** 819:21
**assistant** 774:11
**associate's** 723:20
**associated** 790:19
**assume** 719:17 818:19,22 853:19 857:9
**assuming** 816:13
**assump** 782:11
**assumption** 764:6 782:2,6,9
**ately** 760:24
**attacking** 846:12
**attaining** 723:20
**attempt** 859:23

**attendance** 718:21 719:23 720:4,14 732:2 865:20
**attended** 723:22
**attention** 756:19 764:1 769:23 819:14,19 835:2 837:13 852:22
**attorney** 721:23,24 751:14 863:12,16
**attorneys** 721:23 738:3
**attributed** 781:18
**audio** 741:15 790:19
**august** 741:13,14
**avenue** 715:4
**aware** 764:14 790:2 790:3,4 832:10
**awhile** 726:1

**b**

**b** 792:11 793:2 865:1
**back** 723:7 727:7,16 734:25 742:2 749:9 767:24 774:3,6 776:17 777:6 778:6 781:6 782:2 786:11 794:2,7 795:15 798:13,20,23 821:2 821:6 823:9 824:1 826:24 835:3,20 837:13 840:13 851:18
**background** 723:17 723:19 725:3
**bald** 798:4
**bargaining** 735:6,9
**based** 788:16 798:4 804:2 811:15 829:15 840:19
**basic** 743:10 838:18 838:19
**basically** 751:12 764:19 826:24

827:12
**basics** 838:3
**basis** 803:24 818:19 822:17
**bates** 791:23,24
**battery** 797:23
**becoming** 771:10 784:23 812:18
**bed** 853:20
**began** 724:4 727:9 730:14
**behalf** 716:17
**behavior** 760:10,13 775:23 781:25 783:19 844:23
**believe** 717:21 726:6 726:14 727:3 729:21 733:21 734:21 735:1,3 736:16 741:13,22 743:7,21 746:18 748:8 749:18,20 750:6,20 751:10,10 751:15 755:9,14,23 758:11 761:19 766:17,23 767:22 771:1 780:8,21 781:13,16 785:5,8 786:14 787:2,5 789:15 790:2,3 794:21,22 799:25 800:23 801:11,11 803:24 806:24 807:22 810:2,2 813:3,6,11 817:13 818:2 819:5 821:6 824:6,24 828:20,20 839:3 840:24 842:2 842:7 844:22 846:23 854:23
**believed** 736:4 738:6 745:6 787:11 788:23 839:7 840:19 845:8

believes 784:8
belittled 853:16
benefit 840:2
berated 853:16
bers 833:18
best 732:4 760:15
777:14
better 720:23 757:6
769:25,25 853:21
big 779:23 827:20
843:17,18 857:13
bigger 759:21 829:2
biggest 834:19
836:13 837:16
bility 819:1
billy 733:11
bit 732:13 742:3
772:14
bitch 855:19 856:23
blue 745:22
board 772:23 827:9
827:14
bob 732:11
body 815:14
book 846:5,9 847:11
booking 774:21
794:23
boston 796:19
bottom 835:1
box 714:19 795:9
bracket 732:6
break 721:8 722:11
780:4 797:24
808:23 849:22,24
860:21
breath 760:9 771:1
855:20 856:24
brief 717:13 720:13
723:16 728:12
740:10 752:21
762:19 808:21
briefly 780:23
briefs 720:20 862:20
bring 767:16 791:3
821:6 837:13

bringing 725:17
737:13
bronx 719:6
brother 748:3
brought 756:19
758:7 760:18,25
764:23 770:1
771:14 819:18
brousseau 715:4
716:22,22 717:7
718:5,10,24 719:2
719:10,17 720:10
720:18,21,25 721:5
721:9,12 723:3,14
727:12,17,20,25
728:10 730:10
735:15 738:20,25
739:4,8 740:1,7,25
741:22,24 745:24
746:2 751:16,19,23
752:4,7,18 753:25
754:19 755:20
756:4,12 760:4
761:25 762:16
766:6,14 769:2
779:8,20 780:5
782:16 790:8 791:1
791:7,16 792:18,22
795:5,7,20 796:1,10
796:11 797:6,11,19
797:22 798:1 801:6
801:7,21 802:5,16
803:17 804:2,8,21
805:8,13,15,21
806:8,17 808:15
811:6 815:17 816:3
822:19 831:23
842:5 846:20 851:3
851:6 853:1,6 855:3
855:12 856:15,19
857:7 859:2,8 861:1
861:25 862:4
bruno 784:4
build 857:17

bulk 725:2
bullet 850:18
bulletin 772:23
bullying 856:9
bump 765:8
bunch 779:23
bureau 739:13
865:15
business 721:21
722:23 723:1
737:15
button 778:10,10

c

c 716:1 863:1,1
cabinet 794:8
call 727:3 728:18
738:21 746:11
773:9,10,12,18,22
782:23 786:22
792:12,15 793:11
793:14 798:8
835:12 846:24
853:19 855:19
856:23
called 721:24
738:16 767:11,14
767:17 771:22
775:10 784:3
848:13
calling 721:10,13
760:7,8 784:1
787:16 807:9
846:24 847:3
854:21 856:21
calls 731:19
cameras 725:17
790:14 835:15
capt 725:9 726:14
726:18 727:4
734:21 736:16
755:6 756:18
759:18 761:9,16
763:1,23 764:2,9,13
765:14,18,23

766:21 767:3,16,17
769:5,9 770:5 783:4
786:22 788:19
798:5,6,7,13,18,19
799:22 800:7
811:20 817:22
818:14,21 820:4
821:25 822:2,17
823:6,8 824:23
825:6,19,21,22
827:23,24 828:11
829:20 830:15
831:18,22 832:9
833:10,23 835:20
836:20,22 850:20
851:8,16,19 852:1
852:11 856:2,4,5
captain 725:22
765:5 767:5 769:5
781:5 783:4 787:13
787:13,16 788:2,11
812:3,4 828:23
850:15
captain's 764:18
794:21,22 811:25
car 827:10,15
care 719:4 760:18
760:23 774:22
787:25 816:8,25
831:10 846:6
career 724:10
carefully 722:1
742:13
case 714:10 716:8
725:8,22 734:18
741:17 752:16
763:23 764:8 769:8
774:5 779:7,9 864:6
catholic 723:22
caulfield 761:1
764:22,23,25 765:9
789:22 808:11,11
819:17 828:17
829:5 831:8,8
837:14 854:18

[caulfield's - complaint]                                                    Page 5

| | | | |
|---|---|---|---|
| **caulfield's** 854:18 | **childish** 768:4 845:9 | 731:8 737:22 742:9 | **complain** 742:10,16 |
| **cause** 777:10 812:5 | 846:1,1 | 743:7 744:16 745:4 | 742:18 758:4 |
| **causing** 834:6 | **christine** 714:17,25 | 747:7 749:6,17 | 811:22,23 812:11 |
| **cautious** 814:23 | 716:10 862:16 | 750:3 754:22 761:5 | 824:3,8,10 853:8 |
| **cd** 745:23 | 863:7,23 864:4 | 763:8 770:11 | **complainant** 714:5 |
| **cell** 731:19,20,20 | **circum** 820:8 | 777:21,23 778:6 | 715:7 716:17 720:6 |
| 743:24,24 746:12 | **citizens** 724:25 | 801:12 805:1 | 720:7 721:25 |
| 746:12 | **civil** 735:7 | 810:18 811:16 | 739:18 777:15 |
| **center** 794:20 | **civilian** 858:18,20 | 813:14,17 814:11 | 830:1 |
| **central** 723:22 | **ckellett** 714:20 | 814:17,21,24 | **complainant's** |
| **certain** 759:4 | **claim** 753:2 775:15 | 816:24 824:7 | 718:11 860:10 |
| 774:22 778:7 | **claimed** 753:17 | 825:16 830:20 | **complainants** 734:5 |
| 790:12 800:10 | **claiming** 832:13 | 831:17 837:8 838:1 | 737:17 840:3 |
| 848:14,15,16 | **claims** 747:10,17 | 840:6 | 847:17 |
| 850:14 | 748:14 763:3 | **comes** 794:2 797:13 | **complained** 765:1 |
| **certainly** 756:7 | 854:21 | 798:7 803:2 824:19 | 775:23 776:21 |
| 834:22 | **clarify** 742:3 780:10 | 827:22 830:1 833:9 | 807:3 839:10 849:3 |
| **certainty** 770:21 | 810:4 849:6 | **coming** 737:4 | 849:10,12 |
| **certificate** 863:9 | **class** 743:13 | 758:10 759:22 | **complainer** 823:25 |
| **certified** 784:21 | **clean** 718:6 786:5 | 767:24 793:12 | **complaining** 828:8 |
| **certify** 863:8,12 | **clear** 720:3 750:21 | 795:15 798:3 811:5 | 844:11 |
| **chain** 727:6 824:14 | 780:9 803:21 | 830:18 | **complains** 854:17 |
| **chair** 749:18 | 821:10 830:11 | **command** 727:6 | 854:19 |
| **chance** 719:13 | **clearly** 805:2 | 824:15 | **complaint** 714:4 |
| **change** 792:7,9 | **client** 816:8 | **commander** 726:7 | 716:5 726:9 727:1,5 |
| 795:12 | **closed** 862:19 | **commander's** | 727:9 729:20 |
| **changed** 847:2 | **code** 775:6,7,8,10,11 | 788:22 790:10,12 | 730:14,19,23 731:9 |
| **characterize** 848:23 | 775:12,13 777:19 | 790:23 791:25 | 731:14 738:4,11 |
| **characterized** | 778:1,7,17 | 792:4 794:2,11 | 747:22 755:3,5 |
| 844:22 848:2 | **codes** 775:16 778:4 | 795:13,21 796:6 | 756:16,21,25 |
| **charge** 724:19,21 | 778:20 | 832:16 | 757:24 758:15 |
| 760:6 785:10 | **coffee** 796:21 | **commenced** 754:22 | 759:12 760:20 |
| 837:19 | **col** 776:5 | **commencement** | 761:10 764:5 |
| **charged** 735:17 | **cold** 722:11 | 791:15 | 766:19 768:10,18 |
| 750:16 | **collective** 735:6,8 | **comment** 753:19 | 768:19 769:10,15 |
| **charges** 733:6,8,9 | **college** 723:21 | 770:3 774:10 | 770:9 775:5 777:1,7 |
| 733:13 734:15 | **colonel** 776:4 | 777:12 | 777:17 778:15,18 |
| 735:18 751:9,14 | 783:10,18,22,23 | **comments** 771:1 | 779:24,25 786:14 |
| 754:9 768:15 770:1 | **colonel's** 783:9 | 808:5 | 786:18 789:25 |
| 772:10 843:8,23,25 | **colored** 796:12 | **communicate** 746:9 | 799:17 800:13,14 |
| **check** 835:14 | **com** 731:1 841:6 | **communication** | 805:19 812:8,10 |
| **checked** 734:24 | **combination** 785:20 | 746:6 | 813:5 814:23 815:1 |
| **chicks** 858:1 | **combined** 773:23 | **community** 723:21 | 815:4,5,7 820:25 |
| **chief** 714:17 | **come** 720:17 721:15 | **compilation** 829:18 | 821:4 826:19 827:1 |
| | 726:8,13 729:12 | | 827:21 834:18 |

[complaint - correctional]

836:14,24 839:23
839:25 840:16
842:8,11 843:8,12
847:15 853:7 854:3
854:4
**complaints** 724:24
724:25 745:18
754:23 764:16
765:12 769:11
774:9 775:2 776:7,8
776:13 777:4
779:12,13 780:11
780:12 781:23
782:18,19 783:16
800:24 801:1
815:12 832:22
837:1 847:19
849:16,17 852:10
**complete** 719:22
776:17 804:24
856:22
**completely** 836:5,7
836:8
**complies** 752:3
801:25 806:11
**comply** 738:16
**component** 838:4
**computations**
719:14
**computer** 728:19
791:14 797:8,24
**concerned** 820:25
**concerning** 842:23
**concerns** 767:15
799:23 815:10
**conclude** 812:24
**concluded** 768:6,10
862:23
**conclusion** 745:1,4
**conclusions** 860:24
**concur** 718:13
**concurred** 719:14
**condescending**
771:2

**condescendingly**
771:2
**conditional** 748:10
**conduct** 716:11
738:7,15 741:4
759:7,20 775:1
820:7 827:12
844:21 848:21
**conducted** 737:16
**conducting** 732:24
733:10 751:3
**conference** 784:11
**configured** 791:3
**confused** 829:23,24
**confusing** 842:14
**confusion** 831:11
**connection** 729:17
764:25 827:21
**connell** 761:1
763:22 765:8 769:6
789:15,20,21
793:18 794:13
807:10,12,19 808:9
826:21 829:7
832:11 834:4 835:5
839:11 840:7
844:13 845:1 848:3
848:22 859:14
**connell's** 840:7,12
847:5
**connor** 794:16
**consequence** 828:2
**consider** 726:24
827:3
**consideration**
814:10,16 815:24
816:16
**considered** 772:3
781:14 819:20
**constant** 822:17
823:1
**constantly** 835:3
**consti** 750:4
**contact** 717:9
747:21 748:20,24

763:2 771:18
799:11 800:5
809:10,10 811:20
**contain** 729:11
**containing** 865:20
**contains** 753:1
859:12
**contaminating**
737:19
**content** 753:19
**context** 774:17
**continuation** 827:11
**continue** 746:6,9
**continued** 730:10
740:25 754:19
769:2 805:8 806:17
**continues** 717:6
**continuing** 800:12
**contract** 861:12
**control** 777:20
778:11 854:13
856:9
**conver** 769:23
**conversation** 736:3
743:23 744:10
761:19 764:2
769:21 770:13,14
770:17,21 771:23
771:25 787:23
812:13
**conversations**
731:17,18 738:8
**cooperating** 743:3
747:15 815:6
**copied** 779:25 781:3
860:10
**copies** 748:6 776:8
776:14,15
**copy** 727:13,19,21
739:4 740:3 746:18
747:3,5,6 752:4,14
776:16,17 781:3
790:22 805:14
860:14

**corner** 783:5 794:15
**corning** 714:18
**corporal** 724:12
**correct** 717:7
721:20 725:10
728:9 733:13,14
735:19 736:20
741:20,21 744:2,5,8
746:4 747:4,8,9,13
747:16 749:5,12,13
750:18,19,23 751:1
751:2,4,5,15 753:3
753:13 754:5 757:5
761:12,17 762:3,24
762:25 763:11,17
763:18 765:14
767:6,7 769:16
772:8 776:24
780:20 784:15,16
786:19 790:1,24,25
791:19 792:8,9
794:4 796:3,4,7,14
797:1,2 798:20,21
798:23,24 799:9,10
799:15,20 800:15
800:16,19,20
807:13 808:11,12
809:8 810:15,20,25
811:1,3 817:24
818:2 819:3 820:6
820:10,17,21,23
822:15,18,21
823:19,22 824:11
824:16 826:13
830:10 831:3 832:7
833:19,22 835:25
837:20 840:21
842:21 843:3 849:5
849:11 850:13
853:24 854:5
863:10
**corrected** 831:5
**correctional** 724:6
753:12

corrections 739:12
754:24 772:6
865:15
corrective 764:17
correctly 776:22
800:8
correspondence
718:20 748:22
corroborate 743:5
745:9,9,10 750:8
811:25
corroborated
743:17,18 760:15
cos 758:2
counsel 715:7,12
716:13 762:18
842:18 862:18
863:13,17
county 714:7 716:6
716:24,25 717:2
724:17 726:3
733:16 738:25
739:12 741:19
743:10 754:4,25
757:16 760:11
772:16 790:13
802:1,11,12,21
803:2,7,13 804:14
804:22 805:10,17
806:19 807:5
838:13 863:5
865:10,12,15
couple 717:16 718:6
752:2 775:20
799:13 851:3
courage 761:5
810:18
course 737:15
744:15 752:16
760:17 806:2
849:23
court 717:22,25
780:1
cover 766:25

covered 767:1
808:24
credibility 824:22
825:1
crimi 737:15
criminal 723:21,25
732:21,24 733:4,8,9
733:12 734:7
735:25 737:18,21
738:1 751:4,6,9,14
752:15 753:2,6,9
754:2,9 865:8
cross 753:24 808:17
809:3 839:3 864:7
crossgates 785:8
crying 787:24
822:14 824:19
826:17 827:22
828:10,16
current 724:21
772:15 806:21

**d**

d 716:1 864:1
daily 818:20 823:10
dan 795:2
danger 734:16
735:13
dangerous 811:2
date 725:25 726:1
727:9,11 730:18
731:17 762:9 769:7
771:8 779:24 781:4
786:25 791:17
817:17,17,19,19,22
835:12 838:16
848:14,15,16
849:14
dated 762:23 770:7
852:10 854:14
859:10 865:6,20
dates 780:11
daughter 743:25
744:9 746:25
750:23

dave 840:7
day 716:3 719:5
767:23 783:15
786:6 787:3 790:10
798:18 799:8 800:1
817:10 827:15
829:22 831:15
851:23 852:14
854:15,16 857:23
days 717:12,17
820:19 860:1 861:5
861:7,9
dead 768:14
deal 725:17,18
788:1,2 800:4
829:11 832:1
dealing 763:7 854:2
dealt 788:4
deemed 819:11
defense 759:23
760:1
degree 723:20,25
724:1
delay 719:8 737:12
deliberate 816:9
delineated 779:18
delivered 859:11
dent 725:8 727:3
depart 724:17
754:25 772:16
department 714:7
716:7 717:2 724:5
724:10 725:1
733:17 739:1 740:3
741:20 753:7 754:5
754:8 760:11
802:20 803:23
804:6,15 805:3,11
805:17 806:19
807:5 837:19,23
838:7,13 865:12
department's
802:22
depend 838:14

depicted 793:7
deposition 863:15
derogatory 808:5
describe 755:17
791:8
described 730:2,5
754:12 859:21
desire 812:7
desk 791:10 793:17
794:13,14,15
detail 785:17,21
details 779:15
851:16,25 858:3
determination
744:16 750:3
807:24
determine 733:6
857:21
determining 819:22
develop 742:13
developed 734:19
742:18 802:21
dhr.state.ny.us
714:20
dictates 788:14
died 797:23
different 729:2
761:2 776:2 787:18
796:12 803:1
difficult 774:18
858:7
dillenbeck 783:3
dining 812:13
dire 728:13,16
740:11,13 752:21
752:23 753:24
762:19,21 802:9
864:11
direct 723:13
728:16 730:9
740:13,24 750:13
752:23 754:18
762:21 765:11
769:1 802:9 805:7
806:16 820:13,14

852:22 861:18
864:7
**directed** 772:23
812:19 818:1,21
819:14 826:5
848:21 850:22
**directing** 778:6
814:4
**direction** 826:6,18
**directions** 848:25
**directive** 773:10
**directly** 725:11,21
770:3 788:2 801:12
861:19
**director** 724:14
743:16
**disability** 746:4,7,10
806:23
**disc** 745:21,22
**disci** 761:2 841:19
**disciplinary** 773:23
808:14
**discipline** 773:7
815:6 819:19,24
833:6,7 835:18
837:11 844:2,5
**disciplined** 760:9
761:6 765:9 778:21
843:4
**disciplining** 774:1
**disconnected** 780:2
**discovered** 787:9
**discuss** 737:4
742:20 789:5
**discussed** 732:5
742:6 781:9
**discussing** 720:3
737:13 742:23
754:20
**discussion** 739:25
751:18 756:18
781:17,17 791:11
809:1 812:14
**discussions** 785:12

**dispersed** 847:13
**distinguish** 842:16
**district** 751:13
**division** 714:1,3,13
716:4 719:9 784:7
**division's** 784:11
**document** 728:3,19
730:1 754:12 762:5
765:17,18,21
787:21 804:18
806:3 822:3 854:20
855:1,5 859:20
**documentation**
748:1 749:2
**documented** 760:14
760:21 812:21,25
813:9,20,24 814:2
**documents** 746:14
748:12 752:8 842:6
**doing** 730:22 731:1
761:6 768:4 777:16
785:17,21 793:6
799:22 819:24
827:10 829:4
832:12,13 833:10
836:17 845:18
848:16 856:25
**dominated** 810:23
810:24
**donuts** 795:9
**doo** 776:23
**doors** 777:23,25
**doorway** 785:6
**doubting** 771:16,17
**dragged** 772:3
**drop** 759:12
**drove** 781:1 821:4
**duel** 802:24
**duly** 722:19
**dunkin** 795:9
**duties** 724:22
836:10
**duty** 789:17 820:4
859:16

**e**

**e** 716:1,1 722:18
863:1,1 864:1 865:1
**earlier** 820:23
843:16
**early** 839:9
**easier** 816:1
**easter** 858:1
**educational** 723:17
723:19
**effect** 740:15 802:3
**effort** 737:10
**eight** 788:13
**either** 763:10 773:4
814:3 827:25
832:10
**embar** 812:5
**embarrassed** 853:16
**embarrassing** 856:8
**emergency** 775:9,14
**empire** 714:18
**employed** 803:13
863:13,17
**employee** 806:18
823:21 824:2
838:14 843:1
863:16
**employees** 754:4
803:12 807:4
829:11 842:23
**employer** 802:25
**employment** 724:2
733:16 734:2,2
735:17 772:15
**encourage** 817:2
**encouraged** 812:20
816:22
**ended** 726:20
742:23 783:10
787:15,15 834:16
845:1
**ends** 729:21
**enduring** 816:1
823:2

**enforcement** 723:18
**ensure** 734:12
768:15 784:13
**enters** 799:3
**entitled** 739:11
747:4
**entries** 729:3 850:8
**entry** 850:4
**environ** 810:24
**environment** 810:22
810:23,24 811:2
844:19
**especially** 786:3
**esquire** 715:4,9
**essentially** 718:8
**establish** 795:23
**established** 799:12
807:11
**etcetera** 799:14
**evaluated** 807:14
**evaluation** 807:12
**event** 744:7,21
786:15 795:25
**events** 811:17
**eventually** 736:13
736:18 737:6 741:1
**everybody** 781:1
816:22 826:23
838:25
**everyday** 824:24
**evidence** 719:23
720:12,12,15,20
728:11 730:7
738:19 740:8,22
741:23 751:20
752:19 754:16
756:1,10 762:17
768:25 802:6 805:5
805:22 806:14
816:5,14 859:9,17
860:5
**exact** 727:11 779:23
780:11 829:22
**exactly** 731:16
735:1 742:22

[exactly - floors]

753:20 779:19
831:25 833:25
835:11 839:24
**examination**  723:13
728:16 730:9
740:13,24 752:23
753:24 754:18
762:21 769:1 802:9
805:7 806:16
808:17 809:3 851:5
855:15 856:18
**examined**  722:19
**example**  743:12
**examples**  848:7,8
**exception**  846:7
**excessive**  724:24
**exchange**  748:10
**exchanged**  748:8
**excused**  859:1
**exhibit**  720:24 721:2
727:23 728:11
730:6 739:6,11
740:2,8,21 751:17
751:21 752:19
754:15 755:21
756:2,6 761:23
762:2,17 765:22
766:6,9,9,12 852:9
853:2 855:18 859:6
859:9 860:4,16
864:13,14,14,15,15
865:5,7,9,12,14,17
865:19
**exhibits**  718:3 756:8
801:19 858:23
860:10 864:17
**existed**  745:8 812:16
**exists**  729:1
**exorbitant**  786:2
**expanded**  784:25
**expansion**  784:25
785:1
**experience**  785:7
811:15

**experienced**  801:3,9
813:1 814:12,18
**experiencing**  800:22
822:18 823:12
**explain**  775:7
**explained**  813:3
848:7
**explore**  772:14
**expressed**  785:9
**extended**  763:15
**extension**  715:4
**extensive**  859:23
**extensively**  846:18
**extent**  779:9 849:8
**eye**  771:18

**f**

**f**  715:4 863:1
**faceless**  759:1
**facility**  775:8 784:25
785:9 793:13
**facing**  794:16
**fact**  742:24 743:5
754:2 764:23 772:1
783:11 785:15
789:6 790:3,5
811:19 821:2 840:6
845:7 846:5 860:24
**facts**  816:14 820:8
**failed**  831:22
**fair**  728:19 857:8
**fairly**  818:19
**faith**  800:6
**falling**  832:6
**far**  763:13 765:16
807:7 812:9 817:25
819:8 820:24
850:22
**fast**  792:14,19
797:20
**faster**  797:14
**fault**  719:8
**fd**  822:5
**fear**  811:4

**february**  810:9
859:10 865:20
**federal**  714:10
716:8
**feet**  749:18
**fellows**  844:23
**felt**  742:18 757:12
770:2 787:11,13
832:2 846:13 854:6
**female**  742:8 754:4
765:3 792:23
796:23
**fenton**  714:8 716:7
717:6,9 720:7
726:10 729:20
732:3 733:7 734:23
735:21 736:5,25
737:5 738:7 742:10
742:13,21,24
743:12 745:18
749:12,17,19 750:4
750:12,16 751:10
753:2,10 756:25
757:13 760:6,21
761:4 768:16
780:19 807:20
809:6 810:14
811:21 812:18
813:2 817:23
829:12 836:17
839:8,16 840:9
841:18 843:4 844:3
844:6 846:3,5,7,11
846:23 847:11
850:7 853:14
**fenton's**  733:12,15
742:6,25 759:23
772:10 809:10
**fighting**  775:12
**figure**  759:13
859:24
**file**  728:7 729:5,7,13
738:4,11 743:15
761:15 778:12
780:15 794:8

803:16 836:25
**filed**  733:7,8 755:14
819:22 844:5
**filing**  756:24 836:24
**fill**  821:5
**filled**  752:11 821:1,7
858:14
**finally**  737:9 741:12
782:17 840:16
**financially**  863:18
**find**  776:13 823:20
853:10
**finding**  717:25
835:1
**findings**  860:24
**fine**  720:11 722:5
814:8
**finger**  773:4,21
826:3,11 827:4,6,16
**fingers**  749:24
**finish**  809:21 820:14
844:1,1
**finished**  853:3
**firm**  715:9
**first**  717:18 721:11
721:23 724:4,6,13
726:13 730:21,25
731:13 737:16,18
755:3,5 756:15
764:17 768:19
773:5 777:6 801:18
808:13 812:21
813:4,19 818:14,16
818:22 820:1
821:22 825:16
826:5,7 855:24
**five**  820:19 828:1
855:19,20 856:20
**fix**  862:8
**flipped**  773:21
**floor**  714:18 785:17
785:21,23
**floors**  785:1,2,5,8,11
785:13 786:3,6

[focus - group]                                                    Page 10

focus   759:8,11,11
768:9 836:3,5,18
843:19 847:14
folder   768:17
folders   729:10,13
762:8 865:6
follow   768:8 840:17
856:16
followed   759:9
833:4,6 835:9
follows   722:20
foot   749:25
force   724:24 742:17
815:3
foregoing   863:9
forget   732:11 859:5
forgetting   820:2
form   729:19 821:4
822:20 831:24
formal   735:18 741:5
741:7,11
former   738:2
747:20 748:4,21
forms   820:25
forth   822:3,4 840:14
forward   735:20
737:4,22 742:9
745:18 757:3,24
761:5 783:15
792:14,19 794:14
810:18 811:5,16
813:14,17 814:12
814:17,21,24 837:8
forwarded   813:24
found   812:12,13
813:10,22,23
823:20 827:16
four   757:18 775:13
818:10 828:1
832:11 843:16
fourth   716:3
frame   732:13
779:18,21 792:16
792:24 793:16
810:9 838:21

free   785:3
friday   714:14
717:14
friend   726:23,23,24
friends   781:14
782:14 823:18
front   721:6 729:12
773:2 779:25 781:4
782:21 818:4
821:22 847:4 850:2
fuck   773:16,16,17
full   808:2 842:7
further   783:16
799:11 800:25
808:16 855:12
858:22 860:6,12
863:12
furthermore   863:15
future   742:8

g

g   716:1
gap   717:13
garbage   768:4
gary   789:22 808:11
854:18
gate   778:3,7,11
gating   776:7
gation   732:25 743:3
753:10
gator   733:6
general   780:12
802:1,12 803:18
804:22 805:11,12
818:5 825:2 835:16
865:10,13
generalized   771:9
771:12
generally   728:18
genesis   804:23
gentleman   794:24
gentlemen   860:22
getting   737:3 738:1
747:5 772:2 774:20
777:12,25 780:25

793:4,10,13 796:21
814:25 832:2
836:16 842:13
848:14
girl   829:5
give   723:15 724:8
728:1,7 743:4
745:21 746:14,18
748:6,11 771:15
779:23 780:11
787:1 814:10
815:24 816:16
835:2 855:8 859:3
given   741:15 746:20
765:2,5,18,22
766:16,21 767:2
769:5 773:9 774:4
783:21 790:22
797:7 805:25 806:1
808:10 814:16
827:3,13 833:1
837:22,25 838:6
840:6 851:7
gives   824:22
giving   731:15 759:5
759:6 827:5 851:16
852:1
glance   855:11
gleaned   839:18
840:18
go   717:16 734:25
737:11 744:19
745:17,21 746:20
747:1 755:19 758:9
759:7 760:22
771:13 772:13
775:9 777:19 778:8
779:15 782:1
792:19 808:25
812:23 815:9 818:9
818:20 825:12
831:18 833:11
834:25 842:17
849:19

goes   717:19 756:4
770:2,25 795:12
820:2 827:14
833:17 844:24
846:10 847:12
going   718:22 719:25
720:23 721:18,19
722:10 723:10
736:9 738:12 739:9
746:24,25 751:24
757:7 759:22 762:1
764:14 767:21
770:16 774:3
785:13 786:10,11
787:22 792:6,14
793:1 794:5,7,21
795:15 797:12,21
798:19 799:6 800:7
801:17 802:16
804:2 806:7 811:24
811:24 812:17
813:12 816:12
824:8 825:3 829:4
830:12 833:14
835:20 839:21,25
840:13,23,24,25
842:15 846:23
847:1 848:25
853:17 857:6 859:8
861:5,12 862:7,11
good   716:2,19,20
717:3,5 732:7
739:22 746:1
772:13 791:7
823:21 824:2,12
gossip   853:15
gotten   780:25 781:7
838:17,22 845:2
856:9
governs   738:15
great   748:19
greenaway   714:25
863:7,23
group   807:8

**guess** 722:6 791:2
858:12
**guy** 783:2,3

**h**

**h** 865:1
**hair** 749:23,23,24
**hal** 797:13 811:22
821:6
**hal's** 811:25
**half** 758:8 818:9
**hall** 777:19 794:19
**hallway** 794:20
**hand** 751:17 755:21
756:5,5,5 804:12
838:6 859:11
**handed** 727:15
**handle** 800:7 821:18
821:19 836:11
**handled** 803:22
847:25
**handles** 819:13
**handling** 787:14
819:15
**hands** 809:7 855:25
**handwriting** 762:3
762:14 769:4
**handwritten** 729:9
762:23
**hanging** 784:2
**happen** 757:23
764:13 786:10
815:22 821:9
828:25 835:12,14
835:14 857:15,18
**happened** 732:6
733:15 742:7,21,23
748:14 767:4
770:12 775:18
780:22 782:21,23
798:18 801:12
809:19,22 810:8
811:17 813:19
816:10 817:20
820:5 833:24 834:2

834:3,5 835:22
836:2 843:7 850:12
**happening** 817:5
820:3 826:17
832:16 836:21
844:11
**happens** 757:18
765:12 768:5 778:3
848:8
**harass** 730:13
759:24 781:14
807:20 836:3
**harassed** 736:25
749:11 849:4
857:25
**harassers** 839:10
**harassing** 777:11
830:3,7 834:7
**harassment** 726:21
730:19,22 731:1
733:11,25 734:11
736:5 743:1,11
745:11 749:15
750:5,17 754:3
755:16 756:21
757:4,10 758:15
759:12 760:7,20
763:3 764:14,16
765:15 766:19
767:13 768:10,18
772:10 786:13,18
799:17 800:14
802:2 803:22 804:5
804:13 805:18
807:1 815:25 816:2
816:19 820:24
821:3,9,21 822:9,10
827:1 829:11,12
830:4 834:17 836:6
836:24 837:1,7,9,21
837:25 838:2,4,6,12
838:17,20,22,25
839:23,25 840:15
840:19,23 841:6,11
841:17 842:8,10

843:12,14,20,22
844:6 847:15
849:13 851:17
852:1,12 865:10
**hard** 836:2
**hayes** 763:23 769:7
826:21 832:11
**head** 780:16 791:23
798:5
**hear** 855:19 856:21
856:23
**heard** 756:16
758:19 782:25
812:4 848:24
**hearing** 716:3,12
717:14 719:19
720:1,13,20 721:3
728:8 744:25
779:18 783:5,6
830:6 839:20
841:13,14 851:8,9
860:23 862:18,20
862:22
**heart** 840:14
**hell** 836:15
**help** 728:7 737:20
766:5 777:22,23
858:3
**helping** 764:19
862:17
**hereto** 863:17
**hesitation** 773:25
774:2
**hetman** 773:11,16
773:17,17 800:9
821:7 825:20
827:18 855:25
**hetman's** 825:22
**higgitt** 763:23 769:7
769:7 789:13,13
793:17 794:12,16
796:21 798:14
807:10,19,23
826:21 832:11
834:4 835:5 839:10

844:13 848:3,22
859:14
**high** 723:22,22
768:4 844:13,17,20
844:22 847:7 848:4
848:6,23
**higher** 725:18
**highway** 733:1
**hire** 725:25 726:1
**hired** 838:15,16
**historically** 757:20
**history** 723:16
**hitting** 792:6
**hoffman** 731:7
749:7,10,10,15
750:4,18,22 755:10
755:10,12 769:16
769:18 770:10
786:12,16 787:10
787:17 788:24
789:6,18 795:22
798:22 800:12,13
800:19,21 801:8
807:2 808:7 809:8
809:25 810:13
812:11,20 814:1,4
817:6 820:2 828:9
828:17 829:7 831:3
831:4 837:13 849:8
849:12,16 853:15
854:3 857:21,25
**hoffman's** 750:8
770:9 788:7 814:1
854:19
**hogel** 795:2
**hold** 724:17
**holding** 795:9
**holiday** 857:24
**honor** 716:21 717:4
717:10 718:14
719:11,21 722:14
728:13 738:24
739:23 740:19
744:22 745:19
751:16 779:4,9

806:5 808:19
849:20 851:1 853:5
856:14 857:13
859:2 860:8,20,25
861:1,4,16,19
862:10
**hookup** 797:25
**hopefully** 860:11
**hopping** 827:9
**hops** 827:14
**hour** 758:9
**hours** 788:13,15
**house** 821:5
**housing** 761:2
764:24 765:4
787:10,17,18
788:16,17,24 789:6
817:7,15 819:17
837:14 847:12
**hudson** 723:20
**huh** 797:19
**human** 714:1,3,13
716:5
**humiliated** 853:16
**humiliating** 856:8
**hung** 778:3,7 784:3
**husband** 781:8
782:11 840:10
845:8
**hypothetically**
760:5

**i**

**i.d.** 865:2
**ice** 845:13
**idea** 840:22
**identification**
727:24 739:7,10
751:22,25 756:9
761:24 762:2
801:20 859:7 865:2
**identified** 720:6
763:22
**identify** 728:2
857:16

**immaterial** 834:11
**immedi** 760:23
**immediate** 760:22
773:6
**immediately** 733:18
734:18 829:8
**importance** 837:5
**important** 726:22
834:15
**impossible** 835:2
**improper** 747:11,21
749:3 775:1 786:17
842:23
**inappropriate**
816:13
**incident** 731:22
732:3 737:5 743:11
752:10,25 760:14
770:12 771:11
773:8,19,20,22
780:7 782:21,22
795:21,22 813:6,8,9
813:19,23 814:2
817:20 827:2
843:11,12 846:3,15
854:13 857:10
**incidents** 731:24
761:1 772:21
775:20 783:20
829:2,6 857:15,21
**included** 826:22
838:20
**including** 839:3
**incorrect** 784:18
819:23 828:3
**index** 862:14
**indica** 784:13
**indicate** 797:13
**individual** 736:10
774:22,23 793:23
795:8
**individual's** 782:7
**individuals** 720:6
734:8 735:24 736:1
753:21 761:10

807:3,7 811:19
812:9
**influence** 765:11
**informa** 773:9
**informal** 741:5
**information** 729:11
731:21 734:19
737:3,20 742:14,19
743:4,7 759:6 833:5
834:14 841:3
**informed** 763:1
843:2
**infuriated** 758:4
**ing** 834:17
**initial** 734:5 743:2
746:19 753:11
839:23
**initially** 733:24
734:13,23 789:18
811:20
**inlaw** 739:17
**inmate** 747:20,21
748:4,16,23,25
749:3 774:11,20
775:11,13 792:5
**inmates** 734:17
735:14 748:21
765:4 775:12
787:19 788:16
**inside** 729:10,13
762:8 839:20 841:1
865:5
**instance** 819:16
844:25
**instructor** 784:23
**instructors** 784:21
**intendent** 775:25
**intending** 719:21
**inter** 736:10 847:13
**interaction** 742:23
750:14 774:15
775:21 776:11
848:9
**interest** 785:9

**interested** 784:23
863:18
**internal** 724:19,22
725:5,12,20 733:10
**interview** 736:14
737:14 741:2,4,5,5
741:7,11 742:1,14
742:22,25 743:20
744:12,20 749:7
771:14 799:16
800:18,23 834:3,4
849:15
**interviewed** 734:6
735:24 737:18,25
750:6 770:10
774:13,19 777:9
**interviewing** 832:10
834:18
**interviews** 741:16
750:21
**introduce** 718:22
**investi** 732:24 733:5
743:2 753:9 776:6
**investiga** 807:1
**investigate** 724:23
726:25 727:7
730:22 731:1
747:23 754:8
763:10 788:6,9
819:1 820:4 833:23
836:2,19 857:11
**investigated** 776:25
780:22,23 782:18
819:6 836:14
843:13 854:8
**investigating** 726:20
733:12 834:17
836:23 837:6
**investigation** 727:8
730:13,16 731:21
732:21 733:4,11
734:4,10 736:9,23
737:19 738:16
744:15 747:15
748:7 750:2,20

751:4,7 752:12,15
753:6,6 754:2,21
760:17 764:14
777:3,5 778:24
779:2 784:17 799:1
811:18 819:5,8,20
820:8 823:14 824:7
836:16 839:22
850:13 865:8
**investigations** 725:1
725:3 737:16 836:9
**investigative** 728:7
729:5,7 753:1 762:8
819:12 865:6
**investigator** 733:1
734:7 735:25 738:1
752:11 753:22
**investigators** 737:18
**investigatory**
784:11
**involved** 737:23
749:10 763:16
764:12,12,21 767:6
769:6 774:7,14
807:1 816:7 842:22
844:12
**involvement** 786:20
787:6
**ish** 810:9
**issue** 718:18 721:2
725:15,16 760:16
764:7 776:10
778:25 781:15
782:13 783:8 784:4
788:6 812:6 819:16
828:17 831:13
843:17,18 846:7
**issued** 828:21
**issues** 725:13,14
754:21 760:16
774:7 788:3 824:9
860:12

**j**

**j** 722:18
**jail** 726:3 747:7,20
757:20 771:5 773:2
776:21 778:20
784:22,25 790:13
790:16 837:12
839:20 841:2
858:10
**james** 717:1 721:13
722:24 864:9
**jamie** 794:17
**january** 717:14
**jim** 714:22 715:17
**jimmy** 821:5
**job** 724:5,22 729:21
732:7 757:14,16
760:2 787:4 799:9
799:12 825:6 835:2
835:21 836:10,15
842:9 844:3 848:16
857:4 858:4
**john** 847:9
**johnny** 847:10
**joined** 724:7
**judge** 714:17 716:2
716:19 717:5,8,11
718:8,11,16,25
719:1,3,16 720:2,10
720:16,19,22 721:4
721:6,7,10,14
722:15,22 723:3,5,9
723:16 727:12,21
728:14 729:25
730:3 735:4 738:18
738:21 739:15,20
739:24 740:9,20
741:23 744:23
745:15,20 746:1
751:20 752:20
754:13 755:25
756:5,7 757:6
758:16 760:1,12
762:18 765:24

766:11 768:20,22
773:15 779:5,17
780:3 782:1,8,15
790:4 791:2,5,9,12
792:18,20 795:18
797:6,9 802:7
803:11 804:9,19,25
805:23 806:2,6,9,12
808:17,20 811:9,12
814:6 815:19 816:4
817:10 818:6
822:22 823:3 825:7
829:23 830:11
834:11,22 841:4,12
841:24 842:3,13
845:14,17,20
846:17 848:24
849:23 851:2
852:24 853:3 855:1
855:8 857:8 858:9
858:15,21 859:11
859:22 860:6,9,17
860:22 861:2,7,10
861:17,21 862:7,12
864:9
**july** 729:23
**june** 755:8,24
756:17 766:22
770:5 800:17
806:25 817:8,12,18
822:14 823:9 829:9
832:18 853:25
854:12
**justice** 723:21,25

**k**

**k** 722:18,25 796:16
**karam** 714:22 717:1
717:3 721:13,15,15
722:25 723:15
728:1,18 730:11
739:9 740:2 751:24
752:9 754:20 760:5
780:6 798:2 809:5
864:9 865:5,18

**keep** 747:3 797:12
799:6 834:8
**keeping** 739:21
855:17
**kellett** 714:17 716:2
716:11,19 717:5,8
717:11 718:8,11,16
719:1,3,16 720:2,16
720:19,22 721:4,7
721:10,14 722:15
722:22 723:5,9
728:14 730:3 735:4
738:18,21 739:15
739:20,24 740:9,20
744:23 745:15,20
746:1 752:20
754:13 755:25
756:7 756:9 758:16
760:1 762:18
765:24 766:11
768:22 773:15
779:5,17 780:3
782:1,8,15 790:4
791:5,9,12 792:20
795:18 797:9 802:7
803:11 804:9,19,25
805:23 806:2,6,9,12
808:17,20 811:9,12
814:6 815:19 816:4
817:10 818:6
822:22 823:3 825:7
829:23 830:11
834:11,22 841:4,12
841:24 842:3,13
845:14,17,20
846:17 848:24
849:23 851:2
852:24 853:3 855:1
855:8 857:8 858:9
858:15,21 859:22
860:6,9,17,22 861:2
861:7,10,17,21
862:7,12 864:4
**kelly** 840:7,11
844:25 845:15

**kept** 788:3 840:1
**kevin** 715:9 716:16
  721:1 752:5 805:14
  851:7
**keyed** 745:25
  791:18
**keys** 725:16
**kind** 729:22 737:25
  742:2 749:20
  773:22 774:24
  841:7 843:15
  845:11 847:6 848:5
  848:8
**kluibrand** 715:11
**knew** 770:13 786:6
  839:22 840:14
**knight** 846:16,22,25
  847:10
**knock** 844:13
**know** 719:12 722:3
  722:12 725:17
  727:4,9,11 734:16
  743:5 749:21 751:7
  753:16,20 758:1,11
  758:14,15 759:3,5
  759:14,21 760:16
  766:9 767:23
  770:20 773:21
  780:10,14 781:20
  781:22 801:12
  804:10 811:18
  812:19 813:7,16,17
  815:3,11,13,20,20
  815:22 816:5 818:3
  822:24 826:25
  827:12 833:14
  834:13,13 840:4
  842:3 843:5,17,21
  845:6 850:15,16
  851:15,15,25 852:5
  852:8 856:3,4,6,24
  856:25 858:12
**knowing** 759:24
**knowledge** 820:12
  824:18

**known** 725:23
  756:22
**knows** 853:21
**kosowsky** 774:16
  789:14 793:18
  794:17
**kristin** 774:12,16
  777:9 858:17
**kristine** 774:19

## l

**l** 722:18
**l.l.p.** 715:3
**lapse** 809:9
**lapsed** 809:18,22
**lapses** 809:5
**larger** 787:10
  797:17
**lately** 772:2
**latham** 715:10
**laughed** 774:24
**laughing** 777:11
  788:23 799:2
**law** 714:17 715:9
  723:16,17 735:7
  860:24
**learn** 726:13 827:22
**learned** 726:8 819:4
**leave** 788:12 791:10
  806:22,23
**leaves** 794:18 799:4
  819:5
**leaving** 794:10
**led** 844:21
**left** 750:12 773:1
  780:6 794:14,19,24
  794:25 800:2 834:9
  837:17 857:4
**length** 763:2
**letter** 718:25 719:11
  720:11 859:3,10
  860:14 865:20
**letters** 747:20 748:3
  748:6,9 749:4

**letting** 737:20
**level** 725:18 764:18
  819:12,12
**leverage** 776:5
**liar** 846:24 847:3
**lieutenant** 721:17
  724:14,19,21
  752:25
**light** 760:18
**limited** 859:19
**line** 724:8 726:6
  727:3 728:4,6 729:8
  729:22 730:11
  749:16 768:14,14
  784:9 792:10,11
  793:2,2,3 818:14,22
  820:1 821:18,22,22
  825:17 853:12
  865:17
**lines** 727:13
**list** 774:20
**listed** 759:15 782:24
**listen** 722:1 744:20
  804:9
**literally** 757:17
**little** 718:18 732:13
  742:3 745:21
  772:14 792:12
  842:14 858:1
**live** 781:2
**location** 861:20
**lock** 794:9
**locked** 794:8
**log** 846:5,9 847:11
**long** 725:23 809:5,9
  809:12,25 812:25
**longer** 751:8
**look** 718:15 727:10
  735:1 739:13 752:1
  753:18 759:8
  775:13 784:13
  788:10 791:2 797:7
  798:8 801:23
  807:17 818:3 819:7
  821:2,3 833:12

  850:4 854:24
  862:15
**looked** 758:24 765:1
  790:7 792:25
  793:24 846:18
  862:13
**looking** 729:19
  732:1 738:4 739:16
  793:19 794:13,14
  798:10,11 802:19
  819:21 862:11
**looks** 729:23 752:10
  771:6 791:22,23
  792:17 793:10,18
  794:1,12,15,18
  795:2,8,10 796:19
  796:20,22 798:5,7,8
  798:13 805:11
**lora** 714:4 716:5
  725:23 726:2,9,22
  727:8 730:13,18
  743:4 744:3,7,17,21
  745:2 746:3,7,10
  747:25 748:2
  750:18,22,23
  754:22 755:4,13
  761:10 769:10,11
  786:12,13 787:3,20
  794:2,6,18 796:25
  799:3,8,11,16
  800:11 805:19
  806:18 807:7,11,18
  808:3,5 810:3,7,9
  811:7,19 812:14
  821:5 824:2,5
  829:10 831:14
  845:9,16,17 851:13
  851:15 852:1,10
  853:7
**lora's** 725:25 744:9
**lost** 775:25 779:14
  845:14
**lot** 731:23,23 746:21
  746:23 748:5
  756:22 757:24

[lot - misunderstanding]

758:5,9,14,25
768:18 770:23
771:24 772:1
778:18 787:23
807:25 824:3
840:13 845:12,25
847:13
**loudon** 715:10
**lt** 714:22 717:1,3
721:13,15 723:15
728:1,18 730:11
731:9 739:9 740:2
751:24 752:8
754:20 760:5
773:11,16,16,17
780:6 796:21 798:2
800:8 809:5 821:7
825:20,22 827:18
855:25 864:9 865:5
865:18
**luibrand** 715:9,9
716:16,16,20
717:10 718:13
719:12,20 720:9
723:11 727:15
728:12,17 729:25
739:16,19,22
740:10,14,18 752:6
752:20,21,24
754:11 762:19,22
766:4,15,20 768:20
795:3 796:8 797:3
801:4 802:10,18
803:20 804:11,17
805:23,24 806:4
808:18,22 809:4
811:11,14 814:9
815:23 816:15
817:12,16 818:8
822:23 823:5
825:18 831:16
832:4 834:20,24
842:19 846:21
848:1 849:2,18,25
850:25 855:5,16

856:13 859:12,18
860:8,13,19,25
861:4,9,15,18 862:2
862:9
**luibrandlaw.com**
715:11
**ly** 760:23

### m

**m** 722:18,18,25
**ma'am** 782:6
**machine** 780:1
**mailed** 749:3
**main** 723:1 759:11
847:14
**maintained** 785:6
786:4
**maintaining** 785:8
785:11
**maintenance** 785:3
785:23
**majority** 756:24
837:2
**making** 739:20
758:18 760:8 771:4
774:10 776:22
778:19 786:18
787:15 807:9 808:4
808:5 815:4 830:2
847:15 853:14
**male** 807:4 810:22
810:24
**malingerer** 823:23
824:2
**manila** 729:10,13
**manner** 810:14
815:15 836:17
**manual** 738:14,22
738:24 739:1,13
740:4,15 748:18
757:17 865:15
**marbach** 714:17
716:10 864:4
**march** 714:14 810:3

**mark** 781:10,11,12
781:12,18,20
783:11,12 848:11
**marked** 727:13,23
728:1 739:6,10
751:21,25 756:9
761:23 762:1
765:21 801:18,20
801:22 805:9 859:4
859:6
**mart** 746:21,21,22
747:1 748:5
**massage** 749:25
**master** 772:24 800:3
826:9,10 835:4
**materials** 753:1
**matter** 716:4 717:15
737:15 779:16
780:19,24 781:10
787:7 789:2 840:15
862:19
**matters** 725:5,12
774:1 776:25
**mattey** 750:22
**mean** 762:11 766:25
767:2 768:1 772:5
826:15 828:21
829:16 844:17
845:24
**meaning** 809:12
**means** 768:3
**meant** 848:5
**medical** 775:13
**meet** 746:13,21,22
**meetings** 852:2,3
**member** 735:12,12
750:7 840:5
**member's** 738:15
**members** 725:1
735:13 754:25
755:8,12 756:20
757:12,25 758:6
774:14 778:1,8,19
783:25 784:21
790:7 793:12

812:18 838:1
839:19,20
**memories** 850:19
**memory** 739:23
**ment** 724:18 728:20
730:14 755:1
759:25 772:17
807:21 810:25
836:4
**mention** 852:18
**mentioned** 734:9
**messes** 772:4
**met** 748:5 799:13
**michael** 791:23
**michelle** 749:7,9,10
749:15 750:4,8,17
750:22 755:9,12
769:16,18 770:8
786:12,16 787:9
788:6 789:18
795:22 798:22
800:12,13,18,21
801:8 808:7 854:3
854:19
**middle** 773:4,21
826:2,11 835:1
**midnight** 785:13,16
785:18,24
**mike** 783:2
**mill** 839:21
**mind** 723:4 739:21
768:3 847:2
**mine** 726:23,23
**minimal** 808:1
**minute** 779:15
787:1 806:1 825:7
829:22
**minutes** 817:15
**miracle** 792:21
**misplace** 745:23
**misplaced** 860:15
**missing** 783:8
**misunderstanding**
768:11

**modern** 792:20
**moment** 721:17
808:21 849:19
**month** 757:3 827:23
832:20 833:17
834:4 842:7,10
**months** 732:8 776:9
776:12 779:1 810:5
**mony** 736:7 774:4
**mop** 785:4
**morning** 716:2,18
716:19,20 717:3,5
786:21 793:2
795:12 832:17
852:4
**move** 788:11,15,20
798:20 817:6 849:1
**moved** 764:24 784:8
798:22,23 829:8
831:3
**movement** 765:2
**moving** 765:9
791:13 837:14

**n**

**n** 716:1 864:1
**nal** 737:16
**name** 716:10 721:20
722:23,24 732:12
736:2,8 774:12
834:10,12 835:13
848:13
**named** 807:8
**nameless** 758:25
**names** 760:9 807:9
857:10
**napierski** 715:3,3
716:23,23
**narrative** 752:11
**narrow** 858:7
**nassau** 781:2
**necessarily** 829:21
**necessary** 778:16
819:11

**need** 718:6 722:11
742:2 764:19
788:20 808:22
830:22 857:9 861:3
**needed** 734:1
735:24 736:10
742:14 759:6 764:3
767:12 787:16,21
815:2 816:24 837:8
**needs** 764:13 783:12
828:24 835:3
**negative** 771:2
774:2 778:23
**negotiated** 748:19
751:11
**neither** 863:12
**nervous** 750:11
**never** 736:24 763:14
778:10 781:3
823:11,14 824:17
832:21,22 843:10
862:14
**new** 714:1,3,13,19
715:5,10,10 716:4
723:2,23 742:8
785:1 812:17 863:4
**nick** 783:3
**night** 749:16 827:17
**noise** 759:16 832:25
835:13 840:25
**noises** 758:18 760:8
776:23 807:9 808:6
830:2 833:2 835:23
**nonresponsive**
779:11
**nonsense** 845:13,25
847:8
**notary** 863:8
**notation** 761:15
**note** 717:11 762:7
762:23 763:22
766:13 805:1
829:15,16 832:14
865:5

**notes** 727:10 728:25
729:9,14 741:14
768:17 797:12
817:21 826:20
828:4 829:9,13,17
832:9,14 849:19
850:1,4 863:11
**notice** 759:20
761:14,21 764:3,10
764:21 768:1,2,3
826:14,18,21,25
827:4,8,13 828:1,6
828:7,14,16 830:23
**notifications** 727:6
**notified** 726:14,15
727:1,2 820:20
**number** 718:1
729:17 746:12
775:10 804:1
805:12 809:12,13
809:16,18,20,21
810:5 822:5 860:1
865:2
**numbers** 862:13
**numerous** 731:18
**nvnlaw.com** 715:6
**nys** 714:13

**o**

**o** 716:1
**o'connor** 715:3
716:24
**object** 804:18
822:19
**objection** 722:7,9
730:1 740:9,18
754:11 768:21
802:7 806:5 811:6
811:10 815:17
816:3 831:23
859:19
**obligation** 747:23
831:17,18 833:8
**observation** 750:14

**observe** 799:2
**occasions** 771:4
809:6 839:2,5
**occur** 839:1,15
**occurred** 731:22,25
732:3 738:8 743:23
751:10 771:18
817:11 843:10
**occurring** 769:22
784:14 816:24
817:6 829:17
830:14 836:9
837:12 841:1
**ofc** 736:4,5 751:3
761:1 764:25 765:9
774:16 777:19,22
779:24 783:25
784:3,4 787:17
788:24 789:14
792:25 793:18,24
795:10 796:19
812:19 814:4 847:4
**offender** 816:9
**offer** 728:10 740:7
752:18 762:17
802:5 805:21 859:9
**office** 719:6 721:7
724:3,7 739:12
741:18 770:10
781:9 782:3 783:4
786:23 787:8
788:22 789:10,12
790:10,23 791:25
792:4,5 794:3,11,22
794:23 795:13,21
796:6 798:3 802:24
803:3 804:1 830:18
832:17 865:15
**officer** 724:6,11
736:2 771:8 775:11
776:20 781:9
792:23 796:23
833:1
**officers** 742:8 753:7
753:12 754:24

755:4 771:3 772:6
776:2 795:16,16
**oh** 746:1 751:19
766:1 797:23
841:16 853:1
855:22
**okay** 719:3,16 720:2
720:16,18,21,25
721:4,9 734:21
743:21 745:20
748:10 768:22
773:25 782:15
797:22 804:17
807:17 810:5
811:11 824:4 827:7
836:1 853:1,25
856:25 859:20,22
861:9,14
**once** 719:21 735:18
**ones** 862:5
**open** 778:6,11
**opening** 777:22,25
**operational** 819:11
**operationally**
819:13,15
**opportunity** 736:13
741:1
**oral** 765:19 766:25
767:1 808:12 845:3
845:18 852:2
**order** 742:14 805:11
805:12 818:5,23,25
822:5 825:2 861:24
862:1,2 864:22
865:13
**orders** 824:12
**original** 728:25
729:2,4 863:11
**ous** 861:16
**outside** 724:25
785:5
**outweighed** 816:18
**overheard** 808:4
**overlap** 720:5

**overlooked** 757:22
**overruled** 822:22
**overtime** 726:7
785:17
**ownership** 765:7,8
819:24

**p**

**p** 716:1
**p.m.** 862:23
**p.o.** 714:19
**pachley** 793:24
**package** 827:20
**pact** 742:12 743:6
744:18 745:2,5,7,13
812:15,15
**page** 717:19 718:1
729:12 776:17
779:25 781:4
834:25 846:17
852:23 853:9,17
855:18,20,24,24
856:20 862:13
864:3,17
**pages** 818:10,11
862:8
**paid** 734:14 785:17
785:19
**pains** 748:20
**paint** 779:11
**paper** 718:23
798:15 819:21
827:13
**paperwork** 788:10
793:4 798:11
799:14
**paragraph** 853:18
855:21
**parking** 746:21,23
748:5
**part** 719:25 725:21
734:9 747:12
770:13 775:1 781:6
783:6 784:20 799:1
810:21 824:6

838:18
**particular** 729:16
**parties** 716:15
718:21 719:8 791:8
863:14
**party** 863:17
**pass** 810:17
**passing** 755:25
818:6 834:23
**path** 816:1
**patricelli** 800:3
826:10
**patrick** 750:7,25
783:2
**patrol** 733:1
**patty** 776:18,20
778:25 780:8,23
781:16
**patty's** 782:11
**pause** 787:1 792:15
793:15 796:5
797:22 798:12
806:3 853:2
**pay** 733:19,20,22,24
734:18,23 735:1,2,3
735:5,11,18 786:1,3
**paying** 769:23
**pending** 760:6
**people** 756:22
757:21 758:5,14
759:19 761:14,16
761:20 763:22
764:3,9,20 767:16
767:17 768:1
769:22 778:6
782:24 783:13,14
786:5 789:10
795:15 807:8
830:23 832:11
833:2,12 834:6,18
835:4,18 836:25
837:2,8,11 839:3,21
840:18 841:13
844:12,19 847:4,21
852:19 853:13

857:13,18 858:9
**peoples** 772:4
**perceived** 764:7,24
837:11 849:13
**percent** 766:18
769:14 770:20
781:21 850:14
**perception** 788:17
**performance** 807:12
**performing** 845:3
**period** 724:15
729:22 747:14
775:4 780:12
807:13 812:25
850:12
**permission** 797:7
**person** 759:2,2,15
759:16,17 833:11
**personal** 731:20
824:5,9,9
**personnel** 724:25
**phone** 731:20,20,20
743:24,24,25
746:11,12,12 784:1
786:22
**phonetic** 732:16
776:5 796:25 800:3
**phrase** 767:25 844:8
844:10,15
**physical** 814:13,18
**physically** 809:7
810:1
**piche** 763:22 769:7
769:22 770:17,24
771:20,22,23
772:14,15 774:6,8
774:10,16,17,21
775:1,2,5,15,19,21
776:22 777:1,6,8,17
777:18,21,23
778:22 779:12,13
780:7 781:12,18,20
782:9,18 783:1,11
783:12,17,19,21
784:2 796:2,5,18,20

797:1 800:15,25
807:10,19,23
825:24 826:18,19
826:20 827:4
832:11 834:5,8,8
835:4,12 839:11
842:20 844:12
848:3,11,22 849:13
849:15 854:4,9
859:14
**piche's** 775:23
776:10 777:1,4
778:15 781:24
**pick** 747:1 759:13
**picked** 788:25 789:5
**picture** 759:21
**piece** 798:15 827:13
**pinpoint** 732:1,5
**pipher** 796:25
**place** 729:2 732:22
734:3,12,14 741:12
758:12 768:5
784:11 786:12,22
787:18 805:18
812:6 820:15
827:25 831:9
841:22,23 845:12
**placed** 786:17
787:10 789:6,18,19
789:22 808:10
809:6 831:4,8
**placement** 786:15
788:7,23 790:6
854:18,19
**places** 857:10,19
**placing** 761:1 828:7
**plaint** 731:2 841:7
**plan** 786:9
**play** 792:6
**plaza** 714:18
**please** 716:13
717:22 721:15
722:1,8,12,15,22
751:17 755:21
756:6 787:1 791:12

806:10 829:25
834:21 849:6
861:17
**pline** 841:20
**plined** 761:3
**pllc** 715:9
**plural** 766:1
**point** 728:23 747:10
753:18,19 763:9
772:13 788:5 794:1
796:2 800:6,10
828:13 832:5,8
835:10 843:7
846:25 850:20
853:9
**pointing** 798:15
**points** 850:18
**policies** 741:18
803:1
**policy** 802:2,12,21
802:23 803:7,8,8,18
803:18,25,25 804:1
804:4,7,8,12,14,22
804:23 805:2,16
821:8 865:10
**polished** 786:5
**portion** 790:13
**position** 724:16
742:17 751:12
786:17 825:3
**positions** 858:13
**possession** 748:3
**possibility** 815:25
**possible** 734:10
738:6 753:2 768:16
784:8,9 807:16
814:23,23 847:17
**possibly** 753:12
844:16
**post** 720:1,13,20
721:3 860:23
862:20
**potential** 733:12
737:17

**practice** 758:1
**preceded** 841:9,10
**precedent** 843:15
**prefer** 720:17
779:17
**preferred** 734:14
735:18 768:15
**pregnant** 781:16,19
781:20 782:3
**preliminary** 717:15
734:4 820:8
**prepared** 727:14
728:4,6 865:18
**prerogative** 738:10
738:11
**present** 715:15
717:12 741:9
**presented** 743:12
**president** 738:2,3
826:23 842:20
843:1
**pressed** 778:9,10
783:9
**pressing** 794:8
**pretty** 726:22 732:7
737:24 768:17
773:6 788:3 840:1
**prevented** 848:14
848:15
**previously** 734:22
756:9
**printed** 774:21
**printing** 777:13
**prior** 726:11 774:5
780:17 785:15
827:9 838:5
**probably** 776:1
795:16
**problem** 747:5
757:15 857:14
**problems** 774:5
819:13 834:6
**procedure** 802:13
820:7 821:14,16

**procedures** 741:19
**process** 737:9
784:20 808:14
843:9
**professional** 863:7
**program** 785:24
795:15
**progressed** 724:10
**promoted** 724:12
732:12 838:20
**promotion** 845:3,18
**properly** 786:4
787:14 819:1 820:4
**prosecution** 737:21
**prospects** 816:17
**prove** 735:11 748:24
748:25 832:24
835:18
**provide** 852:6
**provided** 752:15
**provision** 735:7,9
**public** 716:3 863:8
**pull** 759:19 780:14
780:15 832:15
**pulled** 729:6 773:1
778:2
**punch** 758:9
**purpose** 733:3
785:23 821:8
859:19
**purposes** 818:23,24
**pursuant** 735:5
741:18
**pursue** 751:14
**pursued** 751:9
**put** 716:13 759:19
761:21 764:3,9,20
768:1 785:2 819:17
819:18 826:14,18
826:20,25 827:4,8
827:12 828:6,14,15
830:23 840:2,3
845:5 852:12
853:23 857:18

**putting** 761:14
808:7 819:9 836:15

**q**

**quarter** 792:13
**question** 720:5
722:2,4,8 730:24
744:24 763:12
804:4,10 806:7
809:21 813:12
814:7,20 815:8
816:12 829:24
834:15 837:4
839:14 842:24
848:2
**questions** 721:22
722:2 752:2 820:22
829:25 855:13
858:22
**quick** 855:10 856:15
**quickly** 758:24
**quiet** 840:1
**quit** 751:11
**quite** 725:25 787:20
798:10 814:5

**r**

**r** 716:1 722:18,25
751:17 752:19
755:21 756:6,8,9
762:17 766:14,15
768:21 769:10,14
769:15 801:23
802:6 803:4,5,6,7
803:21 804:4,10,12
818:3 819:25 822:4
834:20,23 850:1
852:9,16,18,18,18
855:3,9,18 863:1
**radio** 778:5,11,17
**radliffe** 777:20,22
**raining** 773:3
**rank** 725:11 726:3
**rassment** 812:6
**rat** 758:18 759:16
760:8,8 807:9 808:5

830:2 853:19
854:22 855:19
856:21,23
**rats** 835:23
**read** 755:19 766:10
767:11 769:3,13
830:21 852:20
853:22 856:21
**reading** 753:16
852:25 853:4
**reads** 767:18
**ready** 793:10,13
808:25
**realize** 853:13
**really** 719:24 759:8
770:23 803:12
813:16 815:21
840:14 843:6,10
859:20 862:14
**reason** 722:11 765:2
765:5 810:21,22
811:16 812:24
839:12 846:13
**reassemble** 719:7
776:7
**reassignment** 765:3
828:9
**rebuttal** 860:7
**rec'd** 865:2
**recall** 722:3 735:25
736:22 741:25
749:14 755:3,5
757:11 776:22
**receipt** 861:8 862:20
**receive** 718:20
**received** 724:1
730:1,4,7 736:18
740:20,22 744:6
747:20 754:13,16
756:10 768:21,23
768:25 769:15
770:5 772:21,24
786:22 789:4 805:5
806:6,14 828:23
838:16 852:9 860:2

860:5
**receiving** 747:19
**recognize** 719:9
752:8 762:5 824:20
836:22 837:2,5,10
**recollection** 730:12
746:16 756:13
777:14 798:17
**record** 716:14
717:24 718:14,17
719:22 721:21
722:23 739:24,25
751:18 769:3 780:9
791:11,13 805:2
809:1 859:23
**recorded** 741:5,7,11
741:16,17 742:1
744:12 749:7
750:21 770:11
799:16 800:18
**recordings** 741:15
**records** 718:22
719:23 720:14
732:2 734:24 735:1
752:15 769:5 865:8
**recross** 855:15
864:7
**redirect** 851:2,5
856:18 864:7
**refer** 736:7 741:14
853:17 862:10
**reference** 721:1
864:17
**referenced** 720:23
847:4
**referred** 729:1
**referring** 718:24
739:2 740:4 766:7
776:3 803:4 810:18
**refresh** 730:12
756:13
**refusing** 775:12
**regard** 731:22
745:16 750:4,17
766:3 771:20

780:19 781:23
782:17 786:15
**regarding** 718:21
719:10 727:8
730:13 733:15
744:7 746:16
747:17 748:1,14,15
749:9,15 754:3,23
754:24 755:4
761:10 769:19
772:10 774:5 775:3
777:1 779:12,13
780:7 781:24
782:18 786:12,15
789:1 799:17,18
805:17 829:10
838:11 851:16,25
852:6,11
**regards** 753:15
765:12 777:5 800:8
**registered** 863:7
**regular** 822:17
**regularly** 818:19
**reid** 795:10
**relate** 729:15 779:6
**related** 766:18
863:13
**relates** 753:5 763:14
779:8 850:22
**relating** 754:9
**relationship** 732:9
732:11 824:10
**relative** 863:16
**relayed** 817:22
**relevance** 804:20,21
**relevant** 724:15
**relieved** 795:17
**reluctance** 814:20
857:12
**reluctant** 737:4,22
742:16 814:24
836:25
**remain** 723:4
**remark** 772:23

[remarks - right]

**remarks**  771:3
**remarried**  732:19
**remem**  833:17
**remember**  730:22
  730:25 756:15,18
  771:25 787:23
  844:15 857:22
**reminded**  758:8
**remove**  748:20
**removed**  734:1,2,3
**rensselaer**  714:7
  716:6,25 717:2
  724:17 733:16
  738:25 739:12
  741:19 754:4,25
  760:11 772:16
  790:13 802:1,11
  804:14 805:10,17
  806:19 807:4
  838:12 865:10,12
  865:15
**repeat**  730:24
  763:12
**repeated**  859:25
**rephrase**  813:12
**report**  725:4,9,14,16
  736:15,17,19,21
  743:9 744:6 746:19
  748:11 752:10,25
  755:7,14,18,23
  757:2 758:24
  761:20 763:7 764:1
  765:20 766:17
  767:4,11,13 773:23
  774:17,25 775:17
  776:15,16,17,19
  777:13,17 778:4
  781:13 787:9,22
  789:4 799:25 808:8
  809:24 810:19
  812:20,21 814:3
  818:20 821:17
  828:21,23,24
  829:10,15 830:18
  830:21 834:9 837:9

  837:16 840:6,12
  841:8 844:25 845:5
  847:5 848:19 849:8
  853:22 854:11
  857:5,13 858:2
**reported**  714:24
  731:25 757:8,9,14
  758:20 763:24
  783:5 807:20
  809:10,23 810:1
  815:16 816:2,17
  817:23 818:17
  821:21 828:2 830:4
  830:8 835:24
  837:15 839:8,16
  841:15,16 855:18
**reporter**  717:22,25
  863:8
**reporting**  725:12
  763:4 775:6 780:1
  816:18 821:3
  823:12,15 825:16
  837:7 840:20
**reports**  728:5 729:6
  729:7,11 731:3,5
  734:4,6,11 743:14
  747:2 756:25
  765:18,19,22 766:1
  766:2,16,18,24,25
  766:25 767:1,2,3
  770:4,6 771:24
  772:2,5,6,9 775:22
  775:24,25 777:7
  780:15 781:1
  782:20,20 783:8
  799:24 819:9
  829:19,20 830:14
  830:19 831:13
  833:3 842:22 846:4
  847:19 848:12,17
  849:4,6,9 850:18
  865:17
**represent**  716:24
**representative**
  741:8

**request**  771:12
**requested**  746:14
  857:5
**requesting**  814:3
**requests**  860:23
**resentment**  758:10
**residence**  781:2
**resign**  751:12
**resolve**  718:19
**resolved**  781:15
  860:11
**respect**  763:10,21
  763:23 765:17
  834:3 837:6 840:23
**respectful**  824:14
**respecting**  812:5
**respond**  778:1
**respondent**  751:25
  756:1 762:2 801:23
  805:10
**respondent's**  718:3
  727:23 728:2 730:6
  739:6,11 740:21
  751:21 754:15
  756:8 761:23
  768:24 801:19
  805:4 806:13 859:6
  859:9 860:4 864:6
  864:12,19,19,20
  865:4
**respondents**  714:9
  715:12
**responding**  775:16
  777:25 778:20
**response**  770:8
  775:18 830:5,6
**responses**  722:5
**responsi**  818:25
**responsibilities**
  820:1 822:2 836:10
**responsibility**
  813:18,19 821:22
**result**  751:13 777:3
  778:21,24 784:10
  786:18 811:5

**resulted**  773:6
**retalia**  799:18
**retaliating**  755:8,12
  763:16 840:8
**retaliation**  753:7,15
  753:22 754:9,21
  756:16 763:11,24
  765:13 784:14
  786:9,11 787:12
  800:22 801:3,10,14
  807:4 811:4 816:1
  816:17,23 817:3,5
  818:1,21 821:11,14
  821:20 822:10,18
  823:1 827:24 830:3
  836:18,24 837:7,11
  839:6,15 846:14
  849:10 854:2
**returned**  796:24
**review**  790:9 806:3
  851:13 853:2 855:2
  864:23
**reviewed**  731:5
  736:18 770:7
  777:18 781:5
  798:25 828:24
  851:11 852:11
**reviewing**  730:11
  731:3 852:18
**revised**  728:22
**richard**  726:10
  729:20
**rid**  836:16 843:21
**right**  718:18 720:25
  728:23 729:5 733:9
  752:5 761:18
  765:20 766:13
  783:4 788:12,12
  789:11 792:11
  793:6 794:13
  797:17,18 798:15
  798:25 808:9
  810:10,19,23 811:2
  813:21,24 814:3
  817:9 819:2 820:5,9

820:16,20 821:4,23
821:25 822:5,8,13
822:14 823:18,21
825:4,9 826:18,21
829:14 831:5,19,21
831:22 832:18
833:18,21,24 836:2
839:8 844:14
852:22 853:23
854:13 855:7,20,25
856:3,11 857:1,7
862:12

**rights** 714:1,3,13
716:5

**ring** 839:16

**rmr** 714:25

**road** 715:10

**robert** 750:7,25
776:5

**role** 763:9,13,13
814:11 815:24
818:22

**roll** 773:9,10,12,18
773:22 782:23
792:12,15 793:11
793:13 798:8
846:24

**rolled** 773:3

**room** 722:10 776:23
777:20 783:6
793:14,21 796:17
797:4,5 798:13
799:3,4 854:13

**roster** 789:17

**rosters** 859:16

**roughly** 858:10

**roy** 789:3,4,15 792:2
792:3,17 793:14,22
794:14

**rpr** 714:25

**rubbing** 749:22,23

**rule** 765:6,6

**ruled** 722:8

**rules** 757:16 833:9
833:20 835:21

**rumor** 839:21

**rumors** 845:13

**run** 777:19 860:17

**rundown** 724:8

**s**

**s** 716:1 722:18
766:24 865:1

**safe** 734:13

**sanction** 843:6

**saratoga** 863:5

**sation** 769:24

**saw** 783:1 808:4
841:8 860:14

**sawyer** 776:18,20
778:25 779:15
780:8,23 781:8
782:11

**sawyer's** 779:24
781:2,17

**saying** 764:19
783:18 786:23
803:14 820:23
825:10,13,14
832:25 834:8
841:12,15 842:1
853:13

**says** 765:18,22
766:16 767:5,20
769:21 804:13
820:3 825:11,15
830:1 833:10 835:1
853:13,18 856:5,7
858:2

**schedule** 793:19

**schedules** 807:18
859:24

**school** 723:22,22
768:4 844:13,17,23
847:7 848:4,6,23

**schoolers** 844:20

**scooby** 776:23

**screen** 791:14
794:25

**script** 717:19

**sd** 805:12 865:13

**seabury** 715:17
716:6,18 723:7,8

**seabury's** 821:5

**seamless** 785:2

**seated** 723:4 794:17

**second** 717:20
773:20 813:6 818:9
818:12 822:4 831:7
843:11,11 853:25
855:20,22

**seconds** 791:19

**section** 748:20
818:11,12 822:4

**sections** 821:7

**see** 743:16 755:18
765:23 791:6,13,14
792:21 797:12
807:18 817:6
818:12 830:14
832:15 833:13
850:5,10 855:11

**seeing** 795:19

**seen** 796:2 803:9

**selecting** 784:20

**send** 861:21

**sense** 845:10

**sensitive** 782:4

**sensitivity** 781:18

**sent** 846:6

**sentence** 767:5
853:18 856:11,20
856:22

**september** 837:24

**sergeant** 724:13,13
726:4 758:3,4
769:20 771:11,12
772:24 773:5,11
785:10 789:9
796:16 813:20
826:5,7

**sergeants** 753:12
759:4 771:5,10
789:11 793:4 809:7

**serious** 768:13,17
824:20 847:23

**seroy** 732:12,14,14
732:17

**served** 773:20
841:19

**service** 735:7 838:8
838:23,24

**services** 774:11
792:5

**set** 822:3,4

**settlement** 751:11

**severe** 734:1

**sex** 844:6 845:3,18

**sexual** 726:21
730:13,19,22 731:1
733:10,25 734:10
736:5 743:1,11
745:11 750:5,17
753:11 754:3
756:21 757:4,10
758:15 759:12,24
760:7,20 764:14
766:19 768:9,18
772:10 786:13,18
799:17 800:13
802:2 803:22 804:5
804:13 805:18
807:1,20 810:14
813:1 815:25 816:2
816:18 820:24
821:3,9,21 822:9,10
827:1 829:12 830:4
834:17 836:3,6,24
837:1,7,9,21,25
838:2,3,6,12,17,20
838:22,25 839:23
839:24 840:15
841:6,11,17 842:8
842:10 843:12,14
843:19,22 847:15
865:10

**sexually** 726:10
736:24 749:11

[sexually - snafu]                                                        Page 22

815:14
**sfb**  715:6
**sgt**  726:9 729:19
731:7,10,11,13,17
731:18 732:4,12,14
732:14 733:7,12,15
734:22 735:20,21
736:3,4,25 737:3,5
738:9 741:2 742:5,6
742:7,10,11,12,13
742:24,25 743:8,8
743:12,19,22 745:6
745:10,12 749:12
749:17,19 750:4,12
750:16 753:2,8,10
754:1 755:9,15
756:24,25 757:13
759:23 760:6,21,25
761:1,4,4,20 763:3
763:11,14,25
764:25 765:8
768:16 769:22
770:17,24 771:4,20
771:22,23 772:10
772:14,15 774:4,5,8
774:8,9,10,15,16,17
774:21,25 775:1,2,3
775:5,5,15,15,17,19
775:19,21,21,22,23
776:8,10,15,22
777:1,1,2,4,4,5,8,8
777:18,21,23 778:2
778:3,9,14,19,22
779:10,12,13 780:7
780:19 781:24,24
782:9,17,18 783:1,1
783:16,16,19,20,21
784:2,7,22 785:7,15
785:21,25 786:16
786:23 787:8
788:18,21,25 789:3
789:4,5,13,15,20,21
791:22,22,23 792:2
792:3,17 793:5,7,14
793:17,17,22

794:12,14,16 796:2
796:5,17,20 797:1
798:14 800:3,14,25
807:10,10,10,12,19
807:19,19,20,23,23
808:9 809:6,10,10
812:12,15,16,18,19
813:2,4,10,18 814:2
814:20,22 815:1,4
817:4,23,23 818:1
818:19 820:2,14
821:21 822:13
823:18 825:20,24
826:9,10,16 827:21
835:4,4,5,12,12
836:14,16 837:16
838:11 839:7,16
841:18 844:10
845:2 846:4,4,7,7
846:11,15,22,23,24
846:25 847:3,24
848:3,9,12,21 849:4
849:7,10,13,15
850:7,23 851:7
853:14 854:4,17
855:18 859:13,13
859:14,14
**shared**  755:6 813:7
**shawn**  715:4 716:22
**she'd**  827:22
**sheet**  718:23 798:9
**sheets**  859:17
865:20
**sheriff**  725:2,6,21
733:5 739:12
776:12 783:10
802:13,22 803:13
865:15
**sheriff's**  714:7 716:7
717:2 724:2,5,7,10
724:17 725:7
733:16 739:1 740:3
741:19 754:5,8,25
760:11 772:16

781:8 782:3 802:20
802:24 803:3,8,12
803:23,25 804:5,15
805:3,11,17 806:19
807:5 838:13
865:12
**shift**  726:5,6 749:17
758:2,3 784:9
785:14,14,16,18,25
786:1,6 792:7,9
793:3 795:12
859:15
**shifts**  808:2
**shoes**  749:19
**shopping**  747:1
**short**  759:4 808:23
**shortly**  792:10
799:3
**shoulders**  749:22,22
**show**  718:17 735:12
739:9 751:24 762:1
768:18 801:17,22
802:16 805:9
834:20 848:12
**shown**  791:21
**shows**  718:14
**shredded**  799:13
**sick**  772:2
**sign**  847:11
**signed**  734:5
**simultane**  861:15
**simultaneous**  841:7
**sinnott**  774:4,8,10
774:15,25 775:3,6
775:16,17,19,21,22
776:8,15 777:2,4,8
777:18 778:2,3,9,19
781:24 783:1,16,20
784:7,22 785:7,22
785:25
**sinnott's**  779:10
782:17 785:15
**sir**  821:24 855:23
856:1

**sitting**  749:18
793:19 794:13
**situation**  735:17
742:19 775:9
787:14 800:8
**skip**  797:14
**sleep**  757:21
**sleeping**  729:21
757:1,9,14,15
758:20 760:2,10
761:4 764:7 768:12
827:2 830:8 837:3
839:8,17 840:5,20
841:6,10,16,25
843:4,8,15,16 844:3
853:21
**smith**  725:9 726:14
726:18 727:4
734:21 736:16
755:6 756:19
759:18 761:9,16
763:1,24 764:2,9,13
765:14,19,23
766:21 767:3,16,17
769:5,9 770:5 783:4
786:22 788:20
797:13 798:5,6,7,13
798:18,19 799:22
800:7 811:20
817:22 818:14,21
820:4 821:25
822:17 823:4,6,9
824:23 825:6,19,21
825:22 827:23,24
828:11 829:21
830:15 831:18,22
832:9 833:11,23
835:20 836:22
850:20 851:7,8,16
851:19 852:2,11
856:2,4,5
**smith's**  822:2
836:20
**snafu**  719:6

socks  858:1
somebody  725:18
  734:15,16 760:8,10
  765:7 773:9 786:3
  788:15 830:17
  831:12
soon  768:15
sooner  813:15,17
  814:12,17
sorry  716:25 730:24
  744:22 751:19
  763:12 766:8 779:3
  792:18 813:13
  814:15 826:9
  839:13 842:17
  852:15 855:3,22
sour  732:16,18,19
source  729:2,4
speak  731:13 737:6
  737:10,11 738:12
  744:9 779:2 789:1
  823:8,10 833:25
speaker  743:25
speaks  855:6
special  725:1
specific  724:22
  725:22 731:15,16
  759:1 769:19,19
  771:11,12 803:3,25
  805:16 833:3 835:7
  835:8 854:4,21
  857:9
specifically  759:15
  848:13 854:24
specifics  749:14
  759:9 768:8 771:15
  852:7
specify  786:25
speculate  722:6
spelling  721:20
spent  817:15
spoke  731:8 761:9
  761:16
spoken  767:9

spring  724:16 726:2
ss  863:4
stacy  732:15,16
  736:7,9 737:1,2,7
  737:10,13 739:16
  741:2,25 742:5
  743:5,9,23 744:18
  744:20 745:2,17
  747:12,17 748:12
  748:15 750:18,25
  769:11 807:2
staff  734:17 735:11
  735:12,13 738:15
  750:7 754:24 755:8
  755:11 756:20
  757:12,25 758:6
  764:6 767:6,9,9,21
  767:22 768:12
  769:6 774:14
  777:25 778:8,19
  783:25 784:21
  790:7 793:12
  812:13,18 838:1
  839:19,19 840:5
  858:13,16,20
stage  743:2
stalling  737:24,25
stances  820:9
stand  721:16 756:21
  812:17
standing  765:6
  793:18 794:12,15
stands  804:4
start  717:22 745:25
  791:18 792:6
started  724:2
  725:24 729:18
  749:21,23 844:2
starting  791:17
starts  729:19
state  714:1,3,18
  716:4 721:20
  722:22 728:19
  863:4

stated  750:11
statement  771:9,13
  771:19 816:9
  825:10 845:24
  854:4,7 857:2,3
statements  752:13
  753:17,18 784:7
  827:17 864:3
status  772:16
  806:21
stay  765:7
stayed  788:13
staying  786:4
  819:25
stenographic  863:11
step  764:17 808:13
steps  761:7,21
  763:10,15,21,25
  765:13,14 778:16
  814:3 817:1,1,6
  829:6 836:8,23
  837:6,10 850:15
stipulate  754:1
stood  778:9
stop  768:4
stories  853:15
stormed  773:17
story  750:9
stover  732:15,16,17
  736:8,9 737:1,2,7
  737:10,13 739:17
  741:2,25 742:5,12
  743:3,9,19,24
  744:18,20 745:2,17
  747:12,15,18,19
  748:12,15 750:18
  751:1 769:8,11
  807:2 809:7,14,15
  810:12 812:10,15
  812:16 813:8,22,23
  814:22 815:4 849:8
  849:17 857:22
stover's  745:10
strator  845:4

street  723:1
struggling  841:5
stuff  725:20 743:17
  759:3 761:7 780:16
  781:7,19 787:21
  800:4 819:9 824:3,9
  824:10 827:9,14
  831:2 832:23
  835:15 840:13
  844:14,18,24
  845:11 846:2 847:6
  847:7,14,20,24
  848:4,6,23 852:4
subject  736:5
  826:19 862:19
submission  720:1
submissions  861:16
submit  719:13,18
  720:11 772:9
  820:18 860:23
submitted  731:4,5
  736:21 775:24
  829:16,20 830:15
  831:13 834:9
  837:17 848:19
  849:7,9 850:18
substantial  810:16
substantiate  847:16
summary  729:15
summer  724:16
super  758:1 775:24
  821:18
superinten  725:7
  727:2
superintendent
  776:3
superior  820:19
supervised  772:7
supervisor  818:15
  818:23 820:1,19
  821:18,23 825:17
  833:1
supervisors  757:22
  788:11 821:17
  828:1

supervisory 743:10
838:3,19
supplementals
752:12
supposed 795:19
820:13,14,18 822:3
822:6 833:11,15,16
833:20 835:21
846:9,12 847:11
supposedly 812:16
823:2
sure 723:6 724:9
725:25 727:21
730:25 731:16
739:20 742:4
766:18 769:14
770:19 779:19
781:21 794:7
798:11 808:24
814:5,16 826:23
829:7 833:7 836:13
847:15
surfaced 840:16
surveillance 790:14
790:17,20,23
suspect 816:6
suspend 734:17
735:10
suspended 733:18
733:19,21,24
734:23 735:2,3,17
760:22 772:18,19
772:20 773:24
825:25 826:12
827:19 841:20,21
843:21
suspension 735:5
swear 722:15
773:14 783:1
swearing 852:19
853:8 854:21
switch 846:23 847:1
847:2,9,10
switching 792:10

swore 759:16
773:11
sworn 721:18
722:19 858:13,16

**t**

t 722:18 863:1,1
865:1
take 719:3 721:2,16
727:10 739:13
741:12,16 744:12
752:1 758:22
763:10,21,25
765:13,13 774:22
780:3 785:10
787:17,25 791:2
794:20 801:23
806:9 807:17
808:21,23 816:25
846:6 847:20
849:21 854:24
858:11,23
taken 728:5 734:13
760:18 761:7,22
764:18 774:15
779:14 797:24
829:17 831:10
836:9 837:10
849:24 860:21
863:15
talk 742:19 767:3,8
767:16,22 770:16
786:24 787:12
801:2,8 816:24
824:6 828:18
833:12 845:11
851:20,20,20,21,22
852:3
talked 736:20 743:6
743:15 744:3
761:12,13 767:6,17
769:6,8 770:12
782:7 783:11,24
789:3 811:19
828:21 829:1

831:12 851:8 854:8
858:16
talking 720:8
765:24 767:23
770:18,18,25 780:7
780:8 796:20
798:14 817:18
821:11 830:19
839:19 847:6,7
talks 783:13
tammy 776:19
tapes 833:12
targeted 845:8
task 754:7
tasked 776:10,12
tat 845:7
teasing 784:1
telephone 744:10
tell 724:9 747:25
761:9 780:10
784:17 799:21
811:15 821:22
825:3,6 828:13
847:21
telling 736:22
741:25 744:17
745:13 764:12
778:5 782:6 783:10
787:16 822:16
823:4,6 824:23
827:23 847:23
ten 838:5
terms 859:25
testi 736:6 774:3
testified 722:20
734:22 743:22
786:7,14 825:24
837:18 839:2,5
849:3
testify 750:10
811:24
testimony 717:17
728:7 743:22
745:11 774:4
779:10 784:6,10,12

785:16 816:7
818:18 851:7,9,21
851:22 852:5
thank 717:25 718:1
721:14 722:13
754:14 756:3,11
782:15 806:12
808:18 842:17
851:1 858:21,24
860:3,19 862:16,17
thing 730:21,25
764:22 783:24
784:5 809:15
827:24 834:19
835:10,17 836:13
840:5,10 847:17
852:20
things 717:16 750:1
758:19 760:18
771:10 819:7,13
824:5 831:15
835:18 837:16
840:11 847:22
858:8
think 719:18 727:15
727:18 732:7,10,17
736:6 746:24 751:8
755:7 757:21,22
760:12 774:11
776:1 779:2 782:8
782:10 783:2,3
789:13,14 793:5
799:6,9 800:2
807:11 819:7,8,10
828:22,22 830:23
836:15 837:24
843:7,14 853:19
854:14,15,15 858:2
860:13,14 861:3
thinking 784:3
811:8 851:19
third 717:20 813:9
815:2
thirty 861:7,9

**thomas** 776:19
783:25 784:3
**thorough** 819:8
820:7
**thought** 734:22
756:23,23 757:8
763:19 784:9 814:6
815:18 827:1 837:3
839:21 840:4 855:4
862:14
**three** 717:12,17,18
753:12 754:4
772:21 775:12
776:1,2,9,11 779:1
782:24 787:19
807:7 815:1 818:11
847:16,17
**thrown** 835:16
**tie** 749:23
**tied** 840:10 855:25
**tier** 726:11 786:16
**tile** 785:4
**time** 718:21,25
719:4,22 720:4,14
721:25 722:12
724:8,15 726:8
727:3,13 728:4,6,23
729:8,22,22 730:11
731:8,15,16,23,24
732:2,6,13,22
733:21 736:8
737:12 739:17
741:18 746:3
747:14 748:22
749:6 753:19 754:7
754:22 757:12
759:23 763:2,9
768:14 771:8,21
775:3,6 778:4,4
779:1,18,21 780:12
780:25 781:4,7,16
785:20 786:2
787:20 788:5 790:1
790:17 791:18
792:3,4,15 795:3,24

796:8,16 800:17
802:3 805:19
807:13 808:1 809:5
809:9 810:9,17
812:2,25 813:5
814:21,25 824:17
828:13 829:17
832:5,8 835:13
836:1,4 838:21
842:15 843:10
848:8 850:13,21
853:25 857:18
859:16 861:2
865:17,20
**timely** 836:17
**timers** 758:7
**times** 757:18 799:13
807:22 843:16
845:12,25 859:13
**tion** 773:10 782:12
784:14 799:19
**tions** 807:2
**tired** 772:2
**tit** 845:7
**title** 774:11
**titled** 805:10
**today** 717:15 721:11
820:3 833:10
**told** 726:18 727:5
736:24 742:5
743:22 745:7 748:2
748:2 755:11
756:20 761:16,21
767:8,9,10,14,19,20
767:25 770:16
783:12 784:12
787:20,25 794:6
798:19,19 800:1
801:11,14 808:3
811:13,20 812:3
821:25 822:16
824:25 827:25
834:2 839:11,15,17
856:2,5 857:23

**tolerated** 801:15
**tom** 781:8 782:10
**tommy** 781:17
**tommy's** 781:17
**top** 780:16 791:22
804:13 853:18
**topic** 804:13
**total** 772:21
**touched** 810:1,13
**touching** 815:14
**tower** 714:18
**traffic** 785:14
**training** 724:13,20
725:15 743:10,16
743:18 785:19,20
837:19,21,25 838:1
838:6,8,12,15,17,22
838:23,25
**tran** 717:18
**transcript** 720:3
851:11 861:6,8,24
862:3 863:9,10
864:22
**transcripts** 717:18
851:13 862:1
**transport** 724:11
781:9
**tried** 787:12
**triggered** 841:25
**trouble** 777:10,13
**troy** 723:2,23
**truck** 773:2
**true** 740:2 752:14
764:4 780:21
840:14 863:10
**truly** 771:17
**trust** 832:1
**trusted** 800:2
**truth** 744:17 745:12
**try** 743:14 759:13
792:14 813:12
815:9 859:24
**trying** 731:21 732:5
744:23 758:21
776:12 777:10

778:13,14 779:10
781:14 795:23
814:21,22 840:9
842:15 847:18
848:17
**turned** 829:12
**tuted** 750:5
**two** 750:14 770:4
775:11 782:7
802:25 803:1 812:9
815:1 829:2 861:11
861:11
**type** 741:4 755:16
785:5 844:14,17,23
848:4,6,23
**typewritten** 746:19
854:11
**typical** 795:11
**typically** 726:5
793:1

___

**u**

**uh** 797:19
**ultimately** 750:16
751:6,8 843:20
**unapproachable**
771:6,11
**uncomfortable**
771:4
**underlying** 754:3
**undersheriff** 725:7
761:13 764:3
767:14,15
**understand** 722:4
744:24 764:4
782:25 812:2
821:12 836:12
839:13 842:24
**understanding**
719:11 733:3,23
735:16
**understood** 799:21
**unfair** 757:13 764:8
787:11 788:18

**unfounded** 778:15
**uniform** 796:13
**union** 737:23 738:2
  741:8 826:22
  842:20 843:1
**unit** 764:24 765:4
  787:17,18 788:16
  788:17,24 789:7
  817:7,15 819:17
  831:4 837:14 846:6
  846:10,13 847:12
**units** 787:11
**unknown** 769:22
  813:6
**unsavory** 840:11
**unsigned** 776:14
**unsure** 727:4
**unwanted** 815:14
**upset** 782:12 787:20
  787:24 822:14
  824:19 826:16
  828:10 829:3 846:5
  847:2
**upsetting** 788:18
**use** 766:4 797:16
**uses** 724:24

### v

**valley** 723:20
**vandenburgh** 715:3
  716:23
**vega** 736:3,4,14,14
  736:19,22 792:25
  807:2
**verbal** 783:21
**verbally** 726:15,17
**versus** 716:6 757:9
**vice** 738:2
**victim** 742:12
  813:20
**victimized** 812:18
**victims** 734:10
**video** 790:9,13,16
  790:20,22 791:14
  791:15,21 795:24

799:1 832:15
  864:23
**videos** 778:2
**viewed** 736:11
  811:16
**vigorously** 843:13
**violations** 819:1
**virtually** 835:2
**visitation** 782:22
**visor** 821:19
**visors** 758:2
**voir** 728:13,16
  740:10,13 752:21
  752:23 753:24
  762:19,21 802:9
  864:11
**voluntary** 752:12
**vs** 714:6

### w

**wait** 722:8 767:24
  825:7 852:24
**waiting** 720:11
**wal** 746:21,21,22
  747:1 748:5
**walk** 793:13
**walked** 776:23
  788:22 793:20
  794:25 796:17
**walking** 769:24
  786:5 794:19
**want** 717:16,24
  722:5 723:6 742:17
  745:23 747:7
  750:12,15 765:16
  770:1 779:4 782:1
  788:1 791:1 803:21
  808:20 811:22
  812:10 813:4 815:3
  815:5,5,11,13,15
  832:1 834:12 840:2
  840:17 855:2 859:3
  862:5
**wanted** 719:18
  734:12 737:14

738:10 742:13
  749:25 777:22
  786:24 804:24
  821:10 844:8,12
  847:9
**wanting** 785:10
**wants** 719:18 721:2
  804:10
**warm** 722:10
**warning** 772:22
  783:21 808:10,12
  808:13 852:13
  853:23
**washington** 715:4
**watch** 726:7 783:12
  788:22 790:9,12,23
  791:25 792:4 794:2
  794:11 795:13,21
  796:6 832:16 835:3
**wave** 847:18
**waved** 777:20
**waxed** 786:6
**way** 726:16 737:20
  755:11 767:18
  783:12 788:4
  789:22 791:2,10
  794:25 797:14
  808:10 830:13,16
  835:24 850:13
**ways** 844:24
**we've** 761:7 785:4
  799:12 807:11
  830:22
**wearing** 796:12
**webster** 733:2,6,11
  751:3 752:11 754:1
**week** 861:13
**weeks** 861:11,11
**welcome** 810:13
**wendy** 736:2,14,19
  736:22 807:2,2
**went** 729:14 732:17
  743:18 746:3,7,10
  760:23 799:9
  831:21 838:19

**widely** 756:22
**wife** 840:7
**william** 714:8 716:7
  732:3 733:1
**willing** 837:8
**wind** 849:20
**winding** 793:3
**window** 773:3
**wing** 774:12,13,16
  774:19 777:9
  858:17
**wishes** 812:5
**withdraw** 815:12
  839:4 844:9
**withdrawn** 854:1
**witness** 721:11,16
  721:18 722:13,16
  722:24 723:10
  727:18 735:8
  737:23 738:6,13,17
  738:23 739:3
  743:25 744:10
  745:6,19 752:3
  755:21,22 756:2,3,6
  756:11 757:11
  758:23 760:3 766:1
  766:8,12,15 773:13
  779:3,22 782:5,10
  790:6 797:5,16,20
  801:25 803:15,19
  806:11 811:7
  815:18,21 817:14
  818:7 822:21
  825:14 830:9,13
  834:16 841:9,18
  842:2 845:16,19,22
  849:21 853:5
  855:10 857:12
  858:11,17,23,25
  864:7
**witnesses** 714:21
  737:17 782:25
  860:7,7
**woken** 758:8

[women - york]

**women** 782:3 807:1
813:1 816:6 838:11
849:10
**wondering** 779:6
**word** 728:19 766:16
769:13,13 826:23
**words** 810:17
**work** 725:2 726:5
731:19 734:3,12,13
735:21 746:4
757:16 765:4 768:5
771:5 800:12
807:17 810:24
812:6 819:22 831:2
841:22,23 842:12
844:19 853:20
858:10
**worked** 726:6
807:18,22,25 808:2
857:23 859:15
**working** 724:2,4
725:8,22,24 800:11
810:23 818:20
**works** 781:8
**worse** 757:7
**worth** 805:1
**write** 761:5 772:24
829:13 846:9
**writes** 829:10
**writing** 726:15
727:2,5 756:25
771:24 772:1,5,5
819:9 820:15 827:9
827:13 845:1
**written** 730:19
744:6 753:20
765:19 766:25
767:3 772:9,22,22
773:19 774:23
775:22 777:8
789:21,24,25
799:24 808:10,13
829:7 841:19,24
842:4 865:5

**wrong** 718:17 735:2
777:16
**wrote** 762:7,11
767:2,2 774:17,25
775:16 781:13
799:25 800:25
846:5

| x |
|---|

**x** 833:1 864:1 865:1

| y |
|---|

**y** 833:2
**yeah** 794:22 795:14
798:6 817:19
821:17
**year** 780:12 837:22
838:21
**years** 726:11 774:6
809:12,13,16,18,20
809:22 838:5,10
**yell** 783:1
**yelled** 846:22
**yep** 741:14 776:9
791:20 798:16
850:11 851:24
**york** 714:1,3,13,19
715:5,10 716:4
723:2,23 863:4