Exhibit 6



NEW YORK STATE
# DIVISION OF HUMAN RIGHTS
ONE FORDHAM PLAZA
FOURTH FLOOR
BRONX, NEW YORK 10458

(718) 741-8400
Fax: (718) 741-3214
www.dhr.ny.gov

ANDREW M. CUOMO
GOVERNOR

GALEN D. KIRKLAND
COMMISSIONER

April 24, 2013

Re:   Lora Abbott v. Rensselaer County, Sheriff's Department, William Fenton as Aider and
       Abettor
Case No.   10144564

To the Parties Listed Below:

Enclosed please find a copy of my proposed Recommended Findings of Fact, Opinion and
Decision, and Order.  Please be advised that you have twenty-one (21) days from the date of this
letter to file Objections.

Your Objections may be in letter form, should not reargue material in the Record, and should be
as concise as possible.  Objections provide the parties with an opportunity to be heard on the
issues in the case before the issuance of a final Order of the Commissioner.  *See* Rules of
Practice of the Division of Human Rights, 9 NYCRR § 465.17(c).

Please address your Objections to Peter G. Buchenholz, Adjudication Counsel, at the address
below.  Mail copies to all parties and their attorneys, including all of the following where
applicable:  complainant(s), complainant counsel, respondent(s), respondent counsel, and
Division counsel, at the addresses in the list below.  A copy must also be mailed to Robert
Goldstein, Director of Prosecutions, Division of Human Rights, who is also listed below.  Any
documents not copied to the aforementioned individuals may not be considered.  The Objections
must be filed by May 15, 2013, at the following address.

NYS Division of Human Rights
Order Preparation Unit
Attn: Peter G. Buchenholz, Adjudication Counsel
One Fordham Plaza, 4th Floor
Bronx, New York 10458

No extensions of time to file Objections will be granted, except for good cause shown, by written
request to the Order Preparation Unit.  If the Objections are not received by the Order
Preparation Unit by the deadline noted above, the Division will assume that you do not object to
the proposed Order and will proceed to issue the final Order under that assumption.



Please contact Peter G. Buchenholz, Adjudication Counsel, at (718) 741-8342 if you have any
questions regarding the filing of Objections.

Very truly yours,

Christine Marbach Kellett
Christine Marbach Kellett
Administrative Law Judge

TO:

Complainant
Lora Abbott
224 Fifth Avenue
Troy, NY 12180

Complainant Attorney
Kevin A. Luibrand, Esq.
Luibrand Law Firm, PLLC
950 New Loudon Road, Suite 270
Latham, NY 12110

Respondent
Rensselaer County, Sheriff's Department
Attn: Stephen A. Penchenik
Ned Pattison Government Center, 1500 7th Avenue
Troy, NY 12180

Respondent
William Fenton
7 Moch Terrace
Rensselaer, NY 12144

Respondent Attorney
Shawn F. Brousseau, Esq.
Napierski, VanDenburgh & Napierski, LLP
296 Washington Avenue Extension
Albany, NY 12203

State Division of Human Rights
Robert Goldstein, Director of Prosecutions
One Fordham Plaza, 4th Floor
Bronx, New York 10458

Christine Marbach Kellett, Chief Administrative Law Judge
Christine Marbach Kellett, Administrative Law Judge
Sara Toll East, Chief, Litigation and Appeals
Caroline J. Downey, General Counsel
Peter G. Buchenholz, Adjudication Counsel
Matthew Menes, Adjudication Counsel



ANDREW M. CUOMO
GOVERNOR

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

---

NEW YORK STATE DIVISION OF
HUMAN RIGHTS
   on the Complaint of

LORA ABBOTT, Now Known as LORA
ABBOTT SEABURY,

                  Complainant,

        v.

RENSSELAER COUNTY, SHERIFF'S
DEPARTMENT, WILLIAM FENTON AS
AIDER AND ABETTOR,

                  Respondents.

**RECOMMENDED FINDINGS OF
FACT, OPINION AND DECISION,
AND ORDER**

Case No. **10144564**

## SUMMARY

Complainant charged Respondent with unlawful discriminatory practices in employment due to sexual harassment by her co-worker Fenton in 2007, and a hostile work environment by her co-workers after she reported Fenton's misconduct. Complainant failed to meet her burden of proof regarding Fenton's sexual harassment in 2007 and the charged should be dismissed. Complainant did meet her burden of proof regarding the hostile work environment created by her co-workers after she reported Fenton's conduct.  Complainant is entitled to damages. Civil fines and penalties are assessed against Respondents.

## PROCEEDINGS IN THE CASE

On October 14, 2010, Complainant filed a verified complaint with the New York State Division of Human Rights ("Division"), charging Respondents with unlawful discriminatory

practices relating to employment in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law")[1].

After investigation, the Division found that it had jurisdiction over the complaint and that probable cause existed to believe that Respondents had engaged in unlawful discriminatory practices. The Division thereupon referred the case to public hearing.

After due notice, the case came on for hearing before Christine Marbach Kellett, an Administrative Law Judge ("ALJ") of the Division. Public hearing sessions were held on January 4, 5 and 6, 2012 and on March 9, 2012.

Complainant and Respondents appeared at the hearing. Complainant was represented by Kevin A. Luibrand, Esq. Respondents Rensselaer County and Rensselaer County Sheriff's Department were represented by Shawn F. Brousseau, Esq.

At the public hearing the complaint was amended to reflect Complainant's correct legal name as Lora Abbott Seabury. (Tr. 25) In addition to Lora Abbott, Complainant is also referred to as Lora Lupo (Complainant's Exh. 1), Lora Johnson (Complainant's Exh. 2) and Lora Seabury (Complainant's Exh. 23) and Lora Abbott.

William Fenton did not appear. Proof of service of the Notice of Hearing on Fenton hearing was placed on the record.

Permission to file post-hearing briefs was granted. Counsel for the parties filed timely post-hearing briefs. These briefs were duly considered.

---

[1] The complaint received by the Division designated the Respondent as Jack Mahar, as Sheriff of the County of Rensselaer. The Division recorded the Respondents as Rensselaer County, Sheriff's Department, William Fenton as Aider and Abettor. Papers served by the Division continued designating the Respondents that way. When the hearing ALJ asked about this, the parties indicated the County and the Rensselaer County Sheriff's Office were the proper Respondents. (Tr. 22-23)

Subsequent to the hearing the ALJ asked for specific information relating to disability retirement. Her inquiry and Complainant's attorney's response are received as ALJ Exh. 4.

## FINDINGS OF FACT

1.   Respondents Rensselaer County (County) and the Rensselaer County Sheriff's Office (Respondent) operate the Rensselaer County Jail. The Jail is a maximum security facility used to house individuals accused of, or convicted of, serious crimes. (Tr. 31-32)

2.   Respondents have a policy and procedure regarding sexual harassment. (Respondent's Exh. 21)  The policy prohibits conduct which "has the purpose or effect of unreasonably interfering with an affected person's work performance, or creating an intimidating, hostile or offensive work environment." (Respondents' Exh. 21)

3.   Significantly the policy imposes sanctions on any supervisor or manager who having been made aware of such conduct by a subordinate, knowingly allows such acts to continue." (Respondents' Exh. 21)

4.   Richard Fenton (Fenton) was employed by Respondents as a Sergeant at the County Jail.(ALJ Exh. 1)

5.   Respondent hired Complainant in December 1993 as a Correction Officer at the County Jail. (ALJ Exh. 1)  Complainant rose through the ranks and became a Sergeant in January 2002. (ALJ Exh. 1; Respondents' Exh. 1)

6.   Complainant was well-qualified for her position, and performed her duties well. (Tr. 26, 37)

7.   Prior to 2008, Complainant and Fenton were both assigned to the A-line which is from 11 p.m. to 7 a.m. (Tr. 41-42

- 3 -

8.  Complainant described two sexual assaults by Fenton in 2007, one in which Fenton grabbed her breasts and another in which Fenton grabbed her buttocks. (Tr. 43-45)  After the second assault, Complainant advised Fenton she would tell both the Captain and his wife if he continued.  (Tr. 45) He stopped and there were no further sexual incidents. (Tr. 45) Complainant did not report these assaults at the time as Fenton left her alone. (Tr. 45-46)

9.  Sometime in 2008, Complainant casually mentioned to a Lieutenant Beaudry that Fenton was a "boob-grabber" but provided him with no specific details related to her incidents in 2007. (Tr. 49-50)

10.  The record fails to show Beaudry took any steps to investigate Complainant's report of Fenton being a "boob-grabber".

11.  In 2008, Complainant was designated Primary Watch Commander for the A-line shift (11:00p.m. to 7:30 a.m) at the County Jail, taking over Watch Commander duties from Fenton, who ceased working the A- line shift. (ALJ Exhibits 1 and 3)

12.  The Watch Commander position is prestigious as its designation makes the incumbent the highest ranking officer on the shift. (Tr. 519-522) One of the more tangible benefits is the additional overtime earned due to the increased supervisory responsibilities. (Tr. 519-522)

13.  Fenton moved his shift to the afternoon shift (B-line) when he lost the Watch Commander position. (Tr. 53)

14.  However, while Complainant was out on medical leave beginning in January 2010, Fenton began picking up overtime on the A-Line. (Tr. 52-57)  When she returned from leave in March 2010 and resumed Watch Commander duties on the A-line, Fenton told her he wanted to come back to the A-line, and that he was a changed person. (Tr. 55)

- 4 -

15. At all relevant times, Complainant's direct supervisor was a Lt. Hetman, to whom any incident reports would be sent. His direct supervisor was Captain Harold (Hal) Smith (Smith), who held the authority at the facility. (Tr. 80)

16. Complainant and Smith had been personal friends for years. (Tr. 64)  They spoke together just about every day. (Tr. 590)

17. On April 20, 2010 Complainant filed an incident report with Hetman and Smith regarding Fenton's conduct on April 20, 2010, after Fenton wrote in big red letters in the log book regarding instructions Complainant had given him. (Tr. 62) In the incident report Complainant stated she was tired of what she described as Fenton's continuing harassment but gave no specifics as to Fenton's other conduct. (Complainants' Exh. 13; Respondents' Exh. 1)

18. Complainant had been discussing Fenton's work habits for years with Smith.  In fact, it was Complainant's reports to Smith regarding Fenton's failure to perform his duties as Watch Commander that led to the assignment being taken away from Fenton and given to Complainant in 2008.  (Tr. 54)

19. Smith agreed with Complainant that Fenton's red ink log book entry was inappropriate. (Tr. 238)

20. Also at the direction of Hetman on April 20, 2010 Complainant filed a second incident report indicating that she found Fenton sleeping on the job. (Tr. 62-63; Respondents' Exh. 2)  In this report Complainant also noted Fenton pushed passed her without acknowledgement, conduct she found disrespectful and harassing. (Respondents' Exh. 2)

21. In response to the two incident reports, Smith told Fenton to "knock it off." (Tr. 238)

22. In response to the two incident reports Smith told Complainant to remain professional. (Tr. 63-64) After Smith told Complainant to be professional, Complainant told him about Fenton trying to kiss her and grabbing at her breasts. (Tr. 64-65)

23. Smith kept saying I don't believe it. (Tr. 64-65) He asked her if she was going to report it. (Tr. 65)

24. Complainant told Smith she did not want to report Fenton for sexual harassment in 2007 because she just wanted to be left alone and did not need the humiliation of people saying Fenton grabbed her. (Tr. 65)

25. The record fails to show Smith taking any steps in April of 2010 to investigate Complainant's verbal report to him of Fenton's sexual assaults.

26. On April 27, 2010 Fenton filed a so-called "informational" incident report charging Complainant with being out to get him and harassing him. (Respondents' Exh. 3)

27. After Complainant reported Fenton's sleeping, his friends began making comments regarding not letting her see them with closed eyes. (Tr. 65-66) One officer told her she had opened a can of worms. (Tr. 65-66)

28. Officers were permitted to snooze on the night shift but Fenton had been creating a sleeping space for himself with blankets. (Tr. 61-62).

29. Smith responded to Complainant's report of Fenton sleeping by telling her to remain professional around Fenton. (Tr. 63-64) Complainant responded angrily to this comment and told Smith about the 2007 incidents. (Tr. 64)

30. On or about May 26, 2010, Complainant filed a third incident report against Fenton which included reports of comments made by Fenton regarding a potential grievance over an overtime assignment, about Fenton not moving away from the commander desk when she

- 5 -

needed to get in it, and about a verbal altercation between Complainant and Fenton on May 26, 2010. (Tr. 66-70, Complainant's Exh. 14; Respondent's Exh. 4).

31. In this May 26, 2010 incident report, Complainant reported the two sexual assaults by Fenton against her and that Fenton had sexually harassed two other female officers, Officer Michele Hoffman (Hoffman) and Sergeant Stacey Stover (Stover). (Tr. 43-44; Complainant's Exh. 14; Respondents' Exh. 4).

32. Complainant described Fenton's general conduct toward her as harassing and annoying. (Tr. 54)

33. On May 27, 2010, Hoffman herself, after being directed to do so by Complainant, filed an incident report detailing Fenton's sexually harassing conduct. (Tr. 76, Complainant's Exh. 15; Respondents' Exh. 5)

34. On May 27, 2010, after receiving reports of sexual misconduct from both Complainant and from Hoffman, Respondent immediately placed Fenton on Administrative Leave. (Respondents' Exh. 6)

35. On May 27, 2010, Smith also requested a criminal investigation be opened regarding Fenton's alleged misconduct. (Respondents' Exh. 13)

36. On May 27, 2010, Complainant made a voluntary statement to Investigator William Webster at the Sheriff's office in which she detailed the 2007 sexual assaults as well as the other alleged sexual assaults on her co-workers. (Tr. 78-79; Complainant's Exh. 16)

37. Although Fenton has no direct contact with Complainant after May 27, 2010, (Tr. 735) Fenton had his supporters among the other officers. There were two cliques among the officers: one, consisting of Sergeant John Hayes, and Officers Timmy Hayes, David Hayes and Jimmy Suriano, was particularly associated with Fenton while the other, consisting of consisting of

Sergeants Piche, Higgitt, Connell, Jr. and Officers Jamie Kozowsil, Joe Bruno and Jay Burns, had close relations with many other officers at the Jail. Collectively the two groups were referred to as the Boys Club. The members were well known for openly refer to other officers as "fags" and "faggots" if male, and "bitches" if female. (Tr. 153)  The groups had a reputation for "bullying" other officers.  (Tr. 156-57)

38.  Beginning in April when Complainant reported Fenton sleeping, members of the Boys Club began harassing Complainant with comments about not wanting to be seen with eyes closed lest they get reported for sleeping and making rat noises as she passed. (Tr. 40-41, 65-67, 83-85, 152-153) These remarks would be said during roll call and whenever Complainant passed by. After Fenton was suspended in May, the comments shifted to "Bitch" and "Whore" being said under their breaths or masked as coughs as she passed.(Tr. 40-41, 65-67, 82-85, 152-153).  They also made "Tsk, Tsk" noises, that is: the sound of a squeaking rat every time she neared them. (Tr. 82)

39.  On May 28, 2010, Fenton's friend, Sgt. Connell filed an incident report regarding Complainant's conduct on May 26, 2010.  Connell described Complainant as screaming obscenities at Fenton. (Respondents' Exh. 7)

40.  On May 30, 2010, Complainant submitted an incident report detailing a conversation she had on May 27, 2010, with Stover. Complainant described Stover's reaction to Complainant's report of Fenton's sexual harassment of Stover as one of anger at Complainant, which Complainant attributed to Stover's fear of retaliation.  (Tr. 89-90, 116; Complainant's Exh. 17; Respondents' Exh. 8)

41.  Members of the cliques also questioned other officers about why they would associate with Complainant and Hoffman as the two women were "Bitches" "Rats" and "fucking bitches." (Tr. 175, 176, 189)

42.  Complainant went almost daily to Smith, regarding remarks and asides addressed to her as she performed her duties,   but Smith kept advising her to ignore them, and be tough.  He told her "Lora, just let it slide" and "Lora, you know how those boys are."  Sometimes both Smith and Complainant would cry. (Tr. 86)

43.  Captain Smith knew Complainant had filed sexual harassment charges against Fenton. He knew the reputation of the clique. He took no official steps to stop the taunting.

44.  In the one month period between May 27, 2010, when Fenton was suspended, and June 26, 2010, Complainant's last working day, Complainant was scheduled to work on 19 days. Comparing her schedule with that of the offending officers, there were 38 different occasions when  Complainant and one or more of the offending officers either worked the same shift or would have been present together at the change in shifts. (Respondents' Exh. 24)

45.  Complainant reported that every day she worked members of the clique made harassing, derogatory remarks, and/or rat noises (Tr. 83)  I find that this large number of scheduling interstices over the short period of time created sufficient opportunity for the verbal sexually tainted harassment to be "severe and pervasive"

46.  Although Smith claimed he spoke with the offending officers, Smith did not follow up with any formalized counseling, did not conduct a formal investigation and most importantly, his inaction permitted the harassing conduct to continue thus violating the specific directions of the sexual harassment policy. (See: Respondents' Exh. 20)

- 9 -

47.  On June 19, 2010, Complainant filed an incident report detailing an exchange between herself and Sergeant Connell regarding an error Complainant has made, and stating that since Fenton had been placed on administrative leave her co-workers were not speaking to her, and were watching her every move. (Complainant's Exh. 19; Respondents' Exh. 9)

48.  In the June 19, 2010 report, Complainant describes the conduct of her co-workers as that of a "men's club" and that they have been allowed to "BULLY" staff for years. (Respondents' Exh. 9)

49.  On June 19, 2010, Hoffman also filed an incident report regarding comments directed at her, which was specifically related to the complaints against Fenton.(Respondents' Exh. 10)

50.  On June 21, 2010, Complainant's doctor, Keith Rebehn, M.D.,  put her on Lexapro for depression (Tr. 97-98) He described her as visibly upset, extremely anxious and agitated.[2] (Tr. 330-334)  He wanted her to go to counseling. (Tr. 335-337)

51.  On June 25, 2010, Complainant became aware of a retaliatory action taken against Hoffman when she saw Hoffman had been reassigned to a difficult unit when placed on mandatory over-time.  (Tr. 100-101) Complainant reported this to Smith.  (Tr. 103-104) At roll call, Complainant started to cry (Tr. 104-105)  Complainant left work visibly upset (Tr. 143-144, 149,

52.  On June 25, 2010 Complainant provided a report to Internal Affairs. (Tr. 114)

53.  On June 26, 2010, Complainant filed an incident report entitled "Harassment" in which she advises that she had discussed with Captain Smith her depression due to the abuse she was subjected to and to which he had continually told her "Be tougher." (Respondents' Exh. 12)

---

[2] At the public hearing Dr. Rebehn competed ___ is in the ___ records. (Tr. 334, 341)

54.  By June 29, 2010, Complainant had returned to Rebehn's office. (Tr. 338-339) She was in his words "in very bad shape" "distraught" and "suicidal"; there was, he stated "a general deterioration." (Tr. 339)  Complainant felt stranded and alone.  (Tr. 343) Rebehn described Complainant's work environment as "toxic." (Tr. 344) He added the medication Lorazepam to her medications. (Tr 345) Rebehn took Complainant out of work due to stress-related issues. (Tr. 344; Respondents' Exh. 19)

55.  At the public hearing Rebehn stated emphatically that it was unlikely Complainant could ever return to correctional work due to Post-Traumatic Stress. (Tr. 371)

56.  Complainant's psychiatrist, Dr Charles Van Meter, also opined Complainant could not return to work as a Correction Officer at the Jail. (Tr.384)

57.  Complainant described her reaction to the treatment by her coworkers as one of fear, dread, anger and as an emotional breakdown. (Tr. 99)  Her behaviour at work deteriorated and she began to make errors. She cried before work, she cried after work, and she cried at work. (Tr. 87, 95)  She dreaded getting up to go to work.  She broke down and cried while shopping when she thought about conditions at work. (Tr. 95)  She gained weight, a lot of weight. (Tr. 132-133) She would vomit. (Tr. 134) She lost interest in her usual activities.  She cried in front of her family. (Tr. 95) Her coworkers noticed her anxiety and distress. She was suicidal (Tr. 118)

58.  On June 29, 2010, Complainant applied for short term disability benefits as her physician reported her to be completely disabled from work by major depression, Post Traumatic Stress Disorder (PTSD) and Anxiety caused by conditions at work. (Respondents' Exh. 19)

59.  In September 2010 Complainant underwent a psychiatric evaluation at which she told the evaluator she had had suicidal thoughts and would kill herself if she ever had to go back to work at the correctional facility. (Respondents' Exh. 26)

60. Complainant suffered anxiety about her finances and fear that she would lose her house. (Tr. 120, 127, 352) She had had to use up her sick leave up in January and February due to needed surgery and now she was placed on sheriff's disability at $7.25 an hour, down from her $25.745673/hour  sergeant's pay. (Tr 120, 123; Respondents' Exh. 26)

61. She was upset over the impact her "breakdown" had on her relationship with her family and with her fiancé (now husband). (Respondents' Exh. 26)

62. Workers Compensation has determined Complainant suffered from a work related injury resulting in post-traumatic stress disorder, major depression and anxiety) and awarded Complainant $600 a week in damages which she continues to receive. Her medical expenses associated with the injury are covered by Workers' Comp.  (Tr. 136-137; Complainant's Exhibits 24 and 28)

63. Complainant remains unable to go back to work as a Correction Officer at the Rensselaer County Jail.  ( Tr. 361, 371, 390-392, 410, 426-427; Complainant's Exh. 23; Respondents' Exh. 26) She continues to suffer from depression, PTSD and anxiety. (Respondents' Exh. 26)  The physicians' reports and their testimony at the public hearing make clear she cannot pursue her career in law enforcement. (Respondents' Exh. 26)

64. In 2009, Complainant's last full year of employment with Respondent, Complainant earned $87,377.30 as an employee of Rensselaer County including overtime.  (Complainant's Exhibits 10 and 26)

65. Complainant expected to work a minimum of seven more years until she had twenty-five years of retirement credits at which point she could retire at half pay. (Tr. 49, 131)

66. Complainant is on medication for her mental health conditions. (Complainant's Exh. 23) At various times she has been prescribed Lexapro, Lorazepam, Abilify, Cymbalta, Vistaril,

- 16 -

and Zyprexa for anxiety, depression and mood stabilization. (Tr. 334-337, 357) She remains on medication for anxiety, depression and mood stabilization. (Tr. 358, 409)

67.   Complainant has not filed for disability retirement. (ALJ Exh. 4)

68.   Complainant received $580 biweekly as Sheriff's disability pay (Complainant's Exh. 12) for the period of June 27, 2010 through the first week of February 2011 (30 weeks/ 15 bi weekly payments) for $8700.

69.   Complainant also mitigated her damages by taking a position as a cashier on midnights at Wal-Mart in February 2011 where she earned $9.40 an hour for part-time work. Subsequently she was promoted to counting associate at Walmart during the day at $10.26 per hour for between 20 and 30 hours a week averaging $370 a week.  (Complainant's Exh. 25)  Her annual income from Walmart is roughly $19, 240 a year.

70.   Respondent drafted charges of misconduct against Fenton (Respondent's Exh. 20) On November 12, 2010 Fenton resigned in lieu of charges being filed. Further action on the criminal investigation regarding Fenton ceased.

71.   Testimony from fellow officers Donato Maselli (Tr. 151-153, 156-157), Robert Patrick (Tr. 175-177), and Dennis Sinnott (Tr. 191, 197-198, 201) confirmed the Boys Club members using terms such as fag, faggot, bitch, and lesbian  toward fellow officers together with conduct amounting to harassment and bullying toward  fellow officers, and particularly women including Complainant.

72.   Smith admitted overhearing Piche make a harassing comment regarding Complainant and doing nothing. (Tr. 580-581)  He admitted he urged Complainant to be professional and just let things take their course. (Tr. 596-597)

## OPINION AND DECISION

The Human Rights Law §296 (a) prohibits discrimination on the basis of sex. The Division and New York State Courts have found that sexual harassment constitutes unlawful sex discrimination. *SUNY College of Environmental Science and Forestry v. State Division of Human Rights*, 144 AD 2d 962, 534 NYS2d 270 (4th Dept. 1988)

In order to sustain a claim of sexual harassment involving a supervisor or co-worker, a complainant must show that the employer failed to exercise reasonable care to prevent and/or correct promptly any such sexually harassing behaviour. An employer may raise as a defense the fact that the victim unreasonably failed to take advantage of any protective or corrective opportunities provided by the employer. *See: Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 2293, 141 L.Ed.2d 662, 689 (1998)

In order to sustain a claim of a hostile work environment, Complainant must demonstrate that she was subjected to a work environment permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. The Division must examine the totality of the circumstances and the perception of both the victim and a reasonable person in making its determination. *Father Belle Community Ctr. v. N.Y. State Div. of Human Rights*, 221 A.D.2d 44, 50, 642 N.Y.S.2d 739, 744 (4th Dept. 1996), *lv. denied*, 89 N.Y.2d 809, 655 N.Y.S.2d 889 (1997).

1. Charge of Discrimination (sexual harassment by Fenton)

Complainant charged she was the victim of sexual harassment by Fenton when he physically accosted her at the workplace and made sexual overtures to her. She also claimed he

subjected her to harassment throughout her employment.

Regarding Fenton's sexual harassment of Complainant, Complainant reported two specific allegations of sexual harassment occurring in 2007. The Human Rights Law provides that "[a]ny complaint filed pursuant to this section must be so filed within one year after the alleged unlawful discriminatory practice." Human Rights Law § 297.5. This provision acts as a mandatory statute of limitations in these proceedings. *Queensborough Cmty. College v. State Human Rights App. Bd.*, 41 N.Y.2d 926, 394 N.Y.S.2d 625 (1977). The complaint was filed in 2010. The Statute of Limitations bars relief on those charges arising from the 2007 conduct.

An employer may not be held liable for sexual harassment unless it acquiesces in the harassment, or ratifies or condones it. *See Community Action Organization of Erie County, Inc. v. Mercado*, 261 AD 2d 935, 689 NYS 2d 807 (4th Dept. 1999) Respondents immediately suspended Fenton once Complainant filed her charges of sexual harassment against him. There was no condonation of Fenton's sexually harassing conduct. The charge of illegal discriminatory conduct based upon Fenton's sexual harassment in 2007 must be dismissed.

N.Y. Exec. Law, art. 15 (Human Rights Law) § 296.6 makes it an unlawful discriminatory practice "for any person to aid, abet incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so." Under this theory of liability, liability against the employer is required to find an aider and abettor liable. Where the case against the employer is dismissed, the case against an aider and abettor must also be dismissed. *Yerry v. Pizza Hut of Southeast Kansas*, 186 F.Supp.2d 178 (N.D.N.Y. 2002); *Kent v. Papert Companies, Inc.*, 309 A.D.2d 234, 247, 764 N.Y.S.2d 675, 685 (1st Dept. 2003). Reprehensible as Fenton's actual conduct may have been, either in 2007, or afterward, the sexual nature of his harassment was not disclosed until late April 2010. Because Respondents took step of suspending Fenton,

the charge of sexual harassment against the Respondents arising from Fenton's misconduct must be dismissed, and the charge of sexual harassment against Fenton must be also dismissed.

2. Hostile work environment by co-workers after Complainant reported Fenton.

Complainant charged Respondents with illegal discriminatory conduct when she was subjected to a hostile work environment by various harassing remarks from her fellow sergeants, including Fenton, and by officers after she reported Fenton.

Complainant established that she was subjected to harassing conduct of a sexual nature by a clique of fellow officers, including other sergeants on a daily basis. The offensive conduct was frequent, severe and reprehensible. The under-the-breath remarks, making rat like noises as she neared, being called bitch and whore, are all actions designed to intimidate, ridicule and insult an individual. The actors, including Fenton, had a reputation for being bullies and this conduct perfectly reflects that designation. Once the terms "bitch" and "whore are added to the mix, the harassment became sexual harassment. That such conduct was conducted within the confines of a secured facility, the County Jail, where persons either accused of or convicted of violating the law are incarcerated, makes the conduct by fellow correction officers even more intimidating, disturbing and insulting.

Respondents' arguments that such conduct either did not arise to an adverse employment action or was not motivated by knowledge of the sexual harassment report against Fenton are not convincing. The participants knew Complainant had filed a complaint against one of their own. Even if their initial knowledge was limited to an allegation of sleeping on the job, and hence the rat noises, their conduct escalated to sexually derogatory terms such as bitch and whore. Given the suspension of Fenton, the friendship Fenton enjoyed with the other sergeants and the actual investigation being conducted into both Complainant's report and the report of Hoffman, it is

more likely than not that the entire staff at the Jail knew Complainant and others had filed sexual harassment charges against Fenton. This conduct was designed to punish the reporting officer and prevent other officers from reporting similar actions. It is designed to have a chilling effect. The change in the nature of the under- the- breath remarks from comments relating to sleeping on the job and being a rat to ones related to sex such as Bitch and Whore, reflect the sexual nature of the harassment directed at Complainant. While a "rat" may be male or female, the terms "bitch" and "whore" are derogatory and relate to the female gender.

    As required under the Respondents' own policies, Complainant reported this conduct daily to her supervisor and nothing was done. Respondents knew the reputation of these perpetrators and took no official action to stop it. Rather, Complainant was repeatedly told by her alleged mentor and friend to tough it out. Respondents offered no explanation as to why Smith took no effective action against the offenders. Smith's own testimony continued the theme that he believed Complainant should be able to tough it out. No one in the workplace, and certainly in a workplace such as the County Jail should have to tough it out as to the conduct of their co-workers. One is too dependent on one's co-workers for protection and support to have to "tough it out."

    Respondents argue in their post hearing submission that the harassing conduct by the sergeants could not by law be deemed an adverse employment action as the sergeants had no authority over Complainant. Respondents' focus on the sergeants' conduct at this juncture is misapplied. It is the lack of effective action by the supervisors that is at issue. It is Smith's indifference to the conduct to which Complainant was subjected daily that leads to liability on the part of the employer. Not only did that indifference violate the Respondents' policies, it permitted the sexually harassing and intimidating conduct to continue daily. It is not enough to

simply recommend opening an investigation into Fenton's physical conduct, Smith was familiar with and acknowledged the power of the clique and as supervisor Smith was charged with enforcing Respondents' policies. Simply as Complainant's mentor, he might be expected to take such steps to stop the inappropriate and harassing conduct. He did not. As the direct supervisor he was required by Respondents' policies to take appropriate steps to stop this workplace harassment. He did not. The very individual charged with stopping harassment in the workplace failed Complainant. He left the burden on Complainant to tough it out. To do nothing is to let the harassment continue. The failure to act here by her supervisor, who knew what was going on, condoned the conduct and permitted it to continue. *See: New York State Department of Correctional Services v. New York State Division of Human Rights*, 53 A.D.3rd 823, 825, 861 N.Y.S. 2d 494, 497-498)3rd Dept. 2008)

Complainant has met her burden of proof with regard to the hostile work environment charge and is entitled to damages.

3. Damages:

Having established that she was the victim of illegal discrimination in the workplace, Complainant is entitled to damages, both economic and equitable. The severity, frequency and duration of the conduct may be considered in fashioning an appropriate award. *New York State Dep't of Corr. Servs. V. New York State Div. of Human Rights*, 225 A.D. 2d 856, 859, 638 N.Y.S.2d 827, 830 (3d Dept. 1996).

Economic damages: In her last full year of employment with Respondent, Complainant earned $87, 377.30 in salary and overtime. Her expectations were to work at least seven more years and receive similar or higher compensation. For the time period June 27, 2010 through present Complainant could have expected to make three times $87, 377.30 or $262, 139. 50.

Since February 2011, Complainant has worked part-time work at the rate of $10.92 an hour for a twenty hour week since February of 2011, until the present. There have been 113 weeks between February 2011 and the date of this order.  The income from this clerical work annually is estimated at $19, 240 or $38, 480 for the two years from February 2011 to date of this recommended order.

Complainant received biweekly sheriff's disability payments totaling between the period June 27 and February 2, 2011 for a total of $8600.

She has since received Workers Comp benefits of $600 weekly for a total of $31,200 a year for three years. Complainant is entitled to an award of in lost wages of $183, 859.90 ($262, 139.90 minus ($38, 480 plus $8,600 plus $31, 200). Complainant is entitled to interest on this back pay from the reasonable intermediary date of December 27, 2011. *Aurecchione*

Respondents' conduct has resulted in Complainant losing her ability to work in the future as a Correction Officer, her chosen profession. Complainant is also entitled to future lost wages for the remaining four years of the seven year period she intended to work.  At a similar rate of pay Complainant is entitled to the present value of four times $87,377.30 or $262, 409.20.  This amount may be modified by any contractual increases in salary for Sergeants negotiated since 2010.  The record did not address the present value of the front pay for the next four years. Respondent should verify the present value of the contractual amount including expected overtime Complainant would be entitled to earn as up-front wages for the four remaining expected years of employment as a Sergeant and Watch Commander. [3]

---

[3] Complainant makes a claim for damages as a Lieutenant as she had recently passed the Lieutenant's exam with a second place score on the Civil Service List, and there were anticipated vacancies. However this is too speculative.  Further no proof was presented at the hearing that the alleged vacancies were ever filled.

The record does not contain information sufficient to estimate the impact on Complainant's pension of her inability to reach 25 years of service. Complainant should be made whole with regard to her pension.

Emotional damages.  The Commissioner is empowered to award compensatory damages for the emotional distress suffered by a Complainant as a result of Respondents' discriminatory conduct.  The compensatory damages for emotional stress must be based both on the pecuniary loss and the emotional injuries *actually suffered* (emphasis added). (See:  *NYS Department of Correctional Services v. NYS Division of Human Rights*, 53 A.D.3rd 823, 861 N.Y.S.2d 494 (3rd Dept. 2008)

The word devastating understates the impact on Complainant of the discriminatory conduct endured every day at work. The intensity of the conduct, coupled with the severity of the consequences suffered by this Complainant warrants significant compensatory damages.  The abusive working environment  was pervasive, occurring multiple times during the work day, and was conducted within a County Jail, a work environment already full of danger and threat. Complainant was subjected to the worst forms of harassment and intimidation. Her supervisors let her down in every way. She declined visibly and suffered what she and her doctors described as a debilitating breakdown. As a result of this conduct, Complainant lost her career. Complainant also lost the security of an excellent pension. Complainant received medical treatment and continues under medical treatment including drug therapy for depression, PTSD, and anxiety.  She considered suicide.  She feared she would lose her house.  She cried both at work and at home, and in stores. She gained weight. She continues to suffer as a result of the conduct.

Under the circumstances of this case where the pecuniary damages are high and the

emotional damages are so severe, an award of $300,000 in compensatory damage for the emotional pain and suffering is justified. See: *Matter of Kondrake v. Blue*, 277 A.D.2d 953, 716 NYS2d 533, 3rd Dept. 200 ($400,000) (pervasive discrimination and severe consequences); *NYS Department of Correctional Services v. NYS Division of Human Rights*, 53 A.D.3rd 823, 861 N.Y.S.2d 494 (3rd Dept. 2008) ($200,000) (pervasive discrimination, no loss of work time, no need for medication)    Interest on this amount shall accrue from the date of the Commissioner's Final order. *Aurrechione*

4. Civil Fines and Penalties

The HRL authorizes the Commissioner to assess civil fines and penalties.

There are several factors to be considered in determining appropriate civil fines and penalties including the nature and circumstances of the violation, whether respondents had previously been adjudged to have committed illegal discrimination, respondents' culpability financial resources and the goal of deterrence.   Consideration of the conduct as wanton, willful and malicious is required.

With the exception of Fenton, who failed to appear, Respondents are government entities. No evidence was presented at the public hearing or in the post-hearing filings regarding Respondents' financial capabilities or financial limitations.  N o evidence was presented regarding any prior adjudication of illegal discriminatory action by the Respondents was presented at the hearing. However, each employee witness from supervisors on down acknowledged the general harassing conduct exhibited by The Boys against other employees. The description of the atmosphere at the jail was well-known to the administrators to be one of hostility, bullying and intimidation by employees to other employees. Although Respondents had a sexual harassment prevention program, and reporting policies, Complainant's supervisors

violated these policies regarding effective action to stop illegal harassment in the work place. Smith is on daily notice of the harassing conduct to which Complainant was subjected. Complainant described her deteriorating condition as one in which she is crying daily, losing weight and generally falling apart. Smith is seeing this daily. He is crying with her. Yet Smith, though aware of the cliques and their behaviour, did not take any steps, much less effective steps. Such deliberate inaction on the part of supervisors, especially in the face of daily reports of continuing harassment and Complainant's visible deterioration is not just deliberate and inexplicable. It is wanton. It is willful. And it is malicious. An assessment of civil fines and penalties in the amount of $90,000 will serve the purposes of the Human Rights Law.

## ORDER

On the basis of the foregoing Findings of Fact, Opinion and Decision, and pursuant to the provisions of the Human Rights Law and the Division's Rules of Practice, it is hereby

ORDERED, that the Respondents, their agents, representatives, employees, successors, and assigns shall cease and desist from discriminating against any employees in the terms and conditions of employment; and it is further

ORDERED, that Respondents, their agents, representatives, employees, successors and assigns shall take the following affirmative action to effectuate the purposes of the Human Rights Law:

1. Within sixty days of the date of the Commissioner's Final Order, Respondents shall pay Complainant Lora Abbott Seabury damages in the amount of $183,859.90 for lost wages for the period June 2010 and the date of this order  Interest shall accrue on this award at the rate of nine per cent per annum from the reasonable intermediary date of December 27, 2011.

2. Within sixty days of the Commissioner's Final Order, Respondents shall pay  Complainant

Lora Abbott Seabury damages in the amount of the present value of an estimated $262, 409.20 for future lost wages from the period of the date of this order through her expected retirement at the conclusion of twenty five years of service (December 2018). Interest shall accrue on this award at the rate of nine percent per annum from the date of the Commissioner's Final Order.

3. Within sixty days of the Commissioner's Final Order, Respondents shall pay Complainant Lora Abbott Seabury the sum of $300,000 as compensatory damages for mental anguish, pain and suffering suffered by Complainant as a result of the Respondents' unlawful discrimination against her.  Interest shall accrue on this award at the rate of nine per cent per annum for the date of the Commissioner's Final Order until payment is actually made by Respondents.

4. The above payments shall be made by respondents in the form of certified checks, made payable to the order of Lora Abbott Seabury and delivered by certified mail, return receipt requested to Complainant's attorney, Kevin A. Luibrand, Esq.,  Luibrand Law Firm, PLLC, 950 New Loudon Road, Suite 270, Latham, New York 12110 . Copies of said checks together with proof of delivery of said payments shall be sent to Caroline Downey, General Counsel, New York State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, New York 14508.

5. Within sixty days of the Commissioner's Final Order, Respondents shall take the necessary steps with the Office of the State Comptroller and applicable New York State Retirement System to insure Complainant is made whole with regard to her pension reflecting an anticipated twenty five years of services .Respondents shall provide proof of said actions by appropriate certifications from the Retirement System to both Complainant, her attorney and to the Division's General Counsel at the addresses provided above.

6. Within sixty days of the Commissioner's Final Order, respondents shall provide sexual harassment prevention training in a program to be approved by the Division to all officers and

- 23 -

employees of the Sheriff's Office and the County of Rensselaer.

7. Respondents shall cooperate with the representatives of the Division during any investigation into compliance with the directives and provisions contained in this order.

DATED:  April 23, 2013
          Bronx, New York

Christine Marbach Kellett
Administrative Law Judge