🗒 **ORIGINAL**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - -
JAMES KARAM and LISA KARAM,

                              Plaintiffs,

-against-

COUNTY OF RENSSELAER, NEW YORK; JACK MAHAR, in his
individual and official capacity as the Sheriff of
Rensselaer County; PATRICK RUSSO, in his
individual and official capacity as Undersheriff
of Rensselaer County; KATHLEEN JIMINO, in her
individual and official capacity as the County
Executive of Rensselaer County; RUTH VIBERT, in
her individual and official capacity as Chief of
Corrections of the Rensselaer County Sheriff's
Department; HAROLD SMITH, in his individual and
official capacity as Captain of the Rensselaer
County Sheriff's Department; TOM HENDRY, in his
individual and official capacity as Director of
Human Resources of Rensselaer County; LINDA
BALDWIN, in her individual and official capacity
as the Payroll Clerk of Rensselaer County; and
JOHN DOE(S) and JANE DOE(S), in their individual
and official capacities as officials, officers,
agents, employees and/or representatives of
Rensselaer County,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - -
Held at:

BAILEY, KELLEHER & JOHNSON, P.C.
Pine West Plaza 5, Suite 507
Albany, New York
January 30, 2015
10:25 a.m.

    EXAMINATION BEFORE TRIAL OF DEFENDANT, JACK
MAHAR, held pursuant to Agreement of Counsel,
before Susan Florio, Registered Professional
Reporter and Notary Public in the State of New
York.

APPEARANCES:

        BOSMAN LAW FIRM, LLC
        Attorneys for Plaintiffs
        6599 Martin Street
        Rome, New York  13440
        BY:  A.J. BOSMAN, ESQ.


        BAILEY, KELLEHER & JOHNSON, P.C.
        Attorneys for Defendants County of
         Rensselaer, New York, Jack Mahar,
         Patrick Russo, Kathleen Jimino,
         Harold Smith, Linda Baldwin, John Doe(s)
         and Jane Doe(s)
         Pine West Plaza 5, Suite 507
         Washington Avenue Extension
         Albany, New York  12205
         BY:  JOHN W. BAILEY, ESQ.

        LAW OFFICES OF ELMER ROBERT KEACH, III, PC
        Attorneys for Defendant Ruth Vibert
         One Pine West Plaza, Suite 109
         Albany, New York  12205
         BY:  ELMER ROBERT KEACH, III, ESQ.


ALSO PRESENT:

        JAMES KARAM
        STEPHEN A. PECHENIK, County Attorney

Indexes......................... Pgs. 286-288

1

2                S T I P U L A T I O N S

3                IT IS HEREBY STIPULATED AND AGREED by and

4    between the parties hereto, that all rights

5    provided by the F.R.C.P. including the right to

6    object to any question except as to the form, or to

7    move to strike any testimony at this examination,

8    are reserved, and, in addition, the failure to

9    object to any question or move to strike testimony

10   at this examination shall not be a bar or waiver to

11   make such motion at, and is reserved for, the trial

12   of this action;

13               It is further stipulated and agreed that

14   this examination may be sworn to by the witness

15   being examined before a Notary Public other than

16   the Notary Public before whom this examination was

17   begun;

18               It is further stipulated and agreed that

19   the filing and certification of the original of

20   this examination are waived;

21               It is further stipulated and agreed that

22   the examining party will furnish the examined

23   party with a copy of the transcript free of charge.

24

1

2                    JACK MAHAR,

3  having been first duly sworn by the notary public,

4  and having stated his professional address to be

5  4000 Main Street, Troy, New York 12180, was

6  examined and testified as follows:

7

8  BY MS. BOSMAN:

9      Q.    Would you state your full name for the

10  record, please?

11     A.    Which name do you want for the record?

12  Jack Mahar.

13              MR. BAILEY:  You are known as Jack

14          but --

15     A.    My legal name is John Mahar.  That's why

16  I ask you what name do you want.

17     Q.    What's your address for?

18     A.    Work address?

19              MR. BAILEY:  Yes.

20     A.    4000 Main Street, Troy, New York.

21     Q.    What is your home address?

22     A.    21 Weeden Way, Johnsonville, New York.

23     Q.    How long have you resided there?

24     A.    2002.

1   **[JACK MAHAR - By Ms. Bosman]**

2        Q.   Could you tell me what your educational

3   background is?

4        A.   I have a bachelor's degree.

5        Q.   Where did you receive it and when?

6        A.   Empire State College, 199-, I think, -5.

7        Q.   Since you received your -- and that was a

8   bachelor's degree in what?

9        A.   Public administration.

10       Q.   Since you received your bachelor's degree

11  have you had any other educational or other

12  training?

13       A.   I have attended courses with the FBI, the

14  Law Enforcement Executive Development program.

15       Q.   When did you attend those?

16       A.   I don't know the year off the top of my

17  head.  I'd have to look.

18       Q.   How many times did you attend?

19       A.   It's a one-time class.

20       Q.   And do you know if that has been since

21  2008?

22       A.   No.  It was prior to that.

23       Q.   And can you tell me, sir, are you

24  married?

**[JACK MAHAR - By Ms. Bosman]**

A.   Yes.  I am.

Q.   Do you have children?

A.   Yes.  I do.

Q.   How many children do you have?

A.   Three.

Q.   What are their ages?

A.   Okay.

Q.   I know.  I had the same problem, somebody asked me that this morning.

A.   34, 32 and 29.

Q.   Is your wife employed?

A.   Yes.  She is.

Q.   Where is she employed?

A.   Rensselaer County.

Q.   What does she do for Rensselaer County?

A.   She works in the mental health department.

Q.   Doing what?

A.   She does collections and some advocacy for patients.

Q.   What is her educational background?

A.   She has a high school diploma.

Q.   Now, previously you were married.

**[JACK MAHAR - By Ms. Bosman]**

Correct?

    A.    Yes.  I was.

    Q.    And you were married to the sister of
Mr. Russo; is that correct?

    A.    That's correct.

    Q.    How long have you been the sheriff of
Rensselaer County?

    A.    Since 2004.

    Q.    Prior to 2004 were you employed?

    A.    Yes.  I was.

    Q.    Where?

    A.    City of Troy.

    Q.    What did you do for the City of Troy?

    A.    I was a police officer.

    Q.    How long did you work as a police officer
for the City of Troy?

    A.    Approximately 28 years.  Just a little
under 28 years.

    Q.    What was your rank at the time of your
retirement?

    A.    I was a captain.

    Q.    How long had you held that position?

    A.    Off the top of my head, probably about

1  **[JACK MAHAR - By Ms. Bosman]**

2  10-12 years, somewhere around there.

3      Q.    Who was your direct supervisor?

4      A.    It changed over the years.

5      Q.    At the time of your retirement.

6      A.    At the time of my retirement.  Direct

7  supervisor, it was the chief, assistant chief --

8  it changed so many times I'm trying to remember.

9  It might have been Assistant Chief Iler.  I don't

10  know if Captain McAvoy was assistant chief at

11  that time.  I don't recall.

12      Q.    So, you as a captain were directly

13  supervised by the assistant chief; is that

14  correct?

15      A.    That's correct.

16      Q.    And the chief of the police department in

17  Troy Police at the time of your retirement was

18  whom?

19      A.    Nick Kaiser.

20      Q.    How long did you work under him?

21      A.    You mean how long was he chief while I

22  was there?

23      Q.    Yes.  Yes.  That's what I mean.

24      A.    I'm not sure exactly how long he was

[JACK MAHAR - By Ms. Bosman]

chief.  A couple of years, I think.

Q.  What were the nature of your duties as a captain with the Troy Police Department?

A.  At what time?

Q.  Did they change over the time?

A.  Yes.  They did.  Over the years they changed.

Q.  Starting at the beginning and working toward your retirement can you describe what your duties were as a captain?

A.  Patrol captain and then I worked as the, let's see, traffic.  Then I worked in planning analysis training, Internal Affairs.  Then I ran the detective bureau.

Q.  So, at the time of your retirement you were the captain of the detective bureau; is that correct?

A.  That's correct.

Q.  What were your responsibilities as a patrol captain?

A.  You just oversaw the day-to-day operations of the patrol force, of the shift on which you were assigned.

1  **[JACK MAHAR - By Ms. Bosman]**

2      Q.    How large was the patrol force at the

3  time you were the patrol captain?

4      A.    There was a captain for each shift.  There

5  were three shifts.  So, the one I particularly had

6  you would have approximately, I don't remember

7  exactly, maybe 16 people.  Well, no.  Wait.  It

8  depends which shift you are on.  I do apologize.

9  Some shifts were larger than the others.  If you

10  were a midnight captain, which I was for quite a

11  few years, it was smaller, maybe about 15, 16

12  people.  The other shifts were larger.

13      Q.    Up to what number?

14      A.    Maybe 30.

15      Q.    Did those day-to-day operations that you

16  oversaw include assigning shifts or what?

17      A.    No.

18      Q.    What did you have to do?

19      A.    Basically the City of Troy everything was

20  contractually driven.  The officers come into

21  work on assigned days, assigned hours and

22  assigned zones.  So, it was basically making sure

23  they responded to calls in a safe and efficient

24  manner and overlook those types of things.

**[JACK MAHAR - By Ms. Bosman]**

Q.   And did you supervise any officers of
rank at the time you were the patrol captain?

A.   Only a sergeant.

Q.   One sergeant?

A.   No.  A sergeant.  The rank of sergeant.

Q.   And how many sergeants would they have
on --

A.   Three or four.

Q.   -- the shift?

Just to make it smoother for her.  When I
talk and you talk at the same time it's hard for
her.  So, if you'd wait until the end of my
question.

A.   Um-hmm.

Q.   Before you begin to speak.

A.   Sure.

Q.   It helps her.  And if you make sure you
do all of your responses verbally because they
can't tell whether it's um-hmm, unh-unh.  Okay?
So, if you say yes or no it would be helpful.

So, then you went to be the traffic
captain?

A.   I really don't remember.  I'd have to

**[JACK MAHAR - By Ms. Bosman]**

look back.  It was a long time.

Q.   What's the difference between a traffic
captain and --

A.   You oversaw traffic duties.  Basically
there were a few meter people and you had a
couple officers who work duties or just traffic
enforcement.

Q.   And was that a larger shift?

A.   Small.

Q.   It was a smaller shift.  So, how many
people would you oversee during that time?

A.   Three or four.

Q.   And those were sergeants?

A.   No.  Two patrolmen and then there were
civilians, two civilians or non-sworn.

Q.   Then you became the training analysis
captain, is that what you said?

A.   The exact title I think was planning and
analysis training and Internal Affairs.  You did
all three duties at the same time.

Q.   Okay.  So, that was one assignment.
Correct?

A.   That's correct.

**[JACK MAHAR - By Ms. Bosman]**

Q.   And what were your duties with training and planning analysis?

A.   Training you oversaw the training assignments, in-service training, things like that, training records.  The planning analysis basically was the looking at trends in crimes and zones and where they were and report them out to the zones of where they were.  And the Internal Affairs is just what it was, Internal Affairs, responding to any complaints or any other assignment given to you by the chief.

Q.   So, those three responsibilities you held at the same time, is that your testimony, training and planning analysis?

A.   Yes.

Q.   Internal Affairs?

A.   I believe that's correct.  Yes.

Q.   Or is training and planning analysis one thing?

A.   They are all the same assignment.  I did all three at the same time.

Q.   I see.  Okay.  And how large was the Troy Police force at the time that you --

1    **[JACK MAHAR - By Ms. Bosman]**

2        A.    About 135 people, approximately.

3        Q.    Did you have any support staff?

4        A.    No.

5        Q.    No secretaries?

6        A.    No.

7        Q.    No non-sworn support?

8        A.    Nothing.

9        Q.    Did anyone under your supervision have

10   any clerical support?

11       A.    No.

12       Q.    So, in the training, planning, Internal

13   Affairs position it was just you?

14       A.    Yes.

15       Q.    So, what were your duties with respect to

16   the training and planning?

17       A.    You would develop the training for the

18   year, such as the in-service training.  You would

19   get the instructors, things like that for the

20   class, assign when the classes would be, post

21   orders to the people who were transferred from

22   patrol or whatever their other assignments were

23   to the training and see to it that they went to

24   their training and make sure it went into their

1   **[JACK MAHAR - By Ms. Bosman]**

2   records.

3     Q.   Was the Troy Police Department accredited

4   at the time you served as captain?

5     A.   No.

6     Q.   Was it accredited at the time of your

7   retirement?

8     A.   Yes.  Just before I retired they became

9   accredited.

10     Q.   So, where did you obtain the information

11   for the planning analysis that was to be reported

12   out in terms of crime trends?

13           MR. BAILEY:  Object to the form.

14       You can answer.

15     A.   From the records management system.

16     Q.   What is that?

17     A.   Computerized data that -- the records of

18   all the reports the officers took.

19     Q.   So, it was the information from the

20   arrest records and so forth was like distilled

21   into a report of some sort?

22     A.   No.  Everything was kept on a computer

23   and I distilled the information from that.

24     Q.   You distilled those.  Have you ever had

**[JACK MAHAR - By Ms. Bosman]**

any computer training?

    A.    No formal training, no.

    Q.    What were your duties with respect to the
detective bureau?

    A.    You manage cases, oversaw the assignment
of cases to be followed up by detectives and see
to it that they did their -- followed up and did
their work.

    Q.    With respect to the Internal Affairs
duties that you had, what were you required to
do?

            MR. BAILEY:  Object to the form.

            Go ahead and answer.

    A.    If there was a complaint made against an
officer you would investigate the complaint.  If
it was a complaint that required, depending on
what it required, if it required discipline or
whatever, you would draw up the charges and serve
on the person who which it was for and then the
other was to, if there weren't, was to communicate
with the person who filed the complaint the reasons
why and pretty much that was it.

    Q.    And that applied to both complaints from

**[JACK MAHAR - By Ms. Bosman]**

1  the public as well as complaints from within the

2  department?

3      A.    Correct.

4      Q.    And were the complaints that were

5  assigned to Internal Affairs assigned by the

6  chief of police?

7      A.    Well, there were forms that had to be

8  filled out and they were forwarded up to the

9  Internal Affairs person, which was myself at that

10 time.  And then they come up, I would take my

11 lead from that.  Or if anything else was assigned

12 by a commanding officer, meaning one of the

13 assistant chiefs or chiefs.  Or if someone else

14 had wanted something investigated, another

15 captain, then they would come and ask and I would

16 ask them to fill out the appropriate paperwork

17 and we would go forward.  That's pretty much how

18 it was done.  Or a complaint to come in from the

19 public, of course.

20     Q.    So, the complaints would not go to the

21 chief and then be handed down to you, they would

22 be filtered up through you; is that correct?

23     A.    For the most part.  But it could come

1  **[JACK MAHAR - By Ms. Bosman]**

2  from the chief, yes.

3      Q.    And it could also come from?

4      A.    One of the assistant chiefs.

5      Q.    Did you have to produce written reports

6  following your investigation on matters of

7  Internal Affairs?

8      A.    Yes.

9      Q.    And were those reports then sent to the

10 chief of police?

11     A.    Not all, no.

12     Q.    Which ones were not?

13     A.    If it was minor complaints that were

14 just, or unfounded or there was no basis of fact,

15 they were filed and a report would be given

16 periodically to the chief of the number that come

17 in like that and he had to write a review any

18 time he wanted to see them.  But if it was

19 something serious that he wanted to know about, I

20 would keep him informed.

21     Q.    Were there written directions or outlines

22 for the process of conducting Internal Affairs

23 investigations?

24     A.    Not when I did it, no.

[JACK MAHAR - By Ms. Bosman]

Q. And you did it without any assistance?

A. That's correct.

Q. Okay. How many Internal Affairs investigations would you handle in a given year during the time that you held that position?

A. Not many. I'll be honest with you there weren't many complaints. Most of them were minor complaints, things such as like an officer speaking to someone rudely or something like that. Very little other than that. Some -- there were some use of force complaints that were looked at, but pretty much that's what I dealt with. I never really had any other major complaint such as narcotics investigations, things like that. I never had those.

Q. Did you, at the time that you served as a captain with the Troy Police Department, administer or recommend any discipline?

A. Yes. I did.

Q. Was there what is commonly referred to as a progressive discipline policy at the Troy Police Department?

A. Prior -- when I was doing this, again,

**[JACK MAHAR - By Ms. Bosman]**

there was a very strong push later on in the Troy

Police Department to become accredited and

policies would start to be formulated but at the

time there were very weak policies.  But the

procedure even for writing, "writing someone up"

if you want to use that term or initializing

discipline in any manner, was pretty much

activated by a report to the chief, paperwork

with a full explanation over what happened, what

had transpired, what actions, what -- of anything

what it violated and then from there -- and what

your recommendations were.  And then went up to

the chief and that's how discipline was

administered back when I was there.

It may have subsequently changed once

they, because they had become accredited right

near the end and I know their process probably

changed.  I don't know what that is now.

Q.    Did you participate in the accreditation

process?

A.    Not directly, no.

Q.    Indirectly?

A.    Yeah.  Everyone was asked for information

**[JACK MAHAR - By Ms. Bosman]**

1   on policies and to forward information on where

2   you worked and things like that.   Yes.

3      Q.   Who was it that created those policies at

4   the Troy Police Department?

5      A.   The one who oversaw the accreditation

6   process at the time was Assistant Chief Kaiser

7   who eventually became chief.

8      Q.   K-i --

9      A.   K-a-i-s-e-r.

10      Q.   Did the chief of police set policy?

11                 MR. BAILEY:   Object to the form.

12      A.   I'm trying to figure that out.   Did he

13   set policy?   He may have.   If you mean by did he

14   write the orders, is that what you mean?   I'm not

15   sure if he did it directly.   I know in the end

16   most of the policies at the time were written up

17   by Assistant Chief Kaiser, the ones that we had.

18   There were ones prior to that.   I don't know who

19   did it back then and we followed them.   That was

20   the big change, from the old policies to

21   accreditation.   Does he set formal policy,

22   informal policy?   I guess he sets informal policy

23   a lot.

1    [JACK MAHAR - By Ms. Bosman]

2              MR. BAILEY:  Ms. Bosman, I'll

3         certainly permit, I understand the rules,

4         but I don't think we're working on a case

5         involving the City of Troy Police

6         Department, but go ahead.

7    Q.   Did --

8              MR. BAILEY:  Maybe you are

9         somewhere else, but --

10             MR. KEACH:  I think the only guy in

11        the room working on a case with the Troy

12        Police PD is me but.

13             MR. BAILEY:  I made my point.

14             MR. KEACH:  I could care less about

15        any of this stuff.  Let's get to the

16        heart of the matter.

17             MR. BAILEY:  I made my point.  Go

18        ahead, please.  Sorry for interrupting.

19   Q.   Did you at the time that you served at

20   the Troy Police Department receive any discipline

21   or punishment for anything?

22   A.   No.

23   Q.   Was the captain's position a civil

24   service position?

1    [JACK MAHAR - By Ms. Bosman]

2        A.    Yes.

3        Q.    So you had to take a test for that?

4        A.    Yes.

5        Q.    And you just don't remember the year you

6    did that, right?

7        A.    I did what in?

8        Q.    Took the test, became a captain.

9        A.    It was around -- it was in the '80s.  I

10   don't know the exact year though, no.

11       Q.    Were you employed anywhere before the

12   Troy Police Department?

13       A.    I was in the Marine Corps.

14       Q.    How long were you in the Marine Corps?

15       A.    Four years.

16       Q.    Was that straight out of high school?

17       A.    No.  I went to two years of college.

18       Q.    After two years of college?

19       A.    Yes.

20       Q.    Where did you go to college?

21       A.    I went -- for a short period of time I

22   went over to Albany Business Institute and then I

23   went to Hudson Valley and then I went into the

24   Marine Corps.

1   **[JACK MAHAR - By Ms. Bosman]**

2      Q.    Is Hudson Valley a community college?

3      A.    Yes.

4      Q.    Did you hold any title of rank in the

5   Marine Corps?

6      A.    I was a sergeant.

7      Q.    What years were those, sir?

8      A.    1970 to 1974.

9      Q.    Did you serve overseas?

10     A.    Yes.  I did.

11     Q.    In Vietnam?

12     A.    No.

13     Q.    Where?

14     A.    Iwakuni, Japan.

15     Q.    Japan.  With respect to the training

16  duties you described for me, were those trainings

17  created by you in terms of curriculum or were

18  they set and you just signed people up and did

19  the schedule?

20     A.    No.  The curriculums were pretty well set

21  and then depending on what topics they were

22  doing, the instructor would determine what his

23  curriculum would be and then go from there.

24     Q.    Did you receive any training while you

**[JACK MAHAR - By Ms. Bosman]**

were at the Troy Police Department in the areas

of discrimination or retaliation on the basis of

a protected characteristic?

    A.    To be honest with you I can't recall any,

what trainings I did or didn't have to be

perfectly honest with you. I may very well have

or I may not have. I just don't recall.

    Q.    So, then you ran a campaign to be elected

as sheriff. Correct?

    A.    Yes. I did.

    Q.    And at the time that you were elected,

this was in 2004?

    A.    Well, in 2003 was the campaign year.

    Q.    Okay. And in 2004 you became sheriff.

Correct?

    A.    Yes. That's correct.

    Q.    Who was your immediate predecessor?

    A.    Sheriff Dan Keating.

    Q.    And did he run against you or was he

retiring or something?

    A.    He retired.

    Q.    How many people were employed by the

Rensselaer County Sheriff's Department at the

**[JACK MAHAR - By Ms. Bosman]**

time that you became sheriff?

    A.    If I had to guess -- I don't know the
exact number.  Maybe a guess off the top of my
head probably around 150 or so, 160 maybe.

    Q.    Did that include the jail corrections
division as well?

    A.    Yes.

    Q.    So, there was a corrections division and
a civil division and a patrol division?

    A.    That's correct.

    Q.    Was the structure of those divisions
within the sheriff's department set throughout
the time that you've been the sheriff of
Rensselaer County?

              MR. BAILEY:  Object to the form.
You can answer.

    A.    I'm not sure what you mean.

    Q.    Well, there's a civil division, there's a
patrol division, there's corrections, right?

    A.    Oh, okay.

    Q.    Yes?

    A.    I understand what you are saying.  Yes.
They were there when I got there.

**[JACK MAHAR - By Ms. Bosman]**

Q.   Did you set any policy when you started out as the sheriff in 2004?

MR. BAILEY:  Object to the form of the question.

A.   I don't think so.  No.

Q.   So you just carried on the policies of Mr. Keating --

MR. BAILEY:  Object to the form.

Q.   -- after he retired?

MR. BAILEY:  Object to the form.

A.   For the most part, yes.

Q.   Was there anything that you changed?

MR. BAILEY:  Object to the form.

A.   I'm not sure off the top of my head.  I know things changed over time based on advice from command staff and things like that.  We -- I just can't be specific as to a time frame or what it is or what.

Q.   Now, I understand the Rensselaer County Sheriff's Department was not accredited at the time that you became sheriff; is that correct?

A.   That's correct.

Q.   And is it accredited today?

1  [JACK MAHAR - By Ms. Bosman]

2  A.    No.   It's not.

3  Q.    Why not?

4  A.    Because we are working on the process of

5  having it done.   Highway patrol side, we are in

6  the process of having it accredited very soon.

7  We are in contact with our assessor, it will be

8  coming up we hope in the spring.   And on the

9  corrections side of the house the chief is

10 working on it very diligently and we hope to have

11 it done this year sometime.

12 Q.    How long have they been working on it in

13 the corrections?

14 A.    Well, that's a good question.   They

15 should have been being worked on progressively

16 all along.   It was my understanding that it was.

17 In fact, it really wasn't.   However, it's being

18 done now.

19 Q.    Did you give the directive that it be

20 accredited or that the command staff work toward

21 that accreditation?

22 A.    Yes.   I did.

23 Q.    When?

24 A.    I don't know exactly when.

1    **[JACK MAHAR - By Ms. Bosman]**

2    Q.   Would it have been the same year you

3    became sheriff?

4    A.   It may have been.  It may have been the

5    next year.  It would have been very soon I know

6    after that, but I don't know the exact time

7    frame.  I just don't know.

8    Q.   Who was the officer or staff person who

9    was in charge of Internal Affairs at the time you

10   became sheriff?

11   A.   There wasn't one person directly in

12   charge.

13   Q.   How were Internal Affairs investigations

14   and complaints handled then?

15   A.   I think -- I'm not sure.  If I recall

16   correctly they were assigned by one of the

17   commanders inside the unit to investigate if

18   anything come up.

19   Q.   I'm sorry.  If anything came up?

20   A.   If there was a complaint.  If there was a

21   reason to.

22   Q.   So, investigations in Internal Affairs

23   were assigned by commanders?

24   A.   Yes.  I would assume.  Because if it

**[JACK MAHAR - By Ms. Bosman]**

was -- my understanding was the colonel over in the jail would have been the person directly responsible for it and he could have assigned it to whomever he wanted and the captain in highway patrol would have done the same thing and he could have assigned it however he wanted to.

Q.    So, there was no central Internal Affairs division?

A.    That's correct.

Q.    When did that change?

A.    I changed that when we -- again, I don't know exactly the date, time frame in that.  I just don't recall.  But I consolidated it under one person.

Q.    And you don't recall when?

A.    Not the exact date, no.

Q.    Do you recall generally when you did?

A.    About, no.  It was early on, but I don't know the year exactly.  I really just don't know.

Q.    How did you structure the Internal Affairs division when you consolidated?

A.    Assigned -- investigations were assigned under one person to do it and that person at the

**[JACK MAHAR - By Ms. Bosman]**

1  time that was selected was Lieutenant Karam.

2     Q.   So, my client was your first Internal

3  Affairs consolidation, head of Internal Affairs?

4     A.   That's correct.

5     Q.   Do you remember what year it was?  You

6  don't remember the year?

7     A.   Again, I don't recall.

8     Q.   Did you provide any support staff to him?

9     A.   No.  He was doing it on his own.  If --

10 he was also given a directive that if he needed

11 assistance, he could pull whomever he would need

12 to assist in that, another sergeant or whatever

13 he would need to assist him.

14    And the same on the highway patrol side,

15 if he had -- needed assistance on highway patrol,

16 he would have been assigned someone there to

17 assist him, if he needed it.

18    Q.   Did you have an understanding of the

19 caseload of Internal Affairs investigations

20 before you consolidated Internal Affairs under

21 Mr. Karam's direction?

22    A.   Not really.  We probably would have

23 talked about it as a case, but we wanted to bring

**[JACK MAHAR - By Ms. Bosman]**

it under some type of central area where one

person was doing everything.  It would be easier

to channel things.  That's why it was selected

one person and we looked at their staffing and

felt that Jim was very well qualified to do that

job and we selected him to do that.

     Q.   When you say "we" who are you referring?

     A.   Myself, county sheriff, Colonel Loveridge

and Captain Eckert from the highway patrol.

     Q.   Well, doesn't the accreditation that we

were talking about require Internal Affairs to be

under a single unit?

     A.   We are not there, accredited yet.

     Q.   I know.

     A.   Does it -- be under there?  No.  I don't

believe it's necessary to be under just there.  I

don't know it, to be sure perfectly honest with

you.  I have the chief doing the corrections side

now.  And I'm --

     Q.   Chief who?

     A.   Chief Bly.  He manages all Internal

Affairs complaints now out of corrections and the

captain in highway patrol handles just the

**[JACK MAHAR - By Ms. Bosman]**

1  highway patrol side.

2      Q.    Who is that?

3      A.    Captain Pyle.

4      Q.    So now there's two people doing Mr. Karam's

5  job?

6                  MR. BAILEY:  Object to the form.

7      A.    There's two people doing Internal Affairs

8  work now, yes, separately.

9      Q.    So you decentralized it at this point?

10     A.    That's correct.

11     Q.    Why did you do that?

12     A.    Staffing needs.  We just didn't have the

13  staff.

14     Q.    Do you have an understanding now of what

15  the caseload is for Mr. Pyle and Mr. Bly with

16  respect to Internal Affairs cases?

17     A.    I don't think it has changed much at all.

18  We don't have a lot of Internal Affairs

19  investigations.  There hasn't been.

20     Q.    So, do you have an understanding of how

21  many investigations they are managing?

22     A.    Do I have an understanding?  Yeah.  I

23  know there's none going on in the highway patrol

1   **[JACK MAHAR - By Ms. Bosman]**

2   at all and I don't believe there's any going on

3   right now in corrections.

4       Q.   How are complaints or matters referred to

5   them for investigation?

6       A.   If a complaint comes in from the public a

7   document has to be filled out by the person

8   receiving the complaint.  For the highway patrol

9   it would go over to the captain for review and go

10  from there.  And the same thing from corrections,

11  the chief would get it.

12      Q.   The chief of corrections?

13      A.   Yes.

14      Q.   And then what would happen?

15      A.   They would do their investigation.

16      Q.   So, the head of those individual

17  divisions are now in charge of Internal Affairs

18  of their divisions?

19      A.   That's correct.

20      Q.   Is that correct?

21      A.   That's correct.

22      Q.   Do you see an inherent form of conflict

23  of interest in that structure?

24      A.   Just --

1   **[JACK MAHAR - By Ms. Bosman]**

2          MR. BAILEY:  I object to the form.

3          Go ahead and answer.

4      A.   It's a staffing need.  We just don't have

5   the staff.

6      Q.   My question was do you see an inherent

7   conflict of interest under the structure?

8          MR. BAILEY:  Object to the form.

9          You can answer if you can.

10     Q.   Currently.

11     A.   I don't see it would be any different if

12  we assigned a lieutenant to be the one in charge

13  or the chief or assigned the sergeant or captain.

14  It would be the same thing.  I would expect the

15  integrity of the person to do the job.

16     Q.   So, in addition to their current duties

17  of running the corrections division and running

18  the patrol side, they now have the additional

19  duties of managing Internal Affairs

20  investigations, correct?

21     A.   That's a correct statement.

22     Q.   Have they been provided any additional

23  stipend or monies for those additional duties

24  that have now been assigned to them?

1    [JACK MAHAR - By Ms. Bosman]

2       A.    No.

3       Q.    Have they been awarded or compensated in

4    time or vacation or in any way for the additional

5    work that they now have to do?

6       A.    No.

7       Q.    Were they able to redirect or to delegate

8    some of their preexisting duties to other

9    individuals once they became in charge of the

10   Internal Affairs of their divisions?

11                  MR. BAILEY:  Object to the form.

12      A.    It would only be if they are actually

13   conducting an internal investigation and then

14   they have the ability to, A, do it themselves or,

15   B, delegate it for someone else to do, depending

16   on what the nature of the complaint was.

17      Q.    Do you know how many investigations have

18   been conducted by patrol or corrections since the

19   time my client has last been there, which I think

20   was 2012?

21      A.    The total number?  No.  I don't know to

22   be honest with you.

23      Q.    Do you know how many investigations

24   Mr. Karam did while he was the head of Internal

1    **[JACK MAHAR - By Ms. Bosman]**

2    Affairs?

3        A.    No.  I don't.

4        Q.    Did you request reports concerning

5    Internal Affairs investigations from Mr. Karam

6    from time to time?

7        A.    Mr. Karam would report to me from time to

8    time and let me know what he was working on.

9        Q.    Did he report summaries of numbers of

10   investigations or outcomes of investigations

11   or --

12       A.    The outcomes he did.

13       Q.    Wait.

14             -- or anything of that nature?

15       A.    He would report outcomes, yes.

16       Q.    And was that in written form, like a

17   report?

18       A.    Written form, yes.

19       Q.    How frequently was he to present those

20   reports to you?

21       A.    Whenever it was necessary.  It wouldn't

22   be -- there wasn't a time frame and he could

23   report it at any staff meeting.

24       Q.    So, there weren't like monthly reports or

**[JACK MAHAR - By Ms. Bosman]**

weekly reports or anything of that nature,

correct?

    A.   Correct.

    Q.   Prior to Mr. Karam being assigned the

Internal Affairs investigations, what were his

duties?

    A.   I'm trying to remember back then. I

think he was training. I think he did the

training and -- I'm not sure exactly. I really

just don't recall. Training and I think he

oversaw the CERT team or was involved with the

CERT team.

    Q.   What is the CERT team for the record,

sir?

    A.   It would be the correctional equivalent

to a SWAT team.

    Q.   So, what do the letters stand for?

    A.   Corrections Emergency Response Time, I

believe.

    Q.   So, it's C-E-R-T?

    A.   That's what I perceive it to be, yes.

    Q.   Anything else that he did?

    A.   I just don't recall off the top of my

1    [JACK MAHAR - By Ms. Bosman]

2    head.

3    Q.    Did you reassign his duties that he held

4    preexisting to the Internal Affairs assignment?

5    A.    I can't recall.

6    Q.    Did Mr. Karam ever report to you or

7    complain to you that he had too much work?

8    A.    Later on toward -- he did mention a

9    couple of times that he was doing a lot, yes.

10    Q.    What was your response?

11    A.    I asked him to bear with it, that a lot

12    of people were doing extra right now.  We just

13    didn't have the staffing.  We were short a lot of

14    staff or when we could we would provide the

15    staff.

16    Q.    During the time that you've been the

17    sheriff were there any times that you were not

18    short staffed?

19    A.    For the most part, no, we are short

20    staffed a lot because of the turnaround.  We have

21    a high turnaround.  But we are pretty well

22    staffed now.  I think we are down just four

23    people.  But that's a misnomer as to the number

24    because we have people out on extended time off

1   [JACK MAHAR - By Ms. Bosman]

2   which creates a shortage also.

3       Q.    When you say people on extended time off,

4   what do you mean?

5       A.    People out on sick leave, people on

6   administrative leaves, people on suspensions,

7   people on military leave.

8       Q.    Are those administrative leaves,

9   suspension leaves, well, not military leaves, but

10  the sick leaves, are those all governed by the

11  contract with the collective bargaining

12  agreement?

13          MR. BAILEY:  Object to the form.

14      A.    Are all the people that are out you mean?

15      Q.    Yes.  Sick leave, administrative leave,

16  suspensions.

17          MR. BAILEY:  Object to the form.

18      A.    I believe most of it is, yes.

19      Q.    What purposes do you use administrative

20  leave for?

21      A.    Administrative leave?

22      Q.    Yes.

23      A.    It could be for people who should not be

24  in the workplace, like we don't have enough yet

**[JACK MAHAR - By Ms. Bosman]**

at this time to put them out. We pay them to be

out of work. That could be a reason.

Q. I'm sorry. You don't have enough yet to

do what?

A. Enough to charge them at this point in

time but it might be dangerous to put them into

the workplace.

Q. Dangerous how?

A. Could be many ways. It could be criminal

investigations. It could be problems inside the

workplace or whatever, the potential could

happen.

Q. Is there a time limit for administrative

leave?

A. Not to my knowledge, no.

Q. Do you currently have officers out on

administrative leave?

A. I believe there's one officer out on

administrative leave.

Q. How long has that officer been out on

administrative leave?

A. I'm not sure of the exact time.

Q. Approximately?

**[JACK MAHAR - By Ms. Bosman]**

1

2    A.    I don't know.  About a year and a half

3    maybe, a year.  I'm not sure exactly.

4    Q.    And that's due to a pending criminal

5    matter?

6            MR. BAILEY:  Hold on one second.

7            I'm going to object to the form.  I'll

8            permit you to answer that yes or no, if

9            you can.  And if you can't answer that

10           yes or no, just indicate you can't.

11   A.    Yes.

12   Q.    Are there also pending charges, internal

13   charges from the sheriff's department against

14   that same individual?

15

16           **COUNSEL CONTEMPLATING COURT RULING**

17

18           MR. BAILEY:  Object to the form.

19           We're getting very close now to an

20           Internal Affairs investigation.  I'd like

21           to have this marked and we'll take it

22           back to the court.  If I'm directed to

23           have my client answer but -- I do not

24           want my client jeopardizing any Internal

**[JACK MAHAR - By Ms. Bosman]**

Affairs matters that are going on.  So,
I'm directing him not to answer that for
that reason.

Let me go off the record, let me
talk to my client, let me get a better
understanding.

MS. BOSMAN:  There's a pending
question.  You can't go off the record.

MR. BAILEY:  All right.  Okay.
Then don't answer it.

MS. BOSMAN:  Certify the question.

MR. BAILEY:  Now I'd like a break.
Let's go talk.

(Recess taken at 11:15 a.m.;
proceedings resumed at 11:25 a.m.)

Q.    The individual that you just referenced
that's been out a year to a year and a half due
to a pending matter, is that individual Mr. Rogers?

**COUNSEL CONTEMPLATING COURT RULING**

MR. BAILEY:  Yeah.  A.J., again, I
am not going to permit you to get into an

**[JACK MAHAR - By Ms. Bosman]**

Internal Affairs investigation that's ongoing. I'm just not going to permit that. If Judge Treece --

MS. BOSMAN: Note for the record --

MR. BAILEY: If Judge Treece orders to have my client answer that, I will, but that is a very sensitive matter. And I'm not going to have it jeopardized.

MS. BOSMAN: Note for the record that Mr. Rogers and the criminal matter and the Internal Affairs investigation has been extensively questioned with both my client and other individuals have discussed it on the record in previous depositions. So, I don't think that your objection is well founded. I mean, it's no secret. So, it's not like --

MR. BAILEY: The fact that it's no secret has nothing to do with what my client is going to testify about. He is not going to jeopardize --

MS. BOSMAN: Certify the question again.

1    [JACK MAHAR - By Ms. Bosman]

2            MR. BAILEY:  And, if you want,

3        we'll try to get Judge Treece on the

4        phone right now, explain the situation

5        and get a ruling from him.  Whatever he

6        rules I'll certainly abide by.

7            MR. KEACH:  I think that that's --

8        I'm not going to get in the middle of

9        this except to say I think that's the

10        best thing to do here so that we don't

11        all have to come back and do this again.

12        Why don't we get a quick ruling from him.

13            MR. BAILEY:  Do you want me to get

14        Judge Treece on the phone?

15            MR. KEACH:  Get this resolved.

16            MS. BOSMAN:  If you would feel more

17        comfortable, you go right ahead.  I'm

18        fine with certifying the question.

19            MR. BAILEY:  All right.  Then it's

20        certified.

21    Q.    Did you just testify a moment ago that

22    you had no current internal investigations

23    ongoing at the sheriff's department?

24            MR. BAILEY:  Object to the form.

1    [JACK MAHAR - By Ms. Bosman]

2        A.    No.

3        Q.    You didn't testify to that?

4        A.    No.

5        Q.    So, how many current Internal Affairs

6    investigations are pending at the sheriff's

7    department?

8        A.    I don't know.  I said there was none on

9    highway patrol.  I don't know what's in

10   corrections at this time.  I don't have that

11   number.

12       Q.    The last time you were a recipient of a

13   report on those Internal Affairs investigations

14   what was the number?

15       A.    I don't recall.  I really don't.  I don't

16   know the number.

17       Q.    When was the last time that you received

18   a report concerning Internal Affairs investigations?

19       A.    It's been a long time so I don't know the

20   answer.

21       Q.    More than six months?

22       A.    Yes.

23       Q.    More than a year?

24       A.    Might be, yes.

1   **[JACK MAHAR - By Ms. Bosman]**

2       Q.   At any time since Mr. Karam has been

3   there have you received any reports concerning

4   Internal Affairs investigations?

5       A.   Not a report like that.  An itemized

6   report of how many, no.

7       Q.   So, since Mr. Karam there haven't been

8   any written reports?

9            MR. BAILEY:  Object to the form,

10           but go ahead and answer.

11      A.   There hasn't been a written report.

12  Correct.

13      Q.   Am I correct that Mr. Karam would provide

14  you written reports from time to time?

15      A.   I can't recall exactly.  I just don't

16  recall.  He may have provided a number that he

17  was doing, yes.

18      Q.   Did you review any documents before

19  coming here today?

20      A.   No.  I did not.

21      Q.   Since the time that this action was

22  commenced did you review any records or

23  documents?

24      A.   I'm trying to think.  I don't think I

**[JACK MAHAR - By Ms. Bosman]**

reviewed any documents.  I don't recall any.

     Q.    What is your understanding of the nature
of Mr. Karam's complaint?

     A.    I was informed by Mr. Bailey that his
complaint involves a discrimination complaint
based on his heritage.

     Q.    Anything else?

     A.    I think that's basically it.

     Q.    Did you listen to any of the tape
recordings?

     A.    No.  I did not.

     Q.    You -- I think, according to Ms. Jimino,
I think it was Ms. Jimino, you spoke with her in
regard to hiring Mr. Kevin Rogers.  Do you recall
that?

     A.    Partially, yes.  I do.  It was a long
time ago, yes, but I do remember.

     Q.    I think he was hired in 2005?

     A.    -4.

     Q.    2004?

     A.    Yes.

     Q.    And what was the nature of your
conversation with her in regard to hiring

1  [JACK MAHAR - By Ms. Bosman]

2  Mr. Rogers?

3      A.    I'm trying to surmise that appropriately,

4  would be I was asked and encouraged to hire him.

5      Q.    Anything else?

6      A.    I guess not.

7      Q.    Did you have an understanding of why Ms.

8  Jimino wanted you to hire him?

9      A.    No.  I did not.

10     Q.    Did you know who he was?

11     A.    Yes.  I looked at his records.

12     Q.    And what did you see?

13     A.    Someone I did not want to hire.

14     Q.    Why?

15     A.    Because his record wasn't well.

16     Q.    In what way?

17     A.    There was sick time usage, discipline for

18  falsifying records and that pretty much summed up

19  the reason why I didn't think it was appropriate

20  to bring him on board.

21     Q.    He had been employed in 1994, 1996?

22     A.    He was employed prior.  I don't know the

23  exact years.  I don't know off the top of my

24  head.  I knew he was there prior.  He was out

**[JACK MAHAR - By Ms. Bosman]**

quite a bit, almost ten years I think.

Q.   Did you authorize him to have retirement credit or seniority credit back to his original hire date?

A.   I don't know whether I authorized it.  It would have been whatever the union and the labor attorney advised me to do, would have been what was authorized.

Q.   Why would there be a union or a labor attorney involved?

A.   Because it's probably contractually driven and I'm sure other people would have complained if it was not appropriately done.  He was given whatever -- would have been given whatever I was advised for him to be placed back at.

Q.   Who advised you?

A.   I don't remember the process at all.  I just remember him going back into the system.  I don't remember how he -- where he was assigned or how he was assigned it.  But whenever we may have talked about it, if I did discuss it, it would have been with Attorney Goldberger.

**[JACK MAHAR - By Ms. Bosman]**

Q.   Did Ms. Jimino have any input in that matter?

A.   I don't believe so.  No.

Q.   Did Attorney Goldberger indicate that he had spoken with her about the matter?

MR. BAILEY:  All right.  I'm going to object.  That gets into attorney/ client conversations.

Q.   Was Attorney Goldberger acting as Ms. Jimino's attorney at the time that he advised you with respect to Mr. Rogers' seniority?

MR. BAILEY:  Object to the form. Please restate the question.

MS. BOSMAN:  Read back the question.

(Whereupon, the question was read back.)

MR. BAILEY:  You can answer that.

A.   I don't know how to -- I mean, the only way I can say it is Mr. Goldberger is the county's attorney and was he acting as an attorney or for what I don't know at the time.  I can't answer that.

**[JACK MAHAR - By Ms. Bosman]**

Q.   Okay.  So, did Ms. Jimino have any input with respect to the seniority date of Mr. Rogers?

MR. BAILEY:  Object to the form.

If you can answer it, go ahead.

A.   To my knowledge, no.

Q.   Did you make a statement in the presence of my client or others at any time that Mr. Rogers was hired at the request Ms. Jimino?

A.   Yes.  I did.

Q.   What did you say and who did you say it in front of?

A.   I don't exactly recall what I said, but I would have said it to whoever was there.  It was no secret that, out there that she wanted him hired and asked me to hire him.

Q.   Why was it no secret?

A.   I mean, there was nothing to be hidden. Why would there be anything hidden?  I'm not sure what you are asking here.

Q.   Well, was he on a civil service list?

A.   No.  He had come off a -- my understanding was he had come off a Section, Article 72 or 73, whatever it is under the civil

1  **[JACK MAHAR - By Ms. Bosman]**

2  service and on advice of my counsel I was told

3  that I would have to bring him back if we have an

4  opening.

5      Q.    Article 73 you said?

6      A.    Whatever it was.  I can't recall.  It was

7  a 72 or 73.  Whatever one he went out on on an

8  injury and he was out of work for more than a

9  year and he was let go and on the advice of

10  Mr. Goldberger I was told that I would have to

11  reinstate him.

12      Q.    Was it a work-related injury?

13      A.    I don't believe it was.  No.

14      Q.    Had the discipline for falsifying records

15  you referenced occur prior to his injury?

16

17          **COUNSEL CONTEMPLATING COURT RULING**

18

19          MR. BAILEY:  All right.  I'm going

20          to object.  Again, you are asking him to

21          discuss personnel files.

22          MS. BOSMAN:  He already has.

23          MR. BAILEY:  I'm going to object.

24          He answered generally so that you could

**[JACK MAHAR - By Ms. Bosman]**

2      understand what the questioning was

3      about.  But you are now asking him to

4      reveal matters that are in a personnel

5      file and I am going to direct him not to

6      answer that question.

7           MS. BOSMAN:  Certify the question.

8   Q.   Did you at any time administer discipline

9   to Mr. Rogers?

10          MR. BAILEY:  Hold on one second.

11     Again, I'm going to direct him not to

12     answer because that may very well involve

13     a privilege that Mr. Rogers enjoys by

14     law.  His personnel file has enormous

15     protection associated with it and I don't

16     know and my sense is I should not direct

17     my client to potentially violate that

18     man's rights.

19          MS. BOSMAN:  I think we have a

20     stipulation of confidentiality concerning

21     those matters that I sent to you for your

22     execution.

23          MR. BAILEY:  Yeah.  I don't know

24     that.  But I wouldn't have signed it

1    **[JACK MAHAR - By Ms. Bosman]**

2           anyway even if you did.  I don't recall

3           that, but I would not have signed it.

4           Certainly would never have signed it

5           without reviewing it carefully with my

6           clients, which I have not done.

7      Q.   Okay.  So, does Mr. Rogers' absence from

8    work contribute to the short staffing you

9    referenced?

10     A.   Currently, is that what you mean?

11     Q.   Yes.

12     A.   Yes.

13     Q.   Do you have any other individuals who

14   have been out of work for over a year?

15           MR. BAILEY:  You mean other than

16           your client?

17           MS. BOSMAN:  Um-hmm.

18           MR. BAILEY:  Okay.

19     A.   For what purpose?

20     Q.   Any purpose.

21     A.   There's several people out on 207-c, that

22   have been out for many years.  There's -- I don't

23   know if there's anyone else off the top of my

24   head out right now for more than a year.

1  [JACK MAHAR - By Ms. Bosman]

2       Q.    And those individuals that are out on

3  207-c leave, did they go out during your

4  administration?

5       A.    Some may have.  Some may have not.

6       Q.    So, some of those individuals that are

7  currently out on 207-c leave went out before

8  2004?

9       A.    Correct.

10      Q.    And they are still receiving full salary?

11      A.    Correct.

12      Q.    And there's also Workers' Compensation

13  coverage in the County of Rensselaer, correct?

14      A.    There's Workers' Comp'.  I'm not sure how

15  that works.  If they are getting 207-c, they get

16  their full benefits.  I'm not sure how it works

17  to be honest with you.

18      Q.    Who is it that manages those matters

19  within the sheriff's department?

20      A.    It's the county, human resources handles

21  that.  Workers' Comp' claims and such.

22      Q.    I understand that they handle the

23  paperwork once it gets there, but who in your

24  department handles it before it's handed off to

**[JACK MAHAR - By Ms. Bosman]**

human resources?

    MR. BAILEY:  Object the to form.

    Go ahead and answer.

A. In which way do you mean?  I don't know
the actual of what you are asking.

Q. What is the process that is in place?

A. For what?

Q. For 207-c.

A. Oh, okay.  I didn't know what you were
asking.

Q. I'm sorry.

A. An officer would fill out paperwork.  The
paperwork would then, appropriately would go to
his commander for approval.  It goes from there
to the undersheriff.  And it stays with the
undersheriff until he does the processing of the
hearings and such like that.

Q. Until he does what?

A. Any appropriate hearings or whatever he
needs to do.

Q. What would be an appropriate hearing to
your understanding?

A. Well, right now -- let me clarify that.

**[JACK MAHAR - By Ms. Bosman]**

Right now the chief is handling those, anything

up until that point.  I do apologize because it

changed.

    Q.    When did it change?

    A.    Last year sometime.  The chief is

handling them all.

    Q.    In 2014?

    A.    I think it was 2014.  Yes.  Maybe '13.  I

just don't recall exactly.

    Q.    And that's chief who?

    A.    Bly.

    Q.    So, prior to Chief Bly handling those

matters your testimony is that the paperwork

would go to the commander and then to the

Undersheriff Russo?

    A.    That's correct.

    Q.    And then what would happen?

    A.    It would depend on what needed to be done.

If he determined there was enough appropriate

information to approve it, he would recommend it

for approval.  If he was unsure, he would recommend

a path we should travel.  We would then consult

with our counsel to make that determination, the

1    [JACK MAHAR - By Ms. Bosman]

2    best way to go from there would be.

3        Q.    So, if he was unsure you would consult

4    with your legal counsel?

5        A.    Legal counsel.  Correct.

6        Q.    And what would happen if he was sure?

7        A.    If it was a matter in which there was no

8    question as to the, what caused the 207-c and how

9    it was related to work, its causal relation to

10   work, the undersheriff would recommend to grant

11   it or he would actually grant it or I would grant

12   it depending upon.

13       Q.    Depending upon what?

14       A.    Who was there or might be -- he might

15   just leave it for me to do or he would approve

16   it, which he had the authority to approve.

17       Q.    So, Undersheriff Russo had the authority

18   to approve 207-c benefits?

19       A.    Yes.  He did.

20       Q.    And when you said appropriate hearings,

21   what is it, what hearing?

22       A.    In cases in which there is a 207-c you

23   may hold a hearing for them, for the -- bring the

24   person in who is filing for the 207-c to present

**[JACK MAHAR - By Ms. Bosman]**

1

2   what they have and any further information they

3   may have to assess their eligibility for the

4   207-c claim.  The undersheriff would hold that

5   hearing or if it was the captain of highway

6   patrol, he might, or at times we'd have the

7   superintendent at the jail or the chief or

8   whoever was in the title at the time do it.  It

9   would depend.

10       Q.   On what?

11       A.   On the availability or at the time who

12  was available.  And a lot of them were easily

13  understood 207-c actions.

14       Q.   What do you mean?

15       A.   An officer was in a fight, for example,

16  with an inmate or something like that, may have

17  gotten hurt, something like that.  That was

18  rather obvious.  They had the videos of it and

19  things like that, you could see it and move it

20  rather quickly.

21       Q.   And when it wasn't rather obvious what

22  would occur?

23       A.   They would -- we would get the information

24  from the, whatever, an investigation would be done

[JACK MAHAR - By Ms. Bosman]

to get the most appropriate information.  If it
was medical issues outside of our scope, we would
send them to the appropriate medical care and
wait for the responses of that and based on that
information we would consult with our legal
attorney and then make a decision and go from
there.

Q.    How long does that take?

MR. BAILEY:  Object to the form.

You can answer.

THE WITNESS:  Okay.

A.    It would all depend.  There was no set
time for them.  There were some quicker than
others.

Q.    And what was it that would determine
whether it was quicker than others?

MR. BAILEY:  Object to the form.

Go ahead.  You can answer, please.

A.    A lot of it would be on medical
knowledge, outside of our scope to understand.

Q.    So, in Mr. Karam's case when he provided
his own doctor's records, you would not rely on
his own doctor's?  Is that what you are saying?

1    [JACK MAHAR - By Ms. Bosman]

2              MR. BAILEY:  Object to the form.

3         Go ahead.

4         A.    No.  We would send to our own doctor for

5    review.

6         Q.    Why?  Why wouldn't you just rely on his

7    treating physician?

8         A.    Because that's a process that we are

9    allowed to use and that's the advice that we get

10   from our counsel, to send to our own doctor.

11        Q.    Right.  But what is it that makes the

12   records of the treating physician unreliable?

13             MR. BAILEY:  Object to the form.  I

14             don't think that's his testimony.

15             MS. BOSMAN:  Okay.  Maybe I didn't

16             understand.

17        Q.    When you received Mr. Karam's application

18   together with his medical records from his treating

19   doctor, did you consider that evidence of a

20   work-related injury?

21        A.    It was sent to -- he was to go to a

22   doctor hired by the county to review also.

23        Q.    That wasn't my question.

24        A.    That's the reason why, yes.

1  [JACK MAHAR - By Ms. Bosman]

2      Q.   That wasn't my question.  My question was

3  when Mr. Karam provided his treating physician's

4  records to you --

5      A.   Um-hmm.

6      Q.   -- did you consider that to be evidence

7  that he had a work-related injury?

8              MR. BAILEY:  Object to the form.

9         To the extent you are asking my client to

10        comment on his ability to understand

11        medicine and psychiatric --

12             MS. BOSMAN:  You want to coach him

13        take him outside, John.

14             MR. KEACH:  Oh, come on, man.  He's

15        not coaching the witness.

16      Q.   Do you understand my question, sir?

17             MR. BAILEY:  If you don't

18        understand it, just say you don't

19        understand it.

20      A.   To answer your question the way I think

21  what you are saying is I am not a doctor, never

22  studied to be one.  I have no idea how to

23  interpret that type of information, whether it

24  would be psychiatric or other medical issues.

1 **[JACK MAHAR - By Ms. Bosman]**

2 When a person presents it from a doctor we are

3 entitled to have that reviewed by another doctor

4 and under advice of our counsel that's what we

5 do, we send them to another doctor for review.

6 And based on that information a determination is

7 made. And I will then seek legal advice on many

8 of those because, again, it's outside a lot of

9 the scope of what we understand.

10     Q.   So, is it your testimony that all

11 applications for 207-c benefits are reviewed and

12 sent over to legal counsel?

13             MR. BAILEY:  Object to the form.

14             That isn't his testimony.  Go ahead,

15             Sheriff.

16     A.   No.

17     Q.   So, some of them are?

18     A.   It could be, yes.

19     Q.   And that's based upon the nature of the

20 injury or the illness you are faced with?

21     A.   Correct.

22     Q.   And in Mr. Karam's case because he was

23 diagnosed with a psychiatric illness is that why

24 it was referred over?

**[JACK MAHAR - By Ms. Bosman]**

A.    Yes.   Something we don't understand to determine whether it was related to work or not, yes.

Q.    Didn't his doctor say it was related to work?

A.    I believe that's correct.   Yes.

Q.    Did you have any reason not to believe his doctor?

A.    It's not a --

MR. BAILEY:   Object to the form.

Go ahead and answer.

A.    It's not to disbelieve or to believe.   It wasn't my question of that at all.   It was to -- the county exerted its right to have their own doctor examine the person.

Q.    Well, I understand that's a process that can be used under 207-c, to examine the employee to determine whether or not the disability exists and whether it's causally related to the work, right?

A.    Correct.

Q.    That's what you are talking about, that part of the statute?

1    [JACK MAHAR - By Ms. Bosman]

2        A.    Yes.

3        Q.    And that statute doesn't offer a

4    procedure by which a 207-c benefit is processed,

5    correct?

6                    MR. BAILEY:  If you know the

7            statute go ahead and answer that, please.

8        A.    I don't know.  I couldn't answer that.

9        Q.    You are familiar with the processes

10   employed by the Rensselaer County Sheriff's

11   Department, correct?

12       A.    Yes.

13       Q.    And that's in writing, correct?

14       A.    No.  It's not.  It's in writing for the

15   unions, yes.

16       Q.    It's not in writing?  It's in writing for

17   the union?

18       A.    For the unions.  It's a contract, how

19   we'll follow for the unions, correct.

20       Q.    So, the union contract, collective

21   bargaining agreement sets forth the process by

22   which 207-c applications are handled?

23       A.    Yes.

24       Q.    And does it have a time constraint on it?

**[JACK MAHAR - By Ms. Bosman]**

A.    For the union, yes.

Q.    And what is the time constraint?

A.    I don't have it off the top of my head.
There is a time constraint, but I can't articulate
it.  If I see the contract I can verify it.

Q.    By time constraint I'm referring to the
time the 207-c application is acted upon, correct?

A.    Yes.  It has a time frame associated with
it.  Yes.

Q.    And then the department can challenge the
207-c designation at any time during the illness
or injury, correct?

A.    Yes.

Q.    And that's pursuant to the collective
bargaining agreement?

A.    For the unions, yes.

Q.    When you say for the unions, what do you
mean?  There's somebody that doesn't get that?

A.    If you are not a member of the union,
correct.  Any management employees.

Q.    So you believe that management employees
are not entitled to the same process as union
employees?

1    **[JACK MAHAR - By Ms. Bosman]**

2        A.   I didn't say that.  I said that there's a

3    different process.

4        Q.   Okay.

5        A.   They are entitled to a process, yes, the

6    207-c process.

7        Q.   It's a different process because why?

8        A.   It's not articulated -- there are no time

9    frames articulated.  Well, let me say this,

10   according to the advice I was given by counsel,

11   because I registered to the counsel about time

12   frames and he said they are not -- you are not

13   going by the --

14             MR. BAILEY:  Okay.  All right.

15             Again, I permit --

16             MS. BOSMAN:  I want you to stop

17             interrupting this witness.

18             MR. BAILEY:  I am not going to

19             permit you to invade attorney/client

20             privilege.  Now I gave you a little

21             leeway there because I think you need an

22             understanding of it and I'm willing to do

23             that.

24             MS. BOSMAN:  He's not telling me

**[JACK MAHAR - By Ms. Bosman]**

2      what his attorney advised him.

3            MR. BAILEY:  Of course he is.

4      That's exactly what he just told you.

5            MS. BOSMAN:  Well, he can waive the

6      privilege, John.

7            MR. BAILEY:  Well, he's not going

8      to.

9            MS. BOSMAN:  It's his to waive not

10     yours.

11           MR. BAILEY:  He is not going to.

12     All right.  That's my advice.  Do not

13     waive your privilege.

14  Q.   Why is it that nonunion employees would

15  be treated differently with respect to the time

16  frame to determine 207-c applications?

17           MR. BAILEY:  Object to the form.

18     If you can answer that without revealing

19     what your attorney and you have discussed

20     about that, please do.

21           THE WITNESS:  I can't.

22  Q.   So, you don't know the difference, is

23  that correct?

24           MR. BAILEY:  That isn't his answer.

1  **[JACK MAHAR - By Ms. Bosman]**

2       That isn't his answer.

3  Q.   Is it different because they are not

4  covered by the union?

5            MR. BAILEY:  You are asking him

6       once again to tell you what --

7            MS. BOSMAN:  He's the sheriff of

8       the county.  He managed the 207-c

9       benefit.

10           MR. BAILEY:  You are asking him

11      to tell you --

12           MS. BOSMAN:  He --

13           MR. BAILEY:  -- what his attorney

14      told him.

15           MS. BOSMAN:  Quit talking over me,

16      John.

17           MR. BAILEY:  You are talking over

18      me.

19  Q.   Mr. Mahar, can you tell me what the

20  process is for nonunion employees who apply for

21  207-c benefits?

22           MR. BAILEY:  Go ahead.

23  A.   They would fill out their application,

24  submit the paperwork and we would provide the

1  [JACK MAHAR - By Ms. Bosman]

2  same privileges as to doctors, we would have them

3  examined by doctors, and based on that information

4  and what it was, if it was something we didn't

5  understand the injury, for example, if it was a,

6  someone may have had an injury that could have

7  occurred 20 years ago before they started working

8  and a doctor may say they have this.  Well, we

9  may send them to our doctor for a review to get a

10  determination, what was cause, where was the

11  causal and things like that.  We would also look

12  at if it's -- for example, psychiatric, something

13  we don't understand and how that relates to work,

14  which is something we don't understand, we would

15  send them to our doctor for a review and for a

16  determination.  Based on that information it will

17  come back to legal.  We would have -- the legal

18  would read all the rulings, have a discussion

19  with us and we would then make our determination.

20      Q.   Over what period of time?

21      A.   Whatever time it took.  I can't control

22  the time on that.  A lot of times it would be

23  depending on the doctors, getting doctors to --

24  how long it takes to get a doctor, how long it

1   **[JACK MAHAR - By Ms. Bosman]**

2   takes for them to do the interview, how many

3   sessions they may have with the person and how

4   long it takes to get back.

5       Q.   Do you file Workers' Compensation claims

6   when an employee files a 207-c claim?

7       A.   I believe they are filed at the same

8   time, yes.

9       Q.   And are those Workers' Compensation

10  claims contested until such time as the officer

11  is examined by a department physician?

12      A.   I don't follow how they process them out

13  in the least.  That is we have -- their insurance

14  company deals with all of that.

15      Q.   Is it possible for an employee to receive

16  Workers' Compensation benefits before any

17  determination is made for 207-c benefits?

18      A.   I'm not sure, but I think the answer is

19  yes.

20              MR. KEACH:  A.J., when it's a

21          convenient time can we take a break to

22          use the bathroom, please, and also to

23          discuss what the schedule is here?

24              MS. BOSMAN:  Sure.

**[JACK MAHAR - By Ms. Bosman]**

Q. So, was Mr. Karam's 207-c application known to you when it was filed?

A. Yes. It was.

Q. And was it provided to you or to Mr. Russo?

A. To the undersheriff. It went to the undersheriff.

Q. Mr. Russo?

A. Correct.

Q. And he provided a copy to you?

A. I didn't get a copy. He informed me. I don't take copies of anything. He informed me of that was -- that Lieutenant Karam had filed a 207-c application. I'm not sure -- to be honest with you I'm not sure if he informed me or Marcelle informed me. I just don't recall. One of them did inform me and we at that point in time knew that we would have to make arrangements to, first of all, to have the hearing, for the undersheriff to have the hearing and probably going to need to make arrangements to see a psychiatrist.

Q. When you call it a hearing, is there some

**[JACK MAHAR - By Ms. Bosman]**

written hearing procedure or notice of a hearing?

A.   I believe there is.  I don't know it off
the top of my head, but I'm going on the advice
of counsel on our way to conduct our appropriate
207-c process.

Q.   And you call it a hearing?

A.   Yes.  They are entitled.  We are, they
are entitled to have a hearing and we are to hold
the hearing to get as much information as we can.

Q.   Did Mr. Karam receive notice of any
hearing?

A.   The undersheriff would have handled that,
not I.  I don't do the hearings.

Q.   Did Mr. Karam receive any notice that the
matter had been referred to any physician?

A.   I don't know that.

Q.   When you say a hearing, does that mean
that the employee is to bring in witnesses?

A.   They could bring in any information that
they would find appropriate.

Q.   And is that process that you are talking
about written somewhere?

A.   Yes and no.

**[JACK MAHAR - By Ms. Bosman]**

Q.   Where is it written?

A.   It's written in contracts for the unions.

Q.   Okay.  But we were talking about --

A.   That's our only policy, yes.

Q.   We were talking about nonunion --

A.   That's our own policy.

Q.   We were talking about nonunion employees.

A.   Yes.  And that's when I asked our labor
attorney how to proceed because it was a nonunion
employee.

Q.   Okay.  So, there is no separate written
policy with respect to nonunion employees, am I
correct?

A.   Correct.

          MS. BOSMAN:  We can take your break
          now.

          MR. KEACH:  Thank you, A.J.

          (Recess taken at 12:00 p.m.;
          proceedings resumed at 12:50 p.m.)

Q.   Mr. Mahar, is there a different standard
with respect to union versus nonunion employees
under 207-c?

          MR. BAILEY:  Object to the form.

1　[JACK MAHAR - By Ms. Bosman]

2　　　　Go ahead and answer.

3　A.　I don't know.

4　Q.　Do you treat them differently?

5　　　　MR. BAILEY:　Object to the form.

6　You can answer.

7　A.　I haven't, no.

8　Q.　So, with respect to the time frame as you

9　indicated is outlined in the union contract, is

10　that applied to nonunion applicants for 207-c?

11　　　　MR. BAILEY:　Object to the form.

12　A.　No.

13　Q.　Okay.　So they are treated differently?

14　　　　MR. BAILEY:　Object to the form.

15　A.　I don't -- well, I might be misunder-

16　standing what you are saying because the 207-c

17　itself is not -- is treated the same.　The process

18　how you administer it might be a little different,

19　yes.　I guess that's, do you know what I'm saying?

20　I don't know if I clarified.

21　Q.　The process is different for a union

22　versus nonunion employee?

23　A.　Right, for a union, yes.　But the 207-c

24　itself is the same.

1  [JACK MAHAR - By Ms. Bosman]

2      Q.   Yeah.  I know.  The statutory right --

3      A.   Is the same.  That's correct.

4      Q.   I understand that.

5      A.   Yes.

6      Q.   I'm talking about the process by which an

7  employee applies for and is approved for or

8  denied 207-c status.

9              MR. BAILEY:  Is that a question?

10             MS. BOSMAN:  Yes.

11             MR. BAILEY:  I object to the form.

12     A.   The answer is -- no, that's not correct.

13  The time frame might be the only thing different,

14  but everything else would be the same.

15     Q.   Why would the time frames be different?

16     A.   Because they are not articulated in

17  the -- they are articulated in the contract, but

18  they are not articulated anywhere else.

19     Q.   Well, that's true with everything with

20  respect to the 207-c application process?

21     A.   Correct.

22             MR. BAILEY:  Object to the form.

23     Q.   Am I correct?

24             MR. BAILEY:  Object to the form.

**[JACK MAHAR - By Ms. Bosman]**

Go ahead and answer.

A.     I don't know.  I'm not sure what you are asking.

Q.     Well, you are saying it's not specified for nonunion employees because they are not governed by the collective bargaining agreement, correct?

A.     Correct.

Q.     And there's no written policy or procedure for nonunion employees in terms of applications for 207-c?

A.     Correct.

Q.     So, is it your testimony that because there is no written procedure that you have the discretion to manage that process in any way you see fit?

MR. BAILEY:  Object to the form.

You can answer.

A.     Absolutely not.  That's not what I said at all.

Q.     Okay.  Do you adhere to the time frames as set forth in the collective bargaining agreement with respect to nonunion employees who

1  [JACK MAHAR - By Ms. Bosman]

2  apply for 207-c?

3          MR. BAILEY:  Object to the form.

4          You can answer.

5    A.    I think to answer your question, I think

6  we've only had one to be perfectly honest with

7  you, one 207-c request outside of union.  And how

8  that is handled, of course we want to do that in

9  a timely manner and in a time as fast as we can

10  possibly do it and everything else such as that.

11  You know, no one is trying to deny anybody due

12  right.  The question becomes how do we go about

13  doing that when we were asked of legal counsel,

14  they took control of how that was to be done and

15  we followed their advice the rest of the way

16  through on that.

17    Q.    When?

18    A.    Right after the 207-c was processed.

19    Q.    When was that?

20    A.    I don't know the date.  I can't remember.

21  Whatever --

22    Q.    When you say process, do you mean at the

23  time it was --

24    A.    Submitted.  That's correct.

**[JACK MAHAR - By Ms. Bosman]**

Q.    The application was submitted?

A.    Yes.

Q.    Did you review Mr. Karam's application
for 207-c benefits?

A.    No.  I did not personally review it.  No.
I was given a -- the undersheriff briefed me
about what it entailed.

Q.    And what did he tell you?

A.    He told me that he filed a 207-c
regarding a stress issue regarding his work.  I
already knew that was outside of our scope of
being able to determine.  I contacted our legal
office and apprised them of the situation and how
to proceed from there.

Q.    So your testimony is that when they
received Mr. Karam's application, the
undersheriff brought it to your attention and
then it was immediately referred over to legal
counsel?

A.    Yes.  I called legal counsel myself.

Q.    Were the documents sent to legal counsel?

A.    I'm not sure how they were sent there.
I'm sure -- I'd have to double-check.  I'm sure

**[JACK MAHAR - By Ms. Bosman]**

we asked, because I know they would have asked

for a copy of it to be sent to their office. And

it may have been faxed over to their office. But

I'd have to double-check that. I know they would

have got it.

Q.    Whose office?

A.    Attorney Goldberger's office.

Q.    And did you become aware that Mr. Karam

was making inquiry as to the status of his 207-c

application?

A.    Yes.  I did.  I was made aware of that.

Q.    How did you become aware of that?

A.    There was a couple -- one is I think

Marcelle told me and I believe also Lieutenant

Karam also contacted me or I called him on a

request that someone wanted me to contact him.  I

forget which it was.

Q.    What did Marcelle tell you?

A.    I think she said what the status of the,

where we were moving and what was going on with

it.

Q.    And what did you tell her?

A.    I said that my understanding at the time

**[JACK MAHAR - By Ms. Bosman]**

was they are attempting to locate a psychiatrist

for Mr. Karam to be seen by.

    Q.   Did you direct her to advise Mr. Karam

that there was an effort underway to locate a

psychiatrist at that time?

    A.   Again, I don't recall any exact

conversations. Whoever, how we did it, he was

informed, whether it was Marcelle and I think I

even informed him during that one conversation I

had with him that we were attempting to locate a

psychiatrist or the county was attempting to

locate a psychiatrist.

    Q.   Did you tell him why?

    A.   For him to be seen.

    Q.   Did you tell him why you wanted him to be

seen?

    A.   Because he filed a 207-c application.

    Q.   Right. But everybody that files a 207-c

application doesn't have to be seen by a doctor,

correct, a county doctor?

    A.   Not everybody, but most do if we don't

understand the injury, yes.

    Q.   Did you inform Mr. Karam you did not

**[JACK MAHAR - By Ms. Bosman]**

understand the injury?

A.   I personally did not inform him.  I did
not understand the injury, no.

Q.   Did you send him any kind of a letter or
correspondence from the sheriff's department or
the county indicating that there was confusion or
lack of understanding concerning the injury that
he was claiming under his 207-c application?

A.   No, but I think the only thing he was
informed, that we were attempting to getting him
to a psychiatrist to be reviewed.

Q.   Why wasn't he informed that there was an
attempt to obtain a psychiatric review because of
a lack of understanding of the injury he was
claiming?

MR. BAILEY:  Object to the form.

You can answer.

A.   I think he was informed.  I don't know if
he was informed as to because there's "a lack of
understanding" but he was informed that we were
attempting to get a psychiatrist for him to be
examined by.

Q.   And did you inform him that you were

**[JACK MAHAR - By Ms. Bosman]**

doing that as a result of consultation with

counsel?

    A.    I'm not sure exactly how I said it.

    Q.    Why didn't you send him a letter?

    A.    I think he was informed.  I didn't think

it was necessary.

    Q.    Who informed him?

    A.    I know I told him once.  I'm pretty sure

I did.  I might not have.  I think I did.  And

I'm pretty sure Marcelle did also.

    Q.    Why do you think Marcelle did?

    A.    Because normally she takes care of that,

when we have these cases she let's them know what

the status is on the cases.

    Q.    So you don't normally provide written

correspondence to 207-c applicants concerning

their 207-c application?

    A.    We let them know that -- one, that they

have it, we have it.  We also let them know when

the outcome is, what are the outcomes of it.

    Q.    The outcome of what?

    A.    The examinations and then what the

determination is.

1  **[JACK MAHAR - By Ms. Bosman]**

2  Q.  How long did it take you to determine

3  whether or not Mr. Karam was eligible for 207-c

4  benefits?

5  A.  Once I got the information back it didn't

6  take long to determine it.

7  Q.  That's not what I asked.  Mr. Mahar, how

8  long did it take --

9  MR. BAILEY:  Then I object to the

10  form.  It sounded like that's what you

11  asked, but go ahead and ask again.

12  MS. BOSMAN:  I'm going to clarify.

13  Yes.

14  Q.  How long did it take from the time that

15  Mr. Karam applied for 207-c benefits and the time

16  that you had an outcome or the benefits were

17  approved?

18  A.  I don't know the exact time.  I know it

19  was a very long time.

20  Q.  Why was it so long?

21  A.  Because there was not a psychiatrist

22  given to us to give -- to assign to Mr. Karam.

23  Q.  There was not a psychiatrist given to

24  you?

**[JACK MAHAR - By Ms. Bosman]**

A.   That's correct.

Q.   By who?

A.   For us to assign.  As I told you earlier,
the county attorney -- or our attorney took over
the 207-c process and we were waiting for them to
direct us on who to send Mr. Karam to for review
and that was the delay.

Q.   How long was the delay caused by the
attorney taking over the process and providing a
psychiatrist for an evaluation?

A.   I don't know the total length of time.  I
don't know.  I know it was several months.

Q.   Well, was any of the delay attributed to
you or Mr. Russo?

A.   Actually, no.  I asked many, many, many
times if we could get a psychiatrist's name so we
could send him to and kept on waiting and waiting
for an answer.

Q.   Who did you ask?

A.   I asked the county attorney's office.

Q.   Who?

A.   And Mr. Goldberger.

Q.   Mr. Goldberger?

1    **[JACK MAHAR - By Ms. Bosman]**

2        A.    He was one, yes.

3        Q.    Who else?

4        A.    Mr. Pechenik was the other.

5        Q.    Who else?

6        A.    That's it.

7        Q.    Just Mr. Goldberger and Mr. Pechenik?

8        A.    From the legal side, yes.

9        Q.    Well, anybody from any other side?

10       A.    No.  Normally -- what other side?  I

11   don't understand.

12       Q.    I don't know.  You said from the legal

13   side.  That's the only person you asked.  So, I

14   was trying to understand what you meant by the

15   legal side.

16       A.    Just that.

17       Q.    Did you make anyone aware, including

18   Mr. Russo, Marcelle, or anyone in the sheriff's

19   department, that you had referred the matter over

20   to legal counsel and were awaiting a psychiatric

21   review?

22       A.    Yeah.  They were aware of it.  The

23   undersheriff and Marcelle both were aware.

24       Q.    I didn't ask if they were aware of it.  I

1   **[JACK MAHAR - By Ms. Bosman]**

2   asked if you made them aware. Did you tell them

3   that --

4       A.   Yes.

5       Q.   -- we are waiting because I can't get any

6   response from the attorney or whatever?

7       A.   Yes.

8       Q.   Okay. And how many times did you tell

9   them that?

10      A.   I have no idea.

11      Q.   Did you tell Marcelle that more than

12   once?

13      A.   Yes.

14      Q.   That it was in the hands of the attorney?

15      A.   No. I told her we are waiting for them

16   to give us response for a psychiatrist.

17      Q.   And she understood who "them" was?

18      A.   Well, yeah, she knew.

19      Q.   She knew that the attorney's office was

20   holding up the obtaining of a psychiatric

21   referral?

22             MR. BAILEY: Object to the form.

23      A.   She knew we hadn't gotten a response back

24   of a name to send Mr. Karam to.

1    **[JACK MAHAR - By Ms. Bosman]**

2    Q.   She knew that?

3    A.   Yes. She was aware of that.

4    Q.   From the time that it was sent over until

5 the time it was done?

6    A.   Time what was done? From the time that

7 the county attorney was made aware of the 207-c

8 application?

9    Q.   Um-hmm.

10    A.   Yes. She's fully aware of the process.

11 She knows that we assign -- would send someone

12 for review from the psychiatrist from the county

13 and that's assigned by the county I mean. And

14 she would be aware of that. Until we got the

15 name, she would draft the letter or contact them

16 on how to get there.

17    Q.   You had you the authority to grant

18 Mr. Karam's 207-c application at any time, didn't

19 you?

20        MR. BAILEY: Object to the form.

21    A.   To answer that question, not really. I

22 would never grant anything without knowledge and

23 I didn't have the knowledge to grant it.

24    Q.   You didn't have the knowledge meaning you

1  **[JACK MAHAR - By Ms. Bosman]**

2  don't understand psychiatric injury, is that what

3  you mean?  You didn't have the knowledge?

4      A.   That's correct.  That's correct.

5      Q.   So, if it was a broken leg Mr. Karam was

6  complaining of and you had video footage, as you

7  suggested earlier, then you would be able to make

8  that determination immediately?

9      A.   If it was obvious it was determined as a

10 causal relationship to work we could do that,

11 yes.

12     Q.   Is there something that is difficult to

13 understand about psychiatric illness?

14     A.   Yeah.

15          MR. BAILEY:  Object to the form.

16     You can answer.

17          MS. BOSMAN:  He's just telling me

18     he doesn't like the way I made the

19     question and it gives me a chance to fix

20     my question.

21          MR. BAILEY:  I think he answered

22     yeah.  I think.

23     Q.   Did you understand the question?

24     A.   Yes.

1    **[JACK MAHAR - By Ms. Bosman]**

2    Q.    And so because it was a psychiatric

3    injury or mental injury that made it difficult

4    for you to understand it?  Is that correct?

5    A.    Yes.

6    Q.    Did you review Mr. Karam's doctor's

7    records?

8              MR. BAILEY:  Asked and answered,

9         but go ahead.

10   Q.    Medical records.

11             MR. BAILEY:  Go ahead.

12   A.    No.  Attorney Goldberger reviewed them

13   for me and on his advice I asked him how we

14   should proceed and his advice was to have him see

15   our own psychiatrist.

16             MR. BAILEY:  All right.

17   Q.    When you referred that matter over to the

18   attorney's office upon receipt of his application,

19   did you do that because it was a psychiatric

20   injury?

21   A.    No.  What do you mean did I do it -- no,

22   because it was a 207-c application that we --

23   that it was a cause, the causal relationship was

24   very difficult for us to make that determination.

1    [JACK MAHAR - By Ms. Bosman]

2    It would have to be --

3        Q.    How do you know?

4        A.    That's why we send it to a psychiatrist.

5        Q.    How do you know it was difficult for you

6    to make that determination?

7                    MR. BAILEY:  Object to the form.

8                Go ahead.

9        A.    Because I personally didn't understand

10   whether it was related to the work or not.

11       Q.    But you didn't review his medical

12   records?

13       A.    That's correct.  I asked our counsel to

14   review that.

15       Q.    So you didn't review the medical reports

16   of Mr. Karam that he provided upon your request?

17       A.    That's correct.  The undersheriff could

18   have reviewed them.

19       Q.    Excuse me.  Wait a minute.  And you sent

20   his medical records to the county attorney's

21   office without his knowledge, without his

22   permission and without any notice to him; is that

23   correct?

24                    MR. BAILEY:  Object to the form.

1    [JACK MAHAR - By Ms. Bosman]

2         Go ahead, answer.

3    A.    Yeah.  We sent them.  I know they

4    normally sign medical waivers on all of those, on

5    waivers to send all of that for review.

6    Q.    So the waiver was obtained from Mr. Karam

7    to send it over?

8    A.    I don't know.

9    Q.    Is that what you are saying?

10        MR. BAILEY:  Object to the form.

11        If you can answer it, go ahead.  If you

12        can't --

13   A.    I don't know.

14   Q.    You don't know --

15   A.    Right now I don't know.

16   Q.    -- if you had one or not?

17   A.    I'm not sure to be honest with you.

18   Q.    Is there an investigation concerning

19   HIPAA releases going on with the sheriff's

20   department to your knowledge?

21        MR. BAILEY:  Answer that with a yes

22        or no.

23        MS. BOSMAN:  I object to you

24        instructing your client in that manner,

1    **[JACK MAHAR - By Ms. Bosman]**

2           John.   Please.

3                    MR. BAILEY:   Good for you.   Answer

4           it with a yes or no.

5    A.    Yes.

6    Q.    And is that HIPAA investigation being

7    handled by someone new now?

8

9           **COUNSEL CONTEMPLATING COURT RULING**

10

11                   MR. BAILEY:   Object to the form.

12          Don't answer it in that form.

13                   MS. BOSMAN:   Certify.

14   Q.    Is the HIPAA investigation the same

15   investigation that Mr. Karam was handling?

16   A.    That he initiated, yes.   That was

17   initiated through his office, yes.

18   Q.    When you say initiated from his office,

19   what do you mean?

20   A.    He was the first one to become aware of

21   it.

22   Q.    Did he advise you that the matter had

23   been brought to him?

24   A.    Yes.   He did.

**[JACK MAHAR - By Ms. Bosman]**

Q.   Who brought it to him?

A.   I think he told me an attorney that was working for Samaritan Hospital.

Q.   And did you give him any specific instructions with respect to how to proceed upon that investigation?

A.   I asked him to look into it and to determine what the issues were.

Q.   And did he do that?

A.   He started to do that, yes.

Q.   Did he report to you concerning the status of that investigation?

A.   He reported back, yes, to me a few times. Yes.

Q.   And the information that he reported back to you I believe indicated that there were employees in the sheriff's department that had accessed medical records without authorization; is that correct?

A.   What he reported back was that employees were accessed by someone but we don't know -- at the time it wasn't determined who may have done it yet.  But employees -- they were people other

1    **[JACK MAHAR - By Ms. Bosman]**

2    than, other than the inmates who were run.

3      Q.   Right. And did he indicate to you that

4    he had information as to who was responsible?

5      A.   No. He actually put out a matrix of who

6    was working those days and not working those days

7    and who may or may not have been doing that and

8    what time of day it was and who was working for

9    that, during that time frame.

10      Q.   So, he gave you that information?

11      A.   That's correct.

12      Q.   And as a result of that information were

13    there any further investigations done of those

14    particular individuals identified by Mr. Karam?

15      A.   Of all -- yeah. There were nurses there.

16    There were many nurses and every nurse was

17    interviewed. Yes. To be honest with you that

18    was done.

19          MR. BAILEY: Now, before --

20      Q.   By Mr. Karam?

21      A.   No.

22          MR. BAILEY: I'd like to ask

23          something, Mr. Keach. I'm not sure how

24          much of this is public. I don't know how

**[JACK MAHAR - By Ms. Bosman]**

2      far you are going to go with this, Ms.

3      Bosman, but, again, I'm not handling the

4      HIPAA things for the county.  So, I'm not

5      sure whether we are getting into someone's

6      private records or something.  I'm just

7      alerting you at some point I may object

8      to this.  At the moment I'm not, but I'm

9      concerned about the areas we are getting

10     near.

11     Q.   Did Mr. Karam inform you that something

12  needed to be done with respect to the HIPAA

13  violations?

14     A.   Yes.  And that's what he was investigating.

15     Q.   Did he indicate to you that you needed to

16  take some sort of action?

17          MR. BAILEY:  Object to the form.

18     A.   Yes.  Once it was determined who may or

19  may not have done it.

20     Q.   And what action did he indicate you

21  needed to take?

22          MR. BAILEY:  Object to the form.

23     A.   I don't recall.  I mean, to be honest

24  with you it really was confusing at the time.

**[JACK MAHAR - By Ms. Bosman]**

Lieutenant Karam left at the very beginning of

that investigation and there was a lot more work

to be done afterwards and he wasn't there for

that part of it so I'm not sure what you mean.

    Q.    You are not sure what I mean?

    A.    Yes.  What you are asking for.

           MS. BOSMAN:  Could you read back

        the question, please?

           (Whereupon, the question was read

        back.)

    A.    And I told you I'm not sure.  I don't

recall because it was far from over.  It was --

we knew that they were -- we knew people's names

were run.  We knew people were working there that

day, but it was to be determined who actually

allowed it, who authorized it.  A lot of things

were totally unclear at the time.

    Q.    When did he start that investigation?

    A.    I'm not sure exactly.  I don't know.  I

think it was the month of March, but I'm not

sure.

    Q.    And when was it concluded?

    A.    Jeez, I think the last was -- conclusion,

1  [JACK MAHAR - By Ms. Bosman]

2  well, technically it's still going on so it's not

3  concluded.

4      Q.    Technically it's still going on so it's

5  not concluded?

6      A.    Yeah.  We are still gathering, there's

7  still hearings on the case, still information

8  going on and if we learn any more we investigate

9  into what we learn at the time and we have learned

10 different things as we got further and further

11 into this.  Over about what nurses did what,

12 when, what they knew, and who knew what when.

13     Q.    And so there's a pending suit as

14 Mr. Bailey alluded to a minute ago.  Correct?

15     A.    There are pending suits.  That's correct.

16     Q.    And that has to do with the HIPAA

17 violation or alleged HIPAA violations?

18     A.    I would have to say alleged because

19 Mr. Resila told me they are not --

20          MR. BAILEY:  All right.  That's

21          advice from a lawyer.

22          THE WITNESS:  Okay.

23          MR. BAILEY:  Yeah.

24     Q.    So, the alleged HIPAA violations

1  **[JACK MAHAR - By Ms. Bosman]**

2  investigation is not complete?

3      A.   That's probably correct.

4      Q.   What else needs to be done?

5      A.   It would depend on any other information

6  gleaned or in the information we get, we would

7  have the investigators look into.  Every time

8  we've learned something new, which has been in

9  many cases here, the investigators will sought

10 out, search out the statements made and the

11 veracity to that so we can apply when and where.

12     Q.   So, they are still taking statements from

13 people?

14     A.   If something new is learned, yes, they

15 would.

16     Q.   You are saying yes, they would.  I'm

17 asking are they currently.

18     A.   No, because nothing new has come forward

19 recently.

20     Q.   So how do you know when the investigation

21 is concluded or you just wait for more information

22 to come along?

23     A.   If we can determine anything further on

24 it, yes, because we never have a full determination

1 **[JACK MAHAR - By Ms. Bosman]**

2 over who actually did everything yet. We know

3 some did, but we don't know everybody.

4     Q. So, theoretically your investigation

5 could last well beyond your administration?

6     A. Well, as in any crime, if more

7 information is determined, yes, it could.

8     Q. So, the Internal Affairs investigations

9 at the Rensselaer County Sheriff's Department do

10 not have any kind of schedule, like we want to

11 resolve our investigations within six months or

12 anything like that?

13     A. No. I never said that.

14     Q. Did you indicate to Mr. Karam, you said

15 you spoke to him, right?

16     A. When?

17     Q. When he made application for 207-c

18 benefits.

19     A. I spoke to him some point during that

20 process. I don't know exact time. It was after

21 he had made application.

22     Q. So after he had made the application you

23 spoke to him?

24     A. Yes. Yes.

[JACK MAHAR - By Ms. Bosman]

Q.   And did you speak to him about the application?

A.   I don't know.  I didn't specifically speak with him about the application other than the fact that -- where it was going and we were waiting to get a psychiatrist and going from there.  That's it.

Q.   So you told him that you were waiting to get a psychiatrist?

A.   That's correct.

Q.   And did he say anything in response?

A.   I think he asked me about the time frames.

Q.   And what did you say to that?

A.   I told him the time frames were specifically alluded to the contract with the union members, they weren't really with the management staff, there weren't time frames associated with that but we are working as fast as we could.

Q.   And you remember this conversation by memory, by recall, correct?

A.   Well, as much as I can and in the context

1  **[JACK MAHAR - By Ms. Bosman]**

2  of what it is.  I might not know it verbatim.

3     Q.   Right.  And you didn't listen to the

4  recording of that conversation?

5     A.   No.  I did not.

6     Q.   So, from your recollection, you told him

7  that you were waiting for a psychiatrist?

8     A.   I think I did.  Yes.

9     Q.   And that the collective bargaining

10 agreement did not govern the process for his

11 207-c application?

12    A.   No.  I didn't say that.  I said he wasn't

13 a member of the collective bargaining agreement.

14    Q.   Well, you knew that and he knew that so

15 why would you say that to him?

16    A.   Because he was asking about time frames

17 and I told him the time frames didn't apply.

18    Q.   So you made a determination that the time

19 frames did not apply because he was not a member

20 of the union, correct?

21            MR. BAILEY:  Object to the form.

22         Object to the form.

23    A.   It's a fact.

24    Q.   You made a determination that the time

**[JACK MAHAR - By Ms. Bosman]**

frames did not apply to him because he was not a

member of the union; is that correct?

           MR. BAILEY:  Object to the form.

    A.   I don't know how you -- what you mean by

that.  But I told him that the time frames only

applied to members who are part of the union or

members of the union.

    Q.   But you knew he wasn't a member of the

union?

    A.   Correct.

    Q.   He knew he wasn't a member of the union.

So, why are you even talking about a union to

him?

    A.   Because he's asking about the time

frames.

    Q.   So, you are letting him know that there

are no time frames?

    A.   That there weren't any established time

frames, yes.

    Q.   So, did you tell him at that point that

you had made repeated calls to legal counsel and

that you were waiting for a psychiatrist to be

referred over to you?

1    **[JACK MAHAR - By Ms. Bosman]**

2              MR. BAILEY:  Object to the form.

3              If you can remember what you --

4    A.    No.  I didn't tell him at that time.

5    Q.    Why not?

6    A.    I didn't think of it.

7    Q.    Did you know that Mr. Karam had no

8    income?

9    A.    He had mentioned that to me.

10   Q.    Okay.  So you knew he had no income.

11   Correct?

12   A.    He said that.  Must have been meant he

13   was out of time.

14   Q.    Pardon?

15   A.    He must have been out of time.

16   Q.    Well, you knew that, too, correct?

17   A.    Yes.  Yes.

18   Q.    So, he was out of time, meaning sick

19   time?

20   A.    Um-hmm.

21   Q.    Correct?

22   A.    Obviously.

23   Q.    Out of vacation time?

24   A.    I did not know how much time he had, no.

1   [JACK MAHAR - By Ms. Bosman]

2        Q.   Well, you knew he didn't have any income,

3   correct?

4        A.   No.  I didn't know he -- I didn't know

5   what his full status was other than what he told

6   me, he was having a difficult time financially.

7   The exact connotation I don't remember that, how

8   it went, but that was made aware to me.

9        Q.   Why didn't you make inquiry of him?

10            MR. BAILEY:  Object to the form.

11       Q.   Why didn't you ask Jim about it?

12       A.   About what?

13       Q.   About the time, whether he had any time,

14   whether he had any income?  You said he mentioned

15   to you that money was a problem, right?

16       A.   Right.  But I knew also if he got his

17   207-c he would be totally reimbursed for all of

18   the money.

19       Q.   So, if he wasn't, then what would happen?

20       A.   I don't know.  Because my time frame at

21   that time I never expected that.  I thought that

22   was going to be a very short process.

23       Q.   How long did you expect it to be?

24       A.   I didn't know.  I had no idea.  Couple

1    **[JACK MAHAR - By Ms. Bosman]**

2    months maybe?

3        Q.    What do you consider a short process?

4        A.    Whatever time it would take to assign a

5    psychiatrist, a psychiatrist to interview,

6    whatever times they might have needed for that to

7    make their determination and then to get back to

8    us.

9        Q.    And how long would you expect that to

10   take --

11       A.    I don't know.

12       Q.    -- as a short process?

13            MR. BAILEY:  Object to the form.

14       You can answer.

15       A.    I don't know.  I don't have a time frame

16   for that.  I would think it should be reasonably

17   soon, but I don't know that.

18       Q.    Why do you think it should be reasonably

19   soon?

20            MR. BAILEY:  Object to the form.

21       Go ahead.

22       A.    Only in that they should make the

23   appointment and then he should get to go see him

24   and then it should go on.  Should that take a

1  [JACK MAHAR - By Ms. Bosman]

2  couple of months?  I would think that be would be

3  reasonable.

4      Q.   Do you understand the purpose of 207-c

5  benefits for police officers and firefighters in

6  the State of New York?

7      A.   Yes.  I do.

8      Q.   And what do you understand to be the

9  purpose of that statutory protection?

10     A.   If someone was -- the purpose?

11     Q.   Yes.

12     A.   To compensate them if they can't work.

13     Q.   Why?

14     A.   Because if they were hurt in -- or if

15  their injury was in a line of duty.

16     Q.   Because you don't want them to go without

17  income, right?

18     A.   I think that would probably be it.

19     Q.   But Mr. Karam went without income for how

20  long?

21     A.   I have no idea.

22     Q.   Did you make inquiry of it at any time?

23     A.   No.

24     Q.   Did you make inquiry of anyone who had

1    [JACK MAHAR - By Ms. Bosman]

2    personnel records or information concerning his

3    payroll?

4        A.    No.

5        Q.    Did you make inquiry of Mr. Karam

6    concerning his condition or how he was feeling at

7    any time after he went out sick?

8        A.    No.  No.

9        Q.    Did you dislike Mr. Karam?

10       A.    No.  Actually, I liked him a lot.

11       Q.    So, why didn't you call him up and say

12   how are you doing?

13       A.    Because I never inquire to anybody's

14   status when they are in the process of that.

15       Q.    Why?

16       A.    It would be inappropriate of me.

17       Q.    To ask them how they are doing?

18       A.    No.  To worry about their financial

19   records and all that stuff.  That's not my

20   position to do that.

21       Q.    Aren't you charged with ensuring the

22   welfare and the well-being of the people that

23   work for you?

24                 MR. BAILEY:  Object to the form.

1    **[JACK MAHAR - By Ms. Bosman]**

2        A.   Actually, no, I'm not.  There's a

3    separate county office that if you have no money

4    you may go apply for assistance with the county

5    and you may do that.  There are places to do

6    that.

7        Q.   You want your officers to go on public

8    assistance?

9        A.   It's not for the sheriff to authorize

10   taxpayers' money for something that he has no

11   authority to do.

12       Q.   Like Mr. Rogers' seniority?

13       A.   I didn't --

14            MR. BAILEY:  Object to the form.

15            Is that a question or is that a snotty

16            comment?

17            MS. BOSMAN:  No.  It's a question.

18       Q.   You authorized Mr. Rogers' seniority to

19   go back ten years when he hadn't worked for the

20   county.

21       A.   I would have authorized whatever the

22   contract and union and the attorney, labor

23   attorneys had agreed to.

24       Q.   So you are saying that the union had some

**[JACK MAHAR - By Ms. Bosman]**

involvement in that?

    A.    Oh, gosh, yes.  I received letters, a

tremendous amount of letters from them.

    Q.    From the union?

    A.    From the union regarding bringing

Mr. Rogers back.

    Q.    At what status and seniority?

    A.    On all those things.  Yes.  That was

determined by the union attorneys and everyone

agreeing upon that and that's where he went back.

    Q.    So, you just did what they agreed to.

You didn't exercise any separate discretion

yourself?

    A.    No.  That's correct.  I was advised this

is the way we need to proceed.

    Q.    Okay.  Do you always do that?

    A.    If it's in areas of legal issues that I

don't understand, yes, I will ask for legal

advice.

    Q.    Have you ever disagreed with or taken

actions contrary to those told to you by the

county human resources or any of those people,

union people, or do you always agree?

1   **[JACK MAHAR - By Ms. Bosman]**

2           MR. BAILEY:  You are talking not

3       attorneys?

4           MS. BOSMAN:  No.  Not attorneys.

5           MR. BAILEY:  All right.  Could you

6       read the question back?

7           MS. BOSMAN:  I can reword it if

8       you'd like.

9   Q.  Do you want me to rephrase it for you,

10  Mr. Mahar?

11          MR. BAILEY:  We'll hear it back.

12          (Whereupon, the question was read

13      back.)

14          MR. BAILEY:  To the extent you can

15      answer that question, go ahead.

16  A.  I'm not sure how to answer the question

17  because I'm not sure I fully understand it.

18  Q.  Okay.  I'll rephrase it.

19          The information that you get or the

20  directives, I guess, from the county and the

21  union, do you ever disagree with them and refuse

22  to do what they say?

23          MR. BAILEY:  I object to the form

24      of the question.  Again, I don't know

**[JACK MAHAR - By Ms. Bosman]**

2          that he gets directives from the union or

3          anyone else, but if you can answer that,

4          go ahead.

5      A.    Again, I don't -- normally if there's a

6  question of anything that I may disagree with,

7  with the county in many areas I will go to our

8  legal counsel and seek advice and go from there.

9      Q.    And is it your understanding that if you

10  do that, that you are somehow protected?

11          MR. BAILEY:  Object to the form.

12      A.    Well, I would hope that they wouldn't

13  lead me down a criminal's path and give me the

14  wrong advice and information to follow through,

15  my legal counsel.  So, to answer your question

16  legally protected, I think I would be right

17  following their legal advice.

18      Q.    Yeah.  I understand about legal advice,

19  but you are not testifying about legal advice,

20  right?  You are testifying about the union and

21  the human resources office telling you what to do

22  with respect to Mr. Rogers' seniority?

23      A.    That would have to do with union

24  contracts and other things and we would get legal

**[JACK MAHAR - By Ms. Bosman]**

opinion from to act on, yes.

    Q.    Okay.  So, the union told you what they wanted and then you --

    A.    I don't think.  Never mind.

    Q.    The union told you what they wanted and then you took that over to legal counsel?

    A.    The union made requests, yes, and I would seek legal opinion on that and we would make that determination.

    Q.    When you say would, it makes it sound like you would in the future.  I want to know back then if you --

    A.    I'll be honest with you I don't know.

    Q.    Wait.  Wait.  Wait.  You have to let me finish my question.

    I'm talking about what you did back then. I'm not talking about what you would do in the future.  Do you understand the difference?

    A.    Right.  I was looking at it from when they asked a question prior to it happening it would then become a future event at that time so "would" would be the correct thing to say.  All right?  So, if we get that perspective.  I

1  **[JACK MAHAR - By Ms. Bosman]**

2  understand time.

3      Q.   Right.

4      A.   So, my point, to get what I'm trying to

5  say to you very easily is back then I would have

6  taken the information that I received from the

7  union, brought it to the county, based on the

8  determination that they thought, the county's

9  attorney, and they would advise me that's how we

10  should have to respond without going to

11  arbitration or grievance.

12      Q.   And is that, in fact, what occurred at

13  that time?

14      A.   It probably did but I don't -- I'll be

15  honest with you, I don't even recall the whole

16  process, it's been so long ago, with Rogers.  But

17  that if you are asking me how I would handle

18  something like that, that's how I would handle

19  it.

20      Q.   I wasn't asking you how you would.  I was

21  asking how you did.  That's all right.  I

22  understand.

23          I want to back up for a question I didn't

24  ask you earlier.  Earlier I asked you with

**[JACK MAHAR - By Ms. Bosman]**

respect to his hiring if you had ever made a

statement in front of anyone about his hiring.

Do you recall that?

    A.   Yes.

    Q.   And you indicated Mrs. Jimino had asked

you to hire him?

    A.   Yes.

    Q.   Did you also make reference to

Mr. Rogers' relationship with Ms. Jimino during

that conversation in front of my client?

    A.   No.  I did not.

    Q.   So you never made reference to Ms. Jimino

having a relationship with a relative of

Mr. Rogers?

    A.   Yes.  I made reference to that.

    Q.   What did you say?

    A.   I said -- I was asked at the time why I'm

hiring him and I told him because, said, well,

I'm getting a lot of requests from the county

execs to hire him.  I said I don't -- I said

there's a rumor out there and I said I don't know

the veracity of it, that she's having an affair

with his father.  I said I don't know if there's

**[JACK MAHAR - By Ms. Bosman]**

truth or not truth to that.  I said that's the

rumor I'm hearing.  And that's how everything

went and nothing else got said beyond that.

Q.    Why would you say that rumor?

A.    Because I was asked why.  The staff that

I trusted at the time, two weeks into office,

trying to put -- with the staff there they are

asking me why I would hire somebody that has a

bad record.  I did not want to hire the person

back.  They asked ask why and I told them why.

Q.    So you thought you had to satisfy Ms.

Jimino?

A.    No.  I didn't have to satisfy Ms. Jimino

in anything.  What I was doing is explaining to

the people why I was hiring somebody back that I

didn't want to hire back.

Q.    Right.  Well, that's what I'm trying to

understand, too.  Did you do it because Ms.

Jimino wanted you to do it?

A.    Yes.  I did.

Q.    Okay.  And had she called before on other

individuals?

A.    I was two weeks in office.

**[JACK MAHAR - By Ms. Bosman]**

Q.   Had she called afterwards regarding hiring of other individuals?

A.   No.  No.  She has not.

Q.   So, that was the only person she called you and said, "I want you to hire this guy"?

A.   Correct.

Q.   And the rumor that you repeated in front of my client was a rumor you heard from whom?

A.   I'm not sure who heard it -- that's the rumor I was told.  Because I couldn't understand why I was being -- the county executive was putting a lot of pressure on for me to hire him and somebody said this and I go, I go that's terrible, all these kinds of things.  And I was asked why.  Somebody asked me why.  I told them why.  Again, I clarified.  I didn't tell them why I was hiring him.  They asked why she was doing that.  I said I don't know that.  I said, look, this is what I heard.  I don't know the veracity of that.  So don't go repeating those kind of things, is why I said it that way.  But that's the reason, what I heard.

Q.   Who did you tell that to?

1    [JACK MAHAR - By Ms. Bosman]

2    A.    Whoever was in the room that day.

3    Q.    So you don't remember who you talked to?

4    A.    No.  I don't.  No.  I don't.

5    Q.    But you do remember stating don't go

6    repeating that?

7    A.    No.  That's why I said I don't know the

8    veracity of that so, which you should take that

9    from that.

10   Q.    I see.

11   A.    At least that's how I perceived it.

12   Q.    Did you have a knowledge of who he was?

13            MR. BAILEY:  Of who who was?

14   A.    Who who was?

15   Q.    The individual, Mr. Rogers.  That you had

16   heard that Ms. Jimino was having an affair with?

17   A.    Yeah.  I knew who he was.

18   Q.    And how did you know him?

19   A.    I've known his whole family forever.

20   Q.    How?

21   A.    Just know them.  Just from knowing them.

22   I worked with his uncle.  I worked with his --

23   all that.

24   Q.    You worked with him?

1   **[JACK MAHAR - By Ms. Bosman]**

2     A.   No.  I never worked with him.

3     Q.   Did you have any political connection to

4  him?

5     A.   No.

6     Q.   Do you know who Aaron Samart (phonetic)

7  is?

8     A.   Do I know who Aaron Samart is?  Yes.  I

9  do.

10    Q.   Who is he?

11    A.   He is a CO in the jail.

12    Q.   Did she call about him?

13    A.   Yeah.  She did.  But I didn't hire him

14  because she called.  I hired him through his own

15  progress through the job.  He was on the civil

16  service list and he was taken at the time.  But

17  she called to put a reference in, like many

18  people call to put a reference in.

19    Q.   And he was already top 3 so --

20    A.   He would have been in the roll of 3.

21    Q.   He would have been?

22    A.   If he got hired.  It's the only way he

23  could have been hired, if he was in the roll of

24  3.

**[JACK MAHAR - By Ms. Bosman]**

Q.   Right.  I understand.  Was he --

A.   Yes.

Q.   -- in the top 3 at the time?

A.   Yes.

Q.   Did he have a criminal record?

A.   Who?

Q.   Mr. Samart?

A.   I don't know.

Q.   Did you tell Mr. Karam at any time his application was incomplete?

A.   I don't recall that.  No.

Q.   Did you inform him what was missing from his application?

A.   I don't recall that.  No.

Q.   Well, at the same time or during the same time that the 207-c application had been made there were donations of sick time to Mr. Karam. Correct?

A.   I think there were.  Yes.

Q.   And you deemed them not donatable, I guess is the word, to Mr. Karam.  Didn't you?

A.   No.  I didn't -- donate to no one.  No one could get them.

1   **[JACK MAHAR - By Ms. Bosman]**

2       Q.   Well, that no one could get them

3   determination or policy that you adopted was

4   after donations were made to Mr. Karam, correct?

5       A.   No.  They are not donated until they

6   are -- you can put them out there.

7       Q.   Yeah.

8       A.   You've got to be approved for them.

9       Q.   There is a sheet that came over from

10  other departments with donated sick leave time --

11      A.   Right.

12      Q.   -- to Mr. Karam.  Correct?

13      A.   That's correct.

14      Q.   Those were individuals who had designated

15  him to receive donated sick time.  Correct?

16      A.   Correct.

17      Q.   And that's because those individuals knew

18  that Mr. Karam and his family were going without

19  his income.  Correct?

20      A.   I'm not sure why they donated it.

21      Q.   Well, why do people donate sick time?

22      A.   A lot of them feel pressured into it.

23      Q.   Pressured by who?

24      A.   Unions.

[JACK MAHAR - By Ms. Bosman]

Q.   Why?

A.   They are intimidated to do it if they don't.

Q.   So you think the union makes them donate sick time?

A.   That could be because people have said that before.  Not the union.  The individuals, they put a lot of pressure on people to donate time.

Q.   Who's told you that?

A.   The people themselves.  They don't want to.

Q.   Who?

A.   COs.

Q.   Who?

A.   I don't remember the names.

Q.   You don't remember the name of anyone --

A.   No.

Q.   -- who's told you that they felt pressured --

A.   No.

Q.   -- to donate their sick time --

A.   No.  But I bet you if we brought

1    [JACK MAHAR - By Ms. Bosman]

2    everybody in --

3        Q.    You can't talk the same time I do,

4    Sheriff.  Sorry.

5        A.    That's all right.

6        Q.    You bet if we brought everybody in what?

7        A.    Somewhere people would tell you they feel

8    pressured when they have to do it.

9        Q.    How many people have told you that?

10       A.    A couple have.

11       Q.    Two?

12       A.    I don't know the number.

13       Q.    And you don't know who?

14       A.    No.  I don't.

15       Q.    But you recalled they told you they felt

16   pressured?

17       A.    Yes.

18       Q.    How did you respond to that?

19       A.    I said don't if you don't want to.

20       Q.    And what did they say?

21       A.    They say, well, that's different.  We

22   have to deal with it.

23       Q.    What's different?

24       A.    The pressure.  The peer pressure.

**[JACK MAHAR - By Ms. Bosman]**

Q.   Oh, I see.  Peer pressure?

A.   Yeah.

Q.   Not pressure from the union?

A.   That's what I said.  It has to be from a person, not -- a person could be in the union, but they feel peer pressure.

Q.   To donate sick time?

A.   Correct.

Q.   Okay.  So, is that a bad thing?

          MR. BAILEY:  Object to the form.

          Is what a bad thing?

Q.   That they feel pressured to donate sick time.

          MR. BAILEY:  Object to the form.

          Go ahead and answer.

A.   I think it would be.  I don't know. They'd have to answer that.

Q.   Why would you think it would be a bad thing?

A.   Because most people like to keep their time so they can accrue it and when they retire it's carried forward for them to use toward their sick leave benefits for a period of time.

1  [JACK MAHAR - By Ms. Bosman]

2      Q.   So, an employee can continue collecting

3  their sick time until their retirement.  Is that

4  correct?

5      A.   That's correct.

6      Q.   And so if they donate it, then it doesn't

7  accumulate obviously?

8      A.   That's correct.

9      Q.   So, there's some kind of financial

10 benefit for them if they carry it over, their

11 sick time year after year?

12     A.   That's correct.

13     Q.   Until they retire?

14     A.   Correct.

15     Q.   So, theoretically you could carry enough

16 sick time to retire out for -- have years worth

17 of sick time when you retire?

18     A.   I don't know what the total time is but,

19 yeah, several years, yes.

20     Q.   I see.  So, the employees would be

21 feeling pressure to give up money essentially?

22     A.   Correct.  Or when they needed it.

23     Q.   Was there ever a process in place where

24 the employees would lose any accumulated sick

**[JACK MAHAR - By Ms. Bosman]**

time if they didn't use it?

    A.    Yes.  There is a process.  Well, I don't -- see, it might be semantics but I look at it differently.  You only accrue up to a certain amount of time.  You don't lose anything afterwards because you don't gain it.  You can look at it as I'd lose it, but I don't look at it that way.  I look at it is you don't gain any more time.  You are max'd out.

    Q.    Pardon?

    A.    You max out.

    Q.    So you do max out?

    A.    Yes.

    Q.    So, it's not possible to continue to --

    A.    That's correct.

    Q.    -- accrue -- wait.

    It's not possible for you to continue to accrue sick time throughout your career until retirement?

    A.    Correct.

    Q.    There's a maximum?

    A.    Correct.

    Q.    And once you meet the maximum, you can't

**[JACK MAHAR - By Ms. Bosman]**

accumulate anymore for donation or any other

purpose.  Right?

    A.   That's correct.

    Q.   So, if you donate your sick time, you

could accrue that time back.  Correct?

    A.   If you are allowed to donate, yes.

    Q.   If you are allowed to donate?

    A.   Yes.

    Q.   And you say some people aren't allowed to

donate.  Correct?

    A.   Right.

    Q.   Who is not allowed to donate?

    A.   Anyone that works for the sheriff's

office is not allowed to.

    Q.   Anyone that works for the sheriff's

office --

    A.   That's correct.

    Q.   -- is not allowed to donate sick time?

    A.   Correct.

    Q.   And is that a policy that you put in

place?

    A.   Yes.  I did.

    Q.   When?

1 **[JACK MAHAR - By Ms. Bosman]**

2     A.   I don't know the exact date, time.

3     Q.   Wasn't it the exact date and time that

4 Mr. Karam --

5     A.   It was that vicinity, yes.

6     Q.   -- received sick leave donations?

7     A.   Yes.  It was in that vicinity of time.

8     Q.   And wasn't it also around the same time

9 that Mr. Karam's 207-c application was pending?

10     A.   Yes.  It was.

11     Q.   So you adopted a policy that prevented

12 him from receiving donated sick time.  Correct?

13     A.   Correct.

14     Q.   And you did not tell him when his 207-c

15 application would be acted on.  Correct?

16     A.   I didn't know when it would be acted on.

17     Q.   And you did not tell him that the matter

18 had been referred over to the county attorney.

19 Correct?

20     A.   No.  I think he knew we were waiting for

21 a psychiatrist appointment.

22     Q.   I didn't ask you what he knew.  I asked

23 you if you told him.

24     A.   No.

1 [JACK MAHAR - By Ms. Bosman]

2 Q. So, he was not informed by any one of

3 those things by you. Was he?

4 A. No.

5 Q. And you didn't make inquiry as to the

6 source or whether or not he had any income?

7 A. No. I knew his wife worked.

8 Q. Is that -- did that have some impact on

9 your decision?

10 A. No. It had none. But there's income. I

11 knew that.

12 Q. So, if Mr. Karam did not have a wife who

13 was working, would that have changed any of the

14 decisions you made with respect to his

15 application for benefits?

16 A. No.

17 Q. So, that wasn't a factor. Correct?

18 A. Correct.

19 Q. And you knew he didn't have any income

20 because he complained to you about that? It was

21 Christmas, wasn't it?

22 A. Yeah. I think he said that.

23 Q. So, it was getting close to Christmas, he

24 didn't have any income, you denied the sick leave

1  **[JACK MAHAR - By Ms. Bosman]**

2  donations?

3      A.    Um-hmm.

4      Q.    And then you adopted a policy department

5  wide that nobody was going to get it?

6      A.    That happened before that.

7      Q.    So you are saying you made a decision

8  that nobody was going to get sick leave donations

9  before the time you knew that Mr. Karam was

10  receiving donations from the probation

11  department?

12      A.    No.  It was around the same time.  I said

13  that.

14      Q.    So you don't know which came first?

15      A.    Truthfully, yes, I don't know which came

16  first.

17      Q.    But people were receiving donated sick

18  time both before Mr. Karam was donated sick time

19  and after.  Isn't that correct?

20              MR. BAILEY:  Object to the form.

21      A.    No.  That's not correct.

22      Q.    So were there anybody else in the police

23  department, in your department, that was

24  receiving donated sick leave time before

1  **[JACK MAHAR - By Ms. Bosman]**

2  Mr. Karam?

3      A.    Before Mr. Karam, yes, there were.

4      Q.    And it's your testimony that no one

5  received donated sick benefits after Mr. Karam?

6              MR. BAILEY:  Object to the form.

7          Go ahead.

8      A.    The way you say that, yes, that's

9  correct.

10     Q.    So, once that policy was put into place

11 that your employees could not receive donated

12 sick leave benefits, you stuck with that policy

13 and that's still in place as we sit here today.

14 Is that correct?

15             MR. BAILEY:  Object to the form.

16         You can answer.

17     A.    The only person, anyone who -- to be

18 specific in how you are asking the question,

19 anybody that was approved was allowed to use the

20 sick leave they were given.  Some of it ran

21 beyond the time of the date in which we stopped

22 any new donations of sick leave.

23             So, the answer to your question is yes

24 and no.  They weren't given, granted new time.

[JACK MAHAR - By Ms. Bosman]

They were just allowed to finish the time they were granted.

Q. Did you put the policy that you adopted after Mr. Karam received donations in writing?

A. No.

Q. Did you inform the members of the sheriff's department in writing that the policy had changed?

A. No. They were all informed.

Q. Did you request anyone to draft a written policy?

A. No.

Q. What was the point of changing that policy?

A. Changing the policy?

Q. Yes.

A. Saving the taxpayers millions of dollars.

Q. I see. So you did it for taxpayers?

A. Yes. That's my job.

Q. Is that your job?

A. It's part of it, yes.

Q. What's the rest of it?

MR. BAILEY: Object to the form.

**[JACK MAHAR - By Ms. Bosman]**

A.   What do you mean what's the rest of it?

Q.   I don't know.  You said that's part of it.  So, I wanted know if you delineate it in some fashion.  Is there another part of it?

          MR. BAILEY:  Wait a minute.  You've now got about three questions on the table.  Could we get one question on the table, please?

          MS. BOSMAN:  Sure.

Q.   What's the other part of it?

          MR. BAILEY:  The other part of what?

Q.   Do you understand the question, Mr. Mahar?

A.   The other part of?  Like he said, the other part of what?

Q.   Do you understand the question?  Yes or no?  Do you understand the question?

A.   No, because I'm not sure what you are asking.

Q.   I'll rephrase it.  That's fine.  You just have to tell me and I'll rephrase it.

          You just indicated that the reason you

**[JACK MAHAR - By Ms. Bosman]**

1  changed the policy was to save the taxpayers

2  millions of dollars?

3      A.    That's correct.

4      Q.    And you said that's part of your job?

5      A.    Right.  Part of my job is budget,

6  managing budget.  Managing budget is what I

7  needed to do.

8      Q.    And do you have a responsibility to the

9  individuals you supervise who serve you in and

10  out of uniform?

11                 MR. BAILEY:  Object to the form.

12            You can answer that.

13      A.    Yeah.  To a certain extent.  Yes.

14      Q.    To what extent?

15      A.    It's too ambiguous.  I mean that's very

16  subjective.  I don't know.  You'd have to be more

17  descriptive of what you mean.

18      Q.    Well, that's what I'm trying to

19  understand.  From your perspective what is it you

20  believe you have responsibility for with respect

21  to those employees that work for you?

22                 MR. BAILEY:  Object to the form.

23            Go ahead and answer.

**[JACK MAHAR - By Ms. Bosman]**

A.    Their occupational safety.

Q.    Anything else?

A.    Their, you know, that they -- that their job is secure and they are safe in when they are doing their jobs.

Q.    Anything else?

A.    Not really.

Q.    What about morale?

A.    Of course that's part of it.  That's part of that, all of that.

Q.    That's part of the occupational safety, the morale is?

A.    Well, it's part of that.  Yeah.

Q.    Did Mr. Karam inform you repeatedly that he was overworked?

A.    Yeah.  But he wasn't the only one. A lot of people are overworked and that's very subjective, too.

Q.    Did Mr. Karam inform you repeatedly that he was overworked?

A.    No.  Not repeatedly.  But he did inform me a few times he was overworked, yes.

Q.    And what did you suggest to him could be

**[JACK MAHAR - By Ms. Bosman]**

done in order to alleviate --

A.   I told him to do the best he can and do what he has, what's in front of him and we only can do so much at a time.  And we only have so many staff and that's the best way we can do it.

Q.   Did you yell at him for not getting the accreditation done?

A.   No.  I never yelled at him for not getting accreditation.  No.

Q.   Have you ever yelled at him at all?

A.   I've yelled -- not yelled.  I've been frustrated at people.  You can define yelling.  I would voice my opinion we should have been moving more quickly on this, but I think the big problem was there was confusion on how to move forward on that between the command staff.

Q.   Are you talking about the accreditation?

A.   Yes.

Q.   Who was handling it before it was handed over to Mr. Karam?

A.   I don't know if it was ever handed per se totally to Mr. Karam.  The colonel was handling it and he was to assign --

1    [JACK MAHAR - By Ms. Bosman]

2        Q.    Colonel who?

3        A.    Colonel Loveridge at the time.  And he

4    was to assign handling to different staff members

5    to do different parts of it.

6        Q.    Wasn't Mr. Loveridge allowed to retire

7    out early or something?  Didn't he retire early?

8                    MR. BAILEY:   Object to the form.

9        A.    What do you mean?

10        Q.    Wasn't there like an early buyout or

11    something?

12        A.    There was an early incentive program that

13    he took advantage of.  Yes.

14        Q.    And his position was then vacant for a

15    year and a half.  Correct?

16        A.    That's correct.

17        Q.    And during that time Mr. Karam was

18    expected to take over the responsibilities and

19    duties of the accreditation planning.  Correct?

20        A.    Yes and no.  The captain, Smith, was in

21    charge and it would have been through him that

22    they all should have worked together to resolve

23    that.  Not the whole process all at once.

24        Q.    So, Captain Smith is the one that

**[JACK MAHAR - By Ms. Bosman]**

assigned the accreditation project to Mr. Karam?

A.   I don't know if he assigned the whole
thing to Mr. Karam.  I know Mr. Karam probably
would have been given parts of it to do.
Hopefully the rest of the command staff were
given parts of it to do.  The problem was nothing
got done.  It's getting done now.

Q.   How did you find out nothing got done?

A.   Because in the end we didn't have
anything.

Q.   When did you learn that?

A.   Gees, probably -- I'm not sure of the
exact time.  I really don't know the time frame.

Q.   More than a year ago?

A.   Probably within that time frame, yes.

Q.   So, it was after my client went out?

A.   Yeah, that we didn't have all of it done.

Q.   Right.  And that's the first you learned
that it wasn't --

A.   No.  I knew we were having difficulties
with it.

Q.   When did you learn you were having
difficulties with it?

**[JACK MAHAR - By Ms. Bosman]**

A.    From day one.

Q.    When was that?

A.    When we first asked the command staff to get moving on accreditation.  It was never done.

Q.    When was that?

A.    Probably in 2004.

Q.    Okay.  So, in 2004 it hadn't been done and you directed that it be completed?

A.    We -- I asked them to keep moving on it, amongst many things.

Q.    Who did you --

A.    The colonel.  Colonel Bob Loveridge.

Q.    And so Mr. Loveridge worked on it until he retired.  Yes?

A.    Well, we believed he was.  Yes.  And he was assigning different parts of it, my understanding was, to different people to do.

Q.    And did you get a report from him before his retirement as to the status of the accreditation process?

A.    He showed me parts of what he said they were working on.  Yes.  And I come to find out later that that wasn't necessarily correct and

**[JACK MAHAR - By Ms. Bosman]**

that things weren't being done the way they said

they were being done.

    Q.    So Mr. Loveridge misrepresented it to

you?

    A.    No.  I think it might have been a

difference of opinion on how he thought things

were being done.  I don't think it was

misrepresentation.

            MR. BAILEY:  Ms. Bosman, could we

          try to get to something involved in this

          lawsuit.  It's all very interesting about

          this accreditation, but could we try to

          get to something, please.

            MS. BOSMAN:  If you do that one

          more time, I am going to call the judge.

            MR. KEACH:  Go ahead and call the

          judge.  Wait and see what Judge Treece

          has to say about what I have to say about

          how this is going.  Just like he heard

          from me yesterday about how this is

          going.

            Mr. Bailey has got a good point

          here.  You want to call the judge, call

1  [JACK MAHAR - By Ms. Bosman]

2          the judge.  It's worked out well for you

3          in the past.  You go ahead.

4              MS. BOSMAN:  I don't want any more

5          interruptions, Bob.  And I didn't ask for

6          your --

7              MR. KEACH:  I have a right to

8          participate in this deposition just like

9          anybody else.

10             MS. BOSMAN:  Participate.

11             MR. KEACH:  And you are not going

12         to sit here and raise your voice at me

13         and think I'm not going to participate.

14         You are wrong.

15             MS. BOSMAN:  Who's raising their

16         voice?

17             MR. KEACH:  Let's get on to

18         something relevant to this case rather

19         than wasting all of our time.

20             MS. BOSMAN:  I believe that every

21         single question I asked is relevant,

22         Mr. Keach.

23             MR. KEACH:  All right.  Well,

24         reasonable minds can differ.

1  **[JACK MAHAR - By Ms. Bosman]**

2          MS. BOSMAN:  That's true.  So, I

3    recommend then that you stop interrupting.

4          MR. KEACH:  A.J., I think this is

5    only the second time throughout the

6    course of, how long we've been going now

7    for, four hours, three and a half hours

8    I've spoken.  I haven't interrupted

9    everybody.

10          MS. BOSMAN:  Now --

11          MR. KEACH:  Move on with your

12    examination, please.

13          MS. BOSMAN:  I will if I can have

14    the last question read back again.

15          (Whereupon, the question and answer

16    were read.)

17  Q.    Did you make changes in how it was being

18  done once you learned that from Mr. Loveridge?

19          MR. BAILEY:  You are talking about

20    the accreditation?  You are asking about

21    the accreditation process.  Correct?

22          MS. BOSMAN:  Yes.

23  Q.    Do you understand that?

24  A.    Yes.

1  **[JACK MAHAR - By Ms. Bosman]**

2  Q.   Okay.   If you don't understand the

3  question, let me know.

4              MR. BAILEY:   Go ahead and answer.

5  A.   I'm trying to put things in its time

6  perspective.   This is a long time ago.   I do know

7  that the colonel, I wanted him to get moving on

8  this and he knew it was a high priority to have

9  this thing accomplished and I know Lieutenant

10 Karam was working on it himself in many areas on

11 this, I'm working on that.   The problem was there

12 weren't communications amongst the command staff,

13 is where the big problem was.

14 Q.   Well, he didn't start working, Mr. Karam

15 didn't start working on it until Mr. Loveridge --

16 A.   No.   He should have been working on it

17 prior to that because the colonel should have

18 been assigning people different tasks to do all

19 along on this.

20 Q.   Should have been.   But was he?

21 A.   I would assume he was.

22 Q.   You don't know?   You don't know?

23 A.   No.   I would assume he was.

24 Q.   Were there allegations of sexual

**[JACK MAHAR - By Ms. Bosman]**

1

2  harassment within the department during the time

3  that you've been the sheriff?

4      A.   Yes.

5      Q.   And was there testimony taken regarding

6  those allegations of sexual harassment?

7                  MR. BAILEY:  You can answer that

8              yes or no.

9      A.   I would assume there would have been.

10  I'm not sure yes.  You mean testimony from where?

11     Q.   From anyone in the department.

12     A.   I would assume so.

13                 MR. BAILEY:  Again, Ms. Bosman --

14     Q.   Did you --

15                 MR. BAILEY:  Wait a minute.  Wait a

16             minute.  You are now launching into

17             questions about sexual harassment and I

18             don't see that anywhere in this

19             complaint.

20                 MS. BOSMAN:  Okay.  All right.

21             Let's call the judge.

22                 MR. BAILEY:  All right.  Fine.  Be

23             happy to.

24                 MS. BOSMAN:  All right.  Give him a

1    **[JACK MAHAR - By Ms. Bosman]**

2           call.  If you want to make Judge Treece's

3           life miserable.

4               (Whereupon, there was a pause in

5           the proceedings.)

6    Q.   Do you know a Ms. Abbott?

7    A.   Yes.  I do.

8    Q.   And how do you know her?

9    A.   Wait a second.  Which Ms. Abbott?

10   Q.   Well, what Ms. Abbott do you know?

11   A.   I know a Ms. Abbott that actually babysat

12   me years ago but -- which one, who do you mean?

13   Q.   Do you know any other Ms. Abbotts?

14   A.   I don't know.  Laura Abbott.

15   Q.   Who's Laura Abbott?

16   A.   Laura Abbott is a CO.

17   Q.   And did she file a complaint of sexual

18   harassment?

19   A.   I believe she did, yes.

20   Q.   And do you know what the outcome was of

21   that allegation?

22   A.   The final outcome of the allegation, we

23   found that there was -- actually, I terminated

24   the person who did it, who she actually

1  **[JACK MAHAR - By Ms. Bosman]**

2  complained against.

3      Q.    So the result of the investigation was

4  that the complaint was founded?

5      A.    That's a correct statement.

6      Q.    And did Mr. Karam provide testimony in

7  support of Ms. Abbott in her complaint of sexual

8  harassment?

9      A.    I believe he did.

10      Q.    At the time that he provided testimony in

11  support of her complaint of sexual harassment

12  were you aware of it?

13      A.    Yes.  I was.

14      Q.    Did you express an opinion in words or

15  substance in the presence of anyone that

16  Mr. Karam was responsible for that complaint

17  being founded?

18      A.    Actually, I don't know.  But I know he

19  supported her tremendously during the process and

20  he even came and gave me a lot of information

21  regarding the process that helped us make our

22  decision.

23      Q.    Did you make any statement or opinion --

24  statement of opinion at any time that Mr. Karam

1   **[JACK MAHAR - By Ms. Bosman]**

2   should not have testified on Ms. Abbott's behalf?

3   A.   I don't think I did.  No.  I don't know

4   why I would have done that, but I know he

5   supported her right from day one and helped her

6   out right from day one.

7   Q.   Did you make any statement in the

8   presence of anyone that you do not believe

9   Mr. Karam's 207-c claim was valid?

10   A.   I'm not sure.  I don't know if I did or

11   didn't to be perfectly honest with you.  I know I

12   discussed things with our attorney and the

13   undersheriff, but I don't know if I -- I don't

14   think I discussed them with other people.

15   Q.   What did you discuss with the

16   undersheriff?

17           MR. BAILEY:  If you had a

18           conversation with the undersheriff --

19   A.   The big thing with us, I was debating,

20   this was all feeling things out as we were moving

21   along on this, whether how do we determine what's

22   job related and what's not job related and

23   whether this is a job-related issue or not a

24   job-related issue.  That's really basically what

**[JACK MAHAR - By Ms. Bosman]**

we discussed. The exact language, I don't know

how it was done but we discussed that. And we

were waiting -- while we were waiting for him to

be seen by a psychiatrist and the opinion to come

back.

    Q.    Did you make the statement that you did

not think that his condition was work related?

    A.    I may have made that statement. I may

have said that it might be. I might have done

both.

    Q.    And why would you make that statement?

    A.    For me, as my own personal opinion, it

would be hard for me to see how, you know, that

could be job related or not. But then again

that's why we send them to medical professionals

to make that determination, not me.

    Q.    Well, what did you believe it to be

related to?

    A.    I had no idea. I had no idea if it was

work related. I had no idea either way.

    Q.    So, why would you make the statement that

you didn't believe it was?

    A.    I didn't make a statement. I made a

1  **[JACK MAHAR - By Ms. Bosman]**

2  thought process that it might not be or that it

3  could be.  I went both ways with it.

4      Q.    That's what you told the undersheriff?

5      A.    Yes.  I did.  And I know I told him that

6  it might not be and I also told him that it could

7  be.  That's why we needed to have the medical

8  doctor make that determination.

9      Q.    Did you speak to the medical doctor?

10     A.    Actually, I did.

11     Q.    How often?

12     A.    Once.

13     Q.    When?

14     A.    I don't know exactly when.  It was after

15 Lieutenant Karam had seen him.  Our attorney

16 brought me up to see him.  He wanted me to go up

17 for some reason.

18     Q.    And you don't know why?

19     A.    No.  I don't know why.

20     Q.    And what was it that you discussed with

21 the doctor?

22     A.    The doctor explained to us his

23 methodology and the process of what he did.

24     Q.    Why did you need to be explained the

1    **[JACK MAHAR - By Ms. Bosman]**

2    process on what he did?

3        A.    I don't know.  I didn't ask to go up.

4        Q.    What did the doctor say?

5        A.    The doctor said that he had valid reasons

6    for his, in his opinion that there were valid

7    reasons for his 207-c.

8        Q.    What was the process the doctor described

9    to you?

10        A.    He didn't go into medical things or

11    things Jim had said or anything like that.  He

12    just said that it was his opinion.

13        Q.    Did you ask him what the process was?

14        A.    He said he interviewed him.

15        Q.    Did you ask him what the process was?

16        A.    No.

17        Q.    At the meeting it was you and who else

18    was present?

19        A.    Attorney Goldberger.

20        Q.    Just you, Attorney Goldberger and the

21    doctor?

22        A.    Yes.

23        Q.    Which doctor?

24        A.    Denea.  I think that's his correct name.

1  [JACK MAHAR - By Ms. Bosman]

2  I'm not sure.

3      Q.   Denea?

4      A.   I don't know.

5      Q.   Did Mr. Karam get sent to a separate doctor

6  for evaluation for the Workers' Compensation claim?

7      A.   I don't know that.

8      Q.   Did you receive a copy of the report from

9  Dr. Denea?

10     A.   A copy of the report was sent.  I did not

11 see it.  Attorney Goldberger reviewed it and

12 advised me to its content but I had never read

13 it.

14     Q.   Why didn't you read it?

15     A.   It wasn't necessary.  My attorney read it

16 and he gave me the information, basically what

17 was necessary for me to have.

18     Q.   Did you receive more than one report?

19     A.   I don't know.

20     Q.   Was there a request for additional

21 records after Dr. Denea had examined Mr. Karam?

22     A.   I'm not sure.

23     Q.   Did you send additional records to Dr.

24 Denea?

1    **[JACK MAHAR - By Ms. Bosman]**

2        A.    At what time?

3        Q.    At any time.

4        A.    Whatever Dr. Denea asked for we sent him.

5    I don't know what time you mean.

6        Q.    After Mr. Karam had already been seen did

7    Dr. Denea request additional records?

8        A.    I don't know that.

9        Q.    Did you provide additional records?

10        A.    I would have provided any records Dr.

11    Denea asked for but I don't know when he asked

12    for them.

13        Q.    Were you aware there was more than one

14    version of the report from Dr. Denea?

15        A.    No.  I wasn't.

16            MS. BOSMAN:  Could I have my

17            documents, John?  I still have my

18            discovery.  You told me you'd give them

19            to me twice today.

20            MR. BAILEY:  I'll give them to you.

21            MS. BOSMAN:  It's quarter after 2.

22            MR. BAILEY:  Well, they are not

23            really due until Monday but we'll get

24            them to you today.

1 **[JACK MAHAR - By Ms. Bosman]**

2 MS. BOSMAN: They are due today.

3 MR. BAILEY: No. They are not. I

4 told you we'll get them to you today.

5 Crystal, my associate, is putting them

6 together.

7 MS. BOSMAN: I object to proceeding

8 with this deposition without my

9 discovery. We discussed this on the

10 phone yesterday. I indicated they were

11 due today. You said I would have them in

12 the morning. I do not have them. It's

13 2:00 in the afternoon. I need those

14 records in order to be able to complete

15 the deposition of this witness.

16 (Whereupon, there was a pause in

17 the proceedings.)

18 MR. BAILEY: They are being put in

19 the backers now. Let's please proceed.

20 Q. Did you assign Mr. Karam training of his

21 duties?

22 A. I think he had them before I started

23 there and he continued on with them.

24 Q. And were those training duties including

**[JACK MAHAR - By Ms. Bosman]**

doing training?

A.   There was a training sergeant that handled 90 percent of the training.  I don't know what Mr. Karam fully did.  I just assumed he knew what he was doing and did his job accordingly.

Q.   So you don't know if he did any training himself?

A.   He may have.  I don't know.

Q.   Mr. Karam was also assigned the responsibility of maintaining equipment. Correct?

A.   I don't know.  He assisted and helped him in the equipment because he had a great knowledge and understanding of radios and stuff and he was phenomenal with helping the sheriff's office with that.

Q.   When Ms. Vibert was hired was she weapons qualified?

A.   No.  She wasn't.

Q.   Was she permitted to carry a weapon before she was weapons qualified?

A.   Yes.  She was.

Q.   Who permitted her to carry a weapon

1  **[JACK MAHAR - By Ms. Bosman]**

2  before she was weapons qualified?

3      A.    Let me correct that.  I authorized her,

4  she could carry a gun.  I told her she had to go

5  up to the range and get qualified with it.  That's

6  when it was done.  So, I would assume she got the

7  gun to be able to go up to the range to qualify.

8      Q.    And did she do that?

9      A.    My assumption is, yes, they took her to

10  the range and qualified her.  I don't know who

11  did that but she would have been done.  Normally

12  that would have been done by a range officer.

13      Q.    Did anyone tell you at any time that she

14  had not been authorized or qualified to carry a

15  gun?

16      A.    Who said -- what do you mean that she

17  wasn't authorized or qualified?

18      Q.    Did anyone tell you that at any time?

19      A.    I don't know that.

20      Q.    Did you express an opinion after you met

21  with Dr. Denea that you did not believe Mr. Karam's

22  injury was work related?

23      A.    No.  I think I mentioned to Dr. Denea

24  some facts that, to make sure he was fully aware

**[JACK MAHAR - By Ms. Bosman]**

of so he could make his determination. He said

he's taken all that stuff into consideration and

he made his decision accordingly. That's all.

Nothing -- I didn't express an opinion to him.

Q.   What were the facts that you thought the

doctor should have?

A.   We wanted to make sure the doctor was

aware that Lieutenant Karam's experience as a law

enforcement officer, his CERT team experience and

stuff like that, what he took into his decision.

But beyond that we didn't make any other

determination.

Q.   His CERT team experience?

A.   Yes.

Q.   What experience is that?

A.   What do you mean what experience is that?

Q.   Why did you believe that that experience

was relevant?

A.   Because he was the head of the CERT team.

Q.   So why did you believe that that was

relevant to Dr. Denea's --

A.   Because I wanted him to understand all

the roles Jim did in law enforcement. That's

1    **[JACK MAHAR - By Ms. Bosman]**

2    all.  Nothing more.

3        Q.    Why?

4        A.    Because he needed what he did and he said

5    he did, he already did all of that.

6        Q.    So why were you concerned --

7        A.    I wasn't concerned.  I just wanted to

8    make sure that he took all those things into

9    consideration.  It wasn't a concern.  It was just

10   a fact thing.

11       Q.    Was this before or after Dr. Denea had

12   told you of his opinion?

13       A.    Before.

14       Q.    So at the time you went to see

15   Dr. Denea --

16       A.    Hold off.  I don't remember.  Bryan

17   Goldberger asked me to go up to see him and that,

18   whatever that date was in time, which we probably

19   could find out because I don't know it, and

20   whether it was before he made his decision or

21   after I don't recall.  But I did -- that's

22   what -- the only information I discussed with him

23   and that was that.  And Bryan Goldberger spoke

24   with him for a short period of time and we left.

1    **[JACK MAHAR - By Ms. Bosman]**

2    Q.   Before or after he made the decision

3    concerning whether or not the injury was work

4    related?

5    A.   I can't remember.  I'm not sure if it was

6    before or after to be perfectly honest with you.

7    I just don't know the exact date, if it was

8    before or after.

9    Q.   Have you ever met with a doctor for any

10   other officer who's made an application for 207-c

11   benefits?

12   A.   No.  But I've spoken to them on the phone.

13   Q.   You've spoken to the doctor?

14   A.   Yes.

15   Q.   The treating physician?

16   A.   No.  The doctor on -- that the county

17   hired to ask for clarifications on job duties and

18   responsibilities and stuff like that, yes, they

19   have to understand what they were.

20   Q.   So there have been other doctors who have

21   done an evaluation of officers who you've spoken

22   to on the phone after the evaluation?

23   A.   Or -- I don't know what time frame it was

24   for the doctor, but he called and asked about job

1    **[JACK MAHAR - By Ms. Bosman]**

2    duties and what they did and stuff like that.  We

3    explained to them what they were.

4        Q.   But that didn't happen in the case of

5    Mr. Karam, did it?

6        A.   No.  I was asked to go up and see Dr.

7    Denea.  I don't know who invited, if Dr. Denea

8    asked me or the attorney asked.  I don't know

9    that.

10       Q.   And you don't remember when it was?

11       A.   The exact date and time, no.  It can be

12   looked up.

13       Q.   Did you take any notes?

14       A.   No.

15       Q.   Did you put it on your calendar?

16       A.   I said it might be on the calendar.

17   Marcelle might have put it on the calendar

18   when --

19       Q.   Can you check, and if it's a date you can

20   discern just let Mr. Bailey know.

21       A.   Sure.

22

23       *COUNSEL REQUESTS INFORMATION TO BE SUPPLIED*

24

**[JACK MAHAR - By Ms. Bosman]**

Q. And so other than that one meeting with Dr. Denea you didn't speak with him or meet with him?

A. No.

Q. Did you make a statement in the presence of any individuals that Mr. Karam was not going to get the donated sick leave?

A. No. I told people nobody was getting sick leave, but not anybody specifically. I don't recall ever saying that. Nobody was getting it. Now maybe someone may have asked if he was specifically getting them and I may have said no, but I never said it to make it a special point if that's what you mean.

Q. When was the last time an individual within the department had received donated sick leave prior to Mr. Karam's receipt of donated sick leave?

A. I'm not sure of that.

Q. Did you have conversations with Mr. Karam about 207-c claims for OC exposure?

A. I don't know. I may have. May not have. I don't know.

1  **[JACK MAHAR - By Ms. Bosman]**

2      Q.   Did you complain to Mr. Karam about 207-c

3  benefits for officers within the department?

4      A.   I don't think it's anyone's secret that

5  I'm not -- I have no problem with authorizing

6  207-c when appropriate and then if someone is

7  trying to claim something that's not that I

8  vigorously try not to.

9      Q.   How many times has that happened?

10     A.   A few.  We were successful in turning a

11  few over in that the people were entitled to.

12     Q.   How many?

13     A.   Just a few.  Two or three.

14     Q.   And when you say turn them over, you mean

15  deny them at the outset?

16     A.   Deny them and then follow it through all

17  the way through to arbitration and some who have

18  gotten them were taken away.

19     Q.   So you've revoked their benefits?

20     A.   No.  They revoked them.  They didn't

21  follow the procedure.

22     Q.   Who's "they"?

23     A.   The person who got them.

24     Q.   So the person who got the benefits can

**[JACK MAHAR - By Ms. Bosman]**

revoke their own benefits?

    A.    No.  They didn't.  Well, they didn't revoke them per se, they didn't follow the appropriate procedure.  Therefore they lost them.

    Q.    So they forfeited them?

    A.    That might a better term, yes.

    Q.    So, it wasn't a matter of your decision of saying oh, no, you are not entitled to this anymore, I'm going to stop this?

    A.    Well, it was our decision to proceed with that, yes.  We would have to initiate the process. They don't just -- it just doesn't automatically happen.

    Q.    When you say our decision?

    A.    Meaning the county's decision.

    Q.    So it's possible then after 207-c benefits have been granted to follow some procedure whereby they are taken away from the officer?

    A.    They could lose their benefits, yes, if they don't follow appropriate procedures afterwards.  Yes.

    Q.    Or if you determine that the disability

1  [JACK MAHAR - By Ms. Bosman]

2  no longer exists, correct?

3      A.    That might be another way you can

4  proceed, yes.

5                  (Documents provided to Ms. Bosman.)

6                  MS. BOSMAN:  Thank you so much.  I

7            appreciate it.

8      Q.    Why wasn't Mr. Karam given a cell phone?

9      A.    Why wasn't he?

10     Q.    Yes.

11     A.    Probably didn't need or required one

12  inside the jail.  That's where he worked, inside

13  the jail.

14     Q.    Well, he was Internal Affairs, right?

15     A.    Yes.

16     Q.    But that's not just inside the jail.

17     A.    No.  The majority of the work is inside

18  the jail, yes.

19     Q.    How do you know?

20     A.    Because that's where it is.  That's where

21  most of it would be required.  There would be

22  some instances where he might have to leave the

23  jail, but we were limited in to how many cell

24  phones we could have.

1  **[JACK MAHAR - By Ms. Bosman]**

2       We would meet with the commanders of each

3  area and ask them who would appropriately be

4  given them and it was determined those who were

5  given them were given them based on what their

6  recommendations were.

7       Q.   And did that decision get revisited on an

8  annual basis?

9       A.   No.  It got revisited on an as-needed

10  basis and if we had more money to get phones and

11  things like that and/or if somebody needed one

12  and they could show a reason to have one they

13  were given it.

14       Q.   Did Mr. Karam indicate to you at any time

15  that he needed a cell phone?

16       A.   I don't recall.  He may have, but I don't

17  recall it.

18       Q.   Did he indicate to you at any time he

19  needed a vehicle?

20       A.   He had access to a vehicle whenever he

21  would need one.

22       Q.   Were other individuals given take-home

23  vehicles?

24       A.   Yes.  There were.

**[JACK MAHAR - By Ms. Bosman]**

Q.   Who?

A.   I don't know who the list is off the top
of my head.  Most of them were deputies that need
them, K-9 officers, people who work with the FBI
or did many cases with the FBI, things like that.

Q.   Didn't Mr. Karam do cases with the FBI?

A.   Not -- very rare.  Not often at all.  And
if he needed a vehicle he could have gotten one
any time by going to -- there was always an extra
vehicle available, they call it a fleet vehicle,
for him to use or see Captain Eckert and he would
make sure there was always a vehicle eligible to
be used if someone needed one.

Q.   What happened to the cell phone that was
given to Mr. Loveridge when he retired, who got
his cell phone?

A.   Probably just sat there unused because no
one -- it wasn't to be used at the time.  I don't
know where it went.  I don't look over those
things day to day like that.  Captain Smith might
have put it somewhere.  I have no idea what
happened to it.

Q.   So, it wasn't revoked by the county