UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

JAMES KARAM and LISA KARAM,

      Plaintiffs,          **ORIGINAL**

    -against-

COUNTY OF RENSSELAER, NEW YORK; JACK MAHAR, in his
individual and official capacity as the Sheriff of
Rensselaer County; PATRICK RUSSO, in his individual
and official capacity as the Undersheriff of
Rensselaer County; KATHLEEN JIMINO, in her individual
and official capacity as the County Executive of
Rensselaer County; RUTH VIBERT, in her individual and
official capacity as Chief of Corrections of the
Rensselaer County Sheriff's Department; HAROLD SMITH,
in his individual and official capacity as a Captain
of the Rensselaer County Sheriff's Department; TOM
HENDRY, in his individual and official capacity as
Director of Human Resources of Rensselaer County;
LINDA BALDWIN, in her individual and official capacity
as the Payroll Clerk of Rensselaer County;' and JOHN
DOE(S) and JANE DOE(S), in their individual and
official capacities as officials, officers, agents,
employees and/or representatives of Rensselaer County,

      Defendants

_____

        EXAMINATION BEFORE TRIAL of the Defendant,

**KATHLEEN JIMINO**, held pursuant to notice, on December

23, 2014, at 10:44 a.m. in the law offices of Bailey,

Kelleher & Johnson, PC, Pine West Plaza 5, Suite 507,

Washington Avenue Extension, Albany, New York, before

Mary Ellen Tardiff, a Shorthand Reporter and Notary

Public in and for the State of New York.

APPEARANCES:


For the Plaintiff:
BOSMAN LAW FIRM, LLC
6599 Martin Street
Rome, New York 13440
BY:  A.J. BOSMAN, ESQ.


For the Defendants County of Rensselaer, New York,
Jack Mahar, Patrick Russo, Kathleen Jimino, Harold
Smith, Tom Hendry, Linda Baldwin, John(s) and Jane
Doe(s):
BAILEY, KELLEHER & JOHNSON, PC
Pine West Plaza 5, Suite 507
Washington Avenue Extension
Albany, New York 12205
BY:  JOHN W. BAILEY, ESQ.


For the Defendant Ruth Vibert:
ELMER ROBERT KEACH, III, PC
One Pine West Plaza, Suite 109
Washington Avenue Extension
Albany, New York 12205
BY:  ELMER ROBERT KEACH, III, ESQ.


Also Present:
Stephen A. Pechenik, Esq.
James Karam

# S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties hereto that presence and oath of a Referee be waived;

IT IS FURTHER STIPULATED AND AGREED that the transcript be signed and that the filing of the original transcript with the Federal Court be waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form, are reserved until the time of trial;

IT IS FURTHER STIPULATED AND AGREED that this deposition may be utilized for all purposes as provided by the Federal Rules of Civil Procedure;

AND FURTHER STIPULATED AND AGREED that all rights provided to all parties by the Federal Rules of Civil Procedure shall not be deemed waived and the appropriate sections of the Federal Rules of Civil Procedure shall be controlling with respect thereto.

1  **K A T H L E E N   J I M I N O,**

2  having been first duly sworn by the Notary Public, was

3  examined and testified as follows:

4  **EXAMINATION BY MS. BOSMAN:**

5      Q.    Would you state your full name for the

6  record?

7      A.    Yes, Kathleen Jimino.

8      Q.    Miss Jimino, are you married?

9      A.    Yes, I am.

10     Q.    And where do you reside?

11     A.    In Lansingburg, Troy, New York.

12     Q.    What is your address?

13     A.    300 Sixth Avenue in Troy, New York.

14     Q.    Do you have any children?

15     A.    Yes.

16     Q.    What are their ages?

17     A.    31 and 24.

18     Q.    What is your educational background?

19     A.    I have a bachelor's degree from Siena and a

20 master's degree from Empire State College.

21     Q.    What year did you receive your master's

22 degree from Empire State College?

23     A.    2004.

1      Q.    Are you currently employed?

2      A.    Yes.

3      Q.    Where are you employed?

4      A.    With Rensselaer County.

5      Q.    How long have you have been employed with

6  Rensselaer County?

7      A.    13 years.

8      Q.    What is your position and what are your

9  duties?

10     A.    I am the county executive.  I oversee the

11  services provided by Rensselaer County employees.

12     Q.    You oversee what?

13     A.    The services that are provided by Rensselaer

14  County employees.

15     Q.    My ears are a little clogged up from my

16  cold, so if I don't hear you it's not you.  It's

17  probably me.  How long have you held that position as

18  County Executive?

19     A.    13 years.

20     Q.    Is that an elected office?

21     A.    It is.

22     Q.    And how often do you have to run for that?

23     A.    Every four years.

1    Q.    When was the last election?

2    A.    2013.

3    Q.    So your term ends in 2000 and --

4    A.    17.

5    Q.    -- 17.  And then you have to run again, is

6    that correct?

7    A.    That's correct.

8    Q.    Prior to your position as County Executive

9    did you hold any other position with the county?

10   A.    Yes.  For four years prior to being County

11   Executive I was county legislature representing the

12   City of Troy.  And prior to that I had spent 16 years

13   working for the county in their IT Department including

14   as Commissioner for about five years.

15   Q.    Is the IT position something that you

16   obtained as an appointed position or were you, is that

17   a civil service position?

18   A.    Initially I came into the department as a

19   civil service position and then when Commissioner, that

20   was an executive position.

21   Q.    Now the IT Department, you're talking

22   about Internet Technology, that kind of thing?

23   A.    It was.  At the time I started automating a

1    lot of the different functions of county government on

2    a main frame computer at the time and then eventually

3    to micro computers.

4         Q.    What year was that?

5         A.    I started 1978.

6         Q.    Prior to 1978 were you employed?

7         A.    P&C Supermarket in Wynantskill when I was in

8    college.

9         Q.    That was during college?

10                  (Discussion was held off the

11                  record.)

12        A.    Yes.

13        Q.    She has to have a verbal response because

14   on the record if you say "um-hum," we don't know if

15   you're doing "um-hum" or "uh-huh."  So "yes" or "no."

16   And if there's any questions I ask you that aren't

17   clean or you don't understand, let me know and I'll

18   clarify them for you.  Okay?

19        A.    Yes.

20        Q.    Now, as the County Executive you also

21   provide services or coordinate services, as you said,

22   for the Rensselaer County Sheriff's Department, is

23   that correct?

1          MR. BAILEY:  Object to the form.

2          Go ahead and answer.

3     A.    No, I do not provide services for the

4 Sheriff's Department.

5     Q.    Does your office or your position have any

6 interaction with the Sheriff's Department?

7          MR. BAILEY:  Object to the form.

8          Go ahead and answer.

9     A.    Yes, I do.

10    Q.    And what is that?

11    A.    In the first instance, I would meet with the

12 sheriff on the budget.  Each year in July all of the

13 departments submit their budget requests for the

14 following year.  If the sheriff had other financial

15 needs during the year that were not already addressed

16 in the budget, he may meet with me on that.

17    Q.    And that's on an annual basis, correct?

18    A.    Yes.  We do the budget on an annual basis.

19    Q.    Does the sheriff do that budget meeting by

20 himself?

21    A.    He meets with my, or he or his staff meets

22 with my budget staff.

23    Q.    Who is your budget staff?

```
 1        A.      My budget director is Stacey Farr and she

 2   has budget analysts that work for her:  Jim Breig,

 3   B-R-E-I-G, and Mark Damore, D-A-M-O-R-E.

 4        Q.      And Stacey Farr's position again is what?

 5        A.      She's the Budget Director for the county.

 6        Q.      Are you are her direct supervisor?

 7        A.      Yes.

 8        Q.      How long has she been the Budget Director?

 9        A.      Eight years.

10        Q.      And Breig and Damore, how long have they

11   been supervised by her?

12        A.      Damore for the full eight years that Stacey

13   has been Budget Director and Breig, I would say about a

14   year and a half now.

15        Q.      Who is Breig's predecessor?

16        A.      Dave Snyder.

17        Q.      How long did Mr. Snyder serve in that

18   position?

19        A.      I don't know the exact number of years.

20        Q.      More than three?

21        A.      Yes, I would say.

22        Q.      And you said that the sheriff or his staff

23   would meet with your Budget Director or her
```

1   assistants, correct?

2        A.    Correct.

3        Q.    So does that change from year to year or

4   is does it depend on --

5        A.    Yep.  It would be the sheriff's choice who

6   he would sent up to meet with the Budget Director and

7   her staff.

8        Q.    So the sheriff, himself, would not meet

9   with Stacey Farr?  He would typically send someone

10  else, is that correct?

11       A.    He may meet with her.  He may send somebody

12  else.  That's his choice.

13       Q.    And do you know if he's ever chose to send

14  someone else?

15       A.    I don't know.

16       Q.    And what does Stacey do with the

17  information she gleans from meeting with the sheriff

18  or his representative?

19       A.    Stacey will have received his budget

20  requests prior to that meeting.  So she will typically

21  ask questions about the budget requests particularly

22  variations from year to year.  And then she'll use that

23  to form her decisions about what she will recommend to

1    be allocated in the following year's budget.

2         Q.    Who does she recommend to?

3         A.    To me.

4         Q.    And then if you have any information

5    you're lacking, you could go back to Stacey to get

6    that or do you go directly to the sheriff?

7         A.    Most often through Stacey.

8         Q.    Have you ever met the sheriff?

9         A.    Yes.

10        Q.    When?

11        A.    Have I met with him or met him?

12        Q.    Met with him or meet him?

13        A.    Sure.  I've met with him periodically

14   throughout the year again, if he has a question

15   relative to his financing.  Last week I had a meeting

16   with him with some folks from the State Association of

17   Counties who had someone who wanted to demonstrate some

18   cameras for his cars.  So I made that introduction so

19   that they could discuss about the technical aspects of

20   their product.

21        Q.    You made that introduction to whom?

22        A.    I made the introduction of the Director of

23   the Association of Counties, Steve Aquario, to the

1    sheriff as well as the vendor who had a product that he

2    wanted to demonstrate, but I don't recall his name.

3         Q.    So she sheriff brought the vendor?

4         A.    No, I brought the vendor and the Director of

5    the State Association of Counties to the sheriff.

6         Q.    That was at the sheriff's request?

7         A.    No, my request.

8         Q.    Why did you request that?

9         A.    Because they had a product they were looking

10   to demonstrate that would cost the county no money to

11   demonstrate.  And so they were looking for someone

12   close by to the State Association of Counties which is

13   in Albany.  So I made that introduction.

14        Q.    And that product was what?

15        A.    Cameras for the cars.

16        Q.    So you met with him last week on that

17   issue?

18        A.    Yes, um-hum.

19        Q.    Prior to that when did you meet with him?

20        A.    I really don't recall when's the last time I

21   met with him before that.

22        Q.    Was it more than a month before that?

23        A.    Oh, yeah.

1      Q.      Was it during the summer?

2      A.      I don't recall.

3      Q.      Do you remember the subject matter of your

4  meeting?

5      A.      No.  I know I spoke with him on the phone

6  about the Gang and Drug Task Force when the state was

7  doing away with funding for that, but I don't remember

8  we had a meeting.  So I don't recall when's the last

9  time when I met him or what the topic was.

10     Q.      As far as the reduction in funding of the

11 Gang and Drug Task Force --

12     A.      Um-hum.

13     Q.      -- he contacted you?

14     A.      No, I contacted him.

15     Q.      Why did you contact him about that

16 reduction in funding for the Gang and Drug Task Force?

17     A.      Because there is a problem with heroin in

18 Rensselaer County as there is in much of the state and

19 the northeast part of the country.  I didn't think it

20 was appropriate for us not to direct resources to that

21 though the state was pulling out the funding that the

22 provided us to do that.  And so I met with the sheriff

23 or talked with the sheriff to see if that was something

1    that he wanted us to pursue funding for from local

2    dollars, and if there was any ability for him to bring

3    to the table some forfeiture money to pay for some of

4    that expense in the current year.

5         Q.    "Forfeiture money," what does that mean?

6         A.    Money that the Sheriff's Department obtains

7    based on criminal activity that his office is a part of

8    bringing to justice.

9         Q.    And was he able to bring any of that money

10   to that cause?

11        A.    Yes.  Um-hum.

12        Q.    And so that the Gang and Drug Task Force

13   continues?

14        A.    Yes.

15        Q.    And that's as a result of the funding

16   through forfeiture money?

17        A.    Some and some county tax dollars as well.

18        Q.    And I assume that wasn't part of the

19   budget that was in place at that time?

20        A.    Correct.

21        Q.    Was the forfeiture money designated prior

22   to that meeting you had?

23        A.    No.

1     Q.    Had the Sheriff's Department dedicated

2    forfeiture funds to their budget in the past?

3     A.    Not on the annual basis as they submit a

4    budget submission, but they may have used it during the

5    year for spending.  I can't recall an instance that

6    they do that because it does not need to be run through

7    the county budget.

8     Q.    So that's discretionary with the Sheriff's

9    Department?

10     A.    Correct.

11     Q.    Do you know how much money was used for

12    the Gang and Drug Task Force from the forfeiture

13    funds?

14     A.    Not off the top of my head, no.

15     Q.    Do you know the general amount,

16    approximately?

17     A.    I believe it to be somewhere between 70- and

18    $100,000.

19     Q.    And those funds were then used to pay

20    salaries?

21     A.    Correct.

22     Q.    Did that result in new hires?

23     A.    No.

1          Q.     So that was to pay salaries of existing

2     personnel?

3          A.     Correct.

4          Q.     Were they already assigned to that task

5     force?

6          A.     One person was.  One person was reassigned

7     from elsewhere to the task force.

8          Q.     How many task forces are there through the

9     Sheriff's Department?

10          A.     I don't know.

11          Q.     So you're only familiar with the Gang and

12     Drug Task Force, is that correct?

13          A.     That's correct.

14          Q.     The Sheriff's Department's budget and

15     funding and use of funds, is that independent of the

16     rest of the county?

17                    MR. BAILEY:  Object to the form.

18                    Go ahead and answer.

19          A.     No, that's in the county budget.

20          Q.     So it's part of the county's budget,

21     correct?

22          A.     Correct.

23          Q.     And does the Sheriff's Department budget

1   include all of the allocations for personnel costs on

2   an annual basis?

3        A.    Yes.

4        Q.    And does that include insurance costs?

5        A.    Yes.

6        Q.    Does that include overtime costs?

7        A.    Yes.

8        Q.    Does that include 207-c costs?

9        A.    Yes.

10       Q.    Does that include Workers' Compensation

11  costs?

12       A.    Yes.

13       Q.    So are there any personnel costs that are

14  not included in the annual budget through the county

15  for the Sheriff's Department?

16            MR. BAILEY:  Again, object to the

17            form.  Go ahead and answer.

18       A.    Not that I'm aware of.

19       Q.    Do you know what the annual budget is

20  currently for the Sheriff's Department?

21       A.    No, I do not.

22       Q.    Would you say that the sheriff's budget

23  increases on an annual basis?

1    A.    Yes, it does.

2    Q.    And what do you attribute that to?

3          MR. BAILEY:  Object to the form.

4          Go ahead and answer.

5    A.    There are increased costs in personnel

6    typically because of contract increases.  There are

7    increases in health insurance costs every year.  Over

8    the last several years there have been increases in

9    retirement costs.  And often times the cost of

10   utilities and food go up each year.

11   Q.    Has the Sheriff's Department had to cut

12   their budget since you've been the County Executive?

13   A.    They haven't had to cut their budget so much

14   as cut their budget requests or reduce their budget

15   requests.

16   Q.    So there's not been a year since you've

17   been the County Executive where the Sheriff's

18   Department has operated or had to operate on less

19   funds than the year prior, is that correct?

20         MR. BAILEY:  Object to the form.

21   A.    Not that I'm aware of.

22   Q.    Now, when is the first time that you met

23   Sheriff Mahar?

```
 1        A.      I met him when he worked for the City of

 2   Troy Police Department and I worked in the IT

 3   Department.  So I would guess in the mid '80s, 1980s.

 4        Q.      And what was his position at that time?

 5        A.      He oversaw traffic for the city police

 6   department.

 7        Q.      Do you remember his rank at that time?

 8        A.      I believe he was a sergeant.

 9        Q.      So did you provide IT services to the City

10   of Troy Police Department and Mr. Mahar at that time?

11        A.      Yes, um-hum.

12        Q.      Who was the Chief of Police for the City

13   of Troy Police Department at that time?

14        A.      I believe it was Bill Miller.

15        Q.      And did you know him as well?

16        A.      Yes.

17        Q.      And how did you know him?

18        A.      From meetings that they would have attended.

19              MR. BAILEY:  A.J., I know the

20              rules.  I'm not going to interrupt,

21              but talking about the Troy Police

22              Department 20 years ago is pretty far

23              afield.
```

1      Q.     Was Mr. Mahar at the City of Troy Police

2  Department for the entire time you were?

3      A.     I wasn't at the police department.

4      Q.     I mean, that you served the IT Department?

5      A.     Yes.

6      Q.     Do you know what year Mr. Mahar became

7  sheriff?

8      A.     2004.

9      Q.     And at that time you were in the

10 legislature?

11     A.     No, I was County Executive.

12     Q.     That commenced when again?

13     A.     2001.

14     Q.     So the funding that's provided to the

15 Sheriff's Department through the county for personnel

16 costs, and right now I'm talking about the insurance,

17 the health insurance, the 207-c, the Worker's

18 Compensation premiums, is that money allocated

19 independent of any requests by the Sheriff's

20 Department or do they request that money?

21              MR. BAILEY:  Object to the form.

22              Go ahead and answer.

23     A.     The sheriff requests money in his budget.

1    Q.    And so then it comes to you and then you

2  recommend it?

3    A.    The Budget Director, she recommends it to me

4  and I put out the recommended budget.

5    Q.    Who do you recommend the budget to?

6    A.    The county legislature.

7    Q.    Have there ever been instances within

8  which the county legislature has gone against your

9  recommendations?

10   A.    Yes.

11   Q.    When?

12   A.    Every year.

13   Q.    Specifically with the Sheriff's Department

14 budget?

15   A.    Yes, there have been some years when they

16 went against my recommendations.

17   Q.    When was the last time they did that?

18   A.    I think it was last year, 2000 -- that would

19 have been for the 2013 budget.

20   Q.    And so what happens when they do that?

21 Does it go back to Stacey or --

22   A.    No, the county legislature will amend the

23 budget and then adopt it.

1    Q.    Do you recall what they amended in 2013?

2    A.    They took out some cars and, I believe,

3    reduced overtime.

4    Q.    Does the Sheriff's Department budget

5    include the budget for the jail or is that separate?

6    A.    That would be under the sheriff, so he would

7    have oversight of that budget.

8    Q.    As I understand it, the sheriff has a

9    civil division, a road patrol division, and jail or

10   correction division, is that correct?

11   A.    Correct.

12   Q.    Are there any other divisions other than

13   those two?

14   A.    Well, there is civil, road patrol and

15   corrections.

16   Q.    So civil is considered separate from road

17   patrol?

18   A.    Yes.

19   Q.    And you know my client, Jim Karam?

20   A.    Yes, I do.

21   Q.    How do you know him?

22   A.    I've met with him in meetings at various

23   times.

Q.    Do you recall when you first met him?

A.    No, I do not.

Q.    Do you know how long you've known him?

A.    No, I do not.

Q.    Has it been more than ten years?

A.    I would say, yes.

Q.    And what would your meetings be about over those ten years?

A.    Primarily when the jail was being expanded. We had meetings.  I was part of a committee, actually two committees:  One that was involved in the design of the jail, and one that oversaw the financing of the jail project.

Q.    Is the Sheriff's Department for Rensselaer County accredited?

        MR. BAILEY:  Object to the form.

A.    I don't know.

Q.    Is the correctional facility or jail accredited?

        MR. BAILEY:  Object to the form.

A.    I don't know.

Q.    So you were on these two committees and so was Jim Karam?

1     A.    No, he was not.

2     Q.    Okay.  So how was it that you met with him

3 regarding those two committee-ships that you held?

4     A.    At different times the sheriff would bring

5 staff to the meeting depending on what the topic of the

6 meeting was.

7     Q.    And do you recall under what circumstances

8 Mr. Karam was brought to the committee meetings?

9     A.    No, I do not.

10    Q.    Did you have an opinion at the time that

11 you were serving on those committees as to Mr. Karam

12 himself?

13           MR. BAILEY:  Object to the form.

14    A.    No, I did not.

15    Q.    Did you work with him in a professional

16 manner?

17           MR. BAILEY:  Object to the form.

18    A.    At those meetings, certainly.  Um-hum.

19    Q.    And were there any remarks or any

20 statements made to you by others regarding Mr. Karam

21 during that time?

22           MR. BAILEY:  Object to the form.

23    A.    No.

1      Q.      Did anyone offer an opinion to you about

2  Mr. Karam during that time?

3      A.      No.

4      Q.      Did you observe Mr. Karam's interactions

5  with other individuals in the committee?

6      A.      Yes.

7      Q.      And what did you observe?

8      A.      That he was professional.  That he answered

9  questions that were asked.  Offered opinions when he

10  was asked.

11      Q.      Did you work with anyone else from the

12  Sheriff's Department on those committees?

13      A.      There were others who attended the meetings:

14  Hal Smith, Scott Dunham, Derek Pyle, P-Y-L-E, Under

15  Sheriff Pat Russo, the Superintendent of the jail at

16  the time, Bob LeBridge.

17      Q.      Anyone else you recall?

18      A.      No, I can recall.

19      Q.      So then that committee process was ended,

20  correct?

21      A.      Correct.

22      Q.      And the jail was expanded, correct?

23      A.      Correct.  Um-hum.

1    Q.    Do you recall the next interactions you

2  had with Mr. Karam?

3    A.    I don't recall any interactions after that.

4    Q.    And when did those committee-ships end?

5    A.    The financing committee ended within the

6  last year I would say.  About a year ago, I should say.

7  I don't recall when the design committee ended, but

8  that would have probably been three to four years ago.

9  Yeah, three to four years ago.

10    Q.    And is the construction for the expansion

11  complete?

12    A.    Yes, it is.

13    Q.    And did Mr. Karam serve with you or assist

14  at the time that you were sitting in the finance

15  committee?

16    A.    No.  Financing committee, no.

17    Q.    So he was not part of that committee

18  interaction with you?

19    A.    No.

20    Q.    Just the expansion of the jail?

21    A.    Yes.

22    Q.    So the last time that you interacted with

23  him with respect to those committees was three to four

1   years ago?

2            MR. BAILEY:  Object to the form.

3       A.    Yes.

4            (Mr. Karam entered the deposition

5            room.)

6       Q.    Ms. Jimino, with respect to your position

7   as the County Executive, do you have a role in making

8   or enforcing policy?

9            MR. BAILEY:  Object to the form.

10      A.    In the county government or the jail

11  specifically?

12      Q.    In the county government?

13      A.    Yes, um-hum.

14      Q.    What policy do you make?

15           MR. BAILEY:  Object to the form.

16      A.    There are several policies that we have in

17  place in county government, mostly recommended by

18  department heads, such as computer use policies by

19  county employees, and that would be something that

20  would fall under my department.  The use of county

21  vehicles was a policy that was done in concert with the

22  legislature.  There are a number of personnel policies

23  that come under our HR Department.  There are policies

1    in regard to coming and going from the county office

2    building.

3          Q.    Coming and going to?

4          A.    From the County Office Building after hours,

5    for instance.

6          Q.    Oh, I see.  Anything else?

7                MR. BAILEY:  Anything you can

8                remember, go ahead.

9          A.    I'm sure there are others but I can't think

10   of them right now.

11         Q.    And so you said that these are policies

12   that are recommended by department heads?

13         A.    Typically, yes.  And in some instances, as I

14   say, we work with them on the legislature's purchasing

15   policy, for instance, is another that we do in concert

16   with the county legislature.  Our department heads

17   would recommend it and then it is adopted by the county

18   legislature.

19         Q.    Who is in charge of the HR Department?

20         A.    Tom Hendry.

21         Q.    Is he directly supervised by you?

22         A.    Yes.

23         Q.    How long has he held that position?

```
 1        A.     12 years.

 2        Q.     What is his title?

 3        A.     Director of Human Resources.

 4        Q.     Do you know how many staff Mr. Hendry has?

 5        A.     Three.

 6        Q.     Who are they?

 7        A.     I don't know their names.

 8        Q.     Does Mr. Hendry report to you on a regular

 9   basis like provide reports to you, or how does your

10   interaction work?

11                     MR. BAILEY:  Object to the form.

12                     Go ahead and answer.

13        A.     Interaction by E-mail or by phone primarily.

14   So if there's a question I will E-mail him or call him

15   and he will respond.

16        Q.     When's the last time you received a

17   question from Mr. Hendry by E-mail or phone?

18        A.     He doesn't often ask questions.  Generally

19   I'm asking him a question, so I can't recall the last

20   time.

21        Q.     Do you recall the last time you asked him

22   a question?

23        A.     I don't recall exactly, no.
```

```
1        Q.     Have you ever spoken to him about my

2   client?

3        A.     No, I have not.

4        Q.     Has he ever spoken to you about my client?

5        A.     No.

6        Q.     Has he ever E-mailed you or written you

7   regarding my client?

8        A.     No.

9        Q.     Has he ever E-mailed or written you

10  regarding 207-c issues?

11       A.     No.

12       Q.     Have you ever sought information from him

13  regarding 207-c issues?

14              MR. BAILEY:  Object to the form.

15       A.     I think I did ask him about a couple of

16  207-c cases and when it was that they would be

17  determined.

18       Q.     And why did you do that?

19       A.     Because they were cases that were long

20  outstanding.

21       Q.     Where were they from?

22       A.     The jail.

23       Q.     How long were they outstanding?
```

1          MR. BAILEY:  Object to the form.

2     A.     Probably three or four months, five months

3  maybe.

4     Q.     How did you learn about them?

5     A.     From the county's labor attorney.

6     Q.     Who is that?

7     A.     Ryan Goldberger.

8     Q.     He is the county's labor attorney?

9     A.     Correct.

10    Q.     And who does he report to?

11    A.     He reports to the county attorney, Steve

12  Pechenik.

13    Q.     So Mr. Goldberger contacted you about

14  these outstanding decisions on 207-c applications, is

15  that correct?

16    A.     No, I would not put it that way.  I would

17  say that that came up in conversation when we were

18  discussing other labor matters.

19    Q.     And in what context did it come up in

20  conversation?

21          MR. BAILEY:  A.J., I'm going to

22          permit a general answer, but you're

23          getting very near attorney/client

1              privilege here.

2        Q.      In what context?

3        A.      In regard to the status of our labor

4    contract.

5        Q.      Are there 207-c procedures set forth in

6    the labor contract?

7        A.      I don't know.

8        Q.      Do you have an understanding of what 207-c

9    is or means?

10       A.      Roughly, yes.

11       Q.      What is your understanding?

12       A.      My understanding is that if someone in a law

13   enforcement capacity can not do their job because of

14   some type of limitation caused by the job, that they

15   are entitled to continue being paid under 207-c without

16   working.

17       Q.      Is that it?

18       A.      Um-hum, yes.

19       Q.      How long can someone stay out on 207-c?

20              MR. BAILEY:  Object to the form.

21       A.      It's my understanding they can stay out on

22   207-c until they retire provided that they are not

23   capable of doing the job that they were in previous.

1    Q.    Are you aware of anyone who has received

2  207-c coverage --

3    A.    Yes.

4    Q.    -- through retirement?

5    A.    Oh, through retirement, yes.  There was one

6  individual who was on 207-c, Ed Phillips, until he

7  retired.

8    Q.    What period of time was that, do you know?

9    A.    No, I don't know.  His retirement, I would

10  say, was within the last five years.

11    Q.    Do you know if he was out for more than

12  one year?

13    A.    Yes, he was.

14    Q.    Was he out for more than two?

15    A.    Yes.

16    Q.    More than five?

17    A.    Yes, I believe so.

18    Q.    More than ten years?

19    A.    I don't know.

20    Q.    Am I correct that the individuals who are

21  employed by the Sheriff's Department are also covered

22  by Worker's Compensation coverage insurance?

23              MR. BAILEY:  Object to the form.

1          You can answer.

2     A.    I don't know.

3     Q.    Does the county pay Worker's Compensation

4   premiums for the Sheriff's Department?

5     A.    If there are Worker's Compensation premiums

6   to be paid, yes, we would.

7     Q.    Have you ever seen those in the budget?

8     A.    No.  Our fringe benefits are lumped together

9   in the budget.

10    Q.    Does that include health insurance?

11    A.    Health insurance, retirement, FICA, 207 --

12   not 207-c.

13    Q.    207-c is a separate budget?

14    A.    Separate line, yes.

15    Q.    Is that budget line determined based upon

16   individuals who are continuing in 207-c status from

17   year to year?

18          MR. BAILEY:  Object to the form.

19          You mean the 207-c budget line, just

20          to be clear?

21          MS. BOSMAN:  Yes.

22    A.    That is what the sheriff recommends.  I

23   don't know what goes into that.

1    Q.    When you say that is what the sheriff

2  recommends, what do you mean?

3    A.    You're asking me if there are people in that

4  line that are continuing from year to year.  I don't

5  know how he comes up with the 207-c line, but that is

6  what the sheriff recommends.

7    Q.    Is that 207-c budget line or do the funds

8  for those 207-c moneys come from strictly the budget,

9  the taxpayers?

10    A.    Yes, um-hum.

11    Q.    Are there any state contributions to the

12  207-c?

13    A.    No.

14    Q.    So when Mr. Goldberger informed you of

15  these long standing or long outstanding applications

16  in regard to the status of the labor contracts, what

17  did you do in response?

18              MR. BAILEY:  Object to the form.

19              Let me think for a second here.  If

20              you did anything in response, you

21              certainly can answer the question.

22              But you're not to discuss any

23              conversations you had with Mr.

1              Goldberger.

2     A.     Okay.  So would you ask the question again?

3     Q.     Sure.  In response to the information you

4     received regarding this outstanding 207-c decision for

5     three or four months, what did you do?

6     A.     Nothing.

7     Q.     So why did you ask Mr. Hendry about them?

8              MR. BAILEY:  Object to the form.

9              First of all, it wasn't Mr. Hendry it

10             was Mr. Goldberger.

11             MS. BOSMAN:  Oh, I'm sorry.  I

12             understood --

13     A.     No, I did answer that I asked Tom about

14     that.

15             MR. BAILEY:  All right.  Okay.  Is

16             that who you're asking, him or

17             Goldberger.

18     A.     She said Hendry.

19             MR. BAILEY:  Okay.  Go ahead.

20     A.     Would you ask the question again.  I'm

21     sorry.

22     Q.     So why did you ask Mr. Hendry about it if

23     you did nothing?

1    A.    Because I wanted to know from his

2  perspective when he thought they would be resolved.

3    Q.    What did he tell you?

4    A.    That there were certain steps that had to be

5  undertaken in terms of doctors visits and that he

6  didn't know when it would be done, but it would be

7  after those visits had happened.

8    Q.    Okay.  So he represented to you that these

9  couple of 207-c applications were not decided because

10  they were pending a doctor's report?

11    A.    That's my understanding, yes.

12    Q.    Did you have subsequent conversation with

13  Mr. Hendry about those matters?

14    A.    No.

15    Q.    So you just asked him about them, he said

16  several steps have to be taken, and that was the end

17  of the conversation?

18    A.    That's correct.

19    Q.    Did Mr. Hendry ever follow-up with you and

20  provide you information that those matters had been

21  decided?

22    A.    No.

23    Q.    Do you have an understanding of the

1    interaction of sick time with 207-c status?

2        A.    I'm sorry.  I don't understand the question.

3        Q.    Well employees, including members of the

4    Sheriff's Department, have 207-c if they're injured in

5    the line of duty or on the job, correct?

6        A.    Correct.

7        Q.    And they also accrue sick time as a matter

8    of their employment, correct?

9        A.    Correct.

10       Q.    And that sick time is accrued based upon

11   how long they work, correct?

12       A.    Correct.

13       Q.    And that sick time can be used if they

14   become ill, correct?

15       A.    Correct.

16       Q.    Now if an individual is injured or becomes

17   ill as a result of work at work, are they required to

18   use their sick time?

19       A.    I don't know.

20       Q.    If an individual uses sick time and then

21   the 207-c application is approved, is their sick time

22   reimbursed to them?

23       A.    I don't know.

1      Q.    Have you ever seen a 207-c application?

2      A.    No, I have not.

3      Q.    Were you aware of any other instances in

4 which 207-c applications were delayed?

5              MR. BAILEY:  Object to the form.

6      A.    I'm not aware of any instances where 207-c

7 applications were delayed.

8      Q.    What is the procedure with respect to

9 Worker's Compensation for employees of the County of

10 Rensselaer?

11             MR. BAILEY:  Object to the form.

12      A.    I don't know what the procedure is.

13      Q.    Did Mr. Hendry ever have any conversation

14 with you regarding Worker's Compensation coverage for

15 the Sheriff's Department?

16      A.    No, he did not.

17      Q.    Did he have conversations with you

18 regarding Mr. Karam's illness or injury?

19      A.    No, he did not.

20      Q.    Did he ever speak to you at anytime

21 regarding Mr. Karam's sick time donations?

22      A.    No, he did not.

23      Q.    Are you familiar with the sick time

1   donation program?

2       A.      Yes.

3       Q.      And what is your understanding of how that

4   works?

5       A.      We have a sick leave donation policy in one

6   of our union contracts that allows people to donate

7   time toward a bank established for a specific

8   individual who is ill and does not have sufficient sick

9   time to cover their leave.

10      Q.      Am I correct that those donations are

11  targeted to the individual?

12      A.      Yes, that's correct.

13      Q.      So if Joe Smith is an employee in a branch

14  of county government and wants to donate sick leave

15  time that he has not used to Jim Karam, he can do that

16  by designation?

17                  MR. BAILEY:   Object to the form.

18      A.      I don't know that that's the case because

19  Jim Karam is not a member of the union that has the

20  sick leave policy in the contract.  So I don't know

21  what the particulars are when it's a cross union

22  contract or cross to management.

23      Q.      How do you know Mr. Karam is not a member

1  of a union?

2       A.    Because of his rank and because, actually

3  because he's in the Sheriff's Department.  Our

4  Sheriff's Department employees are not UPSEU other than

5  those in the civil office that are now in the UPSEU

6  contract.

7       Q.    Is it your testimony historically the

8  county has prohibited or denied donations of sick

9  leave to members of the Sheriff's Department?

10       A.    No, that is not my testimony at all.

11       Q.    Was there a recent change in the sick

12  leave donation policy for the county?

13       A.    There was an UPSEU contract that was just

14  signed.  A memorandum of the agreement also took place

15  which limited the number of donations that can be made.

16       Q.    Was that a term that you supported?

17       A.    Yes.

18       Q.    Why?

19       A.    Because the sick leave policy, donation

20  policy, had become very expensive for the county.

21       Q.    In what way?

22       A.    In that there were people that were donating

23  their sick leave before they left employment of the

1  county not because they knew the individual who was ill

2  or believed that person needed time, but just because

3  they weren't going to use the sick leave time

4  themselves.

5       Q.    So they were donating sick leave to

6  someone who wasn't ill?

7       A.    No, they were donating sick leave to someone

8  who was ill and had a sick bank established.  But it

9  was in a way that's just to unload all of their sick

10  time before they left because they themselves weren't

11  going to be using it.  So we were seeing a lot of

12  dollars spend on sick leave that wouldn't have

13  otherwise been spent.

14       Q.    Because the employee's not entitled to

15  reimbursement for the equivalent --

16       A.    Correct.

17       Q.    -- cache of that sick time when they leave

18  employment?

19       A.·    That's correct.  Um-hum.

20       Q.    So it's not a benefit that is carried with

21  the employee into retirement?

22       A.    Into retirement, yes.  But not if you leave

23  the county other than through retirement.  If you

retire from the county then your sick leave is credited

toward your health insurance payments.

Q.    So if you're talking about somebody who

just resigned and they had extra sick leave and they

wanted to donate it to someone?

A.    That's correct.

Q.    It came to your attention they were doing

it just to unload their sick time?

A.    That's correct.

Q.    And how did you learn this?

A.    Through the discussions that I had with my

staff in regard to negotiations for the UPSEU contract.

Q.    And how did they determine that people

were just unloading sick time rather than purposely

giving it to someone that they wanted to give it to?

A.    Because as I was told, people were calling

up to say, I'm leaving.  Does anybody have a sink bank

that I can give all my sick time to?

Q.    And that's it, because someone called up

and said that?

A.    Because people were calling up and saying

that, yes.  Um-hum.

Q.    So that change happened when?

1        A.        In September we negotiated the memorandum of

2    agreement for the UPSEU contract.  So it would be the

3    September time frame.  It would have been ratified in

4    October and passed the county legislature in November,

5    I believe.

6        Q.        So that was just current?

7        A.        Yes, um-hum.

8        Q.        Okay.  So previous to that then the

9    donations of sick time to individuals cross county

10   government had occurred without restriction, am I

11   correct?

12                 MR. BAILEY:   Object to the form.

13       A.        I don't know.

14       Q.        You're not familiar with that?

15       A.        No.

16       Q.        Did Mr. Hendry ever speak to you about

17   sick time or sick leave donations made to Mr. Karam?

18       A.        No, he did not.

19       Q.        Did Mr. Hendry ever speak to you with

20   respect to sick time donations to the Sheriff's

21   Department?

22       A.        No, he did not.

23       Q.        Did Mr. Hendry speak to you with regard to

1  sick leave donations from any unionized branch versus

2  a non-unionized employee?

3      A.    No, he did not.

4      Q.    So the first time that you became aware

5  that there was this issue with respect to unloading

6  sick time was when?

7      A.    Early in 2014 when we began to have

8  discussion what our objectives were for the success for

9  UPSEU contract.

10              (Discussion was held off the

11              record.)

12              MS. BOSMAN:  Would you read back

13              the last answer?

14              (The last answer was read by the

15              reporter.)

16      Q.    Prior to early in 2014 when you became

17  aware that that was an issue, that was through Mr.

18  Hendry, am I correct?

19      A.    It was in a meeting that would have included

20  Mr. Hendry and probably our Chief Fiscal Officer,

21  Budget Director, deputy County Executive.

22      Q.    That's when you learned about that?

23      A.    Correct.

1    Q.    Did you direct those individuals to do

2  anything in response to that information?

3    A.    Their suggestion was that we look to tighten

4  up the sick bank policy so that it wasn't so expensive

5  to us.  And I said, yes, that would be appropriate.

6    Q.    Am I correct that the donations an

7  employee was permitted to give were always limited to

8  the total hours earned within a year?

9         MR. BAILEY:  Object to the form.

10   A.    I don't know.

11   Q.    Was there any policy regarding the sick

12  leave donations prior to November of 2014?

13   A.    Yes.

14        MR. BAILEY:  Object to the form.

15   A.    Yes.

16   Q.    What that a written policy?

17   A.    Yes, it's in the labor contract.

18   Q.    So it didn't exist outside of the labor

19  contract?

20   A.    Not that I'm aware of.

21   Q.    And within that labor contract the sick

22  leave donation policy permitted employees within that

23  union to donate sick leave time to members of the

county government outside the union, am I correct?

                MR. BAILEY:  Object to the form.

    A.    I don't know.

    Q.    Did you make inquiry concerning that at the time that you had these meetings in early 2014?

    A.    No.

    Q.    How much money was the change expected to save the county?

    A.    I don't know.

    Q.    Were there any projections regarding the amount of sick leave donations that were costing the county that would then be reduced?

    A.    Yes, but I don't know what they are.

    Q.    Were those projections in written form?

    A.    Yes, I would expect so.

    Q.    Do you recall them or you just expect they would be?

    A.    I was presented, by my Budget Director and Finance Director, with some numbers in regard to potential changes for the contract.  So yes, it would have been spelled out in that fashion when we were looking at different options.

    Q.   So now the employees within that union,

```
 1   they credit it back to their health insurance,

 2   correct?

 3        A.    Correct, yes.  That's all county employees.

 4        Q.    -- when they retire?

 5        A.    Correct.

 6        Q.    And they can donate their sick leave but

 7   only to other members within the same union?

 8        A.    I don't know if there is that restriction.

 9   The restriction is a limit on how many days they can

10   donate in any given year.

11        Q.    What is that restriction?

12        A.    I don't know for certain, but I believe it's

13   five or seven.

14        Q.    Okay.  So that would be the equivalent of

15   how many weeks of employment to accrue that many days

16   of sick leave?

17        A.    To accrue five to seven days how many would

18   that be?

19        Q.    Yes.

20        A.    That would be somewhere between 20 and 40

21   weeks that would you work to earn that, I believe.

22        Q.    Okay.  So that sick leave donation policy

23   which existed within the labor contract was also in
```

1    written form?

2         A.    Correct.   The labor contract is in writing.

3         Q.    But that policy that applied to all county

4    employees was only in that particular union contract?

5                   MR. BAILEY:  Object to the form.

6                   If you understand it, you can answer

7                   the question.

8         A.    I don't know that it applied to all county

9    employees.

10        Q.    Okay.  So there was no discussion during

11   the negotiation time about donating outside the union?

12        A.    No.

13        Q.    Did the Sheriff's Department have any role

14   in setting policy regarding donation of sick time?

15        A.    Not for the UPSEU contract but they would

16   have had some say in their own contract.

17        Q.    Okay.  So they would have a say with

18   respect to the sick leave policy within their own

19   contracts within the Sheriff's Department?

20        A.    Correct.

21        Q.    And they would be governed by those union

22   contracts within the Sheriff's Department?

23        A.    Correct.

1       Q.      And what about non-union employees in the

2   Sheriff's Department?

3               MR. BAILEY:  Object to the form.

4               Listen to the question.

5       Q.      Do you understand the question?

6       A.      No.

7       Q.      Okay.  So you're saying that the Sheriff's

8   Department sick leave donation policy is governed by

9   their labor contract with the unionized employees,

10  correct?

11      A.      Correct.

12      Q.      What about the employees who are not

13  unionized?

14              MR. BAILEY:  Again, I object to

15              the form.  I do not understand that

16              question.  What about the non

17              unionized?

18              MS. BOSMAN:  Lucky for you I'm not

19              deposing you.

20              MR. BAILEY:  Well, if I don't

21              understand, my client is not going to

22              answer it.  Read the question back

23              again, please.

1          MS. BOSMAN:  I object to that.

2          MR. KEACH:  Would you read the

3      question back, please?

4              (The last question was read by the

5          reporter.)

6     A.     I don't know what that means.

7     Q.     Do you understand the question, Ms.

8  Jimino?

9     A.     No.

10    Q.     Okay.  Do the non-unionized employees have

11  a separate policy regarding sick leave donations?

12             MR. BAILEY:  Object to the form.

13             You can answer.

14    A.     I don't know.  That would be up to the

15  sheriff.

16    Q.     So the sheriff has full discretion with

17  respect to non-unionized employees affected by sick

18  leave donations, is that correct?

19             MR. BAILEY:  Object to the form.

20             You can answer.

21    A.     Yes.

22    Q.     So previous to November of 2014 a union

23  employee from any branch of the county government

1  could donate sick leave time to a designated

2  individual, correct?

3           MR. BAILEY:  Object to the form.

4      A.    I don't know.  The UPSEU contract governs

5  UPSEU employees.  I'm not familiar with other union

6  contract policies in terms of sick bank.

7      Q.    I'm not meaning that.  So if I'm a member,

8  say I'm an employee with the Probation Department for

9  the County of Rensselaer and I want to donate my sick

10 leave time to somebody in the Sheriff's Department

11 that's not a member of the union.  Are you aware of

12 any prohibition for that process if I wanted to do

13 that?

14          MR. BAILEY:  Object to the form.

15     A.    If a bank has been established for an

16 individual, then it would be -- and that individual was

17 exempt, then it would be up to the sheriff to determine

18 whether or not his people can donate to a bank that's

19 established.

20     Q.    Whether his people can donate?

21     A.    Yes.

22     Q.    And how do you know that?

23     A.    Because the sheriff would set policy for his

1  exempt employees.

2      Q.    How do you know that?

3      A.    Because I don't set policy for him, because

4  the sheriff is a separately elected official, thus he

5  would set policy.

6      Q.    But the sheriff policies for his exempt

7  employees are not permitted to affect the policy

8  that's set by other departments outside of the

9  Sheriff's Department, am I correct?

10                 MR. BAILEY:  Object to the form.

11     A.    I don't understand the question.  I'm sorry.

12     Q.    The sheriff does not have the right to set

13 policy for employees who are members of other arms of

14 county government, am I correct?

15     A.    That's correct.

16     Q.    And have you ever seen a written policy

17 regarding sick leave donations?

18     A.    Yes, in the UPSEU contact.

19     Q.    Outside of that contract?

20     A.    I have not, no.

21     Q.    Are those unionized employees --

22 withdrawn.  Is the policy with respect to the sick

23 banks and the donation of sick leave prior to November

1      of 2014 distributed to other departments?

2                    MR. BAILEY:   Object to the form.

3           A.      UPSEU contract is distributed to all of the

4      employees who are covered by that and all of the

5      department heads that are covered.

6           Q.      Is there any arm of the county government

7      that does not have those union employees?

8           A.      The Sheriff's Department road patrol and the

9      Sheriff's Department correction do not have UPSEU

10     employees.

11          Q.      Prior to November of 2014 did they have a

12     donation sick leave policy in their contract in the

13     Sheriff's Department?

14          A.      I don't know.

15          Q.      Were you aware that my client had donated

16     sick time to him?

17          A.      No, I was not.

18          Q.      Did anyone speak to you regarding Jim

19     Karam's illness, absence from work, sick leave, 207-c

20     at any time?

21          A.      Yes.

22          Q.      Who?

23          A.      Brian Goldberger's office.

1      Q.      What did he say?

2              MR. BAILEY:  Object.  Don't answer

3          it.

4              MS. BOSMAN:  Pardon me?

5              MR. BAILEY:  I directed her not to

6          answer.

7              MS. BOSMAN:  Basis?

8              MR. BAILEY:  It's an attorney/

9          client conversation.

10             MS. BOSMAN:  I didn't ask her

11         about her conversation.

12             MR. BAILEY:  You asked what he

13         said.

14             MS. BOSMAN:  Yeah.  That's not

15         advice, is it?

16             MR. BAILEY:  It's the essence of

17         the relationship.  She's not going to

18         tell you about her discussions with

19         her lawyer.

20             MS. BOSMAN:  Certify the question.

21     Q.      With respect to Mr. Karam you became aware

22  at some point in time that there was an issue with

23  respect to his illness?

1      A.      I became aware he had a need for 207-c,

2   um-hum.

3      Q.      Had you become aware at any point in time

4   that Mr. Karam's 207-c application was delayed?

5      A.      I believe in the first instance it was

6   denied and then appealed in some fashion.

7      Q.      Do you have any understanding as to why it

8   was denied?

9      A.      No.

10     Q.      Do you have any understanding of what

11  happened following the appeal?

12     A.      It's my understanding after they appealed

13  the 207-c was granted.

14     Q.      Who handles the appeal?

15     A.      I don't know.

16     Q.      What is the process of making an appeal or

17  bringing an appeal?

18     A.      I don't know.

19     Q.      What is the process for deciding a 207-c

20  application?

21     A.      I don't know.

22     Q.      Is there a process with respect to

23  Worker's Compensation for county employees?

```
1              MR. BAILEY:  Asked and answered.

2              Go ahead.

3         A.   I'm sure there is.

4         Q.   Are you familiar with that?

5         A.   No.

6         Q.   So you don't have any familiarity with

7    Workers' Compensation procedures at all, is that

8    correct?

9         A.   That's correct.

10        Q.   Do you set policy for the county employees

11   regarding Worker's Compensation coverage?

12             MR. BAILEY:  Object to the form.

13             Go ahead and answer it if you can.

14        A.   I don't know how much policy is set by the

15   county and how much is dictated by state law.

16        Q.   You don't?

17        A.   No, I don't.

18        Q.   So the county does not have any policies

19   or rules, regulations, or any kind of written

20   guidelines for its county employees with respect to

21   Worker's Compensation?

22             MR. BAILEY:  Object to the form.

23        A.   I believe we do have a Workers' Compensation
```

```
 1   policy.  That's what I said earlier.

 2        Q.    And is that in written form and is that

 3   distributed to the county employees?

 4        A.    I don't know.

 5        Q.    Have you ever reviewed any of the policies

 6   set by the sheriff in the Sheriff's Department?

 7        A.    No, I have not.

 8        Q.    Are you familiar with any of the policies

 9   as set by the sheriff in the Sheriff's Department?

10             MR. BAILEY:  Object to the form.

11             You can answer it.

12        A.    No, I'm not.

13        Q.    Have you ever seen a written policy from

14   the Sheriff's Department?

15             MR. BAILEY:  Asked and answered.

16             Object to the form.  Go ahead.

17        A.    No.

18        Q.    At the time you spoke with Mr. Goldberger

19   about my client, was anyone else present?

20        A.    No.

21        Q.    Do you recall when it was that you spoke

22   with him regarding my client?

23        A.    No, I do not.
```

59

```
 1       Q.    Was it before January, 2014?

 2             MR. BAILEY:  Asked and answer.  Go

 3             ahead.

 4       A.    I don't know.

 5       Q.    Do you have an understanding as to whether

 6   or not Mr. Karam is currently receiving 207-c

 7   benefits?

 8       A.    It's my understanding he is.

 9       Q.    Where did you get that understanding?

10       A.    Probably from Mr. Goldberger.

11       Q.    But you don't recall specifically?

12       A.    No, I don't.

13       Q.    Do you have an understanding of how long

14   my client's application for 207-c benefits was pending

15   before they were acted upon?

16       A.    No, I don't.

17       Q.    Do you know if it was longer than three or

18   four months?

19       A.    I believe it was.

20       Q.    Do you know of any reasons why it would be

21   pending for so long?

22             MR. BAILEY:  If your answer

23             requires you to relay conversations
```

SUSAN FLORIO, RPR
PROFESSIONAL REPORTING SERVICE
(518) 887-2733

1          with your lawyer, then don't answer

2          it.

3     A.    I don't know.

4     Q.    Did you know that my client went without

5 any income whatsoever?

6     A.    No, I did not know that.

7     Q.    Does the County of Rensselaer have an

8 interest in insuring the health and well-being of its

9 employees?

10          MR. BAILEY:  Object to the form.

11          Restate the question, please.

12          MS. BOSMAN:  Read back the

13          question.

14          (The last question was read by the

15          reporter.)

16     Q.    And does the County of Rensselaer consider

17 that an obligation?

18          MR. BAILEY:  Object to the form.

19     A.    I don't know what you mean by obligation.

20     Q.    Does the County of Rensselaer have a

21 responsibility to its employees to act in ways not to

22 harm their health or well being?

23          MR. BAILEY:  Object to the form.

1    A.    Yes.

2    Q.    And are there any ways that you're aware

3    of that the county acts to make sure that they uphold

4    those responsibilities or obligation?

5                MR. BAILEY:  Object to the form.

6    A.    We have policies that deal with protecting

7    health and safety.  For instance, last year we were

8    required by state law to have training provided to all

9    county employees vis-a-vis how they treat each other

10   respectfully, et cetera.  We have policies that limit

11   or that seek to limit physical strain on people who

12   are, for instance, at our nursing home.  We have

13   policies that recommend healthy alternatives that our

14   public health department has posted for all county

15   employees.  So we have a number of those types of

16   policies.

17   Q.    Do you have an understanding as to the

18   interest of the county behind those policies?

19               MR. BAILEY:  Object to the form.

20   A.    To keep the work, our workers healthy.

21   Q.    But why is that important to the county, I

22   guess I'm asking?

23   A.    Because if people are not healthy and they

1    are out of work, it's lost productivity because others

2    may have to fill in.  There will be overtime involved

3    and so it's more costly for workers to be out.

4            Q.    Anything else?

5                    MR. BAILEY:  Object to the form.

6            A.    I don't know.

7            Q.    Would you agree with me that that the

8    county has an interest in preserving the health and

9    well-being of its law enforcement officials?

10                   MR. BAILEY:  Object to the form.

11                   You can answer.

12           A.    Yes.

13           Q.    Would you agree with me that the county

14   has an obligation to ensure that law enforcement

15   officials are not left without income when they are

16   injured as a result of duty?

17                   MR. BAILEY:  Object the form.  You

18                   can answer.

19           A.    Yes.

20           Q.    Would you agree with me that allowing a

21   law enforcement official to go without income for

22   whatever period of time is counter to their health and

23   well-being?

1           MR. BAILEY:  Object to the form.

2      Q.    If they're injured on the job, I should

3  say?

4           MR. BAILEY:  Is that the question?

5           MS. BOSMAN:  I'll rephrase it.

6           That was bad.  Sorry.

7      Q.    Would you agree with me that the county

8  has an interest in ensuring that law enforcement

9  officials are not left without income when they are

10  sick or injured as a result of their duties?

11          MR. BAILEY:  Object to the form.

12          You can answer.

13     A.    Yes.

14     Q.    Would you also agree with me that prompt

15  action regarding applications for 207-c benefits is

16  imperative to preserve the health and well-being of

17  law enforcement officials?

18          MR. BAILEY:  Object to the form.

19          You can answer it.

20     A.    Yes.

21     Q.    Do you know of any reason why the 207-c

22  policy is not in written form for the Sheriff's

23  Department?

1       A.      No, I do not.

2       Q.      Have you received any complaints or heard

3  of any complaints regarding the 207-c policy being

4  either ignored or not followed or not clear enough?

5       A.      No, I have not.

6       Q.      Are you aware of the reason or the basis

7  for my client's application for 207-c benefits?

8       A.      Yes.

9       Q.      And what is your understanding?

10      A.      My understanding is that there was stress on

11  the job that caused him to be unable to do his job.

12      Q.      Where did you get that understanding?

13      A.      From Mr. Goldberger.

14      Q.      Did Mr. Goldberger have, at the time that

15  he spoke with you regarding my client's illness,

16  obtain a medical release from my client?

17              MR. BAILEY:  Object to the form.

18              If this requires you to relate

19              conversations you had with your

20              counsel, don't answer the question.

21      A.      I won't answer the question.

22              MS. BOSMAN:  Certify the question.

23      Q.      Have you ever seen any medical release

from my client?

A. No, I have not.

Q. Has anyone represented to you at any time they had a medical release from my client?

MR. BAILEY: Object to the form.

A. No.

Q. Do you have an understanding of what a HIPAA release does?

A. Somewhat.

Q. What is your understanding?

A. My understanding is that a written HIPAA release would allow someone to talk about someone's medical condition.

Q. Did you ever have a HIPAA release from John Karam?

A. No.

MR. BAILEY: You mean her personally? Is that the question, A.J., her personally?

MR. BOSMAN: That wasn't my question, John, but if you would like to ask it later you can. Okay.

Q. Is sick leave an income protection

1 benefit?

2     A.     Yes.

3     Q.     Is 207-c an income protection benefit?

4          MR. BAILEY:  Object to the form.

5     A.     Yes.

6     Q.     What's the different between sick leave

7 and 207-c?

8          MR. BAILEY:  Object to the form.

9     A.     Sick leave are hours that you earned through

10 your service.  And 207-c is an award of pay based on an

11 illness related to the job that precludes you from

12 doing the job.

13     Q.     Are employees reimbursed their sick leave

14 that they used prior to approval of 207-c benefits?

15          MR. BAILEY:  Object to the form.

16     A.     I don't know.

17     Q.     Should they be?

18          MR. BAILEY:  Object to the form.

19     A.     I don't know.

20     Q.     So if the law enforcement official is

21 injured in the line of duty or on the job makes an

22 application for 207-c benefits and while the

23 application is pending they are reduced to using their

1    sick leave benefits --

2              MR. BAILEY:  Object to the form.

3         A.    -- do those sick leave benefits get credited

4    to the 207-c benefit?

5              MR. BAILEY:  Object to the form.

6         A.    I don't know.

7         Q.    Would the county have an interest in

8    preserving the sick leave benefits for a law

9    enforcement official so they didn't have to use them

10   when they qualified for 207-c benefits?

11             MR. BAILEY:  Object to the form.

12             You can answer.

13        A.    I don't know.

14        Q.    Do you have an understanding as to the

15   nature of stress that my client was sickened by?

16        A.    No, I do not.

17        Q.    Have you ever received any complaints

18   about the conduct of Sheriff Jack Mahar?

19        A.    No.

20        Q.    Has anybody complained to you or to anyone

21   that you've heard through that Mr. Mahar's conduct

22   with his activities are in some way criticized?

23             MR. BAILEY:  Object to the form.

1          Go ahead.  Answer and question.

2     A.     Only to the extent every elected official is

3 criticized for what they do.

4     Q.     And what is that?

5     A.     Typically that you pick someone because

6 they're your favorite, because they're related.

7 Because they are somehow helpful to you politically,

8 that you're a Republican, they're a Democrat, vice

9 versa.  Those are the types of comments I hear about

10 elected officials.

11    Q.     Did you hear those types of comments with

12 respect to Mr. Mahar?

13    A.     Yes.

14    Q.     What did you hear?

15    A.     Just all of what I said.

16    Q.     Who did you hear that from?

17    A.     I hear it from the blogs that I read.  I

18 hear it from people on the street who suggest that a

19 decision was made based on some political reference.

20 Those are things we hear about elected officials all

21 the time.

22    Q.     So are you saying -- it sounds from your

23 tone and your word choice that you dismiss those

1  criticisms as invalid?

2      A.    Most of them I would say, yes.  Um-hum.

3      Q.    Are there any that you did not dismiss

4  with respect to Mr. Mahar?

5           MR. BAILEY:  Object to the form.

6           You can answer.

7      A.    I don't really know how to answer that

8  question.  If I heard that he had favorites would I

9  dismiss that?  No, because we all have favorites, if

10 you will, people who work for us that do a particularly

11 good job.  So I would not dismiss it but I wouldn't see

12 a problem with it either.

13     Q.    So you don't see a problem with Mr. Mahar

14 having favorites?

15     A.    Correct.

16     Q.    And what about persons who are related?

17     A.    I don't know that he has anyone related to

18 him in the Sheriff's Department.  His wife does work

19 for the county.

20     Q.    What does she do?

21     A.    She works in the Mental Health Department in

22 the billing capacity.

23     Q.    Okay.  Anything else?

1     A.    No.

2     Q.    Did you hear any complaints about Mr.

3 Mahar with respect to people who are related?

4     A.    Yes.  There was a deputy that was hired some

5 years back named Russo and he had a question that he

6 was a relative of the under sheriff which was not the

7 case.  That's it.

8     Q.    With respect to, I think the other

9 category you said was helpful to them.  What did you

10 mean that by that?

11     A.    People that are helpful on a campaign.

12 People that are helpful on a particular issue.

13     Q.    Did you hear those types of criticisms

14 with respect to Mr. Mahar?

15     A.    Yes.  I'm sure I did.

16     Q.    And was that one that you also dismissed?

17     MR. BAILEY:  Object to the form.

18     A.    Well, I can think of one instance where

19 somebody was helpful in the campaign and so then, you

20 know, when it came to consideration for an appointment,

21 that they were considered.  But did I dismiss that as

22 being an unfair criticism?  Yes.

23     Q.    Who was the person?

```
1        A.      The person was that was helpful during the

2    campaign was George Rodgers who is, who was at the

3    time, helpful to the city Republican Committee at the

4    same time the sheriff was running, was helpful with

5    some union endorsements.

6        Q.      What was his name?

7        A.      George Rodgers.

8        Q.      What was the criticism about him?

9        A.      That his son was hired back because of that

10   connection.

11       Q.      Where did you hear that criticism?

12       A.      Basically from people on the street, again

13   in the blogs, that kind of thing.

14       Q.      So he was hired back, you said?

15       A.      That's correct.

16       Q.      And so what was he hired back to?

17       A.      Corrections officer.

18       Q.      And why had he been gone?

19       A.      He was unable to complete the duties of the

20   office was my understanding not because of an injury on

21   the job, because of an injury off the job.  So had to

22   leave the job.  And so he was considered again for

23   reemployment because the civil service law allows for
```

1    that to happen within a certain window of time from

2    when the person left county government.

3         Q.    And what is that window of time?

4         A.    I believe it was three years.

5         Q.    So he left the county employment and came

6    back within three years?

7         A.    That's my understanding.

8         Q.    And he was employed as a correction

9    officer?

10         A.    Yes.

11         Q.    And he was a correction officer before he

12    left?

13         A.    That's correct.

14         Q.    And did he receive any seniority restored

15    to him?

16         A.    I don't know.

17         Q.    And you don't know why he left?

18         A.    Because of an illness that was not job

19    related, he could not perform the duties of the job.

20         Q.    And how do you know that?

21         A.    Because that's what I was told at the time.

22         Q.    Who were you told that by?

23         A.    By his father, George Rodgers.

1      Q.     How do you know his father, George

2   Rodgers?

3      A.     He and I worked together at city hall for

4   some years.  And then he was helpful to the Republicans

5   in the city, as I said earlier, in that campaign year.

6      Q.     Did you speak with Jack Mahar about Mr.

7   Rodgers?

8      A.     I did.

9      Q.     What did you say to him?

10      A.     I said this person left the county under

11   these circumstances, has been cleared by his doctor,

12   and civil service law would allow him to come back.

13   Would you consider bringing him back?

14      Q.     And what did he say?

15      A.     He said, yes, he would consider him.

16      Q.     And so he made application?

17      A.     Yes, um-hum.

18      Q.     Did he take the civil service exam?

19      A.     He had already taken the civil service exam.

20      Q.     Right.  But that was when he was employed

21   previously, correct?

22      A.     Right.  Right.

23      Q.     So you're saying he didn't have to take an

1    exam again?

2         A.    Correct.

3         Q.    Because he was within the three year

4    window?

5         A.    Correct.

6         Q.    And then after he was, he was rehired,

7    correct?

8         A.    Correct.  Um-hum.

9         Q.    And was there any other applicants for

10   that job?

11        A.    Oh, there are always applicants for the

12   correction officer positions, yes.

13        Q.    Had any of those applicants taken a civil

14   service exam?

15        A.    Yes, um-hum.

16        Q.    Had any of those applicants scored within

17   the top three of that civil service exam?

18        A.    Yes, um-hum.

19        Q.    And so at the time that Mr. Rodgers was

20   hired these other individuals were not hired or was

21   there more than one position?

22        A.    I don't know.  Generally the sheriff hires a

23   group of individuals at a time.

1     Q.    Okay.  So why did you contact the sheriff

2  about it?

3     A.    Because his father had spoken to me about it

4  and asked me if I could put in a word as well, as one

5  of the county legislatures, if I could put in a word to

6  the sheriff.

7     Q.    Which county legislature?

8     A.    Bob Mirch.

9     Q.    Pardon?

10    A.    Bob Mirch, M-I-R-C-H.

11    Q.    And how does he know him?

12    A.    He worked in the city government as well

13  with George Rogers, the father.  And he was the one who

14  asked for consideration for the CSEA union in the City

15  of Troy to endorse some of the Republican candidates in

16  that election year.

17    Q.    So how is that not related to the

18  political, I think you said earlier, criticism somehow

19  related to people who have been helpful to them in

20  their campaign?

21    A.    That's what I said.  It is related to that

22  kind of criticism.  Why I dismissed it is because

23  there's nothing wrong with hiring someone as long as

1    you follow the rules.

2         Q.    Is there something wrong with an

3    individual receiving special consideration as a result

4    of their contributions to a political campaign or

5    party?

6                   MR. BAILEY:  Object to the form.

7                   You can answer it.

8         A.    Is there something wrong with somebody being

9    considered?  Not if they meet the qualifications of the

10   position and comport with all of the laws applicable

11   which he did in this instance when it came to the civil

12   service law.

13        Q.    Did any one of the top three candidates

14   who took the civil service exam not meet the same

15   requirements under the law?

16                   MR. BAILEY:  Object to the form.

17                   You can answer it.

18        A.    They met the term of the law.  That's why

19   they were able to take the exam and be on the list.

20   I'm not sure if that answers the question.

21        Q.    But if I understand, you say there is

22   nothing wrong with giving someone a benefit or a head

23   start based upon their contributions to a political

1    candidate or campaign.  That's what I understand you

2    to say.

3        A.    Provided that they are reachable on the

4    list.  Provided that the way they're brought into

5    office they have the qualifications.  And in this case

6    civil service law allows that someone who has left a

7    position because they are unable to do the duties,

8    should they be now able to do the duties, that they can

9    be brought back in without retaking a test based on

10   their having been previously appointed from a list.

11       Q.    Does the law give them a preference over

12   individuals who have taken the exam and appear on the

13   list?

14             MR. BAILEY:  Object to the form.

15       A.    I don't know.

16       Q.    Does the county executive's office make

17   recommendations and referrals concerning hiring on a

18   regular basis?

19       A.    Yes, to all of our departments.  I get

20   requests about two or three times a week from somebody

21   looking for a job.

22       Q.    And do you provide that recommendation or

23   suggestion to the department heads each and every time

1    you get requests?

2         A.    Yes.  I would say, yes.

3         Q.    And are those individuals hired to your

4    knowledge?

5         A.    That's up to the department head.  I make

6    the introduction, if you will, pass along the request

7    for consideration.  And I tell my department heads if

8    the person is qualified, then I would ask that they be

9    considered, they be interviewed with anybody else who's

10   qualified.  But it's up to the department heads.

11        Q.    But they know what your preference is at

12   that point, right?

13        A.    Sure.

14        Q.    So how is that fair to people that don't

15   have an inside line to your office or someone like

16   you?

17               MR. BAILEY:  Objection to form.

18        A.    Again, the person that is recommended for a

19   position has to be reachable on a civil service list.

20        Q.    I understand.

21        A.    So it is fair to the people that if that

22   person is not reachable they are not considered.

23        Q.    Okay.  But you have three people that are

1    reachable in every civil service test, correct?

2         A.    Correct.

3         Q.    In fact, civil service law requires hiring

4    of someone from the top three off that list, correct?

5         A.    Correct.

6         Q.    Or the top three scorers, is that correct?

7         A.    Yes.

8         Q.    So you could have five people that have

9    the same score that brings them up to the top three?

10        A.    Yes.

11        Q.    So if two of those three people on the

12   list do not have recommendations or an in with the

13   county executive's office or someone who is going to

14   call the department head to give them the benefit, how

15   is that fair to them?

16                   MR. BAILEY:  Object to the form.

17                   Asked and answered.

18        A.    It is fair to them because they have the

19   opportunity to interview as well.  My department heads

20   and even other elected officials do not always pick the

21   person I've recommended.

22        Q.    You sometime don't know who you're

23   recommending, correct?

1      A.     I don't know them?  Well, I may not know the

2  individual themselves.  I may know a family member, for

3  instance.

4      Q.     So you may be recommending someone that

5  you have no knowledge about with respect to their

6  background or physical health?

7      A.     And then I say that to the individual that

8  I'm passing along to.  I don't know this person

9  individually.  I know their parent.  I know a sibling,

10 whoever it is I know, and they're a very hard working

11 individual and I highly recommend them.  And I'll add

12 that caveat in there so it's clear I don't know the

13 individual.

14     Q.     And did you do that with Mr. Rodgers?

15     A.     Yes.  I knew his father, but I didn't know

16 him I believe at that point or didn't, couldn't attest

17 to whether or not he was a good worker or any of that.

18     Q.     Did you learn that he was hired?

19     A.     Yes, I did.

20     Q.     How did you learn that?

21     A.     I believe the sheriff probably told me he

22 had acted on that.

23     Q.     You believe he probably did or do you

1    recall him giving you that information?

2        A.    I don't recall it.

3        Q.    So you don't remember how you learned he

4    was hired?

5        A.    Correct.

6        Q.    And do you know what his status is now

7    with the Sheriff's Department?

8        A.    No, I don't.

9        Q.    Did you become aware at some point in time

10   he was placed on leave?

11       A.    Yes, um-hum.

12       Q.    How did you learn that?

13       A.    I don't know.

14       Q.    So if I understand your testimony

15   correctly, Kevin Rodgers is the son.  George Rodgers

16   is the father, and George Rodgers helped the

17   Republican Committee or members of the Republican

18   committee and as a result Kevin Rodgers got his job

19   back?

20            MR. BAILEY:  Object to the form.

21       A.    No.  Kevin Rodgers, or the sheriff was asked

22   to look into the situation of Kevin Rodgers and would

23   he consider bringing him back.

1     Q.    Had he already made application to the

2  Sheriff's Department?

3     A.    I don't know.

4     Q.    How did you learn that he was put on

5  leave?

6     A.    From his father.  And actually he wasn't put

7  on leave.  He had left county employment.  I'm sorry.

8  Recently that he had been put on leave?

9     Q.    Well, yeah.  When was it that he was

10  hired, rehired rather?

11     A.    Shortly after the sheriff was elected, so

12  2004.

13     Q.    And since that 2004 date has Mr. Rodgers

14  been placed on leave?

15     A.    Yes.

16     Q.    And what leave is he on?

17     A.    I don't know.

18     Q.    How do you know he's on leave?

19     A.    Because I was told that, but I don't recall

20  by whom.

21     Q.    How long has he been on leave?

22     A.    I don't know.

23     Q.    When did you learn that he was on leave?

1          MR. BAILEY:  Asked and answered.

2          Go ahead.

3     A.    I don't know.

4     Q.    Has it been more than a year?

5          MR. BAILEY:  Asked and answered.

6          Go ahead.

7     A.    I believe so.

8     Q.    Is he being paid?

9     A.    I believe so.

10    Q.    Is he on 207-c?

11    A.    No.

12    Q.    How is he being paid if he's not working?

13    A.    I don't know.  That would be the sheriff

14    ordering him to be paid.

15    Q.    The sheriff ordered him to be paid?

16    A.    No, I'm saying it would be the sheriff that

17    would say, not ordered -- that's perhaps the wrong word

18    to use -- but directed to be paid.

19    Q.    Did you have any conversations with Mr.

20    Mahar about Mr. Rodgers being paid while he was out on

21    leave?

22    A.    I don't believe we did.

23    Q.    Do you have knowledge that Mr. Rodgers was

1  being investigated for criminal activity?

2      A.    I had heard that there was an investigation

3  into some union activities that he and the president of

4  the union were involved in.  But I don't know that he

5  was being investigated personally.

6      Q.    Does his leave have anything to do with

7  that investigation or that inquiry?

8          MR. BAILEY:  Object to the form.

9          If you know you can answer.

10     A.    I believe it does.

11     Q.    So he's on leave pending investigation for

12  criminal wrong doing, I think it's for stealing moneys

13  from the union, correct?

14     A.    It wasn't job related activities.  I don't

15  know exactly what it was.

16     Q.    And you don't know how long he's been on

17  leave?

18     A.    No, I don't know.

19     Q.    And you don't know who's conducting the

20  investigation?

21          MR. BAILEY:  Hang on one second.

22          I don't want you to answer that

23          question.  You and I can discuss it.

1          I don't want to interfere with any

2     ongoing investigation that may be

3     occurring.  I don't know who knows

4     what about who's investigating what.

5          MS. BOSMAN:  I'm not asking you,

6     John.

7          MR. BAILEY:  That's right but --

8          MS. BOSMAN:  I'm asking her if she

9     knows.  Whether or not she knows is

10    not at all involved in --

11         MR. BAILEY:  It may interfere with

12    ongoing investigations, criminal

13    investigations.  I don't know who

14    knows who's investigating what.

15         MS. BOSMAN:  Well, that's what I'm

16    trying to find out.

17         MR. BAILEY:  Well --

18    Q.   Do you know?

19         MR. BAILEY:  You can answer that

20    "yes" or "no."      .

21    A.   No.

22    Q.   Have there been any inquiries to your

23    knowledge by federal law enforcement authorities

1    regarding Mr. Rodgers' conduct in the Sheriff's

2    Department?

3         A.    I don't know.

4         Q.    Has anyone interviewed you with respect to

5    Mr. Rodgers?

6         A.    No.

7         Q.    Is Mr. Rodgers a member of the union?

8         A.    Yes, he was the union official.

9         Q.    Does the union contract permit leave with

10   pay pending criminal investigation?

11        A.    I don't know.

12        Q.    Has Mr. Rodgers ever made application for

13   207-c?

14        A.    I don't know.

15        Q.    Did Mr. Mahar make any statements to you

16   or to anyone else to your knowledge regarding Mr.

17   Rodgers applying for 207-c status?

18                   MR. BAILEY:  Object to the form.

19              You can answer.

20        A.    I don't know of any requests.

21        Q.    Has anyone said anything about him making

22   or not making application for 207-c benefits?

23        A.    No.

1          (Plaintiff's Exhibits KJ 1, 2 and

2      3 were marked for identification.)

3          (A luncheon recess was taken.)

4  **CONTINUED EXAMINATION BY MS. BOSMAN:**

5      Q.    Did you ever speak to Mr. Richard Cryst

6  about my client?

7      A.    No, I did not.

8      Q.    Martin Reid?

9      A.    R-E-I-D.

10      Q.    How about Chris Meyer?

11      A.    Yes.

12      Q.    When did you speak to Chris Meyer about my

13  client?

14      A.    About the same time I spoke with Brian

15  Goldberger.

16      Q.    And what did you speak with Chris Meyer

17  about?

18      A.    Just briefed him on what Brian and I spoke

19  about.  Chris is my deputy.

20      Q.    So you approached Mr. Meyer or he

21  approached you about Mr. Karam?

22      A.    I don't know that either of us approached

23  each other about Mr. Karam so much as we had sat down

1  to talk about labor issues.

2       Q.    And what is his title?

3       A.    Deputy County Executive.

4       Q.    So he reports to you?

5       A.    Yes.

6       Q.    Had he spoken Mr. Karam himself?

7       A.    I don't know.

8       Q.    What did he tell you?

9       A.    I believe I shared with him what it was that

10  Brian Goldberger and I had spoke about.  (Certify.)

11       Q.    What did you tell him?

12            MR. BAILEY:  Again, that's

13            relating to attorney client.

14            MS. BOSMAN:  I don't believe it

15            is.  For the record, her communication

16            of information provided to her by Mr.

17            Goldberger is essentially a waiver and

18            we will certify the question, bring

19            the witness back if we have to.

20            MR. BAILEY:  Fine.

21            MS. BOSMAN:  Are you going to let

22            her answer?

23            MR. BAILEY:  No.

```
 1        Q.     What did you tell Chris Meyer about Mr.

 2   Karam?

 3               MR. BAILEY:  If it requires you to

 4               relate a conversation with your

 5               attorney, don't disclose it.

 6               MS. BOSMAN:  Actually it's advice

 7               by your attorney not conversation.  So

 8               you're not privileged.  Only advice

 9               is, Ms. Jimino.

10               MR. BAILEY:  Wait a minute.

11               Please don't instruct my client as to

12               what the law is.

13               MS. BOSMAN:  Please don't instruct

14               my witness as to what the law is.  You

15               want to do that, take her outside.

16               MR. BAILEY:  This is my client.

17               MS. BOSMAN:  Take her outside if

18               you want.

19               MR. BAILEY:  Ask your question,

20               please.

21               MS. BOSMAN:  I did.

22        Q.     What did you tell Mr. Meyer about my

23   client?
```

1          MR. BAILEY:  If it requires you to

2          disclose a conversation you had with

3          your labor counsel, don't do it.

4     Q.    You may answer the question.

5     A.    I told Mr. Meyer what Mr. Goldberger and I

6  had spoke about.

7     Q.    Did you give Mr. Meyer any instruction?

8     A.    No, I did not.

9     Q.    Why did you tell him what you and Mr.

10  Goldberger talked about?

11    A.    Because I tell my Deputy County Executive

12  just about everything that I'm involved in so that in

13  my absence he can act in my stead.

14    Q.    What did you expect him to do in your

15  absence with respect to Mr. Karam?

16    A.    Nothing.

17    Q.    So you just kept him informed?

18    A.    Correct.

19    Q.    Did he know anything about Mr. Karam at

20  the time you spoke with him?

21    A.    I don't recall.

22    Q.    Did he know Mr. Karam personally?  Had he

23  met him before?

1     A.     I don't recall.

2     Q.     So you don't know of any relationship

3 between Mr. Meyer and Mr. Karam, is that correct?

4     A.     That's correct.

5     Q.     You don't know if Mr. Karam and Mr. Meyer

6 have spoken in the past, correct?

7     A.     No, I don't know.

8     Q.     And Mr. Meyer did not relate to you that

9 he had spoken to my client, is that correct?

10     A.     That's correct.

11     Q.     Do you instruct your employees or the

12 people that you supervised to report to you any

13 information concerning the status of employees in the

14 County of Rensselaer?

15     A.     No, I do not.

16     Q.     Do you give them any standing instructions

17 with respect to being advised or alerted if there are

18 issues that arise with respect to personnel in the

19 County of Rensselaer?

20     A.     Yes, if it's going to be something that I

21 read in the newspaper or if it's going to be something

22 that I hear when I'm out in the community, then I will

23 instruct them to inform me.

         Q.      So that's the standard by which they alert

you as to matters or issues regarding employees in the

County of Rensselaer?

         A.      Yeah, I would say primarily that's it.

         Q.      So if you're going to be asked about it by

the media --

         A.      Um-hum.

         Q.      -- or you're going to hear about it?

         A.      In the community.

         Q.      -- in the community?

         A.      Correct.

         Q.      Did you receive information from any of

your subordinates regarding Mr. Karam?

         A.      When I spoke with Mr. Goldberger, yes.

         Q.      And Mr. Goldberger is your subordinate?

         A.      He's technically Steve's subordinate, Steve

Pechenik's subordinate.

         Q.      Who is Steve Pechenik?

         A.      County Attorney.

         Q.      So Mr. Goldberger works for Mr. Pechenik?

         A.      Yes, that's correct.

         Q.      And so why don't you work with Mr.

Pechenik?

1    A.    I do work with Mr. Pechenik.

2    Q.    So why are you talking to Mr. Goldberger

3    about my client?

4    A.    Because we were talking about labor issues.

5    Mr. Goldberger oversees our labor negotiations.

6    Q.    Did you speak to Mr. Pechenik about my

7    client?

8    A.    I don't believe so.

9    Q.    Did Mr. Pechenik speak to you about my

10   client?

11   A.    I don't believe so.

12   Q.    Did Mr. Goldberger speak to Mr. Pechenik

13   about my client?

14   A.    I don't know.

15   Q.    Did Mr. Goldberger give you any indication

16   he had received information directly from my client?

17   A.    No, he did not.

18   Q.    Did he tell you that he spoke directly to

19   my client?

20   A.    No, he did not.

21   Q.    Is that information that you would expect

22   to be provided by Mr. Goldberger?

23   A.    No, it is not.

1      Q.     Is that information you would expect to be

2  provided by Mr. Meyer?

3      A.     No, it is not.

4      Q.     Mr. Reid?

5      A.     No.

6      Q.     Mr. Cryst?

7      A.     No.

8      Q.     Mr. Pechenik?

9      A.     No.

10      Q.     Anybody?

11      A.     No.

12      Q.     Did you speak with anyone else about my

13  client?

14      A.     Not that I can recall.

15      Q.     Did you receive a copy of a Notice of

16  Claim in this matter?

17      A.     Yes, um-hum.

18      Q.     And did you receive that in your office?

19      A.     Yes, um-hum.

20      Q.     Upon receipt of that Notice of Claim, did

21  you make inquiry concerning Mr. Karam's status?

22      A.     I don't recall.

23      Q.     Did you take any actions in respond to the

1    Notice of Claim that you received?

2         A.    Yes, I sent it to Mr. Pechenik.

3         Q.    Anything else?

4         A.    I think I asked Mr. Pechenik why I was being

5    sued personally as well as in my capacity as County

6    Executive.

7         Q.    Anything else?

8         A.    No.

9         Q.    Did you ever talk to anyone about Mr.

10   Karam's sick time donations?

11        A.    No, I did not.

12        Q.    Were you aware that individuals had made

13   sick time donations specifically to Mr. Karam?

14        A.    No.

15        Q.    No one advised you of that?

16        A.    No.

17        Q.    Do you authorize Mr. Goldberger to

18   represent that he will speak to you about matters when

19   he does not do so?

20             MR. BAILEY:  Well --

21        A.    I don't understand.

22             MR. BAILEY:  Yeah, I object to the

23             form of the question.

1     Q.     Do you authorize Mr. Goldberger to

2  indicate to people that he has spoken to you when he

3  has not?

4                MR. BAILEY:  Object to the form.

5     A.     No.

6     Q.     Did you have discussions with anyone about

7  my client once he received 207-c benefits?

8     A.     I believe I was informed that he was to

9  receive 207-c benefits.  But that was the extent of it,

10  and I'm not even sure who it was that told me.

11     Q.     Did you respond to that information?

12     A.     Not that I can recall.

13     Q.     Is that information that's provided to you

14  as a routine matter?

15     A.     I don't know how often 207-c cases come up

16  in the Sheriff's Department, so I can't say that's

17  information provided on a routine basis.

18     Q.     How often have you been informed that

19  Sheriff's Department employees are receiving 207-c

20  benefits upon the approval or receipt of those?

21     A.     Maybe two times.

22     Q.     Who was the other individual you were

23  notified of?

1      A.     I can't think of the name.

2      Q.     How long ago was it?

3      A.     I would say probably three years ago, two

4 years ago.

5      Q.     And was that person's 207-c benefits

6 delayed or denied in any fashion?

7      A.     I have no idea.

8      Q.     Why were you being informed of it?

9      A.     It came up in conversation.

10      Q.     Are you familiar with an investigation

11 with the Sheriff's Department regarding violation of

12 HIPAA laws?

13      A.     Yes, I am.

14      Q.     And how did you become familiar with that?

15      A.     I believe that the county attorney, County

16 Attorney Steve Pechenik told me when that became an

17 issue with the hospital notifying us that records had

18 been accessed inappropriately.  I can't say for certain

19 it was the county attorney who told me that.  Someone

20 told me the record were access inappropriately.

21      Q.     Did you know that my client was conducting

22 that investigation?

23      A.     No, I did not.

1      Q.      Did you know there was someone who

2   replaced him in that investigation?

3      A.      No.

4      Q.      Do you keep yourself apprised as the

5   County Executive concerning investigations into

6   criminal wrong doing within county government?

7      A.      Only to the extent that I know an

8   investigation is going on.

9      Q.      And do you know an investigation is going

10  on with respect to the HIPAA violation?

11     A.      Yes, I have been told there is.

12     Q.      And you don't know who has taken over the

13  investigation --

14     A.      No, I do not.

15     Q.      -- from my client?

16     A.      No, I do not.  That would be the Sheriff's

17  Department, so I wouldn't know.

18     Q.      Well aren't the individuals that are

19  accused of violating the HIPAA laws also members of

20  the Sheriff's Department or employees of the Sheriff's

21  Department?

22     A.      Yes, um-hum.

23     Q.      So why would the Sheriff's Department be

1      investigating employees of the Sheriff's Department?

2          A.    I don't know.

3          Q.    Do you believe that represents a conflict

4      of interest?

5          A.    I don't know.

6          Q.    Do you know what a conflict of interest

7      is?

8          A.    Yes, I do.

9          Q.    Do you know what happened to the

10     investigative file that my client created regarding

11     the HIPAA violations?

12         A.    No, I do not.

13         Q.    Did you know that my client's keys to his

14     office were ordered surrendered from him?

15         A.    No, I did not.

16         Q.    Did you know that my client's office was

17     cleaned out by the sheriff?

18         A.    No, I did not.

19         Q.    Did you ever speak with Mr. Mahar about

20     Mr. Karam?

21         A.    I don't recall.

22         Q.    Did anyone tell you or have you heard of

23     any opinions or criticism that Mr. Mahar has with my

1  client?

2       A.     No.

3       Q.     Did Mr. Mahar tell you or have you heard

4  of any compliments or praises he has for my client?

5       A.     No, I have not heard them.

6       Q.     Has Mr. Mahar ever spoken to you about any

7  of his employees?

8       A.     Not that I can recall.

9       Q.     Is that because you don't normally speak

10  with him about those things?

11       A.     Right.  We don't normally speak about his

12  operation other than if he has a need for funding to be

13  fulfilled in budget time or if something comes up

14  during the year.

15       Q.     Has he every spoken to you about Ruth

16  Vibert?

17       A.     Yes, he did speak with me about Ruth Vibert.

18       Q.     When?

19       A.     Yes.

20       Q.     When did he speak to you about Ruth

21  Vibert?

22       A.     He spoke with me when he introduced me to

23  her after she started down at the jail, and then he

1    spoke with me when he let her go.  He advised me he had

2    let her go.

3        Q.    Why did he advise you of that?

4        A.    I don't know.  Probably so that I would not

5    be surprised to hear it on the street.

6        Q.    Did you ask him why?

7        A.    Yes, I did.

8        Q.    What did he say?

9        A.    He said that she was not fulfilling the

10   requirements of the position.

11       Q.    Anything else?

12       A.    No.

13       Q.    Those were his exact words, "she is not

14   fulfilling the requirements of the position"?

15       A.    I don't know.  That was the sense of it.  I

16   don't know what his exact words were.

17       Q.    And you didn't ask him why?

18       A.    No.

19       Q.    And you don't have any further information

20   regarding why he was terminating her?

21       A.    No.

22       Q.    Did you hear from anyone else why he was

23   terminating her?

1       A.      No, I did not.

2       Q.      Were you surprised he was terminating her?

3       A.      Yes, because she wasn't there that long it

4   seemed.

5       Q.      And so even though you were surprised, you

6   did not make inquiry?

7       A.      No, I did not.

8       Q.      Why not?

9       A.      It's his operation and the sheriff is an

10  elected official.  He runs his operation as he sees

11  fit.

12      Q.      Are you concerned about the way he runs

13  his operation?

14              MR. BAILEY:  Object to the form.

15      A.      No.

16      Q.      So as the County Executive, you don't feel

17  that the way the Sheriff's Department is run or not

18  run has any impact with respect to your duties,

19  obligations or responsibilities, is that correct?

20              MR. BAILEY:  Object to the form.

21      A.      I'm sorry.  Would you repeat the question?

22              MS. BOSMAN:  Could you read back

23              the question?

1          (The last question was read by the

2          reporter.)

3               MR. BAILEY:  Object to the form.

4               Go ahead and answer.

5     A.     To the extent it has a fiscal impact,

6    certainly.

7     Q.     So it's only about the money?

8               MR. BAILEY:  Object to the form.

9     A.     The sheriff, being a separately elected

10   official, is going to run the office as he sees fit.

11   That is something the voters empowered him to do.

12   Therefore, I have no ability to change the way he

13   operates his department.  I do get concerned,

14   obviously, for instance when we're sued, that that will

15   have an impact on the county, on the county taxpayers,

16   on the county budget.  And that I speak to him about.

17   But I do not speak with him about how he runs his

18   operation.

19    Q.     Well, isn't how he runs his operation

20   directly related to lawsuits?

21               MR. BAILEY:  Object to the form.

22    A.     Sometimes, if they're based in merit.  If

23   they're not based in merit then, no, it's not.

1    Q.    Who makes the determination of whether or

2    not they're based in merit?

3    A.    I believe a judge does.

4    Q.    Anyone else?

5    A.    I don't know of any.

6    Q.    A jury?

7    A.    If there was a jury involved, sure.

8    Q.    So even though you think that the county

9    has an obligation to protect and ensure the health and

10   welfare of its employees, you don't feel that way

11   about the employees who work for the sheriff because

12   he is elected and he can run his ship the way he

13   wants?

14             MR. BAILEY:  Object to the form.

15             That's argumentative.

16   Q.    Is that a fair summary of your position?

17   A.    No, it is not.

18   Q.    So where does the County Executive's

19   obligation, responsibility towards the employees cross

20   over with the sheriff running his operation the way

21   that he wants because he's elected?

22             MR. BAILEY:  Object to the form.

23   A.    I think the Human Resources Director works

1  with the sheriff to ensure that policies and procedures

2  are followed and the County's Labor Attorney.

3      Q.    Does the Human Resources Director have a

4  supervisor separate and apart from you?

5      A.    No.

6      Q.    So the Human Resources Office is

7  supervised by you, correct?

8      A.    Correct, um-hum.

9      Q.    Did you make any inquiry with the Human

10  Resources Department with respect to the basis upon

11  which Mr. Karam filed and served a Notice of Claim?

12      A.    No, I did not.

13      Q.    Why not?

14      A.    Because I spoke with my attorney about that,

15  and that was it.

16      Q.    Does your attorney have information

17  concerning human resources and personnel that your

18  Director of Human Resources does not?

19          MR. BAILEY:  Object to the form.

20          If you can possibly answer that,

21          answer it.

22      A.    The County's Labor Attorney may have some

23  information that the HR Director does not have.

1     Q.    Okay.  Does the county HR Director have

2 information the county attorney does not?

3             MR. BAILEY:  Again, I object to

4             the form of the question.  If you can

5             possibly answer it, go ahead.

6     A.    I don't know.

7     Q.    Why didn't you make inquiry concerning the

8 allegations made by Mr. Karam in his Notice of Claim

9 through the Department of Human Resources?

10     A.    Because I spoke with the Labor Attorney

11 about it, Brian Goldberger.

12     Q.    But the Human Resources Office sets

13 policy, make sure the policy is enforced and followed

14 amongst the various departments, correct?

15     A.    They don't make policy so much as they

16 oversee policy, yes.

17     Q.    Because the policy's made by you or the

18 legislature?

19     A.    Yes, or state law.

20     Q.    Pardon?

21     A.    Or state law.

22     Q.    Or state law.  So why wouldn't you make

23 inquiry to the Human Resources Department concerning

1   the allegations that Mr. Karam made that were

2   personnel related?

3       A.   Because I spoke with the attorney, Brian

4   Goldberger, about it.

5       Q.   And he told you not to make inquiry to

6   Human Resources?

7               MR. BAILEY:   Objection.   Do not

8               answer any questions about advice you

9               were given by Brian Goldberger.

10      Q.   I don't understand why that would mean

11  don't talk to the people you supervise in human

12  resources.

13              MR. BAILEY:   That's not her

14              answer.   That's not fair.   I object to

15              the form.

16      Q.   Okay.   Well, I'm trying to understand.

17  Maybe I missed something.   Did it occur to you to talk

18  to your Human Resources Department when you were

19  served with a Notice of Claim by Mr. Karam?

20              MR. BAILEY:   Object to the form.

21              Go ahead and answer.

22      A.   No, because I spoke to the Labor Attorney

23  who I assumed would have all the information I would

1  need.

2      Q.    Were you advised by the Human Resources

3  Department that Mr. Karam's claims were without merit?

4      A.    No, I was not.

5      Q.    And did you learn that Mr. Karam's 207-c

6  application had not been acted on?

7      A.    No.

8      Q.    Do you remember what the allegations were

9  in the Notice of Claim?

10     A.    No, I do not.

11     Q.    Do you know what the allegations are in

12  this lawsuit?

13     A.    I believe it has to do with the 207 but I

14  don't know the specific allegations, the 207 wasn't

15  granted or granted in a timely fashion.  But I didn't

16  read the Notice of Claim in full, to tell you the

17  truth.

18     Q.    How long did my client go without income?

19     A.    I don't know.

20     Q.    Were you concerned about that at any time?

21          MR. BAILEY:  Asked and answered I

22          object.  Go ahead.  Answer the

23          question again.

1    A.    I didn't know he was going without income.

2    Q.    Even after you received the Notice of

3 Claim?

4    A.    I didn't read the Notice of Claim, as I

5 said, other than to see that I was named personally.

6    Q.    You didn't read it?

7    A.    Correct.

8    Q.    Why didn't you read it?

9    A.    Because I sent it down to the county for him

10 to handle.

11    Q.    Do you read any of the Notices of Claims

12 you receive as County Executive?

13    A.    I don't think so, not in full.

14    Q.    Not in full?

15    A.    Um-hum.  Not in full, yes.

16    Q.    So you just check to see if you're in the

17 caption and that's it?

18    A.    Sometimes, yes.

19    Q.    Why?

20    A.    Because it's the county attorney's job to

21 represent the county and me as County Executive in any

22 legal actions, and he'll apprise me if I have to

23 prepare for something like today's deposition or if I

1    have to gather information as part of it, whatever.

2          Q.    Is it your job to keep yourself informed

3    regarding what is happening with regard to the

4    employees of the County of Rensselaer?

5                MR. BAILEY:  Object to the form.

6          A.    Is it my -- could you read that again,

7    please?  I'm sorry.

8          Q.    Is it your job to keep yourself informed

9    with respect to the employees of the County of

10   Rensselaer?

11               MR. BAILEY:  Miss Bosman, I don't

12               like the tone in your voice.

13               MS. BOSMAN:  I'm sorry.  I'm just

14               repeating the question.

15         A.    With respect to what with our county

16   employees?

17         Q.    Is it your job to know what's going on

18   when an employee does something like serves a Notice

19   of Claim and complains that he is being discriminated

20   against, retaliated against or denied rights and

21   privileges that are allowed other individuals?

22               MR. BAILEY:  Object to the form.

23               If you can answer it, go ahead.

1      A.    If I was informed of the fact that there was

2 a Notice of Claim made, if I received the Notice of

3 Claim.

4      Q.    But you didn't read it?

5      A.    Correct.

6      Q.    So I'm trying to understand why you don't

7 read it.

8      A.    Because this is an employee of the Sheriff's

9 Department and, therefore, it is not a situation that I

10 would be familiar with and, therefore, I send it to the

11 County Attorney. He advises me if there is something I

12 need to do in preparation for that.

13      Q.    Does anyone advise you whether or not

14 there's anything that needs to be done with respect to

15 the way that employees are treated?

16              MR. BAILEY: Object to the form.

17      A.    Yeah. I don't even know what the question

18 is.

19      Q.    I'm going to hand you what has been marked

20 as Exhibit KJ 1. All right. Exhibit KJ 1. Would you

21 take a moment and review that, please.

22              (Discussion was held off the

23               record.)

1          (A short recess was taken.)

2     Q.     Ms. Jimino, before we go onto Exhibit KJ 1

3 which is in front of you, I have a couple of questions

4 I want to backtrack on.  With respect to the sick

5 leave policy you testified earlier that the policy was

6 set forth in a negotiated union contract?

7     A.     Yes, the sick bank.

8     Q.     And nowhere else?

9     A.     I don't know that it is.  I said I know it's

10 in there.

11     Q.     And you said that the sick leave policy

12 for the County of Rensselaer does not cover nonunion

13 employees?

14     A.     The sick bank policy is in the union

15 contract and doesn't specifically talk about management

16 employees.

17     Q.     I know that.  But outside of that

18 contract, doesn't the County of Rensselaer have a sick

19 bank or sick leave donation --

20     A.     No, we did not.

21     Q.     -- policy that was proposed by you?

22     A.     We had a proposal with the union that was

23 proposed by me.  But to my knowledge we don't have --

1    Q.    And you're saying it was never countywide?

2    It was just with the union?

3    A.    I don't know what's in the other union

4    contracts.

5    Q.    I mean, the one you did the proposal on?

6    A.    That was USPEC.

7    Q.    And not for non-union employees?

8    A.    Right, because non-union employees of the

9    department, rather the elected official heading the

10   department would have the option of whether or not they

11   wanted to allow sick leave use or sick bank use.  It

12   would not be a policy set in writing.

13   Q.    Did you receive a grievance regarding the

14   leave donation policy from the UPSEU?

15   A.    I may have.  I can't recall exactly.

16   Q.    Wasn't that grievance specifically with

17   respect to the fact that Mr. Karam was not being

18   allowed or people were not being allowed to donate

19   sick leave to him?

20   A.    I don't know.

21   Q.    You don't remember that grievance?

22   A.    No.

23   Q.    So then did anyone make inquiry to you

1  with respect to persons who had sought and used

2  donated sick leave?

3       A.    Did anybody make inquiry to me about donated

4  sick time?

5       Q.    Yes, about donated sick leave.  Did

6  anybody make inquiry to you about that subject?

7       A.    No, other than, as I say, that one grievance

8  had something to do with it and the grievance I would

9  have passed onto Brian Goldberger, Tom Hendry and Chris

10  Meyer for the grievance meeting.

11       Q.    And what did they do with it once you

12  passed it onto them?

13       A.    I don't know.

14            MS. BOSMAN:  Could you mark that,

15            please.

16            (Plaintiff's Exhibit KJ4 was

17            marked for identification.)

18       Q.    Handing you now what's been marked as

19  Exhibit KJ 4, could you take a look at this and

20  identify it for the record, please?

21       A.    It's a grievance form from UPSEU, class

22  action dated 11/30/2012, "On or about November 30,

23  2012, it became known that bargaining unit

1    employees..."  --

2                    (Discussion was held off the

3              record.)

4              MR. BAILEY:  Do you want this read

5              into the record?

6              MS. BOSMAN:  If she's responding

7              to the question.

8              MR. KEACH:  A.J., do you want

9              County Executive Jimino to sit there

10             and read that entire document into the

11             record?

12             MS. BOSMAN:  No.

13        Q.    The question was:  Can you identify that

14   for the record?

15        A.    It's a grievance form.

16        Q.    Did you receive that grievance form?

17        A.    I would remember this.  I don't remember

18   receiving this page.  This is address to me, so I could

19   have.

20        Q.    What page are you referring to that was

21   addressed to you?

22        A.    The third page.

23        Q.    And that's a letter to you dated what?

1    A.    September 16th, 2013.

2    Q.    And who is that letter from?

3    A.    Kevin Boyle, B-O-Y-L-E.

4    Q.    And is that letter with respect to the

5    other pages that are contained in that exhibit?

6    A.    I don't know.  I'm just reading it.

7    Q.    Okay.

8              MR. BAILEY:  Your question is:  Is

9              it related to the other documents?

10             Object to the form.  You can answer

11             it.  I think there's some documents in

12             it.

13   A.    It appears to be, yes.

14   Q.    Would you take a look at the first page of

15   that Exhibit KJ 4?

16   A.    Um-hum.

17   Q.    And is that a grievance form that's used

18   by union members?

19   A.    It appears that way.  It says a grievance

20   form, Rensselaer County.

21   Q.    And it says "class action" on it?

22   A.    Yes, um-hum.

23   Q.    But you don't recall receiving that or

1  seeing it before, is that correct?

2      A.    That's correct.

3      Q.    And does it identify the subject matter of

4  the grievance on that first page?

5      A.    Yes, it does.

6      Q.    What is the subject matter of the

7  grievance?

8      A.    The fact that unit employees were not being

9  allowed to donate sick leave to an unrepresented county

10  employee, James Karan.

11      Q.    And what is the date of that document?

12      A.    November 30th, 2012.

13      Q.    So November 30th, 2012, there was a

14  grievance that said that employees were not being

15  allowed to donate sick leave to Mr. Karam?

16      A.    Correct.

17      Q.    And would that suggest to you that Mr.

18  Karam was not receiving any income?

19      A.    Well, it would suggest to me he wasn't

20  receiving sick leave donations.  Whether or not he had

21  any other leave time, I wouldn't know from this

22  document.

23      Q.    Are you permitted to receive donated sick

1    time if you haven't used time of your own?

2                    MR. BAILEY:  Object to the form.

3         A.    I don't know.

4         Q.    Take a look at the second page of that

5    document, please.  What is contained on the second

6    page?

7         A.    This is a UPSEU alert.

8         Q.    And what is the date of that document?

9         A.    September, 2013.

10         Q.    And there's, on the bottom half of the

11    page, what is that?

12         A.    Some type of write up about "There's a

13    Grinch in Rensselaer County."

14         Q.    What is the date of that document?  Is

15    that the same date as the top?

16         A.    I assume.  It's on the same page so --

17         Q.    And what is "There's a Grinch in

18    Rensselaer County" referring to?

19         A.    It says, "UPSEU has had to file a grievance

20    because Sheriff Jack Mahar has refused to allow our

21    members to donate over 500 hours of sick leave..."

22         Q.    Did you know about that in November of

23    2013?

1      A.     Did I know about this?

2      Q.     Yes.

3      A.     No.

4      Q.     So you didn't get any inquires from the

5 media regarding the Grinch in Rensselaer County?

6      A.     No.

7      Q.     And no one alerted you or informed you it

8 would be something you would be asked about by the

9 media?

10     A.     Correct.

11     Q.     And no one alerted or informed you that it

12 is something that would be of interest to the

13 financial security of the county?

14              MR. BAILEY:  Object to the form.

15     A.     No.

16     Q.     For lack of a better term?

17     A.     Uh-huh, no.

18     Q.     So as you sit here today you've never seen

19 that before?

20     A.     I've never seen this, no.

21     Q.     Can you go to the following page?  And

22 that is the letter that you referenced earlier that is

23 addressed to you, correct?

1      A.    Um-hum, yes.

2      Q.    And the date of that letter again is?

3      A.    September 16th.

4      Q.    2000 --

5      A.    -- 13.

6      Q.    And then if you could take a look at the

7 next page, and what is that?

8      A.    Leave bank proposal March, 2003.

9      Q.    Okay.  And that is signed by you, correct?

10     A.    Correct.

11     Q.    So that's a proposal that you signed in

12 2013?

13     A.    Um-hum.  Yes.

14     Q.    And there are other signatures that appear

15 on that, correct?

16     A.    Yes, correct.

17     Q.    Who are the other signatures that appear

18 on that?

19     A.    Kevin Reilly, Vicky Halse, H-A-L-S-E, and

20 Gary Hebert, H-E-B-E-R-T.

21     Q.    Who are they?

22     A.    Vicky Halse and Gary Hebert are county

23 employees, and Kevin Reilly is an employee of UPSEU.

1      Q.      And so that signature that appears on that

2    page in 2003, was that before you were County

3    Executive?

4      A.      No.

5      Q.      So you were the County Executive?

6      A.      Correct, um-hum.

7      Q.      And did you sign that document in your

8    capacity as County Executive?

9      A.      Yes.

10      Q.      And does that sick leave bank proposal go

11    to the legislature after you've signed it or what

12    happened to it?

13      A.      I believe it would have to be approved by

14    the legislature, but I can't say for certain.

15      Q.      And in fact it was approved by the

16    legislature, wasn't it?

17      A.      Okay.  I don't recall.

18      Q.      Can you take a look at the first paragraph

19    on that document?  I know it's a little hard to read.

20              MR. BAILEY:  If you can read it,

21              read it.  If you can't --

22              THE WITNESS:  Okay.

23              MR. BAILEY:  Can you read that?

1          THE WITNESS:  A little bit.  Okay.

2          Q.    Now, does that proposal, which you signed

3  and that was later approved by the legislature,

4  specifically address and reference non-union employees

5  receiving and donating sick leave?

6          A.    Yes, it does.

7          Q.    So the grievance document, which is the

8  first page of that exhibit, that makes reference to

9  the policy including non-union as well as union

10 employees is accurate with respect to your signed

11 document from 2003, correct?

12              MR. BAILEY:  Object to the form.

13              You can answer it.

14         A.    The grievance form is accurate?

15         Q.    You see the text portion of the grievance

16 there?

17         A.    Yes.

18         Q.    And then it says to the effect of,

19 something to the effect of it applies to both union

20 and non-union employees, correct?

21         A.    It says they're being allowed to donate sick

22 leave to unrepresented county employees.

23         Q.    Correct?

1    A.    Correct.

2    Q.    And it makes reference to the policy that

3    allows that, correct?

4    A.    Correct.

5    Q.    And so what happened to that grievance?

6    A.    I don't know.  It appears from the letter

7    that it was set aside for some reason.

8    Q.    In September of 2013?

9    A.    Yes.

10   Q.    What was set aside?

11   A.    It says, "in settling the above captioned

12   and electing not to proceed to Arbitration, UPSEU does

13   not modify it's position..."  So it sounds as though

14   it was settled in 2013, September.

15   Q.    So they resolved the grievance but did not

16   change their position, is that what you understand

17   that to say?

18   A.    That's what it appears to say, yes.

19   Q.    To your knowledge was there any revocation

20   of the policy that was proposed by you and approved by

21   the legislature between 2003 and 2013?

22   A.    I don't know.

23   Q.    Can I have the exhibit, please?

1     A.    (Proffered.)

2     Q.    The first page of this document, second

3 paragraph under "Nature of Grievance," it's that short

4 paragraph there. Could you please read that into the

5 record?

6     A.    "The applicable policy specifically states:

7 "Voluntary contributions of sick leave accrual and/or

8 vacation leave accrual may by made to an individual's

9 sick bank by employees represented by the collective

10 bargaining unit and by employees who are not

11 represented by a collective bargaining unit."

12    Q.    And does that also hold true for the

13 persons who are recipients of donated leave?

14           MR. BAILEY: Object to the form.

15    A.    Does what hold true?

16    Q.    That it applies to both union and

17 non-union employees?

18    A.    I don't know without looking. This is the

19 policy that governs the employees in the UPSEU union.

20 So I don't know. This says they can donate it to

21 somebody not in the union.

22    Q.    What are you reading?

23    A.    I'm reading the leave bank proposal you just

1    handed to me.

2         Q.    The leave bank proposal that you signed?

3         A.    Um-hum.

4         Q.    And you're saying it only applies --

5         A.    I'm saying that this is in the UPSEU

6    employee contract.  So I'm looking at it now to see if

7    it works the other way.

8         Q.    May I have the exhibit?

9              MR. BAILEY:  Can I look at it for

10             a second?

11             MS. BOSMAN:  I was going to show

12             it to you to save you time.  Yes, it's

13             all in the first paragraph.

14             MR. BAILEY:  Wait.  Is there a

15             question on the table?

16             MS. BOSMAN:  No, I'm just helping

17             her locate the information.

18             MR. BAILEY:  That's all right.  I

19             prefer my client read the entire

20             document.

21             MS. BOSMAN:  I think she has.

22             MR. BAILEY:  She was reading it

23             when you interrupted.

1          MS. BOSMAN:  She signed it.  Let's

2     hope she read it.

3          MR. BAILEY:  And you expect her to

4     remember a document she signed ten

5     years ago?

6          MS. BOSMAN:  No, that's why she

7     sat here and read it ten minutes ago.

8     A.     Yes, any employee represented by a

9  collective bargaining unit and by employees who are not

10 represented by a collective bargaining unit.

11     Q.     Thank you.  Now turning your attention

12 again to Plaintiff's Exhibit KJ 1, can you identify

13 that for the record?

14     A.     Equal Employment Opportunity.

15     Q.     And is that a policy of the County of

16 Rensselaer?

17     A.     It appears to be, yes.

18     Q.     And is that the policy that was in effect

19 during the time frame between 2008 through 2012, let's

20 say?

21     A.     I don't know.  There are no dates on this.

22 And that date says 2012, June 20, 2012.  So it was

23 apparently in effect on that date.

1       Q.      Is that a policy that your office

2  publishes, amends, puts forth?

3       A.      It would be in the Human Resources

4  Department but, yes, it's likely that would come out of

5  the Executive Office.

6       Q.      And is that the only policy with respect

7  to discrimination?

8       A.      I don't know, to tell you the truth.

9       Q.      Is that your discrimination policy at

10 least in effect in September of 2012?

11      A.      I believe it is.

12      Q.      And does that policy make reference to

13 retaliation?

14              MR. BAILEY:  You're being asked

15              whether the document in front of you

16              makes reference to retaliation.

17      A.      I thought when I read through it earlier I

18 had seen it, but I'm not seeing it now.  So I'm trying

19 to carefully look through it again.

20      Q.      Okay.  Take your time.

21      A.      I'm not seeing retaliation.

22      Q.      Does the county Sheriff's Department have

23 a separate discrimination policy from the county

1    generally?

2         A.    I don't know.

3         Q.    Would the Sheriff's Department be

4    permitted to adopt their own discrimination policy

5    separate and apart from that of the county?

6         A.    I don't know.

7         Q.    When it says, "Affirmative Action is a

8    policy objective of Rensselaer County..." what does

9    that mean?

10        A.    That means the county wants to see that

11   happen.

12        Q.    So what is the goal of the Affirmative

13   Action?

14        A.    That people are not discriminated against in

15   any hiring, promotional, employment opportunity based

16   on religion, creed, sex, nationality, race, et cetera.

17        Q.    Are there hiring goals or retention goals

18   with respect to race, color, religion, sex, age, it

19   says natural origin.  I think that's a typo, right?

20   It's not supposed to say "natural origin," is it?

21        A.    I wouldn't think.  I would think it be

22   national origin.

23        Q.    I do, too.  So are there hiring or

1  retention goals with respect to any of those protected

2  characteristics in the County of Rensselaer?

3      A.    No, not that I've been aware of since I've

4  been the County Executive.

5      Q.    And you're not aware of any separate

6  retaliation policy concerning participation in

7  complaints or supporting a complainant in complaints

8  of discrimination?

9      A.    Well, I believe that's a federal requirement

10 or federal law.

11     Q.    I'm talking about --

12     A.    County policy.

13     Q.    -- your county policy?

14     A.    No, not that I'm aware of.

15     Q.    So the county does not have a policy with

16 respect to retaliation?

17           MR. BAILEY:  Object to the form.

18     A.    Well, again, we're governed by federal and

19 state laws that would apply.

20     Q.    Is the County of Rensselaer obligated to

21 inform its employees with respect to expectations

22 concerning conduct and behavior in the work place?

23           MR. BAILEY:  Object to the form.

1          You can answer.

2     A.    Yes.

3     Q.    And would that include informing them

4 concerning discrimination on the basis of national

5 origin, ethnic origin, religion, color, race, sex --

6     A.    Um-hum.

7     Q.    -- all of those things?

8     A.    Um-hum.

9     Q.    Yes?

10    A.    Yes.

11    Q.    And would that also include informing them

12 with respect to the illegality of retaliation for

13 complaining about discrimination?

14    A.    Yes.

15    Q.    And does the Department of Human Resources

16 update that policy or does your office do that?

17    A.    I don't think it's been updated.  But I

18 believe if it was to be updated it would need my

19 authorization and potentially the county legislature's

20 authorization.

21    Q.    When's the last time you did a review of

22 the equal employment opportunity policies for the

23 County of Rensselaer?

1      A.      I haven't done it, so I don't know when the

2  last review would be.

3      Q.      Handing you what has been marked as

4  Exhibit KJ 2, could you identify that for the record?

5      A.      It's a letter to Brian Goldberger from

6  Russell Denea, D-E-N-E-A.

7      Q.      What is the date of that document?

8      A.      May 3rd, 2013.

9      Q.      Do you know what that document is?

10     A.      No, I don't.

11     Q.      Do you know who that doctor is?

12     A.      No, I do not.

13     Q.      Could you turn to the second page of that

14  exhibit?

15     A.      Um-hum.

16     Q.      What is on the second page of that

17  exhibit?

18     A.      It's a letter to Brian Goldberger from

19  Russell Denea, M.D., regarding James Karam.

20     Q.      And does that report have a date on it?

21     A.      The letter is dated May 1st, 2013.

22     Q.      Does it reference an interview and/or

23  examination of my client by Dr. Denea?

1      A.      Yes, um-hum.

2      Q.      What is the day that Dr. Denea examined my

3    client?

4      A.      March 22nd, 2013.

5      Q.      So he's sending the report in May to Mr.

6    Goldberger, correct?

7      A.      Correct.

8      Q.      Was there more than one report sent by Dr.

9    Denea to the county?

10     A.      I have no idea.

11            MS. BOSMAN:  For the record, I'm

12            demanding any other copies that exist

13            of Dr. Denea's report.  My

14            understanding is that is the second

15            one.

16     Q.      Do you know when the examination was

17    requested?

18     A.      No.

19     Q.      Is there any standard within the county

20    with respect to how soon an examination is requested

21    by the county for an applicant for 207-c benefits?

22     A.      I have no idea.

23     Q.      Would you agree with me that that would be

1    a good thing to have?

2                    MR. BAILEY:  Object to the form.

3        A.    I can't really comment on the Sheriff's

4    Department operations and 207-c because it's not

5    something that I have knowledge of.

6        Q.    But I thought that's why you used Mr.

7    Goldberger as your legal counsel?

8        A.    Mr. Goldberger and Tom Hendry are available

9    to the Sheriff's Department, but I don't get involved

10   in the Sheriff's Department 207 issues.

11       Q.    Does the County Executive's office have

12   the duty and obligation to enforce state law?

13                   MR. BAILEY:  Objection to the

14                   information.  It calls for a legal

15                   conclusion.

16       Q.    For employees for the county?

17                   MR. BAILEY:  Object to the form.

18                   Calls for a legal conclusion, but go

19                   ahead.  You can answer.

20       A.    If an employee violates state law?  Is that

21   what you're asking?

22       Q.    No.  Earlier you testified that your

23   Director of Human Resources has an obligation to

1    enforce the policy and the EEOC nondiscrimination and

2    state law, and I think you even said federal law to

3    make sure they comply, right?

4         A.    Um-hum.

5         Q.    Yes?

6         A.    Yes.

7         Q.    And they're under your supervision,

8    correct?

9         A.    Yes, um-hum.

10        Q.    And 207-c is a state law, correct?

11        A.    Yes.

12        Q.    So if an employee makes an application for

13   207-c benefits and there is no schedule that is

14   followed by the county, how is an employee supposed to

15   know when or if they have been overlooked?

16             MR. BAILEY:  Object to the form.

17        A.    I don't know.

18        Q.    Would you agree with me it would be a good

19   thing to have a procedure that is set forth in writing

20   so that employees know what to expect when they make

21   application for 207-c benefits from the County of

22   Rensselaer?

23             MR. BAILEY:  Object to the form.

1      A.    Yes, if that's practical.

2      Q.    And in what way would it not be practical?

3      A.    I don't know because I don't know what the

4 process is for 207-c.

5      Q.    Does the county expend moneys to evaluate

6 employees for work related injury?

7      A.    I don't know but I would expect so.

8      Q.    And was Dr. Denea paid to evaluate and

9 examine my client?

10      A.    I don't know.

11      Q.    Have you ever seen the bills from doctors

12 who examined or evaluated 207-c applications?

13      A.    No, I have not.

14      Q.    You've never seen any budget line items or

15 expenses related to that sort of thing?

16      A.    The 207-c line that I see in the budget has

17 to do with people on 207-c.

18      Q.    So the administrative costs for the 207-c

19 program are not included in that line item on the

20 budget?

21      A.    They're not included in the personnel budget

22 where the 207-c line is.

23      Q.    Where is the 207-c administrative cost

1    included in the budget?

2         A.    I don't know.

3         Q.    What are the administrative costs of the

4    207-c program?

5         A.    I don't know.

6         Q.    May I have the exhibit?

7         A.    (Proffered.)

8         Q.    On Exhibit KJ 2 it indicates, in the cover

9    letter to Mr. Goldberger, that Dr. Denea is enclosing

10   the consultation report regarding James Karam and a

11   statement for charges for the consultation is also

12   enclosed.

13              MS. BOSMAN:  I don't know why we

14              don't have that but we want that.  So

15              we're requesting the statement for

16              charges for the consultation from Dr.

17              Denea regarding Mr. Karam as set forth

18              in Exhibit KJ 2.

19              MR. BAILEY:  Put it in a Discovery

20              Demand and we'll respond to it.

21              MS. BOSMAN:  I'll send you a copy

22              of the transcript.  You can read it.

23         Q.    Exhibit KJ 3 for your perusal, Ms. Jimino.

1    Do you know what that document is?

2        A.    Rensselaer Country Correctional Facility

3    Incident Report.

4        Q.    Have you ever seen a document like this

5    before?

6        A.    I don't believe so.

7        Q.    If you turn to the second page of the

8    Exhibit KJ 3.  I know it's double sided, so it would

9    technically be the third page.  What is that document?

10       A.    Individual Psychological Evaluation.

11       Q.    And what the date of the evaluation?

12       A.    October 8th, 2012.

13       Q.    And if you turn to page seven of that

14    document, who is it that apparently signed that

15    document?

16       A.    Richard E. Ovens, O-V-E-N-S.  Psychologist.

17    Psychiatrist.  I'm not sure.  Psy, P-S-Y, D.

18       Q.    I think it indicates he is a licensed

19    clinical psychologist?

20       A.    It does that say that.

21       Q.    The following page appears to be another

22    document.  Do you recognize that?

23            MR. BAILEY:  Let's make sure.  Is

1          it this?  (Indicating.)

2              MS. BOSMAN:  Yes.  They're all in

3          the same order.

4     A.    Yes, Capital Care.  It's a note from Capital

5  Care Medical Group indicating that James Karam is out

6  of work until further notice.

7     Q.    Okay.  And that's dated September 4th,

8  2012, correct?

9     A.    Correct.

10     Q.    And then the next document in the exhibit

11  is what?

12     A.    Rensselaer County, Office of the Sheriff,

13  Employee Injury/Illness Due Process Review Application.

14     Q.    What is the date that is indicated on the

15  top line, number three, of that application?

16     A.    October 31st, 2012.

17     Q.    And if you take a look at the last page of

18  that, not the medical release but the last page of the

19  application, do you see that?

20     A.    Page four on the top.

21     Q.    Yes.

22     A.    Okay.  Um-hum.

23     Q.    And the date of that report as it's

1    denominated is what?

2          A.    October 31st, 2012.

3          Q.    And then there is a Notary Public stamp at

4    the bottom, correct?

5          A.    Correct.

6          Q.    And that indicates what date?

7          A.    November 5th, 2012.

8          Q.    Now turning to the very last page of the

9    exhibit.   This appears to be a medical release,

10   correct?

11         A.    Correct.

12         Q.    And this is signed on what date?

13         A.    On top it's October 31st, 2012, and on the

14   bottom it's November 5th, 2012.

15         Q.    Well, I think on the top it indicates the

16   illness was reported on October 31st, 2012, correct?

17         A.    Yes.   It was reported on the date of

18   10/31/12.

19         Q.    And signed on November 5th, 2012, correct?

20         A.    Correct.

21         Q.    Okay.   So are you familiar with the 207-c

22   application as represented by KJ 3?

23         A.    No, I'm not.

1     Q.    May I have the exhibit?

2     A.    (Proffered.)

3          MS. BOSMAN:  Oh, I've got to go

4          back.  I'm sorry.  The first page of

5          Exhibit KJ 3, I think we did this off

6          the record, Mr. Bailey.  It indicates

7          the signature of supervisory staff

8          member and signature of operational

9          lieutenant both of which are blank.

10         For the record we're requesting any

11         documents that were actually signed

12         indicating they were reviewed by

13         either the supervisor, watch commander

14         or the operational lieutenant.  Okay.

15     Q.    So in November of 2013 when you received

16 or became aware of -- I guess the grievance was 2012.

17 The 2012 class action grievance form, November 30th,

18 2012.  Do you know why Mr. Karam was not being allowed

19 to receive contributions of sick leave from employees

20 in Rensselaer County?

21     A.    No.  That would have been the sheriff's

22 decision.

23     Q.    And the sheriff is permitted to make

1    decisions with respect to employee benefits, policies,

2    without scrutiny by your office or Human Resources?

3         A.    So long as it complies with the policy or

4    law.

5         Q.    What is the process by which your office

6    or Human Resources reviews those policies or actions

7    as implemented by the sheriff to determine whether or

8    not they're in conformance with county policy or law?

9         A.    Well, in this instance it would have been

10   during the grievance process that I would have looked

11   at it.

12        Q.    And what was the result of that review?

13        A.    I don't know.

14        Q.    Did you ever receive a report from anyone

15   from Human Resources regarding donated sick leave or

16   207-c or anything with that --

17        A.    No.

18        Q.    -- with regard to Mr. Karam specifically?

19        A.    No.

20        Q.    Anything with respect to employees

21   generally?

22        A.    In regard to 207, no.

23        Q.    How about in regard to the sick bank

1   donations?

2       A.      I think I saw a report during negotiations

3   as to how much time in total had been donated over the

4   course of the lifetime of the sick bank.  That's, I

5   believe, the only thing I saw in writing with regard to

6   the sick bank.

7       Q.      Were you concerned about -- well,

8   withdrawn.  Did you know that Mr. Mahar suspended sick

9   leave donations entirely for the Sheriff's Department?

10      A.      I understood that they were not being

11  continued but I thought it was a contract issue.  I

12  thought the contract provision had expired.

13      Q.      Why did you think that?

14      A.      Because it was at -- I believe that it

15  happened at the time at the end of a contract.  And the

16  contract doesn't expire -- any terms within the

17  contract that are dated would have expired.

18      Q.      But the document was from November of

19  2012, correct?

20      A.      I don't know which document you're talking

21  about now.

22      Q.      I'm talking about the first page of

23  Exhibit KJ 4?

1      A.     Yes.  November, 2012.

2      Q.     Okay.  So it's your testimony that you

3  knew that Sheriff Mahar had across the board denied

4  people leave donations?

5      A.     That he had suspended the sick bank,

6  correct.

7      Q.     Did you do anything in response to that?

8      A.     No, I did not.

9      Q.     Why?

10      A.     Because the sheriff is a separately elected

11  official and if he wants to run the department that

12  way, then that's his choice.  Again, it was my

13  understanding or thought process.  I don't know.  I

14  can't say.  But it was my understanding, my thought

15  that his contract had come to an end and, therefore, he

16  was not going to be doing that anymore, the sick bank.

17      Q.     Did you talk to him about it?

18      A.     No, I did not.

19      Q.     Who is it that gave you that information

20  regarding it's a contract issue?

21      A.     I don't know.

22      Q.     Is there a board that is appointed by you

23  to evaluate and assess sick leave donations?

1      A.      I don't know.

2      Q.      Did you appoint a board to review sick

3  leave donations in the Sheriff's Department?

4      A.      No.  If there was a board at all, and I

5  can't recall whether we had one or not, I know there

6  was talk about one.  It would have been under the UPSEU

7  contract.  So that would not have affected other than

8  those people in the civil office.

9      Q.      So the policy that you signed in 2003,

10  even though it says it applies to both union and

11  non-union employees, it's your belief that subsequent

12  to that that any administration of that policy would

13  only be relevant to the union?

14      A.      No.  I'm saying that those that were exempt

15  under the County Executive Department certainly would

16  be something that we would review.  But anything that

17  was under the Sheriff's Department, anything that was

18  under the District Attorney's Department that they

19  would have to be responsible for those.  The County

20  Clerk being separately elected, it was up to them to

21  make arrangements.

22      Q.      Except your Human Resources Department

23  would be responsible to ensure that they complied with

1  policy, local law, state law and federal law, right?

2          MR. BAILEY:  Object to the form.

3      Q.    Is that correct?

4      A.    Yes.

5      Q.    Did your Human Resources Department do

6  anything to determine whether, in fact, the sheriff

7  had violated either policy or law?

8      A.    I don't know.

9      Q.    Let's assume for a moment that the sheriff

10 denied Mr. Karam the donated sick leave that was

11 designated for him.  Would that be acceptable under

12 the county policy?

13         MR. BAILEY:  Object to the form.

14     A.    If there was a question about whether or not

15 he was sick, then that would be something.  But

16 otherwise, no.

17     Q.    So if the sheriff believed that he was

18 malingering and pretending to be sick when he wasn't

19 really sick?

20         MR. BAILEY:  Object to the form.

21     A.    No.

22     Q.    Well, what do you mean if there was a

23 question if he was sick?

1      A.    If there was a question of whether or not

2  they were sick.  Policy requires a person be sick and

3  then the donations can be made.

4      Q.    Right.  So was there ever any question to

5  your knowledge that Mr. Karam was sick?

6             MR. BAILEY:  Object to the form.

7      A.    I don't know.

8      Q.    Okay.  So let's assume that Mr. Mahar

9  denied my client donations of sick leave and he was

10  actually sick.

11      A.    Okay.

12      Q.    Would that be contrary to county policy?

13             MR. BAILEY:  Object to the form.

14      A.    Because it is in the Sheriff's Department

15  and because Mr. Karam is an exempt employee, I would

16  have to look at it again.

17             MR. BAILEY:  A.J., when it's a

18             convenient time I need to take a

19             break.

20             (A short recess was taken.)

21      Q.    Did you review any interrogatory or

22  document requests in this action?

23      A.    Did I?

1    Q.    Yes.

2    A.    No.

3    Q.    Do you know who Cliff McClain is?

4    A.    I believe he works in the Sheriff's

5    Department in their maintenance.

6    Q.    Is he in the union?

7    A.    I don't know.

8    Q.    For the record, the responses that we

9    received with respect to those persons who applied

10   for, sought to use donated sick leave between 2003 to

11   the present include Cliff McClain which, I understand,

12   is a person who is not in the union.  Do you know of

13   any reason why Mr. Karam would be denied donated sick

14   leave?

15            MR. BAILEY:  Object to the form.

16   A.    No, I do not.

17   Q.    I'm going to return for a moment with

18   respect to the questions we had earlier in regard to

19   your call to Mr. Mahar regarding Mr. Rodgers'

20   employment.

21   A.    Um-hum.

22   Q.    And that series of questions we spoke

23   about an individual recommending or putting a word in

1    for an applicant for a job.  Do you recall that

2    testimony?

3          A.     Yes, um-hum.

4          Q.     Now, do you know why the civil service

5    system was set up, that testing system was set up?

6          A.     It's my understanding it was set up so that

7    there wasn't going to be, there weren't going to be

8    jobs given to people who were not qualified for the

9    position.

10         Q.     And what was the basis that that was an

11   issue, do you know?

12         A.     No, I do not.

13         Q.     Do you have any knowledge with respect to

14   the history of civil service or public employment jobs

15   going to persons who are friends, relatives or

16   favorites of political leaders or persons in power?

17                MR. BAILEY:  I object to the form.

18         A.     Do I have any knowledge of the history of

19   it?

20         Q.     Yes.

21         A.     Not much, no.

22         Q.     So did you at any time put in a word for

23   or recommend any other candidates at the Sheriff's

1    Department for employment?

2         A.    Yes, I'm sure I did.   There was a relative

3    of one of the committee people out in Pittstown whose

4    grandson-in-law was on the list.   My own son-in-law

5    works down there and I have asked the sheriff to

6    consider him for part of the transition team which he

7    did.   There was someone else that I went to church with

8    whose son was on the correction officer list, and I

9    asked the sheriff to consider him.

10        Q.    Was he hired?

11        A.    Yes.   There was one of the chefs down there,

12   two of the chefs actually I recommended, or cooks down

13   there are people that I had recommended.   I think that

14   may be it.

15        Q.    The son-in-law --

16        A.    Um-hum.

17        Q.    -- that you recommended, that's your

18   son-in-law?

19        A.    Yes, that's my son-in-law.

20        Q.    The cook you recommended is his father?

21        A.    That's correct.

22        Q.    When did you make those recommendations

23   for employment?

1     A.     My son-in-law was probably around 2003,

2  2004, I think.  They were married in '05 and I know he

3  went on before that.  His father was within the last

4  three years, I would say.

5     Q.     And you talked about a transition team.

6  What is a transition team?

7     A.     The transition team was when the jail was

8  expanded, there was a group working on that expansion

9  every day.  So they were pulled out of the correctional

10  facility to work in the construction trailer and to

11  work in the facility as it was being built up.

12     Q.     So in your mind then the recommendations

13  that they hire, that Jack Mahar hire these individuals

14  that you've named that you've identified including Mr.

15  Rodgers, what is it that entitles them to special

16  consideration over individuals who have taken the

17  civil service exam and scored high enough to be in

18  consideration?

19          MR. BAILEY:  Object to the form.

20     A.     They, themselves, have to have taken the

21  exam and be reachable.  So there is nothing that gives

22  them anything over anybody else.  They are on the list

23  just as well as everybody else.  Although I don't know

1  that the cook requires a test.  But he's somebody that

2  has to, nonetheless, meet the requirements of the

3  position.  And I also make the advisement to anybody

4  that if somebody is not doing the job, or is not

5  qualified for the job, then there is no obligation on

6  anybody's part to hire them, to keep them, whatever.

7      Q.    But they could just transfer them to a

8  different job?

9      A.    Or get rid of them from county government.

10     Q.    Pardon?

11     A.    Or get rid of them from county government

12 which happens.  We asked for people to be considered.

13 They're hired.  If they're not working out within the

14 six month period, probationary period, they're gone.

15     Q.    Anyone that you recommended have that

16 happen?

17     A.    Yes.

18     Q.    Who was that?

19     A.    I don't know the person who it was.  It was

20 someone in Social Service.  They were not working out.

21 We extended their probation period for three months and

22 they still didn't work out.

23     Q.    Why did you recommend that?

1    A.    Because it was somebody that I knew.  They

2    said, I'm interested in something in county government.

3    They were on the list or because they were qualified to

4    take the exam.  And I say this is someone I know and

5    I'd appreciate it if you would give them an interview.

6    Q.    Why would any candidate who you knew or

7    somebody that you knew deserve or why should they

8    benefit from your office as opposed to anyone else not

9    lucky enough to know you?

10              MR. BAILEY:  A.J., again I object

11              to the form.  I don't know how that

12              remotely relates to this lawsuit.  But

13              if you I can answer, Kathy, go ahead.

14    A.    Again, it's not as though I know every

15    single one whose name I'm passing along.  However,

16    pretty much anybody who asks me, I will try to help

17    them out.  I have an E-mail on my phone right now from

18    a woman who used to work for the county.  She has a

19    nephew relocating to the county.  She wants to know if

20    there's any chance of him getting a job out of the Van

21    Rensselaer Manor Nursing Home.  I'll pass the name

22    along.  If they have an opening, then would they

23    consider interviewing him.  If he is qualified and has

1    a good interview, they may hire him.  There's no

2    obligation on anybody's part, though, for them to be

3    hired.  In fact, there was a case in the Highway

4    Department where somebody I recommended was, in fact,

5    not hired because he didn't have as much experience and

6    qualifications as somebody else that was more needed in

7    the Highway Department.

8         Q.    So you're confident that these department

9    heads can exercise independent judgment even in spite

10   of the request or your influence?

11        A.    They have, yes.

12        Q.    Did Mr. Mahar's wife work for you?

13        A.    She works in the Mental Health Department.

14        Q.    Did she work for you before the Mental

15   Health Department?

16        A.    In a billing department which is Mental

17   Health Finance Cooperative.

18        Q.    So she worked for you in billing at one

19   time?

20        A.    Yes.  Um-hum.

21        Q.    Where did she work before she worked for

22   you in billing?

23        A.    She worked in the Motor Vehicle office.

1    Q.    Why did she leave the Motor Vehicle

2    office?

3    A.    She was looking for something knew.  She

4    didn't want to keep working there.

5    Q.    So she left that position voluntarily?

6    A.    Yes, um-hum.

7    Q.    Why did she leave the billing position?

8    A.    She's still in the billing position.  She's

9    just in Mental Health as opposed to the Joint Billing

10   Unit.

11   Q.    Why was she moved from the Joint Billing

12   Unit?

13   A.    I don't know really.  I don't recall whether

14   it was a promotion or different work load.  I really

15   don't remember the circumstances of why she moved from

16   the one to the other.

17   Q.    Did she take the civil service exam?

18   A.    I believe she did in both Motor Vehicle and

19   the billing unit.

20   Q.    Did she fail those exams?

21   A.    I know she failed one in the billing unit.

22   Q.    As a result of her failing that exam, was

23   she no longer qualified for the position?

1       A.      She would have been no longer qualified for

2  the position, um-hum.

3       Q.      Who is it that moved her to Mental Health?

4       A.      Well, it would have been either the Mental

5  Health Department or Finance Department that oversaw

6  the billing that collaborated to remove her.

7       Q.      Did you request she be considered in the

8  Mental Health Department?

9       A.      I don't know that I did, but certainly had

10 requested that she be considered for the Billing Unit.

11      Q.      Did Mr. Mahar ask you to make that

12 reference or recommendation?

13      A.      Yes, he did.  Um-hum.

14      Q.      And did you?

15      A.      Yes, I did.  Um-hum.

16      Q.      Once you received the Complaint in this

17 action, you didn't read that I think you told me,

18 right?

19      A.      Correct.  Um-hum.

20      Q.      And are you aware of the allegations of

21 Mr. Karam regarding discrimination on the basis of his

22 ethnic origin?

23      A.      I had heard of that, um-hum.

1      Q.      What have you done to make inquiry

2   concerning his allegations?

3      A.      I haven't done anything.

4           MS. BOSMAN:  I have nothing

5           further.  Thank you.

6           MR. KEACH:  Very briefly.  I just

7           want to firm up.

8   **EXAMINATION BY MR. KEACH:**

9      Q.      When it comes to deciding who does or does

10  not receive 207-c benefits, who are the people in the

11  county government who make that decision?

12     A.      I believe it is the sheriff, but I do not

13  know the process.  So I don't know if it's the

14  sheriff's decision or outside doctor's decision.  I

15  don't know.

16     Q.      Okay.  And so you don't know, is it fair

17  to say, what role my client, Ruth Vibert, played in

18  any of those decisions about the 207-c benefit,

19  correct?

20     A.      Correct.

21     Q.      I also want to confirm, and I believe this

22  has came out, but not as concisely as I would have

23  been able to get it.  You have no personal involvement

1  in any of the allegations in this lawsuit about how

2  Mr. Karam was treated in the Sheriff's Department, am

3  I right about that?

4           MS. BOSMAN:  Objection to form.

5       Q.    There's an allegation Mr. Karam was

6  discriminated against because of his Lebanese

7  heritage.  Do you know anything about that?

8       A.    I only have heard rumors since the lawsuit

9  was filed.

10      Q.    Okay.  That's not something you

11 participated in or knew anything about before this

12 lawsuit came to be, correct?

13      A.    That's correct.

14      Q.    And there's also the claim that Mr. Karam

15 may have been discriminated against because of his

16 involvement in investigations within the Sheriff's

17 Department.  Do you know anything about that?

18      A.    No, I do not.

19      Q.    Now, you indicated previously there is an

20 ongoing investigation into the medical records issue?

21      A.    Yes.

22      Q.    And that is being conducted by whom, if

23 you know?

1    A.    It's my understanding the sheriff's office

2  is doing that.

3    Q.    Okay.

4    A.    I don't know if there are other law

5  enforcement agencies involved.

6    Q.    Now, you also, is it fair to say, have no

7  ability to supervise the Office of the Sheriff because

8  the Office of the Sheriff is an independently elected

9  entity under New York law.  Am I right about that?

10         MS. BOSMAN:  Objection to form.

11   A.    Yes, that's correct.

12   Q.    I want you to assume the Sheriff's

13  Department would do something you don't like, that you

14  don't feel is appropriate.  Is there anything you can

15  do besides talk to the sheriff and indicate your

16  displeasure?

17         MS. BOSMAN:  Objection.

18   A.    No, that's about it.

19   Q.    Okay.  And I think it's fair to say that

20  when you -- the way you have to deal with these

21  problems is when they wash up, when they're brought to

22  your attention when the county is sued and there's a

23  problem, is that fair to say?

1     A.     Correct.

2     Q.     Now, there was a lot of discussion about a

3 gentleman by the name of Kevin Rodgers.  Is that the

4 gentleman who was the head of the union for the

5 correction officers, am I right about that?

6     A.     I think he was the vice-president of SEARCO

7 union.

8     Q.     And there's some allegations Mr. Rodgers

9 was involved in some financial improprieties in

10 running the union, am I correct on that?

11     A.     That's what I've read in the newspaper, yes.

12     Q.     Did you play any role in the decision to

13 deny Mr. Karam being able to receive sick leave from

14 other employees in Rensselaer County Jail?

15     A.     No, I did not.

16     Q.     And you didn't -- did you care either way

17 if somebody wanted to donate sick time to him?

18     A.     Made no difference to me.

19     Q.     And the decision was also, to your

20 knowledge, made by the sheriff?

21     A.     It's my understanding, yes.

22     Q.     Now, have you ever talked with the sheriff

23 about the allegations in this case relative to Mr.

1  Karam?

2      A.    I don't believe I have other than the fact

3  that it had been filed, the lawsuit.

4      Q.    Now, in the interest of full disclosure, I

5  represent Ruth Vibert in her lawsuit against the

6  county.  And, obviously, Miss Bosman brought that up

7  today so I feel compelled to briefly follow-up about

8  that.  You detailed you had a conversation with the

9  sheriff when Mrs. Vibert was terminated from

10  employment where the sheriff said to you, words or

11  substance, that she wasn't, she didn't meet the

12  standards of the job.  Am I right that's what you

13  stated?

14      A.    She didn't meet the requirements of the job.

15      Q.    Okay.  Did you have any other

16  conversations with Sheriff Mahar about Mrs. Vibert's

17  situation beyond where he said to you, in words or

18  substance, that she didn't meet the requirements of

19  the job?

20      A.    I don't believe so.

21      Q.    And did you play any role in the decision

22  to terminate Mrs. Vibert's employment?

23      A.    No.

1    Q.    Have you played any role in the

2  investigation relative to the health records that Mr.

3  Karam also was involved with?

4    A.    No.

5              MR. KEACH:  That's all.  Thank

6              you.

7              MS. BOSMAN:  I just have a couple

8              follow-up questions.

9  **EXAMINATION BY MS. BOSMAN:**

10   Q.    Who is the top administrator for the

11 County of Rensselaer?

12             MR. BAILEY:  Who is what?

13             MS. BOSMAN:  Top administrator?

14             MR. BAILEY:  Object to the form.

15   A.    I think for most of the county it would be

16 me.

17   Q.    And you also supervise and oversee the

18 Personnel Department, correct?

19   A.    Human Resources, yes.

20   Q.    And that's the same as Personnel?

21   A.    Yes.

22   Q.    They hire?

23   A.    They complete the paperwork for hiring.

1    It's the departments that interview and determine who

2    to hire.

3         Q.    So the department sends over who they want

4    to hire, and the Personnel Department sets up payroll

5    and does all of that intake sort of thing?

6         A.    Yes.  Um-hum.

7         Q.    And the Personnel Department fires?

8         A.    No, the individual department would.

9         Q.    And so they notify the Personnel

10   Department and the Personnel Department does the

11   paperwork necessary for termination?

12        A.    The department does the paperwork for

13   termination and sends it to the Human Resource

14   Department.

15        Q.    Does the Human Resources Department

16   maintain statistics or make reports with respect to

17   your goal of affirmative action?

18        A.    I don't know that they do.  I don't believe

19   I've seen any.

20             MS. BOSMAN:  Nothing further.

21             MR. BAILEY:  While we're on the

22        record, A.J., if you want documents

23        from me, please put it in a document

1       so I know what you want.

2           MS. BOSMAN:  I have to get the

3       transcript in order to provide that.

4       But I'll make an effort to get that

5       and send it back to you.

6           MR. KEACH:  I would like the

7       original deposition exhibits affixed

8       to the transcript.  I'm not sure what

9       I got copies of and what I didn't.

10          MS. BOSMAN:  You just got KJ 3.

11          MR. KEACH:  All right.  I just --

12      I don't have any problem with that.

13      Mrs. Jimino is not my witness but I

14      would like all the originals attached

15      and I will get a copy at some point.

16      And also, even though Mrs. Jimino's

17      not my witness, I assume she's

18      reserving her right to read and sign

19      the transcript.

20          MR. BAILEY:  Yes, of course.

21          (Whereupon the deposition was

22      concluded at 3:32 p.m.)

23              *       *       *       *

# I N D E X   O F   E X H I B I T S

Plaintiff's
Exhibit                    Description                        Page

  KJ 1           Equal Employment Opportunity              87
                 Policy - three pages

  KJ 2           Letter and report, Dr. Russell            87
                 Denea -- seven pages

  KJ 3           Incident Report and attachments
                 14 pages                                  87

  KJ 4           UPSEU Grievance Form and
                 attachments - four pages                 114

# I N D E X   O F   E X A M I N A T I O N

Examination by A.J. Bosman, Esq.                             4

Examination by Elmer R. Keach, III, Esq.                   156

Examination by A.J. Bosman, Esq.                           140

# D O C U M E N T   D E M A N D S

Copies of all Dr. Denea's reports                          132

Consultation report of Dr. Denea and statement
 of charges                                                136

Documents signed and reviewed by supervisor,
 watch commander or operational lieutenant                 140

**INDEX TO CERTIFIED QUESTIONS**                                    Page

Q    What did he say?                                              55


Q    Did Mr. Goldberger have, at the time that

he spoke with you regarding my client's

illness obtain a medical release from my client?    64


Q      What did you tell him?                                      88

# ERRATA SHEET

Page ___ Line ___ From This _____

To This _____

Reason for change _____

Page ___ Line ___ From This _____

To This _____

Reason for change _____

Page ___ Line ___ From This _____

To This _____

Reason for change _____

Page ___ Line ___ From This _____

To This _____

Reason for change _____

Page ___ Line ___ From This _____

To This _____

Reason for change _____

Page ___ Line ___ From This _____

To This _____

Reason for change _____

Page ___ Line ___ From This _____

To This _____

Reason for change _____

Page ___ Line ___ From This _____

To This _____

Reason for change _____

_____ No changes needed.

_____
Signature of Deponent/Witness

Sworn to before me this _____ day of _____, 2

_____
Notary Public State of New York

STATE OF NEW YORK

SS:

COUNTY OF _____


        I have read the foregoing record of my

testimony taken at the time and place noted in the

heading hereof and I do hereby acknowledge it to be a

true and accurate transcript of same.



                    _____

                       **KATHLEEN JIMINO**




Sworn to before me this

_____ day of _____, 2014.



_____
    Notary Public

# C E R T I F I C A T E

STATE OF NEW YORK

COUNTY OF ALBANY

I, Mary Ellen Tardiff, shorthand reporter, a
notary public within and for the State of New York,
duly commissioned and qualified, do hereby certify
that **Kathleen Jimino** was duly sworn by me to
testify to the truth in the cause aforesaid; that
the testimony then given was reduced by me to
stenotype in the presence of said witness,
subsequently transcribed into English text and that
the foregoing is a true and accurate transcript of
the testimony so given.

I do hereby certify that her testimony was taken
**December 23, 2014,** at the place as specified in the
foregoing caption.

I do hereby further certify that I am not a
relative, counsel or attorney of any party or
otherwise interested in the outcome of this action.

Witness my hand this 15th day of January,
2015.


MARY ELLEN TARDIFF

Notary Public for State of New York
Commissioned in Albany County
My commission expires 11/07/2018.
UID 01TA4943991

**$**

$100,000 [1] - 15:18

**'**

'05 [1] - 150:2
'80s [1] - 19:3

**1**

1 [6] - 87:1, 111:20, 112:2, 126:12, 164:3
10/31/12 [1] - 139:18
109 [1] - 2:13
11/30/2012 [1] - 114:22
114 [1] - 164:8
12 [1] - 29:1
12205 [2] - 2:10, 2:14
13 [3] - 5:7, 5:19, 120:5
132 [1] - 164:19
13440 [1] - 2:5
136 [1] - 164:20
14 [1] - 164:7
140 [2] - 164:14, 164:22
156 [1] - 164:13
16 [1] - 6:12
16th [2] - 116:1, 120:3
17 [2] - 6:4, 6:5
1978 [2] - 7:5, 7:6
1980s [1] - 19:3
1st [1] - 131:21

**2**

2 [5] - 87:1, 131:4, 136:8, 136:18, 164:5
20 [3] - 19:22, 48:20, 126:22
2000 [3] - 6:3, 21:18, 120:4
2001 [1] - 20:13
2003 [7] - 120:8, 121:2, 122:11, 123:21, 144:9, 147:10, 150:1
2004 [5] - 4:23, 20:8, 82:12, 82:13, 150:2
2008 [1] - 126:19
2012 [21] - 114:23, 117:12, 117:13, 126:19, 126:22, 127:10, 137:12, 138:8, 138:16, 139:2, 139:7, 139:13, 139:14, 139:16, 139:19, 140:16, 140:17, 140:18, 142:19, 143:1
2013 [14] - 6:2, 21:19, 22:1, 116:1, 118:9, 118:23, 120:12, 123:8, 123:14,

123:21, 131:8, 131:21, 132:4, 140:15
2014 [8] - 45:7, 45:16, 46:12, 47:5, 51:22, 54:1, 54:11, 59:1
207 [5] - 34:11, 108:13, 108:14, 133:10, 141:22
207-c [74] - 17:8, 20:17, 30:10, 30:13, 30:16, 31:14, 32:5, 32:8, 32:15, 32:19, 32:22, 33:2, 33:6, 34:12, 34:13, 34:16, 34:19, 35:5, 35:7, 35:8, 35:12, 36:4, 37:9, 38:1, 38:4, 38:21, 39:1, 39:4, 39:6, 54:19, 56:1, 56:4, 56:13, 56:19, 59:6, 59:14, 63:15, 63:21, 64:3, 64:7, 66:3, 66:7, 66:10, 66:14, 66:22, 67:4, 67:10, 83:10, 86:13, 86:17, 86:22, 96:7, 96:9, 96:15, 96:19, 97:5, 108:5, 132:21, 133:4, 134:10, 134:13, 134:21, 135:4, 135:12, 135:16, 135:17, 135:18, 135:22, 135:23, 136:4, 139:21, 141:16, 156:10, 156:18
22nd [1] - 132:4
24 [1] - 4:17

**3**

3 [7] - 87:2, 136:23, 137:8, 139:22, 140:5, 163:10, 164:6
30 [1] - 114:22
300 [1] - 4:13
30th [3] - 117:12, 117:13, 140:17
31 [1] - 4:17
31st [4] - 138:16, 139:2, 139:13, 139:16
3:32 [1] - 163:22
3rd [1] - 131:8

**4**

4 [5] - 114:19, 116:15, 142:23, 164:8, 164:12
40 [1] - 48:20
456-0082 [1] - 2:9
4th [1] - 138:7

**5**

5 [1] - 2:9
500 [1] - 118:21
507 [1] - 2:9
55 [1] - 165:3

**5th** [3] - 139:7, 139:14, 139:19

**6**

64 [1] - 165:8
6599 [1] - 2:4

**7**

70 [1] - 15:17

**8**

87 [3] - 164:3, 164:5, 164:7
88 [1] - 165:11
8th [1] - 137:12

**A**

A.J [7] - 2:5, 31:21, 65:19, 115:8, 146:17, 164:12, 164:14
a.J [3] - 19:19, 152:10, 162:22
ability [3] - 14:2, 103:12, 158:7
able [5] - 14:9, 76:19, 77:8, 156:23, 159:13
absence [3] - 54:19, 90:13, 90:15
acceptable [1] - 145:11
access [1] - 97:20
accessed [1] - 97:18
accredited [2] - 23:15, 23:19
accrual [2] - 124:7, 124:8
accrue [2] - 38:7, 48:15, 48:17
accrued [1] - 38:10
accurate [2] - 122:10, 122:14
accused [1] - 98:19
act [2] - 60:21, 90:13
acted [2] - 59:15, 80:22, 108:6
Action [1] - 128:7
action [8] - 63:15, 114:22, 116:21, 128:13, 140:17, 146:22, 155:17, 162:17
actions [2] - 94:23, 109:22, 141:6
activities [3] - 67:22, 84:3, 84:14
activity [2] - 14:7, 84:1
acts [1] - 61:3
add [1] - 80:11

address [3] - 4:12, 115:18, 122:4
addressed [3] - 8:15, 115:21, 119:23
administration [1] - 144:12
administrative [3] - 135:18, 135:23, 136:3
administrator [2] - 161:10, 161:13
adopt [2] - 21:23, 128:4
adopted [1] - 28:17
advice [4] - 55:15, 89:6, 89:8, 107:8
advise [2] - 101:3, 111:13
advised [4] - 91:17, 95:15, 101:1, 108:2
advisement [1] - 151:3
advises [1] - 111:11
affect [1] - 53:7
affected [2] - 51:17, 144:7
affixed [1] - 163:7
afield [1] - 19:23
age [1] - 128:18
agencies [1] - 158:5
ages [1] - 4:16
ago [10] - 19:22, 26:6, 26:8, 26:9, 27:1, 97:2, 97:3, 97:4, 126:5, 126:7
agree [7] - 62:7, 62:13, 62:20, 63:7, 63:14, 132:23, 134:18
AGREED [5] - 3:4, 3:7, 3:10, 3:13, 3:16
agreement [2] - 41:14, 44:2
ahead [23] - 8:2, 8:8, 16:18, 17:17, 18:4, 20:22, 28:8, 29:12, 36:19, 57:2, 57:13, 58:16, 59:3, 68:1, 83:2, 83:6, 103:4, 106:5, 107:21, 108:22, 110:23, 133:19, 152:13
Albany [3] - 2:10, 2:14, 12:13
alert [2] - 92:1, 118:7
alerted [3] - 91:17, 119:7, 119:11
allegation [1] - 157:5
allegations [10] - 106:8, 107:1, 108:8, 108:11, 108:14, 155:20, 156:2, 157:1, 159:8, 159:23
allocated [2] - 11:1, 20:18
allocations [1] - 17:1
allow [4] - 65:12, 73:12, 113:11, 118:20
allowed [7] - 110:21, 113:18, 117:9, 117:15, 122:21, 140:18
allowing [1] - 62:20
allows [4] - 40:6, 71:23,

77:6, 123:3

**alternatives** [1] - 61:13
**amend** [1] - 21:22
**amended** [1] - 22:1
**amends** [1] - 127:2
**amount** [2] - 15:15, 47:11
**analysts** [1] - 9:2
**AND** [6] - 3:4, 3:7, 3:10, 3:13, 3:16
**annual** [7] - 8:17, 8:18, 15:3, 17:2, 17:14, 17:19, 17:23
**answer** [56] - 8:2, 8:8, 16:18, 17:17, 18:4, 20:22, 29:12, 31:22, 34:1, 35:21, 36:13, 45:13, 45:14, 49:6, 50:22, 51:13, 51:20, 55:2, 55:6, 57:13, 58:11, 59:2, 59:22, 60:1, 62:11, 62:18, 63:12, 63:19, 64:20, 64:21, 67:12, 68:1, 69:6, 69:7, 76:7, 76:17, 84:9, 84:22, 85:19, 86:19, 88:22, 90:4, 103:4, 105:20, 105:21, 106:5, 107:8, 107:14, 107:21, 108:22, 110:23, 116:10, 122:13, 130:1, 133:19, 152:13
**answered** [7] - 25:8, 57:1, 58:15, 79:17, 83:1, 83:5, 108:21
**answers** [1] - 76:20
**anytime** [1] - 39:20
**apart** [2] - 105:4, 128:5
**appeal** [4] - 56:11, 56:14, 56:16, 56:17
**appealed** [2] - 56:6, 56:12
**appear** [3] - 77:12, 120:14, 120:17
**APPEARANCES** [1] - 2:2
**applicable** [2] - 76:10, 124:6
**applicant** [2] - 132:21, 148:1
**applicants** [4] - 74:9, 74:11, 74:13, 74:16
**application** [19] - 38:21, 39:1, 56:4, 56:20, 59:14, 64:7, 66:22, 66:23, 73:16, 82:1, 86:12, 86:22, 108:6, 134:12, 134:21, 138:13, 138:15, 138:19, 139:22
**applications** [7] - 31:14, 35:15, 37:9, 39:4, 39:7, 63:15, 135:12
**applied** [3] - 49:3, 49:8, 147:9
**applies** [4] - 122:19, 124:16, 125:4, 144:10
**apply** [1] - 129:19

**applying** [1] - 86:17
**appoint** [1] - 144:2
**appointed** [3] - 6:16, 77:10, 143:22
**appointment** [1] - 70:20
**appreciate** [1] - 152:5
**apprise** [1] - 109:22
**apprised** [1] - 98:4
**approached** [3] - 87:20, 87:21, 87:22
**appropriate** [4] - 3:18, 13:20, 46:5, 158:14
**approval** [2] - 66:14, 96:20
**approved** [5] - 38:21, 121:13, 121:15, 122:3, 123:20
**Aquario** [1] - 11:23
**Arbitration** [1] - 123:12
**argumentative** [1] - 104:15
**arise** [1] - 91:18
**arm** [1] - 54:6
**arms** [1] - 53:13
**arrangements** [1] - 144:21
**aside** [2] - 123:7, 123:10
**aspects** [1] - 11:19
**assess** [1] - 143:23
**assigned** [1] - 16:4
**assist** [1] - 26:13
**assistants** [1] - 10:1
**Association** [3] - 11:16, 12:5, 12:12
**association** [1] - 11:23
**assume** [6] - 14:18, 118:16, 145:9, 146:8, 158:12, 163:17
**assumed** [1] - 107:23
**attached** [1] - 163:14
**attachments** [2] - 164:6, 164:8
**attended** [2] - 19:18, 25:13
**attention** [3] - 43:7, 126:11, 158:22
**attest** [1] - 80:16
**attorney** [20] - 31:5, 31:8, 31:11, 55:8, 88:13, 89:5, 89:7, 92:19, 97:15, 97:16, 97:19, 105:2, 105:14, 105:16, 105:22, 106:2, 106:10, 107:3, 107:22, 111:11
**attorney's** [2] - 109:20, 144:18
**attorney/client** [1] - 31:23
**attorneys** [1] - 3:5
**attribute** [1] - 18:2
**authorities** [1] - 85:23
**authorization** [2] - 130:19, 130:20
**authorize** [2] - 95:17, 96:1
**automating** [1] - 6:23

**available** [1] - 133:8
**avenue** [1] - 4:13
**Avenue** [2] - 2:10, 2:14
**award** [1] - 66:10
**aware** [22] - 17:18, 18:21, 33:1, 39:3, 39:6, 45:4, 45:17, 46:20, 52:11, 54:15, 55:21, 56:1, 56:3, 61:2, 64:6, 81:9, 95:12, 129:3, 129:5, 129:14, 140:16, 155:20

## B

**B-o-y-l-e** [1] - 116:3
**bachelor's** [1] - 4:19
**background** [2] - 4:18, 80:6
**backtrack** [1] - 112:4
**bad** [1] - 63:6
**Bailey** [2] - 2:9, 140:6
**BAILEY** [163] - 2:11, 8:1, 8:7, 16:17, 17:16, 18:3, 18:20, 19:19, 20:21, 23:16, 23:20, 24:13, 24:17, 24:22, 27:2, 27:9, 27:15, 28:7, 29:11, 30:14, 31:1, 31:21, 32:20, 33:23, 34:18, 35:18, 36:8, 36:15, 36:19, 39:5, 39:11, 40:17, 44:12, 46:9, 46:14, 47:2, 49:5, 50:3, 50:14, 50:20, 51:12, 51:19, 52:3, 52:14, 53:10, 54:2, 55:2, 55:5, 55:8, 55:12, 55:16, 57:1, 57:12, 57:22, 58:10, 58:15, 59:2, 59:22, 60:10, 60:18, 60:23, 61:5, 61:19, 62:5, 62:10, 62:17, 63:1, 63:4, 63:11, 63:18, 64:17, 65:5, 65:17, 66:4, 66:8, 66:15, 66:18, 67:2, 67:5, 67:11, 67:23, 69:5, 70:17, 76:6, 76:16, 77:14, 78:17, 79:16, 81:20, 83:1, 83:5, 84:8, 84:21, 85:7, 85:11, 85:17, 85:19, 86:18, 88:12, 88:20, 88:23, 89:3, 89:10, 89:16, 89:19, 90:1, 95:20, 95:22, 96:4, 102:14, 102:20, 103:3, 103:8, 103:21, 104:14, 104:22, 105:19, 106:3, 107:7, 107:13, 107:20, 108:21, 110:5, 110:11, 110:22, 111:16, 115:4, 116:8, 118:2, 119:14, 121:20, 121:23, 122:12, 124:14, 125:9, 125:14, 125:18, 125:22, 126:3, 127:14, 129:17, 129:23, 133:2, 133:13, 133:17, 134:16, 134:23, 136:19, 137:23, 145:2,

145:13, 145:20, 146:6, 146:13, 146:17, 147:15, 148:17, 150:19, 152:10, 161:12, 161:14, 162:21, 163:20
**Baldwin** [1] - 2:8
**bank** [21] - 40:7, 42:8, 43:17, 46:4, 52:6, 52:15, 52:18, 112:7, 112:14, 112:19, 113:11, 120:8, 121:10, 124:9, 124:23, 125:2, 141:23, 142:4, 142:6, 143:5, 143:16
**banks** [1] - 53:23
**bargaining** [5] - 114:23, 124:10, 124:11, 126:9, 126:10
**based** [11] - 14:7, 34:15, 38:10, 66:10, 68:19, 76:23, 77:9, 103:22, 103:23, 104:2, 128:15
**basis** [13] - 8:17, 8:18, 15:3, 17:2, 17:23, 29:9, 64:6, 77:18, 96:17, 105:10, 130:4, 148:10, 155:21
**Basis** [1] - 55:7
**became** [8] - 20:6, 45:4, 45:16, 55:21, 56:1, 97:16, 114:23, 140:16
**become** [5] - 38:14, 41:20, 56:3, 81:9, 97:14
**becomes** [1] - 38:16
**began** [1] - 45:7
**behavior** [1] - 129:22
**behind** [1] - 61:18
**belief** [1] - 144:11
**benefit** [8] - 42:20, 66:1, 66:3, 67:4, 76:22, 79:14, 152:8, 156:18
**benefits** [21] - 34:8, 59:7, 59:14, 63:15, 64:7, 66:14, 66:22, 67:1, 67:3, 67:8, 67:10, 86:22, 96:7, 96:9, 96:20, 97:5, 132:21, 134:13, 134:21, 141:1, 156:10
**better** [1] - 119:16
**between** [8] - 3:4, 15:17, 48:20, 66:6, 91:3, 123:21, 126:19, 147:10
**beyond** [1] - 160:17
**bill** [1] - 19:14
**billing** [12] - 69:22, 153:16, 153:18, 153:22, 154:7, 154:8, 154:9, 154:11, 154:19, 154:21, 155:6, 155:10
**bills** [1] - 135:11
**bit** [1] - 122:1
**blank** [1] - 140:9
**blogs** [2] - 68:17, 71:13

**board** [4] - 143:3, 143:22, 144:2, 144:4
**Bob** [2] - 25:16, 75:8
**bob** [1] - 75:10
**BOSMAN** [52] - 2:4, 2:5, 4:4, 34:21, 36:11, 45:12, 50:18, 51:1, 55:4, 55:7, 55:10, 55:14, 55:20, 60:12, 63:5, 64:22, 65:20, 85:5, 85:8, 85:15, 87:4, 88:14, 88:21, 89:6, 89:13, 89:17, 89:21, 102:22, 110:13, 114:14, 115:6, 115:12, 125:11, 125:16, 125:21, 126:1, 126:6, 132:11, 136:13, 136:21, 138:2, 140:3, 156:4, 157:4, 158:10, 158:17, 161:7, 161:9, 161:13, 162:20, 163:2, 163:10
**Bosman** [4] - 110:11, 160:6, 164:12, 164:14
**bottom** [3] - 118:10, 139:4, 139:14
**Boyle** [1] - 116:3
**branch** [3] - 40:13, 45:1, 51:23
**break** [1] - 146:19
**Breig** [3] - 9:2, 9:10, 9:13
**BREIG** [1] - 9:3
**Breig's** [1] - 9:15
**Brian** [10] - 54:23, 87:14, 87:18, 88:10, 106:11, 107:3, 107:9, 114:9, 131:5, 131:18
**briefed** [1] - 87:18
**briefly** [2] - 156:6, 160:7
**bring** [4] - 14:2, 14:9, 24:4, 88:18
**bringing** [4] - 14:8, 56:17, 73:13, 81:23
**brings** [1] - 79:9
**brought** [7] - 12:3, 12:4, 24:8, 77:4, 77:9, 158:21, 160:6
**budget** [52] - 8:12, 8:13, 8:16, 8:18, 8:19, 8:22, 8:23, 9:1, 9:2, 9:5, 9:8, 10:19, 10:21, 11:1, 14:19, 15:2, 15:4, 15:7, 16:14, 16:19, 16:20, 16:23, 17:14, 17:19, 17:22, 18:12, 18:13, 18:14, 20:23, 21:4, 21:5, 21:14, 21:19, 21:23, 22:4, 22:5, 22:7, 34:7, 34:9, 34:13, 34:15, 34:19, 35:7, 35:8, 100:13, 103:16, 135:14, 135:16, 135:20, 135:21, 136:1
**Budget** [6] - 9:13, 9:23, 10:6, 21:3, 45:21, 47:18

**building** [1] - 28:2
**Building** [1] - 28:4
**built** [1] - 150:11
**BY** [7] - 2:5, 2:11, 2:15, 4:4, 87:4, 156:8, 161:9

# C

**cache** [1] - 42:17
**cameras** [2] - 11:18, 12:15
**campaign** [7] - 70:11, 70:19, 71:2, 73:5, 75:20, 76:4, 77:1
**candidate** [2] - 77:1, 152:6
**candidates** [3] - 75:15, 76:13, 148:23
**capable** [1] - 32:23
**capacity** [4] - 32:13, 69:22, 95:5, 121:8
**Capital** [2] - 138:4
**caption** [1] - 109:17
**captioned** [1] - 123:11
**care** [1] - 159:16
**Care** [2] - 138:4, 138:5
**carefully** [1] - 127:19
**carried** [1] - 42:20
**cars** [3] - 11:18, 12:15, 22:2
**case** [5] - 40:18, 70:7, 77:5, 153:3, 159:23
**cases** [3] - 30:16, 30:19, 96:15
**category** [1] - 70:9
**caused** [2] - 32:14, 64:11
**caveat** [1] - 80:12
**certain** [5] - 37:4, 48:12, 72:1, 97:18, 121:14
**certainly** [5] - 24:18, 35:21, 103:6, 144:15, 155:9
**CERTIFIED** [1] - 165:2
**certify** [3] - 64:22, 88:10, 88:18
**Certify** [1] - 55:20
**cetera** [2] - 61:10, 128:16
**chance** [1] - 152:20
**change** [6] - 10:3, 41:11, 43:23, 47:7, 103:12, 123:16
**changes** [1] - 47:20
**characteristics** [1] - 129:2
**charge** [1] - 28:19
**charges** [3] - 136:11, 136:16, 164:20
**check** [1] - 109:16
**chefs** [2] - 149:11, 149:12
**chief** [2] - 19:12, 45:20
**children** [1] - 4:14
**choice** [4] - 10:5, 10:12, 68:23, 143:12
**chose** [1] - 10:13
**Chris** [6] - 87:10, 87:12,

87:16, 87:19, 89:1, 114:9
**church** [1] - 149:7
**circumstances** [3] - 24:7, 73:11, 154:15
**city** [7] - 19:1, 19:5, 20:1, 71:3, 73:3, 73:5, 75:12
**City** [6] - 6:12, 19:9, 19:12, 75:14
**Civil** [3] - 3:15, 3:17, 3:19
**civil** [23] - 6:17, 6:19, 22:9, 22:14, 22:16, 41:5, 71:23, 73:12, 73:18, 73:19, 74:13, 74:17, 76:11, 76:14, 77:6, 78:19, 79:1, 79:3, 144:8, 148:4, 148:14, 150:17, 154:17
**claim** [4] - 109:3, 109:4, 110:19, 157:14
**Claim** [10] - 94:16, 94:20, 95:1, 105:11, 106:8, 107:19, 108:9, 108:16, 111:2, 111:3
**claims** [2] - 108:3, 109:11
**clarify** [1] - 7:18
**class** [3] - 114:21, 116:21, 140:17
**clean** [1] - 7:17
**cleaned** [1] - 99:17
**clear** [3] - 34:20, 64:4, 80:12
**cleared** [1] - 73:11
**clerk** [1] - 144:20
**client** [42] - 22:19, 30:2, 30:4, 30:7, 50:21, 54:15, 55:9, 58:19, 58:22, 60:4, 64:16, 65:1, 65:4, 67:15, 87:6, 87:13, 88:13, 89:11, 89:16, 89:23, 91:9, 93:3, 93:7, 93:10, 93:13, 93:16, 93:19, 94:13, 96:7, 97:21, 98:15, 99:10, 100:1, 100:4, 108:18, 125:19, 131:23, 132:3, 135:9, 146:9, 156:17, 165:8
**client's** [6] - 59:14, 64:7, 64:15, 99:13, 99:16, 165:7
**cliff** [2] - 147:3, 147:11
**clinical** [1] - 137:19
**clogged** [1] - 5:15
**close** [1] - 12:12
**cold** [1] - 5:16
**collaborated** [1] - 155:6
**collective** [4] - 124:9, 124:11, 126:9, 126:10
**college** [4] - 4:20, 4:22, 7:8, 7:9
**color** [2] - 128:18, 130:5
**coming** [2] - 28:1, 28:3
**commander** [2] - 140:13, 164:22
**commenced** [1] - 20:12

**comment** [1] - 133:3
**comments** [2] - 68:9, 68:11
**commissioner** [2] - 6:14, 6:19
**committee** [14] - 23:10, 24:3, 24:8, 25:5, 25:19, 26:4, 26:5, 26:7, 26:15, 26:16, 26:17, 81:17, 81:18, 149:3
**Committee** [1] - 71:3
**committee-ships** [2] - 24:3, 26:4
**committees** [5] - 23:11, 23:22, 24:11, 25:12, 26:23
**communication** [1] - 88:15
**community** [3] - 91:22, 92:9, 92:10
**compelled** [1] - 160:7
**Compensation** [11] - 17:10, 20:18, 33:22, 34:3, 34:5, 39:9, 39:14, 56:23, 57:11, 57:21, 57:23
**compensation** [1] - 57:7
**complainant** [1] - 129:7
**complained** [1] - 67:20
**complaining** [1] - 130:13
**complains** [1] - 110:19
**complaint** [1] - 155:16
**complaints** [6] - 64:2, 64:3, 67:17, 70:2, 129:7
**complete** [3] - 26:11, 71:19, 161:23
**complied** [1] - 144:23
**complies** [1] - 141:3
**compliments** [1] - 100:4
**comply** [1] - 134:3
**comport** [1] - 76:10
**computer** [2] - 7:2, 27:18
**computers** [1] - 7:3
**concerned** [4] - 102:12, 103:13, 108:20, 142:7
**concerning** [12] - 47:4, 77:17, 91:13, 94:21, 98:5, 105:17, 106:7, 106:23, 129:6, 129:22, 130:4, 156:2
**concert** [2] - 27:21, 28:15
**concisely** [1] - 156:22
**concluded** [1] - 163:22
**conclusion** [2] - 133:15, 133:18
**condition** [1] - 65:13
**conduct** [4] - 67:18, 67:21, 86:1, 129:22
**conducted** [1] - 157:22
**conducting** [2] - 84:19, 97:21
**confident** [1] - 153:8
**confirm** [1] - 156:21
**conflict** [2] - 99:3, 99:6
**conformance** [1] - 141:8

connection [1] - 71:10
consider [7] - 60:16, 73:13, 73:15, 81:23, 149:6, 149:9, 152:23
consideration [6] - 70:20, 75:14, 76:3, 78:7, 150:16, 150:18
considered [9] - 22:16, 70:21, 71:22, 76:9, 78:9, 78:22, 151:12, 155:7, 155:10
construction [2] - 26:10, 150:10
Consultation [1] - 164:20
consultation [3] - 136:10, 136:11, 136:16
contact [3] - 13:15, 53:18, 75:1
contacted [3] - 13:13, 13:14, 31:13
contained [2] - 116:5, 118:5
context [2] - 31:19, 32:2
continue [1] - 32:15
continued [1] - 142:11
CONTINUED [1] - 87:4
continues [1] - 14:13
continuing [2] - 34:16, 35:4
contract [38] - 18:6, 32:4, 32:6, 40:20, 40:22, 41:6, 41:13, 43:12, 44:2, 45:9, 46:17, 46:19, 46:21, 47:20, 48:23, 49:2, 49:4, 49:15, 49:16, 50:9, 52:4, 52:6, 53:19, 54:3, 54:12, 86:9, 112:6, 112:15, 112:18, 125:6, 142:11, 142:12, 142:15, 142:16, 142:17, 143:15, 143:20, 144:7
contracts [5] - 35:16, 40:6, 49:19, 49:22, 113:4
contrary [1] - 146:12
contributions [5] - 35:11, 76:4, 76:23, 124:7, 140:19
controlling [1] - 3:20
convenient [1] - 146:18
conversation [12] - 31:17, 31:20, 37:12, 37:17, 39:13, 55:9, 55:11, 89:4, 89:7, 90:2, 97:9, 160:8
conversations [6] - 35:23, 39:17, 59:23, 64:19, 83:19, 160:16
cook [2] - 149:20, 151:1
cooks [1] - 149:12
Cooperative [1] - 153:17
coordinate [1] - 7:21
copies [2] - 132:12, 163:9
Copies [1] - 164:19
copy [3] - 94:15, 136:21, 163:15

correct [132] - 6:6, 6:7, 7:23, 8:17, 10:1, 10:2, 10:10, 14:20, 15:10, 15:21, 16:3, 16:12, 16:13, 16:21, 16:22, 18:19, 22:10, 22:11, 25:20, 25:21, 25:22, 25:23, 31:9, 31:15, 33:20, 37:18, 38:5, 38:6, 38:8, 38:9, 38:11, 38:12, 38:14, 38:15, 40:10, 40:12, 42:16, 42:19, 43:6, 43:9, 44:11, 45:18, 45:23, 46:6, 47:1, 48:2, 48:3, 48:5, 49:2, 49:20, 49:23, 50:10, 50:11, 51:18, 52:2, 53:9, 53:14, 53:15, 57:8, 57:9, 69:15, 71:15, 72:13, 73:21, 74:2, 74:5, 74:7, 74:8, 79:1, 79:2, 79:4, 79:5, 79:6, 79:23, 81:5, 84:13, 90:18, 91:3, 91:4, 91:6, 91:9, 91:10, 92:11, 92:21, 102:19, 105:7, 105:8, 106:14, 109:7, 111:5, 117:1, 117:2, 117:16, 119:10, 119:23, 120:9, 120:10, 120:15, 120:16, 121:6, 122:11, 122:20, 122:23, 123:1, 123:3, 123:4, 132:6, 132:7, 134:8, 134:10, 138:8, 138:9, 139:4, 139:5, 139:10, 139:11, 139:16, 139:19, 139:20, 142:19, 143:6, 145:3, 149:21, 156:19, 156:19, 156:20, 157:12, 157:13, 158:11, 159:1, 159:10, 161:18
correction [7] - 22:10, 54:9, 72:8, 72:11, 74:12, 149:8, 159:5
correctional [3] - 23:18, 137:2, 150:9
corrections [2] - 22:15, 71:17
correctly [1] - 81:15
cost [3] - 12:10, 18:9, 135:23
costing [1] - 47:11
costly [1] - 62:3
costs [12] - 17:1, 17:4, 17:6, 17:8, 17:11, 17:13, 18:5, 18:7, 18:9, 20:16, 135:18, 136:3
counsel [3] - 64:20, 90:3, 133:7
counter [1] - 62:22
counties [3] - 11:17, 11:23, 12:5
Counties [1] - 12:12
country [2] - 13:19, 137:2
county [137] - 5:4, 5:6, 5:10, 5:11, 5:14, 6:9, 6:11, 6:13,

7:1, 9:5, 12:10, 13:18, 14:17, 15:7, 16:16, 16:19, 17:14, 20:15, 21:6, 21:8, 21:22, 27:10, 27:12, 27:17, 27:19, 27:20, 28:1, 28:16, 28:17, 31:11, 34:3, 39:9, 40:14, 41:8, 41:12, 41:20, 42:1, 42:23, 43:1, 44:4, 44:9, 47:1, 47:8, 47:12, 48:3, 49:3, 49:8, 51:23, 53:14, 54:6, 56:23, 57:10, 57:15, 57:18, 57:20, 58:3, 60:16, 60:20, 61:3, 61:9, 61:14, 61:18, 61:21, 62:8, 62:13, 63:7, 67:7, 69:19, 72:2, 72:5, 73:10, 75:5, 75:7, 77:16, 79:13, 82:7, 91:14, 92:3, 92:19, 97:15, 97:19, 98:6, 103:15, 103:16, 104:8, 104:18, 106:1, 106:2, 109:9, 109:20, 109:21, 110:4, 110:9, 110:15, 111:11, 112:12, 112:18, 116:20, 117:9, 118:13, 118:18, 119:13, 120:22, 122:22, 127:22, 127:23, 128:5, 128:10, 129:12, 129:13, 129:15, 129:20, 130:19, 132:9, 132:19, 132:21, 133:11, 133:16, 134:14, 135:5, 140:20, 141:8, 144:19, 145:12, 146:12, 151:9, 151:11, 152:2, 152:18, 152:19, 156:11, 158:22, 160:6, 161:11, 161:15
County [30] - 2:7, 5:18, 6:8, 6:10, 7:20, 7:22, 18:12, 18:17, 20:11, 23:15, 27:7, 28:4, 45:21, 52:9, 60:7, 88:3, 90:11, 91:19, 95:5, 98:5, 102:16, 109:12, 109:21, 115:9, 119:5, 121:2, 121:5, 121:8, 126:15, 129:2, 129:4, 130:23, 134:21, 138:12, 144:15, 159:14
county's [5] - 16:20, 31:5, 31:8, 105:2, 105:22
county.. [1] - 128:8
countywide [1] - 113:1
couple [4] - 30:15, 37:9, 112:3, 161:7
course [2] - 142:4, 163:20
Court [3] - 3:9
cover [3] - 40:9, 112:12, 136:8
coverage [4] - 33:2, 33:22, 39:14, 57:11
covered [3] - 33:21, 54:4, 54:5
created [1] - 99:10

credit [1] - 48:1
credited [2] - 43:1, 67:3
creed [1] - 128:16
criminal [6] - 14:7, 84:1, 84:12, 85:12, 86:10, 98:6
criticism [6] - 70:22, 71:8, 71:11, 75:18, 75:22, 99:23
criticisms [2] - 69:1, 70:13
criticized [2] - 67:22, 68:3
cross [4] - 40:21, 40:22, 44:9, 104:19
Cryst [2] - 87:5, 94:6
CSEA [1] - 75:14
current [2] - 14:4, 44:6
cut [3] - 18:11, 18:13, 18:14

## D

D-A-M-O-R-E [1] - 9:3
D-E-N-E-A [1] - 131:6
Damore [3] - 9:3, 9:10, 9:12
date [16] - 82:13, 117:11, 118:8, 118:14, 118:15, 120:2, 126:22, 126:23, 131:7, 131:20, 137:11, 138:14, 138:23, 139:6, 139:12, 139:17
dated [5] - 114:22, 115:23, 131:21, 138:7, 142:17
dates [1] - 126:21
Dave [1] - 9:16
days [3] - 48:9, 48:15, 48:17
deal [2] - 61:6, 158:20
decided [2] - 37:9, 37:21
deciding [2] - 56:19, 156:9
decision [9] - 36:4, 68:19, 140:22, 156:11, 156:14, 159:12, 159:19, 160:21
decisions [4] - 10:23, 31:14, 141:1, 156:18
dedicated [1] - 15:1
deemed [1] - 3:18
Defendant [1] - 2:12
Defendants [1] - 2:7
degree [3] - 4:19, 4:20, 4:22
delayed [4] - 39:4, 39:7, 56:4, 97:6
Demand [1] - 136:20
demanding [1] - 132:12
Democrat [1] - 68:8
demonstrate [4] - 11:17, 12:2, 12:10, 12:11
Denea [10] - 131:6, 131:19, 131:23, 132:2, 132:9, 135:8, 136:9, 136:17, 164:5, 164:20
Denea's [2] - 132:13, 164:19
denied [9] - 41:8, 56:6,

56:8, 97:6, 110:20, 143:3, 145:10, 146:9, 147:13
**denominated** [1] - 139:1
**deny** [1] - 159:13
**department** [48] - 6:13, 6:18, 7:22, 17:15, 19:6, 19:13, 19:22, 20:2, 20:3, 20:4, 27:18, 27:20, 28:12, 28:16, 28:19, 38:4, 54:5, 61:14, 69:21, 77:23, 78:5, 78:7, 78:10, 79:14, 79:19, 103:13, 105:10, 106:9, 106:23, 107:18, 113:9, 113:10, 130:15, 143:11, 144:18, 153:7, 153:8, 153:16, 155:5, 161:18, 162:3, 162:4, 162:7, 162:8, 162:10, 162:12, 162:14
**Department** [82] - 6:21, 8:4, 8:6, 14:6, 15:1, 15:9, 16:9, 16:23, 17:20, 18:11, 18:18, 19:2, 19:3, 19:10, 20:15, 20:20, 21:13, 22:4, 23:14, 25:12, 27:23, 33:21, 34:4, 39:15, 41:3, 41:4, 41:9, 44:21, 49:13, 49:19, 49:22, 50:2, 50:8, 52:8, 52:10, 53:9, 54:8, 54:9, 54:13, 58:6, 58:9, 58:14, 63:23, 69:18, 81:7, 82:2, 86:2, 96:16, 96:19, 97:11, 98:17, 98:20, 98:21, 98:23, 99:1, 102:17, 108:3, 111:9, 127:4, 127:22, 128:3, 133:4, 133:9, 133:10, 142:9, 144:3, 144:15, 144:17, 144:22, 145:5, 146:14, 147:5, 149:1, 153:4, 153:13, 153:15, 155:5, 155:8, 157:2, 157:17, 158:13, 162:15
**Department's** [1] - 16:14
**departments** [6] - 8:13, 53:8, 54:1, 77:19, 106:14, 162:1
**deposing** [1] - 50:19
**deposition** [5] - 3:14, 27:4, 109:23, 163:7, 163:21
**Deputy** [1] - 90:11
**deputy** [4] - 45:21, 70:4, 87:19, 88:3
**Derek** [1] - 25:14
**Description** [1] - 164:2
**deserve** [1] - 152:7
**design** [2] - 23:11, 26:7
**designated** [3] - 14:21, 52:1, 145:11
**designation** [1] - 40:16
**detailed** [1] - 160:8
**determination** [1] - 104:1
**determine** [5] - 43:13, 52:17, 141:7, 145:6, 162:1

**determined** [2] - 30:17, 34:15
**dictated** [1] - 57:15
**difference** [1] - 159:18
**different** [6] - 7:1, 24:4, 47:22, 66:6, 151:8, 154:14
**direct** [3] - 9:6, 13:20, 46:1
**directed** [2] - 55:5, 83:18
**directly** [5] - 11:6, 28:21, 93:16, 93:18, 103:20
**director** [12] - 9:1, 9:5, 9:8, 11:22, 12:4, 29:3, 47:19, 104:23, 105:3, 105:18, 105:23, 106:1
**Director** [7] - 9:13, 9:23, 10:6, 21:3, 45:21, 47:18, 133:23
**disclose** [2] - 89:5, 90:2
**disclosure** [1] - 160:4
**Discovery** [1] - 136:19
**discretion** [1] - 51:16
**discretionary** [1] - 15:8
**discriminated** [4] - 110:19, 128:14, 157:6, 157:15
**discrimination** [8] - 127:7, 127:9, 127:23, 128:4, 129:8, 130:4, 130:13, 155:21
**discuss** [3] - 11:19, 35:22, 84:23
**discussing** [1] - 31:18
**Discussion** [4] - 7:10, 45:10, 111:22, 115:2
**discussion** [3] - 45:8, 49:10, 159:2
**discussions** [3] - 43:11, 55:18, 96:6
**dismiss** [3] - 68:23, 69:3, 69:9, 69:11, 70:21
**dismissed** [2] - 70:16, 75:22
**displeasure** [1] - 158:16
**distributed** [3] - 54:1, 54:3, 58:3
**District** [1] - 144:18
**division** [3] - 22:9, 22:10
**divisions** [1] - 22:12
**doctor** [2] - 73:11, 131:11
**doctor's** [2] - 37:10, 156:14
**doctors** [2] - 37:5, 135:11
**document** [27] - 115:10, 117:11, 117:22, 118:5, 118:8, 118:14, 121:7, 121:19, 122:7, 122:11, 124:2, 125:20, 126:4, 127:15, 131:7, 131:9, 137:1, 137:4, 137:9, 137:14, 137:15, 137:22, 138:10, 142:18, 142:20, 146:22, 162:23
**Documents** [1] - 164:21

**documents** [4] - 116:9, 116:11, 140:11, 162:22
**Doe(s** [1] - 2:8
**dollars** [3] - 14:2, 14:17, 42:12
**donate** [17] - 40:6, 40:14, 43:5, 46:23, 48:6, 48:10, 52:1, 52:9, 52:18, 52:20, 113:18, 117:9, 117:15, 118:21, 122:21, 124:20, 159:17
**donated** [11] - 54:15, 114:2, 114:3, 114:5, 117:23, 124:13, 141:15, 142:3, 145:10, 147:10, 147:13
**donating** [5] - 41:22, 42:5, 42:7, 49:11, 122:5
**donation** [12] - 40:1, 40:5, 41:12, 41:19, 46:22, 48:22, 49:14, 50:8, 53:23, 54:12, 112:19, 113:14
**donations** [24] - 39:21, 40:10, 41:8, 41:15, 44:9, 44:17, 44:20, 45:1, 46:6, 46:12, 47:11, 51:11, 51:18, 53:17, 95:10, 95:13, 117:20, 142:1, 142:9, 143:4, 143:23, 144:3, 146:3, 146:9
**done** [6] - 27:21, 37:6, 111:14, 131:1, 156:1, 156:3
**double** [1] - 137:8
**down** [6] - 87:23, 100:23, 109:9, 149:5, 149:11, 149:12
**Dr** [10] - 131:23, 132:2, 132:8, 132:13, 135:8, 136:9, 136:16, 164:5, 164:19, 164:20
**drug** [6] - 13:6, 13:11, 13:16, 14:12, 15:12, 16:12
**Due** [1] - 138:13
**duly** [1] - 4:2
**Dunham** [1] - 25:14
**during** [12] - 7:9, 8:15, 13:1, 15:4, 24:21, 25:2, 49:10, 71:1, 100:14, 126:19, 141:10, 142:2
**duties** [7] - 5:9, 63:10, 71:19, 72:19, 77:7, 77:8, 102:18
**duty** [4] - 38:5, 62:16, 66:21, 133:12

## E

**E-mail** [4] - 29:13, 29:14, 29:17, 152:17
**E-mailed** [2] - 30:6, 30:9
**early** [3] - 45:7, 45:16, 47:5
**earn** [1] - 48:21

**earned** [2] - 46:8, 66:9
**ears** [1] - 5:15
**Ed** [1] - 33:6
**educational** [1] - 4:18
**EEOC** [1] - 134:1
**effect** [5] - 122:18, 122:19, 126:18, 126:23, 127:10
**effort** [1] - 163:4
**eight** [2] - 9:9, 9:12
**either** [7] - 64:4, 69:12, 87:22, 140:13, 145:7, 155:4, 159:16
**elected** [15] - 5:20, 53:4, 68:2, 68:10, 68:20, 79:20, 82:11, 102:10, 103:9, 104:12, 104:21, 113:9, 143:10, 144:20, 158:8
**electing** [1] - 123:12
**election** [2] - 6:1, 75:16
**ELMER** [2] - 2:13, 2:15
**Elmer** [1] - 164:13
**elsewhere** [1] - 16:7
**Empire** [2] - 4:20, 4:22
**employed** [7] - 5:1, 5:3, 5:5, 7:6, 33:21, 72:8, 73:20
**employee** [18] - 40:13, 42:21, 45:2, 46:7, 51:23, 52:8, 110:18, 111:8, 117:10, 120:23, 125:6, 126:8, 133:20, 134:12, 134:14, 138:13, 141:1, 146:15
**employee's** [1] - 42:14
**employees** [71] - 5:11, 5:14, 27:19, 38:3, 39:9, 41:4, 46:22, 47:23, 48:3, 49:4, 49:9, 50:1, 50:9, 50:12, 51:10, 51:17, 52:5, 53:1, 53:7, 53:13, 53:21, 54:4, 54:7, 54:10, 56:23, 57:10, 57:20, 58:3, 60:9, 60:21, 61:9, 61:15, 66:13, 91:11, 91:13, 92:2, 96:19, 98:20, 99:1, 100:7, 104:10, 104:11, 104:19, 110:4, 110:9, 110:16, 111:15, 112:13, 112:16, 113:7, 113:8, 117:8, 117:14, 120:23, 122:4, 122:10, 122:20, 122:22, 124:9, 124:10, 124:17, 124:19, 126:9, 129:21, 133:16, 134:20, 135:6, 140:19, 141:20, 144:11, 159:14
**employees..** [1] - 115:1
**Employment** [1] - 164:3
**employment** [15] - 38:8, 41:23, 42:18, 48:15, 72:5, 82:7, 126:14, 128:15, 130:22, 147:20, 148:14, 149:1, 149:23, 160:10,

160:22
empowered [1] - 103:11
enclosed [1] - 136:12
enclosing [1] - 136:9
end [4] - 26:4, 37:16, 142:15, 143:15
ended [3] - 25:19, 26:5, 26:7
endorse [1] - 75:15
endorsements [1] - 71:5
ends [1] - 6:3
enforce [2] - 133:12, 134:1
enforced [1] - 106:13
enforcement [10] - 32:13, 62:9, 62:14, 62:21, 63:8, 63:17, 66:20, 67:9, 85:23, 158:5
enforcing [1] - 27:8
ensure [4] - 62:14, 104:9, 105:1, 144:23
ensuring [1] - 63:8
entered [1] - 27:4
entire [3] - 20:2, 115:10, 125:19
entirely [1] - 142:9
entitled [2] - 32:15, 42:14
entitles [1] - 150:15
entity [1] - 158:9
equal [2] - 126:14, 130:22
Equal [1] - 164:3
equivalent [2] - 42:15, 48:14
Esq [4] - 2:17, 164:12, 164:13, 164:14
ESQ [3] - 2:5, 2:11, 2:15
essence [1] - 55:16
essentially [1] - 88:17
established [4] - 40:7, 42:8, 52:15, 52:19
et [2] - 61:10, 128:16
ethnic [2] - 130:5, 155:22
evaluate [3] - 135:5, 135:8, 143:23
evaluated [1] - 135:12
Evaluation [1] - 137:10
evaluation [1] - 137:11
eventually [1] - 7:2
exact [3] - 9:19, 101:13, 101:16
exactly [3] - 29:23, 84:15, 113:15
exam [13] - 73:18, 73:19, 74:1, 74:14, 74:17, 76:14, 76:19, 77:12, 150:17, 150:21, 152:4, 154:17, 154:22
Examination [3] - 164:12, 164:13, 164:14
EXAMINATION [4] - 4:4, 87:4, 156:8, 161:9

examination [3] - 131:23, 132:16, 132:20
examine [1] - 135:9
examined [3] - 4:3, 132:2, 135:12
exams [1] - 154:20
except [2] - 3:11, 144:22
executive [1] - 5:10, 6:20, 127:5
Executive [22] - 5:18, 6:8, 6:11, 7:20, 18:12, 18:17, 20:11, 27:7, 45:21, 88:3, 90:11, 95:6, 98:5, 102:16, 109:12, 109:21, 115:9, 121:3, 121:5, 121:8, 129:4, 144:15
executive's [1] - 77:16, 79:13, 104:18
Executive's [1] - 133:11
exempt [5] - 52:17, 53:1, 53:6, 144:14, 146:15
exercise [1] - 153:9
exhibit [20] - 111:20, 112:2, 116:5, 116:15, 122:8, 123:23, 125:8, 126:12, 131:4, 131:14, 131:17, 136:6, 136:18, 137:8, 138:10, 139:9, 140:1, 140:5, 142:23
Exhibit [5] - 114:16, 114:19, 136:8, 136:23, 164:2
Exhibits [1] - 87:1
exhibits [1] - 163:7
exist [2] - 46:18, 132:12
existed [1] - 48:23
existing [1] - 16:1
expanded [2] - 23:9, 25:22, 150:8
expansion [3] - 26:10, 26:20, 150:8
expect [8] - 47:15, 47:16, 90:14, 93:21, 94:1, 126:3, 134:20, 135:7
expectations [1] - 129:21
expected [1] - 47:7
expend [1] - 135:5
expense [1] - 14:4
expenses [1] - 135:15
expensive [2] - 41:20, 46:4
experience [1] - 153:5
expire [1] - 162:16
expired [2] - 142:12, 142:17
extended [1] - 151:21
Extension [2] - 2:10, 2:14
extent [4] - 68:2, 96:9, 98:7, 103:5
extra [1] - 43:4

**F**

facility [4] - 23:18, 137:2, 150:10, 150:11
fact [9] - 79:3, 111:1, 113:17, 117:8, 121:15, 145:6, 153:3, 153:4, 160:2
fail [1] - 154:20
failed [1] - 154:21
failing [1] - 154:22
fair [10] - 78:14, 78:21, 79:15, 79:18, 104:16, 107:14, 156:16, 158:6, 158:19, 158:23
fall [1] - 27:20
familiar [10] - 16:11, 39:23, 44:14, 52:5, 57:4, 58:8, 97:10, 97:14, 111:10, 139:21
familiarity [1] - 57:6
family [1] - 80:2
far [2] - 13:10, 19:22
Farr [2] - 9:1, 10:9
Farr's [1] - 9:4
fashion [4] - 47:21, 56:6, 97:6, 108:15
father [9] - 72:23, 73:1, 75:3, 75:13, 80:15, 81:16, 82:6, 149:20, 150:3
favorite [1] - 68:6
favorites [4] - 69:8, 69:9, 69:14, 148:16
federal [8] - 85:23, 129:9, 129:10, 129:18, 134:2, 145:1
Federal [4] - 3:9, 3:15, 3:17, 3:19
FICA [1] - 34:11
file [2] - 99:10, 118:19
filed [3] - 105:11, 157:9, 160:3
filing [1] - 3:8
fill [1] - 62:2
finance [3] - 26:14, 47:19, 155:5
Finance [1] - 153:17
financial [3] - 8:14, 119:13, 159:9
financing [4] - 11:15, 23:12, 26:5, 26:16
fine [1] - 88:20
fires [1] - 162:7
FIRM [1] - 2:4
firm [1] - 156:7
first [15] - 4:2, 8:11, 18:22, 23:1, 36:9, 45:4, 56:5, 116:14, 117:4, 121:18, 122:8, 124:2, 125:13, 140:4, 142:22
fiscal [2] - 45:20, 103:5
fit [2] - 102:11, 103:10

five [7] - 6:14, 31:2, 33:10, 33:16, 48:13, 48:17, 79:8
folks [1] - 11:16
follow [4] - 37:19, 76:1, 160:7, 161:8
follow-up [3] - 37:19, 160:7, 161:8
followed [4] - 64:4, 105:2, 106:13, 134:14
following [5] - 8:14, 11:1, 56:11, 119:21, 137:21
follows [4] - 4:3
food [1] - 18:10
force [8] - 13:6, 13:11, 13:16, 14:12, 15:12, 16:5, 16:7, 16:12
forces [1] - 16:8
forfeiture [6] - 14:3, 14:5, 14:16, 14:21, 15:2, 15:12
Form [1] - 164:8
form [126] - 3:11, 8:1, 8:7, 10:23, 16:17, 17:17, 18:3, 18:20, 20:21, 23:16, 23:20, 24:13, 24:17, 24:22, 27:2, 27:9, 27:15, 29:11, 30:14, 31:1, 32:20, 33:23, 34:18, 35:18, 36:8, 39:5, 39:11, 40:17, 44:12, 46:9, 46:14, 47:2, 47:14, 49:1, 49:5, 50:3, 50:15, 51:12, 51:19, 52:3, 52:14, 53:10, 54:2, 57:12, 57:22, 58:2, 58:10, 58:16, 60:10, 60:18, 60:23, 61:5, 61:19, 62:5, 62:10, 62:17, 63:1, 63:11, 63:18, 63:22, 64:17, 65:5, 66:4, 66:8, 66:15, 66:18, 67:2, 67:5, 67:11, 67:23, 69:5, 70:17, 76:6, 76:16, 77:14, 78:17, 79:16, 81:20, 84:8, 86:18, 95:23, 96:4, 102:14, 102:20, 103:3, 103:8, 103:21, 104:14, 104:22, 105:19, 106:4, 107:15, 107:20, 110:5, 110:22, 111:16, 114:21, 115:15, 115:16, 116:10, 116:17, 116:20, 118:2, 119:14, 122:12, 122:14, 124:14, 129:17, 129:23, 132:2, 133:17, 134:16, 134:23, 140:17, 145:2, 145:13, 145:20, 146:6, 146:13, 147:15, 148:17, 150:19, 152:11, 157:4, 158:10, 161:14
forth [5] - 32:5, 112:6, 127:2, 134:19, 136:17
four [10] - 5:23, 6:10, 26:8, 26:9, 26:23, 31:2, 36:5, 59:18, 138:20, 164:8

frame [3] - 7:2, 44:3, 126:19
friends [1] - 148:15
fringe [1] - 34:8
front [2] - 112:3, 127:15
fulfilled [1] - 100:13
fulfilling [2] - 101:9, 101:14
full [8] - 4:5, 9:12, 51:16, 108:16, 109:13, 109:14, 109:15, 160:4
functions [1] - 7:1
funding [9] - 13:7, 13:10, 13:16, 13:21, 14:1, 14:15, 16:15, 20:14, 100:12
funds [6] - 15:2, 15:13, 15:19, 16:15, 18:19, 35:7
FURTHER [4] - 3:7, 3:10, 3:13, 3:16

**G**

gang [6] - 13:6, 13:11, 13:16, 14:12, 15:12, 16:11
Gary [2] - 120:20, 120:22
gather [1] - 110:1
general [2] - 15:15, 31:22
generally [4] - 29:18, 74:22, 128:1, 141:21
gentleman [2] - 159:3, 159:4
George [7] - 71:2, 71:7, 72:23, 73:1, 75:13, 81:15, 81:16
given [3] - 48:10, 107:9, 148:8
gleans [1] - 10:17
goal [2] - 128:12, 162:17
goals [3] - 128:17, 129:1
Goldberger [33] - 31:7, 31:13, 35:14, 36:1, 36:10, 36:17, 58:18, 64:13, 64:14, 87:15, 88:10, 88:17, 90:10, 92:14, 92:15, 92:20, 93:2, 93:5, 93:15, 93:22, 95:17, 96:1, 106:11, 107:4, 107:9, 114:9, 131:5, 131:18, 132:6, 133:7, 133:8, 136:9, 165:6
goldberger [3] - 59:10, 90:5, 93:12
Goldberger's [1] - 54:23
governed [3] - 49:21, 50:8, 129:18
government [17] - 7:1, 27:10, 27:12, 27:17, 40:14, 44:10, 47:1, 51:23, 53:14, 54:6, 72:2, 75:12, 98:6, 151:9, 151:11, 152:2, 156:11
governs [2] - 52:4, 124:19
grandson [1] - 149:4
grandson-in-law [1] -

149:4
granted [3] - 56:13, 108:15
Grievance [2] - 124:3, 164:8
grievance [23] - 113:13, 113:16, 113:21, 114:7, 114:8, 114:10, 114:21, 115:15, 115:16, 116:17, 116:19, 117:4, 117:7, 117:14, 118:19, 122:7, 122:14, 122:15, 123:5, 123:15, 140:16, 140:17, 141:10
grinch [2] - 118:13, 118:17
Grinch [1] - 119:5
group [3] - 74:23, 138:5, 150:8
guess [3] - 19:3, 61:22, 140:16
guidelines [1] - 57:20

**H**

H-E-B-E-R-T [1] - 120:20
Hal [1] - 25:14
half [2] - 9:14, 118:10
hall [1] - 73:3
Halse [2] - 120:19, 120:22
HALSE [1] - 120:19
hand [1] - 111:19
handed [1] - 125:1
handing [2] - 114:18, 131:3
handle [1] - 109:10
handles [1] - 56:14
hang [1] - 84:21
hard [2] - 80:10, 121:19
harm [1] - 60:22
Harold [1] - 2:7
head [5] - 15:14, 76:22, 78:5, 79:14, 159:4
heading [1] - 113:9
heads [9] - 27:18, 28:12, 28:16, 54:5, 77:23, 78:7, 78:10, 79:19, 153:9
health [20] - 18:7, 20:17, 34:10, 34:11, 43:2, 48:1, 60:8, 60:22, 61:7, 61:14, 62:8, 62:22, 63:16, 69:21, 80:6, 104:9, 153:17, 154:9, 155:3, 161:2
Health [4] - 153:13, 153:15, 155:5, 155:8
healthy [3] - 61:13, 61:20, 61:23
hear [15] - 5:16, 68:9, 68:11, 68:14, 68:16, 68:17, 68:18, 68:20, 70:2, 70:13, 71:11, 91:22, 92:8, 101:5, 101:22

heard [9] - 64:2, 67:21, 69:8, 84:2, 99:22, 100:3, 100:5, 155:23, 157:8
Hebert [2] - 120:20, 120:22
held [7] - 5:17, 7:10, 24:3, 28:23, 45:10, 111:22, 115:2
help [1] - 152:16
helped [1] - 81:16
helpful [10] - 68:7, 70:9, 70:11, 70:12, 70:19, 71:1, 71:3, 71:4, 73:4, 75:19
helping [1] - 125:16
hendry [1] - 37:13
Hendry [18] - 2:8, 28:20, 29:4, 29:8, 29:17, 36:7, 36:9, 36:18, 36:22, 37:19, 39:13, 44:16, 44:19, 44:23, 45:18, 45:20, 114:9, 133:8
HEREBY [1] - 3:4
hereto [1] - 3:5
heritage [1] - 157:7
heroin [1] - 13:17
high [1] - 150:17
highly [1] - 80:11
Highway [1] - 153:3
highway [1] - 153:7
himself [4] - 8:20, 10:8, 24:12, 88:6
HIPAA [7] - 65:8, 65:11, 65:14, 97:12, 98:10, 98:19, 99:11
hire [7] - 150:13, 151:6, 153:1, 161:22, 162:2, 162:4
hired [14] - 70:4, 71:9, 71:14, 71:16, 74:20, 78:3, 80:18, 81:4, 82:10, 149:10, 151:13, 153:3, 153:5
hires [2] - 15:22, 74:22
hiring [7] - 75:23, 77:17, 79:3, 128:15, 128:17, 128:23, 161:23
historically [1] - 41:7
history [2] - 148:14, 148:18
hold [3] - 6:9, 124:12, 124:15
home [2] - 61:12, 152:21
hope [1] - 126:2
hospital [1] - 97:17
hours [4] - 28:4, 46:8, 66:9, 118:21
HR [4] - 27:23, 28:19, 105:23, 106:1
hum [51] - 7:14, 7:15, 12:18, 13:12, 14:11, 19:11, 24:18, 25:23, 27:13, 32:18, 35:10, 42:19, 43:22, 44:7, 56:2, 69:2, 73:17, 74:8, 74:15, 74:18, 81:11, 92:7, 94:17, 94:19, 98:22, 105:8, 109:15, 116:16, 116:22,

120:1, 120:13, 121:6, 125:3, 130:6, 130:8, 131:15, 132:1, 134:4, 134:9, 138:22, 147:21, 148:3, 149:16, 153:20, 154:6, 155:2, 155:13, 155:15, 155:19, 155:23, 162:6
Human [6] - 108:2, 127:3, 141:15, 144:22, 145:5, 162:15
human [19] - 29:3, 104:23, 105:3, 105:6, 105:9, 105:17, 105:18, 106:9, 106:12, 106:23, 107:6, 107:11, 107:18, 130:15, 133:23, 141:2, 141:6, 161:19, 162:13

**I**

idea [3] - 97:7, 132:10, 132:22
identification [2] - 87:2, 114:17
identified [1] - 150:14
identify [5] - 114:20, 115:13, 117:3, 126:12, 131:4
ignored [1] - 64:4
Ill [3] - 2:13, 2:15, 164:13
ill [6] - 38:14, 38:17, 40:8, 42:1, 42:6, 42:8
illegality [1] - 130:12
illness [8] - 39:18, 54:19, 55:23, 64:15, 66:11, 72:18, 139:16, 165:8
impact [3] - 102:18, 103:5, 103:15
imperative [1] - 63:16
implemented [1] - 141:7
important [1] - 61:21
improprieties [1] - 159:9
inappropriately [2] - 97:18, 97:20
incident [1] - 137:3
Incident [1] - 164:6
include [10] - 17:1, 17:4, 17:6, 17:8, 17:10, 22:5, 34:10, 130:3, 130:11, 147:11
included [5] - 17:14, 45:19, 135:19, 135:21, 136:1
including [6] - 6:13, 38:3, 122:9, 150:14
income [9] - 60:5, 62:15, 62:21, 63:9, 65:23, 66:3, 108:18, 109:1, 117:18
increased [1] - 18:5
increases [4] - 17:23, 18:6, 18:7, 18:8
independent [3] - 16:15, 20:19, 153:9

independently [1] - 158:8
iNDEX [1] - 165:2
indicate [2] - 96:2, 158:15
indicated [2] - 138:14, 157:19
indicates [5] - 136:8, 137:18, 139:6, 139:15, 140:6
Indicating [1] - 138:1
indicating [2] - 138:5, 140:12
indication [1] - 93:15
individual [17] - 33:6, 38:16, 38:20, 40:8, 40:11, 42:1, 52:2, 52:16, 76:3, 80:2, 80:7, 80:11, 80:13, 96:22, 147:23, 162:8
Individual [1] - 137:10
individual's [1] - 124:8
individually [1] - 80:9
individuals [14] - 25:5, 33:20, 34:16, 44:9, 46:1, 74:20, 74:23, 77:12, 78:3, 95:12, 98:18, 110:21, 150:13, 150:16
influence [1] - 153:10
inform [2] - 91:23, 129:21
information [25] - 10:17, 11:4, 30:12, 36:3, 37:20, 46:2, 81:1, 88:16, 91:13, 92:12, 93:16, 93:21, 94:1, 96:11, 96:13, 96:17, 101:19, 105:16, 105:23, 106:2, 107:23, 110:1, 125:17, 133:14, 143:19
informed [10] - 35:14, 90:17, 96:8, 96:18, 97:8, 110:2, 110:8, 111:1, 119:7, 119:11
informing [2] - 130:3, 130:11
injured [6] - 38:4, 38:16, 62:16, 63:2, 63:10, 66:21
injury [4] - 39:18, 71:20, 71:21, 135:6
injury/illness [1] - 138:13
inquires [1] - 119:4
inquiries [1] - 85:22
inquiry [12] - 47:4, 84:7, 94:21, 102:6, 105:9, 106:7, 106:23, 107:5, 113:23, 114:3, 114:6, 156:1
inside [1] - 78:15
instance [12] - 8:11, 15:5, 28:5, 28:15, 56:5, 61:7, 61:12, 70:18, 76:11, 80:3, 103:14, 141:9
instances [4] - 21:7, 28:13, 39:3, 39:6
instruct [4] - 89:11, 89:13, 91:11, 91:23

instruction [1] - 90:7
instructions [1] - 91:16
insurance [9] - 17:4, 18:7, 20:16, 20:17, 33:22, 34:10, 34:11, 43:2, 48:1
insuring [1] - 60:8
intake [1] - 162:5
interacted [1] - 26:22
interaction [5] - 8:6, 26:18, 29:10, 29:13, 38:1
interactions [3] - 25:4, 26:1, 26:3
interest [9] - 60:8, 61:18, 62:8, 63:8, 67:7, 99:4, 99:6, 119:12, 160:4
interested [1] - 152:2
interfere [2] - 85:1, 85:11
Internet [1] - 6:22
interrogatory [1] - 146:21
interrupt [1] - 19:20
interrupted [1] - 125:23
interview [5] - 79:19, 131:22, 152:5, 153:1, 162:1
interviewed [2] - 78:9, 86:4
interviewing [1] - 152:23
introduced [1] - 100:22
introduction [5] - 11:18, 11:21, 11:22, 12:13, 78:6
invalid [1] - 69:1
investigated [2] - 84:1, 84:5
investigating [3] - 85:4, 85:14, 99:1
investigation [14] - 84:2, 84:7, 84:11, 84:20, 85:2, 86:10, 97:10, 97:22, 98:2, 98:8, 98:9, 98:13, 157:20, 161:2
investigations [4] - 85:12, 85:13, 98:5, 157:16
investigative [1] - 99:10
involved [10] - 23:11, 62:2, 84:4, 85:10, 90:12, 104:7, 133:9, 158:5, 159:9, 161:3
involvement [2] - 156:23, 157:16
IS [3] - 3:4, 3:7, 3:10, 3:13
issue [10] - 12:17, 45:5, 45:17, 55:22, 70:12, 97:17, 142:11, 143:20, 148:11, 157:20
issues [7] - 30:10, 30:13, 88:1, 91:18, 92:2, 93:4, 133:10
IT [9] - 3:7, 3:10, 3:13, 6:13, 6:15, 6:21, 19:2, 19:9, 20:4
item [1] - 135:19
items [1] - 135:14

**J**

jack [4] - 67:18, 73:6, 118:20, 150:13
Jack [1] - 2:7
jail [14] - 22:5, 22:9, 23:9, 23:12, 23:13, 23:18, 25:15, 25:22, 26:20, 27:10, 30:22, 100:23, 150:7, 159:14
James [5] - 2:17, 117:10, 131:19, 136:10, 138:5
Jane [1] - 2:8
January [1] - 59:1
Jim [6] - 9:2, 22:19, 23:23, 40:15, 40:19, 54:18
Jimino [10] - 2:7, 4:7, 4:8, 27:6, 51:8, 89:9, 112:2, 115:9, 136:23, 163:13
Jimino's [1] - 163:16
job [32] - 32:13, 32:14, 32:23, 38:5, 63:2, 64:11, 66:11, 66:12, 66:21, 69:11, 71:21, 71:22, 72:18, 72:19, 74:10, 77:21, 81:18, 84:14, 109:20, 110:2, 110:8, 110:17, 148:1, 151:4, 151:5, 151:8, 152:20, 160:12, 160:14, 160:19
jobs [2] - 148:8, 148:14
Joe [1] - 40:13
JOHN [1] - 2:11
John [3] - 65:15, 65:21, 85:6
John(s [1] - 2:8
Johnson [1] - 2:9
Joint [1] - 154:9
joint [1] - 154:11
judge [1] - 104:3
judgment [1] - 153:9
July [1] - 8:12
June [1] - 126:22
jury [2] - 104:6, 104:7
justice [1] - 14:8

**K**

Karam [53] - 2:17, 22:19, 23:23, 24:8, 24:11, 24:20, 25:2, 26:2, 26:13, 27:4, 40:15, 40:19, 40:23, 44:17, 55:21, 59:6, 65:15, 87:21, 87:23, 88:6, 89:2, 90:15, 90:19, 90:22, 91:3, 91:5, 92:13, 95:13, 99:20, 105:11, 106:8, 107:1, 107:19, 113:17, 117:15, 117:18, 131:19, 136:10, 136:17, 138:5, 140:18, 141:18,

145:10, 146:5, 146:15, 147:13, 155:21, 157:2, 157:5, 157:14, 159:13, 160:1, 161:3
Karam's [9] - 25:4, 39:18, 39:21, 54:19, 56:4, 94:21, 95:10, 108:3, 108:5
Karan [1] - 117:10
Kathleen [2] - 2:7, 4:7
Kathy [1] - 152:13
KEACH [9] - 2:13, 2:15, 51:2, 115:8, 156:6, 156:8, 161:5, 163:6, 163:11
Keach [1] - 164:13
keep [6] - 61:20, 98:4, 110:2, 110:8, 151:6, 154:4
Kelleher [1] - 2:9
kept [1] - 90:17
Kevin [8] - 81:15, 81:18, 81:21, 81:22, 116:3, 120:19, 120:23, 159:3
keys [1] - 99:13
kind [4] - 6:22, 57:19, 71:13, 75:22
KJ [20] - 87:1, 111:20, 112:2, 114:19, 116:15, 116:22, 131:4, 136:8, 136:18, 136:23, 137:8, 139:22, 140:5, 142:23, 163:10, 164:3, 164:5, 164:6, 164:8
KJ4 [1] - 114:16
knowledge [12] - 78:4, 80:5, 83:23, 85:23, 86:16, 112:23, 123:19, 133:5, 146:5, 148:13, 148:18, 159:20
known [2] - 23:3, 114:23
knows [4] - 85:3, 85:9, 85:14

**L**

labor [20] - 31:5, 31:8, 31:18, 32:3, 32:6, 35:16, 46:17, 46:18, 46:21, 48:23, 49:2, 50:9, 88:1, 90:3, 93:4, 93:5, 105:2, 105:22, 106:10, 107:22
lack [1] - 119:16
lacking [1] - 11:5
Lansingburg [1] - 4:11
last [26] - 6:1, 11:15, 12:16, 12:20, 13:8, 18:8, 21:17, 21:18, 26:6, 26:22, 29:16, 29:19, 29:21, 33:10, 45:13, 45:14, 51:4, 60:14, 61:7, 103:1, 130:21, 131:2, 138:17, 138:18, 139:8, 150:3

law [44] - 32:12, 57:15, 61:8, 62:9, 62:14, 62:21, 63:8, 63:17, 66:20, 67:8, 71:23, 73:12, 76:12, 76:15, 76:18, 77:6, 77:11, 79:3, 85:23, 89:12, 89:14, 106:19, 106:21, 106:22, 129:10, 133:12, 133:20, 134:2, 134:10, 141:4, 141:8, 145:1, 145:7, 149:4, 149:15, 149:18, 149:19, 150:1, 154:4, 158:9
LAW [1] - 2:4
laws [4] - 76:10, 97:12, 98:19, 129:19
lawsuit [7] - 108:12, 152:12, 157:1, 157:8, 157:12, 160:3, 160:5
lawsuits [1] - 103:20
lawyer [2] - 55:19, 60:1
leaders [1] - 148:16
learn [8] - 31:4, 43:10, 80:18, 80:20, 81:12, 82:4, 82:23, 108:5
learned [2] - 45:22, 81:3
least [1] - 127:10
leave [91] - 40:5, 40:9, 40:14, 40:20, 41:9, 41:12, 41:19, 41:23, 42:3, 42:5, 42:7, 42:12, 42:17, 42:22, 43:1, 43:4, 44:17, 45:1, 46:12, 46:22, 46:23, 47:11, 48:6, 48:16, 48:22, 49:18, 50:8, 51:11, 51:18, 52:1, 52:10, 53:17, 53:23, 54:12, 54:19, 65:23, 66:6, 66:9, 66:13, 67:1, 67:3, 67:8, 71:22, 81:10, 82:5, 82:7, 82:8, 82:14, 82:16, 82:18, 82:21, 82:23, 83:21, 84:6, 84:11, 84:17, 86:9, 112:5, 112:11, 112:19, 113:11, 113:14, 113:19, 114:2, 114:5, 117:9, 117:15, 117:20, 117:21, 120:8, 121:10, 122:5, 122:22, 124:7, 124:8, 124:13, 124:23, 125:2, 140:19, 141:15, 142:9, 143:4, 143:23, 144:3, 145:10, 146:9, 147:10, 147:14, 154:1, 154:7, 159:13
leave.. [1] - 118:21
leaving [1] - 43:17
Lebanese [1] - 157:6
LeBridge [1] - 25:16
left [12] - 41:23, 42:10, 62:15, 63:9, 72:2, 72:5, 72:12, 72:17, 73:10, 77:6, 82:7, 154:5

legal [4] - 109:22, 133:7, 133:14, 133:18
legislature [16] - 6:11, 20:10, 21:6, 21:8, 21:22, 27:22, 28:16, 28:18, 44:4, 75:7, 106:18, 121:11, 121:14, 121:16, 122:3, 123:21
legislature's [2] - 28:14, 130:19
legislatures [1] - 75:5
less [1] - 18:18
letter [10] - 115:23, 116:2, 116:4, 119:22, 120:2, 123:6, 131:5, 131:18, 131:21, 136:9
Letter [1] - 164:5
licensed [1] - 137:18
lieutenant [3] - 140:9, 140:14, 164:22
lifetime [1] - 142:4
likely [1] - 127:4
limit [3] - 48:9, 61:10, 61:11
limitation [1] - 32:14
limited [2] - 41:15, 46:7
Linda [1] - 2:8
line [14] - 34:14, 34:15, 34:19, 35:4, 35:5, 35:7, 38:5, 66:21, 78:15, 135:14, 135:16, 135:19, 135:22, 138:15
list [11] - 76:19, 77:4, 77:10, 77:13, 78:19, 79:4, 79:12, 149:4, 149:8, 150:22, 152:3
listen [1] - 50:4
LLC [1] - 2:4
load [1] - 154:14
local [2] - 14:1, 145:1
locate [1] - 125:17
look [11] - 46:3, 81:22, 114:19, 116:14, 118:4, 120:6, 121:18, 125:9, 127:19, 138:17, 146:16
looked [1] - 141:10
looking [7] - 12:9, 12:11, 47:22, 77:21, 124:18, 125:6, 154:3
lost [1] - 62:1
lucky [1] - 152:9
Lucky [1] - 50:18
lumped [1] - 34:8
luncheon [1] - 87:3

## M

M-I-R-C-H [1] - 75:10
M.D [1] - 131:19
Mahar [26] - 2:7, 18:23, 19:10, 20:1, 20:6, 67:18, 68:12, 69:4, 69:13, 70:3,

70:14, 73:6, 83:20, 86:15, 99:19, 99:23, 100:3, 100:6, 118:20, 142:8, 143:3, 146:8, 147:19, 150:13, 155:11, 160:16
Mahar's [2] - 67:21, 153:12
mail [2] - 29:13, 29:14, 29:17, 152:17
mailed [2] - 30:6, 30:9
main [1] - 7:2
maintain [1] - 162:16
maintenance [1] - 147:5
malingering [1] - 145:18
management [2] - 40:22, 112:15
manner [1] - 24:16
Manor [1] - 152:21
March [2] - 120:8, 132:4
mark [2] - 9:3, 114:14
marked [5] - 87:2, 111:19, 114:17, 114:18, 131:3
married [2] - 4:8, 150:2
Martin [2] - 2:4, 87:8
master's [2] - 4:20, 4:21
matter [6] - 13:3, 38:7, 94:16, 96:14, 117:3, 117:6
matters [5] - 31:18, 37:13, 37:20, 92:2, 95:18
McClain [2] - 147:3, 147:11
mean [14] - 14:5, 20:4, 34:19, 35:2, 60:19, 65:17, 70:10, 107:10, 113:5, 128:9, 145:22
meaning [1] - 52:7
means [3] - 32:9, 51:6, 128:10
media [3] - 92:6, 119:5, 119:9
Medical [1] - 138:5
medical [8] - 64:16, 64:23, 65:4, 65:13, 138:18, 139:9, 157:20, 165:8
meet [14] - 8:11, 8:16, 9:23, 10:6, 10:8, 10:11, 11:12, 12:19, 76:9, 76:14, 151:2, 160:11, 160:14, 160:18
meeting [1] - 8:19, 10:17, 10:20, 11:15, 13:4, 13:8, 14:22, 24:5, 24:6, 45:19, 114:10
meetings [8] - 19:18, 22:22, 23:7, 23:10, 24:8, 24:18, 25:13, 47:5
meets [2] - 8:21
member [7] - 40:19, 40:23, 52:7, 52:11, 80:2, 86:7, 140:8
members [9] - 38:3, 41:9, 46:23, 48:7, 53:13, 81:17, 98:19, 116:18, 118:21

memorandum [2] - 41:14, 44:1
mental [7] - 69:21, 153:13, 153:14, 153:16, 154:9, 155:3, 155:4
Mental [1] - 155:8
merit [4] - 103:22, 103:23, 104:2, 108:3
met [16] - 11:8, 11:11, 11:12, 11:13, 12:16, 12:21, 13:9, 13:22, 18:22, 19:1, 22:22, 23:1, 24:2, 76:18, 90:23
Meyer [13] - 87:10, 87:12, 87:16, 87:20, 89:1, 89:22, 90:5, 90:7, 91:3, 91:5, 91:8, 94:2, 114:10
micro [1] - 7:3
mid [1] - 19:3
Miller [1] - 19:14
mind [1] - 150:12
minute [1] - 89:10
minutes [1] - 126:7
Mirch [2] - 75:8, 75:10
miss [1] - 4:8
Miss [2] - 110:11, 160:6
missed [1] - 107:17
modify [1] - 123:13
moment [3] - 111:21, 145:9, 147:17
money [13] - 12:10, 14:3, 14:5, 14:6, 14:9, 14:16, 14:21, 15:11, 20:18, 20:20, 20:23, 47:7, 103:7
moneys [3] - 35:8, 84:12, 135:5
month [2] - 12:22, 151:14
months [5] - 31:2, 36:5, 59:18, 151:21
most [3] - 11:7, 69:2, 161:15
mostly [1] - 27:17
motor [3] - 153:23, 154:1, 154:18
moved [3] - 154:11, 154:15, 155:3
MR [170] - 8:1, 8:7, 16:17, 17:16, 18:3, 18:20, 19:19, 20:21, 23:16, 23:20, 24:13, 24:17, 24:22, 27:2, 27:9, 27:15, 28:7, 29:11, 30:14, 31:1, 31:21, 32:20, 33:23, 34:18, 35:18, 36:8, 36:15, 36:19, 39:5, 39:11, 40:17, 44:12, 46:9, 46:14, 47:2, 49:5, 50:3, 50:14, 50:20, 51:2, 51:12, 51:19, 52:3, 52:14, 53:10, 54:2, 55:2, 55:5, 55:8, 55:12, 55:16, 57:1, 57:12, 57:22, 58:10,

58:15, 59:2, 59:22, 60:10, 60:18, 60:23, 61:5, 61:19, 62:5, 62:10, 62:17, 63:1, 63:4, 63:11, 63:18, 64:17, 65:5, 65:17, 65:20, 66:4, 66:8, 66:15, 66:18, 67:2, 67:5, 67:11, 67:23, 69:5, 70:17, 76:6, 76:16, 77:14, 78:17, 79:16, 81:20, 83:1, 83:5, 84:8, 84:21, 85:7, 85:11, 85:17, 85:19, 86:18, 88:12, 88:20, 88:23, 89:3, 89:10, 89:16, 89:19, 90:1, 95:20, 95:22, 96:4, 102:14, 102:20, 103:3, 103:8, 103:21, 104:14, 104:22, 105:19, 106:3, 107:7, 107:13, 107:20, 108:21, 110:5, 110:11, 110:22, 111:16, 115:4, 115:8, 116:8, 118:2, 119:14, 121:20, 121:23, 122:12, 124:14, 125:9, 125:14, 125:18, 125:22, 126:3, 127:14, 129:17, 129:23, 133:2, 133:13, 133:17, 134:16, 134:23, 136:19, 137:23, 145:2, 145:13, 145:20, 146:6, 146:13, 146:17, 147:15, 148:17, 150:19, 152:10, 156:6, 156:8, 161:5, 161:12, 161:14, 162:21, 163:6, 163:11, 163:20

**MS** [49] - 4:4, 34:21, 36:11, 45:12, 50:18, 51:1, 55:4, 55:7, 55:10, 55:14, 55:20, 60:12, 63:5, 64:22, 85:5, 85:8, 85:15, 87:4, 88:14, 88:21, 89:6, 89:13, 89:17, 89:21, 102:22, 110:13, 114:14, 115:6, 115:12, 125:11, 125:16, 125:21, 126:1, 126:6, 132:11, 136:13, 136:21, 138:2, 140:3, 156:4, 157:4, 158:10, 158:17, 161:7, 161:9, 161:13, 162:20, 163:2, 163:10

## N

**name** [7] - 4:5, 12:2, 71:6, 97:1, 152:15, 152:21, 159:3
**named** [3] - 70:5, 109:5, 150:14
**names** [1] - 29:7
**national** [2] - 128:22, 130:4
**nationality** [1] - 128:16
**natural** [2] - 128:19, 128:20
**nature** [2] - 67:15, 124:3

**near** [1] - 31:23
**necessary** [1] - 162:11
**need** [7] - 15:6, 56:1, 100:12, 108:1, 111:12, 130:18, 146:18
**needed** [2] - 42:2, 153:6
**needs** [2] - 8:15, 111:14
**negotiated** [2] - 44:1, 112:6
**negotiation** [1] - 49:11
**negotiations** [3] - 43:12, 93:5, 142:2
**nephew** [1] - 152:19
**never** [4] - 113:1, 119:18, 119:20, 135:14
**New** [7] - 2:5, 2:7, 2:10, 2:14, 4:11, 4:13, 158:9
**new** [1] - 15:22
**newspaper** [2] - 91:21, 159:11
**next** [3] - 26:1, 120:7, 138:10
**non** [12] - 45:2, 50:1, 50:16, 51:10, 51:17, 113:7, 113:8, 122:4, 122:9, 122:20, 124:17, 144:11
**non-union** [8] - 50:1, 113:7, 113:8, 122:4, 122:9, 122:20, 124:17, 144:11
**non-unionized** [3] - 45:2, 51:10, 51:17
**nondiscrimination** [1] - 134:1
**nonetheless** [1] - 151:2
**nonunion** [1] - 112:12
**normally** [2] - 100:9, 100:11
**northeast** [1] - 13:19
**Notary** [2] - 4:2, 139:3
**note** [1] - 138:4
**nothing** [8] - 36:6, 36:23, 75:23, 76:22, 90:16, 150:21, 156:4, 162:20
**Notice** [12] - 94:15, 94:20, 95:1, 105:11, 106:8, 107:19, 108:9, 108:16, 109:4, 110:18, 111:2
**notice** [2] - 109:2, 138:6
**Notices** [1] - 109:11
**notified** [1] - 96:23
**notify** [1] - 162:9
**notifying** [1] - 97:17
**November** [16] - 44:4, 46:12, 51:22, 53:23, 54:11, 114:22, 117:12, 117:13, 118:22, 139:7, 139:14, 139:19, 140:15, 140:17, 142:18, 143:1
**nowhere** [1] - 112:8
**number** [5] - 9:19, 27:22, 41:15, 61:15, 138:15

**numbers** [1] - 47:19
**nursing** [2] - 61:12, 152:21

## O

**O-V-E-N-S** [1] - 137:16
**oath** [1] - 3:6
**object** [112] - 8:1, 8:7, 16:17, 17:16, 18:3, 18:20, 20:21, 23:16, 23:20, 24:13, 24:17, 24:22, 27:2, 27:9, 27:15, 29:11, 30:14, 31:1, 32:20, 33:23, 34:18, 35:18, 36:8, 39:5, 39:11, 40:17, 44:12, 46:9, 46:14, 47:2, 49:5, 50:3, 50:14, 51:1, 51:12, 51:19, 52:3, 52:14, 53:10, 54:2, 55:2, 57:12, 57:22, 58:10, 58:16, 60:10, 60:18, 60:23, 61:5, 61:19, 62:5, 62:10, 62:17, 63:1, 63:11, 63:18, 64:17, 65:5, 66:4, 66:8, 66:15, 66:18, 67:2, 67:5, 67:11, 67:23, 69:5, 70:17, 76:6, 76:16, 77:14, 79:16, 81:20, 84:8, 86:18, 95:22, 96:4, 102:14, 102:20, 103:3, 103:8, 103:21, 104:14, 104:22, 105:19, 106:3, 107:14, 107:20, 108:22, 110:5, 110:22, 111:16, 116:10, 118:2, 119:14, 122:12, 124:14, 129:17, 129:23, 133:2, 133:17, 134:16, 134:23, 145:2, 145:13, 145:20, 146:6, 146:13, 147:15, 148:17, 150:19, 152:10
**Object** [1] - 161:14
**objection** [6] - 78:17, 107:7, 133:13, 157:4, 158:10, 158:17
**objections** [1] - 3:11
**objective** [1] - 128:8
**objectives** [1] - 45:8
**obligated** [1] - 129:20
**obligation** [10] - 60:17, 60:19, 61:4, 62:14, 104:9, 104:19, 133:12, 133:23, 151:5, 153:2
**obligations** [1] - 102:19
**observe** [2] - 25:4, 25:7
**obtain** [2] - 64:16, 165:8
**obtained** [1] - 6:16
**obtains** [1] - 14:6
**obviously** [2] - 103:14, 160:6
**occur** [1] - 107:17

**occurred** [1] - 44:10
**occurring** [1] - 85:3
**October** [6] - 44:4, 137:12, 138:16, 139:2, 139:13, 139:16
**offer** [1] - 25:1
**offered** [1] - 25:9
**office** [31] - 5:20, 8:5, 14:7, 28:1, 41:5, 54:23, 71:20, 77:5, 77:16, 78:15, 79:13, 94:18, 99:14, 99:16, 103:10, 105:6, 106:12, 127:1, 127:5, 130:16, 133:11, 138:12, 141:2, 141:5, 144:8, 152:8, 153:23, 154:2, 158:1, 158:7, 158:8
**Office** [1] - 28:4
**officer** [6] - 45:20, 71:17, 72:9, 72:11, 74:12, 149:8
**officers** [1] - 159:5
**official** [10] - 53:4, 62:21, 66:20, 67:9, 68:2, 86:8, 102:10, 103:10, 113:9, 143:11
**officials** [7] - 62:9, 62:15, 63:9, 63:17, 68:10, 68:20, 79:20
**often** [6] - 5:22, 11:7, 18:9, 29:18, 96:15, 96:18
**once** [3] - 96:7, 114:11, 155:16
**one** [29] - 16:6, 23:11, 23:12, 33:5, 33:12, 40:5, 70:16, 70:18, 74:21, 75:4, 75:13, 76:13, 84:21, 95:15, 113:5, 114:7, 119:7, 119:11, 132:8, 132:15, 144:5, 144:6, 149:3, 149:11, 152:15, 153:18, 154:16, 154:21
**One** [1] - 2:13
**ongoing** [3] - 85:2, 85:12, 157:20
**opening** [1] - 152:22
**operate** [1] - 18:18
**operated** [1] - 18:18
**operates** [1] - 103:13
**operation** [7] - 100:12, 102:9, 102:10, 102:13, 103:18, 103:19, 104:20
**operational** [3] - 140:8, 140:14, 164:22
**operations** [1] - 133:4
**opinion** [2] - 24:10, 25:1
**opinions** [2] - 25:9, 99:23
**opportunity** [4] - 79:19, 126:14, 128:15, 130:22
**Opportunity** [1] - 164:3
**opposed** [2] - 152:8, 154:9
**option** [1] - 113:10
**options** [1] - 47:22

order [2] - 138:3, 163:3
ordered [3] - 83:15, 83:17, 99:14
ordering [1] - 83:14
origin [6] - 128:19, 128:20, 128:22, 130:5, 155:22
original [2] - 3:8, 163:7
originals [1] - 163:14
otherwise [2] - 42:13, 145:16
outside [9] - 46:18, 47:1, 49:11, 53:8, 53:19, 89:15, 89:17, 112:17, 156:14
outstanding [5] - 30:20, 30:23, 31:14, 35:15, 36:4
ovens [1] - 137:16
overlooked [1] - 134:15
oversaw [3] - 19:5, 23:12, 155:5
oversee [4] - 5:10, 5:12, 106:16, 161:17
oversees [1] - 93:5
oversight [1] - 22:7
overtime [3] - 17:6, 22:3, 62:2
own [5] - 49:16, 49:18, 118:1, 128:4, 149:4

**P**

P&C [1] - 7:7
p.m [1] - 163:22
page [26] - 115:18, 115:20, 115:22, 116:14, 117:4, 118:4, 118:6, 118:11, 118:16, 119:21, 120:7, 121:2, 122:8, 124:2, 131:13, 131:16, 137:7, 137:9, 137:13, 137:21, 138:17, 138:18, 138:20, 139:8, 140:4, 142:22
Page [2] - 164:2, 165:2
pages [5] - 116:5, 164:4, 164:5, 164:7, 164:8
paid [9] - 32:15, 34:6, 83:8, 83:12, 83:14, 83:15, 83:18, 83:20, 135:8
paperwork [3] - 161:23, 162:11, 162:12
paragraph [4] - 121:18, 124:3, 124:4, 125:13
pardon [4] - 55:4, 75:9, 106:20, 151:10
parent [1] - 80:9
part [10] - 13:19, 14:7, 14:18, 16:20, 23:10, 26:17, 110:1, 149:6, 151:6, 153:2
participated [1] - 157:11
participation [1] - 129:6

particular [2] - 49:4, 70:12
particularly [2] - 10:21, 69:10
particulars [1] - 40:21
parties [2] - 3:5, 3:17
party [1] - 76:5
pass [2] - 78:6, 152:21
passed [2] - 44:4, 114:9, 114:12
passing [2] - 80:8, 152:15
past [2] - 15:2, 91:6
Pat [1] - 25:15
Patrick [1] - 2:7
patrol [4] - 22:9, 22:14, 22:17, 54:8
pay [6] - 14:3, 15:19, 16:1, 34:3, 66:10, 86:10
payments [1] - 43:2
payroll [1] - 162:4
PC [2] - 2:9, 2:13
Pechenik [13] - 2:17, 31:12, 92:18, 92:20, 92:23, 93:1, 93:6, 93:9, 93:12, 94:8, 95:2, 95:4, 97:16
Pechenik's [1] - 92:17
pending [6] - 37:10, 59:14, 59:21, 66:23, 84:11, 86:10
people [35] - 35:3, 40:6, 41:22, 43:13, 43:16, 43:21, 52:18, 52:20, 61:11, 61:23, 68:18, 69:10, 70:3, 70:11, 70:12, 71:12, 75:19, 78:14, 78:21, 78:23, 79:8, 79:11, 91:12, 96:2, 107:11, 113:18, 128:14, 135:17, 143:4, 144:8, 148:8, 149:3, 149:13, 151:12, 156:10
perform [1] - 72:19
perhaps [1] - 83:17
period [5] - 33:8, 62:22, 151:14, 151:21
periodically [1] - 11:13
permit [2] - 31:22, 86:9
permitted [6] - 46:7, 46:22, 53:7, 117:23, 128:4, 140:23
person [15] - 16:6, 42:2, 70:23, 71:1, 72:2, 73:10, 78:8, 78:18, 78:22, 79:21, 80:8, 146:2, 147:12, 151:19
person's [1] - 97:5
personal [1] - 156:23
personally [6] - 65:18, 65:19, 84:5, 90:22, 95:5, 109:5
Personnel [4] - 161:18, 162:4, 162:9, 162:10
personnel [12] - 16:2, 17:1, 17:13, 18:5, 20:15, 27:22, 91:18, 105:17, 107:2, 135:21, 161:20, 162:7

persons [6] - 69:16, 114:1, 124:13, 147:9, 148:15, 148:16
perspective [1] - 37:2
perusal [2] - 136:23
Phillips [1] - 33:6
phone [4] - 13:5, 29:13, 29:17, 152:17
physical [2] - 61:11, 80:6
pick [2] - 68:5, 79:20
Pine [2] - 2:9, 2:13
Pittstown [1] - 149:3
place [4] - 14:19, 27:17, 41:14, 129:22
placed [2] - 81:10, 82:14
Plaintiff [1] - 2:3
Plaintiff's [4] - 87:1, 114:16, 126:12, 164:2
play [2] - 159:12, 160:21
played [2] - 157:16, 161:1
Plaza [2] - 2:9, 2:13
point [6] - 55:22, 56:3, 78:12, 80:16, 81:9, 163:15
Police [2] - 19:2, 19:10
police [6] - 19:5, 19:12, 19:13, 19:21, 20:1, 20:3
policies [19] - 27:16, 27:18, 27:22, 27:23, 28:11, 52:6, 53:6, 57:18, 58:5, 58:8, 61:6, 61:10, 61:13, 61:16, 61:18, 105:1, 130:22, 141:1, 141:6
Policy [1] - 164:4
policy [73] - 27:8, 27:14, 27:21, 28:15, 40:5, 40:20, 41:12, 41:19, 41:20, 46:4, 46:11, 46:16, 46:22, 48:22, 49:3, 49:14, 49:18, 50:8, 51:11, 52:23, 53:3, 53:5, 53:7, 53:13, 53:16, 53:22, 54:12, 57:10, 57:14, 58:1, 58:13, 63:22, 64:3, 106:13, 106:15, 106:16, 112:5, 112:11, 112:14, 112:21, 113:12, 113:14, 122:9, 123:2, 123:20, 124:6, 124:19, 126:15, 126:18, 127:1, 127:6, 127:9, 127:12, 127:23, 128:4, 128:8, 129:6, 129:12, 129:13, 129:15, 130:16, 134:1, 141:3, 141:8, 144:9, 144:12, 145:1, 145:7, 145:12, 146:2, 146:12
policy's [1] - 106:17
political [5] - 68:19, 75:18, 76:4, 76:23, 148:16
politically [1] - 68:7
portion [1] - 122:15
position [30] - 5:8, 5:17, 6:8, 6:9, 6:15, 6:16, 6:17, 6:19, 6:20, 8:5, 9:4, 9:18,

19:4, 27:6, 28:23, 74:21, 76:10, 77:7, 78:19, 101:10, 101:14, 104:16, 123:16, 148:9, 151:3, 154:5, 154:7, 154:8, 154:23, 155:2
position.. [1] - 123:13
positions [1] - 74:12
possibly [2] - 105:20, 106:5
posted [1] - 61:14
potential [1] - 47:20
potentially [1] - 130:19
power [1] - 148:16
practical [2] - 135:1, 135:2
praises [1] - 100:4
precludes [1] - 66:11
predecessor [1] - 9:15
prefer [1] - 125:19
preference [1] - 77:11, 78:11
premiums [3] - 20:18, 34:4, 34:5
preparation [1] - 111:12
prepare [1] - 109:23
presence [1] - 3:5
present [2] - 58:19, 147:11
Present [1] - 2:16
presented [1] - 47:18
preserve [1] - 63:16
preserving [2] - 62:8, 67:8
president [2] - 84:3, 159:6
pretending [1] - 145:18
pretty [2] - 19:22, 152:16
previous [2] - 32:23, 44:8, 51:22
previously [3] - 73:21, 77:10, 157:19
primarily [3] - 23:9, 29:13, 92:4
privilege [1] - 32:1
privileged [1] - 89:8
privileges [1] - 110:21
probation [2] - 52:8, 151:21
probationary [1] - 151:14
problem [5] - 13:17, 69:12, 69:13, 158:23, 163:12
problems [1] - 158:21
Procedure [3] - 3:15, 3:18, 3:19
procedure [2] - 39:8, 39:12, 134:19
procedures [3] - 32:5, 57:7, 105:1
proceed [1] - 123:12
process [11] - 25:19, 52:12, 56:16, 56:19, 56:22, 135:4, 138:13, 141:5, 141:10, 143:13, 156:13
product [4] - 11:20, 12:1, 12:9, 12:14

productivity [1] - 62:1
professional [2] - 24:15, 25:8
Proffered [3] - 124:1, 136:7, 140:2
program [3] - 40:1, 135:19, 136:4
prohibited [1] - 41:8
prohibition [1] - 52:12
project [1] - 23:13
projections [2] - 47:10, 47:14
promotion [1] - 154:14
promotional [1] - 128:15
prompt [1] - 63:14
proposal [8] - 112:22, 113:5, 120:8, 120:11, 121:10, 122:2, 124:23, 125:2
proposed [3] - 112:21, 112:23, 123:20
protect [1] - 104:9
protected [1] - 129:1
protecting [1] - 61:6
protection [2] - 65:23, 66:3
provide [7] - 7:21, 8:3, 19:9, 29:9, 37:20, 77:22, 163:3
provided [15] - 3:14, 3:17, 5:11, 5:13, 13:22, 20:14, 32:22, 61:8, 77:3, 77:4, 88:16, 93:22, 94:2, 96:13, 96:17
provision [1] - 142:12
Psy [1] - 137:17
PSY [1] - 137:17
psychiatrist [1] - 137:17
Psychological [1] - 137:10
psychologist [2] - 137:16, 137:19
Public [1] - 4:2
public [3] - 61:14, 139:3, 148:14
publishes [1] - 127:2
pulled [1] - 150:9
pulling [1] - 13:21
purchasing [1] - 28:14
purposely [1] - 43:14
purposes [1] - 3:14
pursue [1] - 14:1
put [10] - 21:4, 31:16, 75:4, 75:5, 82:4, 82:6, 82:8, 136:19, 148:22, 162:23
puts [1] - 127:2
putting [1] - 147:23
Pyle [1] - 25:14
PYLE [1] - 25:14

**Q**

qualifications [3] - 76:9, 77:5, 153:6
qualified [9] - 67:10, 78:8, 78:10, 148:8, 151:5, 152:3, 152:23, 154:23, 155:1
QUESTIONS [1] - 165:2
questions [9] - 7:16, 10:21, 25:9, 29:18, 107:8, 112:3, 147:18, 147:22, 161:8

**R**

R-E-I-D [1] - 87:9
race [3] - 128:16, 128:18, 130:5
rank [2] - 19:7, 41:2
rather [3] - 43:14, 82:10, 113:9
ratified [1] - 44:3
reachable [5] - 77:3, 78:19, 78:22, 79:1, 150:21
read [34] - 45:12, 45:14, 50:22, 51:2, 51:4, 60:12, 60:14, 68:17, 91:21, 102:22, 103:1, 108:16, 109:4, 109:6, 109:8, 109:11, 110:6, 111:4, 111:7, 115:4, 115:10, 121:19, 121:20, 121:21, 121:23, 124:4, 125:19, 126:2, 126:7, 127:17, 136:22, 155:17, 159:11, 163:18
reading [4] - 116:6, 124:22, 124:23, 125:22
really [6] - 12:20, 69:7, 133:3, 145:19, 154:13, 154:14
reason [4] - 63:21, 64:6, 123:7, 147:13
reasons [1] - 59:20
reassigned [1] - 16:6
receipt [2] - 94:20, 96:20
receive [14] - 4:21, 72:14, 92:12, 94:15, 94:18, 96:9, 109:12, 113:13, 115:16, 117:23, 140:19, 141:14, 156:10, 159:13
received [14] - 10:19, 29:16, 33:1, 36:4, 64:2, 67:17, 93:16, 95:1, 96:7, 109:2, 111:2, 140:15, 147:9, 155:16
receiving [8] - 59:6, 76:3, 96:19, 115:18, 116:23, 117:18, 117:20, 122:5
recent [1] - 41:11
recently [1] - 82:8
recess [3] - 87:3, 112:1, 146:20
recipients [1] - 124:13
recognize [1] - 137:22
recommend [2] - 10:23, 11:2, 21:2, 21:5, 28:17, 61:13, 80:11, 148:23, 151:23
recommendation [2] - 77:22, 155:12
recommendations [6] - 21:9, 21:16, 77:17, 79:12, 149:22, 150:12
recommended [11] - 21:4, 27:17, 28:12, 78:18, 79:21, 149:12, 149:13, 149:17, 149:20, 151:15, 153:4
recommending [3] - 79:23, 80:4, 147:23
recommends [4] - 21:3, 34:22, 35:2, 35:6
record [20] - 4:6, 7:11, 7:14, 45:11, 88:15, 97:20, 111:23, 114:20, 115:3, 115:5, 115:11, 115:14, 124:5, 126:13, 131:4, 132:11, 140:6, 140:10, 147:8, 162:22
records [2] - 97:17, 157:20, 161:2
reduce [1] - 18:14
reduced [2] - 22:3, 47:12, 66:23
reduction [2] - 13:10, 13:16
reemployment [1] - 71:23
Referee [1] - 3:6
reference [8] - 68:19, 122:4, 122:8, 123:2, 127:12, 127:16, 131:22, 155:12
referenced [1] - 119:22
referrals [1] - 77:17
referring [2] - 115:20, 118:18
refused [1] - 118:20
regard [12] - 28:1, 32:3, 35:16, 43:12, 44:23, 47:19, 110:3, 141:18, 141:22, 141:23, 142:5, 147:18
regarding [38] - 24:3, 24:20, 30:7, 30:10, 30:13, 36:4, 39:14, 39:18, 39:21, 46:11, 47:10, 49:14, 51:11, 53:17, 54:18, 57:11, 58:22, 63:15, 64:3, 64:15, 86:1, 86:16, 92:2, 92:13, 97:11, 99:10, 101:20, 110:3, 113:13, 119:5, 131:19, 136:10, 136:17, 141:15, 143:20, 147:19, 155:21, 165:7
regular [2] - 29:8, 77:18
regulations [1] - 57:19
rehired [2] - 74:6, 82:10
reid [1] - 87:8
Reid [1] - 94:4
Reilly [2] - 120:19, 120:23
reimbursed [2] - 38:22, 66:13
reimbursement [1] - 42:15
relate [3] - 64:18, 89:4, 91:8
related [15] - 66:11, 68:6, 69:16, 69:17, 70:3, 72:19, 75:17, 75:19, 75:21, 84:14, 103:20, 107:2, 116:9, 135:6, 135:15
relates [1] - 152:12
relating [1] - 88:13
relationship [2] - 55:17, 91:2
relative [5] - 11:15, 70:6, 149:2, 159:23, 161:2
relatives [1] - 148:15
relay [1] - 59:23
release [9] - 64:16, 64:23, 65:4, 65:8, 65:12, 65:14, 138:18, 139:9, 165:8
relevant [1] - 144:13
religion [3] - 128:16, 128:18, 130:5
relocating [1] - 152:19
remarks [1] - 24:19
remember [8] - 13:3, 13:7, 19:7, 28:8, 81:3, 108:8, 113:21, 115:17, 126:4, 154:15
remotely [1] - 152:12
remove [1] - 155:6
Rensselaer [36] - 2:7, 5:4, 5:6, 5:11, 5:13, 7:22, 13:18, 23:14, 39:10, 52:9, 60:7, 60:16, 60:20, 91:14, 91:19, 92:3, 110:4, 110:10, 112:12, 112:18, 116:20, 118:13, 118:18, 119:5, 126:16, 128:8, 129:2, 129:20, 130:23, 134:22, 137:2, 138:12, 140:20, 152:21, 159:14, 161:11
repeat [1] - 102:21
repeating [1] - 110:14
rephrase [1] - 63:5
replaced [1] - 98:2
Report [1] - 164:6
report [15] - 29:8, 31:10, 37:10, 91:12, 131:20, 132:5, 132:8, 132:13, 136:10, 137:3, 138:23, 141:14, 142:2, 164:5, 164:20
reported [2] - 139:16, 139:17
reporter [4] - 45:14, 51:5, 60:15, 103:2

reports [5] - 29:9, 31:11, 88:4, 162:16, 164:19
represent [3] - 95:18, 109:21, 160:5
representative [1] - 10:18
represented [7] - 37:8, 65:3, 124:9, 124:11, 126:8, 126:10, 139:22
representing [1] - 6:11
represents [1] - 99:3
Republican [5] - 68:8, 71:3, 75:15, 81:17
Republicans [1] - 73:4
request [7] - 12:6, 12:7, 12:8, 20:20, 78:6, 153:10, 155:7
requested [3] - 132:17, 132:20, 155:10
requesting [2] - 136:15, 140:10
requests [11] - 8:13, 10:20, 10:21, 18:14, 18:15, 20:19, 20:23, 77:20, 78:1, 86:20, 146:22
required [2] - 38:17, 61:8
requirement [1] - 129:9
requirements [6] - 76:15, 101:10, 101:14, 151:2, 160:14, 160:18
requires [7] - 59:23, 64:18, 79:3, 89:3, 90:1, 146:2, 151:1
reserved [1] - 3:11
reserving [1] - 163:18
reside [1] - 4:10
resigned [1] - 43:4
resolved [2] - 37:2, 123:15
Resource [1] - 162:13
Resources [10] - 29:3, 108:2, 127:3, 130:15, 141:6, 141:15, 144:22, 145:5, 161:19, 162:15
resources [15] - 13:20, 104:23, 105:3, 105:6, 105:10, 105:17, 105:18, 106:9, 106:12, 106:23, 107:6, 107:12, 107:18, 133:23, 141:2
respect [47] - 3:20, 26:23, 27:6, 39:8, 44:20, 45:5, 49:18, 51:17, 53:22, 55:21, 55:23, 56:22, 57:20, 68:12, 69:4, 70:3, 70:8, 70:14, 80:5, 86:4, 90:15, 91:17, 91:18, 98:10, 102:18, 105:10, 110:9, 110:15, 111:14, 112:4, 113:17, 114:1, 116:4, 122:10, 127:6, 128:18, 129:1, 129:16, 129:21, 130:12, 132:20, 141:1,

141:20, 147:9, 147:18, 148:13, 162:16
respectfully [1] - 61:10
respective [1] - 3:5
respond [4] - 29:15, 94:23, 96:11, 136:20
responding [1] - 115:6
response [6] - 7:13, 35:17, 35:20, 36:3, 46:2, 143:7
responses [1] - 147:8
responsibilities [2] - 61:4, 102:19
responsibility [2] - 60:21, 104:19
responsible [2] - 144:19, 144:23
rest [1] - 16:16
restate [1] - 60:11
restored [1] - 72:14
restriction [4] - 44:10, 48:8, 48:9, 48:11
result [9] - 14:15, 15:22, 38:17, 62:16, 63:10, 76:3, 81:18, 141:12, 154:22
retaking [1] - 77:9
retaliated [1] - 110:20
retaliation [6] - 127:13, 127:16, 127:21, 129:6, 129:16, 130:12
retention [2] - 128:17, 129:1
retire [3] - 32:22, 43:1, 48:4
retired [1] - 33:7
retirement [8] - 18:9, 33:4, 33:5, 33:9, 34:11, 42:21, 42:22, 42:23
return [1] - 147:17
review [8] - 111:21, 130:21, 131:2, 138:13, 141:12, 144:2, 144:16, 146:21
reviewed [3] - 58:5, 140:12, 164:21
reviews [1] - 141:6
revocation [1] - 123:19
Richard [2] - 87:5, 137:16
rid [2] - 151:9, 151:11
rights [2] - 3:16, 110:20
road [4] - 22:9, 22:14, 22:16, 54:8
ROBERT [2] - 2:13, 2:15
Rodgers [22] - 71:2, 71:7, 72:23, 73:2, 73:7, 80:14, 81:15, 81:16, 81:18, 81:21, 81:22, 82:13, 83:20, 83:23, 86:5, 86:7, 86:12, 86:17, 150:15, 159:3, 159:8
rodgers [1] - 74:19
Rodgers' [2] - 86:1, 147:19
Rogers [1] - 75:13
role [6] - 27:7, 49:13,

156:17, 159:12, 160:21, 161:1
Rome [1] - 2:5
room [1] - 27:5
roughly [1] - 32:10
routine [2] - 96:14, 96:17
rules [3] - 19:20, 57:19, 76:1
Rules [3] - 3:15, 3:17, 3:19
rumors [1] - 157:8
run [8] - 5:22, 6:5, 15:6, 102:17, 102:18, 103:10, 104:12, 143:11
running [3] - 71:4, 104:20, 159:10
runs [4] - 102:10, 102:12, 103:17, 103:19
Russell [3] - 131:6, 131:19, 164:5
Russo [2] - 2:7, 25:15, 70:5
Ruth [6] - 2:12, 100:15, 100:17, 100:20, 156:17, 160:5
Ryan [1] - 31:7

**S**

safety [1] - 61:7
salaries [2] - 15:20, 16:1
sat [2] - 87:23, 126:7
save [2] - 47:8, 125:12
saw [2] - 142:2, 142:5
schedule [1] - 134:13
score [1] - 79:9
scored [2] - 74:16, 150:17
scorers [1] - 79:6
Scott [1] - 25:14
scrutiny [1] - 141:2
SEARCO [1] - 159:6
second [10] - 35:19, 84:21, 118:4, 118:5, 124:2, 125:10, 131:13, 131:16, 132:14, 137:7
sections [1] - 3:19
security [1] - 119:13
see [11] - 13:23, 28:6, 69:11, 69:13, 109:5, 109:16, 122:15, 125:6, 128:10, 135:16, 138:19
seeing [4] - 42:11, 117:1, 127:18, 127:21
seek [1] - 61:11
sees [2] - 102:10, 103:10
send [6] - 10:9, 10:11, 10:13, 111:10, 136:21, 163:5
sending [1] - 132:5
sends [2] - 162:3, 162:13
seniority [1] - 72:14
sense [1] - 101:15

sent [4] - 10:6, 95:2, 109:9, 132:8
separate [9] - 22:5, 22:16, 34:13, 34:14, 51:11, 105:4, 127:23, 128:5, 129:5
separately [4] - 53:4, 103:9, 143:10, 144:20
September [9] - 44:1, 44:3, 116:1, 118:9, 120:3, 123:8, 123:14, 127:10, 138:7
sergeant [1] - 19:8
series [1] - 147:22
serve [2] - 9:17, 26:13
served [3] - 20:4, 105:11, 107:19
serves [1] - 110:18
service [20] - 6:17, 6:19, 66:10, 71:23, 73:12, 73:18, 73:19, 74:14, 74:17, 76:12, 76:14, 77:6, 78:19, 79:1, 79:3, 148:4, 148:14, 150:17, 151:20, 154:17
services [6] - 5:11, 5:13, 7:21, 8:3, 19:9
serving [1] - 24:11
set [19] - 32:5, 52:23, 53:3, 53:5, 53:8, 53:12, 57:10, 57:14, 58:6, 58:9, 112:6, 113:12, 123:7, 123:10, 134:19, 136:17, 148:5, 148:6
sets [2] - 106:12, 162:4
setting [1] - 49:14
settled [1] - 123:14
settling [1] - 123:11
seven [4] - 48:13, 48:17, 137:13, 164:5
several [3] - 18:8, 27:16, 37:16
sex [3] - 128:16, 128:18, 130:5
shall [2] - 3:18, 3:19
shared [1] - 88:9
sheriff [70] - 8:12, 8:14, 8:19, 9:22, 10:8, 10:17, 11:6, 11:8, 12:1, 12:3, 12:5, 13:22, 13:23, 18:23, 20:7, 20:23, 22:6, 22:8, 24:4, 25:15, 34:22, 35:1, 35:6, 51:15, 51:16, 52:17, 52:23, 53:4, 53:6, 53:12, 58:6, 58:9, 67:18, 70:6, 71:4, 74:22, 75:1, 75:6, 80:21, 81:21, 82:11, 83:13, 83:15, 83:16, 99:17, 102:9, 103:9, 104:11, 104:20, 105:1, 118:20, 138:12, 140:23, 141:7, 143:3, 143:10, 145:6, 145:9, 145:17, 149:5, 149:9, 156:12, 158:7, 158:8, 158:15, 159:20, 159:22,

160:9, 160:10, 160:16
sheriff's [10] - 7:22, 8:6, 10:5, 12:6, 17:15, 17:22, 38:4, 140:21, 156:14, 158:1
Sheriff's [65] - 8:4, 14:6, 15:1, 15:8, 16:9, 16:14, 16:23, 17:20, 18:11, 18:17, 20:15, 20:19, 21:13, 22:4, 23:14, 25:12, 33:21, 34:4, 39:15, 41:3, 41:4, 41:9, 44:20, 49:13, 49:19, 49:22, 50:2, 50:7, 52:10, 53:9, 54:8, 54:9, 54:13, 58:6, 58:9, 58:14, 63:22, 69:18, 81:7, 82:2, 86:1, 96:16, 96:19, 97:11, 98:16, 98:20, 98:23, 99:1, 102:17, 111:8, 127:22, 128:3, 133:3, 133:9, 133:10, 142:9, 144:3, 144:17, 146:14, 147:4, 148:23, 157:2, 157:16, 158:12
ship [1] - 104:12
ships [2] - 24:3, 26:4
short [3] - 112:1, 124:3, 146:20
shortly [1] - 82:11
show [1] - 125:11
sibling [1] - 80:9
sick [113] - 38:1, 38:7, 38:10, 38:13, 38:18, 38:20, 38:21, 39:21, 39:23, 40:5, 40:8, 40:14, 40:20, 41:8, 41:11, 41:19, 41:23, 42:3, 42:5, 42:7, 42:8, 42:9, 42:12, 42:17, 43:1, 43:4, 43:8, 43:14, 43:18, 44:9, 44:17, 44:20, 45:1, 45:6, 46:4, 46:11, 46:21, 46:23, 47:11, 48:6, 48:16, 48:22, 49:14, 49:18, 50:8, 51:11, 51:17, 52:1, 52:6, 52:9, 53:17, 53:22, 53:23, 54:12, 54:16, 54:19, 63:10, 65:23, 66:6, 66:9, 66:13, 67:1, 67:3, 67:8, 95:10, 95:13, 112:4, 112:7, 112:11, 112:14, 112:18, 112:19, 113:11, 113:19, 114:2, 114:4, 114:5, 117:9, 117:15, 117:20, 117:23, 118:21, 121:10, 122:5, 122:21, 124:7, 124:9, 140:19, 141:15, 141:23, 142:4, 142:6, 142:8, 143:5, 143:16, 143:23, 144:2, 145:10, 145:15, 145:18, 145:19, 145:23, 146:2, 146:5, 146:9, 146:10, 147:10, 147:13, 159:13, 159:17
sickened [1] - 67:15

sided [1] - 137:8
Siena [1] - 4:19
sign [2] - 121:7, 163:18
signature [3] - 121:1, 140:7, 140:8
signatures [2] - 120:14, 120:17
signed [16] - 3:8, 41:14, 120:9, 120:11, 121:11, 122:2, 122:10, 125:2, 126:1, 126:4, 137:14, 139:12, 139:19, 140:11, 144:9, 164:21
single [1] - 152:15
sink [1] - 43:17
sit [2] - 115:9, 119:18
sitting [1] - 26:14
situation [3] - 81:22, 111:9, 160:17
six [1] - 151:14
sixth [1] - 4:13
Smith [3] - 2:8, 25:14, 40:13
Snyder [2] - 9:16, 9:17
social [1] - 151:20
someone [25] - 10:9, 10:14, 11:17, 12:11, 32:12, 32:19, 42:6, 42:7, 43:5, 43:15, 43:19, 65:12, 68:5, 75:23, 76:22, 77:6, 78:15, 79:4, 79:13, 80:4, 97:19, 98:1, 149:7, 151:20, 152:4
sometime [1] - 79:22
sometimes [2] - 103:22, 109:18
somewhat [1] - 65:9
somewhere [2] - 15:17, 48:20
son [8] - 71:9, 81:15, 149:4, 149:8, 149:15, 149:18, 149:19, 150:1
son-in-law [5] - 149:4, 149:15, 149:18, 149:19, 150:1
soon [1] - 132:20
sorry [10] - 36:11, 36:21, 38:2, 53:11, 63:6, 82:7, 102:21, 110:7, 110:13, 140:4
sort [2] - 135:15, 162:5
sought [3] - 30:12, 114:1, 147:10
sounds [2] - 68:22, 123:13
special [2] - 76:3, 150:15
specific [2] - 40:7, 108:14
specifically [9] - 21:13, 27:11, 59:11, 95:13, 112:15, 113:16, 122:4, 124:6, 141:18
spelled [1] - 47:21
spend [1] - 42:12
spending [1] - 15:5

spent [2] - 6:12, 42:13
spite [1] - 153:9
spoken [9] - 30:1, 30:4, 75:3, 88:6, 91:6, 91:9, 96:2, 100:6, 100:15
Stacey [5] - 9:1, 9:4, 9:12, 10:9, 10:16, 10:19, 11:5, 11:7, 21:21
staff [9] - 8:21, 8:22, 8:23, 9:22, 10:7, 24:5, 29:4, 43:12, 140:7
stamp [1] - 139:3
standard [2] - 92:1, 132:19
standards [1] - 160:12
standing [2] - 35:15, 91:16
start [1] - 76:23
started [3] - 6:23, 7:5, 100:23
State [1] - 11:16
state [20] - 4:5, 4:20, 4:22, 12:5, 12:12, 13:6, 13:18, 13:21, 35:11, 57:15, 61:8, 106:19, 106:21, 106:22, 129:19, 133:12, 133:20, 134:2, 134:10, 145:1
statement [3] - 136:11, 136:15, 164:20
statements [2] - 24:20, 86:15
states [1] - 124:6
statistics [1] - 162:16
status [8] - 32:3, 34:16, 35:16, 38:1, 81:6, 86:17, 91:13, 94:21
stay [2] - 32:19, 32:21
stead [1] - 90:13
stealing [1] - 84:12
Stephen [1] - 2:17
steps [2] - 37:4, 37:16
Steve [5] - 11:23, 31:11, 92:16, 92:18, 97:16
Steve's [1] - 92:16
still [2] - 151:22, 154:8
STIPULATED [5] - 3:4, 3:7, 3:10, 3:13, 3:16
strain [1] - 61:11
street [3] - 68:18, 71:12, 101:5
Street [1] - 2:4
stress [2] - 64:10, 67:15
strictly [1] - 35:8
subject [4] - 13:3, 114:6, 117:3, 117:6
submission [1] - 15:4
submit [2] - 8:13, 15:3
subordinate [3] - 92:15, 92:16, 92:17
subordinates [1] - 92:13
subsequent [2] - 37:12, 144:11

substance [2] - 160:11, 160:18
success [1] - 45:8
sued [3] - 95:5, 103:14, 158:22
sufficient [1] - 40:8
suggest [3] - 68:18, 117:17, 117:19
suggestion [1] - 46:3, 77:23
Suite [2] - 2:9, 2:13
summary [1] - 104:16
summer [1] - 13:1
Superintendent [1] - 25:15
Supermarket [1] - 7:7
supervise [3] - 107:11, 158:7, 161:17
supervised [4] - 9:11, 28:21, 91:12, 105:7
supervision [1] - 134:7
supervisor [4] - 9:6, 105:4, 140:13, 164:21
supervisory [1] - 140:7
supported [1] - 41:16
supporting [1] - 129:7
supposed [2] - 128:20, 134:14
surprised [3] - 101:5, 102:2, 102:5
surrendered [1] - 99:14
suspended [2] - 142:8, 143:5
sworn [1] - 4:2
system [2] - 148:5

## T

table [2] - 14:3, 125:15
targeted [1] - 40:11
Task [1] - 16:12
task [8] - 13:6, 13:11, 13:16, 14:12, 15:12, 16:4, 16:7, 16:8
tax [1] - 14:17
taxpayers [2] - 35:9, 103:15
team [4] - 149:6, 150:5, 150:6, 150:7
technical [1] - 11:19
technically [2] - 92:16, 137:9
technology [1] - 6:22
ten [5] - 23:5, 23:8, 33:18, 126:4, 126:7
term [4] - 6:3, 41:16, 76:18, 119:16
terminate [1] - 160:22
terminated [1] - 160:9
terminating [3] - 101:20, 101:23, 102:2

termination [2] - 162:11, 162:13
terms [3] - 37:5, 52:6, 142:16
test [3] - 77:9, 79:1, 151:1
testified [3] - 4:3, 112:5, 133:22
testimony [5] - 41:7, 41:10, 81:14, 143:2, 148:2
testing [1] - 148:5
text [1] - 122:15
THE [2] - 121:22, 122:1
themselves [4] - 42:4, 42:10, 80:2, 150:20
therefore [4] - 103:12, 111:9, 111:10, 143:15
thereto [1] - 3:20
third [2] - 115:22, 137:9
three [24] - 9:20, 26:8, 26:9, 26:23, 29:5, 31:2, 36:5, 59:17, 72:4, 72:6, 74:3, 74:17, 76:13, 77:20, 78:23, 79:4, 79:6, 79:9, 79:11, 97:3, 138:15, 150:4, 151:21, 164:4
throughout [1] - 11:14
tighten [1] - 46:3
timely [1] - 108:15
title [2] - 29:2, 88:2
TO [1] - 165:2
today [2] - 119:18, 160:7
today's [1] - 109:23
together [2] - 34:8, 73:3
Tom [5] - 2:8, 28:20, 36:13, 114:9, 133:8
tone [2] - 68:23, 110:12
took [3] - 22:2, 41:14, 76:14
top [13] - 15:14, 74:17, 76:13, 79:4, 79:6, 79:9, 118:15, 138:15, 138:20, 139:13, 139:15, 161:10, 161:13
topic [2] - 13:9, 24:5
total [2] - 46:8, 142:3
toward [2] - 40:7, 43:2
towards [1] - 104:19
traffic [1] - 19:5
trailer [1] - 150:10
training [1] - 61:8
transcript [6] - 3:8, 3:9, 136:22, 163:3, 163:8, 163:19
transfer [1] - 151:7
transition [4] - 149:6, 150:5, 150:6, 150:7
treat [1] - 61:9
treated [2] - 111:15, 157:2
trial [1] - 3:12
Troy [8] - 4:13, 6:12, 19:2, 19:10, 19:13, 19:21, 20:1, 75:15
troy [1] - 4:11

true [2] - 124:12, 124:15
truth [2] - 108:17, 127:8
try [1] - 152:16
trying [4] - 85:16, 107:16, 111:6, 127:18
turn [3] - 131:13, 137:7, 137:13
turning [1] - 126:11, 139:8
two [10] - 22:13, 23:11, 23:22, 24:3, 33:14, 77:20, 79:11, 96:21, 97:3, 149:12
type [2] - 32:14, 118:12
types [4] - 61:15, 68:9, 68:11, 70:13
typically [5] - 10:9, 10:20, 18:6, 28:13, 68:5
typo [1] - 128:19

## U

um-hum [51] - 7:14, 7:15, 12:18, 13:12, 14:11, 19:11, 24:18, 25:23, 27:13, 32:18, 35:10, 42:19, 43:22, 44:7, 56:2, 69:2, 73:17, 74:8, 74:15, 74:18, 81:11, 92:7, 94:17, 94:19, 98:22, 105:8, 109:15, 116:16, 116:22, 120:1, 120:13, 121:6, 125:3, 130:6, 130:8, 131:15, 132:1, 134:4, 134:9, 138:22, 147:21, 148:3, 149:16, 153:20, 154:6, 155:2, 155:13, 155:15, 155:19, 155:23, 162:6
unable [3] - 64:11, 71:19, 77:7
under [17] - 22:6, 24:7, 25:14, 27:20, 27:23, 32:15, 70:6, 73:10, 76:15, 124:3, 134:7, 144:6, 144:15, 144:17, 144:18, 145:11, 158:9
understood [2] - 36:12, 142:10
undertaken [1] - 37:5
unfair [1] - 70:22
union [49] - 40:6, 40:19, 40:21, 41:1, 46:23, 47:1, 47:23, 48:7, 49:4, 49:11, 49:21, 50:1, 51:22, 52:5, 52:11, 54:7, 71:5, 75:14, 84:3, 84:4, 84:13, 86:7, 86:8, 86:9, 112:6, 112:14, 112:22, 113:2, 113:3, 113:7, 113:8, 116:18, 122:4, 122:9, 122:19, 122:20, 124:16, 124:17, 124:19, 124:21, 144:10, 144:11, 144:13,

147:6, 147:12, 159:4, 159:7, 159:10
unionized [8] - 45:1, 45:2, 50:9, 50:13, 50:17, 51:10, 51:17, 53:21
unit [9] - 114:23, 117:8, 124:10, 124:11, 126:9, 126:10, 154:12, 154:19, 154:21
Unit [2] - 154:10, 155:10
unload [2] - 42:9, 43:8
unloading [2] - 43:14, 45:5
unrepresented [2] - 117:9, 122:22
up [31] - 5:15, 10:6, 18:10, 31:17, 31:19, 35:5, 37:19, 43:17, 43:19, 43:21, 46:4, 51:14, 52:17, 78:5, 78:10, 79:9, 96:15, 97:9, 100:13, 118:12, 144:20, 148:5, 148:6, 150:11, 156:7, 158:21, 160:6, 160:7, 161:8, 162:4
update [2] - 130:16
updated [2] - 130:17, 130:18
uphold [1] - 61:3
UPSEU [22] - 41:4, 41:5, 41:13, 43:12, 44:2, 45:9, 49:15, 52:4, 52:5, 53:18, 54:3, 54:9, 113:14, 114:21, 118:7, 118:19, 120:23, 123:12, 124:19, 125:5, 144:6, 164:8
uses [1] - 38:20
USPEC [1] - 113:6
utilities [1] - 18:10
utilized [1] - 3:14

## V

vacation [1] - 124:8
van [1] - 152:20
variations [1] - 10:22
various [2] - 22:22, 106:14
vehicle [3] - 153:23, 154:1, 154:18
vehicles [1] - 27:21
vendor [3] - 12:1, 12:3, 12:4
verbal [1] - 7:13
versa [1] - 68:9
versus [1] - 45:1
Vibert [7] - 2:12, 100:16, 100:17, 100:21, 156:17, 160:5, 160:9
Vibert's [2] - 160:16, 160:22
vice [2] - 68:8, 159:6

vice-president [1] - 159:6
Vicky [2] - 120:19, 120:22
violated [1] - 145:7
violates [1] - 133:20
violating [1] - 98:19
violation [2] - 97:11, 98:10
violations [1] - 99:11
vis [2] - 61:9
vis-a-vis [1] - 61:9
visits [2] - 37:5, 37:7
voice [1] - 110:12
voluntarily [1] - 154:5
voluntary [1] - 124:7
voters [1] - 103:11

## W

wait [2] - 89:10, 125:14
waived [3] - 3:6, 3:9, 3:18
waiver [1] - 88:17
wants [6] - 40:14, 104:13, 104:21, 128:10, 143:11, 152:19
wash [1] - 158:21
Washington [2] - 2:10, 2:14
watch [2] - 140:13, 164:22
ways [2] - 60:21, 61:2
week [3] - 11:15, 12:16, 77:20
weeks [2] - 48:15, 48:21
welfare [1] - 104:10
well-being [4] - 60:8, 62:9, 62:23, 63:16
West [2] - 2:9, 2:13
whatsoever [1] - 60:5
wife [2] - 69:18, 153:12
window [3] - 72:1, 72:3, 74:4
withdrawn [2] - 53:22, 142:8
WITNESS [2] - 121:22, 122:1
witness [4] - 88:19, 89:14, 163:13, 163:17
woman [1] - 152:18
word [6] - 68:23, 75:4, 75:5, 83:17, 147:23, 148:22
words [4] - 101:13, 101:16, 160:10, 160:17
worker [1] - 80:17
Worker's [9] - 20:17, 33:22, 34:3, 34:5, 39:9, 39:14, 56:23, 57:11, 57:21
workers [2] - 61:20, 62:3
workers' [1] - 17:10
Workers' [2] - 57:7, 57:23
works [8] - 40:4, 69:21, 92:20, 104:23, 125:7, 147:4, 149:5, 153:13

16

**write** [1] - 118:12

**writing** [4] - 49:2, 113:12, 134:19, 142:5

**written** [11] - 30:6, 30:9, 46:16, 47:14, 49:1, 53:16, 57:19, 58:2, 58:13, 63:22, 65:11

**Wynantskill** [1] - 7:7

## Y

**year** [35] - 4:21, 7:4, 8:12, 8:14, 8:15, 9:14, 10:3, 10:22, 11:14, 14:4, 15:5, 18:7, 18:10, 18:16, 18:19, 20:6, 21:12, 21:18, 26:6, 33:12, 34:17, 35:4, 46:8, 48:10, 61:7, 73:5, 74:3, 75:16, 83:4, 100:14

**year's** [1] - 11:1

**years** [28] - 5:7, 5:19, 5:23, 6:10, 6:12, 6:14, 9:9, 9:12, 9:19, 18:8, 19:22, 21:15, 23:5, 23:8, 26:8, 26:9, 27:1, 29:1, 33:10, 33:18, 70:5, 72:4, 72:6, 73:4, 97:3, 97:4, 126:5, 150:4

**York** [7] - 2:5, 2:7, 2:10, 2:14, 4:11, 4:13, 158:9

**yourself** [3] - 98:4, 110:2, 110:8

# Rensselaer County Correctional Facility
## Incident Report

1. Type of Incident: *Informational*
2. Location of Incident: *RCPSB — Home*
3. Date of Incident: *8/24/12*    3a. Time of Incident: *7:30 Am*
4. Name(s) of Inmate(s) involved and Cell Assignment:
   a. *N/A*                Cell: _____    c. _____    Cell: _____
   b. _____    Cell: _____    d. _____    Cell: _____

5. Was inmate(s) locked in cell after incident?                Yes ☐    No ☑
6. Was inmate(s) locked in another Housing Unit?                Yes ☐    No ☑
   If yes, what Housing Unit(s) was the Inmate(s) moved to:
   a. _____    Cell: _____    c. _____    Cell: _____
   b. _____    Cell: _____    d. _____    Cell: _____
   Move(s) Authorized By: _____

7. Endorsement of other Employee Witnesses, (if any):
   a. _____    Badge: _____    c. _____    Badge: _____
   b. _____    Badge: _____    d. _____    Badge: _____

8. Were there any injuries to Officer(s) or Inmate(s)?                Yes ☑    No ☐
   List: *See report from DR Ovens*

9. Was Physical Force used?                Yes ☐    No ☑
   If yes, explain type of force used and reason in the narrative of this report. Also complete Use of Force Form.

10. Medical Care given by: _____
11. Damage to Property?    Yes ☐    No ☑    Describe: _____
12. Were Photographs taken?    Yes ☐    No ☑    If yes, by whom? _____
13. If an Assault, type of weapon used: _____
14. Evidence secured?    Yes ☐    No ☑    List here: _____
15. Evidence given to: _____
16. If illness/death, what was cause? _____
17. Victim/Injured taken to? _____
18. By what means Transported? _____
19. Deputy assigned to investigate?    Yes ☐    No ☑    Deputy's name: _____
20. NARRATIVE: On the rear of this report, describe the incident, action(s) of inmates and staff involved. Include all pertinent information, if already stated above on this page. Use Supplemental Sheets if necessary.

*James Karam*    Lieutenant                *1012*
Printed Name of Reporting Officer                Badge

*LTJ Karam*                *10/31/12*    *3:30 pm*
Signature of Reporting Officer                Date    Time

### Reviewed by Supervisor or Watch Commander

_____                _____    _____
Signature of Supervisory Staff Member                Rank    Badge

                _____    _____
                Date of Review    Time of Review

### Reviewed by Operational Lieutenant

_____                _____    _____
Signature of Operational Lieutenant                Date of Review    Time of Review

Page 1 of 2

PLAINTIFF'S
EXHIBIT NO. *KJ - 3*
FOR IDENTIFICATION
DATE: *12/23/14*    RPTR: *WET*

# Narrative

On Sunday 8/26/12 I woke up at home and had trouble eating my breakfast that morning. I have been suffering from TMJ from grinding my teeth for sometime now. I took several days off to heal my jaw and upon returning to work I decided to seek additional help from my doctor. I scheduled an appointment with my DR and was taken out of work. Upon recommendation from my doctor and other mental health professionals I sought out treatment for mental health. I have been seeing Dr. Richard Oven with the NYSP EAP, after several sessions I finally received a diagnosis from Dr. Oven on October 31, 2012 stating that I suffer from work related stress and PTSD. Over a very long period of time I have been treated for other stress related issues that are related to work. EOR.

_____
Jowey Karam
Printed Name of Reporting Officer

_____
James E
Signature of Reporting Officer

Page 2 of 2

OP-07



R E C E I V E D

JUN 20 2012

RENSSELAER COUNTY
ATTORNEY'S OFFICE

SCANNED

JUN 20 2012

By:_____ _____

# EQUAL EMPLOYMENT OPPORTUNITY

It is and will continue to be the policy of Rensselaer County to provide Equal Opportunity to qualified individuals for their initial appointment and subsequent promotion without regard to race, color, religion, sex, age, natural origin or physical condition. Further, no local practice, procedure or policy shall be maintained to diminish such Equal Opportunity. Affirmative Action is a policy objective of Rensselaer County and must be an integral part of every aspect of personnel policy and practice in the employment, development, advancement and treatment of employees of the County government. Any Rensselaer County employee who fails to comply with this policy shall be subject to disciplinary action, in accordance with, the Rensselaer County Work Rules



PLAINTIFF'S
EXHIBIT NO. RJ - 1
FOR IDENTIFICATION
DATE: 12/23/14    RPTR: NET

TOPIC:  EQUAL EMPLOYMENT OPPORTUNITY

POLICY:

The progress of Rensselaer County requires that all available manpower be utilized to the fullest, regardless of race, color, religion, sex, or national origin. It is the policy of Rensselaer County to grant equal employment opportunity to all qualified persons without regard to age, race, color, religion, sex, or national origin.  This policy is in accordance with the Equal Employment Opportunity Act of 1972 which Rensselaer County adheres to completely.

PROCEDURE:

In order to effectuate the above policy, each department will adhere to the following:

1.  Each Department Head will establish and maintain a positive program for equal employment opportunity consistent with the goals and operations of the department.  Each policy is to be cleared through the County Executive's Office.

2.  Department Heads and Supervisory personnel will plan and take affirmative action to achieve equal employment opportunity and thus improve the status of minority group members in employment, training and promotional opportunities.

3.  All advertising for employees shall include the statement that "The County of Rensselaer is an Equal Opportunity Employer."

4.  All decisions pertaining to employment, upgrading, demotion, transfer, security, layoff, termination, and training will be made without regard to race, creed, color, sex, age, or national origin.

PROCEDURE:

1.  Recruitment -- Each department, through the Office of Assistant for Labor Relations and Personnel, will consider qualified minority group applicants for vacancies in all job classifications in conjunction with County policy on qualification and job performance:

A. Should public and/or private employment offices be used for recruitment purposes, said offices will be advised in writing of the County equal employment policy and will be urged to refer qualified minority group applicants to County or departments as the need arises.

B. When advertising for position, the term the County of Rensselaer is an Equal Opportunity employer will be used in all such advertisements.

2. Job Placement and Promotions -- The County and departments will provide promotional and upgrading opportunities to all qualified minority group employees.

A. Supervisors at all levels will be briefed that the County intends to insure utilization of qualified minority group personnel at all job levels.

B. Review objectively all qualifications of all candidates for promotion from within.

3. Training and Development -- Department Heads will periodically review all training and educational programs, where applicable, to be certain that all personnel are given equal opportunity in such programs.

4. Layoff and Termination -- Whenever necessary to reduce the work force such reduction and/or layoff and recall will be done strictly in accordance with the provision and procedures of Civil Service Law and the agreement between the County and its employees.

5. Communication of EEO Policies -- The County and departments will take appropriate steps to insure that all personnel know of the County's sincere desire to support and take affirmative action such as the following:

A. Bulletin boards showing official EEOC and County EEOC Policy

B. Employee Handbook

C. Policy Manual

D. Employee Newsletter where applicable

E. Supervisory Staff Meetings

6. Affirmative Action Coordinator -- The Assistant for Labor Relations and Personnel has been appointed Equal Employment Opportunity Officer. He will coordinate the efforts of all Department Heads and Supervisory Personnel. He will advise and assist them and make periodic reports on progress to the County Executive.

# Russell Denea, M.D. , D.F.A.P.A.
Psychiatry and Psychoanalysis

268 Broadway, Suite 202
Saratoga Springs, New York 12866
Telephone: (518) 584-8888
Facsimile: (518) 584-1666

May 3, 2013

Brian J. Goldberger, Esq.
Goldberger and Kremer
39 North Pearl Street Suite 201
Albany, New York  12207

Re: James Karam
  DOB: 6/10/1968

Dear Mr. Goldberger:

Please find enclosed the consultation report for the above-named individual. I also enclose a copy of the signed consent to allow me to share information with you and the Sheriff's Department. A statement for charges for the consultation is also enclosed.

Thank you for allowing me to assist you in this consultation. If there are any questions or concerns about the consultation or the report please feel free to contact me.

Sincerely,

Russell Denea, M.D., DLFAPA
Enc.

PLAINTIFF'S
EXHIBIT NO. KJ-2
FOR IDENTIFICATION
DATE: 12/03/14   RPTR: MET

# Russell Denea, M.D. , D.F.A.P.A.

Psychiatry and Psychoanalysis

268 Broadway, Suite 202
Saratoga Springs, New York 12866
Telephone: (518) 584-8888
Facsimile: (518) 584-1666

May 1, 2013

Brian J. Goldberger, Esq.
Goldberger and Kremer
39 North Pearl Street Suite 201
Albany, New York 12207

Re: Karam, James J.
DOB: 6/10/68

At the request of the above-named counsel I performed a psychiatric examination and evaluation of James J. Karam, which included review of medical records and other information listed below and an interview on March, 22, 2013 which lasted approximately 150 minutes.

Prior to this evaluation I reviewed the following information:

1. Employee Injury/Illness Due Process Review Application dated 10/31/12
2. Rensselaer County Correctional Facility Incident Report dated 10/31/12
3. Records from Family Practice Averill Park of a patient encounter dated 10/05/2012 9:10 AM
4. Records from Family Practice Averill Park of a patient encounter dated 09/04/2012 12:30 PM
5. Prescription for James Karam from Deborah Hildreth, RPA-C of Family Practice Averill Park dated 9/4/12 stating "out of work until further notice"
6. Individual Psychological Evaluation of James J. Karam completed by Richard E. Ovens, Psy.D. dated 10/08/12
7. Letter to then Sheriff Keating from T/Sgt. Paul J. Higgitt Jr. with the subject of "Recognition of Staff involved in 14 February 1993 incident" with attachment of "Voluntary Statement Rensselaer County Sheriff's Dept." completed by James Karam signed 18 February 1993 and witnessed by Sgt. S. R. Lucy

Subsequent to this evaluation I reviewed the following information:

1. A collection of copies of diplomas, awards, certificates of training, employment records, personnel evaluations, disciplinary actions, and academic records dating from 1988 through 2012.
2. Records from Karner Psychological Associates including an evaluation performed by Karen Miscavage, L.M.H.C. on 9/03/12 with a followup session 9/04/12 and Case Notes completed by June Morier, L.C.S.W.-R. for psychotherapy 9/05/12 and 9/12/12.

Identifying Data: James J. Karam is a 44-year-old married white male who lists his address as 21 Edwards Road, Wynantskill, New York, 12198. Telephone-518-283-0736.

Mr. Karam arrived for the appointment accompanied by his wife about 20 minutes before it was scheduled to begin. I interviewed Mr. Karam alone. Before beginning the evaluation I informed Mr. Karam that the examination was an Independent Psychiatric Evaluation. I clarified I was not establishing a doctor-patient relationship and would be offering him no medical advice.

Pertinent History:

Mr. Karam describes feeling like a "bouncing ball" over the past nearly 25 years during his work as a Sheriff's Department officer feeling affected and stressed by many different types of stressors. He attributes a variety of physical complaints to the stresses including: "Acid reflux"; ocular migraines; temporomandibular joint symptoms; tremors; and bowel difficulties. He

also reports feelings of depressed moods, fatigue, anxiety, panic, and anhedonia associated with the stresses. His difficulties increased in the summer of 2012 and culminated in increased difficulty with chewing and movement of his jaw. After a brief absence from work he returned only to describe a more severe incident occurring on 8/26/12 when he was unable to chew or eat his breakfast. After consulting his primary care physician's office on 9/04/12 where he was seen Deborah Hildreth, RPA-C he was given a prescription stating that he would be "out of work until further notice". He has not returned to work since that time.

After the August incident Mr. Karam was seen for psychotherapy at Karner Psychological Associates by Karen Miscavage, L.M.H.C. for evaluation 9/03/12 and one followup psychotherapy session 9/04/12. He then was seen by June Morier, L.C.S.W.-R. for 2 psychotherapy sessions 9/05/12 and 9/12/12. The diagnosis was not clearly stated in the records but references were made to "PTSD", anxiety, and "dep.". The Case Note completed by Ms. Morier for the session of 9/12/13 notes "9/20-appt cn-a counselor through work". No records from a subsequent counselor were available for review. Subsequently, Mr. Karam was seen for a psychological evaluation 10/08/12 by Richard E. Ovens, Psy.D. who diagnosed Mr. Karam with: Axis I: 309.81 Posttraumatic Stress Disorder, Chronic and Severe; 311 (sic) Major Depressive Disorder, Chronic; Axis II V 71.09 No diagnosis; Axis III ICD K76.0 Fatty (change of) Liver; ICD 25.0 Essential Tremor; ICD K21 Gastric Reflux Disease; ICD K76.0 Temporomandibular Joint Disorder; ICD G 43.81 Ocular Migraine; Axis IV Occupational Problems: Unable to Return to Work; Axis V GAF 50 Serious Occupational Impairment Due to PTSD symptoms. (No records of treatment by Dr. Ovens were available for review although Mr. Karam, in the Rensselaer County Correctional Facility Incident Report completed 10/31/12, reports that he saw Dr. Oven for "several sessions".) After 10/31/12 Mr. Karam reports seeing Dr. Ovens weekly but he was not sure how long he saw Dr. Ovens.

During the evaluation Mr. Karam outlined a number of stressors he felt were associated with his work as a Sheriff's Deputy. He described an incident in 1989 where there was an allegation of deputies using excessive force resulting in a civil trial; in 1990 he described being assaulted by an inmate, David Francis; he remembers an incident where an inmate had razor blades and required Mr. Karam and other deputies to restrain him; an incident in 1991 where he was involved in transporting a prisoner who had had a myocardial infarction (Mr. Karam describes feeling guilty and worried that he might have caused some of the inmates' problems); difficulties encountered with the transfer in 1992 from an older County Jail structure to the new County Jail structure including some difficulties with training and computer systems; a prominent incident in February of 1993 involving a riot at the jail where he remembers being asked to organize "perimeter coverage" during the riot where he feared he would be attacked by escaping inmates; a lawsuit in about 2004 involving complaints about "strip searches" which Mr. Karam reports "divided the staff"; the suicide of another Sheriff Deputy in 2002; difficulties dealing with "a new chief", Ruth Vribert; and difficulties dealing with a "nursing supervisor" Mr. Karam feels "who almost killed some inmates".

In describing his symptoms Mr. Karam reports depressed moods and anxiety. The depressed moods are accompanied by anhedonia, fatigue, occasional weeping, withdrawal, decreased interest in previously enjoyable activities, and some problems with concentration. He reports his sleep has been disturbed with onset delay and midphase waking as well as shortened cycle where he estimates that he sleeps 4 1/2-5 hours per night. His appetite has also fluctuated. During the months before he left work he remembers his appetite decreasing but he then reported an increase in his appetite after not working. He currently reports his weight as 185 pounds (height= 5' 10") with a fluctuation being up to 200 pounds in the fall of 2012. He has noticed decreased interest in sexual relations as well as difficulty with erections. He denies difficulty with ejaculation. Mr. Karam denies a history of delusions, hallucinations, or illusions. He denies a history of suicidal ideas or thoughts of self-harm. He also denies a history of homicidal ideas or thoughts of harming another. There is no history of manic-like symptoms.

The anxious symptoms are described as worry, panic-like symptoms, and fears about his future. He has additional complaints of recollections of fearful incidents where he feared he might be killed or harmed and where others might be killed or harmed. These thoughts can intrude during the day as well as disrupt his sleep. He does have some sense of foreshortened future.

At the time of the interview Mr. Karam reports that the level of his depressed moods, anxiety, and associated somatic symptoms is reduced from what he experienced in the fall of 2012. He currently described feeling concerned about whether he will be able to support himself without working and without disability income.

Family Psychiatric History:
Maternal Family: None known.
Paternal Family: None known.
Siblings: None known.
Children: None known.

Family and Social History:

Mr. Karam reports being born and raised in Troy, New York. His parents were of Lebanese heritage. His father who died in 1984 is described as a man who worked primarily as a grocer and struggled to make a living. His mother who died at age 74 from Parkinson's disease is described as a woman who spoke 3 languages but was not formally educated. The patient remembers good relationships with both of his parents. The parents separated when Mr. Karam was 2 years old and later divorced. Mr. Karam has 6 siblings including 2 sisters and 4 brothers. He describes having good relationships with his siblings except for his brother, Michael, with whom he feels estranged. After his parents separated the family struggled with his mother trying to take care of all of the children.

Developmental History: As noted Mr. Karam describes the early separation of his parents complicated by poverty. He did remember good relationships with his siblings and the relationships have remained close except for the relationship with Michael.

Educational History: Mr. Karam attended Catholic schools from kindergarten through 12th grade. He remembers being an average student. After graduating high school he attended Hudson Valley Community College where he studied Criminal Justice. He described continuing classes from 1992-2007 when he finally graduated with the degree of Associate in Applied Science. He also participated in a variety of training programs through the Sheriff's Department for which he has a variety of training certificates.

Occupational History: Mr. Karam was hired by the Rensselaer County Sheriff's Department on August 20, 1998. He has worked continuously for the Sheriff's Department first as a deputy, later promoted to sergeant, and after 2004 as a lieutenant. He has duties have involved working in the jail, working in training programs, and working in some internal affairs activities.

Relationship History:
Friendships: Mr. Karam describes feeling that he has had an adequate circle of friends throughout his childhood and through his adulthood.
Romantic and Sexual: Mr. Karam remembers beginning dating in high school. He reported "a couple of long-term relationships and a few short ones". He met and began dating the woman he would marry in 1991. The couple married in 1993 and they have 2 children, a daughter Elizabeth, age 16 and a son, Joseph, age 11. Mr. Karam denies any sexual difficulties until he experienced some decreased interest and difficulty with direction over the past few months. He also denied any adverse sexual experiences.

Pertinent Medical History:

Mr. Karam's personal physician is Lisa Thorn, M.D., Capital Care Medical Group, Averill Park, New York. He also has been seen by Deborah Hildreth, RPA-C
Allergies: Mr. Karam reports no known drug allergies. He also denies any history of exogenous/environmental allergies.
Current Nonpsychiatric Medications: None. He does report that he had been taking pantoprazole for gastroesophageal reflux disorder symptoms but has not been taking it recently. He also occasionally takes melatonin.
Previous Illness: Mr. Karam describes the history of gastroesophageal reflux disorder which he remembers as being very severe in 2012; he has the history of "ocular migraines" which produced both headaches and visual distortions; he describes a history of temporomandibular joint symptoms including pain, difficulty chewing, and difficulty eating; he has the history of hepatic problems variously diagnosed as "chronic persistent hepatitis (571.41), hemochromatosis, cirrhosis, and "fatty liver"; he reports the diagnosis of "essential tremor" as well.
Nonpsychiatric Hospitalizations: Denies
Surgeries: Denies.
History of Head Trauma: Denies.
History of Seizures: None.

Family Medical History:
Maternal Family: Mr. Karam reports that his mother had the history of hypothyroidism and later in life developed Parkinson's disease from which she finally died at age 74.
Paternal Family: Mr. Karam reports that his father had arteriosclerotic cardiovascular disease and died from a myocardial infarction at age 55 in 1984
Siblings: Noncontributory.
Children: Noncontributory.

Substance Abuse History:
Alcohol: Mr. Karam describes himself as a social drinker of alcohol. Usually he drinks "a couple of beers" twice a week. Sometimes the amount increases in the summer on weekends.
Other Substances of Abuse: Denies use of other substances of abuse.
No history of treatment for Substance Abuse.

Mental Status Examination:

Appearance: Mr. Karam appeared as a casually dressed, well-groomed, Caucasian male who appeared about his stated age. He ambulated easily into the room without evidence of gait disturbance.
Attitude: Mr. Karam's attitude was slightly guarded and hypervigilant.
Motor Activity: There was no evidence of increased or decreased psychomotor activity.
Speech: Mr. Karam had no evidence of dysarthria, dysphonia, or abnormal cadence. At times his speech was slightly pressured and it was difficult to interrupt him occasionally.
Mood: Slightly anxious and slightly depressed.
Affect: Mr. Karam was tense at times with some worry and expressions of frustration; he used humor well; he was occasionally angry; at one point he was tearful; the affect was appropriate to thought content throughout the interview.
Thought Content: There was no evidence of delusions, hallucinations, or illusions. Mr. Karam had no current evidence of suicidal ideas or thoughts of self-harm. He also had no evidence of homicidal ideas or thoughts of harming another. He focused on descriptions of a long series of what he considered were the work stresses, the multiple somatic complaints, and the difficulty with handling the depressed and anxious feelings. He was very concerned about his ability to support his family and the process of applying for disability.
Thought Processes:
Orientation: Mr. Karam was oriented to person, place, time, and situation.
Associations: No evidence of tangential or loose associations. No flight of ideas. Mr. Karam did have some circumstantiality with a somewhat rigid need to detail the stressful events over the past 25 years of work. It was difficult for him to summarize information and when we shifted subject he returned to continue relisting the various occupational stresses.
Memory: Immediate: Mr. Karam had no difficulty reciting 7 digits forward and 5 in reverse. He was able to remember 3 random objects immediately but only 2 after 3 minutes. He easily followed the conversation with no lapses in memory.
    Recent: He was able to remember both personal and public events over the last several weeks with no significant absences. This included descriptions of recent headlines and public concerns including local and national sports and political concerns.
    Remote: Mr. Karam was able to remember both public and personal events in the remote past including the dates of his marriage, his school history, and employment details as noted. He was able to recite presidents back to President Kennedy. He knew the President is Obama; Vice President is Biden; the governor of New York is Cuomo. The New York senators are Gillibrand and Schumer.
Concentration: Intact during the interview.
Attention: Intact during the interview.
Abstract Thinking: Intact during the interview.
    Calculations: Additions intact with complex figures including. Multiplication intact with fairly complex multiplications including 11x12=132. Subtraction intact with fairly complex figures. Division intact with fairly complex figures including 108/12=9. Knew the square roots of 49 and 144.
    Similarities: Apple/orange=fruit; bicycle/locomotive=methods of transportation; statue and painting = art; butterfly/pine tree=living things/nature.
    Proverbs: "2 heads are better than one"=people cooperating helps; "stitch in time saves 9"=fix problems early to avoid bigger difficulties.
Mini-Mental Status Exam Score=30/30

Diagnostic Summary:

Mr. Karam presents with a history of multiple stresses associated with his employment which have been associated with waxing and waning symptoms of depressed moods, vivid memories of the stressful incidents, and associated anxiety, hypervigilance, and dysphoria. He does report associated flat and dulled feelings accompanied by fatigue, difficulty concentrating, anhedonia, and some avoidance behaviors. In addition, he has described somatic problems including temporomandibular joint symptoms of pain and limitation of motion, migraine headaches, and gastroesophageal reflux disorder. These symptoms appear be influencing the psychological symptoms and appear to be influenced by the

- 4 -

psychological symptoms. Mr. Karam does not have a family history of affective illness or affective spectrum illness such as alcohol abuse. Mr. Karam does not appear to have recurrent episodes of major depressive disorder symptoms. Instead he appears to have depressed moods and anxiety which have been diagnosed as "311.00 (sic) Major Depressive Disorder, Chronic", "Depression 311", and "Anxiety Disorder, NOS 300.00". At the time of the evaluation Mr. Karam appeared to be experiencing mild to moderate symptoms of anxiety and depressed moods. He continued to describe some recurring memories of stressful incidents with associated hypervigilance and dysphoria despite not working since 8/29/12. The difficulties with sleep, appetite, and sexual interest/dysfunction were associated with the depressed symptoms occurring in 2012. Sleep disruption has improved and appetite disruption has also improved. Mr. Karam continues to experience some diminished interest in sexual relations and continues to experience some erectile dysfunction.

With the interval between the last day of work and the time of the evaluation it does appear that the severity of the depressed moods, associated neurovegetative signs of sleep, appetite, and sexual interest/dysfunction, and anxiety have diminished to current levels of mild to moderate.

I think the most reasonable diagnoses appear to be Posttraumatic Stress Disorder, Chronic (309.81) and Depressive Disorder, NOS (311). It does not appear that a separate diagnosis for the anxiety is necessary or likely given that the anxious symptoms can readily be explained by the two other diagnoses.

The associated medical conditions of Essential Tremor, Gastroesophageal Reflux Disorder, Temporomandibular Joint Disorder, and Migraine Headaches appear to be influenced by the psychological diagnoses and to influence the psychological diagnoses. The hepatic disorder diagnosed as "Chronic Persistent Hepatitis 571.41 (chronic liver disease and cirrhosis)" and "ICD K 76.0 Fatty (changes of) Liver" does not appear to be influenced by the psychological disorders and does not appear to be influencing the psychological disorders to any significant degree. There is some possibility that the hepatic condition could cause some depressive symptoms particularly if it was severe enough to produce elevations of BUN and serum ammonia levels. No records were available to assess the severity of the chronic liver disease.

DSM-IV Diagnosis:


Axis I: Posttraumatic Stress Disorder, Chronic (309.81); Depressive Disorder, NOS (311)
Axis II: None identified.
Axis III: Gastroesophageal Reflux Disorder; Essential Tremor; Temporomandibular Joint Disorder; Migraine Headaches; Chronic Persistent Hepatitis.
Axis IV: Occupational, Health Care, Economic, and Legal Stresses-Judged to be Severe
Axis V: Current GAF: 60 (Mr. Karam is functioning with symptoms in the mild to moderate range) Highest GAF in the Past Year: 65 (Mr. Karam has a history of functioning with mild to moderate symptoms within the past year.)

Discussion:

1. Mr. Karam has had significant symptoms associated with the Posttraumatic Stress Disorder and Depressive Disorder, NOS as noted above. It is notable that Mr. Karam has had very little psychological treatment for what he describes as very long-standing symptoms. Aside from the brief treatment of 3 sessions at Karner Psychological Associates and the "several weeks" of treatment with Dr. Ovens he has had no other psychotherapy.

2. Mr. Karam does report being treated with psychotropic medications including the citalopram 20 mg p.o. q.d. and alprazolam 0.25 mg one p.o. b.i.d. p.r.n. According to the record and reports from Mr. Karam the medications were begun in September and he continues to take these medications although he reports using very little of the alprazolam.

3. Because of the limited treatment with both psychotherapy and medications it is difficult to judge the prognosis and level of chronic disability. Both the Posttraumatic Stress Disorder and Depressive Disorder, NOS do have evidence-based treatments with medications and various forms of psychotherapy. The prognosis with adequate therapy is likely to be favorable. As outlined in the report completed by Dr. Ovens the psychotherapy is likely to provide specific relief of symptoms. In regards to the psychotropic medications it does appear that Mr. Karam has had less than adequate followup for the medication treatment. For example, the dose of the citalopram has remained stable without increase since Mr. Karam began the medication. Serotonin reuptake inhibitors such as citalopram generally are increased at regular intervals until symptom relief is achieved, adverse effects occur, or the maximum dose recommended for the medication is reached. This has not occurred with the medication treatment for Mr. Karam. In regards to the treatment with the benzodiazepine, alprazolam, the dose utilized is a very low dose for treating anxious symptoms related to the Posttraumatic Stress Disorder and/or anxious symptoms associated with the Depressive Disorder, NOS.

4. With the current moderate degree of symptoms which have improved some from the levels in September and October of 2012, a reasonable conclusion is that Mr. Karam may not have chronic disability associated with either of the two psychiatric diagnoses. With more adequate treatment he may be able to achieve adequate resolution of both of these psychiatric diagnoses which could potentially allow him to return to work. Despite the severity of the symptoms in the latter half of 2012, the Posttraumatic Stress Disorder did not appear to produce disability before 2012 despite the very long history of less severe symptoms.

5. The Posttraumatic Stress Disorder does appear to be predominantly related to the stresses encountered by Mr. Karam during his employment as a Sheriff's Deputy. The cause of the Depressive Disorder appears to be more multifaceted and associated with some of his nonpsychiatric medical illnesses. The stress of these medical illnesses has been considerable for Mr. Karam according to his reports and records reviewed. The Temporomandibular Joint Disorder, the Migraine Headaches, the Gastroesophageal Reflux Disorder, and the Chronic Persistent Hepatitis appear to be illnesses which can increase the level of affective (mood) symptoms.

6. Further assessment of the severity of the Chronic Persistent Hepatitis may offer further information about the potential contribution of the hepatitis to the affective symptoms. The cause of the Chronic Persistent Hepatitis does not appear to be related to the employment history and stresses.

7. Mr. Karem did not appear to have evidence for malingering or falsifying information during this evaluation.

If there are any questions about the circumstances of the evaluation or content of this report please feel free to contact me.

Sincerely,

*Russell Denea*

Russell Denea, M.D., DLFAPA

# Rensselaer County Correctional Facility
## Incident Report

1. Type of Incident: _Informational_
2. Location of Incident: _RCPSB — Home_
3. Date of Incident: _8/24/12_    3a. Time of Incident: _7:30 Am_
4. Name(s) of Inmate(s) involved and Cell Assignment:
   a. _N/A_ ___ Cell: ___    c. ___ Cell: ___
   b. ___ Cell: ___    d. ___ Cell: ___

5. Was inmate(s) locked in cell after incident?    Yes ☐  No ☑
6. Was inmate(s) locked in another Housing Unit?    Yes ☐  No ☑
   If yes, what Housing Unit(s) was the Inmate(s) moved to:
   a. ___ Cell: ___    c. ___ Cell: ___
   b. ___ Cell: ___    d. ___ Cell: ___
   Move(s) Authorized By: ___
7. Endorsement of other Employee Witnesses, (if any):
   a. ___ Badge: ___    c. ___ Badge: ___
   b. ___ Badge: ___    d. ___ Badge: ___
8. Were there any injuries to Officer(s) or Inmate(s)?    Yes ☑  No ☐
   List: _See report from DR Ovens_

9. Was Physical Force used?    Yes ☐  No ☑
   If yes, explain type of force used and reason in the narrative of this report. Also complete Use of Force Form.

10. Medical Care given by: ___
11. Damage to Property?    Yes ☐  No ☑  Describe: ___
12. Were Photographs taken?    Yes ☐  No ☑  If yes, by whom? ___
13. If an Assault, type of weapon used: ___
14. Evidence secured?    Yes ☐  No ☑  List here: ___
15. Evidence given to: ___
16. If illness/death, what was cause? ___
17. Victim/Injured taken to: ___
18. By what means Transported? ___
19. Deputy assigned to investigate?    Yes ☐  No ☑  Deputy's name: ___
20. NARRATIVE: On the rear of this report, describe the incident, action(s) of inmates and staff involved. Include all pertinent information, if already stated above on this page. Use Supplemental Sheets if necessary.

_James Karam_         _Lieutenant_                      _1012_
Printed Name of Reporting Officer                        Badge

_LtJ Karam_                              _10/31/12_      _3:30 pm_
Signature of Reporting Officer              Date          Time

### Reviewed by Supervisor or Watch Commander

_____        _____  _____
Signature of Supervisory Staff Member        Rank        Badge

                                   _____  _____
                                   Date of Review  Time of Review

### Reviewed by Operational Lieutenant

_____        _____  _____
Signature of Operational Lieutenant         Date of Review  Time of Review

Page 1 of 2

PLAINTIFF'S
EXHIBIT NO. _KJ-3_
FOR IDENTIFICATION
DATE _12/03/14_  RPTR: _MET_

**Richard E. Ovens, Psy. D.**
Licensed Clinical Psychologist
National Certified Counselor
**Esquire Building**
83 South Chestnut Street
New Paltz, NY  12561
(845) 255-2855
rovens@hvc.rr.com

---

## INDIVIDUAL PSYCHOLOGICAL EVALUATION
### Privileged and Confidential

Name:   **James  J. Karam**           Date of Birth:      **06/10/1968  (44-3)**

File#:  **12T3197**                   Date of Evaluation:  **10/08/12**


## REASON FOR REFERRAL:

   Lieutenant James Karam requested a psychological evaluation and  personal psychotherapy for himself as a result of work-related stress that he reports has caused significant changes in his health. He stated that the changes have been extremely upsetting and have compromised his ability to work and regulate his emotional states.

## TESTS ADMINISTERED:

   Clinical Interview
   Minnesota Multiphasic Personality Inventory -2  (MMPI-2)
   Detailed Assessment of Posttraumatic Stress (DAPS)
   Symptom Checklist-90- R (SCL-90-R)
   Quality of Life Inventory  (QOLI)

## BACKGROUND:

   On 09/17/12 Lieutenant James Karam was seen for an initial session.  Lieutenant Karam is a 44-year-old, 5 foot 10 inch, 185 pound white male employed by the Rensselaer County Sheriff's Office.  He has responsibility for the operation of the Corrections and Internal Affairs bureaus of the Rensselaer County Sheriff's Department.

   Lieutenant Karam is married and has two children a daughter age 16 and a son age 10 and resides with his family in Rensselaer County, New York.  He is a youngest of 7 children. He has two sisters and four brothers. His parents divorced when he was two years old and his mother was his primary caretaker. His parents relationship was contentious and the family grew up in poverty. He reports that his health was good during his childhood and adolescence. He attended Catholic schools through high school and graduated from of Hudson Valley Community College with an AAS in Criminal Justice.   After graduating from high school he  worked in an auto and radiator repair shop for a year before accepting employment with the Rensselaer County Sheriff's Office in 1988.   Lieutenant Karam is currently reporting the following symptoms: headaches,

stomach troubles, eating problems, bowel disturbances, fatigue, insomnia, feeling tense, feeling panicky, experiencing tremors, feeling depressed, unable to relax, being shy around people, inattentiveness and memory problems, concentration difficulty, and being unable to have a good time. Additionally he checked the following words as being descriptive of his current feelings: inadequate, guilty, evil, morally wrong, hostile, full of hate, anxious, agitated, cowardly, panicky, depressed, misunderstood, unconfident, and in conflict.

Lieutenant Karam is currently on leave as a result of work-related stress, which he believes has caused severe health changes.  He has been diagnosed with: a fatty liver, essential tremors, acid reflux, TMJ, and ocular migraines. He is currently being treated by his personal physician, Dr. Lisa Thorn, and has received psychotherapy from Karner Psychological Associates. His current medications include: Xanax (alprazolam) .25mg p.r.n., Celexa (Citalopram) 20mg. q.h.s., and Protonix  (pantoprazole) 40 mg p.r.n.

## BEHAVIORAL OBSERVATIONS:

Lieutenant Karam presented as a well groomed and neatly attired man of average or above intellect, who appeared his stated age.  His mood varied from euthymic to anxious and/or sad with appropriate affect.  His motoric activity was slow, and deliberate. His speech was normal, with intact receptive and expressive capacities, and an age appropriate vocabulary.  His thinking was logical and age appropriate, and he was oriented in all three spheres.  Lieutenant Karam's immediate, and remote memory functions were intact; however he reports deficits in his working memory.  He denied any persecutory, referential, suicidal, or homicidal ideation, and his judgment and insight appeared to be good.

## TEST RESULTS:

Lieutenant James Karam's Psychological Test Protocols are considered valid.  He responded to items in the various protocols on the basis of their content, and there were no unscorable items and no indications under-reporting; however, he generated a larger than average number of infrequent responses to the MMPI-2-RF items. This level of infrequent responding occurs in individuals who are over-reporting or exaggerating there symptoms. However, a person with genuine psychological difficulties who is reporting credible symptoms (as Lieutenant Karam is) might appear to be over-reporting, but is actually reporting substantial psychological distress, thus, his results do not constitute over-reporting. Overall, Lieutenant Karam's item endorsements do not suggest that he is attempting to portray himself in an especially positive, negative or pathological manner.

### SCL-90-R

Lieutenant Karam's symptom profile reveals a pattern and magnitude to be considered in the clinical range, thus qualifying him as a positive clinical case. His symptomatic distress levels are clearly defined as being in the clinical range. Lieutenant Karam's scores on multiple primary symptom dimensions are elevated and in the clinical range and it is clear that he is experiencing significant psychological difficulties consistent with a variety of disorders.

### MMPI-2-RF

Lieutenant Karam reports a diffuse and pervasive pattern of somatic complaints involving different bodily systems including: head pain, the vague neurological complaints, and a number of gastrointestinal complaints. It is likely to have a history of gastrointestinal problems. He is also very likely that he has a psychological component to his somatic complaints. Additionally, he is likely to be prone to developing physical symptoms in response to stress and is currently reporting a general sense of malaise which is manifested in poor health, feeling tired, weak and incapacitated. He is likely to be preoccupied with poor health and to complain of sleep disturbances, fatigue and sexual dysfunction. He is reporting a diffuse pattern of cognitive difficulties including concentration and memory problems. He is currently experiencing a low tolerance for frustration and is having difficulty coping with stress.

Lieutenant Karam's responses indicate a significant level of emotional distress. More specifically, he reports a significant lack of positive emotional experiences, pronounced anhedonia, and marked lack of interest and energy. His results suggest multiple problems involving experiences of stress and worry, including preoccupation with his disappointments, difficulties with time pressure, and specific worries over misfortune and finances. He is likely to be stress-reactive, worry-prone and to engage in obsessive rumination.

Lieutenant Karam might appear to present as a suspicious and distrustful person with prominent persecutory ideation built upon paranoid delusions. However; in reality his presentation is factually based upon actual experience. Lieutenant Karam reports that there are people in his work environment; namely, inmates who have in the past frequently threatened and/ or actually physically harmed him and other coworkers. Thus, what might appear to be delusional is factually based reality. Prisoners do plot and act out violently against correctional staff and Lieutenant Karam has been assaulted and injured on numerous occasions.

There are no indications of maladaptive externalizing behaviors on the part of Lieutenant Karam. Nevertheless, his personal experiences have resulted in some cynical beliefs that tend to alienate him from others. Thus, he is appears to have developed an introverted and emotionally restricted style of relating in social situations. Lieutenant Karam reports an average number of interests in activities or occupations of an aesthetic or literary nature (e.g., writing, music the theater). Additionally, he reports an average number of interests in activities or occupations of a mechanical or physical nature (e.g., fixing and building things the out of doors, sports).

## DAPS

The Detailed Assessment of Posttraumatic Stress (DAPS) is an inventory that provides detailed information on an adult client's history of various types of trauma exposure, as well as his or her immediate psychological reactions (cognitive, emotional, and dissociative), enduring posttraumatic stress symptoms (reexperiencing, avoidance, and hyperarousal), and level of posttraumatic impairment in the context of a specific traumatic event.

Lieutenant Karam's index trauma (that is the trauma that the he selected as his most upsetting and clinically important at this time) was the 1993 Valentine's Day riot, which occurred in the Rensselaer County Correctional Facility. Lieutenant Karam reported that he was not certain that he would survive the attempt to take back the housing unit of the Rensselaer County Correctional Facility. Additional traumas include: numerous incidents with inmates throughout the years involving physical threats and violence to his person, exposure to traumatic incidents

involving serious personal injury and death to members of the public. Additionally, he reports a lack of support by his superiors at work for his decisions as a supervisor at the correctional facility.

Lieutenant Karam reported only the Index trauma on his test protocol; therefore, his Relative Trauma Exposure (RTV) score is below average for people who have a trauma history.

Peritraumatic Distress is evaluated on two levels. At the general level Lieutenant Karam's score on the peritraumatic distress scale indicates the degree of negative emotionality and negative thoughts he experienced at time or soon after the trauma. Traumatic distress is associated with greater traumatization and greater likelihood of developing Posttraumatic Stress Disorder (PTSD) or Acute Stress Disorder (ASD). At the specific level his endorsements of the individual items on the PDST scale can be interpreted in the terms of the amount of fear, horror, disgust, etc., that he experienced at the time of the trauma as compared to others who have been exposed to trauma. Lieutenant Karam's T-score of 89 on the PDST scale, indicates that he experienced more distress during or soon after the index trauma than the average trauma victim. Peritraumatic distress at this level indicates that he was significantly traumatized by what he experienced and thus he is likely to report significant posttraumatic symptomatology. His endorsements of the specific items on the PDST scale were significantly higher than the normative sample, suggesting a very significant level of peritraumatic distress

Peritraumatic Dissociation refers to alterations in awareness, especially those involving depersonalization and derealization, which occurred during a traumatic event. Such responses may arise when a sufficiently destabilizing event temporarily overwhelms the individual's nervous system, or may represent the activation of previous dissociative capacities in the face of new emotional distress. Lieutenant Karam's T-score of 61 indicates generally normal associational processes at the time of the index trauma as compared to other adults with similar trauma exposures.

Reexperiencing involves intrusive thoughts about the trauma, flashbacks, upsetting memories, and dreams or nightmares of the traumatic event, as well as psychological distress and autonomic nervous system reactivity upon exposure to trauma-reminiscent events. Reexperiencing is often, but not inevitably, triggered by a stimulus in the environment that is in some way very similar to the aspects of the original trauma. When the intrusive memories are sensory, as occurs in flashbacks, it may consist of auditory, visual, olfactory, tactile, or gustatory sensations associated with the original event. These intrusive sensations and memories are often experienced as ego-dystonic and quite upsetting, and may trigger a sense of reliving the original traumatic event. Lieutenant Karam's T-score on the RE scale is 109. This suggests that he is undergoing significant posttraumatic stress. He is regularly bothered by intrusive recollections of the traumatic event or exposure to similar events, and may feel unable to control these reexperiencing symptoms. An elevated scale, such as Lieutenant Karam's T-score of 109, is often accompanied by attempts to avoid environmental events that might trigger more reexperiencing.

The Avoidance responses include not only conscious attempts to avoid people, places, conversations and situations that might trigger flashbacks or other intrusive reexperiencing symptoms, but also emotional numbing and constriction. Lieutenant Karam's overall T-score of 102 indicates that he is experiencing significant posttraumatic avoidance symptoms. Additionally,

*Karam*

his Effortful Avoidance (AV-E) T-Score of 98, and his Numbing Avoidance (AV-N) Subscale T-Score of 111 suggest significant withdrawal, apathy, and emotional numbing, as well as a tendency to avoid people, places, or situations that remind him of the index trauma. These scores suggest an avoidance pattern that is associated with a more severe and chronic course of posttraumatic stress.

The Hyperarousal scales measures symptoms which arise from the fact that the exposure to overwhelming trauma can prompt sustained hyperactivation of the sympathetic ("fight or flight") component of the autonomic nervous system. Symptoms of hyperarousal include heightened startle responses, attention, sleeping difficulties, irritability, problems with attention and concentration, and hypervigilance. Lieutenant Karam's AR T-score of 105 suggests that he is experiencing some combination of tension, irritability, and a tendency to be jumpy or "on edge."

The Posttraumatic Stress-Total scale is the sum of the reexperiencing, avoidance, and arousal scale scores and reflects the overall severity of the posttraumatic stress symptoms endorsed by Lieutenant Karam. Based on Lieutenant Karam's PTS-T score of 108, the overall severity of his posttraumatic stress symptoms is in the severe range.

The Posttraumatic Impairment scale assesses the self-reported level of psychosocial impairment as a result of the effects of the index trauma. An elevated score on this scale is also required for the diagnosis of a posttraumatic stress disorder and/or an acute stress disorder. The posttraumatic impairment scale measures the amount of difficulty the person is having at work, school, social situations, relationships, or other aspects of one's life. These scores can be used as an indication of the overall functional impairment associated with his posttraumatic symptomatology. Lieutenant Karam's T-score on the posttraumatic impairment scale is 98, indicating that he is reporting that the effects of the index trauma are significant, to the extent that his ability to function on an ongoing basis has been compromised.

Based upon Lieutenant Karam's responses to the Detailed Assessment of Posttraumatic Stress instrument he meets the diagnostic criteria for a Complex Posttraumatic Stress Disorder, Chronic and Severe.

The Trauma-Specific Dissociation Scale evaluates derealization, depersonalization, and attachment symptoms that can persist following exposure to traumatic event. Lieutenant Karam's T-DIS scale T-score of 70 indicates that he has developed clinically significant levels of dissociation following the index trauma that remain present at the time of assessment.

The Substance Abuse scale measures the respondent self-reported use of drugs and alcohol, a known associated feature of a posttraumatic stress disorder. Lieutenant Karam's SUB scale T-score of 51 indicates that he did not endorse significant substance abuse activities.

The Suicide Scale measures the person self-reported suicidal motives, ideations, and behaviors. Lieutenant Karam's T-score on the SUI scale is 47, which suggests he is not reporting high levels of suicidality.

## QOLI

Lieutenant Karam's Satisfaction with his life is Very Low. He is extremely unhappy and

unfulfilled in his current life circumstances. His scores suggest that he lacks enthusiasm for life and feels that his life lacks meaning and/or purpose at this time. In general, his most cherished needs, goals, and wishes have not been fulfilled. Additionally his scores suggest that he is at risk for experiencing problems in his relationships, health, work, and educational activities or pursuits.

## SUMMARY:

There are no indications of behavioral dysfunction (inappropriate, violent or acting-out behaviors); however, there are indications of somatic, cognitive and thought dysfunctions. He is currently reporting a lack of positive emotional experiences, significant anhedonia and lack of interest in his life. He is currently pessimistic and reporting feelings of hopelessness and feeling overwhelmed by the current strain in his personal work circumstances. He is currently experiencing self-doubt, is prone to rumination, feels insecure and inferior, tends to be self-disparaging and intropunitive. Lieutenant Karam's current satisfaction with his life is very low. Lieutenant Karam currently meets the diagnostic criteria for a Posttraumatic Stress Disorder, Chronic and Severe, his current level of distress suggests a more complex Posttraumatic Stress Disorder. This more complicated clinical picture often requires more extended or intense psychological and/or pharmacological treatment. Furthermore, greater attention to avoidance or subjective distress issues may be indicated during treatment, especially in the context of therapeutic exposure to traumatic memories. Additionally, he meets diagnostic criteria for a Major Depressive Disorder, Chronic.

### DSM-IV-TR and ICD-10 DIAGNOSES

| Axis I | 309.81 | Posttraumatic Stress Disorder, Chronic and Severe |
|--------|--------|---------------------------------------------------|
|        | 311.00 | Major Depressive Disorder, Chronic |
| Axis II | V71.09 | No diagnosis |
| Axis III | ICD K76.0 | Fatty (change of ) Liver |
|          | ICD 25.0 | Essential Tremor |
|          | ICD K21 | Gastric Reflux Disaease |
|          | ICD K76.0 | Tempomandibular Joint Disorder |
|          | ICD G43.81 | Ocular Migraine |
| Axis IV |         | Occupational Problems: Unable to Return to Work |
| AXIS V | GAF 50 | Serious Occupational Impairment Due to PTSD symptoms |

## RECOMMENDATIONS:

Lieutenant James Karam is currently experiencing unresolved conflict and associated anxiety arising from work related stress and he meets diagnostic criteria for Posttraumatic Stress Disorder, Chronic and Severe and a Major Depressive Disorder, Chronic. Therefore; Lieutenant Karam should continue his participation in psychotherapies with a proven history of effectively treating Posttraumatic Stress Disorder symptoms. Consideration might be given to a trial of Acceptance and Commitment Therapy (ACT), Cognitive Processing Therapy (CPT), Eye Movement Desensitization and Reprocessing Therapy (EMDR) or Cognitive Behavioral Therapy

(CBT) to reduce and/or resolve his PTSD and Depressive Symptoms. Lieutenant Karam's therapy should accomplish the following goals:

1. Enable him to identify the triggers, internal and external, which elicit physiological reactivity that lead to emotional arousal

2. Help him identify the thoughts, feelings, negative self-talk, actions, and activities, which cause psychic numbing or lead to his avoidance of any stimuli associated with the trauma

3. Provide him with the skills and coping strategies to neutralize stress triggers and permit him to tolerate thoughts, images and memories of the traumatic events

4. Provide him with behavioral, physical, and cognitive strategies to dampen persistent arousal, initiate sleep, control irritability and sustain concentration and focus

5. Provide the support, encouragement, and training necessary to master: thought stopping, disputation of automatic negative thoughts, and establishment of rational beliefs

6. Provide training to ensure the mastery of the following stress skills: diaphragmatic breathing, deep muscle relaxation, guided imagery, mindfulness meditation, control of blood flow to the extremities, and journaling to relieve stress

7. Development of nutritional, exercise, and sleep hygiene plans

Sincerely,

Richard E. Ovens, Psy. D.
Licensed Clinical Psychologist
National Certified Counselor

**CapitalCare**
Medical Group, LLC
Family Medicine • Averill Park

Lisa M. Thorn, MD
Deborah Hildreth, RPA-C

3305 Rte. 43, Lower Level
P.O. Box 820
Averill Park, New York 12018
Telephone (518) 674-5797

NAME _Anne Kaun_

ADDRESS _____ AGE ___ DATE 9/14/12

Out of work
until further
notice

SIGNATURE _____

POS® Reorder # 120/877


# Employee Injury/Illness Due Process Review Application

1. James Karam
   Name

2. 44
   Age

3. 10/31/12
   Date

4. 21 Edwards Rd
   Address

   Wynantskill
   City

   NY
   State

   12198
   Zip

5. 283-0736
   Telephone Number

6. Capt. Hal Smith
   Supervisor's Name

7. Captain
   Current Title

8. Corrections Lieutenant
   Occupation At Time Of Injury

9. 8/20/88
   Date of Hire

10. 8/26/12
    Date of Incident

11. Sunday
    Day of the Week

11a. 7:30 Am
     Time

12. Names and addresses of witnesses to injury/illness.

N/A
Name

_____
Address

_____
Name

_____
Address

_____
Name

_____
Address

_____
Name

_____
Address

*Rensselaer County Office of the Sheriff*
**EMPLOYEE INJURY/ILLNESS DUE PROCESS REVIEW APPLICATION**

**13. NAMES OF CO-EMPLOYEES AT THE INCIDENT SITE:**

A. _N/A_
   NAME

B. _____
   NAME

C. _____
   NAME

**14. Describe what the officer was doing when the incident occurred. (Provide as many details as possible. Be specific. Use additional sheets if necessary.**

My TMJ had been very bad during my sleep the night before & upon waking up I could not chew my breakfast properly. It hurt to talk and I took several days off to heal my jaw. Towards the end of the week, due to the pressures I have been under at work I decided to seek treatment. My primary doctor took me out of work and placed me on medications to help with stress. I have been in psychological counseling and under the care of Dr. Richard Ovens NYSP EAP. After several sessions with Dr. Ovens and testing to determine what is wrong with me, Dr. Ovens was able to provide me with a written diagnosis on 10/31/12.

**15. Where did the incident occur? Be specific.**

Various Incidents over the course of my career, with one incident on Feb 14, 1993 having a significant impact on my health.

**16. How was the claimed injury or illness sustained? (Describe fully, stating whether injured per slipped, fell, was struck, etc., and detail what factors led up to, or contributed.) Use additional sheets if necessary.**

please refer to Dr. Ovens report.

### Rensselaer County Office of the Sheriff
### EMPLOYEE INJURY/ILLNESS DUE PROCESS REVIEW APPLICATION

17. When was the incident first reported? _With this application and my doctors report, I am reporting my illness for the first time with an accurate diagnosis. I could Not accurately report my illness until I received my doctors report which I received on 10/2/12_

To whom was the incident reported? _I received on 10/2/12_ Time?: _____

Witness(es) (If any): _____

_____

_____

_____

18. Was first aid or medical treatment authorized? _Yes_

_Dr Lisa Thorn, P.A. Deb Hildreth_

By Whom?: _DR. Richard Ovens_ — Time?: _____

19. Attending Physicians:

_DR Lisa Thorn / R.A. Deb Hildreth_  _3305 Route 43 Averill Park 12018_
Name                                          Address

_DR Richard Ovens PSY_  _83 S Chestnut St Suite 3 New Paltz NY 125_
Name                                          Address

_____  _____
Name                                          Address

_____  _____
Name                                          Address

20. Personal Physician:

_DR Lisa Thorn_  _3305 Route 43 Averill Park 12018_
Name                                          Address

21. Name of Hospital: _N/A_

22. State nature of injury and part (or parts) of body affected:

_TMJ, essential tremors, ocular migraine, Acid Reflux, PTSD_

_TMJ (Jaw) essential tremors (hands) ocular migraine (eye sight) Acid reflux (esophagus) PTSD (Brain)_

*Rensselaer County Office of the Sheriff*
**EMPLOYEE INJURY/ILLNESS DUE PROCESS REVIEW APPLICATION**

**23. Pre-existing conditions (Prior illness or injuries). Describe condition(s) and note standing physicians.**

TMJ, essential tremors, ocular migraines, acid reflux

DR Thomas Hopper DDS
DR Lisa thorn MD
DR Richard ovens psy

**24. Will the Officer be returning to duty?** Unknown **When?:** when my sick time runs out, I may be forced to come back to work against DR Ovens Advice, If I Am Granted, 207C I con continue my treatment which includes Anti-Anxiety medication which is a controlled substance.

10/31/12
**Date of Report**

_(signature)_
**Signature of Injured/Ill Employee**

**State of New York** }
**County of Rensselaer** }

James Karam , being duly sworn, deposes and says that he/she has read the foregoing notice and knows the content thereof; that the same is true to the knowledge of deponent except as the matters therein stated to be alleged upon information and belief; and that as to those matters he/she believes it to be true; any false statements herein may subject the deponent to the penalties of perjury.

**Sworn to before me this**

5th **day of** November 20 12

_(signature)_ Kathleen DeCelle
**Notary Public/State of New York**

KATHLEEN DeCELLE
Notary Public, State of New York
No. 01DE5018166
Qualified in Rensselaer County
Commission Expires September 20, 2013

*Rensselaer County*    *Office of the Sheriff*

**DANIEL V. KEATING**
**SHERIFF**

**LAWRENCE M. WALRAED**
**UNDERSHERIFF**

## MEDICAL RELEASE

I do hereby authorize any physician, nurse or other health care provider who has attended, examined, or treated me, or any hospital at which I have been examined or treated, to furnish the County of Rensselaer; New York, or its duly authorized representative, with any and all medical billing information which may be requested regarding my physical condition and treatment rendered as a result of my injury/illness which occurred on the date of _10/31/12_, *was reported* 20_12_.

I further authorize the Sheriff of Rensselaer County or his designee to reproduce this document and authorize these reproductions to be used with the same force and effect as the original.

_November 5_, 20_12_.
**Date**

_James E. _____
**Signature of Deputy or Correction Officer**

_James Karam_
**Printed Name of Deputy or Correction Officer**

Subscribed and sworn to before me this

_5th_ day of _November_, 20_12_.

_Kathleen DeCelle_
**Notary Public / State of New York**

KATHLEEN DeCELLE
Notary Public, State of New York
No. 01DE5018166
Qualified in Rensselaer County
Commission Expires September 20, 20_13_



# GRIEVANCE FORM
# RENSSELAER COUNTY
## United Public Service Employees Union

| Name: | Class Action | File # G12072 | Date: 11/30/2012 |
|---|---|---|---|
| Address: | UPSEU, 21 Aviation Road | | Phone: 729-4805 |
| City: Albany | State: NY | Zip: 12205 | Phone: |
| Employer: | Rensselaer County | | Dept.: |
| Title: | | Supervisor: | Location: |

**NATURE OF GRIEVANCE: (Explain and give details)**

On or about November 30, 2012 it became known that bargaining unit employees were not being allowed to donate sick leave to an unrepresented County employee (James Karam) pursuant to the provisions of Addendum VI of the collective bargaining agreement.

The applicable policy specifically states: "Voluntary contributions of sick leave accrual and/or vacation leave accrual may be made to an individual's sick bank by employees represented by the collective bargaining unit and by employees who are not represented by a collective bargaining unit."

**Business Representative:** Kathy A. Wright

**Remedy Sought:**

1. Allow the donations per the provisions of the agreement.
2. Make all affected employees whole in everyway

MIS018.KEB/ljb

PLAINTIFF'S
EXHIBIT NO. KJ 4
FOR IDENTIFICATION
DATE: 12/23/14   RPTR: MET

**HEADQUARTERS**
3555 Veterans Hwy. Ste. H, Ronkonkoma, NY 11779
(631) 738-8773

**ONEIDA COUNTY**
288 Genesee Street, Utica, NY 13502
(315) 798-8934

**FRANKLIN COUNTY**
232 West Main Street, Malone, NY 12953
(518) 481-4240

# UPSEU ALERT

## UPSEU'S GRIEVANCE PRESSURES SHERIFF
## TO AWARD DISABILITY & BACKPAY

Two days before an arbitration was to be held regarding the Sheriff's refusal to credit long-time Sheriff's Department Leutenant James Karam with sick and vacation accruals donated from UPSEU members, UPSEU was notified that after 10 long months, Rensselaer County Sheriff Jack Mahar was finally granting James Karam his long awaited disability application.

"This long awaited decision means a couple of things." said UPSEU Regional Coordinator, Kathy A. Wright-Muzio. "First and foremost, it means Jim was made whole for all of the time he has been off the payroll since last year and that he will receive his 207c disability rights under the law. It also means that the time our members so generously offered to donate will no longer be needed because of the back pay award so, that time will remain in the respective employees' accruals balances."

Jim and his wife, UPSEU member Lisa expressed their deep appreciation and gratitude for UPSEU's efforts in pushing this issue as well as their thanks to the many UPSEU members who so generously offered their time.

---



### THERE'S A GRINCH IN
### RENSSELAER COUNTY

UPSEU has had to file a grievance because Sheriff Jack Mahar has refused to allow our members to donate over 500 hours of sick leave to a long-time (25 year) employee of the Sheriff's Department, James Karam who is in need.

While Mr. Karam is not a member of UPSEU, he is eligible for the donated leave because the UPSEU Sick Bank agreement allows for UPSEU members to donate to members of the bargaining unit as well as unrepresented employees of the County. Additionally, Mr. Karam is family to UPSEU because he is also the husband of a UPSEU member.

The Sheriff has attempted to excuse his actions under the guise that he does not believe Mr. Karam is eligible and therefore, is not entitled to the leave time. UPSEU's agreement, however, specifically allows the donation and does not give the Sheriff the right to deny the donations. Equally more interesting is that Mr. Karam has been out of work sick since late August yet, the Sheriff never questioned his leave until Mr. Karam was within days of drawing on the last of his accrued time in early December. As of the first week of December and to date, Mr. Karam has been without pay.

UPSEU Representatives and President Kevin E. Boyle have worked tirelessly and relentlessly to get this matter resolved before the Christmas Holiday but the Sheriff remains rigid and unwilling to change his position without formal litigation; a process that will unfold long after the holiday.

Absent a Christmas miracle, the next step in the UPSEU grievance process is a legal review for formal arbitration. Additionally, Mr. Karam may also have to file a personal lawsuit against the County to force the Sheriff to award him the disability benefits the Sheriff has failed to award as well.

---

## United Public Service Employees Union
### ☞ Making a difference in your workplace ☜



**UNITED PUBLIC SERVICE EMPLOYEES UNION**
21 Aviation Road • Albany • NY • 12205
(518) 729-4806 • Fax: (518) 729-4956
www.upseu.org

September 16, 2013

Honorable Kathleen Jimino
Rensselaer County Executive
1600 7th Avenue
Troy, New York 12180

RE:    Case Number A2012-413
       County of Rensselaer and UPSEU (County Employees)
       (Leave Donation Policy - Class Action G-12072)

Dear County Executive Jimino

In settling the above captioned and electing not to proceed to Arbitration, UPSEU does not modify its position held throughout the grievance procedure and during the arbitration process, that being that the provisions of "Addendum VI Sick and Vacation Leave Donation Policy" memorialized in the Collective Bargaining Agreement (hereinafter referred to as the CBA) between the parties covering the period January 1, 2010 to December 31, 2013 at page 67-68 remains in full force and unmodified.

UPSEU reaffirms that both Rensselaer County and UPSEU are bound by all the provisions of the CBA, and in this particular instance, by all the provisions of the Addendum VI that allows any employee covered by the CBA to designate and contribute sick leave or vacation time to any County employee, including, but not limited to, persons represented or not represented by collective bargaining agreements with the County of Rensselaer.

It is the continuing position of UPSEU that both parties to the CBA are bound by its provisions, not withstanding any decision(s) made in the instant arbitration settling the issue raised in the grievance.

Sincerely,

Kevin E. Boyle, Jr.
President

pc:    Kathy A. Wright-Muzio
       Jamison Facteau
       Dan Mahoney
       Sue McAvoy

iap2935.kaw

**HEADQUARTERS**
3555 Veterans Hwy. Ste. H, Ronkonkoma, NY 11779
(631) 738-8773

**ONEIDA COUNTY**
288 Genesee Street, Utica, NY 13502
(315) 796-9534

**FRANKLIN COUNTY**
232 West Main Street, Malone, NY 12953
(518) 481-4240

## Sick Leave Bank

A sick leave bank may be established for an individual employee upon exhaustion of all leave accruals. Voluntary contributions of sick leave accrual and / or vacation leave accrual may be made to an individual's sick bank by employees represented by the collective bargaining unit and by employees who are not represented by a collective bargaining unit. Likewise, employees represented by the collective bargaining unit may donate sick or vacation leave accrual to a sick bank established for an employee who is not represented by a collective bargaining unit. Contributions are to be made specifically for the individual in need.

Contributions to the sick bank will be made in units of hours and will be credited to the sick bank of the individual for whom the bank is established in units of hours.

Contributions may be made to the sick bank of an employee within the same department as the contributing employee as well as the sick bank of an employee in another department.

The maximum amount of sick leave each employee may donate in one year is the equivalent of earned annual sick leave, provided they may not donate more sick time than they have accrued. Employees may also donate an unlimited amount of vacation time, up to the maximum allowable annual accrual, to the bank.

An individual employee for whom a sick bank is established may have use of the sick bank leave, up to the amount donated on his or her behalf, as well as use of extended sick leave in accordance with Section 21.1 in the Collective Bargaining Agreement, the combination of both not to exceed 40 weeks. An employee who has drawn on this bank will not be expected to make repayment for the number of days used.

The Department Head and the Director of Human Resources will jointly administer the sick bank leave. They will require physician's and other necessary documentation as they determine that the employee is unable to work for a minimum of 4 weeks. They will require that notice of leave time donations be on a form prepared by them. The Bargaining Agent will communicate to its members the information necessary for them to make said donations. All donations to the sick leave bank must be made within 30 calendar days of the Department Head approval of the request for donations.

Criteria for extended sick leave as provided in article 21.1.1 of the Collective Bargaining Agreement shall continue in full force and effect.

This policy is not to be used as a substitute for Social Security Disability or Disability Retirement.

County of Rensselaer by:                    United Public Service Employees Union by:

_signature_                                 _signature_

Date: 3/11/03                               Date: 03/11/03    3/11/03

_signatures_        3/11/03