**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JAMES KARAM and LISA KARAM,**

                         **Plaintiffs,**

      **vs.**                                **1:13-cv-01018**
                                             **(MAD/DJS)**

**COUNTY OF RENSSELAER, NEW YORK; JACK
MAHAR, in his individual and official capacity as
Sheriff of Rensselaer County; PATRICK RUSSO, in
his individual and official capacity as the Undersheriff
of Rensselaer County; KATHLEEN JIMINO, in her
individual and official capacity as the County Executive
of Rensselaer County; RUTH VIBERT, in her individual
and official capacity as Chief of Corrections of the
Rensselaer County Sheriff's Department; HAROLD SMITH,
in his individual and official capacity as Captain of the
Rensselaer County Sheriff's Department; TOM HENDRY,
in his individual and official capacity as Director of Human
Resources of Rensselaer County; LINDA BALDWIN, in her
individual and official capacity as the Payroll Clerk of
Rensselaer County; JOHN DOE(S), in their individual and
official capacities as officials, officers, agents, employees
and/or representatives of Rensselaer County; and JANE
DOE(S), in their individual and official capacities as officials,
officers, agents, employees and/or representatives of
Rensselaer County,**

                                **Defendants.**
_____
**RUTH VIBERT, in her individual and official capacity as
Chief of Corrections of the Rensselaer County Sheriff's Department**,

                           **Cross Claimant,**

      **vs.**

**COUNTY OF RENSSELAER, NEW YORK,**

                           **Cross Defendant.**
_____
**RUTH VIBERT, in her individual and official capacity as
Chief of Corrections of the Rensselaer County Sheriff's Department**,

                         **Counter Claimant**

      **vs.**
**JAMES KARAM and LISA KARAM,**

APPEARANCES:                              OF COUNSEL:

**BOSMAN LAW OFFICE**                     **AJ BOSMAN, ESQ.**
3232 Seneca Turnpike                      **DANIEL W. FLYNN, ESQ.**
Suite 15
Canastota, New York 13032
Attorneys for Plaintiffs and
Counter Defendants


**BAILY, KELLEHER LAW FIRM**             **CRYSTAL R. PECK, ESQ.**
Pine West Plaza 5                         **JOHN W. BAILEY, ESQ.**
Suite 507
Washington Avenue Extension
Albany, New York 12205
Attorneys for Defendants and Cross
Defendants Rensselaer County, Mahar,
Russo, Jimino, Smith, Handry, Baldwin,
and Doe(s)

**LAW OFFICES OF ELMER ROBERT**          **ELMER R. KEACH, III, ESQ.**
**KEACH, III, P.C.**                     **MARIA K. DYSON, ESQ.**
One Pine West Plaza
Suite 109
Albany, New York 12205
Attorneys for Defendant, Cross Claimant,
and Counter Claimant Vibert

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiffs James and Lisa Karam commenced this action on August 20, 2013 asserting

twenty-nine causes of action against eight named Defendants pursuant to New York Executive

Law § 296 (the New York Human Rights Law ("NYHRL")), 42 U.S.C. §§ 1981, 1983, 1985, and

1986, the New York State Constitution, New York Civil Rights Law §§ 40-c and 79-n, the

Americans with Disabilities Act ("ADA"), the Rehabilitation Act of 1973, common law claims of

prima facie tort, loss of consortium, and negligence, and for a writ of mandamus. *See* Dkt. No. 1.

The named Defendants, sued in their individual and official capacities, are Rensselaer County,

Sheriff Jack Mahar, Undersheriff Patrick Russo, County Executive Kathleen Jimino, Captain

Harold Smith, director of human resources Tom Hendry, payroll clerk Linda Baldwin

(collectively the "County Defendants"), and former Chief of Corrections Ruth Vibert ("Defendant

Vibert"), as well as unnamed Jane and John Doe(s). *See id.* Currently before the Court are

motions for summary judgment submitted independently by the County Defendants and

Defendant Vibert. *See* Dkt. Nos. 99, 101. Plaintiffs have opposed each of the pending motions.

*See* Dkt. Nos. 125, 128.

## II. BACKGROUND

Plaintiff[1] was appointed as a corrections officer at the Rensselaer County Sheriff's

Department ("Sheriff's Department") in September of 1988. Dkt. No. 141 at ¶ 42. Between 1990

and 2003, Plaintiff was promoted five times and received seven salary increases. *Id.* at ¶¶ 43-48.

Following Defendant Mahar's election as sheriff in 2003, Plaintiff was appointed as the internal

affairs officer for the Sheriff's Department. *Id.* at ¶ 53. In addition to the duties of this position,

Plaintiff performed training sessions for corrections officers. *Id.* at ¶¶ 54, 55.

Over the course of his employment, Plaintiff alleges that he was the target of numerous

discriminatory actions concerning his Arab ancestry. In 2003, Plaintiff was a recipient of a mass

e-mail depicting an Arab headdress and joking about two Arab people on a plane. Dkt. No. 111-

1. In 2005, Defendants Smith and Russo placed a sign on a burned car that read "Lt. Karam's

Undercover Unit." Dkt. No. 111-2. On March 5, 2010, Plaintiff received an e-mail from

---

[1] Unless otherwise noted, James Karam will be referred to singularly as "Plaintiff."

Defendant Russo titled "What the Taliban do when they aren't killing people...," which contained a night vision video depicting a person having sex with an animal. *Id.*; Dkt. No. 130. At some indeterminate time, Plaintiff received a time sheet that indicated his department was the "rat squad." Dkt. No. 111-3. Some of the County Defendants made a statement to Defendant Vibert that Plaintiff could not work with her because "Lebanese men do not like to answer to women." Dkt. No. 125 at ¶ 8. At some indeterminate time a comment was made that Plaintiff was "out feeding [his] camels." *Id.*

Starting on or around August 26, 2012, Plaintiff was unable to return to his employment at the Sheriff's Department because he was suffering from temporomandibular joint ("TMJ") pain. Dkt. No. 141 at ¶¶ 56, 57. At that time, the Sheriff's Office and Rensselaer County had a sick leave donation program incorporated into various union agreements, which allowed employees with excess sick time accruals to donate that time to another employee who was at risk of depleting their own leave time due to serious illness or injury. *Id.* at ¶¶ 59-61. To use this program, an employee's initial sick leave donation slips were provided to Defendant Baldwin to check the donating employee's file to ensure they had adequate sick leave. *Id.* at ¶ 64. The donation slips were then passed on to a committee for review, which consisted of Defendants Hendry, Russo, and a union representative. *Id.* at ¶¶ 64-66. After Plaintiff had depleted his accumulated sick leave in the fall of 2012, he was informed that he would not be able to receive any sick time donations. *Id.* at ¶¶ 58, 76. Defendant Mahar permanently discontinued the Sheriff's Department's sick leave donation program around this same time. *Id.* at ¶ 74.

On or about November 5, 2012, Plaintiff applied for benefits under New York General Municipal Law § 207-c ("207-c benefits"), which are afforded to law enforcement officials who are injured in the line of duty. *Id.* at ¶¶ 80-81; Dkt. No. 111-10 at 2-5. The 207-c benefits

provide for full pay to officers during any time that they are unable to work due to a work related injury. Dkt. No. 141 at ¶ 82. The Sheriff's Department has a policy of requiring an independent medical examination for 207-c benefits from injuries that are not easily verified as work-related. *Id.* at ¶ 89. The basis for Plaintiff's 207-c benefit application was that he was suffering from post traumatic stress disorder ("PTSD") and depression due to work-related stress. *Id.* at ¶ 86. Plaintiff submitted his initial 207-c application with a report from clinical psychologist Dr. Richard Ovens stating that Plaintiff's conditions of PTSD and major depressive disorder arose from work related stress. Dkt. No. 111-10 at 14-15. Thereafter, the Sheriff's Department contacted Dr. Russell Denea to perform an independent psychiatric examination on Plaintiff. *See* Dkt. No. 116-1 at 157-162. On May 1, 2013, Dr. Denea confirmed the findings of Dr. Ovens. *Id.* at 161-162. Plaintiff's 207-c application was approved on September 23, 2013, and he was issued a check for $53,276.33 for retroactive benefits and back pay. Dkt. No. 141 at ¶¶ 95, 96; Dkt. No. 111-20. Plaintiff was issued two additional checks in the amount of $2,017.93 and $1,735.10, which accounted for his remaining holiday, sick, personal, and vacation hours. Dkt. No. 141 at ¶¶ 97-99.

Defendant Vibert was the Chief of Corrections at the Rensselaer County Jail from March 19, 2012 until March 18, 2013. Dkt. No. 140 at ¶¶ 1, 2. During her employment, Defendant Vibert was the highest ranking member of the Rensselaer County corrections staff, apart from undersheriff Russo and Sheriff Mahar. *Id.* at ¶ 3. Plaintiff and Defendant Vibert worked together for approximately five months before Plaintiff stopped reporting to work in August of 2012. *Id.* at ¶ 8. However, Plaintiff stated that he "rarely interacted with [Defendant Vibert] from March 2012 until August 2012 when [he] left work . . . ." Dkt. No. 144-2 at ¶ 2. After learning that Plaintiff had not reported to work on several occasions, Defendant Vibert instructed Defendant

Smith to draft a "concern letter" regarding Plaintiff's use of sick time. *Id.* at ¶¶ 41-43, 47. This letter was never served upon Plaintiff because he never returned to work after it was drafted. *Id.* at ¶ 51. Defendant Vibert played no role in Plaintiff's 207-c benefit application. *Id.* at ¶ 75.

On or about July 23, 2013, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Dkt. No. 141 at ¶ 100; Dkt. No. 99-16. The EEOC charge alleged that Plaintiff was discriminated against on the basis of his perceived disability under the ADA and his Arab ancestry, and that he was retaliated against throughout his employment with the Sheriff's Department. Dkt. No. 141 at ¶ 101; Dkt. No. 125 at ¶ 6. Plaintiff received a "right-to-sue" letter from the EEOC on February 6, 2014. Dkt. No. 141 at ¶ 102.

## III. DISCUSSION

**A.      Standard of Review**

### *1. Summary Judgment*

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). It is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting FED. R. CIV. P. 56(c), (e)). Moreover, "disputes over irrelevant facts must not be allowed to obscure the lack of a material dispute[.]" *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 923 (2d Cir. 1985).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). However, "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

### 2. Summary Judgment Standard for Employment Discrimination

Courts are cautious in granting summary judgment in employment discrimination cases where the employer's intent is at issue, *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "because direct evidence of an employer's discriminatory intent is rare and 'must often be inferred from circumstantial evidence.'" *Serby v. N.Y.C. Dep't of Educ.*, No. 09-CV-2727, 2012 WL 928194, *5 (E.D.N.Y. Mar. 19, 2012) (quoting *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006)). However, "'[s]ummary judgment is appropriate even in discrimination cases, for . . . the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to other areas of litigation.'" *Hongyan Lu v. Chase Inv. Servs. Corp.*, 412 Fed. Appx. 413, 415 (2d Cir. 2011) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000)). Indeed, "'[i]t is not beyond cavil that summary

judgment may be appropriate even in the fact-intensive context of discrimination cases.'"

*Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) (quoting *Abdu-Brisson v. Delta Air*

*Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001)).  Furthermore, "[e]ven in the discrimination context

. . . a plaintiff must provide more than conclusory allegations to resist a motion for summary

judgment."  *Holcomb*, 521 F.3d at 137 (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

A "nonmoving party 'must offer some hard evidence showing that its version of the events is not

wholly fanciful.'"  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting

*D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)).  "If the evidence [presented by

the non-moving party] is merely colorable, or is not significantly probative, summary judgment

may be granted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations

omitted).  The Second Circuit has held that:

> In discrimination cases, the inquiry into whether the plaintiff's sex
> (or race, etc.) caused the conduct at issue often requires an
> assessment of individuals' motivations and state of mind, matters
> that call for a "sparing" use of the summary judgment device
> because of juries' special advantages over judges in this area . . .
>
> Nonetheless, an employment discrimination plaintiff faced with a
> properly supported summary judgment motion must do more than
> simply show that there is some metaphysical doubt as to the
> material facts.  She must come forth with evidence sufficient to
> allow a reasonable jury to find in her favor.

*Brown v. Henderson*, 257 F.3d 246, 251-52 (2d Cir. 2001) (internal citations and quotations

omitted).

Summary judgment is inappropriate merely because the court "believes that the plaintiff

will be unable to meet his or her burden of persuasion at trial.  There must either be a lack of

evidence in support of the plaintiff's position, or the evidence must be so overwhelmingly tilted in

one direction that any contrary finding would constitute clear error."  *Danzer v. Norden Sys. Inc.*,

151 F.3d 50, 54 (2d Cir. 1998) (internal citations omitted). "Nonetheless, when an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer." *Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 493 (S.D.N.Y. 2010) (citation omitted); *see also Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997) (same); *Meloff v. N.Y. Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995) (same).

**B.      County Defendants' Motion**

*1. Statute of Limitations*

The statute of limitations for claims brought in New York pursuant to 42 U.S.C. § 1983 and the NYHRL is three years. *See Johnson v. Dep't of Hous. Pres. & Dev.*, 218 Fed. Appx. 5, 6 (2d Cir. 2007). Consequently, those claims that fall outside of this three-year time period are deemed time-barred and must be dismissed. *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996). Furthermore, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 102, 122 S. Ct. 2061, 2066 (2002). Discrimination claims brought pursuant these statutes "accrue[] when the plaintiff knows or has reason to know of the harm." *Washington v. Cnty. of Rockland*, 373 F.3d 310, 317 (2d Cir. 2004).

However, "[t]he 'continuing violation doctrine' is an 'exception to the normal knew-or-should-have-known accrual date' if there is 'evidence of an ongoing discriminatory policy or practice.'" *Fierro v. Dep't of Educ.*, 994 F. Supp. 2d 581, 586 (S.D.N.Y. 2014) (quoting *Corona Realty Holding, LLC v. Town of N. Hempstead*, 382 Fed. Appx. 70, 72 (2d Cir. 2010)) *see also Jackson v. New York*, 381 F. Supp. 2d 80, 87-88 (N.D.N.Y. 2005) (noting that, while the

continuing violation doctrine has evolved from Title VII employment discrimination cases, the doctrine likewise applies to § 1983 and NYHRL claims). The continuing violation exception requires showing "specific discriminatory policies or mechanisms such as discriminatory seniority lists, or discriminatory employment tests." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993), *abrogated in part on other grounds by Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 131 S. Ct. 1325 (2011) (internal citations omitted). The exception does not apply, however, to "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism." *Id.*; *see also Nat'l R.R. Passenger Corp*, 536 U.S. at 114 ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify . . . [and] constitute a separate actionable 'unlawful employment practice'").

Hostile work environment claims are treated with a different approach because "[t]heir very nature involves repeated conduct." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 115. Hostile work environment claims are judged by the cumulative affect of individual acts which may not be themselves actionable, but together amount to one "unlawful employment practice." *Id.* at 118. However, the mere allegation of a hostile work environment does not automatically bring unrelated discriminatory conduct within the continuing violation exception. *See Brennan v. Bally Total Fitness*, 153 F. Supp. 2d 408, 413 (S.D.N.Y. 2001) ("A claim of hostile work environment does not presuppose a continuing violation"); *see also Findlay v. Reynolds Metals Co., Inc.*, 82 F. Supp. 2d 27, 36-37 (N.D.N.Y. 2000) (citations omitted) (noting that the continuing violation exception is disfavored in the Second Circuit). Courts in the Second Circuit have adopted a three factor test established by the Fifth Circuit in *Berry v. Board of Supervisors* to evaluate continuing violations in hostile work environment claims.

The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring . . . or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness and duty to assert his or her rights[?]

*Riedinger v. D'Amicantino*, 974 F. Supp. 322, 326 (S.D.N.Y. 1997) (quoting *Berry v. Bd. of Supervisors*, 715 F.2d 971, 981 (5th Cir. 1983)). To file a timely hostile work environment claim, the plaintiff need only show that one of the contributing acts occurred within the statute of limitations. *See Cornwell v. Robinson*, 23 F.3d 694, 703-04 (2d Cir. 1994).

### a. Discrimination

Plaintiff's allegations of discrimination fall into four general categories: the manner in which he was promoted on several occasions between 1990 and 2005, *see* Dkt. No. 125 at ¶¶ 9, 43, 54-59, the type of accommodations he was afforded to complete his job duties, i.e. being granted a cell phone and take home vehicle, *see id.* at ¶¶ 109-18, numerous comments by coworkers regarding his national origin, *see id.* at ¶ 8, and the manner in which Defendants handled his sick leave usage, donations, and related 207-c application, *see id.* at ¶¶ 17-18, 24-25, 27, 30, 32.

Plaintiff's promotions between 1990 and 2005 are each separate, discrete employment decisions, which are individual employment actions and not subject to the continuing violations doctrine. *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 114.

Plaintiff claims that he was discriminated against when he was denied the use of a take-home vehicle and a department cell phone. Dkt. No. 125 at ¶¶ 109-18. Further, he claims that Defendants Smith and Russo discriminated against him by placing a sign on a "burned out

vehicle" that read "Lt. Karam's undercover car." *Id.* at ¶ 115. While no direct evidence was

submitted regarding the date that these alleged violations occurred, the Court finds that these

events occurred at or around the time Plaintiff was promoted to internal affairs officer in 2005.

Plaintiff testified that he asked for a take home vehicle in 2005, Dkt. No. 113 at 53-54, and

Defendants Russo and Smith sent Plaintiff the picture of the burned out car at the time Plaintiff

requested the take home vehicle, Dkt. No. 120 at 149-50. Plaintiff has presented no evidence that

he continued to ask for a take-home vehicle or cell phone after his initial promotion to internal

affairs. Further, the denial of these accommodations are discrete, individual employment actions

and are not subject to the continuing violations doctrine. *See Nat'l R.R. Passenger Corp.*, 536

U.S. at 114. The picture depicting the burned out car with the sign reading "Lt. Karam's

undercover car" clearly related to Plaintiff's request for a take-home vehicle and is not so

factually similar to any other alleged discriminatory conduct as to constitute a continuing

violation. *See Martin v. N.Y. State Dept. of Corr. Servs.*, 224 F. Supp. 2d 434, 444 (N.D.N.Y.

2002) (noting that multiple physical acts of discrimination are not a continuing violation absent a

"constant stream" of similar, allegedly discriminatory conduct). Thus, the actions surrounding

Plaintiff's denial of his requests for a take-home vehicle and cell phone do not fall within the

continuing violation exception.

Plaintiff alleges that numerous discriminatory comments were made about his national

origin throughout his employment at the Sheriff's Department. The nature and date of these

instances include: (1) in 2003, Plaintiff was one recipient of a mass e-mail that depicted an Arab

headdress and stated a joke about two Arab people on a plane, Dkt. No. 111-1, (2) on March 5,

2010, Plaintiff received a chain e-mail from Defendant Russo titled "What the Taliban do when

they aren't killing people...," which contained a night vision video depicting a person having sex

with an animal, *id.*, (3) at some point in 2012,[2] Defendant Mahar made a statement to Defendant Vibert that Plaintiff could not work with her because "Lebanese men do not like to answer to women," Dkt. No. 125 at ¶ 8, (4) at an indeterminate time, Plaintiff received a time sheet that indicated his department was the "rat squad," Dkt. No. 111-3, (5) at an indeterminate time, a comment was made that Plaintiff was "out feeding [his] camels," Dkt. No. 125 at ¶ 8, (6) prior to Defendant Mahar's election, Plaintiff was assigned the password "camel" for the computer booking system, Dkt. No. 113 at 208, (7) on September 11, 2001, a coworker made the comment that Plaintiff's cousins were attacking the World Trade Centers, Dkt. No. 112 at 141, and (8) when Plaintiff applied for his 207-c benefits, Defendant Russo made a comment that Plaintiff should shave his goatee or he would be put back on the terrorist watch list, *id.* at 138. The Court finds that these eight discriminatory comments are not sufficiently repetitious or continuous throughout the twelve year period to constitute a continuing violation of discrimination against him. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998), *abrogated in part on other grounds by Nat'l R.R. Passenger Corp.*, 536 U.S. at 113 (holding that six discriminatory incidents over a five year period do not amount to a continuing violation).

### b. Hostile Work Environment

The first factor in the *Berry* analysis of the continuing violation exception for a hostile work environment claim is whether "the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation[.]" *Riedinger*, 974 F. Supp. at 326 (quotation omitted). In the present case, there are essentially no similarities between the alleged misconduct

---

[2] While no exact date is given for when this comment was made, it occurred between Defendant Vibert's hiring on March 19, 2012 and when Plaintiff last worked on August 26, 2012. *See* Dkt. No. 99-2 at ¶¶ 2, 7.

surrounding the manner in which Plaintiff was promoted from 1990 until 2005, the denial of his requests for a take home vehicle and cell phone in 2005, and the denial of his access to the sick leave donation program in 2012. While Plaintiff contends that each of these incidents is similar because he was treated differently than other similarly situated officers, *see* Dkt. No. 125 at ¶¶ 9, 27, 30, 39, nothing other than Plaintiff's conclusory allegations supports this fact. Thus, the Court finds that each of these allegedly discriminatory actions is not of the same type of discrimination to constitute a continuing violation for Plaintiff's hostile work environment claims.

In contrast, each of the allegedly discriminatory comments and e-mails about Plaintiff's national origin are of a similar type to satisfy the first *Berry* factor. *See Schwapp v. Town of Avon*, 118 F.3d 106, 111-12 (2d Cir. 1997) (holding that racially derogatory comments, even if directed at differing races or individuals, are sufficiently similar to constitute a continuing violation for hostile work environment claims).

The second inquiry is the frequency of the allegedly discriminatory events. Here, the eight similar discriminatory comments were made over a twelve year period and several of the comments were made prior to Defendant Mahar's election in 2005. The Court finds that this sporadic occurrence of discriminatory language is not frequent enough to constitute a continuing violation for a hostile work environment claim. *Compare Bembry v. Darrow*, 97 F. Supp. 2d 281, 286-88 (N.D.N.Y. 2000) (holding that six allegedly discriminatory acts within four years was insufficient for a continuing violation), *with Schwapp*, 118 F.3d at 112 (finding a continuing violation when there were twelve discriminatory comments made over twenty months).

The third, and most important, inquiry is whether the events should have triggered Plaintiff's awareness to assert his rights at the moment that they were violated. *See Riedinger*, 974 F. Supp. at 326. In this case, Plaintiff was put on notice of the alleged discrimination at each

time a discriminatory comment was made to him.  Further, the Sheriff's Department has a policy

in place to report such instances of discriminatory conduct.  Dkt. No. 103-1 at ¶ 52; Dkt. No. 103-

12.  Plaintiff did not file a complaint concerning any of the allegedly discriminatory comments.

Dkt. No. 113 at 258; Dkt. No. 99-4 at 2.  Thus, based on a balance of the *Berry* factors, the Court

finds that there was no continuing violation for purposes of Plaintiff's hostile work environment

claims.  *See generally Findlay v. Reynolds Metals Co., Inc.*, 82 F. Supp. 2d 27, 36-37 (N.D.N.Y.

2000) (citations omitted) (noting that the continuing violations exception is disfavored in the

Second Circuit).

As Plaintiff filed his complaint on August 20, 2013, and no continuing violation discussed

above applies to this time period, only actions occurring after August 20, 2010 may be considered

in evaluating Plaintiff's § 1983 and NYHRL discrimination and hostile work environment claims.


*2. Retaliation*[3]

*a. First Amendment*

To state a *prima facie* claim of First Amendment retaliation under § 1983 and Article 1,

Section 8 of the New York Constitution, a plaintiff must prove that "(1) his speech was

constitutionally protected, (2) he suffered an adverse employment decision, and (3) a causal

connection exists between his speech and the adverse employment determination against him."

*Brunell v. Clinton Cnty., N.Y.*, 334 Fed. Appx. 367, 370 (2d Cir. 2009) (citation omitted); *see also*

*Carter v. Ocean Beach*, 693 F. Supp. 2d 203, 212 (E.D.N.Y. 2010) ("[F]ree speech claims under

---

[3] Plaintiff asserts seven retaliation claims pursuant to the NYHRL, 42 U.S.C. §§ 1981, 1983, Article 1, Section 8 of the New York State Constitution, Title V of the ADA, and the Rehabilitation Act.  *See generally* Dkt. No. 1.  However, Plaintiff's response to the instant motion only addresses his claims of First Amendment retaliation.  Dkt. No. 128 at 19.

Article 1, Section 8 of the New York State Constitution are subject to the same analysis as free speech claims under the First Amendment").

If a plaintiff is successful in satisfying these four elements and thereby establishes a *prima facie* case of retaliation, the burden then shifts to the defendant to "show that it would have taken the same adverse action in the absence of the protected speech." *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011) (quotation omitted). If the defendant is successful in introducing a non-retaliatory reason for taking the adverse employment action against the plaintiff, the burden then shifts back to the plaintiff. *See Murray v. Town of N. Hempstead*, 853 F. Supp. 2d 247, 262 (E.D.N.Y. 2012) (citation omitted). The plaintiff then has the burden to "demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for [retaliation]'" *Id.* at 262-63 (quoting *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004)).

### *i. Protected Activity*

A government employee's speech is constitutionally protected if the employee is speaking in his capacity as a citizen on a matter of public concern. *See Weintraub v. Bd. of Educ.*, 593 F.3d 196, 201-02 (2d Cir. 2010) (citations and quotations omitted). An employee is not speaking in his capacity as a citizen for purposes of the First Amendment if he is acting pursuant to his official duties. *See Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

Plaintiff asserts that he engaged in two protected activities, testifying in a fellow employee's Division of Human Rights ("DHR") sexual harassment hearing on March 9, 2012, *see* Dkt. No. 111-5, and speaking with the Sheriff's Department's attorney, Bryan Goldberger, about potential violations of the Health Insurance Portability and Accountability Act ("HIPAA") *see* Dkt. No. 125 at ¶¶ 19-21. Specifically, Plaintiff asserts that he

> told Bryan Goldberger about what [he] knew about the HIPAA
> violations and what [he] believed to be unlawful violations and the
> attempts of the Sheriff to cover up the HIPAA violations and the
> attempts of the Sheriff to stall the investigation and prevent the
> investigation and the release of the information as far as whose
> records were accessed.

Dkt. No. 113 at 154.

Plaintiff's March 9, 2012 testimony at the DHR hearing regarding the sexual harassment of Laura Abbott at the Rensselaer County Jail (the "Abbott matter") is a protected activity. *See Konits v. Valley Stream Cent. High Sch. Dist.*, 394 F.3d 121, 125 (2d Cir. 2005) ("[A]ny use of state authority to retaliate against those who speak out against discrimination suffered by others, including witnesses or potential witnesses in proceedings addressing discrimination claims, can give rise to a cause of action under 42 U.S.C. § 1983 and the First Amendment").

Allegations of potential cover-ups in the Sheriff's Department are matters of public concern. *See Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) (quotation omitted) ("Exposure of official misconduct, especially within the police department, is generally of great consequence to the public"). Defendants assert that Plaintiff's conversations with Mr. Goldberger, while admittedly involving matters of public concern, are not protected speech because he was acting upon his official duties as the internal affairs officer. *See* Dkt. No. 101-22 at 22 (citing *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011)). In *Anemone*, the Second Circuit held that the plaintiff did not engage in protected speech when he spoke to the Queens District Attorney ("DA") concerning an investigation that he was involved in. 629 F.3d at 116. The plaintiff was initially assigned to an official investigation, which required cooperation with the DA. *Id.* The plaintiff testified that he was the director of security at the Metropolitan Transportation Authority and "regularly interacted with the District Attorneys' office and viewed cooperating with these offices as among his duties." *Id.* The plaintiff claimed that, although the

communication with the DA started as part of his official duties, he was subsequently removed from the investigation and his continued conversations with the DA were protected speech. *Id.* The Second Circuit rejected this argument, holding that "[w]hen a government employee concededly engages in speech pursuant to his official duties, the fact that he persists in such speech after a supervisor has told him to stop does not, without more, transform his speech into protected speech made as a private citizen." *Id.* (citing *Thompson v. District of Columbia*, 530 F.3d 914, 918 (D.C. Cir. 2008)).

The Court finds that Defendants' reliance on *Anemone* is unpersuasive because Plaintiff had no duty to consult with Mr. Goldberger, he first mentioned his concerns about Defendant Mahar's conduct to Mr. Goldberger after he had been removed from the investigation, and he ultimately revealed this information to the press. While Defendants' statement that the "sole purpose for [Plaintiff's] speaking with Attorney Goldberger in the first place was to discuss an internal affairs investigation" is not untrue, it is misplaced in this context. Dkt. No. 143-3. Plaintiff testified that he initially spoke with Mr. Goldberger to inform him that he would not be able to testify at an upcoming arbitration concerning Scott Radliff. Dkt. No. 113 at 128, 161. Plaintiff was not investigating this matter as an internal affairs officer, but rather was expected to be called as a witness. *Id.* at 128-29. It was only after this discussion about Scott Radliff that Plaintiff mentioned to Mr. Goldberger his belief that Defendant Mahar had engaged in misconduct by covering up certain HIPAA violations.

In March of 2012, Plaintiff initially began investigating alleged HIPAA violations. *Id.* at 66-67. After discovering several concerning violations, Plaintiff reported his findings to Defendant Mahar. *Id.* at 76. Defendant Mahar then told Plaintiff to suspend his investigation to see if some other entity could investigate the HIPAA violations. *Id.* at 76-77. This task was

assigned to another person at the Sheriff's Department after Plaintiff started suffering migraines and being absent from work. *Id.* at 77, 96-96. Defendant Mahar testified that Plaintiff "left at the very beginning of that investigation." Dkt. No. 116 at 98. Thus, at the time Plaintiff first spoke with Mr. Goldberger about these issues, he was no longer assigned to this investigation or actively working as the internal affairs officer. *See Schoolcraft v. City of New York*, No. 10 Civ. 6005, 2012 WL 3960118, *6 (S.D.N.Y. Sept. 10, 2012) (noting that speech occurring after an employee is placed on suspension weighs in favor of finding that the speech was made as a citizen). That Plaintiff learned of the alleged HIPAA violations through his employment is not conclusive that his speech was made as an employee rather than as a citizen. *See Hagan v. City of New York*, 39 F. Supp. 3d 481, 510 (S.D.N.Y. 2014) ("[E]mployee speech is not precluded from protection simply because it 'concerns information *related to or learned through* public employment'" (quoting *Lane v. Franks*, 134 S. Ct. 2369, 2376 (2014)). Further, the chain of command for Plaintiff's investigation was to report his findings to Defendant Mahar, not directly to Mr. Goldberger. Dkt. No. 116 at 95; Dkt. No. 125 at ¶ 16; *see Hagan*, 39 F. Supp. 3d at 510 (holding that a public employee reporting the improper conduct of supervisors and other officials outside the chain-of-command was protected speech). Plaintiff also relayed his concerns about Defendant Mahar's conduct to the press after speaking to Mr. Goldberger. Dkt. No. 113 at 299-300; *see Taylor v. N.Y.C. Dept. of Educ.*, No. 11 Civ. 7833, 2012 WL 3890599, *6 (S.D.N.Y. Sept. 6, 2012) (noting that speech being relayed to the press weighs in favor of finding that the speech was made as a citizen, not as an employee); *see also Jackler v. Byrne*, 658 F.3d 225, 238 (2d Cir. 2011) (discussing that speech by a public employee may be made "as a citizen" if there is a "relevant civilian analogue" to reveal such information). Accordingly, the Court finds that

Plaintiff's testimony in the Abbott matter and his conversations with Mr. Goldberger concerning the cover-up of potential HIPAA violations are both protected speech under the First Amendment.

### ii. Adverse Employment Action

The standard for evaluating an adverse employment action is the same in First Amendment and Title VII retaliation claims. *See Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006). As the Second Circuit described in *Hicks v. Baines*, the Supreme Court now recognizes that "Title VII's anti-discrimination and anti-retaliation provisions 'are not coterminous'; anti-retaliation protection is broader and 'extends beyond workplace-related or employment-related retaliatory acts and harm.'" *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)). In a Title VII retaliation claim, an adverse employment action is one that is "materially adverse to a reasonable employee or job applicant." *Id.* (quoting *White*, 548 U.S. at 57, 126 S. Ct. 2405) (internal quotation marks omitted). "Actions are 'materially adverse' if they are 'harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *White*, 548 U.S. at 57, 126 S. Ct. 2405). Although Title VII "does not set forth a general civility code for the American workplace," *id.* (quoting *White*, 548 U.S. at 68-69, 126 S. Ct. 2405), "the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Id.* (quoting *Zelnik*, 464 F.3d at 227).

"'[P]etty slights or minor annoyances that often take place at work and that all employees experience' do not constitute actionable retaliation." *Id.* (quotation omitted). "Thus, '[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.'" *Id.* (quotation omitted).

Plaintiff contends that the following instances of retaliation occurred after his testimony in the Abbott hearing: (1) he was subject to continuous yelling, which contributed to increased stress and migraines; (2) his keys, firearm, computer access, and office were taken from him after he left on sick leave; (3) he was denied donated sick time; (4) he was prevented access to his personal mail; (5) he was not automatically placed on disability after his sick time ran out; (6) he was required to seek an independent medical evaluation for his 207-c application, and (7) the approval of his 207-c benefits was unreasonably delayed.[4]

The Court will first address the alleged actions that do not amount to adverse employment actions. Plaintiff provides no support that he was subject to increased yelling or job duties after his testimony in the Abbott matter. While Plaintiff has established that he was yelled at after his testimony, the evidence presented indicates that Defendant Mahar's yelling at employees was a common occurrence that pre-dated the Abbott hearing and, thus, was not an adverse change in employment. *See* Dkt. No. 113 at 35-38, 41-42, 130-31. Plaintiff's return of his Department issued equipment after he had left on disability leave had no impact on the terms of his employment, pay, or benefits. Plaintiff acknowledged that it was reasonable for him to have to return his firearm and that there were important files locked inside his office. *See* Dkt. No. 99-22 at 6; Dkt. No. 130, Exh. 26 at 3:15-5:00 (discussing that Plaintiff's gun was department issued and that at least one Department firearm was missing). Further, other employees at the Sheriff's Department who applied for 207-c benefits for an indefinite term likewise had to return their keys, badge, and weapon. Dkt. No. 103-1 at ¶ 47. Plaintiff had some of his personal mail delivered to his office, which was not immediately forwarded to his home after he left work due

---

[4] The Court will not consider the allegation that Plaintiff received a blank pay slip with his name and "rat squad" for his title since no evidence was submitted as to the date this slip was received.

to his illness. Dkt. No. 140 at ¶¶ 14-17. Any delay in receiving his mail was due to the fact that it was combined with important work-related information, such as investigation reports, that could not be released from the Sheriff's Department without first being reviewed. *See* Dkt. No. 130, 802_0062 call to Ruth Vibert, at 5:20; Dkt. No. 113 at 240. Further, Plaintiff failed to submit a change of address card to the post office to receive his personal mail at home. Dkt. No. 113 at 240-41. Finally, the requirement for Plaintiff to seek an independent medical analysis for his 207-c application is not an adverse employment action, since his benefits were ultimately granted. *See Dawson v. Cnty. of Westchester*, 274 F. Supp. 2d 364, 377-78 (S.D.N.Y. 2003), *vacated in part on other grounds* 373 F.3d 265 (2d Cir. 2004) (holding that the requirement to attend a hearing to determine eligibility to receive benefits is not an adverse employment action if the hearing was for a proper purpose and the benefits are ultimately approved); *Kleehammer v. Monroe Cnty.*, 743 F. Supp. 2d 175, 187-88 (W.D.N.Y. 2010). The Court finds that these actions, individually and in the aggregate, would not dissuade a reasonable employee from engaging in a protected activity because they were all an ordinary part of employment at the Sheriff's Department.

The remaining allegations, however, constitute materially adverse employment actions. While a delay in granting an employee's benefits, standing alone, is not an adverse employment action, *see Barriera v. Bankers Tr.*, No. 98 Civ. 3641, 2003 WL 22387099, *8 (S.D.N.Y. Oct. 20, 2003), extensive delays or a delay coupled with other adverse consequences is sufficient to withstand summary judgment for Title VII retaliation, *see Dechberry v. N.Y.C. Fire Dep't*, No. 14-CV-2130, 2015 WL 4878460, *13 (E.D.N.Y. Aug. 14, 2015) (noting that a delay in benefits which exacerbates physical injuries is an adverse employment action); *see also Birkholz v. City of New York*, No. 10-CV-4719, 2012 WL 580522, *9 (E.D.N.Y. Feb. 22, 2012) (finding that a delay

that results in "significant financial injury" is an adverse employment action).  Here, Plaintiff's

207-c benefits were not granted until September 23, 2013, over a year after his last day working

at the Sheriff's Department.[5]  Dkt. No. 141 at ¶ 95.  The delay in granting Plaintiff's 207-c

benefits, coupled with his inability to use donated sick leave and lack of disability benefits,

resulted in a prolonged period without income.

After Plaintiff's examination for his 207-c benefits, Dr. Denea reported that Plaintiff's

physical complaints to his work related stress "increased in the summer of 2012."  Dkt. No. 116-1

at 158.  Further, Plaintiff "described feeling concerned about whether he will be able to support

himself without working and without disability income."  *Id.*  Thus, Plaintiff has established that

the denial of his access to donated sick leave, coupled with the delay in processing his 207-c

benefits, were adverse employment actions.

### iii. Causation

It is well settled that proof of causation may either be shown directly by establishing a

retaliatory animus toward the plaintiff or indirectly through circumstantial evidence that, among

other things, demonstrates that the protected activity was followed closely by a retaliatory action.

*See Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (citations omitted); *see also Gordon*

*v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *Feingold v. New York*, 366 F.3d 138,

160 (2d Cir. 2004) (applying the same causation analysis to First Amendment and Title VII

---

[5] Defendants provide a list of individuals who applied for 207-c benefits and how long their applications were pending, without providing any original documentation, to establish that Plaintiff's benefits were not unreasonably delayed.  *See* Dkt. Nos. 103-11, 101-5.  However, such a self-serving document created in anticipation of litigation is inadmissible evidence that cannot be considered in a motion for summary judgment.  *See Rubens v. Mason*, 387 F.3d 183, 188 (2d Cir. 2004) ("[I]n deciding a motion for summary judgment, a court may rely only on material that would be admissible at trial").

retaliation claims). Further, the cases demonstrate that the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001) (citations omitted). The relevance of temporal proximity in a particular First Amendment retaliation case turns on its unique facts and circumstances. *See Smith v. Da Ros*, No. 09 Civ. 458, 2011 WL 839374, *13 (D. Conn. Feb. 25, 2011) (citing *Burkybile v. Bd. of Educ. of Hastings–On–Hudson Union Free Sch. Dist.*, 411 F.3d 306, 314 (2d Cir. 2005)). A plaintiff can withstand summary judgment if he establishes that "'a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause.'" *Terry v. Ashcroft*, 336 F.3d 128, 140-41 (2d Cir. 2003) (quoting *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993)); *see also Jute v. Hamilton Soundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (quoting *Woodman v. WWOR-TV*, 411 F.3d 69, 76 (2d Cir. 2005)) ("The burden of proof that must be met to permit a Title VII plaintiff to survive a summary judgment motion at the *prima facie* stage has been characterized as 'minimal' and '*de minimis*'").

The first sick leave donation form was submitted for Plaintiff on November 19, 2012, Dkt. No. 111-12 at 16, and Plaintiff submitted his 207-c application on October 31, 2012, Dkt. No. 141 at ¶ 80. Plaintiff spoke to Mr. Goldberger in late August or early September of 2012. Thus, the two or three month gap between Plaintiff's protected speech with Mr. Goldberger and the allegedly retaliatory actions is sufficient to infer a retaliatory motive. *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (holding that the passage of six months between the protected activity and the adverse action was sufficient to support an inference of causation).

The connection between Plaintiff's testimony in the Abbott matter on March 9, 2012, and the allegedly retaliatory actions is more attenuated. *See* Dkt. No. 111-5. While this nearly eight month gap is within the period that other Second Circuit courts have held is sufficient to infer causation, *compare Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (finding a causal connection with an eight month period between the protected activity and retaliatory action), *with Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990) (finding no inference of causation for adverse action taken three months after protected speech), such a determination is heavily reliant upon the specific factual circumstances of each case, *see Espinal*, 558 F.3d at 129 (allowing a court to "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases").

Plaintiff's only arguments in support of a connection between his testimony in the Abbott matter and the allegedly retaliatory actions are that a copy of the hearing transcript was forwarded to Defendant Mahar and that he was increasingly yelled at after giving his testimony.[6] *See* Dkt. No. 128 at 25. As noted earlier, Plaintiff's claim that he was yelled at more after testifying in the Abbott matter is unpersuasive in light of evidence that yelling was a common part of his job for the entirety of his employment. *See supra* Part III(B)(2)(b)(ii). Plaintiff provides no evidence, apart from his opinion, that his deposition was ever delivered to the Sheriff, and Defendant Mahar denies ever receiving it. Dkt. No. 103-1 at ¶ 54. Significantly, several other employees testified at the Abbott hearing and Plaintiff has presented no evidence that Defendants retaliated against any of those individuals for engaging in the same protected speech. *See Gordon*, 232 F.3d at 117

---

[6] The Court will not consider Plaintiff's assertions that others were discriminated against for various reasons, *see* Dkt. No. 128 at 25-26, because these instances are not connected to testifying in the Abbott matter, nor is there any evidence to support these assertions other than Plaintiff's conclusory statements.

(noting that "evidence such as disparate treatment of fellow employees who engaged in similar conduct" can establish a causal connection). The Court finds that Plaintiff failed to establish a causal connection between his testimony in the Abbott matter and the allegedly retaliatory actions.

### iv) Defendants' Rebuttal

The County Defendants contend that the decision to end the sick leave donation program was based upon a general displeasure with the program and the financial burdens it placed on the Sheriff's Department. Dkt. No. 101-22; Dkt. No. 141 at ¶¶ 69-71. Moreover, this decision could not have been for a retaliatory purpose because Defendant Mahar did not learn of Plaintiff's protected speech with Mr. Goldberger until this lawsuit was filed. Dkt. No. 103-1 at ¶ 56.

The Court finds that this explanation is mere pre-text and a retaliatory motive contributed, at least in part, to the adverse actions taken against Plaintiff. Marcelle Swanberry, Defendant Mahar's secretary, testified that the Sheriff's Office revamped the sick leave donation program in 2010 or 2011. Dkt. No. 112 at 60-66. This revamping consisted of requiring specific approval of each leave donation, and only granting donations to the extent that they were needed for the employee on sick leave to receive a full paycheck. *Id.* Ms. Swanberry never indicated that the Department considered eliminating the program in its entirety. *Id.* Rather, the donation program was unilaterally canceled by Defendant Mahar over objections by Defendants Hendry and Russo, *see* Dkt. No. 141 at ¶¶ 78, 79, without notifying any employees that such a change was forthcoming, Dkt. No. 122 at 70-71. The sick leave donation program was terminated after Plaintiff received donations, but before they were approved by the committee. *Id.* at 69-70.

The County Defendants' argument that Defendant Mahar was unaware of Plaintiff's protected speech is undermined by actions taken shortly after Plaintiff reported that he would not

be returning to work. Plaintiff submitted a doctor's note on November 4, 2012 indicating that he would be "out of work until further notice." Dkt. No. 99-18. Shortly thereafter, Defendant Mahar ordered Defendant Vibert to clean out Plaintiff's office. Dkt. No. 116-1 at 17. While Defendant Mahar claims that the first time he learned of Plaintiff's allegations of his criminal conduct in connection with the HIPAA violations was in the context of this lawsuit, Dkt. No. 103-1 at ¶ 56, he specifically instructed Defendant Vibert to look for the HIPAA investigation file when cleaning out Plaintiff's office, Dkt. No. 119 at 165-66. Significantly, Defendant Mahar told Defendant Vibert that "if you find it, you are not to let it out of your sight, you are not to hand it to anybody else, you are to hand it directly to me, not even to Marcelle." *Id.* at 166. Upon finding the file, Defendant Vibert was instructed to "secure it where nobody has access to it but [her,] and [she was] to personally hand it to [Defendant Mahar]." *Id.* at 167. The Court finds that, even if the decision to end sick leave donations was done, in part, to save the department money, this reasoning is mere pretext given the immediate termination of the program without discussion or notification to anyone else in the Sheriff's Department at the exact time Plaintiff started receiving donations, coupled with the urgency and secrecy that Defendant Vibert was instructed to search Plaintiff's office for the HIPAA investigation files. *See Terry v. Ashcroft*, 336 F.3d 128, 140-41 (2d Cir. 2003) (noting that a retaliatory motive need only be a part, not the sole reason, for the adverse employment actions).

The County Defendants also assert that the delay in granting Plaintiff's 207-c application was because he did not present with an easily verifiable injury and the psychiatrist that the Sheriff's Department typically used had a conflict of interest. *See* Dkt. No. 101-22. Plaintiff submitted his initial 207-c application on October 31, 2012 with a report from clinical psychologist Dr. Richard Ovens stating that Plaintiff's conditions of PTSD and major depressive

disorder arose from work related stress.  Dkt. No. 111-10 at 14-15.  Thereafter, the Sheriff's

Department contacted Dr. Russell Denea to perform an independent psychiatric examination of

Plaintiff.  *See* Dkt. No. 116-1 at 157-62.  On May 1, 2013, Dr. Denea confirmed the findings of

Dr. Ovens.  *Id.* at 161-62.  Defendants present no explanation for why Plaintiff's 207-c application

was delayed until September 23, 2013, *see* Dkt. No. 111-20, an additional four months after their

independent medical evaluation confirmed Plaintiff's work related injury.  Therefore, the County

Defendants' motion on this ground is denied in part and Plaintiff's nineteenth and twentieth causes

of action for First Amendment retaliation against Defendants Mahar and Rensselaer County[7]

based on Plaintiff's statements concerning the alleged HIPAA violation cover-up survive the

instant motion for summary judgment.

### b. ADA, NYHRL, Rehabilitation Act, and § 1981 Claims

Claims of retaliation under the ADA, NYHRL, 42 U.S.C. § 1981, and the Rehabilitation

Act are analyzed under the same standard as Title VII claims.  *See Treglia v. Town of Manlius*,

313 F.3d 713, 719 (2d Cir. 2002) (applying the Title VII standard to ADA, NYHRL, and

Rehabilitation Act retaliation claims); *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)

(applying the Title VII standard to NYHRL and § 1981 claims).  To survive summary judgment

on a retaliation claim, a public employee must establish "(1) that []he engaged in [a protected

activity], (2) that the employer was aware of this activity, (3) that the employer took adverse

action against the plaintiff, and (4) that a causal connection exists between the protected activity

and the adverse action . . . ."  *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001) (citations

---

[7] As Plaintiff has failed to present any evidence that the other individual defendants retaliated against him on this basis, the County Defendants' motion on this ground is granted in part and Plaintiff's nineteenth and twentieth causes of against Defendants Russo, Jimino, Smith, Hendry, and Baldwin are dismissed.

omitted).  Title VII prohibits an employer from discriminating against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  *Terry*, 336 F.3d at 141 (quoting 42 U.S.C. § 2000e-3(a)).  Courts analyze Title VII and First Amendment retaliation claims according to the same burden-shifting framework.  *See id.*

### i. Protected Activity

Plaintiff asserts the same two instances of protected activities as his First Amendment retaliation claims: testifying in the Abbott matter, *see* Dkt. No. 111-5, and speaking with Mr. Goldberger, *see* Dkt. No. 125 at ¶¶ 19-21.  Testifying in the Abbott matter concerning a charge of sexual harassment is a protected activity under Title VII.  *See Cortes v. City of New York*, 700 F. Supp. 2d 474, 482 (S.D.N.Y. 2010).

Conversely, the conversation with Mr. Goldberger only discussed possible criminal activities by Defendant Mahar and did not discuss any allegedly discriminatory actions taken by the Sheriff's Department.  *See* Dkt. No. 113 at 154.  Thus, the Court finds that this conversation is not a protected activity under Title VII.  *See Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 15 (2d Cir. 2013) (noting that complaints regarding illegal action not covered by Title VII are not classified as protected activity).

Plaintiff has failed to present any argument that he engaged in a protected activity under the ADA.  *See* Dkt. No. 101-22 at 22-23.  He has not made any requests for reasonable accommodations, nor has he taken any action to oppose disability discrimination.  *See Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999) (discussing the protected activity prong of ADA retaliation claims).  To the extent that Plaintiff's filing the instant lawsuit asserting discrimination based on his perceived disability is his protected activity, all of

the allegedly retaliatory acts took place before this action was commenced. Thus, the Court grants Defendants motion for summary judgment on this ground and Plaintiff's twenty-first cause of action for retaliation under the ADA is dismissed.

### ii. Employer's Awareness

Defendant Mahar stated that he was not present when Plaintiff testified at the DHR hearing and he did not read or review the testimony after the fact. Dkt. No. 103-1 at ¶ 54. However, Defendant Mahar also stated that, at the time of the hearing, he was at least generally aware that Plaintiff testified in the Abbott matter. Dkt. No. 116 at 147. Thus, the Court finds that Plaintiff's testimony in the Abbott matter satisfies the first two prongs of this analysis. *See Risco v. McHugh*, 868 F. Supp. 2d 75, 112 (S.D.N.Y. 2012) (citations omitted) (holding that general employer knowledge of a plaintiff's protected activity is sufficient).

### iii. Adverse Action

The standard for adverse employment actions in First Amendment retaliation claims is analyzed in the same manner as Title VII retaliation claims. *See Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006). Therefore, Plaintiff has established that the denial of donated sick leave, not being automatically placed on disability when his sick time ran out, and a lengthy delay in processing his 207-c benefits were adverse employment actions. *See supra* Part III(B)(2)(a)(iii).

### iv. Causation

The causation analysis for First Amendment and Title VII retaliation claims is identical. *See Feingold v. New York*, 366 F.3d 138, 160 (2d Cir. 2004). Thus, Plaintiff has not established a *prima facie* case that his protected activity of testifying in the Abbott matter caused the alleged

retaliatory actions. *See supra* Part III(B)(2)(b)(iii). Accordingly, the Court grants the County

Defendants' motion on this ground and Plaintiff's sixteenth, seventeenth, eighteenth, and twenty-

second causes of action for retaliation pursuant to the ADA, the NYHRL, 42 U.S.C. § 1981, and

the Rehabilitation Act are dismissed.

### 3. Discrimination

#### a. Section 1981, NYHRL, and NYS Civil Rights Law § 40-c

To withstand summary judgment of a Title VII discrimination claim, a plaintiff must

prove that "(1) [he] is a member of the protected class; (2) [he] is qualified for the job; (3) [he]

suffered an adverse employment action; and (4) the circumstances surrounding the adverse action

give rise to an inference of discrimination." *Jackson v. Bataglia*, 63 F. Supp. 3d 214, 222

(N.D.N.Y. 2014) (applying the same standard to § 1981 discrimination claims); *see also Ganzy v.*

*Allen Christian Sch.*, 995 F. Supp. 340, 346-50 (E.D.N.Y. 1998) (applying the same standards to

Title VII, NYHRL, and Civil Rights Law § 40-c discrimination claims).

Defendants concede that Plaintiff is a member of a protected class and that, prior to going

out on extended disability leave, he was qualified for his job. *See* Dkt. No. 101-22 at 24 n.3.

While the definition of an adverse employment action is narrower in discrimination than

retaliation claims, *see Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010), a "material loss of

benefits" is a sufficiently adverse employment action to state a *prima facie* claim of

discrimination, *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (citation omitted). Thus,

Plaintiff's inability to utilize donated sick leave and the prolonged delay in receiving his 207-c

benefits constitutes an adverse employment action. *See supra* Part III(B)(2)(a)(ii).

#### i. Disparate Treatment

A plaintiff can establish an inference of discrimination by "showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citations omitted). "To be similarly situated, Plaintiffs must show that they were similarly situated 'in all material respects' to the individuals with whom they seek to compare themselves." *Glenwright v. Xerox Corp.*, 832 F. Supp. 2d 268, 274 (W.D.N.Y. 2011) (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)).

In the present motion, Plaintiff's allegations concerning his promotions and his denial of a take home vehicle and cell phone are barred by the statute of limitations. *See supra* Part III(B)(1)(a). Thus, the Court will consider Plaintiff's contentions that he was assigned an exceedingly heavy work load, that his personal mail was not forwarded to his home after he went out on sick leave, that he was forced to surrender his office keys and department issued firearm, that he was denied use of donated sick leave, and that his 207-c benefits were delayed. *See* Dkt. No. 128 at 10-12.

First, Plaintiff contends that his workload was unreasonably excessive compared to similarly situated employees. A majority of the excess work that Plaintiff complains of was assigned at the time he was promoted to internal affairs officer, which was well before the applicable statute of limitations period. The remaining additional duties allegedly assigned to Plaintiff are that he "was expected to assist and train Defendant Vibert when she was hired," and that he was involved in numerous ongoing investigations. *Id.* at 12; Dkt. No. 112 at 61-67. The Court finds that Plaintiff has failed to present evidence that any other employee had sufficiently similar job duties to Plaintiff's internal affairs position to evaluate whether his work duties were disproportionately assigned to him because of his ethnicity, or simply because of his job

responsibilities. *See Whethers v. Nassau Health Care Corp.*, 956 F. Supp. 2d 364, 379 (E.D.N.Y. 2013) ("These allegations, however do not provide sufficient evidence that defendants treated [plaintiff] less favorably than similarly situated employees because plaintiff fails to name similarly situated individuals with similar job titles and responsibilities").

Second, Plaintiff's allegation of disparate treatment based on his personal mail not being forwarded to him after he left work on extended leave is unsupported by a showing of any similarly situated employees. Defendant Mahar testified that he was unaware of any other individuals that had their personal mail sent to the Sheriff's Department, let alone any employees on extended leave that would require such mail to be forwarded. *See* Dkt. No. 116-1 at 101-02. Further, Plaintiff's personal mail continued to be delivered to his office after he had left work because he failed to submit a change of address card with the post office. Dkt. No. 113 at 240-41. Thus, Plaintiff was not subject to disparate treatment with regards to his personal mail being delivered to the Sheriff's Department.

Third, Plaintiff contends that no other employees were required to turn in their office keys and firearms when they were out on sick leave. *See* Dkt. No. 101-4 at ¶ 8. The Court finds that Defendants treated Plaintiff similarly to the only other individual who was out of work for an indefinite period of time due to mental health issues. *See* Dkt. No. 119 at 86-88; Dkt. No. 103-1 at ¶¶ 47, 48. Plaintiff's brief on the instant motion concedes that "[t]he other 207-c mental injury applicant . . . also suffered significant delays in the approval of his application and has his weapon taken as well." Dkt. No. 128 at 17. Further, Plaintiff acknowledged that it was reasonable for him to return his firearm and that there were important files locked inside his office. *See* Dkt. No. 99-22 at 6; Dkt. No. 130, Exh. 26 at 3:15-5:00 (discussing that Plaintiff's gun was department issued and that at least one other firearm was missing). Thus, Plaintiff was not

treated disparately by being required to return his firearm and office keys after leaving work for an indefinite period due to a mental health injury.

Fourth, Plaintiff asserts that he was denied the use of donated sick leave, while other Caucasian employees were allowed to use the donated time throughout the end of 2012. The County Defendants argue that donations were denied to every employee, and only employees who had their donations approved prior to the change in policy were entitled to use them. *See* Dkt. No. 103-1 at ¶ 34. However, this account is contradicted by the statements of other Defendants. Defendant Vibert testified that she was aware of at least one other employee receiving donated sick time after the program had been abolished. Dkt. No. 119 at 102. Thus, the Court finds that Plaintiff was subject to disparate treatment through the denial of his sick leave donations. As Defendants rely on their argument that no employee was allowed to use donated sick leave after the program was abolished, they have not provided a nondiscriminatory explanation for why employees other than plaintiff were allowed to use such donated time after Plaintiff was denied access to it. Therefore, the Court denies the County Defendants' motion on this ground and Plaintiff's first, second, third, and ninth causes of action for discrimination relating to the denial of his sick leave donations survive the instant motion for summary judgment.

Finally, Plaintiff asserts that his 207-c benefits were unnecessarily delayed, while similarly situated employees were granted 207-c benefits without delay. Defendants contend that Plaintiff's 207-c application was delayed because his injury was not easily verifiable, which required an independent medical examination. Dkt. No. 103-1 at ¶¶ 41-43. Plaintiff acknowledges that the only other individual who applied for 207-c benefits based on a mental health injury likewise suffered significant delays in the approval of his benefits. *See* Dkt. No. 128 at 17; Dkt. No. 119 at 87. Thus, Plaintiff was treated in the same manner as the only other

similarly situated employee and he has not established a claim of discrimination based on the disparate treatment in processing his 207-c benefits.

## ii. Hostile Work Environment

To withstand summary judgment of a Title VII hostile work environment claim, a plaintiff must present facts that would allow a reasonable juror to conclude that the complained of conduct "(1) 'is objectively severe or pervasive, that is, . . . the conduct creates an environment that a reasonable person would find hostile or abusive'; (2) creates an environment 'that the plaintiff subjectively perceives as hostile or abusive'; and (3) 'creates such an environment because of the plaintiff's [protected characteristic],'" *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quoting *Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001)); *see also Gregory*, 243 F.3d at 692 (indicating that any characteristic protected by Title VII is sufficient to satisfy the third element).

> For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments. Thus, whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment.

*Findlay v. Reynolds Metals Co., Inc.*, 82 F. Supp. 2d 27, 39 (N.D.N.Y. 2000) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)).

In the present matter, only two statements concerning Plaintiff's ancestry were made within the applicable statute of limitations period. *See supra* Part III(B)(1)(b). Defendant Russo stated that Plaintiff had better shave his goatee or he would be placed back on the no fly list, Dkt. No. 112 at 138, and Defendant Mahar stated that Plaintiff did not like working with women because of his ancestry, Dkt. No. 125 at ¶ 8. Thus, the Court finds that Plaintiff has failed to

establish that these sporadic comments were objectively so severe or pervasive that an ordinary person would find them hostile or abusive. *See Findlay*, 82 F. Supp. 2d at 39.

Plaintiff has likewise failed to present evidence that he subjectively perceived his work environment as hostile. Plaintiff never filed a complaint concerning any of the allegedly hostile actions taken against him. Dkt. No. 113 at 258; Dkt. No. 99-4 at 2. The workers compensation panel noted that "none of the medical reports indicate that [Plaintiff] was specifically verbally harassed by supervisors." Dkt. No. 101-20 at 3. Plaintiff made no mention of being the subject of racially insensitive jokes or comments in his initial workers compensation application. *Id.* at 5. Moreover, Plaintiff joined in the use of abusive language by calling Defendant Vibert a "cunt" and joking about Defendant Smith's Polish heritage. Dkt. No. 141 at ¶¶ 129-131; Dkt. No. 112 at 142-43. The Court finds that Plaintiff has failed to raise any genuine question of fact that his workplace was either objectively or subjectively hostile in relation to Plaintiff's ancestry. Thus, the County Defendants' motion is granted on this ground and Plaintiff's first, second, and third causes of action for discrimination based on a hostile work environment are dismissed.

### c. Disability Discrimination

Disability discrimination claims under the Rehabilitation Act and the NYHRL "are governed by the same legal standard as such claims under the ADA." *Reddick v. Niagara Mohawk Power Co.*, No. 08 CV 0995, 2010 WL 5185098, *3 n.8 (N.D.N.Y. Dec. 16, 2010); *see also Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (applying the same standard to ADA and Rehabilitation Act disability discrimination claims). To withstand summary judgment under the ADA, a plaintiff must present evidence showing that "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he

suffered adverse employment action because of his disability." *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) (quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)). "A qualified individual can base a discrimination claim on any of 'three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation.'" *Fulton v. Goord*, 591 F.3d 37, 43 (2d. Cir. 2009) (quoting *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 (2d. Cir. 2003)). A discrimination claim based on a perceived disability requires a plaintiff to show that the "employer perceived him as having a disability as defined in the ADA." *Thomsen v. Stantec, Inc.*, 483 Fed. Appx. 620, 622 (2d Cir. 2012).

The ADA defines "disability" as: "A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; B) a record of such an impairment; or C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). The NYHRL defines "disability" somewhat more broadly as "a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques[.]" N.Y. EXEC. LAW § 292(21). Thus, the NYHRL "provides that disabilities are not limited to physical or mental impairments, but may also include 'medical' impairments," and, in addition, "unlike the ADA, the NYHRL does not impose the requirement that the impairment substantially limit the individual's normal activities." *Penberg v. HealthBridge Mgmt.*, 823 F. Supp. 2d 166, 182 (E.D.N.Y. 2011) (internal quotation marks omitted). Additionally, the NYHRL makes it unlawful for an employer "because of an individual's . . . disability . . . to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in

terms, conditions or privileges of employment." N.Y. Exec. Law § 296-1(a). "Aside from the law's unique definition of 'disability,'" however, claims under the NYHRL are analyzed under the same burden-shifting framework as ADA claims. *See Penberg*, 823 F. Supp. 2d at 182 (citation omitted).

Plaintiff was diagnosed with PTSD and major depressive disorder on October 8, 2012. Dkt. No. 111-10 at 9. These conditions caused Plaintiff to leave work for an extended period of time. Dkt. No. 99-18. Plaintiff also testified that these conditions manifested in numerous physical ailments. *See* Dkt. No. 112 at 50. Thus, the Court finds that Plaintiff was disabled under the ADA and NYHRL because his medical condition prevented him from reporting to work.

Plaintiff "has been determined by his physician to be unable to return to work," and "pursuant to his doctor's directive, [he] has been out of work since the end of August 2012." Dkt. No. 101-3 at ¶¶ 8, 9; Dkt. No. 125 at ¶¶ 23, 24. Thus, the evidence indicates that Plaintiff was not able to perform his job at the time of the alleged discrimination. *See Henzel v. Del. Otsego Corp.*, 285 F. Supp. 2d 271, 276 (N.D.N.Y. 2003) ("It is axiomatic that an individual cannot perform the essential functions of a job if he is completely unable to work regardless of accommodation" (citations omitted)). Therefore, the Court grants the County Defendants' motion on this ground and Plaintiff's eleventh, twelfth, thirteenth, and fourteenth causes of action for disability discrimination are dismissed.

### *d. NYS Civil Rights Law § 79-n*[8]

---

[8] The Court will address Plaintiff's claims brought pursuant to this section even though neither party has specifically addressed it in their briefs. *See MSF Holding Ltd. v. Fiduciary Tr. Co. Intern.*, 435 F. Supp. 2d 285, 304 (S.D.N.Y. 2006) (citing *First Fin. Ins. Co. v. Allstate Interior Demolition Corp.*, 193 F.3d 109, 114 (2d Cir. 1999)) (holding that summary judgment may be granted *sua sponte* if the evidence shows that no material dispute of fact exists and that a party is entitled to judgment as a matter of law).

New York Civil Rights Law § 79-n creates a civil cause of action for "[a]ny person who intentionally selects a person or property for harm or . . . causes physical injury or death to another" because of, *inter alia*, a disability or national origin. NY CIV. RIGHTS L. § 79-n(2). To date, no New York courts have interpreted the applicability of this law in an employment discrimination context or the extent of "harm" required to state a cause of action. *See Spring v. Allegany-Limestone Cent. Sch. Dist.*, No. 14-CV-476S, 2015 WL 5793600, *12 (W.D.N.Y. Sept. 30, 2015). Without interpretation from other courts regarding this statute, the legislative history provides a helpful understanding of its applicability to employment discrimination actions. *See Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 143-44 (2d Cir. 2002) (noting that courts may look at legislative history to interpret ambiguous text of a statute). The legislative history of § 79-n clearly states that "this new remedy applies only to 'bias-related <u>violence</u> or <u>intimidation.</u>'" Assemb. 223-529, Reg. Sess. (N.Y. 2010). Further, this statute is not "available where existing discrimination laws already provide protection, such as in employment or public housing decisions." *Id.* Thus, Plaintiff is precluded from relief under this statute both by the nature of the employment discrimination action and by the lack of any alleged violence or intimidation. Accordingly, Plaintiff's tenth and fifteenth causes of action are dismissed.

### 4. Liability for Individual Defendants

Individuals may be personally liable under the NYHRL and § 1981 "where the individual possessed 'power to do more than carry out personnel decisions made by others,' or is shown to have 'actually participate[d] in the conduct giving rise to a discrimination claim.'" *Jackson v. Battaglia*, 63 F. Supp. 3d 214, 222 (N.D.N.Y. 2014) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)) (other citation omitted). Whether such individual's actions classify him or her

as an "employer" for liability under the NYHRL is determined by examining "whether the alleged employer: (1) had the power to hire employees; (2) made the payment of salary or wages to the employee; (3) had the power of dismissal over the employee; and (4) had the power to control the employee's conduct." *White v. Pacifica Found.*, 973 F. Supp. 2d 363, 375 (S.D.N.Y. 2013) (citations omitted). Individuals may also be liable under the NYHRL if they "aided and abetted" the allegedly improper conduct "by encouraging, condoning, or approving it." *Id.* (citation omitted); *see also Frank v. Lawrence Union Free Sch. Dist.*, 688 F. Supp. 2d 160, 174-75 (E.D.N.Y. 2010) (noting that a defendant cannot aid and abet discriminatory conduct if he was unaware that the allegedly improper actions were carried out for a discriminatory purpose).

### a. Defendant Jimino

Defendant Jimino, as Rensselaer County Executive, has limited interactions with the Sheriff's Department that do not include hiring, disciplining, or terminating Sheriff's Department employees. Dkt. No. 101-24 at ¶ 4. Defendant Jimino does not directly supervise the Sheriff's Department, nor does she play any role in 207-c benefit applications. *Id.* at ¶¶ 3, 11. Defendant Jimino stated that she never witnessed, heard, or made any discriminatory statements to or about Plaintiff. *Id.* at ¶¶ 6, 8, 9.

Plaintiff contends that Defendant Jimino, "in her position of County Executive for Rensselaer County, influences and/or decides some issues of hiring, discipline, and benefits." Dkt. No. 128 at 27. Plaintiff cites a grievance submitted by the United Public Service Employees Union, served upon Defendant Jimino as County Executive, to support this contention. *See id.*; Dkt. No. 112-12 at 4-7. This grievance includes a copy of a proposal for the creation of the sick leave donation program, signed by Defendant Jimino on behalf of the County on March 11, 2003. Dkt. No. 112-12 at 7. Rather than proving Defendant Jimino's personal involvement in the

determination of sick leave donations, this provision states that the "Department Head and the Director of Human Resources will jointly administer the sick bank leave." *Id.* Plaintiff provides no evidence that Defendant Jimino played any personal role in discriminatory practices against Plaintiff, nor that she had any independent control over Plaintiff's actions. *See White*, 937 F. Supp. 2d at 376 (noting that individuals with no independent control over the plaintiff are not sufficiently involved to be considered an employer under the NYHRL). Further, there is no evidence that Defendant Jimino had any knowledge of the discriminatory actions taken against Plaintiff as to be an "aider and abettor" under the NYHRL. *See Frank*, 688 F. Supp. 2d at 174-75.

### b. Defendant Hendry

Plaintiff contends that Defendant Hendry, as Director of Human Resources for Rensselaer County, has the authority to hire, fire, supervise, and to collect and record sick time donations for county employees. *See* Dkt. No. 128 at 27. Plaintiff contends that Defendant Hendry knew or should have known that Plaintiff was entitled to sick leave donations because of his role on the committee tasked with reviewing sick leave donations. *Id.*

Defendant Hendry attested that he has "no authority to hire, fire or supervise any Sheriff's Department employee." Dkt. No. 101-25 at ¶ 5. Defendant Hendry, along with Defendant Russo and a union representative, were on the committee that approved sick time donations for the Sheriff's Department. *Id.* at ¶ 8. In 2012, Defendant Hendry received sick time donations for Plaintiff, noted that he supported the donations, and sent them to Defendant Russo in accordance with ordinary procedures. Dkt. No. 121 at 11-12. After this, Defendant Hendry was informed that Plaintiff's sick time donations would not be approved because the Sheriff's Department had decided to cancel its donation program. *Id.* at 12-13; Dkt. No. 101-25 at ¶ 9. Defendant Hendry did not speak to Defendants Russo or Mahar about why Plaintiff's donations were denied, he did

not know why the donations were denied, and he was "shocked" that the donations were not approved. Dkt. No 121 at 21-23. Defendant Hendry stated that he had no other direct involvement in the denial of Plaintiff's donations or the decision to cancel the donation program and has "no ability to approve sick leave donations absent the Sheriff's approval." Dkt. No. 101-25 at ¶¶ 9, 11. Defendant Hendry plays no role in determining 207-c benefit applications. *Id.* at ¶¶ 2-4.

### c. Defendant Baldwin

Plaintiff contends that Defendant Baldwin, as the payroll clerk for Rensselaer County, had the duty and ability to provide Plaintiff with donated sick leave information. Dkt. No. 128 at 28. Plaintiff asserts that Defendant Baldwin's actions of failing to provide him with this information resulted in these records being altered and/or destroyed. *Id.* Plaintiff cites the recorded conversations with Defendant Baldwin to support this contention. After reviewing the recordings, the Court finds that the conversations between Plaintiff and Defendant Baldwin do not support the contention that she had a duty to provide Plaintiff with this information, or that her actions resulted in these records being altered or destroyed. *See* Dkt. No. 130. Moreover, Defendant Baldwin attested that she has no independent authority to grant or approve sick time donations or 207-c applications, that she merely receives such applications and presents them to her supervisor for approval, and that she never engaged in or witnessed any discrimination against Plaintiff for his national origin or his perceived disability. Dkt. No. 101-26 at ¶¶ 3, 4, 6-8.

### d. Defendant Smith

The only allegation against Defendant Smith it that he placed a sign on a burned out vehicle that read "Lt. Karam's undercover car." Dkt. No. 128 at 28. This action falls outside the applicable three year statute of limitations. *See supra* Part III(B)(1)(b)(i).

### e. Defendant Russo

Plaintiff alleges that Defendant Russo joined Defendant Smith in placing the sign on the burned out car, and that he was personally involved in denying Plaintiff's use of sick leave donations. *See* Dkt. No. 128 at 28. Similar to Defendant Hendry's role in determining Plaintiff's sick leave donations, Defendant Russo simply acted as he was ordered to do by Defendant Mahar. Dkt. No. 117 at 65-71.

For the foregoing reasons, the Court finds that Defendants Jimino, Hendry, Baldwin, Smith, and Russo were neither an employer nor an aider and abettor of discrimination against Plaintiff. Thus, the County Defendants' motion is granted on this ground and Plaintiff's second, third, fourteenth, seventeenth, and eighteenth causes of action against Defendants Jimino, Hendry, Baldwin, Smith, and Russo are dismissed.

### 5. Equal Protection

"Title VII claims for disparate treatment parallel the equal protection claims brought under § 1983. 'The elements of one are generally the same as the elements of the other and the two must stand or fall together.'" *Demoret v. Zegarelli*, 451 F.3d 140, 153 (2d Cir. 2006) (quoting *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004) (internal citation omitted)). Since Plaintiff's discrimination claims based on the denial of his sick leave donations have withstood summary judgment, *see supra* Part III(B)(3)(a)(i), the facts surrounding those claims likewise withstand summary judgment on his § 1983 equal rights claim. Accordingly, the County

Defendants' motion is denied on this ground and Plaintiff's fourth cause of action against Defendants Mahar[9] and Rensselaer County for equal protection violations survive the instant motion.

Where adequate remedies are available under § 1983, a plaintiff has "no private right of action under the New York State Constitution" for equal protection claims under Article 1, Section 11. *Wierzbicki v. Cnty. of Rensselaer*, No. 1:14-CV-950, 2015 WL 4757755, *6 (N.D.N.Y. Aug. 12, 2015) (citations omitted). Plaintiff has failed to articulate how his state constitutional claim differs from his § 1983 claims. Therefore, the County Defendants' motion on this ground is granted in part, and Plaintiff's eighth cause of action is dismissed.

Plaintiff also asserts a "general claim of disparate treatment in violation of his right to equal protection," which appears to be a class-of-one equal protection claim. Dkt. No. 128 at 19; Dkt. No. 1 at ¶¶ 138-143. The Supreme Court has clearly stated that "the class-of-one theory of equal protection has no application in the public employment context . . . ." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 607 (2008). Accordingly, Plaintiff's twenty-seventh cause of action is dismissed.

### 6. 42 U.S.C. §§ 1985 & 1986

Section 1985 allows an injured party to recover damages "[i]f two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, [the injured party] of the equal protection of the laws, or of equal privileges . . . of the laws." 42 U.S.C. § 1985(3). To recover pursuant to Section 1985(3), a plaintiff must demonstrate that there was:

---

[9] As discussed in *supra* Part III(B)(4), no individual County Defendant other than Defendant Mahar played a role in discriminating against Plaintiff. Thus, Plaintiff's equal protection claims against Defendants Russo, Jimino, Smith, Hendry, and Baldwin are dismissed.

> (1) a conspiracy; (2) for the purpose of depriving a person . . . of the
> equal protection of the laws, or the equal privileges and immunities
> of the laws; (3) an overt act in furtherance of the conspiracy; and
> (4) an injury to the plaintiff's person or property, or a deprivation of
> a right or privilege of a citizen of the United States.

*Morpugo v. Inc. Vill. of Sag Harbor*, 697 F. Supp. 2d 309, 339 (E.D.N.Y. 2010) (citing *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999)). "A conspiracy is an agreement between two or more individuals, where one individual acts in furtherance of the objective of the conspiracy, and each member has knowledge of the nature and scope of the agreement." *Dove v. Fordham Univ.*, 56 F. Supp. 2d 330, 337 (S.D.N.Y. 1999) (citation omitted). There must be a "meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (citations omitted). Furthermore, a plaintiff must demonstrate that the conspiracy was "motivated by 'some racial or perhaps otherwise class-based'" factors. *Mian v. Donaldson, Lufkin, & Jenrette Sec. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1999) (quoting *United Bhd. of Carpenters, Local 610 v. Scott*, 463 U.S. 825, 828-29 (1983)). "[C]onclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Gyadu v. Hartford Ins. Co.*, 197 F.3d 590, 591 (2d Cir. 1999) (quoting *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983)).

Section 1986 establishes a cause of action against "anyone who 'having knowledge that any of the wrongs conspired to be done and mentioned in section 1985 are about to be committed and having power to prevent or aid, neglects to do so.' Thus, a § 1986 claim must be predicated upon a valid § 1985 claim." *Mian*, 7 F.3d at 1088 (internal quotation and citations omitted).

Plaintiff has provided no evidence to establish that a conspiracy existed amongst the Defendants. His only support for his conspiracy claims are his statements that Defendants Russo and Hendry were on the committee that approved Plaintiff's sick leave donations and that,

"between Defendant Hendry, Russo, and Mahar, at some point the donated sick leave documents disappeared." Dkt. No. 128 at 31. In contrast to the allegations that an agreement existed to deprive Plaintiff of his rights, Defendant Hendry stated that he "had no say or authority over the Sheriff's Department sick leave donation program or its determination to cancel the program." Dkt. No. 101-25 at ¶ 9. Defendant Russo likewise had no say in canceling the sick leave donation program. Dkt. No. 117 at 65-71. Rather than conspiring to limit Plaintiff's use of donated sick leave, both Defendants Russo and Hendry opposed the termination of the donation program. *Id.* Thus, Plaintiff has presented no evidence to establish that the Defendants worked together in any way, let alone in a discriminatory manner, to deprive Plaintiff of his rights. Therefore, the County Defendants' motion is granted on this ground and Plaintiff's fifth, sixth, and seventh causes of action for conspiracy are dismissed.

### 7. Prima Facie Tort

"[T]he prima facie tort is aimed at providing relief for the intentional infliction of harm under circumstances that do not lend themselves to categorization as one of the traditional causes of action." *Nat'l Nutritional Foods Ass'n v. Whelan*, 492 F. Supp. 374, 382-83 (S.D.N.Y. 1980). To prevail on a prima facie tort claim, the plaintiff must show "(1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, (4) by an act or series of acts that would otherwise be lawful." *Curiano v. Suozzi*, 63 N.Y.2d 113, 117 (1984) (citations omitted). "[T]here is no recovery in prima facie tort unless malevolence is the sole motive for defendant's otherwise lawful act." *Smith v. Meridian Tech., Inc.*, 927 N.Y.S.2d 141, 144 (App. Div. 2011) (quotation omitted).

Defendants assert that the sick leave donation program was terminated because it was an expensive undertaking for the Sheriff's Department. Dkt. No. 103-1 at ¶ 33. Further, Defendant

Mahar had expressed concerns over the leave donation program well before Plaintiff sought to use donated sick leave. Dkt. No. 112 at 60-66. The delay in Plaintiff's 207-c application was due, in part, to the need for an independent medical evaluation. Dkt. No. 103-1 at ¶ 43. Thus, Defendants allegedly improper actions were motivated, at least in part, by proper purposes. Further, Plaintiff has failed to provide any evidence that he suffered special damages. Therefore, the County Defendants' motion is granted on this ground and Plaintiff's twenty-third cause of action for prima facie tort is dismissed.

### 8. Negligence

The "alleged violation of federal, state, and city anti-discrimination laws are not torts under New York Law." *Bauger v. Spanish Broad. Sys., Inc.*, No. 04-CV-8393, 2007 WL 2780390, *4 (S.D.N.Y. Sept. 20, 2007). A tort claim cannot arise in employment settings absent some other "independent legal duty" owed by the employer beyond the anti-discrimination statutes. *Id.* Further, "plaintiff's receipt of General Municipal Law § 207–c benefits provide[s] his exclusive remedy and bar[s] any cause of action based on common law negligence." *Braxton v. City of Yonkers*, 717 N.Y.S.2d 326, 327 (App. Div. 2000) (citations omitted).

Plaintiff has failed to establish that Defendants owed him any other duty apart from his employment contract and his 207-c benefits. *See* Dkt. No. 128 at 28-30. Thus, the County Defendants' motion on this ground is granted and Plaintiff's twenty-fourth and twenty-ninth causes of action for negligence are dismissed.

### 9. Mandamus and Due Process

"Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496

(1969).  Plaintiff alleges that he was entitled to "a writ of mandamus forcing Defendants to provide [him] retroactive and current pay and benefits in accordance with [207-c]" and that such failure to pay these benefits deprived him of his due process rights.  Dkt. No. 1 at ¶¶ 137, 146.  Plaintiff's 207-c application was approved and he was retroactively paid all benefits and back pay.  *See* Dkt. No. 141 at ¶¶ 95-99.  Accordingly, the County Defendants' motion on this ground is granted and Plaintiff's twenty-sixth and twenty-eighth causes of action are dismissed as moot.

### *10. Doe Defendant(s)*

"Where a plaintiff 'has had ample time to identify' a Doe defendant but gives 'no indication that he has made any effort to discover the [defendant's] name,' the plaintiff 'simply cannot continue to maintain a suit against' the [Doe Defendants]."  *Valade v. City of New York*, 949 F. Supp. 2d 519, 532 (S.D.N.Y. 2013) (quotations omitted).  Plaintiff has failed to provide any evidence to establish the identity of any of the unnamed Doe Defendant(s).  Accordingly, all causes of action against any Doe Defendant(s) are dismissed.

## C.      Defendant Vibert's Motion[10]

Plaintiff's allegations against Defendant Vibert are that she unlawfully withheld his personal mail that was delivered to the Sheriff's Department, that she accused him of stealing office equipment, that she failed to act to protect Plaintiff after hearing statements regarding his ethnicity, Dkt. No. 125 at ¶ 25, and that she aided and abetted the issuance of a false disciplinary memorandum, Dkt. No. 99-26 at 8.

---

[10] The Court will only consider Defendant Vibert's motion to the extent that it addresses Plaintiff's causes of action numbered 2, 3, 4, 9, 19, 20, and 25, as all other claims asserted against her were dismissed by the County Defendants' motion for summary judgment.

### 1. Discrimination

Plaintiff's second, third, fourth, and ninth causes of action for discrimination and equal protection violations based on the denial of Plaintiff's access to donated sick leave survived the County Defendants' motion for summary judgment. *See supra* Part III(B)(3)(a)(i). Plaintiff has presented no evidence that Defendant Vibert played any role in the decision to end the sick leave donation program or to deny Plaintiff's access to donated sick leave. Rather, numerous Defendants testified that Defendant Vibert was not involved in any decision regarding Plaintiff's sick leave donations or his 207-c benefits. *See* Dkt. No. 122-1 at 235-36; Dkt. No. 113 at 292-93; Dkt. No. 116-1 at 259-60; *see also Jackson v. Battaglia*, 63 F. Supp. 3d 214, 222 (N.D.N.Y. 2014) (noting that individuals may be liable for discrimination under the NYHRL and § 1981 if they "actually participate[d] in the conduct giving rise to a discrimination claim"). Accordingly, Defendant Vibert's motion for summary judgment is granted on this ground and Plaintiff's second, third, fourth, and ninth causes of action against her are dismissed.

### 2. First Amendment Retaliation

Plaintiff's nineteenth and twentieth causes of action for First Amendment retaliation survived the County Defendants' motion. *See supra* Part III(B)(2)(a). The protected speech in these claims involved Plaintiff's conversations with Mr. Goldberger regarding Defendant Mahar's allegedly unlawful actions in covering up numerous HIPAA violations. Defendant Vibert's only role in the events surrounding these claims is that she retrieved the HIPAA investigation files from Plaintiff's office at the request of Defendant Mahar. Dkt. No. 119 at 165-66. Plaintiff has not alleged that Defendant Vibert knew of his protected speech, nor that she played any role in the denial of his sick leave donations or his 207-c application. *See* Dkt. No. 122-1 at 235-36; Dkt. No. 113 at 292-93; Dkt. No. 116-1 at 259-60. Therefore, Defendant Vibert's motion is granted on

this ground and Plaintiff's nineteenth and twentieth causes of action against Defendant Vibert are dismissed.[11]

### 3. Loss of Consortium

"A claim for loss of consortium 'is not an independent cause of action, but is derivative in nature, and may only be maintained where permitted pursuant to the primary tort.'" *Wright v. City of Ithaca*, 2012 WL 1717259, *5 (N.D.N.Y. May 15, 2012) (quoting *Dilworth v. Goldberg*, No. 10 Civ. 2224, 2011 WL 3501869, *23 (S.D.N.Y. July 28, 2011)). None of Plaintiff's remaining causes of action support a derivative loss of consortium claim. *See Santiago v. Newburgh Enlarged City Sch. Dist.*, 434 F. Supp. 2d 193, 198 (S.D.N.Y. 2006) (citing *Moss v. Stinnes Corp.*, 169 F.3d 784, 785 (2d Cir. 1999) ("It is well settled that none of the statutes invoked by plaintiff—Title VII, the First or Fourteenth Amendments to the United States Constitution, or the New York Human Rights Law—can serve as the basis for a derivative claim for loss of consortium"); *Russell v. Marboro Books*, 18 Misc. 2d 166, 189 (N.Y. Sup. Ct. 1959) ("[T]he [New York] Civil Rights Law is statutory only and a derivative cause is not therein established"). Accordingly, the Court grants Defendant Vibert's motion on this ground and Plaintiff Lisa Karam's twenty fifth cause of action for loss of consortium is dismissed.

### 4. Punitive Damages

Punitive damages are allowed for claims of First Amendment retaliation against municipal officers sued in their individual capacities. *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 122 (2d Cir. 2006) (citing *Smith v. Wade*, 461 U.S. 30, 55-56 (1983)).

---

[11] As all causes of action asserted against Defendant Vibert have been dismissed on other grounds, the Court will not consider whether she is entitled to a defense of qualified immunity.

Summary judgment on the issue of punitive damages is inappropriate if "there [is] sufficient evidence to permit the factfinder to infer that the responsible official was motivated by malice or evil intent or that he acted with reckless or callous indifference to the federally protected rights of the plaintiff . . . ." *Id.* As there is a material question of fact as to whether Defendant Mahar deliberately retaliated against Plaintiff in violation of his First Amendment rights, summary judgment will not be granted on this issue.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the court hereby

**ORDERS** that Defendants' motions for summary judgment (Dkt. Nos. 99 and 101) are **GRANTED in part** and **DENIED in part** as set forth herein;[12] and the Court further

**ORDERS** that Defendant Vibert's cross-claim against Defendant Rensselaer County is **DISMISSED** as moot; and the Court further

**ORDERS** that Defendants Russo, Jimino, Vibert, Smith, Hendry, Baldwin, and Doe(s) are **TERMINATED** from this action; and the Court further

**ORDERS** that Plaintiff Lisa Karam is **TERMINATED** from this action; and the Court further

---

[12] Plaintiff's first, second, third, fourth, and ninth causes of action against Rensselaer County and Defendant Mahar for discrimination and equal protection violations based on disparate treatment in the denial of his donated sick leave, and his nineteenth and twentieth causes of action against Rensselaer County and Defendant Mahar for First Amendment retaliation based on his statements concerning an alleged cover-up of HIPAA violations are not dismissed. All remaining causes of action and all claims against the other individual Defendants are dismissed.

**ORDERS** that the Clerk of the Court shall serve a copy of the Memorandum-Decision and

Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  January 4, 2016
          Albany, New York

Mae A. D'Agostino
U.S. District Judge